**ORAL ARGUMENT NOT YET SCHEDULED**

———————————

**No. 20-1449**
(CONSOLIDATED WITH NOS. 21-1006, 21-1090, 21-1108, 21-1173, & 21-1246)

———————————

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

AMERICAN MUNICIPAL POWER INC., *et al.*,
*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————————

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———————————

**TRANSMISSION OWNER PETITIONERS' JOINT BRIEF**

———————————

John Longstreth
Donald A. Kaplan
K&L GATES LLP
1601 K Street, NW
Washington, DC 20006
(202) 778-9000
john.longstreth@klgates.com
don.kaplan@klgates.com

*Counsel for Petitioner PPL Electric
Utilities Corp.*

David M. Gossett
   *Counsel of Record*
Richard P. Sparling
MaryAnn T. Almeida
DAVIS WRIGHT TREMAINE LLP
1301 K Street NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com
ricksparling@dwt.com
maryannalmeida@dwt.com

*Counsel for Petitioners the
FirstEnergy Transmission Companies*

*(Additional Petitioners and Counsel Listed Inside Cover)*

April 11, 2022

Morgan E. Parke
*Associate General Counsel*
Evan K. Dean
*Corporate Counsel*
FirstEnergy Service Company
76 South Main Street A-GO-15
Akron, OH 44308
(330) 384-4595
mparke@firstenergycorp.com
edean@firstenergycorp.com

*Attorneys for the FirstEnergy
Transmission Companies*

Stacey Burbure
Senior Counsel
American Electric Power Service
Corporation
801 Pennsylvania Ave. NW, Suite 735
Washington, D.C. 20004
(202) 383-3452
slburbure@aep.com

*Attorney for American Electric Power
Service Corporation*

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave NW, Suite 200
Washington, DC 20004
(202) 824-8011
molly.suda@duke-energy.com

*Attorney for Duke Energy*

Christopher R. Jones
Miles H. Kiger
Troutman Pepper Hamilton
Sanders LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 662-2181
Chris.Jones@troutman.com
Miles.Kiger@troutman.com

*Attorneys for Dominion Energy
Services, Inc.*

Daniel E. Frank
Allison E. Speaker
Eversheds Sutherland (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
(202) 383-0838
danielfrank@eversheds-
sutherland.com
allisonspeaker@eversheds-
sutherland.com

*Attorneys for East Kentucky Power
Cooperative, Inc.*

Steven M. Nadel
*Senior Counsel*
PPL Services Corporation
Two North Ninth Street
Allentown, PA 18101-1179
(610) 774-4775
SMNadel@pplweb.com

*Attorney for PPL Electric Utilities
Corporation*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, D.C. 20068
(202) 872-2576
gary.guy@exeloncorp.com

*Attorney for Exelon Corporation*

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

### (A) Parties and *Amici*

The parties to this proceeding are as follows:

*Docket No. 20-1449*:

- Petitioners: American Municipal Power, Inc.; Delaware Division of the Public Advocate; District of Columbia Office of the People's Counsel; Indiana Office of Utility Consumer Counselor; LSP Transmission Holdings II, LLC; New Jersey Division of Rate Counsel, Old Dominion Electric Cooperative; PJM Industrial Customer Coalition; The Public Utilities Commission of Ohio's Office of The Federal Energy Advocate; and West Virginia Consumer Advocate.

- Respondent: Federal Energy Regulatory Commission.

- Intervenors: American Transmission Systems Incorporated; Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company d/b/a Dominion Energy Virginia; Duquesne Light Company; East Kentucky Power Cooperative, Inc.; Exelon Corporation; Jersey Central Power & Light Company; Mid-Atlantic Interstate Transmission LLC; Monongahela Power Company; PJM Interconnection, L.L.C.; PPL Electric Utilities Corporation; Public Service Electric and Gas Company; The Potomac Edison Company; West Penn Power Company; American Electric Power Service Corporation; Duke Energy Business Services LLC; Duke Energy Kentucky, Inc.; Duke Energy Ohio, Inc.

*Docket No. 21-1006*:

- Petitioners: American Municipal Power, Inc.; Delaware Division of the Public Advocate; District of Columbia Office of the People's Counsel; Indiana Office of Utility Consumer Counselor; LSP Transmission Holdings II, LLC; New Jersey

Division of Rate Counsel; Old Dominion Electric Cooperative; PJM Industrial Customer Coalition; Public Utilities Commission of Ohio's Office of the Federal Energy Advocate; West Virginia Consumer Advocate.

- Respondent: Federal Energy Regulatory Commission.

*Docket No. 21-1090*:

- Petitioners: American Municipal Power, Inc.; Blue Ridge Power Agency; Central Transmission, LLC; Delaware Division of the Public Advocate; Office of the People's Counsel for the District of Columbia; LSP Transmission Holdings II, LLC; Old Dominion Electric Cooperative; PJM Industrial Customer Coalition; Public Utilities Commission of Ohio's Office of the Federal Energy Advocate; West Virginia Consumer Advocate.

- Respondent: Federal Energy Regulatory Commission.

- Intervenors: American Electric Power Service Corporation; American Transmission Systems Incorporated; Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company d/b/a Dominion Energy Virginia; Duke Energy Business Services LLC; Duke Energy Kentucky, Inc.; Duke Energy Ohio, Inc.; Exelon Corporation; Jersey Central Power & Light Company; Mid-Atlantic Interstate Transmission LLC; Monongahela Power Company; PJM Interconnection, L.L.C.; PPL Electric Utilities Corporation; Public Service Electric and Gas Company; The Dayton Power and Light Company; The Potomac Edison Company; West Penn Power Company.

*Docket No: 21-1108*:

- Petitioner: New Jersey Board of Public Utilities.

- Respondent: Federal Energy Regulatory Commission.

ii

*Docket No. 21-1173*:

- Petitioners: American Municipal Power, Inc.; Blue Ridge Power Agency; Central Transmission, LLC; Delaware Division of the Public Advocate; Office of the People's Counsel for the District of Columbia; LSP Transmission Holdings II, LLC; New Jersey Board of Public Utilities; Old Dominion Electric Cooperative; PJM Industrial Customer Coalition; Public Utilities Commission of Ohio's Office of the Federal Energy Advocate; West Virginia Consumer Advocate.

- Respondent: Federal Energy Regulatory Commission.

- Intervenor: Duquesne Light Company.

*Docket No. 21-1246*:

- Petitioners (the "Transmission Owners Petitioners" that are filing this brief) are: American Electric Power Service Corporation, Dominion Energy Services, Inc., Duke Energy (Duke Energy Business Services LLC; Duke Energy Kentucky, Inc., and Duke Energy Ohio, Inc.), East Kentucky Power Cooperative, Inc., Exelon Corporation, the FirstEnergy Transmission Companies (American Transmission Systems Incorporated, Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, Monongahela Power Company, The Potomac Edison Company, and West Penn Power Company), and PPL Electric Utilities Corporation.

- Respondent: Federal Energy Regulatory Commission.

The Transmission Owner Petitioners are unaware of any parties that intend to participate as amici in any of the consolidated cases.

iii

**(B) Rulings Under Review**

*Docket No. 20-1449*:

- *PJM Interconnection, L.L.C. and American Transmission Systems Inc.,* Order Accepting Proposed Tariff Revisions, Docket No. 20-1449R, 172 FERC ¶ 61,136 (Aug. 11, 2020); and

- *PJM Interconnection, L.L.C. and American Transmission Systems Inc.,* Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration, Docket No. 20-1449R, 173 FERC ¶ 62,021 (Oct. 13, 2020).

*Docket No. 21-1006:*

- *PJM Interconnection, L.L.C. and American Transmission Systems Inc.,* Order Accepting Proposed Tariff Revisions, Docket No. 20-1449R, 172 FERC ¶ 61,136 (Aug. 11, 2020);

- *PJM Interconnection, L.L.C. and American Transmission Systems Inc.,* Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration, Docket No. 20-1449R, 173 FERC ¶ 62,021 (Oct. 13, 2020); and

- *PJM Interconnection, L.L.C. and American Transmission Systems Inc.*, Order Addressing Arguments Raised on Rehearing, Docket No. 20-1449R, 173 FERC ¶ 61,225 (December 17, 2020).

*Docket Nos. 21-1090 and 21-1108*:

- *PJM Interconnection, L.L.C.,* Order Rejecting Proposed Tariff Revisions, Docket No. 21-1090R, 173 FERC ¶ 61,242 (Dec. 17, 2020); and

- *PJM Interconnection, L.L.C.,* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket No. 21-1090R, 174 FERC ¶ 62,111 (Feb. 19, 2021).

iv

*Docket No. 21-1173:*

- *PJM Interconnection, L.L.C.,* Order Rejecting Proposed Tariff Revisions, Docket No. 21-1090R, 173 FERC ¶ 61,242 (Dec. 17, 2020);

- *PJM Interconnection, L.L.C.,* Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket No. 21-1090R, 174 FERC ¶ 62,111 (Feb. 19, 2021); and

- *PJM Interconnection, L.L.C.,* Order Addressing Arguments Raised on Rehearing, Docket No. 21-1090R, 176 FERC ¶ 61,053 (July 29, 2021).

*Docket No. 21-1246* (this Petition):

- *PJM Interconnection, L.L.C.,* Order Addressing Arguments Raised on Rehearing, Docket No. 21-1090R, 176 FERC ¶ 61,053 (July 29, 2021); and

- *PJM Interconnection, L.L.C.,* Notice of Denial of Rehearings by Operation of Law, Docket No. 21-1090R, 176 FERC ¶ 62,158 (Sept. 30, 2021).

## (C) Related Cases

The Court has consolidated six pending petitions for review. *See* Dkt. Nos. 20-1449 and 21-1006 (petitions from the Commission's orders as to the Attachment M-3 filing); Dkt. Nos. 21-1090, 21-1108, 21-1173, and 21-1246 (petitions from the Commission's orders as to the Stakeholder proposal filing). The Transmission Owner Petitioners—the petitioners in Dkt. No. 21-1246—are unaware of any pending cases related to these consolidated cases.

# CORPORATE DISCLOSURE STATEMENTS

---

## CORPORATE DISCLOSURE STATEMENT OF
## AMERICAN ELECTRIC POWER SERVICE CORPORATION

Pursuant to Rule 26 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Circuit, American Electric Power Service Corporation ("AEPSC") states that it is a corporation organized and existing under the laws of the State of New York. AEPSC is a wholly-owned subsidiary of American Electric Power Company, Inc. ("AEP"), a New York corporation whose common stock is held by the public and traded on the New York Stock Exchange. AEP has no parent company, and no publicly-held company has a 10 percent or greater ownership interest in AEP. Among its many subsidiaries, AEP owns ten electric operating companies and seven transmission companies and is a joint owner in several additional transmission companies. AEPSC provides a variety of administrative and technical services to AEP's affiliates, including Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, AEP Indiana Michigan Transmission Company,

AEP Kentucky Transmission Company, AEP Ohio Transmission Company, and AEP West Virginia Transmission Company, on behalf of which AEPSC participated in the proceedings before the Federal Energy Regulatory Commission that resulted in the Orders as to which review is sought in this Court.

## CORPORATE DISCLOSURE STATEMENT OF
## DOMINION ENERGY SERVICES, INC.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the District of Columbia Circuit, Dominion Energy Services, Inc., on behalf of its affiliate Virginia Electric and Power Company d/b/a Dominion Energy Virginia ("Dominion"), hereby provides the following Corporate Disclosure Statement:

Dominion is a Virginia corporation, and is regulated by the Federal Energy Regulatory Commission as a "public utility" under the Federal Power Act. Dominion generates, transmits, and distributes electricity for sale in Virginia and North Carolina. Dominion Energy Virginia is a wholly-owned subsidiary of Dominion Energy, Inc. ("Dominion Energy") (NYSE: D), which is a publicly-held USCA company incorporated in the Commonwealth of Virginia. Dominion Energy has no parent company and no publicly-held corporation owns 10 percent or greater ownership interest in Dominion Energy.

## CORPORATE DISCLOSURE STATEMENT OF
## DUKE ENERGY

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of this Court, Petitioners Duke Energy Business Services LLC ("DEBS"), Duke Energy Kentucky, Inc. ("DEK"), and Duke Energy Ohio, Inc. ("DEO") (collectively, "Duke Energy") provide the following:

DEBS certifies that it is a Delaware limited liability company. DEBS is a direct, wholly-owned subsidiary of Duke Energy Corporate Services, Inc., which is a direct, wholly-owned subsidiary of Duke Energy Corporation (NYSE: DUK).

DEK certifies that it is a non-governmental corporation organized and existing under the laws of Kentucky. DEK is a direct, wholly-owned subsidiary of DEO. DEO certifies that it is a non-governmental corporation organized and existing under the laws of Ohio. DEO is a direct, wholly-owned subsidiary of Cinergy Corp. Cinergy Corp. is a direct, wholly-owned subsidiary of Duke Energy Corporation (NYSE: DUK).

Duke Energy Corporation is publicly traded on the New York Stock Exchange. There is no company that has a 10 percent or greater ownership interest in Duke Energy Corporation.

## CORPORATE DISCLOSURE STATEMENT OF
## EAST KENTUCKY POWER COOPERATIVE, INC.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, East Kentucky Power Cooperative, Inc. ("EKPC") states as follows:

Petitioner EKPC is a not-for-profit generation and transmission cooperative that provides wholesale electric power to 16 owner-member cooperatives in Kentucky. EKPC's principal place of business is in Winchester, Kentucky. EKPC is owned by its 16 retail electric distribution cooperative members. None of EKPC's members owns 10% or more of EKPC. Relevant to this proceeding, EKPC is a generation- and transmission-owning member and customer of PJM Interconnection, L.L.C., and EKPC is a party to and has participated in the proceedings in Docket No. ER20-2308 that are the subject of this appeal.

## CORPORATE DISCLOSURE STATEMENT OF
## EXELON CORPORATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1 of the United States Court of Appeals for the District of Columbia Circuit, Petitioner Exelon Corporation ("Exelon") submits the following disclosure statement.

Exelon is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal offices at 10 South Dearborn Street, Chicago, Illinois 60603. Exelon has no parent company, and no publicly-held company has a 10 percent or greater ownership interest in Exelon. Exelon is engaged in the purchase, transmission, distribution, and sale of electricity through its electric utility subsidiaries, Commonwealth Edison Company, PECO Energy Company, Baltimore Gas and Electric Company, Potomac Electric Power Company, Delmarva Power & Light Company and Atlantic City Electric Company, all of which are electric utilities under the Federal Power Act subject to regulations by the Federal Energy Regulatory Commission.

Exelon Generation Company, LLC is a United States competitive power generator located in a number of organized markets. The company's Constellation business unit is a marketer of electricity and

natural gas and related products in wholesale and retail markets throughout the United States.

## CORPORATE DISCLOSURE STATEMENT OF
## THE FIRSTENERGY TRANSMISSION COMPANIES

Pursuant to Federal Rule of Appellate Procedure 26.1 and DC Circuit Rule 26.1, Petitioners American Transmission Systems, Incorporated, Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, Monongahela Power Company, The Potomac Edison Company, and West Penn Power Company (collectively the "FirstEnergy Transmission Companies") are all direct or indirect subsidiaries of FirstEnergy Corp., a holding company engaged, through its subsidiaries, in the generation, transmission and distribution of power throughout the eastern portion of the United States. No publicly held company owns more than 10% of FirstEnergy Corp.

xiv

## CORPORATE DISCLOSURE STATEMENT OF
## PPL ELECTRIC UTILITIES CORPORATION

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, and District of Columbia Circuit Rule 26.1, Petitioner PPL Electric Utilities Corporation ("PPL Electric") submits the following required Disclosure Statement:

PPL Electric is a wholly owned direct subsidiary of PPL Corporation. The Vanguard Group has a 10% or greater ownership interest in PPL Corporation. No other publicly held company has a 10% or greater ownership interest in PPL Corporation.

Pursuant to the requirement of Circuit Rule 26.1(b) that movants provide a statement of general nature and purpose relevant to the litigation, PPL Electric hereby states as follows:

PPL Electric is a Pennsylvania Corporation and owner of transmission and distribution facilities located within PJM Interconnection, L.L.C. PPL Electric is a provider of last resort in central and eastern Pennsylvania under Pennsylvania's Electric Generation Customer Choice and Competition Act, 66 Pa. C. S. § 2801, *et seq.*

xv

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS UNDER
    REVIEW, AND RELATED CASES ................................................. i

CORPORATE DISCLOSURE STATEMENTS ............................... vi

TABLE OF CONTENTS ....................................................... xvi

TABLE OF AUTHORITIES .................................................. xviii

GLOSSARY .......................................................................... xxi

INTRODUCTION .................................................................... 1

JURISDICTIONAL STATEMENT ........................................... 4

ISSUE PRESENTED ............................................................... 6

STATUTES AND REGULATIONS ........................................... 6

STATEMENT ......................................................................... 6

    A.    Regulatory Background .............................................. 6

    B.    Factual Background .................................................... 8

        1.    The PJM Consolidated Transmission
            Owners Agreement ......................................... 8

        2.    Supplemental and asset-management
            projects, including End-of-life projects ........................ 10

        3.    PJM stakeholder involvement in project
            planning ....................................................... 12

    C.    Procedural History Underlying This Petition ....................... 15

SUMMARY OF ARGUMENT ................................................. 18

STANDING .......................................................................... 20

ARGUMENT ......................................................................... 22

I.    The Owners Agreement Unambiguously Establishes
    The Transmission Owners' Responsibility Over
    End-of-life Projects. ......................................................... 23

    A.    The Owners Agreement explicitly reserves for the transmission owners all rights not specifically transferred to PJM. ................................................. 23

    B.    The Owners Agreement does not delegate End-of-life project planning to PJM. ................................. 27

II.  Interpreting The Owners Agreement To Unambiguously Reserve To Transmission Owners Responsibility Over End-of-life Projects Accords With Previous Decisions By This Court And The Commission. ................................................................... 33

    A.    This Court has previously held that transmission owners retain rights not voluntarily transferred. ................ 33

    B.    Other Commission precedent also recognizes transmission owners' rights cannot be transferred involuntarily. ................................................................... 35

CONCLUSION .................................................................... 37

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION ............................................................... 40

CERTIFICATE OF SERVICE .............................................. 41

ADDENDUM: DECLARATION OF TAKIS LAIOS ............................. 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. City Elec. Co. v. FERC,*
295 F.3d 1 (D.C. Cir. 2002) ....................................................... 7, 27, 34

*Atl. City Elec. Co. v. FERC,*
329 F.3d 856 (D.C. Cir. 2003) ............................................................ 35

*Cal. Indep. Sys. Operator Corp. v. FERC,*
372 F.3d 395 (D.C. Cir. 2004) ............................................................ 28

*Louisville Gas & Elec. Co. v. FERC,*
988 F.3d 841 (6th Cir. 2021) ...................................................... 26, 33

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ............................................................................ 21

*Mastrobuono v. Shearson Lehman Hutton, Inc.,*
514 U.S. 52 (1995) .............................................................................. 25

*Old Dominion Elec. Coop. v. FERC,*
898 F.3d 1254 (D.C. Cir. 2018) .......................................................... 11

*Overdevest Nurseries, L.P. v. Walsh,*
2 F.4th 977 (D.C. Cir. 2021) .............................................................. 31

*Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC,*
272 F.3d 607 (D.C. Cir. 2001) .................................................... 8, 27, 34

*Transmission Agency of N. Cal. v. FERC,*
628 F.3d 538 (D.C. Cir. 2010) ............................................................ 23

*Yates v. United States,*
574 U.S. 528 (2015) ............................................................................ 28

**Statutes**

Federal Power Act, 16 U.S.C. Ch. 12 .................................................. 6, 27

    16 U.S.C. § 825*l*(a) ............................................................................. 5

    16 U.S.C. § 825*l*(b) ............................................................................. 4

**Agency Authorities**

*Appalachian Power Co. PJM Interconnection, L.L.C.*,
    173 FERC ¶ 61,157 (2020)........................................................... 36, 37

*Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.*,
    164 FERC ¶ 61,161 (2018)........................................................... 14, 30

*Monongahela Power Co.*,
    Order on Rehearing and Compliance,
    164 FERC ¶ 61,217 (2018)......................................... 10, 13, 27, 35, 36

Promoting Wholesale Competition Through Open Access
    Non-Discriminatory Transmission Services, Order No.
    888, 61 Fed. Reg. 21540-01 (May 10, 1996) ........................................ 7

*Pennsylvania-New Jersey-Maryland Interconnection*,
    Order Conditionally Accepting Open-Access Transmission
    Tariff, 81 FERC ¶ 61,257 (Nov. 25, 1997) ..................................... 7, 26

*PJM Interconnection, L.L.C. et al.*,
    Order Provisionally Granting RTO Status,
    96 FERC ¶ 61,061 (2001)............................................................ 1, 8, 15

Preventing Undue Discrimination and Preference in
    Transmission Service, Order No. 890, 72 Fed. Reg. 12,266
    (Mar. 15, 2007)............................................................................ 12, 13

Regional Transmission Organizations, Order No. 2000,
    89 FERC ¶ 61,285 (1999)................................................................... 6

*S. Cal. Edison Co. Local Transmission Plan Within the Cal. Indep. Sys. Operator Corp.*, Order on Tariff Filing, 164 FERC ¶ 61,160 (2018)................................................ 11, 14, 28, 32

## Other Sources

First Energy MAAC Local Plan Submission for the 2019 RTEP, available at https://www.pjm.com/-/media/committees-groups/committees/srrtep-ma/postings/2019/first-energy-east-local-plan-submission-for-2019-rtep.ashx (visited Apr. 10, 2022)........................................ 10

# GLOSSARY

| | |
|---|---|
| Attachment M-3 Order | Order Accepting Proposed Tariff Revisions, 172 FERC ¶ 61,136 (Aug. 11, 2020) (JA___) |
| Commission | Federal Energy Regulatory Commission |
| FERC | Federal Energy Regulatory Commission |
| ISO | Independent System Operator |
| Owners Agreement | PJM Consolidated Transmission Owners Agreement (JA___) |
| PJM | PJM Interconnection, L.L.C. |
| PJM ISO Order | *Pennsylvania-New Jersey-Maryland Interconnection,* 81 FERC ¶ 61,257 (1997) |
| PJM RTO Order | *PJM Interconnection, L.L.C. et al.,* 96 FERC ¶ 61,061 (2001) |
| Rehearing Order | Order Addressing Arguments Raised on Rehearing, 176 FERC ¶ 61,053 (July 21, 2021) (JA___) |
| RTO | Regional Transmission Organization |
| Stakeholder Proposal Order | Order Rejecting Proposed Tariff Revisions, 173 FERC ¶ 61,242 (Dec. 17, 2020) (JA___) |

## INTRODUCTION

PJM Interconnection, L.L.C. manages the power grid across 13 states—but does not itself own or directly operate any transmission facilities. It existed as an "Independent System Operator" before being designated a Regional Transmission Organization (RTO) in 2001. *PJM Interconnection, L.L.C. et al.*, Order Provisionally Granting RTO Status (PJM RTO Order), 96 FERC ¶ 61,061, 61,226 (2001). PJM was created by the transmission owners in its region, which voluntarily ceded certain limited responsibilities to it—in particular, the responsibility to operate a wholesale electrical market, manage the power grid, and plan certain projects related to that grid. But both before and after creating PJM, the transmission owners—including petitioners here—have always built, owned, and maintained the transmission facilities within PJM's geographic area.

One specific type of project the transmission owners have always planned and built—subject to any necessary regulatory approvals—are projects to reinforce or replace aging transmission facilities nearing the end of their useful lives, known as "End-of-life" projects."[1] Doing so has

---

[1] The Commission uses the acronym "EOL Projects."

always been one of the transmission owners' ownership rights and maintenance responsibilities. Before these proceedings, PJM's creation as an independent entity (now an RTO) was never thought to have affected that retention of authority. This is because neither the FERC-jurisdictional agreement known as the Consolidated Transmission Owners Agreement (Owners Agreement), nor its predecessor agreements—which delineate the transfer of responsibilities to PJM as the RTO—expressly transfer authority for End-of-life projects to PJM; the Owners Agreement "expressly reserve[s]" to the transmission owners all "rights not specifically transferred." Owners Agreement § 5.6 (JA___).

In spring 2020, the transmission owners proposed amendments to the process set out in "Attachment M-3" of the PJM Tariff to afford PJM stakeholders an opportunity to provide input on the planning of certain projects, including End-of-life projects. This wholly voluntary proposal to accept input on asset-management activities did not cede any of the transmission owners' responsibility to plan or build the projects. PJM endorsed this proposal and filed it on the transmission owners' behalf,

2

and FERC accepted it without suggesting that the Owners Agreement was in any way ambiguous on the point.[2]

Thereafter, and despite the plain language of the Owners Agreement, a group of PJM Stakeholders[3] sought to have FERC transfer responsibility for planning End-of-life projects from the transmission owners to PJM. PJM itself objected to this proposal, agreeing that it violated the Owners Agreement, and FERC rightly rejected this attempt. *PJM Interconnection, L.L.C.*, Order Rejecting Proposed Tariff Revisions (Stakeholder Proposal Order), 173 FERC ¶ 61,242 (Dec. 17, 2020) (JA___).[4]

On rehearing, the Commission reaffirmed that determination—but it significantly changed its reasoning, holding for the first time that the Owners Agreement is *ambiguous* as to whether End-of-life project planning was delegated to PJM or retained by the transmission owners.

---

[2] These orders are under review in Docket Nos. 20-1449 and 21-1006.

[3] "Stakeholders" in this brief refers to the self-described "independent transmission and consumer-side stakeholders" that are petitioners in Docket Nos. 21-1090, 21-1108, and 21-1173; some Stakeholders are also petitioners in Docket Nos. 20-1449 and 21-1006.

[4] The Stakeholders petitioned this Court for review of that determination in Docket Nos. 21-1090, 21-1108, and 21-1173.

*PJM Interconnection, L.L.C.*, Order Addressing Arguments Raised on Rehearing (Rehearing Order), 176 FERC ¶ 61,053, at P 16 (July 29, 2021) (JA___). This novel ambiguity holding is inconsistent with the plain terms of the Owners Agreement and the uniform understanding of what responsibility the transmission owners transferred to PJM. And it introduces substantial uncertainty regarding the parties' rights and obligations, which will wreak havoc with the project-planning process.

The Court should thus grant this Petition and hold that the Owners Agreement unambiguously provides that the transmission owners retain the right to plan End-of-life projects.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction under 16 U.S.C. § 825*l*(b). On December 17, 2020, the Commission issued an order rejecting the Stakeholders' proposal to transfer responsibility for End-of-life project planning from transmission owners to PJM. Stakeholder Proposal Order (JA___). The Stakeholders petitioned for rehearing, which FERC denied by operation of law. *PJM Interconnection, L.L.C.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration (Deemed Denial Order), 174 FERC ¶ 62,111 (Feb. 19, 2021) (JA___). The

Commission issued the Rehearing Order (JA___) on July 29, 2021, reaching the same result as the initial order but changing the reasoning for that determination—and holding for the first time that the Owners Agreement was ambiguous regarding whether consideration of End-of-life projects was delegated to PJM. *Id.* P 16 (JA___). Petitioners (capitalized "Transmission Owners") sought rehearing of this Rehearing Order pursuant to 16 U.S.C. § 825*l*(a), which FERC denied without explanation. *See PJM Interconnection, L.L.C.*, Notice of Denial of Rehearings by Operation of Law (Denial Notice), 176 FERC ¶ 62,158 (Sept. 30, 2021) (JA___).

The petition for review was timely filed on November 26, 2021, and was consolidated with the petitions filed by the Stakeholders challenging the denial of their proposal. Those cases were later consolidated with two petitions in which an overlapping group of Stakeholders challenge FERC's approval of the transmission owners' Attachment M-3 filing (Nos. 20-1449 and 21-1006).

## ISSUE PRESENTED

Whether the Commission erred in holding that the Owners Agreement is ambiguous as to whether the planning of End-of-life projects was delegated to PJM or retained by the transmission owners.

## STATUTES AND REGULATIONS

There are no pertinent statutes or regulations warranting reproduction.

## STATEMENT

### A.    Regulatory Background

The Federal Energy Regulatory Commission administers the country's power grid under the Federal Power Act, 16 U.S.C. ch. 12. In 1999, FERC established a regulatory framework for Regional Transmission Organizations, or "RTOs." *Reg'l Transmission Orgs.*, Order No. 2000, 89 FERC ¶ 61,285, at *3 (1999). RTOs are independent, regionally operated organizations that, among other things, manage the transmission of power in a competitive market and conduct transmission planning at a regional scale to ensure reliability and appropriate investment in projects expanding capacity within their geographic area. *Id.* at *16, *37.

6

FERC first proposed separating grid management from transmission-facility ownership by authorizing regional organizations known as "Independent System Operators" or "ISOs." Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services, Order No. 888, 61 Fed. Reg. 21,540-01, 21,595-96 (May 10, 1996). The transmission owners in PJM elected to convert their pre-existing power pool to an ISO, and FERC approved this change in November 1997. *See Pennsylvania-New Jersey-Maryland Interconnection*, Order Conditionally Accepting Open-Access Transmission Tariff (PJM ISO Order), 81 FERC ¶ 61,257, 62,234 (Nov. 25, 1997).

In approving PJM as an ISO, FERC directed that all of the transmission owners' tariff-related rights be ceded to PJM. The transmission owners objected and appealed to this Court, which reversed and held that FERC had no authority to require the transmission owners to cede any rights they had not voluntarily agreed to surrender. *See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9-11 (D.C. Cir. 2002). The Court also ruled that the transmission owners did not transfer any ownership interest in their transmission facilities by joining an ISO. *Id.* at 11-14.

In 1999, FERC created the concept of an RTO and further defined the role of independent managers of the transmission grid and energy markets. *See Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607, 609 (D.C. Cir. 2001) (per curiam) (explaining FERC Order 2000). Rejecting a challenge to this order, this Court ruled that membership in an RTO is "voluntary and impose[s] no mandatory requirements upon the Utilities." *Id.* FERC approved PJM as an RTO in 2001. PJM RTO Order, 96 FERC ¶ 61,061, 61,227.

## B. Factual Background

### 1. The PJM Consolidated Transmission Owners Agreement

As noted above, PJM is a voluntary creation of transmission owners that, as the term suggests, build, own, operate, and maintain the regional and local transmission facilities within PJM. The Owners Agreement, which was negotiated between the transmission owners and PJM, governs their relationship and delineates the division of responsibility between them. *See* Owners Agreement, Preamble, art. 2 (JA___).

In the Owners Agreement, the transmission owners transferred to PJM the responsibility to plan projects that "enhance[] or expan[d]" transmission within the PJM Region. Owners Agreement § 4.2.1 (JA___).

The criteria for PJM's projects are set forth in PJM's Operating Agreement, *see* PJM Operating Agreement, Sched. 6 (Sept. 17, 2010) (JA___), and in Attachment M-3 to the PJM Tariff. PJM Tariff, Attach. M-3, § (a) (JA___). PJM is, for example, responsible for planning any necessary expansions of the grid to avoid potential future violations of reliability standards established by the North American Electric Reliability Corporation. PJM Operating Agreement at §1.2(e) (JA___); Attach. M-3 § (a)(1) (JA___). This kind of long-term, regional planning is consistent with the role of an RTO—to plan the enhancement and expansion of transmission.

The transmission owners, by contrast, retain broad responsibility under the Owners Agreement to manage the facilities they own, from the proverbial cradle to grave. The Owners Agreement expressly provides that the transmission owners "have the right to build, finance, own, acquire, sell, dispose, retire, merge or otherwise transfer or convey" assets they own, "including any Transmission Facilities." Owners Agreement § 5.2 (JA___). Additionally, the Owners Agreement stresses that "Rights not *specifically transferred* by the [transmission owners] to PJM pursuant to this Agreement or any other agreement are *expressly*

*reserved* by the Parties." Owners Agreement § 5.6 (emphasis added) (JA___).

### 2.  Supplemental and asset-management projects, including End-of-life projects

Consistent with their reserved rights under the Owners Agreement, the transmission owners plan and manage certain projects. One category involves "Supplemental Projects," *Monongahela Power Co.*, Order on Rehearing and Compliance, 164 FERC ¶ 61,217, P 2 (2018), defined in PJM's Operating Agreement as "a transmission expansion or enhancement that is not required for compliance with [certain defined] PJM criteria … and is not [a] state public policy project." *See PJM Interconnection, L.L.C. and Am. Transmission Sys. Inc.*, Order Accepting Proposed Tariff Revisions (Attachment M-3 Order), 172 FERC ¶ 61,136 at P 9 & n.17 (Aug. 11, 2020) (JA___). A Supplemental Project typically would be an expansion of a transmission owners' facility to serve growing load or enhance the resiliency of its system, where neither is required under Schedule 6. A project might, for example, add a connection for a new local customer. *See, e.g.*, First Energy MAAC Local Plan Submission for the 2019 RTEP, 2, available at https://www.pjm.com/-/media/committees-groups/committees/srrtep-ma/postings/2019/first-

10

energy-east-local-plan-submission-for-2019-rtep.ashx (visited Apr. 10, 2022).

The Transmission Owners also plan and execute "asset management" projects for facilities they own. Asset-management projects "encompass the maintenance, repair, and replacement work done on existing transmission facilities as necessary to maintain a safe, reliable, and compliant grid based on existing topology." *S. Cal. Edison Co. Local Transmission Plan Within the Cal. Indep. Sys. Operator Corp.*, Order on Tariff Filing, 164 FERC ¶ 61,160, P 31 & n.55 (2018).

"End-of-life" projects—the subject of this litigation—are a particular kind of asset-management project. These projects involve rebuilding existing infrastructure to maintain functionality and reliability when a particular facility is at or near the end of its useful life. For example, an End-of-life project may replace obsolete or deteriorating relays or line equipment that are becoming unreliable. *Id.* P 33. These projects have always been managed by transmission owners, not PJM.[5]

---

[5] Although transmission owners retain responsibility over Supplemental and asset-management projects under the Owners Agreement, individual transmission owners may voluntarily assign project planning for these to PJM, by filing "Form No. 715" with FERC. *See* Attachment M-3 Order at P 8; *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254,

### 3.    PJM stakeholder involvement in project planning

PJM stakeholders, including the Stakeholder petitioners, do not plan transmission projects; nor can they veto them. But they do have input into the planning process. *See* Preventing Undue Discrimination and Preference in Transmission Service, Order No. 890, 72 Fed. Reg. 12,266, 12,267-68 (Mar. 15, 2007).

For projects that PJM plans—such as to address violations of reliability standards or to reduce transmission congestion that increases costs to consumers, *see* PJM Operating Agreement, Sched. 6 (JA__)— PJM solicits stakeholder input, both with respect to proposed projects and to understand the needs driving them. PJM also publishes a proposed Regional Transmission Expansion Plan that includes the projects it plans to undertake, which affords stakeholders an additional opportunity to review and comment on projects before the plans are finalized.

By contrast, nothing in the PJM organizational documents historically mandated stakeholder input into any project that

---

1256 (D.C. Cir. 2018). Any Form No. 715 assignment is wholly voluntary and at the transmission owners' sole election.

transmission owners plan and execute themselves. In 2007, however, the Commission issued Order No. 890 "requir[ing] transmission providers to develop a transmission planning policy that satisfied certain transmission planning principles—including … transparency to customers and other stakeholders regarding the basic criteria, assumptions, and data underlying their transmission system plans, and coordination with stakeholders." *Monongahela Power Co.*, 164 FERC ¶ 61,217, P 3.

After issuing Order No. 890, in 2018 the Commission approved an amendment to the PJM Tariff that the transmission owners proposed to establish explicit procedures for receiving stakeholder input into the transmission owners' planning of Supplemental Projects. *See* Attachment M-3 Order at P 11 (JA__); *Monongahela Power Co.*, 164 FERC ¶ 61,217. This "Attachment M-3" created a stakeholder review process that furthered the goals of Order No. 890. Attachment M-3 Order at P 11 (JA__); *Monongahela Power Co.*, 164 FERC ¶ 61,217, PP 7-8.

Until recently, the Attachment M-3 process covered only Supplemental Projects, as defined in PJM's Operating Agreement. Attachment M-3 Order at P 9 & n.17 (JA__). In a series of orders not at

13

issue, the Commission concluded that Order No. 890 does not cover transmission owner "asset management project[s] or activit[ies]"—even where they incidentally expand the capabilities of transmission facilities. *See id.* at P 12 (citing *S. Cal. Edison Co.,* 164 FERC ¶ 61,160, at P 33 (2018); *Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.,* 164 FERC ¶ 61,161, at P 68 (2018) (the "*California Orders*").

Although under no contractual or legal obligation to do so, in 2020 the transmission owners proposed amending the Attachment M-3 process to provide PJM stakeholders an opportunity to review and comment on the plans for asset-management projects, including End-of-life projects, through the same process used for Supplemental Projects. The Commission accepted that amendment to Attachment M-3, over the objection of certain Stakeholders that PJM instead should plan End-of-life projects, and found that the transmission owners had not transferred planning responsibility for End-of-life projects to PJM in the Owners Agreement because they "specifically retain the right to 'maintain' their transmission facilities and generally reserve all rights not specifically granted to PJM," Attachment M-3 Order at P 82 (JA__);

*id.* at PP 82-86. The Commission later denied rehearing.[6] These orders are the subject of consolidated Docket Nos. 20-1449 and 21-1006.

### C.    Procedural History Underlying This Petition

While the Attachment M-3 amendment proceeding was pending, the Stakeholders separately prepared an amendment to the PJM Operating Agreement to have *PJM* plan End-of-life projects. PJM submitted the Stakeholder proposal to the Commission on July 2, 2020—as the Operating Agreement requires—although in so doing PJM stated that it disagreed with the proposal and would not be able to implement it. Stakeholder Proposal Order at P 21 (JA__); Comments of PJM Interconnection, L.L.C. (PJM Comments), 21-1090R, 2, 19-23 (July 2, 2020) (JA___). That proposal is the subject of this petition and the Stakeholders' petitions in Docket Nos. 21-1090, 21-1108, and 21-1173.

On December 17, 2020, the Commission rejected the Stakeholder proposal, concluding that it was inconsistent with the limited scope of

---

[6] *See PJM Interconnection, L.L.C. and Am. Transmission Sys. Inc.*, Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration, 173 FERC ¶ 62,021 (Oct. 13, 2020) (JA__); *PJM Interconnection, L.L.C. and Am. Transmission Sys. Inc.*, Order Addressing Arguments Raised on Rehearing, 173 FERC ¶ 61,225 (Dec. 17, 2020) (JA__).

planning responsibility transferred to PJM in the Owners Agreement. *See* Stakeholder Proposal Order (JA___). The Commission stressed that transmission owners "retain the right to 'maintain' their transmission facilities, and generally retain all rights not specifically granted to PJM." *Id.* at P 51, 53 (JA___). It concluded that End-of-life projects "go[] beyond the scope of planning responsibilities delegated to PJM in the PJM Operating Agreement" because they "do[] not involve expansion or enhancement of the regional transmission system." *Id.* at P 54 (JA__). Instead, End-of-life projects "involve decisions regarding retirement and maintenance of existing equipment, a responsibility that the PJM Transmission Owners specifically retained." *Id.*

The Stakeholders filed for rehearing, which the Commission denied by operation of law. *See* Deemed Denial Order (JA___). On July 29, 2021, the Commission issued an order addressing the Stakeholders' rehearing arguments. *See* Rehearing Order (JA___). In that order, which is the subject of this petition, the Commission significantly changed its interpretation of the Owners Agreement—although it ultimately reaffirmed the conclusion that authority over these projects rests with the transmission owners. Reversing its prior holding in the Stakeholder

Proposal Order and its reasoning in the Attachment M-3 orders that the plain text of the Owners Agreement reserved for the transmission owners planning responsibility over End-of-life projects, FERC "f[ound] the [Owners Agreement] to be ambiguous whether consideration of [End-of-life] projects was a matter delegated to PJM." Rehearing Order P 16 (JA___). Based on this holding, the Commission determined it must consider "extrinsic evidence" to interpret the Owners Agreement's allocation of responsibilities. *Id.*

The Transmission Owners sought rehearing of the Rehearing Order to address the Commission's erroneous ambiguity holding. The Commission denied the rehearing request by operation of law on September 30, 2021. Denial Notice, 176 FERC ¶ 62,158 (JA___). Because the Commission's July 29, 2021, Rehearing Order is based on an unsupportable reading of the Owners Agreement, which will have significant implications in a wide array of disputes, the Transmission Owners filed for review in this Court. All the petitions seeking review of

17

the Attachment M-3 amendment and Stakeholder proposal orders have

now been consolidated.[7]

## SUMMARY OF ARGUMENT

The Commission erred in concluding that the Owners Agreement

was ambiguous regarding whether the transmission owners delegated

End-of-life projects to PJM; it unambiguously specifies that they did not.

Under the Owners Agreement, the transmission owners voluntarily

transferred *certain* activities to PJM, including the responsibility to plan

projects that enhance and expand the grid. But the Owners Agreement

specifies that the transmission owners retain the rights to build,

maintain, and retire the transmission facilities they own, and that they

reserved all rights not "specifically transferred" to PJM. There was no

such specific transfer of End-of-life project planning, so the Commission's

determination that the Owners Agreement is ambiguous is inconsistent

with the plain terms of the Owners Agreement.

*First*, the reservation of rights in the Owners Agreement—that the

Transmission Owners reserve all rights not "specifically transferred" to

---

[7] The Transmission Owner petitioners have intervened and will later file
a brief in support of the Commission in the other consolidated dockets.
This brief focuses solely on the ambiguity issue.

PJM by contract—requires that any provision that transfers specific rights to PJM be explicit. The Commission correctly found that no term in the Owners Agreement specifically transferred to PJM responsibility over End-of-life project planning. That should have ended the inquiry. The Commission nonetheless went on to hold that the Owners Agreement was ambiguous as to who has that responsibility. But the reservation-of-rights provision unambiguously answers that question: Under the express language of Section 5.6 the *absence* of specific transference instead *reserves for the Transmission Owners* any rights in question. The absence of a specific transference of rights cannot be ambiguous.

*Second*, the Commission parsed isolated terms in the Owners Agreement and determined that each was susceptible to multiple interpretations. This approach ignored basic principles of contract interpretation: A contract must be read as an entire instrument, with the meaning of specific terms derived from context. When the Owners Agreement is construed as a whole, it unambiguously provides that transmission owners retain the right to plan and execute End-of-life

projects. The terms the Commission parsed out of context do not undermine that conclusion.

*Finally*, interpreting the Owners Agreement to preserve for transmission owners the responsibility to plan End-of-life projects follows previous decisions of this Court and FERC. Precedent recognizes that transmission owners may *voluntarily* transfer their rights to plan and operate their facilities, but that they cannot be *required* to do so. By failing to give effect to the Transmission Owners' reservation of rights, as well as the particular rights specifically retained under the Owners Agreement, the Commission's ambiguity holding departed from this precedent.

The Court should grant the Transmission Owners' petition, reverse FERC's determination that the Owners Agreement is ambiguous, and hold that the Owners Agreement unambiguously provides that transmission owners retain responsibility to plan End-of-life projects.

## STANDING

The Transmission Owners have standing because they are aggrieved by the Rehearing Order in a concrete and particularized

manner. *See* Declaration of Takis Laios, attached to this brief; *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Although the Transmission Owners agree with the Commission's reaffirmation in that Order of its prior rejection of the Stakeholder proposal to transfer responsibility over End-of-life projects to PJM, the Commission's ambiguity holding undermines the basic principle underlying the Owners Agreement that the Transmission Owners only transferred specific, limited planning responsibility to PJM. PJM is responsible for conducting only those planning functions identified in Schedule 6 of the Operating Agreement and Section (a) of Attachment M-3: The Transmission Owners expressly retain all remaining responsibilities.

The ambiguity holding creates a significant injury to the Transmission Owners. It burdens the Transmission Owners in the project-planning process, for example. Laios Decl., ¶ 16. As noted above, projects planned by the Transmission Owners are subject to extensive stakeholder input and meetings under Attachment M-3. The ambiguity holding interferes with and adds uncertainty to that planning process, as Transmission Owner planners presenting these projects are constantly

questioned whether those projects should instead be planned by PJM. *Id.* Addressing these concerns—and the Stakeholders' broader argument that all projects should be planned by PJM—adds time and uncertainty to that process and requires the use of additional resources. *Id.* ¶¶ 15-16. More generally, the Commission's holding that the Owners Agreement is ambiguous undermines the reservation-of-rights provision in the Owners Agreement, which will complicate planning processes and burden the Transmission Owners. *Id.* ¶ 13.

## ARGUMENT

In the Rehearing Order, the Commission correctly determined that the Transmission Owners retained responsibility for planning End-of-life projects because the Transmission Owners never transferred that responsibility to PJM. Rehearing Order PP 23-24 (JA___). But in reaching that correct determination, the Commission erroneously held as a threshold matter that the Owners Agreement is ambiguous regarding whether the Transmission Owners contractually transferred End-of-life project planning to PJM. *Id.* P 16 (JA__). That finding of ambiguity is wrong. The Court reviews the Commission's ambiguity holding *de novo*,

*Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 547 (D.C. Cir. 2010), and should reverse.

## I. The Owners Agreement Unambiguously Establishes The Transmission Owners' Responsibility Over End-of-life Projects.

The Commission's holding that the Owners Agreement is ambiguous relied on isolating terms in the contract from their context. When considered in full, the Owners Agreement unambiguously provides that transmission owners retain the right to plan End-of-life projects because those projects involve building, maintaining, and retiring facilities—responsibilities expressly retained by transmission owners— and because transmission owners also explicitly reserved all rights not specifically transferred to PJM.

### A. The Owners Agreement explicitly reserves for the transmission owners all rights not specifically transferred to PJM.

Any interpretation of the Owners Agreement must take account of its fundamental proviso that each PJM transmission owner "expressly reserve[s]" all "[r]ights not specifically transferred … to PJM." Owners Agreement § 5.6 (JA___). In other words, unless the Owners Agreement

23

(or another contract) expressly states otherwise, transmission owners retain all their rights under law.

The Owners Agreement contains no provision specifically transferring to PJM the right to plan End-of-life projects—and no party that negotiated the Owners Agreement has ever asserted it does. The Transmission Owners' counterparty, PJM, agrees that End-of-life planning is not specifically transferred to PJM, and instead is reserved to the Transmission Owners under Section 5.6 or the Transmission Owners' listed rights. *See* PJM Comments at 9-11 (JA__); Stakeholder Proposal Order at P 21 (JA__).

Indeed, even the Commission agrees with PJM and the Transmission Owners that the Owners Agreement does not specifically transfer responsibility to plan End-of-life projects to PJM. The Rehearing Order states that the Commission was "not able to conclude that the [Owners Agreement] provides for the transfer of responsibility for the consideration of [End-of-life] Projects," when particular terms were "[v]iewed through the lens of the general reservation." Rehearing Order P 16 (JA___). This is correct and should have ended the discussion.

But the Commission then held that the *lack* of any provision for the transfer of these responsibilities meant that the Owners Agreement was ambiguous about whether the responsibility to plan End-of-life projects was transferred to PJM. *Id.* Yet Section 5.6's reservation of rights applies to any interpretation of the rest of the Owners Agreement. Under basic principles of contract interpretation requiring harmonization of terms, any transferred rights and responsibilities must be construed in light of Section 5.6's requirement that they be *specifically* transferred. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) ("[A] document should be read to give effect to all its provisions and to render them consistent with each other.").

Section 5.6 means that the Commission (and the courts) cannot find rights and responsibilities to be transferred to PJM through an ambiguous provision; they must instead reject the idea that responsibilities have been transferred unless the transfer is specific. As Commissioner Danly stated in his concurrence, the reservation of rights "not '*specifically transferred*'" precludes the Commission's effort to "stretch" other terms to cover activities that "would have been 'specifically transferred' to PJM if the PJM Transmission Owners had so

25

intended." Rehearing Order Concurrence at P 5 (JA__). If the reservation-of-rights provision is to mean anything, it must mean that the rights that *are* specifically transferred encompass only what is plainly specified—nothing more. Indeed, FERC never explained how it could properly conclude that unclear language might support a transfer in light of the requirement that only responsibilities "specifically transferred" are PJM's. *See Louisville Gas & Elec. Co. v. FERC*, 988 F.3d 841, 848 (6th Cir. 2021) (FERC erred in finding ambiguity where it failed to "articulate[] … that the language supported multiple reasonable interpretations, or what those interpretations were.").

The history of negotiation of the Owners Agreement shows that Section 5.6 is key to interpreting it. Before PJM was created, transmission owners were responsible for planning *all* expansions to and replacements of their transmission facilities. When the Transmission Owners voluntarily formed PJM, they transferred to PJM limited responsibility to prepare the Regional Transmission Expansion Plan to plan certain "enhancements and expansions" to the grid. *See* PJM ISO Order, 81 FERC ¶ 61,257 at 62,235; Owners Agreement § 6.3.4 (JA___). But transmission owners coordinate with RTOs by choice; nothing in the

Federal Power Act or the Commission's regulations require it. *Snohomish Cty.*, 272 F.3d at 609. And nothing in the law requires transmission owners to transfer to an RTO any of their rights unless they so choose. *See Atl. City Elec. Co.*, 295 F.3d at 9.

The PJM Transmission Owners thus voluntarily chose to transfer to PJM limited responsibility to plan certain projects, as part of their decision to form PJM. And FERC recognized the limitations of PJM's transferred responsibility when it approved the original version of Attachment M-3: "When transmission owners participate in an RTO, the Commission did not require them to allow the RTO to do all planning for local or Supplemental Projects." *Monongahela Power Co.*, 164 FERC ¶ 61,217, P 13. Indeed, as FERC noted, "PJM Transmission Owners, in fact, do the planning for [these] Projects" under the Owners Agreement. *Id.* That is the point of the reservation-of-rights provision, which FERC effectively read out of the Owners Agreement.

## B.    The Owners Agreement does not delegate End-of-life project planning to PJM.

Setting aside the clear reservation of the transmission owners' rights, the Commission found ambiguity in the Owners Agreement through a contorted reading of discrete provisions. This approach is

invalid because the plain meaning of the Owners Agreement, read as a whole, is clear. *See Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C. Cir. 2004) ("At the first step we begin with a 'plain language' analysis of the [] text," and turn to canons of construction "to regard the word in its context" if necessary.); *Yates v. United States*, 574 U.S. 528, 564 (2015) (Kagan, J., dissenting) (Courts "use[] *noscitur a sociis* and *ejusdem generis* to resolve ambiguity, not create it.").

But even on its own terms, the Commission's parsing of isolated words in the Owners Agreement is unavailing.

1.    The Commission concluded, for example, that one specific right delegated to PJM—the right to "[c]onduct[] its planning for the … enhancement of transmission facilities"—"could be viewed as including consideration of [End-of-life] Projects, because [End-of-life] Projects generally have a longer useful life than the retired facility." Rehearing Order P 16 (JA___). But that "longer useful life" does not constitute an "enhancement" as that term is used in the Owners Agreement—or under Commission precedent, *see S. Cal. Edison,* 164 FERC ¶ 61,160, at P 33.

The full paragraph from which the Commission derives the phrase "expansion and enhancement" affords PJM the obligation to "[c]onduct

its planning for the expansion and enhancement of transmission facilities based on a planning horizon of at least ten years, or such longer period as may be required by the PJM Tariff or Operating Agreement, including the Regional Transmission Expansion Planning Protocol." Owners Agreement § 6.3.4 (JA___). The references to PJM's organizational and planning documents show that the term "enhancement," which the Commission considered to be ambiguous, is in fact plain. "[E]nhancement[s]" in this context are projects consistent with those documents—specifically, the planning process outlined in Operating Agreement Schedule 6. *See* Rehearing Order P 23 (JA__). End-of-life projects are not covered by Schedule 6 planning criteria, which are explicitly limited to transmission facility enhancement and expansion. PJM Operating Agreement Sched. 6 § 1.2. Indeed, the Commission ultimately concluded "that the better reading of enhancement in th[e] context [of the Owners Agreement] is to mean an increase in capacity or other modification to the transmission system required by PJM's reliability and economic planning criteria." Rehearing Order P 23 (JA__). This is clearly—unambiguously—what the term means in context.

2.      The Commission also incorrectly found ambiguity in the specific rights retained by the Transmission Owners. In particular, the Commission reasoned that the Transmission Owners' express responsibility for "planning for 'retirement' can reasonably be viewed as including consideration of [End-of-life] Projects"—but that, "read narrowly, [this provision] could be interpreted as excluding decisions to replace retired facilities because such replacements could be viewed as enhancements [in] that the replacement facilities generally have a longer useful life than the facilities that they replaced." Rehearing Order P 16 (JA___). This analysis has several problems.

*First*, it is flatly inconsistent with FERC's own reasoning in the *California Orders.* Indeed, later in the Rehearing Order, the Commission noted that the *California Orders* "recognized that a project may still be a replacement even if it includes an 'incremental increase in transmission capacity.'" *Id.* P 20. That alone should have been enough to foreclose any ambiguity about what "retire" encompasses.

*Second*, the conclusion that the term "retire" as used in the Owners Agreement is ambiguous cannot be squared with traditional canons of construction. Under the canon *noscitur a sociis*, "words grouped in a list

30

should be given related meaning." *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021) (citation omitted). Section 5.2 of the Owners Agreement, "Facility Rights," provides that each transmission owner "shall have the right to build, finance, own, acquire, sell, dispose, retire, merge or otherwise transfer or convey all or any part of its assets, including any Transmission Facilities." Owners Agreement § 5.2 (JA___). Each of the words in the list of "Facility Rights" is an action a Transmission Owner may take with respect to the facilities it owns. Together, these actions comprise the life cycle of a transmission facility, beginning with "build[ing]" the facility (and the financing doing so may entail) and running through the end of the owner's use of that facility.

Just as a Transmission Owner may stop operating a facility by "sell[ing]" or "dispos[ing]" of it, so too can a Transmission Owner take it offline by "retir[ing]" it. And just as a Transmission Owner can "build" a new facility, so too can it "build" a replacement for a retired facility— again, consistent with the enumerated rights in Section 5.2. Nothing about the position of the term "retire" in Section 5.2's list of rights could support reading the term "narrowly," as the Commission suggests is possible. *Cf.* Rehearing Order P 16 (JA__).

31

*Third*, PJM itself agreed that the Transmission Owners "did not turn over to PJM replacement decisions … associated with the retirement of existing infrastructure." PJM Comments at 9-10 ("PJM's role has limitations.") (JA___). It also pointed to several problems with the Stakeholder proposal, including that, notwithstanding claims to the contrary, it would effectively assign the determination of when a transmission facility needs to be retired and replaced to PJM. *Id.* at 21 (JA__).

3.    The Transmission Owners' responsibility to "maintain" transmission systems, Owners Agreement § 4.5 (JA___), likewise includes replacing facilities to ensure functionality. Although the Commission suggested this word was ambiguous, Rehearing Order P 16 (JA__), FERC has previously interpreted the right to "maintain" facilities to cover any "work done on existing transmission facilities as necessary to maintain a safe, reliable, and compliant grid based on existing topology"—in contrast to projects designed to *expand* system capacity. *S. Cal. Edison*, 164 FERC ¶ 61,160, P 31 & n.55. Here, too, the Commission correctly noted that "maintain" "can reasonably be read to reserve consideration of [End-of-life] Projects to the PJM Transmission Owners,"

32

Rehearing Order P 16 (JA___)—and it failed to identify *any* interpretation of "maintain" that would *not* encompass those projects. *See id.* P 24 (JA___) ("[End-of-life Projects are a part of the continuum of maintenance."). Without identifying an alternative meaning, the Commission's conclusion of ambiguity falls short. *Cf. Louisville Gas & Elec. Co.*, 988 F.3d at 848.

The Commission reached its conclusion that the Owners Agreement is ambiguous by impermissibly parsing discrete terms in isolation. Because "retire" and "maintain" in context unambiguously encompass End-of-life project planning—even setting aside the catchall reservation of rights—the Commission's ambiguity holding is wrong.

## II. Interpreting The Owners Agreement To Unambiguously Reserve To Transmission Owners Responsibility Over End-of-life Projects Accords With Previous Decisions By This Court And The Commission.

### A. This Court has previously held that transmission owners retain rights not voluntarily transferred.

This Court has repeatedly rejected prior decisions by the Commission, like the one here, that would have undermined the fundamental principle that an RTO may only exercise rights that utility owners have voluntarily transferred to it. As discussed above, the Court

33

has long held that membership in an RTO is "voluntary and impose[s] no mandatory requirements upon the Utilities." *Snohomish Cty.*, 272 F.3d at 609. Similarly, FERC has no authority to force transmission owners to cede rights not voluntarily transferred. In *Atlantic City,* for instance, the Court reversed an order by the Commission that would have assigned PJM the right to initiate rate and rate-design changes, explaining that "utilities may choose to voluntarily give up, by contract, some of their rate-filing freedom," but "FERC lacks the authority to *require* the utility owners" to do so. 295 F.3d at 9-10 (emphasis added). Nor, the Court explained, could the Commission require Transmission Owners to seek approval before withdrawing from PJM. *Id.* at 11. When the Commission reinstated these requirements, this Court again reversed. *Atl. City Elec. Co. v. FERC*, 329 F.3d 856, 858-59 (D.C. Cir. 2003) (per curiam).

The same principle applies here. Under the Rehearing Order, FERC has arrogated to itself the power to determine that transmission owners have ambiguously—that is, implicitly or indirectly—transferred rights to PJM. That is inconsistent not only with the express reservation-of-rights provision, but also with the overarching notion,

34

reaffirmed in *Atlantic City*, that it is solely up to transmission owners to decide what rights to delegate to an RTO.

## B. Other Commission precedent also recognizes transmission owners' rights cannot be transferred involuntarily.

FERC likewise previously has affirmed that transmission owners retain all rights not specifically transferred to an RTO.

In *Monongahela Power*, for example, the Commission rejected an attempt by stakeholders to transfer planning for supplemental projects from transmission owners to PJM. 164 FERC ¶ 61,217 P 14. The Commission explained that, "[u]nlike [Regional Transmission Expansion Plan] projects, for which the PJM Transmission Owners have ceded planning to PJM as part of establishing an RTO, the PJM Transmission Owners remain responsible for planning Supplemental Projects," and thus could "establish the process for planning these transmission projects and [] initiate [related rate changes]." *Id.*

Likewise, in *Appalachian Power Co. PJM Interconnection, L.L.C.*, the Commission rejected an attempt by certain PJM stakeholders to assign PJM responsibility for planning critical infrastructure projects, known as CIP-014 Mitigation Projects. 173 FERC ¶ 61,157 (2020). FERC

rejected the stakeholders' argument that PJM is responsible for planning these projects because PJM's Regional Transmission Expansion Plan contains criteria that could be used to plan them. *Id.* at P 6. The Commission explained that "the fact that certain criteria *can* be used in an individual transmission owner's local planning process does not mean that the project is required for compliance with PJM criteria and *must* be planned through the [Expansion Plan] process." *Id.* at P 9. Assessing the Owners Agreement, the Commission then explained that "the transmission owners retain the right to plan Supplemental Projects when [criteria requiring planning under the Regional Transmission Expansion Plan] are not present," based on the Owners Agreement's reservation of rights. *Id.* at P 12. Finally, the option for transmission owners to transfer planning to PJM voluntarily through Form No. 715—as they may for End-of-life projects, *see* note 5, *supra*—did not mean planning *was* transferred unless an individual owner so chose. *Id.* at P 14.

These orders support the principle that the Transmission Owners cannot be compelled involuntarily to transfer their rights to PJM; they are fundamentally inconsistent with the notion that there is anything ambiguous about the Owners Agreement. The Commission's ambiguity

36

holding is thus not only wrong but also inconsistent with Commission precedent.

## CONCLUSION

For these reasons, the Court should grant the Petition for Review, reverse the Commission's holding that the Owners Agreement is ambiguous, and hold that the Owners Agreement unambiguously provides that the Transmission Owners retain responsibility for End-of-life projects.

Respectfully submitted,

/s/ David M. Gossett

| | |
|---|---|
| John Longstreth | David M. Gossett |
| Donald A. Kaplan | *Counsel of Record* |
| K&L GATES LLP | Richard P. Sparling |
| 1601 K Street, NW | MaryAnn T. Almeida |
| Washington, DC 20006 | DAVIS WRIGHT TREMAINE LLP |
| (202) 778-9000 | 1301 K Street NW |
| john.longstreth@klgates.com | Suite 500 East |
| don.kaplan@klgates.com | Washington, DC 20005-3317 |
| | (202) 973-4200 |
| Steven M. Nadel | davidgossett@dwt.com |
| *Senior Counsel* | ricksparling@dwt.com |
| PPL SERVICES CORPORATION | maryannalmeida@dwt.com |
| Two North Ninth Street | |
| Allentown, PA 18101-1179 | Morgan E. Parke |
| (610) 774-4775 | Evan K. Dean |
| SMNadel@pplweb.com | FIRSTENERGY SERVICE COMPANY |
| | 76 South Main Street A-GO-15 |
| *Counsel for Petitioner PPL Electric* | Akron, OH 44308 |
| *Utilities Corp.* | (330) 384-4595 |
| | mparke@firstenergycorp.com |
| | edean@firstenergycorp.com |
| | |
| | *Counsel for Petitioners the* |
| | *FirstEnergy Transmission* |
| | *Companies* |

Stacey Burbure
Senior Counsel
American Electric Power Service
Corporation
801 Pennsylvania Ave. NW, Suite
735
Washington, D.C. 20004
(202) 383-3452
slburbure@aep.com

*Attorney for American Electric
Power Service Corporation*

Molly Suda
Associate General Counsel
Duke Energy Corporation
1301 Pennsylvania Ave NW, Suite
200
Washington, DC 20004
(202) 824-8011
molly.suda@duke-energy.com

*Attorney for Duke Energy*

Gary E. Guy
Assistant General Counsel
Exelon Corporation
701 Ninth Street, N.W., Suite 9426
Washington, D.C. 20068
(202) 872-2576
gary.guy@exeloncorp.com

*Attorney for Exelon Corporation*

Christopher R. Jones
Miles H. Kiger
Troutman Pepper Hamilton
Sanders LLP
401 9th Street, NW, Suite 1000
Washington, DC 20004
(202) 662-2181
Chris.Jones@troutman.com
Miles.Kiger@troutman.com

*Attorneys for Dominion Energy
Services, Inc.*

Daniel E. Frank
Allison E. Speaker
Eversheds Sutherland (US) LLP
700 Sixth Street, NW, Suite 700
Washington, DC 20001-3980
 (202) 383-0838
danielfrank@eversheds-
sutherland.com
allisonspeaker@eversheds-
sutherland.com

*Attorneys for East Kentucky Power
Cooperative, Inc.*

April 11, 2022

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and this Court's order of January 10, 2022, because it contains 6495 words, excluding the parts of the brief exempted by Circuit Rule 26(a)(1), as determined by the word-counting feature of Microsoft Word.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: April 11, 2022

/s/ David M. Gossett

## CERTIFICATE OF SERVICE

I hereby certify under Circuit Rule 25(c), that on this 11th day of April, 2022, I electronically filed the foregoing Brief with the Court using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: April 11, 2022

/s/ David M. Gossett

**ADDENDUM: DECLARATION OF TAKIS LAIOS**

**United States Court of Appeals**
**for the District of Columbia Circuit**

|  |  |  |
|---|---|---|
| AMERICAN ELECTRIC POWER SERVICE CORPORATION, *et al.*,      *Petitioners,* | ) ) ) ) ) | |
| v. | ) ) ) | No. 21-1246 (consolidated with Nos. 20-1449, 21-1006, 21-1090, 21-1108, and 21-1173) |
| FEDERAL ENERGY REGULATORY COMMISSION,      *Respondent.* | ) ) ) ) ) | |

## DECLARATION OF TAKIS LAIOS

1.      I am Takis Laios, Director, Transmission Strategy & Grid Development, responsible for representing American Electric Power Service Corporation and its affiliates ("AEP") on transmission matters in PJM Interconnection, L.L.C. ("PJM"). In that capacity, I am responsible for facilitating the development, implementation and utilization of transmission facilities in the AEP Transmission Zone of PJM. Our company operates within the PJM Regional Transmission Organization, which is administered by PJM.

2.     In connection with my responsibilities in my company's transmission business, I am familiar with the basic documents establishing PJM and the relationship of my company to PJM as a PJM Transmission Owner.   These documents include the Consolidated Transmission Owners Agreement ("Owners Agreement"), the PJM Open Access Transmission Tariff ("Tariff") and the critical Federal Energy Regulatory Commission ("FERC") and judicial decisions that define the relationship between the Transmission Owners and PJM.   These documents and decisions structure how my company conducts its transmission business, including what responsibilities are transferred to PJM, and how it plans for the construction of new or replacement transmission facilities.

3.     The challenges of owning transmission facilities that must serve local needs but are also part of a large regional transmission systems are significant.   Many of these facilities are funded by local ratepayers.   However, as the benefits of large integrated regional transmission networks operated by a single administrator became more and more apparent, utilities began to work more cooperatively on a regional basis.

2

4.     Before the creation of PJM as an independent entity in 1997, Transmission Owners such as AEP, like other public utilities, were responsible for planning all expansions to and replacements of their transmission facilities. When PJM became an independent system operator and thus independent of the Transmission Owners, the Transmission Owners agreed to transfer some, but not all, of these rights and responsibilities to PJM. They did so by means of a transmission owners agreement, which outlined which rights the owners had delegated and which they reserved.

5.     The Transmission Owners are privately owned either by their shareholders or member cooperatives, and neither FERC nor PJM has the authority to order them to give up any of their rights or share their responsibilities. Accordingly, the question of which responsibilities the Transmission Owners chose to transfer voluntarily to PJM was central to the creation of PJM as an independent entity that would administer the regional interconnection. The scope of that transfer remains central to my own work; in order to be able to operate within the regional system and to make decisions with respect to our facilities, I need to have a clear understanding of which responsibilities and duties we have transferred

3

to PJM and which remain with the Transmission Owners.  Any uncertainty as to this division of responsibilities makes my job more difficult and interferes with the efficient development and management of our transmission facilities.

6.    The principle that the Transmission Owners, and not FERC or PJM, have the right to determine which planning and construction duties the Transmission Owners transferred to PJM—and which they retained for themselves—was confirmed in litigation shortly after PJM became an independent entity.  In a 1997 decision, the Commission ruled that PJM would exercise all of the Transmission Owners' tariff filing rights, even though the Transmission Owners had not agreed to delegate those rights to PJM.  This order was reversed on appeal in the *Atlantic City* case, which ruled that the FERC had no authority to require the Transmission Owners to transfer any of their tariff filing rights to PJM beyond those they voluntarily agreed to transfer.  The court also affirmed that a Transmission Owner's decision to join a regional organization did not transfer any ownership interest to PJM and thus each  Transmission Owner was  free to withdraw from the organization and to revoke any

transfer or delegation of its rights to the organization without FERC approval.

7.     Following the *Atlantic City* decision, the Transmission Owners and PJM entered into negotiations in which PJM sought to gain some tariff filing rights and the Transmission Owners sought to eliminate a claimed right of the PJM Board to veto tariff filings. The results of those negotiations were incorporated into a revised Consolidated Transmission Owners Agreement (or "Owners Agreement") — the version of that contract between PJM and the Transmission Owners that remains in effect today. The Owners Agreement delineates the limited rights and responsibilities transferred by the Transmission Owners to PJM.

8.     Given the history of litigation over Transmission Owners' rights, the Owners Agreement contains the express clarification that any rights and duties not specifically delegated to PJM (in that agreement or another agreement) are reserved by the Transmission Owners. The Owners Agreement has been effective between the parties since 2005, and it was approved by FERC in 2006.

5

9.    PJM's rights and responsibilities are thus limited to the activities expressly delegated to it, including preparing regional transmission expansion plans that identify expansions and enhancements to the PJM transmission system as is required for compliance with certain criteria. The PJM transmission owners retain all other planning responsibilities, including the responsibility to plan for and implement end of useful life projects and other asset management activities, unless they voluntarily transfer some of that responsibility to PJM.[1]    The transmission owners also expressly retained "the right to *build*, acquire, sell, dispose, *retire*, merge or otherwise transfer or convey all or any part of its assets, including any Transmission Facilities." (emphasis added).

10.    A plain reading of the Agreement allows me to undertake my activities with considerable confidence that I know which are within the Transmission Owners' purview and which have been transferred to PJM. For example, as a Transmission Owner, my company must maintain and repair its transmission equipment and replace transmission facilities

---

[1]    Transmission owners may voluntarily transfer additional planning responsibility to PJM as part of a filing with the FERC regarding their transmission planning and operating activities.  This filing is known as Form No. 715.

6

when they are approaching the end of their useful lives. This is known as "asset management." Accordingly, my company plans "asset management projects," *i.e.*, those not intended to expand the transmission system, but to maintain transmission facilities or replace those approaching the end of their useful life. This responsibility has not been transferred to PJM, but was specifically retained by the Transmission Owners in the Owners Agreement through a provision that obligates them to maintain their transmission facilities and the provision that affirms their right to build or retire assets.

11.    I and my company have been able to operate under this bright line division of planning responsibilities between PJM and the Transmission Owner parties for over 15 years. It was plain to me, for example, that authority over end of useful life projects was within our purview and not PJM's, and my company could thus proceed to plan those activities free from the concern that FERC may somehow find that it could order PJM to assume that responsibility. It was also important to my company that PJM, the counterparty to the Transmission Owners in the Owners Agreement, agreed that the responsibility had not be transferred and confirmed to FERC and PJM Members that an

amendment to the Schedule 6 of the PJM Operating Agreement purporting to give that authority to PJM was beyond the scope of the authority transferred to PJM by the Transmission Owners.

12. On the other hand, where an expansion of the transmission system is required to meet the planning criteria delegated to PJM, it was also clear that this is within PJM's planning responsibilities.

13. FERC's decision that the Owners Agreement is ambiguous on the matter, giving FERC the authority to rule if it finds it reasonable to do so that these projects are within PJM's authority, creates uncertainty where it did not previously exist and is flatly inconsistent with the shared understanding of PJM and the Transmission Owners, the parties to the Owners Agreement. That is a significant injury to the Transmission Owners that will burden both them and PJM.

14. The ramifications of this error go well beyond the end of life issue. It places the Transmission Owners in a position of significant and immediate uncertainty as to the extent of their ongoing rights and responsibilities under the Owners Agreement.

15. As this case demonstrates, the rights of the Transmission Owners to plan their own facilities except where those responsibilities

8

have been transferred to PJM has been under continual assault by certain PJM stakeholders, such as the petitioners in several appeals that are currently before the court. Their views are reflected in an affidavit submitted to FERC in which they claim that replacement of "every transmission line and substation" should be planned by PJM.[2] The Commission's conclusion that the Owners Agreement is ambiguous with respect to whether it delegates planning for end-of-life projects to PJM adds fuel to that fire: Stakeholders will use that holding to argue that other authorities were transferred to PJM, even where the Owners Agreement does not say so.

16.    This continual assault on the rights and responsibilities that the Transmission Owners retained creates a constant cloud over the planning process. Under Attachment M-3 to the Tariff, projects planned by Transmission Owners are subject to extensive stakeholder input and meetings. The transmission project planners in my company and those of other Transmission Owners are subject to questions whether projects they plan within their retained rights and

---

[2] Johannes Pfeifenberger and John M. Hagerty, Brattle Group, submitted by LSP Transmission Holdings II, LLC and Central Transmission, LLC, ER2-2308 (July 23, 2020), at 10-11.

9

responsibilities should instead be planned by PJM or are otherwise unnecessary given other projects planned by PJM. Project planners divert resources to address these questions during the course of planning and implementing a project. This interferes with and adds uncertainty to our planning process, adds additional time to the already lengthy process of planning and building transmission facilities and is a costly, burdensome and unnecessary expenditure of company resources.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

DATED this __9th__ day of April, 2022 at ___Worthington, Ohio___.


By: ____*Takis Laios*____
      Takis Laios

10