**ORAL ARGUMENT NOT YET SCHEDULED**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**Nos. 20-1449, 21-1006, 21-1090, 21-1108, 21-1173, and 21-1246
(consolidated)**

———————————

**AMERICAN MUNICIPAL POWER, INC., ET AL.,**
*Petitioners,*

v.

**FEDERAL ENERGY REGULATORY COMMISSION,**
*Respondent.*

———————————

**ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION**

———————————

**DEFERRED JOINT APPENDIX**

**VOLUME I OF V: JA0001-JA0592**

———————————

Christina Switzer
Engleman Fallon, PLLC
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 464-1330
mengleman@efenergylaw.com
cswitzer@efenergylaw.com

Counsel for
LSP Transmission Holdings II, LLC
and Central Transmission, LLC

September 6, 2022

**ORAL ARGUMENT NOT YET SCHEDULED**

### *JOINT APPENDIX*

VOLUME I OF V: JA0001-JA0592

| Record No. | Description | Joint Appendix Page |
|---|---|---|
| 20-1449R 2 | Filed By: American Transmission Systems, Incorporated<br>Filed Date: 6/12/2020<br>Accession No: 20200612-5124<br>Description: American Transmission Systems, Incorporated submits tariff filing per 35.13(a)(2)(iii: Amendments to Attachment M-3 to be effective 8/11/2020 under ER20-2046. | JA0001-JA0104 |
| 20-1449R 16 | Filed By: American Municipal Power, Inc.<br>Filed Date: 6/18/2020<br>Accession No: 20200618-5180<br>Description: (doc-less) Motion to Intervene of American Municipal Power, Inc. under ER20-2046. | JA0105-JA0106 |
| 20-1449R 18 | Filed By: Old Dominion Electric Cooperative AMP Transmission, LLC<br>Filed Date: 6/18/2020<br>Accession No: 20200618-5187<br>Description: Motion to Dismiss Filing, Without Prejudice, and Suspend Procedural Schedule until Ruling on Motion to Dismiss, et al. of AMP Transmission, LLC and Old Dominion Electric Cooperative under ER20-2046. | JA0107-JA0117 |
| 20-1449R 35 | Filed By: Office of the People's Counsel for the District of Columbia<br>Filed Date: 7/2/2020<br>Accession No: 20200702-5254<br>Description: (doc-less) Motion to Intervene of Office of the People's Counsel for the District of Columbia under ER20-2046. | JA0118-JA0119 |

| | | |
|---|---|---|
| 20-1449R 52 | Filed By: Office of the People's Counsel for the District of Columbia Delaware Division of the Public Advocate Old Dominion Electric Cooperative<br>Filed Date: 7/6/2020<br>Accession No: 20200706-5234<br>Description: Interested Parties' Protest of PJM Transmission Owners Proposal and Comments in Support of the Joint Stakeholder Proposal under ER20-2046, et al. | JA0120-JA0140 |
| 20-1449R 53 | Filed By: New Jersey Board of Public Utilities<br>Filed Date: 7/6/2020<br>Accession No: 20200706-5235<br>Description: Protest of the Office of the New Jersey Board of Public Utilities to June 12, 2020 Attachment M-3 tariff filing under ER20-2046. | JA0141-JA0159 |
| 20-1449R 54 | Filed By: American Municipal Power, Inc., et al.<br>Filed Date: 7/6/2020<br>Accession No: 20200706-5236<br>Description: Joint Protest of the Load Group to June 12, 2020 Attachment M-3 tariff filing under ER20-2046. | JA0160-JA0211 |
| 20-1449R 55 | Filed By: LSP Transmission Holdings II, LLC<br>Filed Date: 7/6/2020<br>Accession No: 20200706-5238<br>Description: Protest of LSP Transmission Holdings II, LLC to June 12, 2020 Attachment M-3 tariff filing under ER20-2046. | JA0212-JA0305 |
| 20-1449R 59 | Filed By: FirstEnergy Companies, et al.<br>Filed Date: 7/21/2020<br>Accession No: 20200721-5166<br>Description: Answer of the PJM Transmission Owners to July 26, 2020 Protests and Comments, and Motion for Consolidation or Requests for Additional Procedures under ER20-2046. | JA0306-JA0369 |

2

| 20-1449R 64 | Filed By: LSP Transmission Holdings II, LLC<br>Filed Date: 7/30/2020<br>Accession No: 20200730-5057<br>Description: Motion for Leave to Answer and Limited Answer of LSP Transmission Holdings II, LLC to July 21, 2020 Answer by the Sponsoring Transmission Owners under ER20-2046. | JA0370-JA0385 |
| --- | --- | --- |
| 20-1449R 65 | Filed By: Old Dominion Electric Cooperative, et al.<br>Filed Date: 7/31/2020<br>Accession No: 20200731-5324<br>Description: Motion for Leave to Answer and Answer of the Load Group to July 21, 2020 Answer by the PJM Transmission Owners under ER20-2046. | JA0386-JA0419 |
| 20-1449R 69 | Issued By: Secretary of the Commission, FERC Commissioners & Immediate Staff (THE COMMISSION)<br>Filed Date: 8/11/2020<br>Accession No: 20200811-3078<br>Description: Order Accepting Proposed Tariff Revisions re PJM Interconnection, L.L.C. et al under ER20-2046. | JA0420-JA0456 |
| 20-1449R 71 | Filed By: American Municipal Power, Inc.<br>Filed Date: 9/10/2020<br>Accession No: 20200910-5284<br>Description: Request for Rehearing of the Protesting Parties of the August 11, 2020 Order under ER20-2046. | JA0457-JA0530 |
| 20-1449R 73 | Filed By: New Jersey Board of Public Utilities<br>Filed Date: 9/10/2020<br>Accession No: 20200910-5286<br>Description: Request for Rehearing of New Jersey Board of Public Utilities under ER20-2046. | JA0531-JA0551 |

| 20-1449R 75 | Issued By: Secretary of the Commission, FERC Filed Date: 10/13/2020 Accession No: 20201013-3048 Description: Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration re PJM Interconnection, L.L.C. et al under ER20-2046. | JA0552-JA0553 |
|---|---|---|
| 20-1449R 76 | Filed By: American Municipal Power, Inc., et al. Filed Date: 11/20/2020 Accession No: 20201120-5203 Description: Petition for Review filed in U.S. Court of Appeals for D.C. Circuit of American Municipal Power Inc., et al. under ER20-2046. (Case No. 20-1449) *Petition only, removed Disclosure Statement, Service List, and Exhibits | JA0554-JA0559 |
| 20-1449R 79 | Issued By: Secretary of the Commission, FERC Commissioners & Immediate Staff (THE COMMISSION) Filed Date: 12/17/2020 Accession No: 20201217-3044 Description: Order Addressing Arguments Raised on Rehearing re PJM Interconnection, L.L.C. et al. under ER20-2046. Commissioner Clements is not participating. | JA0560-JA0592 |
| 21-1090R 2 | Filed By: PJM Interconnection, L.L.C. Filed Date: 7/2/2020 Accession No: 20200702-5115 Description: PJM Interconnection, L.L.C. submits tariff filing per 35.13(a)(2)(iii): End of Life Joint Stakeholder Proposal Filing to be effective 1/1/2021 under ER20-2308. | JA0593-JA0871 |
| 21-1090R 8 | Filed By: Office of the People's Counsel for the District of Columbia Filed Date: 7/2/2020 Accession No: 20200702-5255 Description: (doc-less) Motion to Intervene of Office of the People's Counsel for the District of Columbia under ER20-2308. | JA0872-JA0873 |

4

| 21-1090R 10 | Filed By: PJM Interconnection, L.L.C.<br>Filed Date: 7/2/2020<br>Accession No: 20200702-5407<br>Description: Comments of PJM Interconnection, L.L.C. on the July 2, 2020 tariff filing of a proposal developed by the Joint Stakeholders under ER20-2308. | JA0874-JA0907 |
|---|---|---|
| 21-1090R 38 | Filed By: American Municipal Power, Inc.<br>Filed Date: 7/21/2020<br>Accession No: 20200721-5026<br>Description: (doc-less) Motion to Intervene of American Municipal Power, Inc. under ER20-2308. | JA0908-JA0909 |
| 21-1090R 40 | Filed By: FirstEnergy Transmission Companies<br>Filed Date: 7/21/2020<br>Accession No: 20200721-5159<br>Description: Motion of the Indicated Transmission Owners for Summary Rejection of July 2, 2020 PJM Interconnection, L.L.C. tariff filing under ER20-2308. | JA0910-JA1033 |
| 21-1090R 57 | Filed By: American Municipal Power, Inc., et al.<br>Filed Date: 7/23/2020<br>Accession No: 20200723-5148<br>Description: Comments of the Joint Stakeholders in Support of July 2, 2020 PJM Interconnection, L.L.C. tariff filing under ER20-2308. | JA1034-JA1106 |
| 21-1090R 61 | Filed By: LSP Transmission Holdings II, Central Transmission, LLC<br>Filed Date: 7/23/2020<br>Accession No: 20200723-5152<br>Description: Comments of LSP Transmission Holdings II, LLC and Central Transmission, LLC in Support of July 2, 2020 PJM Interconnection, L.L.C. tariff filing under ER20-2308. | JA1107-JA1220 |

5

| 21-1090R 63 | Filed By: LSP Transmission Holdings II, Central Transmission, LLC<br>Filed Date: 7/24/2020<br>Accession No: 20200724-5191<br>Description: Supplemental Exhibits to July 23, 2020 Comments of LSP Transmission Holdings II, LLC and Central Transmission, LLC in Support of July 2, 2020 PJM Interconnection, L.L.C. tariff filing under ER20-2308. | JA1221-JA1525 |
|---|---|---|
| 21-1090R 65 | Filed By: Joint Stakeholders<br>Filed Date: 8/4/2020<br>Accession No: 20200804-5271<br>Description: Answer of the Joint Stakeholders to July 21, 2020 Motion for Summary Rejection by the Indicated Transmission Owners under ER20-2308. | JA1526-JA1555 |
| 21-1090R 68 | Filed By: American Municipal Power, Inc., et al.<br>Filed Date: 8/11/2020<br>Accession No: 20200811-5144<br>Description: Answer of the Joint Stakeholders to July 23, 2020 Protest by the Indicated Transmission Owners under ER20-2308. | JA1556-JA1574 |
| 21-1090R 69 | Filed By: LSP Transmission Holdings II, Central Transmission, LLC<br>Filed Date: 8/17/2020<br>Accession No: 20200817-5256<br>Description: Motion to Answer and Answer of LSP Transmission Holdings II, LLC and Central Transmission, LLC to Protests and Comments under ER20-2308. | JA1575-JA1920 |
| 21-1090R 75 | Filed By: LSP Transmission Holdings II, Central Transmission, LLC<br>Filed Date: 11/23/2020<br>Accession No: 20201123-5155<br>Description: Supplemental Comments of LSP Transmission Holdings II, LLC, et. al. regarding PJM Members Committee Approved Section 205 Filing on Transmission End of Life Planning under ER20-2308. | JA1921-JA1939 |

6

| 21-1090R 77 | Issued By: Secretary of the Commission, FERC Commissioners & Immediate Staff (THE COMMISSION)<br>Filed Date: 12/17/2020<br>Accession No: 20201217-3117<br>Description: Order Rejecting Proposed Tariff Revisions re PJM Interconnection, L.L.C. under ER20-2308. Commissioner Clements is not participating. | JA1940-JA1969 |
| --- | --- | --- |
| 21-1090R 78 | Filed By: American Municipal Power, Inc., et al.<br>Filed Date: 1/19/2021<br>Accession No: 20210119-5239<br>Description: Request for Rehearing of the Joint Stakeholders re the December 17, 2020 Order under ER20-2308. | JA1970-JA2020 |
| 21-1090R 80 | Issued By: Secretary of the Commission, FERC<br>Filed Date: 2/19/2021<br>Accession No: 20210219-3009<br>Description: Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration re PJM Interconnection, L.L.C. under ER20-2308. | JA2021-JA2023 |
| 21-1090R 82 | Issued By: Secretary of the Commission, FERC Commissioners & Immediate Staff (THE COMMISSION)<br>Filed Date: 7/29/2021<br>Accession No: 20210729-3073<br>Description: Order Addressing Arguments Raised on Rehearing re<br>PJM Interconnection, L.L.C. under ER20-2308. Commissioner Chatterjee is not participating. Commissioner Danly and Commissioner Clements are concurring with a separate statement attached. | JA2024-JA2064 |
| 21-1090R 89 | Issued By: Secretary of the Commission, FERC<br>Filed Date: 09/30/2021 002<br>Accession No: 20210930-3023<br>Description: Notice of Denial of Rehearings By Operation of Law re PJM Interconnection, L.L.C. under ER20-2308. | JA2065-JA2067 |

| N/A.1 | PJM Operating Agreement<br><br>Sec. 1. – Definitions, M-N and S-T<br>Sec. 8<br>Sec. 10<br>Schedule 6 | JA2068-2151 |
|---|---|---|
| N/A.2 | PJM Tariff<br><br>Section I.1. – Definitions, R-S and T-U<br>Section 9<br>Schedule 12<br>Attachment H-1B<br>Attachment M-3 | 2152-2306 |
| N/A.3 | PJM Transmission Owners Agreement | JA2307-JA2489 |
| N/A.4 | PJM Order 1000 Compliance Filing, Docket No. ER13-198-000 (filed Oct. 25, 2012).<br>Cover Page<br>Page 3<br>Page 11 | JA2490-JA2492 |

8

# CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d) and the Court's Administrative

Order Regarding Electronic Case Filing, I hereby certify that I have, this 6th day of

September, 2022 served the foregoing upon the counsel listed in the Service

Preference Report via email through the Court's CM/ECF system.

Respectfully submitted,

*/s/ Christina R. Switzer*
Christina R. Switzer
Engleman Fallon, PLLC
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 464-1330
cswitzer@efenergylaw.com

Counsel for
LSP Transmission Holdings II, LLC
and Central Transmission, LLC

K&L GATES

Donald A Kaplan
don.kaplan@klgates.com
T +1 202 661 6266
F +1 202 778 9100

June 12, 2020

**VIA ELECTRONIC FILING**

Hon. Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Re:    **Amendments to Attachment M-3 to the PJM Interconnection, L.L.C. Open Access Transmission Tariff**
**Docket No. ER20-_____**

Dear Secretary Bose:

Pursuant to Section 205 of the Federal Power Act ("FPA"),[1] Section 35.13 of the Rules and Regulations of the Federal Energy Regulatory Commission ("Commission"), Section 9.1(a) of the PJM Interconnection, L.L.C. ("PJM") Open Access Transmission Tariff ("Tariff") and Attachment M-3 of the Tariff, the PJM Transmission Owners, acting through the PJM Consolidated Transmission Owners Agreement ("CTOA"),[2] respectfully submit for filing amendments to Attachment M-3 of the Tariff ("Proposed Revisions").[3]

---

[1] 16 U.S.C. § 824d(d) (2018).

[2] The amendments to the PJM Tariff described herein were authorized pursuant to the individual and weighted voting requirements in Section 8.5 of the CTOA on June 10, 2020. In addition, on May 7, 2020, pursuant to Section 9.1(b) of the PJM Tariff, the PJM Transmission Owners initiated consultation with PJM and with the PJM Members Committee by providing notice of the modifications proposed in this filing together with a draft of those modifications. That notice requested the submission of written comments by June 8, 2020. The PJM Transmission Owners also provided an overview of the modifications during a May 15, 2020 special session of the PJM Markets and Reliability Committee and held an open webinar for the PJM Members Committee on June 1, 2020.

[3] Pursuant to Order No. 714, this filing is submitted by PJM on behalf of the PJM Transmission Owners as part of an XML filing package that conforms with the Commission's regulations. PJM has

K&L GATES LLP
1601 K STREET NW   WASHINGTON   DC 20006
T +1 202 778 9000   F +1 202 778 9100   klgates.com

The Proposed Revisions will expand the scope of the Attachment M-3 from solely prescribing procedures governing the planning of Supplemental Projects in PJM to also (1) encompass certain PJM Transmission Owner asset management activities and projects despite the fact that they are not subject to the transmission planning requirements of Order No. 890[4] and (2) improve coordination between the Transmission Owners' planning for certain asset management projects to replace Transmission Facilities nearing the end of their useful lives ("EOL Need") with PJM's development of the Regional Transmission Expansion Plan under Schedule 6 of the PJM Operating Agreements ("RTEP Planning Process") when a single solution would address both the EOL Need and the need to plan for a Required Transmission Enhancement under the RTEP Planning Process.  The Proposed Revisions, explained in further detail below, will enhance transparency, enrich the opportunities for stakeholder input with respect to asset management activities and projects beyond any Commission requirements, and codify the Transmission Owners' coordination with PJM in its development of the RTEP.

The Transmission Owners respectfully request that the Commission allow for expeditious implementation of these transparency improvements as early as PJM's upcoming planning cycle as possible by accepting the Proposed Revisions without hearing, modification or condition, effective sixty (60) days from the date of this filing.  Acceptance within the 60-day period provided in Section 205(d) of the FPA and the Commission's regulations[5] is essential for PJM and the Transmission Owners to implement the additional requirements and procedures under the Proposed Revisions in time for the 2021 planning cycle that begins in the fall of this year.

## I.    EXECUTIVE SUMMARY

In Docket No. ER17-179, the Commission approved Attachment M-3 of the Tariff, which the Transmission Owners submitted pursuant to Section 205 of the FPA.[6]  Attachment

---

agreed to make all filings on behalf of the PJM Transmission Owners in order to retain administrative control over the PJM Tariff. Thus, the PJM Transmission Owners have requested PJM submit this Agreement in the eTariff system as part of PJM's electronic Intra PJM Tariff.

[4] *Preventing Undue Discrimination and Preference in Transmission System Service*, Order No. 890, FERC Stats. & Regs. ¶ 31,241 ("Order No. 890"), *order on reh'g*, Order No. 890-A, FERC Stats. & Regs. ¶ 31,261 (2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

[5] 18 C.F.R. § 35.3 (2019).

[6] *Monongahela Power Co.*, 162 FERC ¶ 61,129 (2018) ("Monongahela Power Co."), *order on rehearing and compliance*, 164 FERC ¶ 61,217 (2018) ("Monongahela Power Co. Rehearing Order"). The Commission accepted the Transmission Owners' submission of a revised Attachment M-3 in compliance with the Commission's conditions on September 26, 2018.  Monongahela Power Co. Rehearing Order.  The discussion of Attachment M-3 in this transmittal refers to the attachment, as the Commission accepted it in that order.

JA0002

M-3 sets forth the procedures that the Transmission Owners employ to plan Supplemental Projects, which are expansions and enhancements to the Transmission System that are not required to satisfy certain PJM regional planning criteria, in a manner that satisfies the requirements of Order No. 890 for openness and transparency. Such expansions and enhancements do not, however, represent all the planning activities the Transmission Owners undertake. Nor do transmission projects subject to the transmission planning requirements of Order No. 890 encompass all transmission investments that Transmission Owners must undertake.

In addition to planning Supplemental Projects, the Transmission Owners engage in asset management activities, which the Commission defines as "activities necessary to maintain a safe, reliable, and compliant grid, based on existing grid topology."[7] Each Transmission Owner's asset management activities include projects required to maintain, repair, or replace transmission facilities, including those approaching the end of their useful lives, in order to maintain the Transmission Owner's existing electric transmission system and meet regulatory compliance requirements. The Commission has found that these asset management activities are not subject to the transmission planning requirements of Order No. 890,[8] and the Transmission Owners retain responsibility under the CTOA for planning to address the needs driving these activities. However, with the Commission's acceptance of this filing, the Transmission Owners will plan certain asset management activities through the open and transparent Attachment M-3 planning procedures, providing greater transparency and the opportunity for stakeholder comment.

Specifically, the Proposed Revisions will improve planning coordination between Transmission Owners and PJM by significantly expanding the scope of the Attachment M-3 process to include asset management projects that affect PJM's modeling of the Transmission System, even though they do not expand the capability of the transmission system (and hence are not Supplemental Projects under the PJM Tariff).[9] Although the Commission has ruled that asset management activities and projects are not transmission planning subject to the requirements of Order No. 890, the Transmission Owners believe that it would be beneficial to enhance transparency and the opportunity for stakeholder comment with respect to the planning of these asset management projects. Rather than create wholly new planning procedures for these projects, the Transmission Owners are proposing to expand the scope of Attachment M-3's open and transparent planning process to provide for the review of planning for asset management project needs meeting the criteria discussed below. The

---

[7] Calif., Publ. Util. Com'n. v. Pacific Gas & Electric Co., 168 FERC ¶ 61,171, at P 7, n. 19 (2019) ("PGE Rehearing Order") denying reh'g of California Public Utilities Commission, et al. v. Pacific Gas & Electric Company, 164 FERC ¶ 61,161 (2018) ("PG&E Order"); Southern Calif.,Edison Co., 168 FERC ¶ 61,170, at P 7 n. 15 (2019) ("SCE Rehearing Order"), denying reh'g of Southern California Edison Co., 164 FERC ¶ 61,160 (2018) ("SCE Order") (together, the "California Orders").

[8] See SCE Order at P 33; PG&E Order at P 68.

[9] As discussed below, consistent with Commission precedent, an asset management project may result in an incidental increase in the capacity of the transmission system, but the purpose of such a project is not to increase capacity. See SCE Order at P 33; PG&E Order at P 68.

3

Proposed Revisions would expand an existing process that provides more opportunity for stakeholder input into the Transmission Owners' planning of asset management projects than the Commission has required, either in Order No. 890 or in orders addressing asset management activities and projects in other regions.

The Proposed Revisions also support the objectives constructively identified by PJM in a recent PJM stakeholder process for improved coordination of the Transmission Owners' planning for the replacement of transmission facilities approaching the end of their useful lives as part of their asset management activities and PJM's planning of the bulk electric system to satisfy regional criteria.  The Transmission Owners endorse the principles of PJM's proposal and, having the sole right to submit tariff language with respect to these asset management activities, have developed the Proposed Revisions so that the Transmission Owners' planning activities will support these objectives.  In particular, the Proposed Revisions require each Transmission Owner to present its criteria for assessing whether a need exists to replace an existing transmission facility for stakeholder input at least annually.  The Proposed Revisions also respond to PJM's request for non-binding forecasts of each Transmission Owner's anticipated transmission replacement needs so that PJM can use that information in its preparation of regional transmission expansion plans.  In addition, the Proposed Revisions recognize that PJM's regional expansion plan may identify solutions to regional planning needs that also address end of useful life needs identified by a Transmission Owner.  In such cases, the Transmission Owner will consider whether the regional solution obviates the need for an asset management project and, if it determines that the regional solution does not, present its conclusion to stakeholders through the Attachment M-3 process.[10]  The Proposed Revisions thus promote effective, coordinated planning among PJM and the Transmission Owners to identify cost-effective solutions both to regional and asset management needs.

Finally, the Proposed Revisions maintain and build on the existing allocation of planning responsibilities in the PJM governing documents by articulating the roles of PJM and the Transmission Owners in planning transmission projects in PJM.  They expand the successful Attachment M-3 process by improving transmission planning transparency and coordination.

The key elements of the Proposed Revisions are:

- The mandatory inclusion of asset management projects meeting certain criteria in the Attachment M-3 process to provide opportunities for stakeholder input;

---

[10] The Proposed Revisions' coordination provisions in Section (d) also apply to projects that PJM plans because a Transmission Owner has included end of useful life criteria in its Form No. 715. However, where a Transmission Owner has included end of useful life criteria in its Form No. 715, projects required to satisfy those criteria will continue to be planned through PJM's regional transmission planning process; the Proposed Revisions do not bring them into the Attachment M-3 process.

4

- A new mandatory requirement for Transmission Owners to document their respective end of useful life determination methodologies beyond levels required by the current Attachment M-3 process;

- A new mandatory requirement for Transmission Owners to provide a non-binding five-year forecast of end of useful life candidates to PJM; and

- A new process to ensure that end of useful life candidates that overlap with PJM Planning Criteria violations that qualify for the Order No. 1000 proposal window process will be posted to ensure efficient and cost-effective solutions in areas where there may be multiple system issues (violations and candidates).

For the reasons discussed below, the Transmission Owners respectfully urge the Commission to accept these Proposed Revisions to the PJM Tariff without hearing, modification or condition, and allow these new transparency and coordination measures to become effective in sixty (60) days so that they can be fully implemented in time for the imminent PJM planning cycle that begins this fall.

## II.    BACKGROUND

As noted above, the Proposed Revisions bring into the Attachment M-3 planning process certain Transmission Owner asset management projects and establish procedures for the coordination of PJM planning with Transmission Owner end of useful life asset management activities.  These improvements bring greater transparency and enhance stakeholder input into two areas that, as discussed below, have been reserved to the Transmission Owners.  They are also consistent with PJM's objectives in the recently concluded stakeholder process.

### A.    Asset Management and End of Useful Life

The transmission system consists of thousands of components, such as circuit breakers, transformers, switches, communication systems, filters, and other equipment necessary for operations that must be periodically replaced due to wear and tear or upgraded because of obsolescence.  Asset management activities and projects include, but are not limited to:  (i) maintenance, repair and replacement activities, including but not limited to capital additions; (ii) work on infrastructure at the end of its useful life; (iii) work to satisfy compliance requirements; (iv) infrastructure security; (v) system reliability and automation; (vi) information technology; (vii) work requested by others (including generator interconnection); and (viii) increases in transmission capacity that are incidental to, and not reasonably severable from, the asset management project or activity.[11]  Addressing a

---

[11] *See* SCE Order at P 31, n. 55, SCE Rehearing Order at P 7, n. 15; PG&E Order at P 65, n. 119; PGE Rehearing Order at P7, n. 19.

transmission facility as it nears the end of its useful life is a subset of asset management activities.[12]

The concept of utility asset management takes its cue from the world of finance, particularly with respect to risk and the predictability of future performance. Fundamentally, asset management is a strategy that seeks to balance performance, cost and risk. Transmission Owners, as the asset owners, bear both the liability and responsibility for maintaining their assets and maintaining reliability.

The Commission has held that Order No. 890 does not apply to asset management activities and projects, including "work on infrastructure at the end of its useful life," because Order No. 890 was adopted to remedy opportunities for undue discrimination in the *expansion* of the transmission grid.[13] And, to the extent a transmission owner's asset management activities and projects do not expand the transmission system, they do not fall within the scope of Order No. 890. In addition, the Commission recognized that there may be instances in which a transmission owner's asset management activity or project may result in an incidental increase in transmission capacity that is not reasonably severable from the asset management activity or project, *e.g.,* advancements in technology of replaced equipment and changes in design and industry standards.[14] However, such an incidental increase would not render the asset management activity or project a transmission expansion subject to Order No. 890.

The line the Commission drew in the California Orders between planning for projects to expand the transmission grid and asset management activities that do not expand the grid's capacity (or do so only incidentally) parallels the division of planning responsibility between PJM and the Transmission Owners. As discussed briefly below, PJM is responsible for the preparation of regional plans for the enhancement and expansion of the transmission system as necessary to ensure compliance with certain regional standards. Transmission expansions and enhancements required for other reasons remain the responsibility of the individual Transmission Owners. As the Commission has recognized, such expansions and enhancements are referred to in PJM as Supplemental Projects.[15] Asset management activities and projects that do not expand the grid or do so only incidentally are also the responsibility of the individual Transmission Owners, but, as the Commission has recognized, they are not the same as Supplemental Projects, as defined in the PJM Operating

---

[12] SCE Order at P 33; PG&E Order at P 68.

[13] SCE Order at PP 31-32; PG&E Order at PP 66-67.

[14] SCE Order at P 33; PG&E Order at P 68.

[15] PG&E Rehearing Order at P 58 ("PJM defines a Supplemental Project as a *transmission expansion or enhancement* . . . .") (Emphasis in the original); *see also id.* at P 59 ("This language shows that activities that expand the grid are an element of the definition of Supplemental Projects").

Agreement.[16]  Accordingly asset management activities are not within the current scope of the planning procedures set forth in Attachment M-3, which apply only to Supplemental Projects.

### B.     Allocation of Planning Authority and Responsibilities in PJM

Although they predated Order No. 890 and the California Orders, PJM's founding agreements, as approved by the Commission in 1997,[17] reflected the same distinction between asset management and expansion planning responsibility described in those seminal orders.  As part of the package of governing agreements creating PJM as the independent system operator, although not required by Order No. 888,[18] the Transmission Owners delegated to PJM the responsibility to prepare the Regional Transmission Expansion Plan ("RTEP") to plan for the "enhancement and expansion" of the PJM Transmission System.[19] This delegation was also incorporated into the original version of the PJM Regional Transmission Expansion Planning Protocol.[20]  PJM's responsibility was to plan for the expansion of Transmission Facilities as necessary to comply with applicable reliability principles, guidelines and standards.[21]  The focus of PJM's role on planning for the expansion of the transmission system it operates was confirmed in 2006, when PJM became a party to the CTOA, under provisions that remain in force today.[22]  In the CTOA, Transmission

---

[16] See SCE Order at P 33; PG&E Order at P 68; Amended and Restated Operating Agreement of PJM Interconnection, L.L.C., Rate Schedule No. 24 ("Operating Agreement"), § 1, OA Definitions – S – T.

[17] PJM Interconnection, L.L.C., 81 FERC ¶ 61,257 (1997) ("November 1997 Order").

[18] See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities, Order No. 888, 61 Fed. Reg. 21,540, 21,595-97 (1996), FERC Stats. & Regs., Regulations Preambles January 1991-June 1996 ¶ 31,036 (1996), order on reh''g, Order No. 888-A, 62 Fed. Reg. 12,274 (1997), FERC Stats. & Regs. ¶ 31,048 (1997), order on reh''g, Order No. 888-B, 62 Fed. Reg. 64,688 (1997), 81 FERC Stats. & Regs. ¶ 61,248 (1997); see also Order No. 888 at 21,596 (ISO Principle 4) ("An ISO may also have a role with respect to reliability planning.").

[19] November 1997 Order at 62,236; see Atlantic City Electric Company, et al., Filing of the PJM Supporting Companies ("Supporting Companies Filing"), Docket No. ER97-3189, et al. at Attachment F, Transmission Owners Agreement dated as of June 2, 1997 ("Original TOA") at § 2.3.7 (filed June 2, 1997).

[20] November 1997 Order at 62,266, 62,275; Supporting Companies Filing, Amended and Restated Operating Agreement Of PJM Interconnection, L.L.C., Schedule 6 ("Original Schedule 6"), § 1.1 ("This Regional Transmission Expansion Planning Protocol shall govern the process by which the Members shall rely upon the Office of the Interconnection to prepare a plan for the enhancement and expansion of the Transmission Facilities in order to meet the demands for firm transmission service in the PJM Control Area.").

[21] Original Schedule 6, § 1.2.

[22] As PJM expanded beyond its original Mid-Atlantic transmission owners, the separate agreements among different groups of transmission owners were superseded by the CTOA, which explicitly retained the Transmission Owners' rights under the superseded agreements and, with Commission's

7

Owners only agreed to transfer to PJM the responsibility to prepare a "Regional Transmission Expansion Plan." Similarly, PJM agreed to "[c]onduct its planning *for the expansion and enhancement of transmission facilities*."[23]

Thus, the Transmission Owners retained responsibility for planning and constructing their own facilities, including expansions not delegated to PJM. Each agreed to operate and maintain its Transmission Facilities in accordance with applicable reliability standards and Good Utility Practice,[24] retaining "the right to build, acquire, sell, dispose, retire, merge or otherwise transfer or convey all or any part of its assets, including any Transmission Facilities . . . ."[25] The Transmission Owners retained these rights and responsibilities in the CTOA, including the responsibility to "physically operate and maintain all Transmission facilities that it owns," the right to "build, finance, own [and] retire . . . all or any part of its assets, including Transmission Facilities,"[26] and all "[r]ights not specifically transferred . . . to PJM pursuant to [the CTOA] or any other agreement . . . ."[27] Thus, from the very inception of PJM's existence as an entity distinct from the Transmission Owners, its role in transmission planning was to focus on expanding the PJM Transmission System[28] while the Transmission Owners' role was to address the needs unique to their Transmission Zones and to maintain and build their transmission facilities.[29]

---

encouragement, made PJM a party to the superseding agreement. *See PJM South Order,* 109 FERC ¶ 61,012 at P 24 (2004). In approving the CTOA, the Commission noted, "As a general matter, we agree that the Consolidated TO Agreement largely tracks the [superseded] Agreements and will be beneficial to all market participants to the extent it provides a single articulation of the parties' respective rights and obligations." *PJM Interconnection L.L.C. and the PJM Transmission Owners*, 114 FERC ¶ 61, 283, at P 10 (2006). *See also* CTOA, § 9.22.

[23] *Id*. § 6.3.4. (Emphasis added).

[24] Original TOA, §§ 2.3.3, 4.5.

[25] *Id.* § 2.2.3. This right under the Original TOA was to be maintained, "[n]otwithstanding any other provision of [the Original TOA], or any other agreement or amendment made in connection with the restructuring of PJM . . . .". *Id.* at § 2.2. It was also reflected in the Original Schedule 6, which stated, "[The RTEP] shall . . . (iii) take into account the legal and contractual rights and obligations of the Transmission Owners;" Original Schedule 6, § 1.4(d)(iii). This provision has been retained in the in the current version of Schedule 6. *See* Operating Agreement, Schedule 6, § 1.4(d)(iii).

[26] CTOA, § 5.2.

[27] CTOA, § 5.6.

[28] PJM's planning responsibility for reliability projects was subsequently expanded in compliance with Order No. 2000 to include reduction of congestion, *see PJM Interconnection, LLC,* 109 FERC ¶ 61,067 at PP 48-52, 59-62 (2004), *order on rehearing and compliance filing,* 110 FERC ¶ 61, 377 at PP 14-19 (2005) and public policy, *see PJM Interconnection, L.L.C.,* 147 FERC ¶ 61,128 at PP 66-71 (2014)(Order on Rehearing and Compliance).

[29] In an appeal from the November 1997 Order, the court of appeals ruled that when the Transmission Owners joined PJM "there was no transfer of ownership or even physical operation of their

The Transmission Owners' retention of planning responsibility for expansions and enhancements beyond those delegated to PJM was confirmed when the Commission approved the addition of Attachment M-3 to the Tariff. In response to an Order to Show Cause regarding the Transmission Owners' compliance with Order No 890,[30] the Transmission Owners and PJM jointly submitted Attachment M-3 to provide additional detail regarding the Transmission Owners' process for planning Supplemental Projects, including a minimum of three public stakeholder meetings (an Assumptions Meeting, a Needs Meeting, and a Proposed Solutions Meeting), as well as an opportunity to submit comments on Supplemental Projects included in the Local Plan. Rejecting various arguments that challenged the Transmission Owners' rights to plan Supplemental Projects, the Commission ruled that the Transmission Owners retain responsibility for planning Supplemental Projects, and therefore retain the filing rights to make modifications to the Supplemental Project planning provisions in the Tariff.[31] On rehearing, the Commission explained that under Order No. 890, transmission owners participating in an RTO are not required to have the RTO perform all planning for local or Supplemental Projects.[32] The Commission concluded:

> Unlike the RTEP transmission projects, for which the PJM Transmission Owners have ceded planning to PJM as part of establishing an RTO, the PJM Transmission Owners remain responsible for planning Supplemental Projects, and we find that it is just and reasonable for the PJM Transmission Owners to establish the process for planning these transmission projects and to initiate under section 205 any proposed revisions.[33]

### C.     PJM Proposal

In response to recent stakeholder processes in PJM to address planning for the replacement of Transmission Facilities approaching the end of their useful lives, PJM developed a proposal, endorsed by its Board of Managers, to better coordinate end of useful life planning with PJM planning under Schedule 6 of the Operating Agreement.[34] The principal features of the PJM proposal were the submission to PJM by each Transmission Owner, a five-year projection of end of useful life planning needs, on a confidential basis to

---

facilities . . . [and] each of the [transmission owners] retained both ownership and physical control of their facilities[.]" *Atlantic City Electric Co., v. FERC*, 295 F.3d 1, 6 (D.C. Cir. 2002).

[30] *Monongahela Power Co., et al.,* 156 FERC ¶ 61,134 (2016) ("Show Cause Order").

[31] Monongahela Power Co. at PP 96-97.

[32] Monongahela Power Co. Rehearing Order at P 13.

[33] *Id.* at P 14. *See also Appalachian Power Company, et al*, 170 FERC ¶ 61,196, at PP 57-59 (2020) (affirming the Transmission Owners' right to add planning procedures for a subset of Supplemental Projects (*i.e.,* CIP-014 Mitigation Projects) as Attachment M-4 to the PJM Tariff).

[34] *See* Markets and Reliability Committee, PJM EOL Planning Package, May 28, 2020 at 35, attached as Exhibit E. Exhibit E incorporated PJM's earlier presentation to a special session of the Markets and Reliability Committee on April 17, 2020.

maintain the security of such information,[35] and the formulation of a process allowing PJM to plan transmission projects where a single project might more efficiently and cost-effectively address both PJM planning criteria needs and a Transmission Owner's end of useful life needs. As described by PJM, among the benefits of its proposal are that it reinforces PJM's role as the regional planner while respecting both the authority granted PJM as part of the CTOA and Commission precedent regarding asset management projects and activities, enhances system reliability and transparency by requiring an annual presentation of a Transmission Owners' end-of-useful life program and posting of end-of-useful-life needs that interact with RTEP violations and promotes competition by identifying potential broader regional solutions where end-of-useful-life needs interact with RTEP violations.[36] As described below, the elements of the PJM Proposal implicating the Transmission Owners' asset management activities are effectively incorporated into the Proposed Revisions at section (d).

In the course of presenting its solution package in these stakeholder proceedings, PJM explicitly recognized the rights and responsibilities of the Transmission Owners to plan asset management projects and advised stakeholders that "to the extent that [a competing proposal by some stakeholders] is proposing to require that all proposed EOL facilities are planned for by PJM through its RTEP process, such authority was not transferred to PJM under the CTOA."[37] Although noting that under CTOA, Section 4.1.4, the Transmission Owners explicitly transferred to PJM the responsibility to prepare an RTEP and the authority to reasonably request from the Transmission Owners information needed by PJM to prepare the RTEP, PJM concluded that Transmission Owners did not transfer to PJM the decision to retire Transmission Owners' transmission facilities, citing CTOA, Sections 5.2 and 5.6. It was thus PJM's position that, based on CTOA, Section 5.2, "PJM does not have planning authority over the Transmission Owners EOL program/process . . . ."[38]

The PJM Board confirmed this position in a letter to stakeholders dated May 27, 2020. In that letter, the Board noted that the PJM Package takes a reasonable approach because, among other things, it respects the authorities defined within the governing documents.[39] The May 27, 2020 Board Letter attached a thorough analysis of PJM's and the Transmission Owners' responsibilities for planning under PJM's governing documents and the California Orders. That analysis concluded that "[i]mportantly, FERC determined that asset management activities are not 'planning' so long as any capacity increase is only

---

[35] *See* Operating Agreement, Schedule 6, § 1.5.4(e).

[36] *See* Exhibit E at 6, 8.

[37] *See* Exhibit E at 35.

[38] Id.

[39] Letter from Dean Oskvig, Chair-Board Reliability & Security Committee, PJM Board of Managers to the Jolene M. Harris, President/CEO, American Municipal Power, Inc. and others, dated May 27, 2020 ("May 27, 2020 PJM Board Letter"). This letter is included as Exhibit D to this filing.

incidental to the replacement project."[40]  The PJM Board's position has been consistent throughout the stakeholder end of life processes.  In fact, a letter dated October 4, 2019, the PJM Board acknowledged that "PJM does not have the authority or expertise to assume responsibility for asset management decisions or to determine when a facility is at the end of its useful life or otherwise needs to be replaced.  Those decisions are the sole responsibility of the Transmission Owner."[41]

The Proposed Revisions will support the objectives PJM identified in the stakeholder process in a manner consistent with PJM's governing documents and Commission precedent.

## III.    OVERVIEW OF THE CHANGES

The Proposed Revisions, if approved by the Commission, would achieve two important goals.  First, they would expand the scope of the Transmission Owners' Attachment M-3 planning procedures to asset management projects that affect PJM's modeling of the transmission system, which will enhance transparency and the opportunity for stakeholder review of these projects.[42]

Second, the Proposed Revisions would better coordinate the Transmission Owners' end of useful life asset management activities with PJM's planning to address RTEP planning criteria.  In support of that goal, the Proposed Revisions increase transparency regarding the process that Transmission Owners use to evaluate the need to replace Transmission Facilities and provide PJM, for the first time (on a confidential basis), up to five years of projected replacements that a Transmission Owner has identified.  This second goal would implement through the PJM Tariff those elements of the PJM Package that were developed during the recently concluded PJM stakeholder process.

### A.      Section (a) - PJM Transmission Owner Planning Responsibilities.

The Proposed Revisions will expand the scope of Attachment M-3 to include transmission projects that are not required to be planned through an Order No. 890-compliant transmission planning process.  As the preamble to Section (a) of the Proposed Revisions states, the process set out in Attachment M-3 would include certain asset management projects and all Supplemental Projects.  As discussed above, under the Commission's California Orders, asset management projects are not subject to Order No. 890.[43]  Thus, the Proposed Revisions would codify in the PJM Tariff a significant expansion of stakeholder

---

[40] Exhibit D at 7.  *See id.*  ("While there may be a desire to broaden the category of projects under PJM's authority by creating a new category of projects and thus effectively amending the definition of Supplemental Projects, such an amendment is beyond the scope of the authority transferred to PJM by the PJM Transmission Owners.")

[41] Letter from Dean Oskvig, Chair-Board Reliability Committee, PJM Board of Managers to the PJM Members Committee, dated October 4, 2019.  This letter is included as Exhibit C to this filing.

[42] *See infra* at Section III.B, discussing the definition of "Attachment M-3 Project."

[43] *See supra,* Section II.A.

11

involvement in Transmission Facility replacement that even exceeds the Southern California Edison procedures approved by the Commission in the California Orders.[44]

Supplemental Projects are already covered by Attachment M-3.  However, the definition of Supplemental Project in the Operating Agreement is defined in the negative, generally referring to transmission enhancement or expansions not falling within categories of transmission planning under Schedule 6 of the Operating Agreement.  To implement the expansion of Attachment M-3 to cover Transmission Owner planning not transferred to PJM, it is necessary to articulate precisely the complementary planning roles of PJM and the Transmission Owners.  Section (a) of the Proposed Revisions provides that articulation.  Section (a) memorializes the planning responsibilities transferred to PJM under the CTOA and its predecessor Transmission Owners Agreements.  Four broad categories of planning have been transferred to PJM:  (1) NERC issued or approved reliability criteria, including operational performance (section (a)(1));[45] (2) individual transmission owner planning criteria filed in FERC Form No. 715 (section (a)(2));[46] (3) criteria to address economic constraints under Schedule 6 of the Operating Agreement and the PJM-MISO Joint Operating Agreement (section (a)(3));[47] and (4) planning for public policy projects as specified in Schedule 6 (section (a)(4)).

Section (a) recognizes that PJM's planning to meet these needs could result in its identification of an expansion or enhancement that could more efficiently and cost-effectively address both a PJM planning criterion and a need to replace an existing Transmission Facility nearing the end of its useful life.  This category implements the transmission planning coordination goal of the Proposed Revisions and will be discussed in detail below in section D.2.

**B.     Section (b) - Definitions**

Section (b) includes definitions used in the Attachment M-3 Amendments.  The definitions address, among other things, the type of asset management project that will be

---

[44] *See* SCE Order at PP 39-40.  For example, under the Southern California Edison procedures, Southern California Edison holds only one meeting with stakeholders to discuss asset management projects.  Attachment M-3 provides for a minimum of three public stakeholder meetings: (1) an Assumptions Meeting; (2) a Needs Meeting; and (3) a Proposed Solutions Meeting.

[45] *See* Operating Agreement, § 1.2.

[46] *See* Operating Agreement, § 1.2(e).

[47] *See* Operating Agreement, Schedule 6, § 1.5.7; Coordinated System Plan Periodically Developed Pursuant to the Joint Operating Agreement Between the Midwest Independent Transmission System Operator, Inc. and PJM Interconnection, L.L.C. ("PJM-MISO JOA") at § 9.3.7.2(c).  Schedule 12 – Appendix B lists interregional joint planning and coordination agreements between PJM and neighboring regions.  Although joint planning to address economic constraints has only taken place under the PJM-MISO JOA, the language of the Proposed Revisions has been drafted to account for the possibility that such joint planning could take place under other interregional agreements.  Joint planning between PJM and another region to address reliability issues is covered under section (a)(1).

subject to the Attachment M-3 planning procedures under section (c) and the transmission replacement needs that will be addressed by the coordinated planning procedures described in section (d). Following is a description of each of the definitions to be added by the Proposed Revisions.

### 1. *"Asset Management Project"*

"Asset Management Project" describes the range of planning activities undertaken by Transmission Owners to maintain and repair their systems, including replacing Transmission Facilities, as necessary, where the project as planned does not result in more than an Incidental Increase in transmission capacity. The definition encompasses the scope of activities described by the Commission in the California Orders.[48]

### 2. *"Attachment M-3 Project"*

"Attachment M-3 Project" is defined to include both Supplemental Projects and certain Asset Management Projects that would become subject to Attachment M-3 planning. Since Asset Management Projects could range from transmission line replacements to repairs of transmission towers, to individual component replacements such as transmission towers or substation equipment, in order to utilize the Attachment M-3 process efficiently, only Asset Management Projects that affect PJM's modeling of the Transmission System are included within the definition of Attachment M-3 Project. In engineering terms, this includes projects that affect the connectivity of Transmission Facilities or significantly affect Transmission Facility ratings or impedance. Asset Management Project needs that meet any of these criteria will be subject to the Attachment M-3 planning process. To the extent that the Transmission Owners have utilized the current Attachment M-3 process to solicit stakeholder input on Asset Management Projects, this definition conforms to the current practices.

The definition of "Attachment M-3 Project" also includes "any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 under any of clauses (1) through (5) of section (a)." This additional clause is intended to ensure that Order No. 890 compliant planning procedures under Attachment M-3 extend to any need to expand or enhance Transmission Facilities not delegated to PJM planning under Schedule 6 of the Operating Agreement. Finally, the definition of "Attachment M-3 Project" clarifies that Attachment M-3 planning does not apply to projects to address planning criteria filed by a Transmission Owners in Form No. 715. These are planned by PJM under Schedule 6 of the Operating Agreement.[49]

---

[48] SCE Order at PP 30-32 and n. 55; PG&E Order at PP 66-68 and n. 119.

[49] Operating Agreement, Schedule 6, § 1.2(e).

(Page 23 of Total)                                                                                    JA0013

### 3.    *"Incidental Increase"*

The definition of "Incidental Increase" is based on the description used by the Commission in the California Orders.[50]

### 4.    *"Transmission Facilities"*

"Transmission Facilities" are defined in the CTOA, section 1.27.  It covers all transmission facilities as defined in the Commission's Uniform System of Accounts that have been integrated into the planning and operation of PJM to serve the power and transmission customers within the PJM Region.  This existing definition is used in defining the scope of the Proposed Revisions, including the extension of Attachment M-3 planning procedures to Asset Management Projects.

### 5.    *"EOL Need"*

"EOL Need" is defined to include a whole transmission line operating at or above 100 kV and a transformer, the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities.  This definition is used to identify the universe of projected Transmission Facility replacement needs that the Transmission Owners will identify to PJM and that would be eligible for PJM planning when a single project could address the EOL Need as well as PJM Planning Criteria Need(s).  This definition should cover the vast majority of potential Transmission Facility replacement needs that could reasonably benefit from such coordinated planning.  It is designed to exclude normal maintenance and repair, such as replacement of several poles or towers, but include the reconstruction of a whole transmission line.  The 100 kV threshold is also consistent with the generally accepted definition of the Bulk Electric System.[51]

### 6.    *"Candidate EOL Needs List"*

"Candidate EOL Needs List" is the list of projected EOL Needs provided to PJM under section (d)(1)(iii).  The Candidate EOL Needs List will be discussed in detail below.[52]

### 7.    *"Form No. 715 EOL Planning Criteria"*

"Form No. 715 EOL Planning Criteria" recognizes that some Transmission Owners have included EOL Need planning criteria in their FERC Form No. 715.  This definition is used in Section (d) to extend the additional coordination procedures specified in that section to such needs.  It does not in any way change PJM planning responsibility for Form No. 715

---

[50] SCE Order at P 33; PG&E Order at P 68.

[51] NERC Rules of Procedure, App. 5B, Statement of Compliance Registry Criteria § I (Oct. 31, 2016), https://www.nerc.com/FilingsOrders/us/RuleOfProcedureDL/Appendix_5B_RegistrationCriteria_20161031.pdf.

[52] *See infra,* Section III.D.1.

(Page 24 of Total)

projects.[53]  In addition, this section clarifies that Transmission Owners shall not be required to file Form No. 715 EOL Planning Criteria other than as required by Commission regulations generally applicable to Form No. 715.

### 8.    *"Attachment M-3 EOL Planning Criteria"*

"Attachment M-3 EOL Planning Criteria" are PJM Transmission Owner planning criteria to address EOL Needs.  This definition is used in section (d) to require Transmission Owners to articulate and identify the planning criteria they use to address EOL Needs to be presented at the annual Assumptions Meeting along with other planning criteria, models and assumptions used in Attachment M-3 Project planning.[54]

### 9.    *"PJM Planning Criteria Need"*

"PJM Planning Criteria Need" is any one of the PJM planning needs specified in section (a), clauses (1) through (4).  This would include both reliability and economic projects planned by PJM.  This definition is used in section (d) in connection with the determination of an overlap between of a PJM Planning Criteria Need and an EOL Need.

### 10.    *"RTEP Planning Process"*

"RTEP Planning Process" is the planning process to develop the RTEP under Schedule 6 of the Operating Agreement.  This term is used in connection with what happens under section (d)(2)(ii) when PJM determines under the RTEP Planning Process that an RTEP Project would more efficiently and cost-effectively address the identified PJM Planning Criteria Need and may, as well, address the projected confirmed EOL Need.

### C.    Section (c) - Procedure for Review of Attachment M-3 Projects

Section (c) is identical to Sections 1 to 7 of the current text of Attachment M-3 with four changes.  These changes either expand or clarify the scope of the original seven sections of Attachment M-3, but in no way alter the Order No. 890-compliant planning procedures already approved by the Commission.

The first and most significant change, as noted above, is the extension of the Attachment M-3 process to certain Asset Management Projects.  This is accomplished by substituting the defined term, "Attachment M-3 Project," for "Supplemental Project" everywhere the latter is used in Section (c).  As noted above, an Attachment M-3 Project includes Supplemental Projects, any other project need to expand or enhance the Transmission System for which the Transmission Owners have not transferred planning responsibility to PJM, and Asset Management Projects that affect PJM's modeling of the

---

[53] *See* Operating Agreement, Schedule 6, § 1.2(e).

[54] *See* Tariff, Attachment M-3, § 2.  Under the Proposed Revisions, this section is essentially unchanged and renumbered as § (c)(2).

Transmission System.[55]  This last category would include projects to address needs to replace transmission lines and transmission level transformers.[56]  While several Transmission Owners have been presenting such projects at the Subregional RTEP Committees and the Transmission Expansion Advisory Committee ("TEAC"), this change would require all qualifying asset management needs and solutions to be presented at the relevant committee for stakeholder input.

The second change codifies the existing practice of presenting Supplemental Project needs for facilities operating at 200 kV and above to the TEAC, rather than the Subregional RTEP Committees.  The TEAC reviews both RTEP and Supplemental Project needs where the solution is likely to operate at 200 kV and above.  Thus, under the existing text of Attachment M-3, when the TEAC is reviewing a Supplemental Project need it is in effect acting as the relevant Subregional RTEP Committee.  Section (c)(1) codifies this practice by stating that when the TEAC considers an Attachment M-3 Project need, the TEAC is subject to the requirements of Attachment M-3.

The third change clarifies the procedure for submission of comments on Solutions to be included in the Local Plan.  The existing text of Attachment M-3 specified the period of time that Transmission Owners must consider Stakeholder comments on the Solutions to be included in the Local Plan, but did not specify how Stakeholders would know that Solutions have been selected, thus initiating their opportunity to comment on those Solutions.  A sentence has been added to Section (c)(5) providing for the posting of the selected Solutions which begins a comment period of at least ten days, following which the PJM Transmission Owner will begin the ten day period of consideration of any comments received on the Solutions as specified in the current language of Attachment M-3.  This clarification is consistent with the structure of the existing Attachment M-3 provisions as well as current practice under Attachment M-3.

The fourth change is the addition of a provision to Section (c)(7) acknowledging that a PJM Transmission Owner is free to use the Attachment M-3 process for Asset Management Project needs that are not subject to Attachment M-3, but which the PJM Transmission Owner believes would benefit from consideration through its processes.  For example, a Transmission Owner may seek stakeholder input regarding an Asset Management Project need that would not affect PJM's modeling of the Transmission System.  This addition is comparable to the existing provision in section (c)(7) acknowledging a PJM Transmission Owner's ability to conduct additional meetings or communications with Stakeholders regarding Attachment M-3 Projects in addition to those provided for in Attachment M-3, as several Transmission Owners currently do.

---

[55] *See supra,* Section III.B.2.

[56] *See supra,* Section III.B.5.

### D.     Section (d) - EOL Planning Documentation and Coordination.

Section (d) describes additional procedures applicable to planning to address EOL Needs and the coordination with PJM planning when PJM identifies a potential overlap between a PJM planning need and a need to address a Transmission Facility nearing the end of its useful life.  This section effectively implements proposals in the PJM Package to address end of useful life planning presented in the recent stakeholder process.[57]

#### 1.     *End of Useful Life Documentation*

Section (d)(1) requires that each Transmission Owner document its criteria for assessing whether a need exists to replace an existing Transmission Facility (section (d)(1)(i)) and that such planning criteria be presented at least annually (section (d)(1)(ii)).[58]  While several Transmission Owners have documented these criteria and presented them during the Annual Assumptions meeting, Section (d)(1) would make this requirement universal.  Importantly, there is no requirement—and there can be no requirement—of uniformity among the Transmission Owners in the adoption and documentation of end of useful life criteria.  Each Transmission Owner transmission system is different.  While all Transmission Owners must operate and maintain their systems in accordance with Good Utility Practice and reliability principles,[59] that does not require a single set of specifications or technical implementation.  Rather, each Transmission Owner's system reflects differing customer requirements, engineering approaches and decisions, technical standards, economic judgments, risk assessments and prioritizations, local needs, operating conditions, system designs and topologies that have driven its development over time.

Although each Transmission Owner will be required to disclose and explain the criteria it employs, it is important to remember, as the name "Asset Management" implies, that decisions to replace transmission facilities involve the use of judgment with respect to performance, physical condition, and risk of failure, as well as maximizing the efficient deployment of human and capital resources.  While the objective factors that go into those decisions can be documented and explained, the judgmental factors are not readily capable of replication.  As Order No. 890 recognizes, ultimately planning decisions are the responsibility of the entities that bear the risks and costs.  An Order No. 890-compliant planning process is not one in which planning decisions are shared with stakeholders, rather it is one in which stakeholders have a meaningful opportunity to provide input into those decisions.[60]

Section (d)(1)(iii) requires each PJM Transmission Owner to provide to PJM annually an updated "Candidate EOL Needs List" which is a five-year non-binding projection of its

---

[57] *See supra,* Section II.C

[58] For Transmission Owners who address EOL Needs through the Attachment M-3 process, the criteria could be presented at the annual Assumptions Meeting.  *See* Proposed Revisions, Section C.2.

[59] CTOA, § 4.5.

[60] *See* Order No. 890 at P 454; Order No. 890-A at P 188.

EOL Needs identified under its documented Attachment M-3 EOL Planning Criteria. Projections up to five years into the future as to when specific facilities may need replacement are, as discussed above, based on judgment weighing numerous factors, and are inherently subject to change. For example, successful maintenance and repair could extend the lives of facilities, while weather and other factors could shorten them. Thus, the Candidate EOL Needs List needs to be non-binding since conditions could change and an EOL Need could be accelerated or postponed, or even drop off the list. Accordingly, any projection of future needs to replace Transmission Facilities is proprietary and must remain highly confidential. Thus, disclosure of the Candidate EOL Needs List is limited to PJM. The only exception to this limitation is the need to disclose a projected EOL Need in connection with the planning to address an identified overlap between the projected EOL Need and a PJM Planning Criteria Need under the RTEP Planning Process under section (d)(2) of the Proposed Revisions.

During the stakeholder consultation process with respect to the Proposed Revisions, a concern was raised regarding state regulatory commission access to projected Transmission Owner identified EOL Needs included in the Candidate EOL Need List. While section (d)(1)(iii) obligates PJM to maintain the confidentiality of the Candidate EOL Needs List, nothing in the Proposed Revisions is intended to govern or regulate the availability of information to state regulatory commissions or other state regulators. Thus, state regulators are not prohibited from requesting, nor is a Transmission Owner prohibited from providing its projected EOL Needs to its state commission or other governmental agencies with responsibilities in the area in which the projected EOL Needs exist. Of course, any such disclosure would be subject to any conditions and limitations applicable to such agency or agreed to between such agency and the relevant Transmission Owner.

### 2.      *Coordination of EOL Needs and RTEP Project Planning*

Section (d)(2) sets forth the procedures for coordinating PJM planning under Schedule 6 of the Operating Agreement with Transmission Owner planning to address end of useful life issues. The process begins with PJM engaging in its normal planning activity to identify and then validate, for example, reliability violations or economic projects to reduce congestion, as defined in the Proposed Revisions, "PJM Planning Criteria Needs." Under the Proposed Revisions, PJM would then be able to examine the Transmission Owners' Candidate EOL Needs Lists and, after confirming with the Transmission Owner that the EOL Need still exists,[61] make an initial determination whether an overlap exists between the identified PJM Planning Criteria Need and an EOL Need such that a single solution could address both needs.

Section (d)(2)(i) also requires a Transmission Owner to consult with PJM if PJM makes an initial determination that a projected EOL Need on the Transmission Owner's Candidate EOL Needs List could be addressed by a single Solution that also addresses one or more PJM Planning Criteria Needs. This provision is intended to facilitate PJM's ability to confirm the scope of the overlap, the current status of the relevant Transmission Owner's

---

[61] As noted above, EOL Needs can be accelerated or postponed, or even drop off the list.

planning to address the projected EOL Need, and the feasibility of PJM's planning a single project that fully addresses both needs.

The Proposed Revisions anticipate that PJM would then proceed under Schedule 6 of the Operating Agreement to identify the reliability or economic project need to be addressed.[62] This would include the procedures for developing projects under section 1.5.8 of Schedule 6 of the Operating Agreement, including opening up an Order No. 1000 proposal window for project proposals[63] and applying the other Schedule 6 provisions regarding project selection.

Section (d)(2)(ii) establishes what happens if the PJM Planning Process results in a single Solution that is intended to address both a projected EOL Need confirmed by the relevant Transmission Owner and the PJM Planning Criteria Needs. If the Solution is not one proposed by the affected Transmission Owner, the Transmission Owner must determine whether the Solution does, in fact, address its projected EOL Need. If the Transmission Owner determines it does not and the Transmission Owner determines it must still address the projected EOL Need through an Attachment M-3 Project, the Transmission Owner must provide documentation to PJM and Stakeholders supporting its determination at the next meeting of the TEAC or Subregional RTEP Committee that considered the single Solution. If the EOL Need was identified by a Transmission Owner with Form No. 715 end of useful life planning criteria, the Transmission Owner would determine if it needed to propose a project to PJM to address that EOL Need to be planned by PJM, although the Transmission Owner would be obligated to support its determination that it needed to propose such a project at the next meeting of the TEAC or Subregional RTEP Committee, and the ultimate determination regarding planning to satisfy the Form No. 715 criterion would remain with PJM. This process is comparable to that set out in PJM Manual 14B.[64]

Section (d)(2)(ii) provides for the provision of information to the relevant PJM planning committee, in which the state commissions can participate. However, nothing in the proposed revisions prevents a Transmission Owner from providing the documentation provided to the TEAC under Section (d)(2)(ii) to the interested state commissions where the need is located. The Transmission Owners are committed to providing state commissions with the information they need to perform their functions while respecting jurisdictional boundaries. The filing will not change in any respect the ongoing working relationship that each Transmission Owner has maintained with its state regulators with respect to information on EOL Needs or any other matter.

---

[62] PJM could also identify an overlap with a State Agreement Approach project under Schedule 6, § 1.5.9 or Multi-Driver Project under § 1.5.10.

[63] *See* Operating Agreement, Schedule 6, § 1.5.8(c).

[64] PJM Manual 14B, § 1.4.2.3.

## IV.    THE PROPOSED REVISIONS ARE JUST AND REASONABLE

The Transmission Owners respectfully request that the Commission find the Proposed Revisions just and reasonable and accept them without hearing, modification or condition. As discussed above, the Proposed Revisions expand the scope of Attachment M-3 to include asset management projects. This will give stakeholders additional opportunities for input into the Transmission Owners' planning of asset management projects that go beyond the obligations established in Order No. 890 and other utilities' procedures for planning asset management projects. The Proposed Revisions also provide PJM with additional forward looking information to enhance its planning capabilities, achieving a stated goal of the PJM Board.[65] Moreover, the Proposed Revisions require the documentation and review of Transmission Owner end of useful life planning criteria, which also will increase the amount of information available to PJM to support its RTEP planning responsibilities. This level of transparency surpasses the requirements applicable in other regions. In addition, the Proposed Revisions provide for an open and transparent asset management planning process. The Proposed Revisions provide opportunities for stakeholder review and input with respect to asset management planning that go far beyond the procedures the Commission has accepted as just and reasonable in the SCE Order. Finally, the Proposed Revisions authorize PJM to coordinate RTEP and end of life planning where those needs overlap to develop a more efficient and cost-effective result.

In sum, the Transmission Owners' Proposed Revisions are just and reasonable, not unduly discriminatory or preferential and should be approved without hearing, modification, or condition.

## V.    EFFECTIVE DATE

The Transmission Owners request that the Proposed Revisions be made effective sixty (60) days from the date of this filing. As discussed above, if the Commission accepts the Proposed Revisions with this effective date, PJM and the Transmission Owners can begin implementing the additional requirements and procedures under the Proposed Revisions in time for the 2021 planning cycle that begins this fall.

## VI.    CORRESPONDENCE AND COMMUNICATIONS

Correspondence and communications with respect to this filing should be sent to:

---

[65] *See* May 27, 2020 PJM Board Letter at 2.

Jeffrey W. Stuchell
Manager, FERC & Transmission Technical
Support
FirstEnergy
800 Cabin Hill Drive
Greensburg, PA 15601
Telephone: 724-331-6714
jstuche@firstenergycorp.com

*Chair of the Transmission Owners*
*Agreement Administrative Committee*

Donald A. Kaplan
William M. Keyser
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C. 20006
Telephone: 202-778-9000
don.kaplan@klgates.com
william.keyser@klgates.com

Kenneth G. Jaffe
Richard P. Sparling
Alston & Bird LLP
950 F Street, N.W.
Washington, D.C. 20004
Telephone:  202-239-3300
Kenneth.Jaffe@alston.com
Richard.Sparling@alston.com

## VII.    ADDITIONAL INFORMATION REQUIRED UNDER 18 C.F.R. § 35.13(b)

### A.    Documents Submitted with this Filing

Along with this transmittal letter, the Transmission Owners submit the following exhibits with this filing:

1.    **Exhibit A** – Marked versions of Attachment M-3 to the PJM Tariff reflecting the changes proposed herein.

2.    **Exhibit B –** Clean versions of Attachment M-3 to the PJM Tariff reflecting the changes proposed herein.

3.    **Exhibit C –** Letter from Dean Oskvig, Chair-Board Reliability Committee, PJM Board of Managers to the PJM Members Committee, dated October 4, 2019.

4.    **Exhibit D –**Letter from Dean Oskvig, Chair-Board Reliability & Security Committee, PJM Board of Managers to the Jolene M. Harris, President/CEO, American Municipal Power, Inc. and others, dated May 27, 2020.

5.    **Exhibit E –** PJM EOL Planning Package, Transparency and End of Life Planning, May 28, 2020**.**

### B. Service

PJM has served a copy of this filing on all PJM Members and on all state utility regulatory commissions in the PJM Region by posting this filing electronically.  In accordance with the Commission's regulations,[66] PJM will post a copy of this filing to the FERC filings section of its internet site, located at the following link: http://www.pjm.com/documents/ferc-manuals/ferc-filings.aspx with a specific link to the newly-filed document, and will send an e-mail on the same date as this filing to all PJM Members and all state utility regulatory commissions in the PJM Region[67] alerting them that this filing has been made by PJM and is available by following such link.  If the document is not immediately available by using the referenced link, the document will be available through the referenced link within 24 hours of the filing.  Also, a copy of this filing will be available on the Commission's eLibrary website located at the following link: http://www.ferc.gov/docs-filing/elibrary.asp in accordance with the Commission's regulations and Order No. 714.

### C. Description of and Reason for Rate Change

A detailed description of the rate change is included in Section III, above.

### D. Agreement Required for Rate Change

As indicated in note 2, above, this rate change has been authorized pursuant to the individual and weighted voting requirements in Section 8.5 of the CTOA.

### E. Request for Waivers

To the extent necessary, the Transmission Owners request waiver of the requirement to submit the cost of service data required by 18 C.F.R. § 35.13.  Further, the information submitted with this filing substantially complies with the requirements of Part 35 of the Commission's rules and regulations applicable to filings of this type.  The Transmission Owners request a waiver of any applicable requirement of Part 35 for which a waiver is not specifically requested, if necessary, in order to permit this filing to become effective as proposed.

---

[66] 18 C.F.R. §§35.2(e), 385.2010(f)(3).

[67] PJM already maintains, updates and regularly uses e-mail lists for all PJM members and affected state commissions.

## VIII.  CONCLUSION

For the reasons set forth herein, the PJM Transmission Owners respectfully request that the Commission accept these Proposed Revisions to the PJM Tariff without hearing, modification or condition, and allow these changes to become effective sixty (60) days from the date of this filing, as requested herein.

Respectfully submitted,

*/s/ Kenneth G. Jaffe*                          */s/ Donald A. Kaplan*

Kenneth G. Jaffe                                Donald A. Kaplan
Richard P. Sparling                             William M. Keyser
Alston & Bird LLP                               K&L Gates LLP
950 F Street, N.W.                              1601 K Street, N.W.
Washington, D.C. 20004                          Washington, D.C. 20006
Telephone:  202-239-3300                        Telephone: 202-778-9000
Kenneth.Jaffe@alston.com                        don.kaplan@klgates.com
Richard.Sparling@alston.com                     william.keyser@klgates.com

*Counsel for the FirstEnergy*                   *Counsel for PPL Electric Utilities*
*Companies*                                     *Corporation*

*On behalf of the PJM Transmission Owners*

23

Document Accession #: 20200612-5124      Filed Date: 06/12/2020

# EXHIBIT A

JA0024

**ATTACHMENT**
**M-3**
**ADDITIONAL PROCEDURES FOR PLANNING**
~~OF~~ **SUPPLEMENTAL PROJECTS AND ASSET MANAGEMENT PROJECTS**

**(a) Applicability.** Each Transmission Owner shall be responsible for planning and constructing in accordance with Schedule 6 of the Operating Agreement as provided in this Attachment M-3, to the extent applicable, (i) Asset Management Projects, as defined herein, (ii) Supplemental Projects, as defined in section 1.42A.02 of the Operating Agreement, and (iii) any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more of the following planning criteria:~~This document provides additional details of the process that PJM and the PJM Transmission Owners will follow in connection with planning Supplemental Projects, as defined in section 1.42A.02 of the Operating Agreement, in accordance with Schedule 6 of the Operating Agreement. This process will only apply to Transmission Owners that plan Supplemental Projects~~

1. NERC Reliability Standards (which includes Applicable Regional Entity reliability standards);

2. Individual Transmission Owner planning criteria as filed in FERC Form No. 715 and posted on the PJM website, provided that the Additional Procedures for the Identification and Planning of EOL Needs, set forth in section (d), shall apply, as applicable

3. Criteria to address economic constraints in accordance with section 1.5.7 of the Operating Agreement or an agreement listed in Schedule 12-Appendix B;

4. State Agreement Approach expansions or enhancements in accordance with section 1.5.9(a)(ii) of the Operating Agreement; or

5. An expansion or enhancement to be addressed by the RTEP Planning Process pursuant to section (d)(2) of this Attachment M-3 in accordance with RTEP Planning Process procedures in Schedule 6 of the Operating Agreement.

This Attachment M-3 shall not apply to CIP-014 mitigation projects that are subject to Attachment M-4.

**(b) Definitions.**

1. Asset Management Project. "Asset Management Project" shall mean any modification or replacement of a Transmission Owner's Transmission Facilities that results in no more than an Incidental Increase in transmission capacity undertaken to perform maintenance, repair, and replacement work, to address an EOL Need, or to effect infrastructure security, system reliability, and automation projects the Transmission Owner undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements.

2.      Attachment M-3 Project.  "Attachment M-3 Project" means (i) an Asset Management Project that affects the connectivity of Transmission Facilities that are included in the Transmission System, affects Transmission Facility ratings or significantly changes the impedance of Transmission Facilities; (ii) a Supplemental Project; or (iii) any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 under any of clauses (1) through (5) of section (a).  "Attachment M-3 Project" does not include a project to address Form No. 715 EOL Planning Criteria.

3.      Incidental Increase.  "Incidental Increase" shall mean an increase in transmission capacity achieved by advancements in technology and/or replacements consistent with current Transmission Owner design standards, industry standards, codes, laws or regulations, which is not reasonably severable from an Asset Management Project. A transmission project that results in more than an Incidental Increase in transmission capacity is an expansion or enhancement of Transmission Facilities.

4.      Transmission Facilities.  "Transmission Facilities" shall have the meaning set forth in the Consolidated Transmission Owners Agreement, section 1.27.

5.      EOL Need.  "EOL Need" shall mean a need to replace a transmission line between breakers operating at or above 100 kV or a transformer, the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities, which the Transmission Owner has determined to be near the end of its useful life, the replacement of which would be an Attachment M-3 Project.

6.      Candidate EOL Needs List. "Candidate EOL Needs List" shall have the meaning ascribed to it in section (d)(1)(iii).

7.      Form No. 715 EOL Planning Criteria. "Form No. 715 EOL Planning Criteria" shall mean planning criteria filed by a Transmission Owner in FERC Form No. 715 to address EOL Needs.  No Transmission Owner may be compelled to file a Form No. 715 EOL Planning Criteria not required to be filed pursuant to FERC regulations applicable to Form No. 715.

8.      Attachment M-3 EOL Planning Criteria.  "Attachment M-3 EOL Planning Criteria" shall mean planning criteria utilized by a Transmission Owner under Attachment M-3 to address EOL Needs.

9.      PJM Planning Criteria Need.  "PJM Planning Criteria Need" shall mean a need to plan a transmission expansion or enhancement of Transmission Facilities other than those reserved to each Transmission Owner in accordance with section (a).

10.     RTEP Planning Process.  "RTEP Planning Process" shall mean the process by which PJM develops the Regional Transmission Expansion Plan under Schedule 6 of the Operating Agreement.

**(c)     Procedures for Review of Attachment M-3 Projects.**  The following procedures shall be applicable to the planning of Attachment M-3 Projects:

1.  **Review of ~~Supplemental~~ Attachment M-3 Projects.** As described in sections 1.3(c) and (d) of Schedule 6 of the Operating Agreement, the Subregional RTEP Committees shall be responsible for the review of ~~Supplemental~~Attachment M-3 Projects. The Subregional RTEP Committees shall have a meaningful opportunity to participate and provide feedback, including written comments, throughout the transmission planning process for ~~Supplemental~~Attachment M-3 Projects. Disputes shall be resolved in accordance with the procedures set forth at Schedule 5 of the Operating Agreement. For purposes of this section (c), reference to the Subregional RTEP Committees shall be deemed to include the Transmission Expansion Advisory Committee (TEAC) when the TEAC reviews Attachment M-3 Projects in accordance with these procedures.

2.  **Review of Assumptions and Methodology.** In accordance with sections 1.3(d), 1.5.4(a), and 1.5.6(b) and 1.5.6(c) of Schedule 6 of the Operating Agreement, each Subregional RTEP Committee shall schedule and facilitate a minimum of one Subregional RTEP Committee meeting to review the criteria, assumptions, and models Transmission Owners propose to use to plan and identify ~~Supplemental~~Attachment M-3 Projects (Assumptions Meeting). Each Transmission Owner shall provide the criteria, assumptions, and models to PJM for posting at least 20 days in advance of the Assumptions Meeting to provide Subregional RTEP Committee Participants sufficient time to review this information. Stakeholders may provide comments on the criteria, assumptions, and models to the Transmission Owner for consideration either prior to or following the Assumptions Meeting. The Transmission Owner shall review and consider comments that are received within 10 days of the Assumptions Meeting and may respond or provide feedback as appropriate.

3.  **Review of System Needs.** No fewer than 25 days after the Assumptions Meeting, each Subregional RTEP Committee shall schedule and facilitate a minimum of one Subregional RTEP Committee meeting per planning cycle to review the identified criteria violations and resulting system needs, if any, that may drive the need for ~~a Supplemental~~an Attachment M-3 Project (Needs Meeting). Each Transmission Owner will review the identified system needs and the drivers of those needs, based on the application of its criteria, assumptions, and models that it uses to plan ~~Supplemental~~Attachment M-3 Projects. The Transmission Owners shall share and post their identified criteria violations and drivers no fewer than 10 days in advance of the Needs Meeting. Stakeholders may provide comments on the criteria violations and drivers to the Transmission Owner for consideration prior to, at, or following the Needs Meeting. The Transmission Owner shall review and consider comments that are received within 10 days of the Needs Meeting and may respond or provide feedback as appropriate.

4.      **Review of Potential Solutions.** No fewer than 25 days after the Needs Meeting, each Subregional RTEP Committee shall schedule and facilitate a minimum of one Subregional RTEP Committee meeting per planning cycle to review potential solutions for the identified criteria violations (Solutions Meeting). The Transmission Owners shall share and post their potential solutions, as well as any alternatives identified by the Transmission Owners or stakeholders, no fewer than 10 days in advance of the Solutions Meeting. Stakeholders may provide comments on the potential solutions to the Transmission Owner for consideration either prior to or following the Solutions Meeting. The Transmission Owner shall review and consider comments that are received within 10 days of the meeting and may respond or provide feedback as appropriate.

5.      **Submission of ~~Supplemental~~Attachment M-3 Projects.** Each Transmission Owner will finalize for submittal to the Transmission Provider ~~Supplemental~~Attachment M-3 Projects for inclusion in the Local Plan in accordance with section 1.3 of Schedule 6 of the Operating Agreement and the schedule established by the Transmission Provider.  Stakeholders may provide comments on the ~~Supplemental~~Attachment M-3 Projects in accordance with section 1.3 of Schedule 6 of the PJM Operating Agreement before the Local Plan is integrated into the Regional Transmission Expansion Plan.  Stakeholders shall have at least 10 days to comment on the Local Plan after the solutions selected by the Transmission Owner for inclusion in the Local Plan are posted. Each Transmission Owner shall review and consider comments that are received at least 10 days before the Local Plan is submitted for integration into the Regional Transmission Expansion Plan.

6.      **Information Relating to ~~Supplemental~~Attachment M-3 Projects.** Information relating to each Transmission Owner's ~~Supplemental~~Attachment M-3 Projects will be provided in accordance with, and subject to the limitations set forth in, section 1.5.4 of Schedule 6 of the Operating Agreement. Local Plan Information will be provided to and posted by the Office of Interconnection as set forth in section 1.5.4(e) of Schedule 6 of the Operating Agreement.

7.      **No Limitation on Additional Meetings and Communications~~.~~ or Use of Attachment M-3 For Other Transmission Projects.**

i.      Nothing in this Attachment M-3 precludes any Transmission Owner from agreeing with stakeholders to additional meetings or other communications regarding ~~Supplemental~~Attachment M-3 Projects, in addition to the Subregional RTEP Committee process.

ii.      Nothing in this Attachment M-3 precludes a Transmission Owner from using the procedures set forth in section (c) to solicit stakeholder input in the planning of Transmission Facilities not subject to this section (c) or the RTEP Planning Process.

**(d)     Additional Procedures for the Identification and Planning of EOL Needs.**

    1.    **EOL Need Planning Criteria Documentation and Identification**

        i.    Each PJM Transmission Owner shall develop documentation for its Attachment M-3 EOL Planning Criteria and/or its Form 715 EOL Planning Criteria through which each identifies EOL Needs.

        ii.    Each Transmission Owner's Attachment M-3 EOL Planning Criteria and/or Form 715 EOL Planning Criteria shall be clearly and separately delineated and presented by the Transmission Owner at least once annually pursuant to section (c)(2) and/or in its FERC Form No. 715 at a meeting of the TEAC.

        iii.    Annually, each Transmission Owner will provide to PJM a Candidate EOL Needs List comprising its non-public confidential, non-binding projection of up to 5 years of EOL Needs that it has identified under the Transmission Owner's processes for identification of EOL Needs documented under section (d)(1)(i).  Each Transmission Owner may change its projection as it deems necessary and will update it annually. Any Candidate EOL Needs List provided to PJM shall remain confidential within PJM, except to the extent necessary for PJM to make the determination referenced in clause (a) of section (d)(2)(ii).

    2.    **Coordination of EOL Needs Planning With PJM Planning Criteria Needs**.

        i.    If, as part of the RTEP Planning Process, PJM initially determines that a substantial electrical overlap exists such that a single Solution may address a validated PJM Planning Criteria Need(s) identified during the current PJM planning cycle under the RTEP Planning Process and address a projected EOL Need on the Candidate EOL Needs List, which the relevant Transmission Owner has confirmed remains a projected EOL Need, the relevant Transmission Owner shall consult with PJM regarding such potential overlap.

        ii.    If, (a) PJM determines through the RTEP Planning Process that a proposed Required Transmission Enhancement would more efficiently and cost-effectively address the identified PJM Planning Criteria Need and may, as well, address the projected EOL Need confirmed under section (d)(2)(i), and (b) the proposed Required Transmission Enhancement is not a solution proposed by the Transmission Owner pursuant to section (c)(4), and (c) the Transmission Owner determines that the projected EOL Need is not met by the proposed Required Transmission Enhancement and determines that it will plan an Attachment M-3 Project to address the projected EOL Need or propose a project to address the Form No. 715 EOL Planning Criteria, the Transmission Owner will provide

documentation to PJM and stakeholders on the rationale supporting its determination at the next appropriate meeting of the TEAC or Subregional RTEP Committee that considered the proposed Required Transmission Enhancement.

(e)    **Modifications.** This Attachment M-3 may only be modified under section 205 of the Federal Power Act if the proposed modification has been authorized by the PJM Transmission Owners Agreement-Administrative Committee in accordance with section 8.5 of the Consolidated Transmission Owners Agreement.

**EXHIBIT B**

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

### ATTACHMENT
### M-3
### ADDITIONAL PROCEDURES FOR PLANNING
### SUPPLEMENTAL PROJECTS AND ASSET MANAGEMENT PROJECTS

**(a) Applicability.** Each Transmission Owner shall be responsible for planning and constructing in accordance with Schedule 6 of the Operating Agreement as provided in this Attachment M-3, to the extent applicable, (i) Asset Management Projects, as defined herein, (ii) Supplemental Projects, as defined in section 1.42A.02 of the Operating Agreement, and (iii) any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more of the following planning criteria:

1.  NERC Reliability Standards (which includes Applicable Regional Entity reliability standards);

2.  Individual Transmission Owner planning criteria as filed in FERC Form No. 715 and posted on the PJM website, provided that the Additional Procedures for the Identification and Planning of EOL Needs, set forth in section (d), shall apply, as applicable;

3.  Criteria to address economic constraints in accordance with section 1.5.7 of the Operating Agreement or an agreement listed in Schedule 12-Appendix B;

4.  State Agreement Approach expansions or enhancements in accordance with section 1.5.9(a)(ii) of the Operating Agreement; or

5.  An expansion or enhancement to be addressed by the RTEP Planning Process pursuant to section (d)(2) of this Attachment M-3 in accordance with RTEP Planning Process procedures in Schedule 6 of the Operating Agreement.

This Attachment M-3 shall not apply to CIP-014 mitigation projects that are subject to Attachment M-4.

**(b) Definitions.**

1.  Asset Management Project. "Asset Management Project" shall mean any modification or replacement of a Transmission Owner's Transmission Facilities that results in no more than an Incidental Increase in transmission capacity undertaken to perform maintenance, repair, and replacement work, to address an EOL Need, or to effect infrastructure security, system reliability, and automation projects the Transmission Owner undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements.

2.  Attachment M-3 Project. "Attachment M-3 Project" means (i) an Asset Management Project that affects the connectivity of Transmission Facilities that are included in the Transmission System, affects Transmission Facility ratings or significantly changes the impedance of Transmission Facilities; (ii) a

JA0032

Supplemental Project; or (iii) any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 under any of clauses (1) through (5) of section (a). "Attachment M-3 Project" does not include a project to address Form No. 715 EOL Planning Criteria.

3.   Incidental Increase. "Incidental Increase" shall mean an increase in transmission capacity achieved by advancements in technology and/or replacements consistent with current Transmission Owner design standards, industry standards, codes, laws or regulations, which is not reasonably severable from an Asset Management Project. A transmission project that results in more than an Incidental Increase in transmission capacity is an expansion or enhancement of Transmission Facilities.

4.   Transmission Facilities. "Transmission Facilities" shall have the meaning set forth in the Consolidated Transmission Owners Agreement, section 1.27.

5.   EOL Need. "EOL Need" shall mean a need to replace a transmission line between breakers operating at or above 100 kV or a transformer, the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities, which the Transmission Owner has determined to be near the end of its useful life, the replacement of which would be an Attachment M-3 Project.

6.   Candidate EOL Needs List. "Candidate EOL Needs List" shall have the meaning ascribed to it in section (d)(1)(iii).

7.   Form No. 715 EOL Planning Criteria. "Form No. 715 EOL Planning Criteria" shall mean planning criteria filed by a Transmission Owner in FERC Form No. 715 to address EOL Needs. No Transmission Owner may be compelled to file a Form No. 715 EOL Planning Criteria not required to be filed pursuant to FERC regulations applicable to Form No. 715.

8.   Attachment M-3 EOL Planning Criteria. "Attachment M-3 EOL Planning Criteria" shall mean planning criteria utilized by a Transmission Owner under Attachment M-3 to address EOL Needs.

9.   PJM Planning Criteria Need. "PJM Planning Criteria Need" shall mean a need to plan a transmission expansion or enhancement of Transmission Facilities other than those reserved to each Transmission Owner in accordance with section (a).

10.   RTEP Planning Process. "RTEP Planning Process" shall mean the process by which PJM develops the Regional Transmission Expansion Plan under Schedule 6 of the Operating Agreement.

**(c)**    **Procedures for Review of Attachment M-3 Projects.**  The following procedures shall be applicable to the planning of Attachment M-3 Projects:

1.    **Review of Attachment M-3 Projects.** As described in sections 1.3(c) and (d) of Schedule 6 of the Operating Agreement, the Subregional RTEP Committees shall be responsible for the review of Attachment M-3 Projects. The Subregional RTEP Committees shall have a meaningful opportunity to participate and provide feedback, including written comments, throughout the transmission planning process for Attachment M-3 Projects. Disputes shall be resolved in accordance with the procedures set forth at Schedule 5 of the Operating Agreement. For purposes of this section (c), reference to the Subregional RTEP Committees shall be deemed to include the Transmission Expansion Advisory Committee (TEAC) when the TEAC reviews Attachment M-3 Projects in accordance with these procedures.

2.    **Review of Assumptions and Methodology.** In accordance with sections 1.3(d), 1.5.4(a), and 1.5.6(b) and 1.5.6(c) of Schedule 6 of the Operating Agreement, each Subregional RTEP Committee shall schedule and facilitate a minimum of one Subregional RTEP Committee meeting to review the criteria, assumptions, and models Transmission Owners propose to use to plan and identify Attachment M-3 Projects (Assumptions Meeting). Each Transmission Owner shall provide the criteria, assumptions, and models to PJM for posting at least 20 days in advance of the Assumptions Meeting to provide Subregional RTEP Committee Participants sufficient time to review this information. Stakeholders may provide comments on the criteria, assumptions, and models to the Transmission Owner for consideration either prior to or following the Assumptions Meeting. The Transmission Owner shall review and consider comments that are received within 10 days of the Assumptions Meeting and may respond or provide feedback as appropriate.

3.    **Review of System Needs.** No fewer than 25 days after the Assumptions Meeting, each Subregional RTEP Committee shall schedule and facilitate a minimum of one Subregional RTEP Committee meeting per planning cycle to review the identified criteria violations and resulting system needs, if any, that may drive the need for an Attachment M-3 Project (Needs Meeting). Each Transmission Owner will review the identified system needs and the drivers of those needs, based on the application of its criteria, assumptions, and models that it uses to plan Attachment M-3 Projects. The Transmission Owners shall share and post their identified criteria violations and drivers no fewer than 10 days in advance of the Needs Meeting. Stakeholders may provide comments on the criteria violations and drivers to the Transmission Owner for consideration prior to, at, or following the Needs Meeting. The Transmission Owner shall review and consider comments that are received within 10 days of the Needs Meeting and may respond or provide feedback as appropriate.

4.      **Review of Potential Solutions.** No fewer than 25 days after the Needs Meeting, each Subregional RTEP Committee shall schedule and facilitate a minimum of one Subregional RTEP Committee meeting per planning cycle to review potential solutions for the identified criteria violations (Solutions Meeting). The Transmission Owners shall share and post their potential solutions, as well as any alternatives identified by the Transmission Owners or stakeholders, no fewer than 10 days in advance of the Solutions Meeting. Stakeholders may provide comments on the potential solutions to the Transmission Owner for consideration either prior to or following the Solutions Meeting. The Transmission Owner shall review and consider comments that are received within 10 days of the meeting and may respond or provide feedback as appropriate.

5.      **Submission of Attachment M-3 Projects.** Each Transmission Owner will finalize for submittal to the Transmission Provider Attachment M-3 Projects for inclusion in the Local Plan in accordance with section 1.3 of Schedule 6 of the Operating Agreement and the schedule established by the Transmission Provider.  Stakeholders may provide comments on the Attachment M-3 Projects in accordance with section 1.3 of Schedule 6 of the PJM Operating Agreement before the Local Plan is integrated into the Regional Transmission Expansion Plan.  Stakeholders shall have at least 10 days to comment on the Local Plan after the solutions selected by the Transmission Owner for inclusion in the Local Plan are posted. Each Transmission Owner shall review and consider comments that are received at least 10 days before the Local Plan is submitted for integration into the Regional Transmission Expansion Plan.

6.      **Information Relating to Attachment M-3 Projects.** Information relating to each Transmission Owner's Attachment M-3 Projects will be provided in accordance with, and subject to the limitations set forth in, section 1.5.4 of Schedule 6 of the Operating Agreement. Local Plan Information will be provided to and posted by the Office of Interconnection as set forth in section 1.5.4(e) of Schedule 6 of the Operating Agreement.

7.      **No Limitation on Additional Meetings and Communications or Use of Attachment M-3 For Other Transmission Projects.**

i.      Nothing in this Attachment M-3 precludes any Transmission Owner from agreeing with stakeholders to additional meetings or other communications regarding Attachment M-3 Projects, in addition to the Subregional RTEP Committee process.

ii.     Nothing in this Attachment M-3 precludes a Transmission Owner from using the procedures set forth in section (c) to solicit stakeholder input in the planning of Transmission Facilities not subject to this section (c) or the RTEP Planning Process.

(d)     **Additional Procedures for the Identification and Planning of EOL Needs.**

    1.     **EOL Need Planning Criteria Documentation and Identification**

        i.     Each PJM Transmission Owner shall develop documentation for its Attachment M-3 EOL Planning Criteria and/or its Form 715 EOL Planning Criteria through which each identifies EOL Needs.

        ii.     Each Transmission Owner's Attachment M-3 EOL Planning Criteria and/or Form 715 EOL Planning Criteria shall be clearly and separately delineated and presented by the Transmission Owner at least once annually pursuant to section (c)(2) and/or in its FERC Form No. 715 at a meeting of the TEAC.

        iii.     Annually, each Transmission Owner will provide to PJM a Candidate EOL Needs List comprising its non-public confidential, non-binding projection of up to 5 years of EOL Needs that it has identified under the Transmission Owner's processes for identification of EOL Needs documented under section (d)(1)(i).  Each Transmission Owner may change its projection as it deems necessary and will update it annually. Any Candidate EOL Needs List provided to PJM shall remain confidential within PJM, except to the extent necessary for PJM to make the determination referenced in clause (a) of section (d)(2)(ii).

    2.     **Coordination of EOL Needs Planning With PJM Planning Criteria Needs**.

        i.     If, as part of the RTEP Planning Process, PJM initially determines that a substantial electrical overlap exists such that a single Solution may address a validated PJM Planning Criteria Need(s) identified during the current PJM planning cycle under the RTEP Planning Process and address a projected EOL Need on the Candidate EOL Needs List, which the relevant Transmission Owner has confirmed remains a projected EOL Need, the relevant Transmission Owner shall consult with PJM regarding such potential overlap.

        ii.     If, (a) PJM determines through the RTEP Planning Process that a proposed Required Transmission Enhancement would more efficiently and cost-effectively address the identified PJM Planning Criteria Need and may, as well, address the projected EOL Need confirmed under section (d)(2)(i), and (b) the proposed Required Transmission Enhancement is not a solution proposed by the Transmission Owner pursuant to section (c)(4), and (c) the Transmission Owner determines that the projected EOL Need is not met by the proposed Required Transmission Enhancement and determines that it will plan an Attachment M-3 Project to address the projected EOL Need or propose a project to address the Form No. 715

EOL Planning Criteria, the Transmission Owner will provide documentation to PJM and stakeholders on the rationale supporting its determination at the next appropriate meeting of the TEAC or Subregional RTEP Committee that considered the proposed Required Transmission Enhancement.

**(e)**     **Modifications.** This Attachment M-3 may only be modified under section 205 of the Federal Power Act if the proposed modification has been authorized by the PJM Transmission Owners Agreement-Administrative Committee in accordance with section 8.5 of the Consolidated Transmission Owners Agreement.

JA0037

**EXHIBIT C**

2750 Monroe Blvd.
Audubon, PA 19403

October 4, 2019

PJM Members Committee

Dear Members:

The PJM Board of Managers is pleased with the progress on Supplemental Projects that PJM and stakeholders have accomplished in the last few months. The PJM Manual 14B revisions that were approved with stakeholder support at the Aug. 22 Markets & Reliability Committee clarify the interaction of Supplemental Projects with the Regional Transmission Expansion Plan process. The result is more comprehensive and transparent documentation of this interaction.

The vote demonstrated how stakeholders and PJM can work together to build consensus through the stakeholder process, even when issues are complex and controversial. The Board appreciates stakeholders' attention to these issues and commends everyone involved for their commitment to identifying solutions.

Over the last few months, the PJM Board has undertaken a review of Supplemental Project issues. This review was informed by the letters from stakeholders, the discussions at stakeholder meetings, and a review of our governing documents, together with the relevant FERC orders and policy statements.

Through this review, the PJM Board has determined that PJM's role in the Supplemental Projects process can be expanded in some areas but also remains appropriately constrained in others, such as asset management decisions by Transmission Owners.

PJM will continue to focus its efforts on enhancing the transparency of the Supplemental Projects processes. PJM does not have the authority or expertise to assume responsibility for asset management decisions or to determine when a facility is at the end of its useful life or otherwise needs to be replaced. Those decisions are the sole responsibility of the Transmission Owner. PJM has the authority, expertise, and the obligation, to develop the RTEP. In some circumstances, PJM may be in the best position to determine the more cost-effective regional solution to replace a retired facility. PJM welcomes input from stakeholders to determine under what circumstances PJM might assert that authority.

The PJM Board is committed to continuing the progress that has been made toward clarifying PJM's role regarding Supplemental Projects and PJM's regional planning authority. The PJM Board recognizes that the concerns regarding Supplemental Projects may not be ameliorated and will continue to work with the PJM management to ensure that the appropriate actions are being taken by PJM.


Sincerely,

*Dean Oskvig*

Dean Oskvig, Chair-Board Reliability Committee
Board of Managers

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

**EXHIBIT D**

2750 Monroe Blvd.
Audubon, PA 19403-2497

Dean Oskvig
Chair, Board Reliability & Security Committee

May 27, 2020

**VIA ELECTRONIC MAIL**

Jolene M. Thompson
President/CEO
American Municipal Power, Inc.

Marcus Harris
President/CEO
Old Dominion Electric Cooperative

Sharon K. Segner
Vice President, LS Power

Robert A. Weishaar, Jr.
Susan E. Bruce
Counsel to PJM Industrial Customer
Coalition

Alice Wolfe
General Manager
Blue Ridge Power Agency

Patrick E. McCullar
President & CEO
Delaware Municipal Electric
Corporation, Inc.

Brian Vayda
Executive Director
Public Power Association of New Jersey

Sandra Mattavous-Frye
People's Counsel
Karen R. Sistrunk
Deputy People's Counsel
Anjali G. Patel
Senior Ast. People's Counsel
Frederick (Erik) Heinle III
Ast. People's Counsel
Office of the People's Counsel for the
District of Columbia

Andrew Slater
Public Advocate
The Delaware Division of the Public Advocate

**Re: End of Life (EOL) Conditions and Replacement Projects**

Dear Stakeholders:

Thank you for your letter of May 12th presenting your concerns and vision regarding the management of end of life conditions and replacement projects. Thank you also for sharing your proposal and Operating Agreement changes. The PJM Board of Managers appreciates the significant time and effort expended by stakeholders in considering these issues.

The PJM Board has been aware of, and engaged on, the issues surrounding investment in Supplemental Projects, including end of life condition assessments and replacement projects. Indeed, the PJM Board has been closely involved with the issues surrounding Supplemental Projects since 2016, including the prior senior task force and the proceedings before the Federal Energy Regulatory Commission.

Such matters are regularly addressed before the Board Reliability Committee (recently rechartered as the Board Reliability & Security Committee) that has been delegated primary responsibility for these topics, and are regularly reported to the full Board.  As stated in the PJM Board letter cited in your correspondence, the PJM Board views the execution of its responsibilities in regional planning as requiring the proper exercise of its authority, appropriate transparency, and a commitment to a non-discriminatory independent process, including the consideration of competitive solutions where appropriate.[1]  As noted therein, the PJM Board believes that, in some circumstances, PJM may be in the best position to determine the appropriate regional solution to replace a facility that has been identified as nearing its end of life.

PJM's end of life solution package presented at the recent meetings of the Markets & Reliability Committee appropriately applies PJM's authority.  Specifically, the PJM Board supports the conclusion that an appropriate exercise of PJM's regional planning authority is to identify the intersection of potential end of life conditions with regional planning needs, and to identify and plan the cost-effective and efficient regional solution, utilizing a competitive window process where appropriate.  The PJM end of life solution package takes a reasonable approach that (i) reflects the guidance provided by FERC in its orders, (ii) respects the authorities defined within the governing documents, and (iii) enhances the existing PJM's Regional Transmission Expansion Plan (RTEP) process.  PJM has prepared a more detailed response and feedback to your proposed Operating Agreement revisions, and the PJM Board is providing that feedback as part of its response and its comments on the proposed Operating Agreement revisions.

These are complicated issues and it is apparent that there is not an alignment among the stakeholders and many of the Transmission Owners who are parties to the Consolidated Transmission Owners Agreement. We expect that these issues will be presented to the Commission for resolution in the near future.  The PJM Board recognizes its responsibility to ensure that PJM is fulfilling its role as the independent regional planner, maintaining compliance with its governing agreements and system reliability into the future.

Sincerely,

*Dean Oskvig*

Dean Oskvig
Chair of the Board Reliability & Security Committee

Attachment

---

[1] *See the October 4, 2019 Letter to the PJM Members Committee from Dean Oskvig, Chair-Board Reliability Committee* (available at: https://www.pjm.com/-/media/about-pjm/who-we-are/public-disclosures/20191004-pjm-board-reliability-committee-chair-dean-oskvig-regarding-supplemental-projects.ashx?la=en).

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

## Attachment

## Comments on the Stakeholder Proposed Operating Agreement Revisions Provided May 12th

In your letter, you inquire how PJM, as the independent regional transmission organization (RTO), will carry out its regional planning functions in planning the "Grid of the Future."  In the relatively narrow context of end of life replacement projects, this question cannot be addressed without first considering PJM's role as the regional planner and its core functions.

PJM's primary planning responsibility is to provide for the safe and reliable operation of the transmission system.  In addition to compliance with reliability standards, PJM's regional planning in this context means planning to serve the native load on PJM's system, as well as any other firm transmission service obligations.  PJM's RTEP process was designed to ensure that the *expansion* of the transmission system to deliver power to its customers occurs in an efficient, reliable, and non-discriminatory manner.  Indeed, a principal focus of PJM's RTEP is ensuring that the needs of municipalities, cooperatives, and other transmission-dependent utilities are considered on a level playing field with the needs of the larger investor-owned utilities.  PJM's RTEP process has been a tremendous success in this regard.

In ensuring non-discriminatory open access transmission service, PJM must plan for new transmission service requests.  Attendant to that obligation, and as part of its commitment to ensure a robust, competitive, and non-discriminatory power market, PJM is charged with the planning associated with the processing of generator (and merchant transmission) interconnection service requests.  Finally, among other things, PJM is also charged with enabling market-driven expansions to prevent and relieve congestion, accommodating state-agreement projects, and interregional planning.  These regional planning responsibilities provide PJM with the opportunity to utilize the economy of scale provided by PJM's large regional footprint, leading to more efficient and cost-effective transmission planning.  These are the nature of the "planning" responsibilities conferred to PJM.  But PJM did not assume all of the Transmission Owner operation, maintenance or planning responsibilities – and it is the interplay of PJM's regional transmission planning responsibilities and the Transmission Owner reserved responsibilities that make these issues so complex.

*I.      PJM's Planning Authority as the Independent Regional Planner*

PJM's regional planning role is partially defined in the FERC's regulations for RTOs,[2] in the Operating Agreement,[3] and in the Consolidated Transmission Owners Agreement (CTOA) wherein the PJM Transmission Owners transfer to PJM the responsibility to prepare a regional transmission expansion plan.[4]  The RTEP is defined in the Operating Agreement as the plan prepared by PJM for the expansion

---

[2] 18 C.F.R. § 35.34(7)(k)(7) (2019).

[3] *See* Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. (Operating Agreement), Schedule 6.

[4] Consolidated Transmission Owners Agreement (CTOA), Rate Schedule FERC No. 42, section 4.1.4.

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

and enhancement of the transmission system *to meet the demands for firm transmission service* within its region.[5]

PJM's role has limitations.  The Transmission Owners were explicit in the CTOA that any rights not specifically transferred by the Transmission Owners to PJM therein were expressly reserved by the Transmission Owners.[6]  Thus, PJM's role is bounded by numerous regulatory constraints and contractual obligations that define the limits of its authority over the planning process.

## II.      Determinations of Transmission Asset Condition

We are appreciative that the stakeholder proposal recognizes that PJM does not have the information or authority to make assessments or determinations regarding asset condition.  The physical operation and maintenance of all transmission facilities was reserved to the Transmission Owners, and clear obligations were placed upon the Transmission Owners to perform these responsibilities in accordance with Good Utility Practice.[7]  All physical inspections, condition assessments, and asset condition determinations are the domain of the Transmission Owners.  Importantly, the Transmission Owners explicitly reserved the right to determine when their facilities have reached their end of useful life.[8]

## III.     Criteria Used to Assess End of Life Conditions

Notwithstanding the foregoing, PJM is supportive of transparency regarding such end of life determinations and replacement projects.  Currently, a significant amount of transparency is provided regarding end of life replacement project determinations through the recently adopted Attachment M-3 process for Supplemental Projects, including a review of the assumptions, the need, and the solution.[9]  Indeed, in the California orders discussed further herein, FERC observed that, to the extent Supplemental Projects included projects that were identified as "asset management activities," the level of transparency that was being provided in PJM for Supplemental Projects through the Attachment M-3 process exceeded that which would be required by FERC for the California utilities.[10]  To the extent that certain end of life replacement projects are addressed through a Transmission Owner's FERC Form 715 criteria, those projects are addressed as baseline projects under PJM's Operating Agreement with appropriate transparency.

---

[5] Operating Agreement, Schedule 6, section 1.1 (as well as to support competition).  Hand-in-hand with preparing the RTEP is the responsibility to include in the models used by PJM all system changes to ensure open, non-discriminatory access to the transmission system.  And it is important that those models be as accurate as reasonably possible to support the processing of transmission service requests, including generator and merchant transmission interconnection service requests.

[6] CTOA, section 5.6.

[7] CTOA, section 4.5; *see also* CTOA, section 4.1.4.

[8] Tariff, Attachment M-3, sections 2 and 3.

[9] Tariff, Attachment M-3, sections 2 and 3.

[10] *Southern Cal. Edison Co., et al.*, 164 FERC ¶ 61,160 (2018) (SoCal Edison Order), *order on reh'g*, 168 FERC ¶ 61,170 (Sept. 19, 2019) (SoCal. Edison Order on Rehearing); *Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161 (2018) (PG&E Order), *order on reh'g*, 168 FERC ¶ 61,171 (Sept. 19, 2019) (PG&E Order on Rehearing) (collectively, the California Orders).

However, we believe more could be done with respect to the Transmission Owners providing transparency regarding how they assess their assets and make end of life determinations. Thus, PJM is supportive of a requirement that each Transmission Owner make available, in writing, its criteria for making an end of life determination and, that each Transmission Owner review such criteria surrounding such determinations annually. PJM should not assume the role of specifying what the criteria should be, or otherwise providing guidelines to the Transmission Owners.

It is a legitimate expansion of PJM's authority to require that the Transmission Owners clearly delineate their end of life planning criteria to identify end of life needs. Specifically, in connection with its preparation of the RTEP, PJM has the general authority to request planning criteria from the Transmission Owners. Under the terms of the CTOA, the Transmission Owners have explicitly agreed to provide information reasonably requested by PJM to prepare the RTEP and to otherwise cooperate with PJM in the preparation of the RTEP.[11] This transfer of authority was memorialized in the Operating Agreement. Specifically, Schedule 6 of the Operating Agreement requires the Transmission Owners to provide to PJM in the form and manner specified by PJM all criteria, assumptions and models used by the Transmission Owners, including those used to develop Supplemental Projects.[12]

Additionally, FERC made clear in its recent Show Cause Orders relative to the Transmission Owners' Supplemental Projects that, while the Transmission Owners' Tariff, Attachment M-3 process and the PJM Operating Agreement are adequate to ensure compliance with Order No. 890's transparency requirements, the Transmission Owners must make available the criteria guiding their decisions.[13] Thus, while PJM does not want the role of specifying what the criteria should be, nor did FERC assign that responsibility to PJM, PJM has the authority to require that the Transmission Owners provide their criteria and explain their programs.

## IV.    *Advance Notice of End of Life Candidates*

Although PJM does have the ability to look further forward, given the lack of material load growth, PJM plans system improvements five years forward and uses the resulting five-year model generated from its RTEP process to evaluate service requests and any resulting necessary improvements. Thus, requiring each Transmission Owner to provide advance notice of its potential end of life facilities (i.e., "candidates") five years forward at the start of an annual RTEP cycle is appropriate because it aligns with PJM's planning process. There is little value to PJM to attempt to identify end of life facilities ten years forward because of the uncertainty of any determination made that far ahead and, such an advance notice would not be utilized in PJM's five-year forward planning process. Furthermore, any requirement for such notice, even at the five year mark, must provide the Transmission Owners with the flexibility to add projects, delay retirements

---

[11] CTOA, section 4.1.4.

[12] Amended and Restated Operating Agreement of PJM Interconnection, L.LC. Schedule 6, section 1.5.4(a). Moreover, the Operating Agreement, Schedule 6, section 1.5.4(e) requires PJM to provide access through its website to all of the Transmission Owner's criteria, assumptions and models used by the Transmission Owners in their internal planning processes, including the development of Supplemental Projects.

[13] *Monongahela Power Co., et al.*, 164 FERC ¶ 61,217 at P 30 (Sept. 26, 2018) (September 26 Order on Rehearing and Compliance).

(Page 55 of Total)

JA0045

Document Accession #: 20200612-5124          Filed Date: 06/12/2020

or replacements, or otherwise adjust course due to changes in condition assessments, unforeseen conditions, changes in circumstances (e.g., weather/wind damage), or other developments. And Transmission Owners also need the flexibility to both expedite replacement projects to avoid run-to-failure scenarios and to delay replacement projects when condition assessments indicate that the continued operation of the facilities can be done without jeopardizing reliability.

## V.     End of Life Replacement Projects – Form 715

Under the PJM RTEP planning processes, the determination of when and how to replace facilities at their end of useful life can occur in two ways.[14]  One occurs when a Transmission Owner chooses to include end of life replacement criteria in its FERC Form 715.[15]  Under the Operating Agreement, because FERC Form 715 is designed to set forth a Transmission Owner's *planning* criteria, PJM includes projects identified by Transmission Owners as Form 715 projects in its planning process and, historically, has treated projects stemming from Form No. 715 criteria as baseline reliability projects.[16]  And, as a result of a recent order issued by FERC,[17] PJM will have a role in planning Form 715 projects, and such projects may be subject to its competitive planning process (unless certain exemptions apply) and to regional cost-allocation.  It is not apparent that any changes are needed or appropriate for such Form 715 projects.

## VI.    End of Life Replacement Projects – Supplemental Projects

The other category or type of end of life replacement projects can be found in Supplemental Projects. Supplemental Projects are defined in the Operating Agreement as any transmission expansion or enhancement that is not required for compliance with the PJM planning criteria.  While the placement of this definition in the Operating Agreement may suggest an ability for the stakeholders to modify this definition, the definition is closely tied back to the rights transferred to PJM and to the rights reserved by the Transmission Owners under the CTOA.  Indeed, this definition has served as the foundation for the boundary between PJM's regional planning role and the individual Transmission Owners' reserved

---

[14] End of life replacement projects initiated by a Transmission Owner that do not enhance or expand the transmission system could be conducted outside of both the Form No. 715 and Supplemental Project processes.

[15] FERC Form 715 requires "submission of transmission planning reliability criteria that the Transmission Owner uses to assess and test the strength and limits of its transmission system."

[16] *See PJM Interconnection, L.L.C.,* 171 FERC ¶ 61,013 (Apr. 3, 2020) (Order on Compliance supporting PJM's reassignment of Form 715 projects using reliability cost allocation methodology)..

[17] *See PJM Interconnection, L.L.C.,* 170 FERC ¶ 61,049 at P 2 (Jan. 23, 2020) (accepting PJM's revisions to its Operating Agreement to eliminate the exemption from the competitive proposal window process for transmission projects addressing Form 715 criteria); *see also PJM Interconnection, L.L.C.,* 168 FERC ¶ 61,133 at P 34 (August 30, 2019) (accepting PJM Transmission Owners removal of the Form 715 cost allocation methodology from Tariff, Schedule 12).

authority.  This authority was recognized in Order No. 1000,[18] as well the Commission's Orders relative to the creation of the Transmission Owners' Attachment M-3 process.[19]  While there may be a desire to broaden the category of projects under PJM's authority by creating a new category of projects and thus effectively amending the definition of Supplemental Projects, such an amendment is beyond the scope of the authority transferred to PJM by the PJM Transmission Owners.[20]  Moreover, these issues were recently litigated before FERC in the Attachment M-3 dockets and FERC rejected the attempts to move the planning of Supplemental Projects under PJM's RTEP processes and determined that the Attachment M-3 process provides the appropriate level of transparency to satisfy Order No. 890 requirements.[21]  In so doing, FERC reaffirmed Supplemental Projects as being Transmission Owner directed.

## VII.    *Asset Management Activities*

In addition, the two California Orders involving California utilities provide precedential guidance regarding the boundary between asset management activities and transmission planning activities subject to the Order No. 890 planning requirements.[22]  In those orders, FERC offered clarity as to the meaning and characterization of asset management activities and projects.  Importantly, FERC determined that asset management activities are not "planning" so long as any capacity increase is only incidental to the replacement project.[23]  Some stakeholders disagree as to the relevance of the California orders to the PJM paradigm, but we believe that FERC was simply observing that Supplemental Projects is a broader

---

[18] *Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051 at P 64 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) clarifying that:

> In some regions, transmission facilities not selected for purposes of regional or interregional cost allocation nonetheless may be in a regional transmission plan for informational purposes, and the presence of such transmission projects in the regional transmission plan does not necessarily indicate an evaluation whether such transmission facilities are more efficient or cost-effective solutions to a regional transmission need . . . . [and] we do not intend to disturb regional practices with regard to other transmission facilities that also may be in the regional transmission plan.

*See also PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 65 (Mar. 22, 2013) (accepting PJM's Order No. 1000 Compliance Filing, including: "Supplemental Projects, which are projects that are not identified by PJM as necessary for reliability or economic reasons, but may address local planning criteria or public policy requirements . . . . that may be included in the RTEP for information purposes and its costs are not eligible for cost allocation under Schedule 12.").

[19] *See Monongahela Power Co.*, 162 FERC ¶ 61,129 (Feb. 15, 2018) (accepting in part and requiring further compliance filing relative to Tariff, Attachment M-3 provision); *see also* September 26 Order on Rehearing and Compliance at P 37 (finding Attachment M-3 and the Operating Agreement, as revised, adequate to ensure compliance with Order No. 890).

[20] Arguments that Transmission Facilities turned over to PJM's operational control are subject to PJM's planning authority are without basis. Under the CTOA, the Transmission Owners explicitly separated the authority transferred to PJM relative to the operational control of their assets and the authority transferred to PJM relative to planning the transmission system.

[21] *See, e.g., Appalachian Power Co., et al.*, 170 FERC ¶ 61,196 at P 59 (Mar. 17, 2020) (citing to September 26 Order on Rehearing and Compliance at PP 13, 14, and 22 stating "[i]n *Monongahela Power Co.*, the Commission made clear that the PJM Transmission Owners retain responsibility for planning Supplemental Projects, and therefore 'retain the filing rights to make modifications to [the Supplemental Project planning] provisions' in the Tariff."

[22] *See* SoCal Edison Order at P 55 and PG&E Order at P 37:

> Whether or not other transmission planning regions are considering asset management projects and activities through their regional transmission planning process does not, in and of itself, determine whether Order No. 890 requires them to do so.

[23] In the stakeholder process, PJM proposed to clarify the definition of incidental:  *"Incidental expansion is defined as those achieved by advancements in technology and/or replacements consistent with current TO design standards, industry standards, codes, laws or regulations."*

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

category than asset management activities, including replacement projects that increase the capacity of the grid beyond an incidental increase.[24] The question before FERC in the show cause orders related to Attachment M-3 was simply whether Supplemental Projects were being treated consistent with PJM's Order No. 890-compliant transmission planning process.[25] As recognized by FERC in the *CPUC v. PG&E* orders, to the extent PJM's Supplemental Projects include asset management activities, then the Attachment M-3 process actually provides *greater* transparency than what FERC ultimately required in California for asset management activities.[26]

## VIII.     Intersection of Supplemental Projects and Regional Needs

PJM's role in regional planning and the intersection of end of life replacement facilities can be further clarified. Specifically, PJM has proposed reviewing the five-year forward candidate list and comparing that list with any identified regional needs. Where there is an intersection of a candidate with a regional need, it is appropriate for PJM, as the regional planner, to pursue the more efficient and cost-effective solution for the regional need, which may include an end-of-life replacement project. In those cases where there is an intersection, the solution may be different than a Transmission Owner-identified replacement project and, accordingly, would be part of the baseline regional solution.

---

[24] In the California Orders, the Commission observed that PJM's Supplemental Projects provided greater transparency than was required under Order No.890. *See* SoCal Edison Order on Rehearing at P 57 and PG&E Order on Rehearing at P 57.

[25] *See Southern California Edison Co.*, 168 FERC ¶ 61,170 at P 54 (Sept. 19, 2019).

[26] *Id.*

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

**EXHIBIT E**

JA0049

# PJM EOL Planning Package

Markets and Reliability Committee

May 28, 2020

Dave Souder, Senior Director – System Planning

# PJM Package Key Tenets

**Adhere to PJM Board Directive**

- Enhance transparency

- Honor Transmission Owner (TO) responsibility over asset management decisions

- Use PJM's expertise and authority to develop the RTEP and, in some circumstances, determine the more cost-effective regional solution to replace a retired facility

**Enhance existing planning processes**

**Ensure PJM Package respects authorities within governing documents**

**Allow FERC Orders to inform the PJM Package**

**Reflect stakeholder education and interest identification**

# EOL Package Comparison

## Areas of Alignment

- Both packages require similar TO-specific end-of-life determination program/process.

- Both packages promote transparency:

  - Annual presentation of the details of TO EOL program as part of stakeholder meeting

  - Conceptual 5 years EOL list

- Both packages incorporate a component that includes EOL replacement analysis consistent with RTEP.

## Areas of Divergence

- Differences in timing of EOL Notification and Determination

- Recognition of the time horizon in which end-of-life determinations are made

- Honoring existing Competitive Proposal Window Rules

- Differentiation between asset management and planning and resultant subset of EOL facilities that may be part of a broader regional solution

- Fundamental disagreement about PJM's jurisdiction

PJM©2020

USCA Case #21-1246     Document #1962371     Filed: 09/06/2022     Page 63 of 602

# Legal Analysis – PJM Authority



**Under the Consolidated Transmission Owners Agreement (CTOA), the TOs transferred to PJM the "authority to prepare a regional transmission expansion plan (RTEP)." CTOA, sec. 4.1.4.**

RTEP is a plan prepared by PJM for the enhancement and expansion of the transmission system in order to meet demand for firm transmission service in PJM.  Tariff, Definitions R-S

- Under the CTOA, section 5.2, the TOs retained the authority to build, finance, own, acquire, sell, dispose, retire, merge or otherwise transfer or convey all or any part of its assets, including any Transmission Facilities. Section 5.2 further clarified that "PJM shall not challenge any such sale, disposition, retirement, merger, or other action under this Section 5.2."

- Nowhere in the CTOA did the TOs transfer any authority over asset management activities or projects.

- Under CTOA, sec. 5.6, the TOs explicitly reserved all rights not specifically transferred to PJM.

- Asset management projects include maintenance, repair and replacement work on existing facilities to maintain a safe, reliable and compliant grid based on existing topology.  See Cal. Pub. Utils. Comm'n, et al. v. Pacific Gas and Elec. Co., 164 FERC 61,161 at 30, n. 119.

- Additionally, the Commission further clarified in the California Orders that asset management is not regional planning as defined in Order No. 890. More specifically, Order No. 890 was intended to address concerns regarding undue discrimination in grid expansion; thus, to the extent asset management projects and activities do not expand the grid, they do not fall within the scope of Order No. 890. See PG&E Order at P 66.

- Under the PGE Rehearing Order, the Commission found identification of EOL facilities to be "asset management," i.e., replacing equipment that has reached the end of its operation life" and "replacing failed equipment." See California Public Utilities Commission, et al. v. Pacific Gas and Electric Co., 168 FERC ¶ 61,171 P 57 (Sept. 19, 2019) ("PGE Rehearing Order"); see also Southern Cal. Edison Co., 168 FERC ¶ 61,170 at P 57 (Sept. 19, 2019) ("SoCal Edison Order Denying Rehearing").

0053

Redacted - Session #: 20200612-5124    USCA Case #21-1246    Document #1963371    Filed: 06/12/2020    Page 64 of 602

| End-of-Life Program (1b, 2b) | Program Transparency (1c, 2c, 2d) | Local Abandonment Process (2a) | Determination (1a, 1d, 3a) | Planning Analysis (3c) |
|---|---|---|---|---|
| **Mandatory TO-specific program/process** for (i) **asset condition assessments** which may consider frequency of assessments based upon age and (ii) **EOL determination process** which may consider industry averages, manufacturers recommendations and Good Utility Practice. | TO will **annually present** the details of the TO **EOL program** as part of the TEAC meeting. | TOs **shall** provide to PJM a **five years EOL retirement/ replacement candidate projection list** (limited to transmission lines, including associated transmission line support equipment such as tower structures, and transformers). | PJM runs its annual **RTEP analysis** to identify **potential reliability violations,** and identifies other issues which may be included in the review of the RTEP short-term proposal window, e.g. FERC Form 715 violations. If **PJM identifies** any **overlap with a facility(ies) on the EOL retirement/replacement candidate projection list and potential RTEP issues to be included in the short term proposal window,** PJM will note the EOL facility(ies) in the posting of the identified RTEP issues and include both in a competitive proposal window problem statement for the short-term window. Otherwise, where TOs address EOL through Attachment M-3, the design component is provided through Assumptions presented in the Assumptions Meetings and Needs presented in the Needs Meetings. | PJM performs planning processes for all TO EOL retirement determinations for facilities identified as under PJM's Markets & Reliability and Reliability BES, ensuring the current level of reliability and considering impacts to operational performance; market efficiency and to ensure the solution does not result in the creation of CIP-014 critical facilities. **PJM runs its annual RTEP analysis to identify potential reliability violations,** and identifies other issues which may be included in the review of the RTEP short-term proposal window, e.g. FERC Form 715 violations. If **PJM identifies** any **overlap with a facility(ies) on the EOL retirement/replacement candidate projection list and potential RTEP issues to be included in the short-term proposal window,** PJM will note the EOL facility(ies) in the posting of the identified RTEP issues and include both in a competitive proposal window problem statement for the short term window. **Otherwise,** where **TOs address EOL through Attachment M-3,** the design component is provided through Assumptions presented in the Assumptions Meetings and Needs presented in the Needs Meetings. Additionally, consistent with current practices (M14B Section 1.4.2.1 & 1.4.2.2), **PJM will provide notice** of the potential **interaction** associated with **EOL needs in the M-3 process** or EOL supplemental project(s) submitted for inclusion in the Local Plan **and any identified violation, system condition, economic constraint, or public policy requirement included in the PJM open proposal window.** |

USCA Case #21-1246    Document #1962371    Filed: 03/06/2022    Page 65 of 602

# PJM EOL Package Benefits

**End-of-Life Program:**
Mandatory Asset Management programs support system reliability and are consistent with good utility practice, eliminating a "run to failure" approach to asset management.

**Program Transparency:**
Annual presentation of the details of the methodology of TO EOL program promoting transparency and understanding.

**Look-ahead Program:**
Five-year notification of potential EOL candidates coincides with the RTEP cycle.

**EOL Determination and Planning Process:**
Posting EOL candidates that interact with RTEP violations as part of a competitive window allows for potential broader regional solutions, while also allowing asset owner to prolong asset life for the remaining facilities based on EOL Determination programs.

# Areas of Concern

## Stakeholder Package:

- **Introduces a dichotomy** by requiring EOL determination 6 years in advance while also verifying asset management determinations, when actual final EOL determinations typically occur at the 1–3 year timeframe.

- **Mandates** a six year final EOL determination for all facilities which may result in the forced replacement of facilities not at their end-of-life.

- **Incorrectly asserts** that Final EOL Determinations resulting in mandatory EOL Replacement Projects/EOL Retirements can easily be delayed by PJM similar to any other system reinforcement without fully considering NERC Compliance (modeling) and Generator Impacts (Interconnection Queue, Deliverability / Performance Assessment).

- **Incorrectly assert** their package" has an added benefit of greatly reducing the need to 'retool' generation queues because of Supplemental Projects coming in throughout the year."

- **Incorrectly asserts** the PJM Package only requires notification of lines and poles.

- **Incorrectly asserts** PJM Package "Might reduce transparency and certainly does not increase it."

Document Accession #: 20200612-5124    Filed Date: 06/12/2020
USCA Case #21-1246    Document #1962371    Filed: 09/06/2022    Page 67 of 602

Conclusion

## PJM Package:

- **Reinforces PJM's Role as Regional Planner while respecting the authority** granted PJM as part of the CTOA and the precedent set by the FERC CA orders regarding the planning of asset management projects and activities.

- **Enhances system reliability** by requiring Mandatory EOL Program as opposed to "run to failure approach".

- **Increases transparency** by requiring an annual presentation of Transmission Owners EOL program and posting of EOL Candidates that interact with RTEP violations.

- **Promotes competition** by identifying potential broader regional solutions where EOL Candidates interact with RTEP violations

Document Accession #: 20200612-5124    Filed Date: 06/12/2020
USCA Case #21-1246    Document #1962371    Filed: 09/06/2022    Page 68 of 602

Appendix

# PJM EOL Planning Package

Transparency and End of Life Planning
April 17, 2020
Dave Souder, Senior Director – System Planning
Pauline Foley, Associate General Counsel
Aaron Berner, Manager – Transmission Planning



Document Accession #: 20200612-5124    Filed Date: 06/12/2020

# Table of Contents

| Topic | Slide Number |
|-------|--------------|
| Introduction Slides | 12 – 14 |
| EOL Program | 15 – 17 |
| EOL Program Transparency | 18 -19 |
| Look-ahead Process | 20 – 23 |
| EOL Determination | 24 – 28 |
| EOL Planning Analysis | 29 – 36 |
| Status Quo | 37 – 39 |
| Next Steps | 40 |
| Overlap Examples | 41 - 49 |

Document Accession #: 20200612-5124    Filed Date: 06/12/2020



# PJM Package Key Tenets

**Adhere to PJM Board Directive**

- Enhance transparency

- Honor Transmission Owner (TO) responsibility over asset management decisions

- Use PJM's expertise and authority to develop the RTEP and, in some circumstances, determine the more cost-effective regional solution to replace a retired facility

**Enhance existing planning processes**

**Ensure PJM Package respects authorities within governing documents**

**Allow FERC Orders to inform the PJM Package**

**Reflect stakeholder education and interests**

USCA Case #21-1246    Document #1962371    Filed: 09/06/2022    Page 71 of 602

# EOL Package Comparison

## Areas of Alignment

- Both packages require similar TO-specific end-of-life determination program/process.

- Both packages promote transparency:
    - Annual presentation of the details of TO EOL program as part of stakeholder meeting
    - Conceptual 5 years EOL list

- Both packages incorporate a component that includes EOL replacement analysis consistent with RTEP.

## Areas of Divergence

- Differences in timing of EOL Notification and Determination

- Recognition of the time horizon in which end-of-life determinations are made

- Honoring existing Competitive Proposal Window Rules

- Differentiation between asset management and planning and resultant subset of EOL facilities that may be part of a broader regional solution

- Fundamental disagreement about PJM's jurisdiction

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

# Design Component Process Flow

**End-of-Life Program**

Program Transparency



Look-Ahead Process



Determination

Planning Analysis



USCA Case #21-1246      Document #1962371      Filed: 09/06/2022      Page 73 of 602



# EOL Program (1b, 2b)

**PJM Solution Option:**

Mandatory TO-specific program/process for (i) asset condition assessments which may consider frequency of assessments based upon age and (ii) EOL determination process which may consider industry averages, manufacturers recommendations and Good Utility Practice.

**Business Rationale:**

Asset Management programs support system reliability and are consistent with good utility practice, eliminating a "run to failure" approach to asset management.

**Business Thoughts on Stakeholder Packages:**

PJM does not see the benefit associated with a 10-year look-ahead program since it does not align with the PJM RTEP process nor does it reflect the time horizon in which EOL decisions are made.

**Legal Analysis:**

Under the PJM governing documents, transmission owners are required to provide criteria, assumptions and methodology used by them to plan Supplemental Projects. OA, Schedule 6, Section 1.5.4(e) and Tariff, Attachment M-3(2). See also Order 890, PP 471, 477 and 478.

- Nothing in the governing documents requires the TOs to have an EOL program using a "10-year" planning horizon.

- Order 890 at P 461 requires that transmission providers (transmission owners) reduce to writing and make available the basic methodology, criteria and processes they use to develop their transmission plans, including how they treat retail native loads, in order to ensure that standards are consistently applied. FERC contemplated that this information should enable customers, other stakeholders or an independent third party to replicate the results of planning studies and thereby reduce the incidence of after-the-fact disputes regarding whether planning has been conducted in an unduly discriminatory fashion.

Document Accession #: 20200612-5124     Filed Date: 06/12/2020



# EOL Program (1b, 2b)

## Legal Thoughts on Stakeholder Packages:

If AMP/ODEC is proposing that TOs submit their specific methodology for the EOL program in sufficient detail to understanding and use the results as input to subsequent planning studies, PJM agrees as this would be consistent with Order 890 and the Commission's February 15 Order relative to Attachment M-3. *See Monongahela Power Co., et al.,* 162 FERC ¶ 61,129 (Feb. 15, 2018) (February 15 Order). However, any proposals seeking to be able to replicate the TOs determination of the solution is beyond what the Commission required under Order 890 or the February 15 Order (at P 73).

Document Accession #: 20200612-5124    Filed Date: 06/12/2020



# EOL Program Transparency (1c, 2c, 2d)

**PJM Solution Option:**

TO will annually present the details of the TO EOL program as part of the TEAC meeting.

**Business Rationale:**

Annual presentation of the details of the methodology of TO EOL program promotes transparency and understanding.

**Business Thoughts on Stakeholder Packages:**

- PJM has concerns with requirements to "replicate the results for individual facilities determined to be EOL"

- PJM has defined "models" within M14B to powerflow, short circuit and stability models and not TO asset management or EOL determination models.

- Stakeholder and TOs should work constructively to continue to improve the existing Attachment M-3 process.

Document Accession #: 20200612-5124      Filed Date: 06/12/2020

# EOL Program Transparency (1c, 2c, 2d)

## Legal Analysis:

In terms of annually updating the details of their EOL programs, OA, Schedule 6, Sections 1.5.4(a) and (e) require that the PJM TOs provide to PJM on an annual or periodic basis all criteria, assumptions and models used by the TOs to develop Supplemental Projects.

## Legal Thoughts on Stakeholder Packages:

Agree with requiring TOs to annually or periodically communicate updates their EOL programs.



# Look-ahead Process (2a)

**PJM Solution Option:**

TOs to provide to PJM a five years EOL retirement/ replacement candidate projection list (limited to transmission lines, including associated transmission line support equipment such as tower structures, and transformers).

**Business Rationale:**

- Five-year notification for potential for EOL candidates coincides with the identification of RTEP needs

- Providing PJM the EOL retirement/replacement candidate list (limited to transmission lines and transformers) and PJM posting "candidate EOL facilities" that interact with RTEP violations provides the appropriate level of actionable transparency, recognizes the difference between asset management and planning, and addresses the TO liability risk if list made public

**Business Thoughts on Stakeholder Packages:**

PJM does not see the benefit associated with a 10-year look-ahead program since it does not align with the PJM RTEP process nor does it reflect the time horizon in which EOL decisions are made.

Document Accession #: 20200612-5124      Filed Date: 06/12/2020



# Look-ahead Process (2a)

| **Legal Analysis:** <br><br> With regard to the requirement that TOs provide a five-year candidate list for potential EOL facilities: | • No prohibition to requiring TOs to provide information within a specific timeframe regarding potential EOL facilities based on its EOL Program. *See* CTOA, Section 4.1.4 requiring TOs "to provide information reasonably requested by PJM to prepare the RTEP and shall otherwise cooperate with PJM in such preparation." <br><br> • CTOA, Section 6.3.4 requires PJM to conduct its planning for the expansion and enhancement of transmission facilities based on a planning horizon of at least 10 years, or such longer period as may be required by the PJM Tariff or Operating Agreement, including the Regional Transmission Expansion Planning Protocol. <br><br>   – This obligation is specific to PJM, not the TOs. <br><br>   – This obligation is specific to "expansions and enhancements" of facilities, not asset management (replacement-in-kind or not more than incidental increases to the capability of the transmission system). <br><br>   – Identification of EOL facilities is not an activity under PJM's authority. Under the California Rehearing Orders, the Commission found identification of EOL facilities to be "asset management," i.e., replacing equipment that has reached the end of its operation life" and "replacing failed equipment." See e.g., California Public Utilities Commission, et al. v. Pacific Gas and Electric Co., 168 FERC ¶ 61,171 P 57 (Sept. 19, 2019) ("PGE Rehearing Order"). |
|---|---|

Document Accession #: 20200612-5124    Filed Date: 06/12/2020



# Look-ahead Process (2a)

**Legal Analysis:**

Manual 14B, Section 2.1 provides that PJM uses a 15-year planning horizon for consideration of expansion or enhancements projects.

Manual 14B, Attachment B.2 states PJM prepares an RTEP which consolidates the region's transmission needs into a single plan that includes:

- A five-year plan ("near-term plan") to address needs for which a commitment to expand or enhance the transmission system must be made in the near term in order to meet scheduled in-service dates.

- A 15-year plan ("long-term plan") to address new transmission construction and right-of-way acquisition. System evaluations will be performed to address on 200 kV above transmission system.

Document Accession #: 20200612-5124   Filed Date: 06/12/2020



## Look-ahead Process (2a)

**Legal Thoughts on Stakeholder Packages:**

PJM agrees that TOs should be required to comply with a look-ahead process for notification of potential EOL facilities. Stakeholders are proposing a ten-year look ahead. PJM proposes a five-year look ahead based on PJM's current planning process

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

# EOL Determination (1a, 1d, 3a)



| **PJM Solution Option:** | PJM runs its annual RTEP analysis to identify potential reliability violations, and identifies other issues which may be included in the review of the RTEP short-term proposal window, e.g. FERC Form 715 violations. If PJM identifies any overlap with a facility(ies) on the EOL retirement/replacement candidate projection list and potential RTEP issues to be included in the short term proposal window, PJM will note the EOL facility(ies) in the posting of the identified RTEP issues and include both in a competitive proposal window problem statement for the short-term window. Otherwise, where TOs address EOL through Attachment M-3, the design component is provided through Assumptions presented in the Assumptions Meetings and Needs presented in the Needs Meetings. |
|---|---|

Document Accession #: 20200612-5124    Filed Date: 06/12/2020



# EOL Determination (1a, 1d, 3a)

## Business Rationale:

- Five-year notification for potential for EOL candidates that coincide with the identification of RTEP needs

- Providing to PJM a confidential EOL candidate list (limited to transmission lines and transformers) and then PJM posts publicly the EOL candidates that interact with RTEP violations, providing the appropriate level of actionable transparency, recognizing the difference between asset management and planning, while addressing the TO liability risk if the list was made public.

- Allows for potential broader regional solutions when EOL Supplemental Projects and RTEP violations overlap

## Business Thoughts on Stakeholder Packages:

- Mandating a six- to eight-year final EOL determination for all facilities would result in the forced replacement of facilities that are not at their end-of-life.

- Requiring TO to make early EOL determinations would be dictating their asset management practices and is outside of PJM's and stakeholders' authority.

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

# EOL Determination (1a, 1d, 3a)

| **Legal Analysis:** See, e.g., Manual 14B, Section 1.1 which provides that: | As part of the review of Supplemental Projects PJM will also apprise the relevant TO if a baseline upgrade might alleviate or partially mitigate the need for a Supplemental Project. In addition, PJM will determine if a Supplemental Project might impact a baseline need identified through the RTEP process, which might be in progress. A discussion of guidelines associated with potential for overlapping needs is included in this Manual below in Section 1.4.2. |
|---|---|



Document Accession #: 20200612-5124     Filed Date: 06/12/2020

# EOL Determination (1a, 1d, 3a)

| **Legal Analysis:** See, e.g., Manual 14B, Section 1.4.2 provides in part: | During a review of the RTEP analysis, it may become apparent that a supplemental need identified in the Attachment M-3 Process may interact with an identified violation, system condition, economic constraint, or public policy requirement posted on the PJM website. In this case, PJM will provide notice of the potential interaction associated with the posted system condition by posting the newly available information to the PJM website and provide notification to stakeholders. |
|---|---|

Document Accession #: 20200612-5124     Filed Date: 06/12/2020



# EOL Determination (1a, 1d, 3a)

## Legal Thoughts on Stakeholder Packages:

It is unclear what stakeholders mean by "information for understanding?" or "allow stakeholders to ensure determination was done consistent with TO program." Under Attachment M-3, phases one, two and three, including comment periods, are intended to provide the information up front and allow the opportunity for comment so that stakeholders can see the rationale for a TO's project selection to address EOL facilities. Without being more precise as to what AMP/ODEC are inferring is not provided for under Attachment M-3, it is unclear whether this proposal intends to revise the Tariff, Attachment M-3 process approved by FERC.

# EOL Planning Analysis (3c)

**PJM Solution Option:**

PJM performs planning processes for all TO EOL retirement determinations for facilities identified as under PJM's Markets & Reliability and Reliability BES, ensuring the current level of reliability and considering impacts to operational performance; market efficiency and to ensure the solution does not result in the creation of CIP-014 critical facilities. PJM runs its annual RTEP analysis to identify potential reliability violations, and identifies other issues which may be included in the review of the RTEP short-term proposal window, e.g. FERC Form 715 violations. If PJM identifies any overlap with a facility(ies) on the EOL retirement/replacement candidate projection list and potential RTEP issues to be included in the short-term proposal window, PJM will note the EOL facility(ies) in the posting of the identified RTEP issues and include both in a competitive proposal window problem statement for the short term window. Otherwise, where TOs address EOL through Attachment M-3, the design component is provided through Assumptions presented in the Assumptions Meetings and Needs presented in the Needs Meetings. Additionally, consistent with current practices (M14B Section 1.4.2.1 & 1.4.2.2), PJM will provide notice of the potential interaction associated with EOL needs in the M-3 process or EOL supplemental project(s) submitted for inclusion in the Local Plan and any identified violation, system condition, economic constraint, or public policy requirement included in the PJM open proposal window.

Document Accession #: 20200612-5124    Filed Date: 06/12/2020
USCA Case #21-1246    Document #1962371    Filed: 09/06/2022    Page 88 of 602

# EOL Process Integration Into the Annual RTEP Cycle (Part 1)



**PJM**

Start → PJM establishes RTEP schedule → PJM aggregates all analysis performed by PJM and Transmission Owners including RTEP violations and FERC Form 715 issues → PJM reviews aggregate analysis list, which includes RTEP violations and FERC Form 715 issues and determines if candidate list overlaps exist

Confidential candidate list received by PJM

Continued

**TEAC / SRRTEP Meeting(s)**

TO presents EOL program information during annual assumptions meeting

**Transmission Owners**

TO prepares information associated with EOL program for inclusion in annual assumptions presentation

Transmission Owner EOL Program → Is Facility judged to be reaching it's EOL 5 years in the future?

Yes → Submit Confidential EOL Candidate List, to include transmission lines and transformers, to PJM

No → TO continues to monitor facilities in EOL Program

Document Accession #: 20200612-5124    Filed Date: 06/12/2020

USCA Case #21-1246    Document #1962371    Filed: 09/06/2022    Page 89 of 602



# EOL Process Integration into the Annual RTEP Cycle (Part 3)



Document Accession #: 20200612-5124     Filed Date: 06/12/2020



# EOL Planning Analysis (3c)

## Business Rationale:

- PJM performs planning processes for all TO EOL retirement determinations for facilities identified as under PJM's Markets & Reliability and Reliability BES, ensuring the current level of reliability and considering impacts to operational performance; market efficiency and to ensure the solution does not result in the creation of CIP-014 critical facilities.

- PJM's five-year notification for potential EOL candidates links to RTEP needs identification.

- Posting a subset of EOL retirement/replacement candidate list that interact with RTEP violations provides the appropriate level of actionable transparency allowing for potential broader regional solutions when EOL and RTEP violations overlap.

- A five year candidate list permits broader regional solution when RTEP violations overlap while allowing asset owner to prolong asset life based on EOL Determination program

## Business Thoughts on Stakeholder Packages:

- The stakeholder package introduces a dichotomy by requiring EOL determination 6–8 years in advance while also verifying asset management determinations, which typically occur within a 1–3 year timeframe.

- The stakeholder package does not honor the difference between asset management and system planning.

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

# EOL Planning Analysis (3c)

**Legal Analysis:**

See, e.g., Manual 14B, Section 1.1 which provides that:

As part of the review of Supplemental Projects PJM will also apprise the relevant TO if a baseline upgrade might alleviate or partially mitigate the need for a Supplemental Project. In addition, PJM will determine if a Supplemental Project might impact a baseline need identified through the RTEP process, which might be in progress. A discussion of guidelines associated with potential for overlapping needs is detailed in Manual 14B, in Section 1.4.2.



Document Accession #: 20200612-5124    Filed Date: 06/12/2020
USCA Case #21-1246    Document #1962371    Filed: 09/00/2022    Page 93 of 602

**Legal Analysis:**

Manual 14B, Section 1.4.2 provides in part:

During a review of the RTEP analysis, it may become apparent that a supplemental need identified in the Attachment M-3 Process may interact with an identified violation, system condition, economic constraint, or public policy requirement posted on the PJM website. In this case, PJM will provide notice of the potential interaction associated with the posted system condition by posting the newly available information to the PJM website and provide notification to stakeholders.

Document Accession #: 20200612-5124    Filed Date: 06/12/2020

# EOL Planning Analysis (3c)

## Legal Thoughts on Stakeholder Package:

- To the extent the stakeholder proposal is proposing to require that **all** proposed EOL facilities are planned for by PJM through its RTEP process, such authority was not transferred to PJM under the CTOA. Specifically,

  - Regarding planning, the TOs explicitly transferred to PJM per CTOA, Section 4.1.4:

    - The responsibility to prepare an RTEP, which is defined in the Tariff as "the plan prepared by [PJM] pursuant to Operating Agreement, Schedule 6 for the enhancement and expansion of the Transmission System in order to meet the demands for firm transmission service in the PJM Region."

    - The authority to reasonably request from the TOs information need by PJM to prepare the RTEP.

- CTOA, Section 5.2 did not transfer to PJM the decision to retire TOs' transmission facilities. In fact, Section 5.2 specifically stated that "PJM shall not challenge any such sale, disposition, retirement, merger, or other action under this Section 5.2 on the basis that they are a signatory to this Agreement."

- CTOA, Section 5.6 reserves to the TOs rights not specifically transferred by the TOs to PJM under the CTOA. Based on Section 5.2 above, PJM does not have planning authority over the TOs EOL program/process such as requiring that the TOs utilize a 10-year planning horizon.

Document Accession #: 20200612-5124     Filed Date: 06/12/2020



# Status Quo (3b, 4, 6, 8)

**PJM Solution Option:**

No change to Competition, Documentation (Summarizing EOL Look-Ahead by zone), Supplemental and RTEP definition Design Components.

**Business Rationale:**

- The PJM solution separates asset management from system planning.

- The PJM solution leverages existing committee processes, which are continuously modified in an effort to strive for continuous improvement.

**Legal Analysis:**

- To the extent the stakeholder proposal is proposing to require that *all* proposed EOL facilities are planned for by PJM through its RTEP process, such authority was not transferred to PJM under the CTOA. Specifically,

  - Regarding planning, the TOs explicitly transferred to PJM per CTOA, Section 4.1.4:

    - The responsibility to prepare an RTEP, which is defined in the Tariff as "the plan prepared by [PJM] pursuant to Operating Agreement, Schedule 6 for the enhancement and expansion of the Transmission System in order to meet the demands for firm transmission service in the PJM Region."

    - The authority to reasonably request from the TOs information need by PJM to prepare the RTEP.

- CTOA, Section 5.2 did not transfer to PJM the decision to retire TOs' transmission facilities. In fact, Section 5.2 specifically stated that "PJM shall not challenge any such sale, disposition, retirement, merger, or other action under this Section 5.2 on the basis that they are a signatory to this Agreement."

- CTOA, Section 5.6 reserves to the TOs rights not specifically transferred by the TOs to PJM under the CTOA. Based on Section 5.2 above, PJM does not have planning authority over the TOs EOL program/process such as requiring that the TOs utilize a 10-year planning horizon.



**Legal Thoughts on Stakeholder Package:**

Based on PJM's review of the governing documents, the PJM TOs did not transfer to PJM the authority to plan for enhancements or expansions not needed to address PJM planning criteria set forth in the OA, Schedule 6 or a TO's asset management activity or projects; and, therefore, the stakeholders cannot accord to PJM through revisions to the OA authority not specifically transferred to PJM under the CTOA. *See* CTOA, Section 5.6.

Document Accession #: 20200612-5124        Filed Date: 06/12/2020



# PJM Package Next Steps

**Documentation Impacts**
PJM is investigating impact to Governing Document and Manuals

- PJM believes PJM's Package does not substantially impact Governing Documents
  - No impact to CTOA
  - PJM is performing a more detailed review of Operating Agreement

- PJM's Package will result in modifications to Manual 14B

**Answer Questions**

**Solicit Feedback**

**Evaluate Feedback to Improve PJM Package**

# Overlapping Issues in the RTEP

Aaron Berner, Manager – Transmission Planning



Document Accession #: 20200612-5124      Filed Date: 06/12/2020

# Intersection of Baseline and EOL Needs

## OVERLAP IDENTIFIED FOR BASELINE AND EOL CANDIDATES

**Baseline and EOL candidates are identified that have potential for overlap of solutions**

PJM determines that baseline and EOL candidates intersect

→ Review circumstances associated with all needs

Determine path forward for RTEP

One solution does not solve both needs (baseline upgrade does not eliminate the need for an EOL project)

→ RTEP Baseline proceeds and TO determines next step for EOL candidate project

Document Accession #: 20200612-5124    Filed Date: 06/12/2020



# Violation and EOL on Different Circuits

**Example 1**



A thermal violation on circuit **C-D**



An EOL candidate is identified on circuit **A-B**



Document Accession #: 20200612-5124     Filed Date: 06/12/2020

# Violation and EOL on Different Circuits

**Example 1**

- The project that upgrades A-B may or may not be able to address the issues identified on circuit C-D, and vice versa. If A-B has load tapped from the circuit or the network for A-B and C-D beyond the endpoints of this diagram for each circuit shown diverges, then upgrades made to circuit C-D are not guaranteed to eliminate the issues with EOL on A-B

- If A-B and C-D do not share common facilities then it may be unlikely that a baseline upgrade to C-D eliminates the EOL issue on A-B



**If PJM determines no overlap, no note of EOL candidate in posting for competitive window**



Document Accession #: 20200612-5124     Filed Date: 06/12/2020

# Violation and EOL on Different Circuits

**Example 2**



A thermal violation ☀ on circuit **C-D**

---



An EOL candidate ✳ is identified on circuit **A-B** (Circuits C-D and A-B are on same structures)

 Thermal violation      EOL candidate

Document Accession #: 20200612-5124      Filed Date: 06/12/2020

# Violation and EOL on Different Circuits

**Example 2**

The project that upgrades A-B may or may not be able to address the issues identified on circuit C-D. If A-B and C-D share common facilities, and the upgrade to C-D appears to require a rebuild of C-D then it is likely that A-B should be replaced at the same time work is completed for the C-D circuit (rebuild requirement will be based on magnitude of overload and conductor rating information)



PJM notes in posting for the competitive process that the EOL issue is identified along with a violation that PJM believes may overlap the EOL issue

 Thermal violation      EOL candidate

Document Accession #: 20200612-5124    Filed Date: 06/12/2020

# Violation and EOL on Same Circuits

**Example 3**



A thermal violation ✷ on circuit **A-B** is identified which requires mitigation



Circuit **A-B** is identified as an EOL candidate ✷

**PJM notes in posting for the competitive process that the EOL issue is identified along with a violation that PJM believes may overlap the EOL issue**

 Thermal violation     EOL candidate

Document Accession #: 20200612-5124    Filed Date: 06/12/2020
USCA Case #21-1246    Document #1962371    Filed: 09/08/2022    Page 106 of 602

**Example 4**



An EOL candidate ✴ is identified on circuit **A-B**

A thermal violation ✴ on circuit **C-D** at < 200 kV with no other violations

**In this example,** the single violation on the < 200 kV facility does not meet the requirement to list the facility as available for competition in accordance with the Operating Agreement Schedule 6, Section 1.5.8(n)(i) & (ii). This determination does not change if the facility A-B and C-D are the same facility (both violations on a single facility)

The EOL facility from the EOL Candidate List would not be noted on the posting of the violation. A note would indicate the facility would not be available for competition due to the exemption for the facility being < 200 kV

Document Accession #: 20200612-5124      Filed Date: 06/12/2020

Violation and EOL <200 kV

**Example 5**



An EOL candidate ⭐ is identified on circuit **B-F**

Thermal violations ☀ are identified on circuits **B-C** and **D-E** at < 200 kV

**In this example,** the multiple violations on the < 200kV facilities meets the requirement to list the facility as available for competition in accordance with the Operating Agreement Schedule 6, Section 1.5.8(n)(i) & (ii). This determination does not change if the EOL candidate directly overlaps any of the thermal violations

A note would be placed in the posting indicating the exception to the < 200 kV exemption from competition, and the EOL facility from the EOL Candidate List would be listed as well.

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

FERC rendition of the electronically filed tariff records in Docket No. ER20-02046-000
Filing Data:
CID: C000030
Filing Title: Amendments to Attachment M-3
Company Filing Identifier: 5016
Type of Filing Code: 10
Associated Filing Identifier:
Tariff Title: Intra-PJM Tariffs
Tariff ID: 23
Payment Confirmation:
Suspension Motion:


Tariff Record Data:
Record Content Description, Tariff Record Title, Record Version Number, Option Code:
  OATT ATT M-3, OATT Attachment M-3, 1.0.0, A
Record Narative Name:
Tariff Record ID: 1655
Tariff Record Collation Value: 430060800     Tariff Record Parent Identifier: 357
Proposed Date: 2020-08-11
Priority Order: 500
Record Change Type: CHANGE
Record Content Type: 1
Associated Filing Identifier:

# ATTACHMENT
## M-3
### ADDITIONAL PROCEDURES FOR PLANNING
### SUPPLEMENTAL PROJECTS AND ASSET MANAGEMENT PROJECTS

(a) **Applicability.**   Each Transmission Owner shall be responsible for planning and constructing in accordance with Schedule 6 of the Operating Agreement as provided in this Attachment M-3, to the extent applicable, (i) Asset Management Projects, as defined herein, (ii) Supplemental Projects, as defined in section 1.42A.02 of the Operating Agreement, and (iii) any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more of the following planning criteria:

1.    NERC Reliability Standards (which includes Applicable Regional Entity reliability standards);

2.    Individual Transmission Owner planning criteria as filed in FERC Form No. 715 and posted on the PJM website, provided that the Additional Procedures for the Identification and Planning of EOL Needs, set forth in section (d), shall apply, as applicable;

3.    Criteria to address economic constraints in accordance with section 1.5.7 of the Operating Agreement or an agreement listed in Schedule 12-Appendix B;

4.    State Agreement Approach expansions or enhancements in accordance with section 1.5.9(a)(ii) of the Operating Agreement; or

5.    An expansion or enhancement to be addressed by the RTEP Planning Process pursuant to section (d)(2) of this Attachment M-3 in accordance with RTEP Planning Process procedures in Schedule 6 of the Operating Agreement.

This Attachment M-3 shall not apply to CIP-014 mitigation projects that are subject to Attachment M-4.

**(b) Definitions.**

1.    Asset Management Project. "Asset Management Project" shall mean any modification or replacement of a Transmission Owner's Transmission Facilities that results in no more than an Incidental Increase in transmission capacity undertaken to perform maintenance, repair, and replacement work, to address an EOL Need, or to effect infrastructure security, system reliability, and automation projects the Transmission Owner undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements.

2.    Attachment M-3 Project.   "Attachment M-3 Project" means (i) an Asset Management Project that affects the connectivity of Transmission Facilities that are included in the Transmission System, affects Transmission Facility ratings or significantly changes the impedance of Transmission Facilities; (ii) a Supplemental Project; or (iii) any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 under any of clauses (1) through (5) of section (a).   "Attachment M-3 Project" does not include a project to address Form No. 715 EOL Planning Criteria. 3.              Incidental Increase.   "Incidental Increase" shall mean an increase in transmission capacity achieved by advancements in technology and/or replacements consistent with current Transmission Owner design standards, industry standards, codes, laws or regulations, which is not reasonably severable from an Asset Management Project. A transmission project that results in more than an Incidental Increase in transmission capacity is an expansion or enhancement of Transmission Facilities.

4.    Transmission Facilities.   "Transmission Facilities" shall have the meaning set forth in the Consolidated Transmission Owners Agreement, section 1.27.

5.    EOL Need.   "EOL Need" shall mean a need to replace a transmission line between breakers operating at or above 100 kV or a transformer, the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities, which the Transmission Owner has determined to be near the end of its useful life, the replacement of which would be an Attachment M-3 Project.

6.    Candidate EOL Needs List. "Candidate EOL Needs List" shall have the meaning ascribed to it in section (d)(1)(iii).

7.    Form No. 715 EOL Planning Criteria. "Form No. 715 EOL Planning Criteria" shall mean planning criteria filed by a Transmission Owner in FERC Form No. 715 to address EOL Needs.   No Transmission Owner may be compelled to file a Form No. 715 EOL Planning Criteria not required to be filed pursuant to FERC regulations applicable to Form No. 715.

Document Accession #: 20200612-5124   Filed Date: 06/12/2020

8.     Attachment M-3 EOL Planning Criteria.   "Attachment M-3 EOL Planning Criteria" shall mean planning criteria utilized by a Transmission Owner under Attachment M-3 to address EOL Needs.

9.     PJM Planning Criteria Need.   "PJM Planning Criteria Need" shall mean a need to plan a transmission expansion or enhancement of Transmission Facilities other than those reserved to each Transmission Owner in accordance with section (a).

10.    RTEP Planning Process.   "RTEP Planning Process" shall mean the process by which PJM develops the Regional Transmission Expansion Plan under Schedule 6 of the Operating Agreement.

**(c)     Procedures for Review of Attachment M-3 Projects.**   The following procedures shall be applicable to the planning of Attachment M-3 Projects:

1.     **Review of Attachment M-3 Projects.** As described in sections 1.3(c) and (d) of Schedule 6 of the Operating Agreement, the Subregional RTEP Committees shall be responsible for the review of Attachment M-3 Projects. The Subregional RTEP Committees shall have a meaningful opportunity to participate and provide feedback, including written comments, throughout the transmission planning process for Attachment M-3 Projects. Disputes shall be resolved in accordance with the procedures set forth at Schedule 5 of the Operating Agreement. For purposes of this section (c), reference to the Subregional RTEP Committees shall be deemed to include the Transmission Expansion Advisory Committee (TEAC) when the TEAC reviews Attachment M-3 Projects in accordance with these procedures.

2.     **Review of Assumptions and Methodology.** In accordance with sections 1.3(d), 1.5.4(a), and 1.5.6(b) and 1.5.6(c) of Schedule 6 of the Operating Agreement, each Subregional RTEP Committee shall schedule and facilitate a minimum of one Subregional RTEP Committee meeting to review the criteria, assumptions, and models Transmission Owners propose to use to plan and identify Attachment M-3 Projects (Assumptions Meeting). Each Transmission Owner shall provide the criteria, assumptions, and models to PJM for posting at least 20 days in advance of the Assumptions Meeting to provide Subregional RTEP Committee Participants sufficient time to review this information. Stakeholders may provide comments on the criteria, assumptions, and models to the Transmission Owner for consideration either prior to or following the Assumptions Meeting. The Transmission Owner shall review and consider comments that are received within 10 days of the Assumptions Meeting and may respond or provide feedback as appropriate.

3.     **Review of System Needs.** No fewer than 25 days after the Assumptions Meeting, each Subregional RTEP Committee shall schedule and facilitate a minimum of one Subregional RTEP Committee meeting per planning cycle to review the identified criteria violations and resulting system needs, if any, that may drive the need for an Attachment M-3 Project (Needs Meeting). Each

Transmission Owner will review the identified system needs and the drivers of those needs, based on the application of its criteria, assumptions, and models that it uses to plan Attachment M-3 Projects. The Transmission Owners shall share and post their identified criteria violations and drivers no fewer than 10 days in advance of the Needs Meeting. Stakeholders may provide comments on the criteria violations and drivers to the Transmission Owner for consideration prior to, at, or following the Needs Meeting. The Transmission Owner shall review and consider comments that are received within 10 days of the Needs Meeting and may respond or provide feedback as appropriate.

4.    **Review of Potential Solutions.** No fewer than 25 days after the Needs Meeting, each Subregional RTEP Committee shall schedule and facilitate a minimum of one Subregional RTEP Committee meeting per planning cycle to review potential solutions for the identified criteria violations (Solutions Meeting). The Transmission Owners shall share and post their potential solutions, as well as any alternatives identified by the Transmission Owners or stakeholders, no fewer than 10 days in advance of the Solutions Meeting. Stakeholders may provide comments on the potential solutions to the Transmission Owner for consideration either prior to or following the Solutions Meeting. The Transmission Owner shall review and consider comments that are received within 10 days of the meeting and may respond or provide feedback as appropriate.

5.    **Submission of Attachment M-3 Projects.** Each Transmission Owner will finalize for submittal to the Transmission Provider Attachment M-3 Projects for inclusion in the Local Plan in accordance with section 1.3 of Schedule 6 of the Operating Agreement and the schedule established by the Transmission Provider.   Stakeholders may provide comments on the Attachment M-3 Projects in accordance with section 1.3 of Schedule 6 of the PJM Operating Agreement before the Local Plan is integrated into the Regional Transmission Expansion Plan.   Stakeholders shall have at least 10 days to comment on the Local Plan after the solutions selected by the Transmission Owner for inclusion in the Local Plan are posted. Each Transmission Owner shall review and consider comments that are received at least 10 days before the Local Plan is submitted for integration into the Regional Transmission Expansion Plan.

6.    **Information Relating to Attachment M-3 Projects.** Information relating to each Transmission Owner's Attachment M-3 Projects will be provided in accordance with, and subject to the limitations set forth in, section 1.5.4 of Schedule 6 of the Operating Agreement. Local Plan Information will be provided to and posted by the Office of Interconnection as set forth in section 1.5.4(e) of Schedule 6 of the Operating Agreement.

7. **No Limitation on Additional Meetings and Communications or Use of Attachment M-3 For Other Transmission Projects.**

   i. Nothing in this Attachment M-3 precludes any Transmission Owner from agreeing with stakeholders to additional meetings or other communications regarding Attachment M-3 Projects, in addition to the Subregional RTEP Committee process.

   ii. Nothing in this Attachment M-3 precludes a Transmission Owner from using the procedures set forth in section (c) to solicit stakeholder input in the planning of Transmission Facilities not subject to this section (c) or the RTEP Planning Process.

(d) **Additional Procedures for the Identification and Planning of EOL Needs.**

   1. **EOL Need Planning Criteria Documentation and Identification**

      i. Each PJM Transmission Owner shall develop documentation for its Attachment M-3 EOL Planning Criteria and/or its Form 715 EOL Planning Criteria through which each identifies EOL Needs.

      ii. Each Transmission Owner's Attachment M-3 EOL Planning Criteria and/or Form 715 EOL Planning Criteria shall be clearly and separately delineated and presented by the Transmission Owner at least once annually pursuant to section (c)(2) and/or in its FERC Form No. 715 at a meeting of the TEAC.

      iii. Annually, each Transmission Owner will provide to PJM a Candidate EOL Needs List comprising its non-public confidential, non-binding projection of up to 5 years of EOL Needs that it has identified under the Transmission Owner's processes for identification of EOL Needs documented under section (d)(1)(i).  Each Transmission Owner may change its projection as it deems necessary and will update it annually. Any Candidate EOL Needs List provided to PJM shall remain confidential within PJM, except to the extent necessary for PJM to make the determination referenced in clause (a) of section (d)(2)(ii).

   2. **Coordination of EOL Needs Planning With PJM Planning Criteria Needs**.

      i. If, as part of the RTEP Planning Process, PJM initially determines that a substantial electrical overlap exists such that a single Solution may address a validated PJM Planning Criteria Need(s) identified during the current PJM planning cycle under the RTEP Planning Process and address a projected EOL Need on the Candidate EOL Needs List, which the relevant Transmission Owner has confirmed remains a projected EOL Need, the relevant Transmission Owner shall consult with PJM regarding such potential overlap.

Document Accession #: 20200612-5124     Filed Date: 06/12/2020

      ii.       If, (a) PJM determines through the RTEP Planning Process that a proposed Required Transmission Enhancement would more efficiently and cost-effectively address the identified PJM Planning Criteria Need and may, as well, address the projected EOL Need confirmed under section (d)(2)(i), and (b) the proposed Required Transmission Enhancement is not a solution proposed by the Transmission Owner pursuant to section (c)(4), and (c) the Transmission Owner determines that the projected EOL Need is not met by the proposed Required Transmission Enhancement and determines that it will plan an Attachment M-3 Project to address the projected EOL Need or propose a project to address the Form No. 715 EOL Planning Criteria, the Transmission Owner will provide documentation to PJM and stakeholders on the rationale supporting its determination at the next appropriate meeting of the TEAC or Subregional RTEP Committee that considered the proposed Required Transmission Enhancement.

**(e)**      **Modifications.** This Attachment M-3 may only be modified under section 205 of the Federal Power Act if the proposed modification has been authorized by the PJM Transmission Owners Agreement-Administrative Committee in accordance with section 8.5 of the Consolidated Transmission Owners Agreement.

Document Content(s)

5016-2d09a376-7433-42b5-b618-36fa67bf158f.PDF.............................1
5016-8357baf0-5e7f-42f0-981f-86bfd73cf134.PDF.............................24
5016-1715ec54-d046-4a5e-93a9-641a0a87ed55.PDF.............................31
5016-747cb36d-2e9a-43ae-a22e-66aa368e39a0.PDF.............................38
5016-2d2cfd26-3e7a-4c6e-872f-db97e6aca375.PDF.............................40
5016-f0d18f5b-6f64-4c94-b527-886216c89584.PDF.............................49
FERC GENERATED TARIFF FILING.RTF..........................................98

Submission Description: (doc-less) Motion to Intervene of American Municipal Power, Inc. under ER20-2046-000.

Submission Date:          6/18/2020 4:51:16 PM

Filed Date:               6/18/2020 4:51:16 PM

Dockets
-------
ER20-2046-000        PJM Interconnection, L.L.C. submits tariff filing per 35.13(a)(2)(iii): Amendments to Attachment M-3 submitted on 6/12/2020 2:07:24 PM, Filing Type code: 10

Filing Party/Contacts:

Filing Party                    Signer (Representative)
    Other Contact (Principal)
------------                    -----------------------
    -------------------------
American Municipal Power, Inc.   lmcalister@amppartners.org
    ghull@amppartners.org

Basis for Intervening:
American Municipal Power, Inc. (â€œAMPâ€) is a nonprofit Ohio corporation with members in Delaware, Indiana, Kentucky, Maryland, Michigan, Ohio, Pennsylvania, Virginia, and West Virginia, the majority of which are load-serving entities within the PJM Interconnection, L.L.C. (â€œPJMâ€) region. To meet those membersâ€™ load service responsibilities, AMP purchases transmission and related services from PJM and also purchases and sells electricity products in the markets operated by PJM. On June 12, 2020, the PJM Transmission Owners filed amendments to Attachment M-3 of PJMâ€™s Open Access Transmission Tariff (â€œTariffâ€). As entities that may be impacted by these revisions to the Tariff, AMP and its members have an interest in this proceeding that cannot be adequately represented by any other party. Accordingly, and since it is in the public interest, AMP moves to intervene herein.

Document Accession #: 20200618-5180     Filed Date: 06/18/2020

Document Content(s)

1106007_Interv.TXT......................................................1

JA0106

Document Accession #: 20200618-5187     Filed Date: 06/18/2020

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | |
| | ) | Docket No. ER20-2046-000 |
| American Transmission Systems, | ) | |
| Incorporated, et al | ) | |

MOTION TO DISMISS FILING, WITHOUT PREJUDICE, AND SUSPEND
PROCEDURAL SCHEDULE UNTIL RULING ON MOTION TO DISMISS AND
MOTION FOR SHORTENED ANSWER PERIOD

Pursuant to Rules 212, 213 and 217 of the Federal Energy Regulatory Commission's

Rules of Practice and Procedure,[1] AMP Transmission, LLC. ("AMPT") and Old Dominion

Electric Cooperative ("ODEC" and collectively with AMPT "Movants") move the Commission

to dismiss, without prejudice, the June 12, 2020 Federal Power Ace ("FPA") Section 205[2] filing

by PJM Interconnection, L.L.C. ("PJM") on behalf of the PJM Transmission Owners seeking to

Amend Attachment M-3 to the PJM Open Access Transmission Tariff ("Tariff") ("TO Filing").[3]

As discussed herein, the TO Filing arose after the Sponsoring Transmission Owners (or group

thereof), acting outside the terms of the Consolidated Transmission Owner Agreement

("CTOA"), had a "notice" issued that purported to be on behalf of the Transmission Owners

Agreement Administrative Committee ("TOA-AC"). That Notice violated the terms of the

CTOA and in doing so violated the rights of AMPT and ODEC as PJM Transmission Owners

---

[1]     18 CFR § 385.212, 18 CFR § 385.213 & 18 CFR § 385.217.

[2]     16 U.S.C. § 824d.

[3]     *Amendments to Attachment M-3 to PJM Interconnection L.L.C. Open Access Transmission Tariff*,
filed June 12, 2020 by PJM on behalf of the PJM Transmission Owners ("June 12 Filing"). For
purposes of this Motion the sponsoring PJM Transmission Owners are referred to as the
"Sponsoring Transmission Owners".

1

and parties to the CTOA.  Because the Section 205 Filing was dependent on proper Notice, the June 12 Filing is *ultra vires,* fatally deficient and should be dismissed.

As a consequence of the Filing being fatally deficient, thus requiring summary dismissal, the Movants request that the Commission suspend the Comment Date in this proceeding, currently set for July 6, 2020, until ruling on the Motion to Dismiss.  Further, because of the request to suspend the Comment Date and the fact that the underlying deficiency is unassailable (*i.e.*, that the TOA-AC violated its requirements for action), the Movants request a shortened answer period to this Motion of five business days from filing.

Although dismissal of a Section 205 filing is unusual, the Commission must demand that the Sponsoring Transmission Owners, and more importantly the TOA-AC, follow the requirements of the CTOA in order to ensure compliance with this contract, and in order to ensure that the rights of all Transmission Owners, particularly minority Transmission Owners, are appropriately respected, as well as those of PJM stakeholders who rely on adherence to those obligations in an open and transparent forum.

## I.    FACTUAL BACKGROUND

On June 12, 2020, the PJM Transmission Owners made a filing with the Commission to amend Attachment M-3 to the PJM Tariff.  AMPT and ODEC, among other Transmission Owners who are signatories to the CTOA, voted against the proposal and its filing.  This Motion is unrelated the outcome of that vote.  The vote  should never have occurred because the TOA-AC failed to follow its obligation to hold a meeting and take a formal vote before initiating action purporting to be on behalf of the TOA-AC, *i.e.*, the Notice required by Section 9.1(b) of the PJM Tariff.[4]  Section 9.1(b) requires that "[t]he Transmission Owners shall consult with PJM

---

[4]    In making this Motion, the Movants do not concede that the PJM Transmission Owners have the unilateral right to make a collective Section 205 filing related to planning matters and reserve

2

and the PJM Members Committee beginning no less than thirty (30) days prior to any Section 205 filing . . .."[5]  The June 12 Filing acknowledges this requirement.[6]

In their filing letter, the PJM Transmission Owners assert that they were "acting through" the CTOA with respect to the filing.  In the footnote to that assertion, the Sponsoring Transmission Owners further assert that "on May 7, 2020, pursuant to Section 9.1(b) of the PJM Tariff, the PJM Transmission Owners initiated consultation with PJM and with the PJM Members Committee by providing notice of the modifications proposed in this filing together with a draft of those modifications."[7]  This statement is vague as "Transmission Owners" is not defined.

The May 7, 2020 Notice states "the **CTOA Administrative Committee hereby initiates consultation** with the PJM Members Committee with regard to proposed changes to Attachment M-3 of the PJM Tariff ("Proposed Attachment M-3 Amendments")."[8]  Although the Notice unequivocally states that the TOA-AC is initiating the required consultation, the TOA-AC held no meeting nor took any vote authorizing the TOA-AC to initiate such action.    The Movants were given no prior notice that the TOA-AC would send notice or otherwise take action that could be construed as being taken on behalf of all PJM Transmission Owners.  In fact, when the TOA-AC did hold a meeting on June 10, 2020, to vote on whether to file the proposal, AMPT

---

their right to demonstrate no such right exists under the PJM Tariff.  Nevertheless, even if such a right existed under Section 9.1, the instant filing is fatally deficient as the TOA-AC did not follow the requirements of the CTOA before issuing the Notice upon which the Filing was premised.

[5]    PJM Tariff Section 9.1(b)

[6]    June 12 Filing at 1.

[7]    *Id*.

[8]    A copy of the Notice is attached hereto as Exhibit 1.

3

requested that the TOA-AC meeting minutes reflect the objection by a minority of Transmission

Owners to the May 7 2020 and May 30 2020 Notices being issued without a TOA-AC vote.[9]

## II.    OBLIGATIONS OF THE CTOA

With respect to actions of the TOA-AC, the CTOA is very specific:

> **8.5 Manner of Acting.**
>
> Subject to the limitations of Section 9.7.1(a), **any action taken by the Administrative Committee** shall require a combination of the concurrence of the representatives' Individual Votes of the representatives of those Parties entitled to vote on such matters and Weighted Votes as specified in this Section 8.5.[10] (emphasis added.)

No vote was taken by the TOA-AC prior to the action of the TOA-AC providing Notice to PJM

and the PJM Members Committee that certain transmission owners desired a change to

Attachment M-3.  The requirement that **all actions** of the TOA-AC are subject to a vote is

further confirmed by Sections 8.5.1 and 8.5.2 addressing the "Action By Two-thirds Majority"

and "Action by Simple Majority" respectively.  Section 8.5.1 starts out that "[t]he following

actions of the Administrative Committee shall require" and then lists actions requiring a vote by

two-thirds majority.  Section 8.5.2 states:

> Action by the Administrative Committee **on any matter other than those specified in Section 8.5.1 shall require**: (i) the presence of a quorum at the time of the vote; and (ii) the concurrence of: (a) representatives' whose combined Individual Votes exceed one-half of the total Individual **Votes cast at a meeting**; and (b) representatives' whose combined Weighted Votes exceed one-half of the total Weighted **Votes cast at a meeting.** (emphasis added.)

---

[9]    The meeting minutes from the June 10, 2020 Open Meeting of the TOA-AC have not yet been issued or approved by the TOA-AC but there were no objections to the request.

[10]    Referenced Section 9.7.1(a) related to Defaults by Parties to the CTOA and thus the loss of vote.

4

Document Accession #: 20200618-5187     Filed Date: 06/18/2020

Finally, Section 8.4 of the CTOA addresses "Meetings" and the requirements for such meetings.

Those requirements include:

- [8.4] that "matters to be addressed at all meetings shall be specified in the agenda provided in the notice distributed pursuant to Section 8.4.1. . .."

- [8.4.1] "Notice of a meeting shall be distributed to the representatives not later than ten (10) days prior to the meeting, provided, however, that meetings may be called on shorter notice at the discretion of the Chair as the Chair shall deem necessary to deal with an emergency or to meet a deadline for action. The notice shall state the time and place of such meeting, and shall include an agenda sufficient to notify the representatives of the substance of the matters to be considered at the meeting. In addition, notice of all meetings shall be provided over the PJM website at the same time as it is provided to the representatives."

- [8.4.4] "all meetings of the Administrative Committee shall be open to entities that are signatories to the Operating Agreement and to personnel of PJM, and all matters upon which the representatives vote shall be open to such entities and to such personnel."

The TOA-AC violated every one of the above enumerated requirements by issuing a Notice on behalf of the TOA-AC, simply because transmission owners with sufficient votes to compel such action asked.

## III.    THE JUNE 12 FILING IS FATALLY DEFICIENT AND MUST BE DISMISSED

The Sponsoring Transmission Owners concede that prior to making a Section 205 filing, even on areas reserved to their unilateral filing, Notice must be provided to PJM and the PJM Members Committee 30 days prior to making such a filing.  Although Section 9.1(b) of the Tariff does not specify the manner of Notice, in this instance, because the Sponsoring Transmission Owners deemed it worthwhile that the Notice come from the TOA-AC.  However, in their haste to circumvent an ongoing PJM stakeholder process, the TOA-AC violated multiple provisions of the CTOA, and in doing so, Movants' rights.  As set forth unquestionably above, for the TOA-AC to take **any action**, including issuing a Notice pursuant to Tariff Section 9.1(b), required that the TOA-AC do so after a vote, at an open meeting, for which an agenda was sent a

5

least 10 days prior.[11]  Because these did not happen, the Notice was improper and violated the rights of the Movants.

The fact that the Sponsoring Transmission Owners potentially could have provided Section 9.1(b) notice through a means other than the TOA-AC is of no relevance to this Motion to Dismiss as, for reasons known only to them, they chose to have the Notice issued by the TOA-AC in violation of the provisions of the CTOA.  The provisions of the CTOA provide important safeguards for not just PJM stakeholders (through the requirement for open meetings) but for the transmission owners themselves.  For one, the requirement for a vote after proper advance notice protects transmission owners that may not be in the majority to have advance knowledge of actions taken on their behalf by the TOA-AC.  Although it may be correct that there would have been sufficient votes to take the action of issuing a Notice, the very act of doing so protects the rights of minority position transmission owners like the Movants.

Equally important, the requirement that collective action only occur after notice to all transmission owners and at a meeting open to PJM and PJM members is protection for the transmission owners against their collective action being construed as an antitrust violation. Every agenda for a PJM meeting incudes an Antitrust statement to the effect:

> Antitrust:
>
> You may not discuss any topics that violate, or that might appear to violate, the antitrust laws including but not limited to agreements between or among competitors regarding prices, bid and offer practices, availability of service, product design, terms of sale, division of markets, allocation of customers or any other activity that might unreasonably restrain competition. If any of these items are discussed the chair will re-direct the conversation. If the conversation still persists, parties will be asked to leave the meeting or the meeting will be adjourned.

---

[11]     While there are limited exceptions to both the open meeting and prior notice agenda requirements, neither are applicable here as no meeting or vote was held.

6

When a group of transmission owners circumvent the provisions of the CTOA to take self-interested action purporting to be on behalf of all transmission owners and through the TOA-AC, they call into question whether their concerted actions were in violation of antitrust laws, causing harm to all transmission owners.

Because the Section 9.1(b) Notice, a prerequisite to collective Transmission Owner action under Section 205, was issued as: "the CTOA Administrative Committee hereby initiates consultation with the PJM Members Committee", and because that Notice was not authorized by the CTOA-AC as required by the CTOA, the June 12 Filing is *ultra vires,* and as such, is fatally deficient and must be dismissed.  It is also of no consequence that the purpose of Section 9.1(b) is to provide notice to PJM and the PJM Members, who received the Notice even though it was deficient.  Although the purpose of the notice may have been achieved, the contractual protections afforded Movants as Parties to the CTOA were breached.  The Sponsoring Transmission Owners chose their backroom approach to the Notice, and must bear the consequences.[12]

## IV.     MOTION TO SUSPEND DEADLINE FOR INTERVENTION, PROTESTS AND COMMENTS AND FOR A SHORTENED ANSWER PERIOD

Movants have established that the Sponsoring Transmission Owners breached the requirements of the CTOA and that their Section 205 Filing is fatally deficient.  The June 12 Filing was made through eTariff in an effort to put the Commission on a 60 day clock for action.

---

[12]     Moreover, the only right the PJM Transmission Owners have to initiate consultation with the PJM Members through the Members Committee is by virtue of the TOA-AC acting.  A group of Sponsoring Transmission Owners has no such right absent action of the TOA-AC.  Thus, the consultation was also invalid.

7

JA0113

The Commission set July 6, 2020 as the date for intervention and comment.  Although the Commission could issue a deficiency letter at any point before the required action date, in light of the clear and intentional breach of multiple provisions of the CTOA, the Movants request that the Commission suspend the date for intervention and comments during the pendency of this motion as it is unjust to require parties to move forward with extensive responses to an *ultra vires* filing.  If, notwithstanding the breaches of the CTOA outlined above, the Commission ultimately determines that the Section 205 filing can move forward, an appropriate comment period can be set.  Alternatively, the Movants request that the Commission immediately issue a deficiency letter requiring that the Sponsoring Transmission Owners refile through eTariff once they have cured any deficiency in the meeting and voting requirements for an appropriately issued Notice and comment period.

Pursuant to Rule 213 of the Commission's Rules of Practice and Procedure, the Movants request a shortened answer period for this Motion.  Parties should be able to quickly respond given that the Motion raises simple issues of CTOA compliance.  In light of the July 6 Comment Date, Movants request expedited ruling on this Motion.

## V.     CONCLUSION

As set forth fully above, the June 12 Filing must be dismissed as the Sponsoring Transmission Owners breached the CTOA in convincing the TOA-AC to take action through the issuance of a notice of consultation, without complying with the requirements for TOA-AC action.  Specifically, Movants were deprived of notice of a meeting, an agenda identifying the item to be voted on with 10 days' notice, an actual meeting and the right to vote pursuant to Section 8.5 of the CTOA.   Further, because the Movants and all other PJM stakeholders will be

8

harmed by preparing a response to a fatally deficient filing, the Commission should suspend the Comment Date during the pendency of this Motion or immediately issue a deficiency letter tolling the statutory action period. The Movants believe the better course is to summarily dismiss the deficient filing.

Respectfully submitted,

*/s/ Adrienne E. Clair*
Adrienne E. Clair
Thompson Coburn, LLP
1909 K Street, NW
Suite 600
Washington, DC 20006
Tel: (202) 585-6919
Email: aclair@thompsoncoburn.com

Counsel for Old Dominion Electric Cooperative

Dated: June 18, 2020

/s/ *Lisa G. McAlister*
Lisa G. McAlister
General Counsel
AMP Transmission, LLC
1111 Schrock Rd.
Columbus, OH 43229

Counsel for AMP Transmission , LLC

9

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing document upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated at Washington, DC this 18th day of June 2020.

By: */s/ Adrienne E. Clair*

10

Document Accession #: 20200618-5187    Filed Date: 06/18/2020

Document Content(s)

ER20-2046 Motion to Dismiss.PDF.........................................1

JA0117

**Submission Description:** (doc-less) Motion to Intervene of Office of the People's Counsel for the District of Columbia under ER20-2046-000.

**Submission Date:**          7/2/2020 2:46:50 PM

**Filed Date:**              7/2/2020 2:46:50 PM

**Dockets**
-------
ER20-2046-000        PJM Interconnection, L.L.C. submits tariff filing per 35.13(a)(2)(iii): Amendments to Attachment M-3 submitted on 6/12/2020 2:07:24 PM, Filing Type code: 10

**Filing Party/Contacts:**

**Filing Party**                        **Signer (Representative)**
    Other Contact (Principal)
------------                        -----------------------
    ------------------------
Office of the People's Counsel for the District of Columbia
fheinle@opc-dc.gov                        apatel@opc-dc.gov


**Basis for Intervening:**
The Office of the People's Counsel for the District of Columbia was created by statute to protect consumer interests in matters involving public utilities before federal and local regulatory authorities. D.C. Code Â§34-804(d)(2).

Document Content(s)

1111489_Interv.TXT......................................................1

Document Accession #: 20200706-5234          Filed Date: 07/06/2020

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| **American Transmission Systems, Incorporated** | ) | **ER20-2046-000** |
| | ) | |
| **PJM Interconnection, L.L.C.** | ) | **ER20-2308-000** |
| | ) | **(not consolidated)** |

**INTERESTED PARTIES' PROTEST OF PJM TRANSMISSION OWNERS PROPOSAL
AND COMMENTS IN SUPPORT OF THE JOINT STAKEHOLDER PROPOSAL**

Pursuant to Rule 211 of the Federal Energy Regulatory Commission ("FERC" or "Commission") Rules of Practice and Procedure, 18 C.F.R § 385.211, the Office of the People's Counsel for the District of Columbia, Delaware Division of the Public Advocate, and Old Dominion Electric Cooperative ("ODEC") (together the "Interested Parties") respectfully submit this protest of the PJM Transmission Owners' ("PJM TOs") June 12, 2020 Proposed Amendments to Attachment M-3 of the PJM Interconnection, L.L.C. ("PJM") Open Access Transmission Tariff ("Tariff")[1] and separately provide comments in support of the Joint Stakeholders' July 2, 2020 End of Life Proposal.[2]  Because of the unusual procedural posture the Commission finds itself in – two Section 205 filings that are incompatible with each other – the Interested Parties appreciate the opportunity to provide the Commission a broader perspective as it relates to regional transmission organization ("RTO") governance, planning, and achieving the goals articulated in

---

[1] American Transmission Systems, Incorporated Amendments to Attachment M-3, eLibrary No. 20200612-5124 (June 12, 2020) ("PJM TO Proposal").

[2] Joint Stakeholder End of Life Proposal, eLibrary No. 20200702-5115 (July 2, 2020) ("Joint Stakeholder Proposal").  The Joint Stakeholders are American Municipal Power, Inc., Old Dominion Electric Cooperative, LS Power, PJM Industrial Customer Coalition, Blue Ridge Power Agency, Delaware Municipal Electric Corporation, Inc., Public Power Association of New Jersey, Office of People's Counsel for the District of Columbia, and the Delaware Division of the Public Advocate.

Order Nos. 890 and 1000.[3]    Unlike a traditional single application under Section 205, the Commission will invariably weigh the respective merits of each proposal and will come to the following conclusions:

- Only one proposal was thoroughly vetted through an extensive stakeholder process.

- Only one proposal received the required two-thirds sector-weighted super-majority support for approval by the PJM Members Committee, including support from members of each of PJM's five sectors.

- Only one proposal adheres to PJM's governing documents.

- Only one proposal fulfills PJM's role as a regional transmission planner.

- Only one proposal is consistent with the policy goals of Orders No. 890 and 1000.

- And only one proposal is just and reasonable.

The impact of the Commission's decision could not be more significant.  In recent written comments to the Commission, PJM transmission owner FirstEnergy noted that "two-thirds of all transmission assets in [PJM] are more than 40 years old and approximately half of those assets are over 50 years old."[4]  This is not only a question of how much money will be spent, but *how* that money will be spent.  Again, citing FirstEnergy, "infrastructure investments are particularly critical now as our industry faces a rapidly changing energy mix."[5]  It is not hyperbole to state that the decisions made regarding transmission investment over the next decade will impact the grid for the next half-century.  In rejecting the PJM TO Proposal and accepting, by September 1, 2020, the Joint Stakeholder Proposal, the Commission has the opportunity to affirm that: (i) regional transmission planning should be conducted by the regional transmission planner; (ii) in an

---

[3] This protest and comments are not intended to address all aspects of either the PJM TO Proposal or the Joint Stakeholder Proposal.  Members of the Interested Parties have filed separate comments addressing the PJM TO Proposal and/or will fill separate comments addressing the Joint Stakeholder Proposal on or before July 23, 2020.  In any event, each of the Interested Parties reserves the right to supplement the record as appropriate.

[4] Comment of FirstEnergy Service Company, eLibrary No. 20200630-5221 (June 30, 2020), p. 2.

[5] *Id.*

increasingly diverse and multi-faceted electric market, stakeholder input on critical issues like transmission planning has never been more important; and (iii) Order Nos. 890 and 1000 serve as the guideposts for the development of the grid of the future.

**I.    THE JOINT STAKEHOLDER PROPOSAL IS THE PRODUCT OF AN EXTENSIVE STAKEHOLDER PROCESS, HAS THE SUPPORT OF A SUPER-MAJORITY OF PJM MEMBERS, AND ITS APPROVAL IS CONSISTENT WITH COMMISSION RESPECT FOR THE STAKEHOLDER PROCESS.**

A.    *Addressing End-of-Life Transmission Planning is a Significant and Longstanding Concern for PJM Members.*

At the December 2019 Markets and Reliability Committee ("MRC") meeting, PJM Members, by a sector-weighted vote of 3.83 in favor,[6] endorsed an Issue Charge brought by American Municipal Power ("AMP") and ODEC to "develop specific governing document language to establish criteria that will apply to all transmission projects that address end of life drivers on PJM Tariff transmission assets, address planning horizon requirements, and improve overall transparency, consistency, and clarity in the [Regional Transmission Expansion Plan ("RTEP")] planning process."[7]  The Issue Charge received the support of seventy-three Members in total and had the support of eighty-nine percent or more of the Members in four out of the five PJM sectors.[8]  Of the fourteen "no" votes, all but three were from the transmission owner sector.[9]

It is not surprising that the Issue Charge garnered widespread Member support.  As explained in the accompanying Problem Statement, in 2018 "a majority of the Baseline and

---

[6] PJM Interconnection, L.L.C., Dec. 5, 2019 Markets and Reliability Committee, Voting Report, https://www.pjm.com/-/media/committees-groups/committees/mrc/20191205/20191205-summarized-mrc-voting-report.ashx. ("Dec. 5 MRC Voting Report").

[7] PJM Interconnection, L.L.C., Dec. 5, 2019 Markets and Reliability Committee, Item 1 - AMP-ODEC Transparency & End of Life Planning - Issue Charge - Clean – Updated, https://www.pjm.com/-/media/committees-groups/committees/mrc/20191205/20191205-item-01-3-amp-odec-transparency-and-end-of-life-planning-issue-charge-clean.ashx. ("Issue Charge").

[8] Dec. 5 MRC Voting Report.

[9] *Id.*

Supplemental Projects proposed had end of life drivers," and end-of-life ("EOL") transmission planning accounted for more than seventy-eight percent of the projects in PJM's $7.8 billion transmission planning spend.[10]  In addition to the significant dollars involved, EOL projects impact other areas of transmission planning.   For example, the Problem Statement notes the "unprecedented number of generation interconnection projects in the PJM queue" and that "inherent uncertainty surrounding the Supplemental Projects contributes to significant time delays in PJM generation queue retools."[11]

The Problem Statement finds that although many transmission owners employ sophisticated models to assess aging infrastructure and determine whether continued maintenance or replacement is the appropriate course of action, that information is not shared with other stakeholders.   This lack of transparency prevents other stakeholders from conducting their own due diligence, a concern that is only exacerbated because PJM limits its review to a do-no-harm analysis.  Furthermore, EOL projects are often addressed as either Supplemental Projects or FERC Form 715 criteria projects, minimalizing any effective oversight by either PJM or stakeholders.

Rather than addressing these deficiencies, the PJM TO Proposal compounds them, unlawfully expanding the reach of its Supplemental Projects Attachment M-3 Process.  This approach falls well short of the goals Members sought in approving the Problem Statement. Because "[s]takeholders need to have more confidence that PJM and the TOs are proposing the most cost-effective transmission solution for the future and that competition is not being unduly thwarted," the Member-endorsed Problem Statement calls for revisions to PJM's governing

---

[10] PJM Interconnection, L.L.C., Oct. 31, 2019 Markets and Reliability Committee, Item 2 - AMP ODEC Transparency & End of Life Planning - Problem Statement, https://www.pjm.com/-/media/committees-groups/committees/mrc/20191031/20191031-item-02-amp-odec-transparency-and-end-of-life-planning-problem-statement.ashx.

[11] Id.

4

documents "to ensure that the entire PJM stakeholder community will have meaningful input into how end of life planning should occur."[12]

The desire to reform the EOL transmission planning process is not new. For over two years, the Transmission Replacement Senior Task Force ("TRPSTF")[13] met to develop the following deliverables:

> 1. Presentation of recommendations to the MRC for increasing transparency and consistency in the communication and review of End of Life projects.

> 2. Potential guidelines or criteria for establishing, communicating, reviewing, and setting forth the process for inclusion of Transmission Owner initiated End of Life projects within the RTEP,

> 3. Changes to PJM Manuals(s) as required to address recommendations from the group. No Tariff, Operating Agreement or other documentation changes are expected to be necessary.[14]

While the TRPSTF was initially expected to complete its work by the end of third quarter of 2016,[15] it continued for an additional eighteen months with extensive education[16] as well as interest identification, design component formation, and the development of solutions packages as is typical under PJM's Consensus Based Issue Resolution ("CBIR") stakeholder process. Despite the development of solutions packages by both AMP/ODEC and PJM and the Member-approved

---

[12] *Id.*

[13] The TRPSTF or its predecessor, the End of Life Senior Task Force, met a total of twenty-five times between March 2016 and June 2018.

[14] PJM Interconnection, L.L.C., April 27, 2016 End of Life/Transmission Replacement Senior Task Force, Item 3 - Draft Charter – Clean, https://www.pjm.com/-/media/committees-groups/task-forces/trpstf/20160427/20160427-item-03-eolstf-draft-charter-clean.ashx.

[15] *Id.*

[16] The TRPSTF education component was incorporated into the Issue Charge.

charge to bring those packages forward for review, the TRPSTF was suspended by PJM in June 2018 due to a perceived "impasse" in stakeholder negotiations.[17]

Building on the work of the TRPSTF, AMP/ODEC brought proposed PJM Manual 14B revisions to the January 2019 MRC.[18]  AMP/ODEC's revisions sought to "ensure that planned facilities are indeed necessary and economical;" that planning was done based on "transparent criteria, assumptions and models" with a "meaningful opportunity for review and input;" and that planning criteria had "consistency and uniformity to the extent practical."[19]  Again, PJM Members strongly supported reforms to EOL transmission planning, approving AMP/ODEC's proposal by a sector-weighted vote of 3.46.[20]  And again, PJM acted unilaterally to stop any significant reform by refusing to implement manual changes that had received majority support in every sector but the transmission owner sector.[21]

Over the past four plus years, PJM Members have worked constructively and diligently to address a well-documented problem: the lack of transparency, oversight, and regional planning for EOL projects.  They have done so across various stakeholder forums and with the consistent support of two-thirds or more of PJM Members.  In each instance these efforts have been rebuffed

---

[17] *PJM Seeks to Suspend Task Force in 'Unprecedented' Move*, R. Sweeney, RTO Insider (July 3, 2018).

[18] The PJM package developed in the TRPSTF was also brought before the MRC with FirstEnergy as the mover and Public Service Electric & Gas as the second.  As the first alternative it was not voted on.  PJM Interconnection, L.L.C., Jan. 24, 2019 Markets and Reliability Committee, Agenda, https://www.pjm.com/-/media/committees-groups/committees/mrc/20190124/20190124-agenda.ashx.

[19] PJM Interconnection, L.L.C., Jan. 24, 2019 Markets and Reliability Committee, Item 2A - Transmission Replacement Process - AMP Presentation, https://www.pjm.com/-/media/committees-groups/committees/mrc/20190124/20190124-item-02a-transmission-replacement-process-amp-presentation.ashx.

[20] PJM Interconnection, L.L.C., Jan. 24, 2019 Markets and Reliability Committee, Voting Report, https://www.pjm.com/-/media/committees-groups/committees/mrc/20190124/20190124-summarized-voting-report.ashx.

[21] *PJM Rebuffs Stakeholders on Supplemental Projects*, C. Smith, RTO Insider (Jan. 28, 2019).

Document Accession #: 20200706-5234      Filed Date: 07/06/2020

by the very organization that is charged with that transparency, oversight, and regional planning responsibility: PJM.

> B. *The Transparency and End of Life Planning Meetings Represent the Most Comprehensive, Stakeholder-Driven Effort to Address EOL Transmission Planning.*

Following approval of the Issue Charge, a series of seven special MRC meetings were held.[22]  Building off of previously discussed efforts, and consistent with the directive from the Members, Key Work Activities included:

> a.  Establish requirements for an end of life (EOL) determination process;

> b.  Improve transparency in the TO EOL determination process such that stakeholders can confirm that EOL processes were followed (e.g., development or adoption of TO EOL criteria, development of minimum requirements for EOL determinations, etc.);

> c.  Establish requirements for EOL replacement planning process in the RTEP plan, including specification of the planning horizon requirements and;

> d. Improve consistency by having PJM review, plan and ultimately approve as part of the RTEP approved by the PJM Board EOL replacement projects.[23]

Utilizing the CBIR process to develop solutions that represented the interest of a broad swath of Members, most stakeholders reviewed packages offered by AMP/ODEC, LS Power, and PJM.[24]

Briefly, the Joint Stakeholder Package creates a non-binding, ten-year look-ahead of potential EOL projects.  The Joint Stakeholder Package also requires a six-year notification when a transmission asset has reach EOL status and will need to be retired.  This timeframe aligns with PJM's existing five-year RTEP planning models.  Both of these provisions will provide needed transparency for PJM and stakeholders regarding future asset retirements and necessary

---

[22] Special MRCs on Transparency and End of Life Planning were held on December 18, 2019, January 15, 2020, February 7, 2020, February 28, 2020, March 24, 2020, April 17, 2020, and May 15, 2020.

[23] Issue Charge.

[24] The LS Power Package was combined with the AMP/ODEC Package to form the Joint Stakeholder Package.

replacements.  Once the notification process occurs, PJM will, subject to certain exemptions, regionally plan through the RTEP process expansions, if any, made necessary by the expected retirement of any asset.  This allows PJM to consider a broader spectrum of solutions as it integrates asset replacement into its larger, region-wide, transmission planning process.  PJM will be able to place EOL needs in competitive open windows, and EOL needs may be potentially combined with other needs for the most cost-effective solutions.

The end result of the Joint Stakeholder Package will be less costly, more competitive, and more diverse transmission assets that will meet the needs of many stakeholders rather than a few and a planning process that allows PJM to develop the transmission grid necessary to support its dynamic energy markets.  The Joint Stakeholder Proposal is entirely consistent with the Joint Stakeholder Package filed with the Commission.  It easily meets the statutory requirements of being just and reasonable and should be approved by the Commission.

Conversely, the PJM Package did not comply with many of the Key Work Activities outlined in the Issue Charge.  The PJM Package utterly failed to meet Members' desire for a more transparent EOL planning process.  The PJM Package completely avoided the non-binding, ten-year look-ahead and replaced the required six-year notification of EOL status with a voluntary five-year notice that would only have been shared with PJM.  Rather than enhancing transparency to allow stakeholders to better align their own commercial and regulatory activities with the changing topography of the grid, the PJM Proposal created a black box around transmission planning into which only the transmission owner and PJM may look.  Furthermore, it is not entirely clear what PJM would do with its increased "transparency," as its Proposal still left the vast majority of EOL planning to the transmission owner.  Only when there is a related PJM reliability open window violation *and* the EOL need can be combined with a PJM open window reliability

violation *and* the EOL project is over 200 kV *and* the EOL project relates only to poles and wires (i.e., no substation equipment, including transformers) would PJM plan the EOL project. For those counting, three "ands" add up to an average of less than ten percent of all EOL projects that PJM would actually plan under its Package.[25] The PJM Package did not, as it claims, "[e]nhance existing planning processes" or "[r]einforce[] PJM's Role as Regional Planner," and it certainly did not "[r]eflect stakeholder education and interest identification."[26] Instead, the PJM Package doubled down on an opaque and flawed EOL planning process that Members have repeatedly voiced their desire to reform.

The PJM TOs claim that their Proposal "support[s] the principles"[27] of the PJM Package, if that description weren't damning enough. In fact, the PJM TO Proposal filed before the Commission would place limitations on PJM and stakeholders that not even the PJM Package envisioned: it is a brazen attempt to undermine the stakeholder process, prevent PJM and stakeholders from designing changes to the planning process in the future and virtually eliminate stakeholder input into EOL planning; to codify, through Tariff changes, a subservient role for PJM in transmission planning; and to undo the Commission's mandates in Order Nos. 890 and 1000 for the vast majority of transmission planning in the PJM region. To accomplish this, it relies on the

---

[25] PJM Interconnection, L.L.C., April 30, 2020 Markets and Reliability Committee, Item 8A - Joint Stakeholder Package End of Life Package - Presentation , https://www.pjm.com/-/media/committees-groups/committees/mrc/2020/20200430/20200430-item-08a-1-joint-stakeholder-package-end-of-life-package-presentation.ashx.

[26] PJM Interconnection, L.L.C., May 28, 2020 Markets and Reliability Committee, Item 4B - PJM Solutions Package – Presentation, https://www.pjm.com/-/media/committees-groups/committees/mrc/2020/20200528/20200528-item-04b-1-pjm-solutions-package-presentation.ashx.

[27] PJM Interconnection, L.L.C., June 1, 2020 Transmission Owners Agreement-Administrative Committee, Item 2 - Amendments Attachment M-3 – Presentation, https://www.pjm.com/-/media/committees-groups/committees/toa-ac/2020/20200601-special/20200601-item-02-amendments-attachment-m-3-presentation.ashx.

9

mischaracterization of Commission precedent that is not even applicable to PJM.[28]  The PJM TO Proposal is unjust and unreasonable and must be rejected by the Commission.

    C.  *The Commission Should Respect the Judgement of PJM Members and Approve the Joint Stakeholder Proposal.*

    Upon the completion of the Transparency and End of Life Planning stakeholder process, two fully developed packages were brought before the May 2020 MRC.  While neither the Joint Stakeholder Package nor the PJM Package received the required two-thirds sector-weighted super-majority vote for approval, the difference in Member support was stark.  While the PJM Package was decisively rejected, receiving only 1.77 in favor (or approximately sixty-five percent *opposed*), the Joint Stakeholder Package narrowly missed receiving the required two-thirds sector-weighted super-majority with a vote of 3.23 support (or approximately sixty-five percent *in favor*).[29]  Additionally, while the Joint Stakeholder Package received support from Members of each of PJM's five sectors, the PJM Package was rejected by Members of each of PJM's five sectors.[30]  The unmistakable message from the May 2020 MRC is that PJM Members do not believe that the PJM Package appropriately addresses their longstanding concerns regarding the EOL planning process.

---

[28] *See*, *Cal. Pub. Utils. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161 (2018), *order denying reh'g.*, 168 FERC ¶ 61,171 (2019); *see also S. Cal. Edison Co.*, 164 FERC ¶ 61,160 (2018), order denying reh'g, 168 FERC ¶ 61,170 (2019) (together the "California Orders"). The Joint Stakeholders submit that the California Orders are inapplicable; first, because they explicitly do not apply to transmission planning in PJM and, second, because nothing in the Joint Stakeholder Proposal alters the transmission owners' management of their existing assets.

[29] PJM Interconnection, L.L.C., May 28, 2020 Markets and Reliability Committee, Voting Report, https://www.pjm.com/-/media/committees-groups/committees/mrc/2020/20200528/20200528-summarized-voting-report.ashx.

[30] *Id.*

At the June 2020 Members Committee ("MC") meeting, the Joint Stakeholder Package was again placed before PJM Members.[31]  By a sector-weighted vote of 3.444 in favor,[32] the required two-thirds super-majority of PJM Members endorsed the Joint Stakeholder Package as the appropriate approach for providing necessary reform to the PJM EOL planning process. Ninety-four Members supported the Joint Stakeholder Package, with "yes" votes coming from each of PJM's five sectors.[33]  In all but one sector, the transmission owner sector, the Joint Stakeholder Package received a majority (fifty-one percent or greater) support and in three of the five sectors Member support exceeded eighty percent.[34]  On July 2, 2020, PJM, fulfilling its obligations under the Operating Agreement ("OA") to "[f]ile with FERC on behalf of the Members any amendments to this Agreement,"[35] submitted the Joint Stakeholder Proposal for the Commission's consideration and approval.

PJM's Members have spoken clearly.  They desire greater transparency in the EOL process and a more active role for PJM as the regional transmission planner.  But under the PJM TO Proposal only PJM will have any advance notice of a transmission owner EOL determination, and even then will have little to no authority to do anything about them.  This is the very antithesis of what Order Nos. 890 and 1000 demand.

---

[31] It is worth noting that neither PJM nor any other Member offered the PJM Package to the MC.

[32] PJM Interconnection, L.L.C., June 18, 2020 Members Committee, Voting Report, https://www.pjm.com/-/media/committees-groups/committees/mc/2020/20200618/20200618-voting-report.ashx.

[33] *Id.*

[34] *Id.*

[35] OA §10.4 (xiii).

D. *Approval of the Joint Stakeholder Proposal is Consistent with Established Commission Preference for Stakeholder Vetted and Approved Proposals.*

The Commission has a well-established preference for proposals that have been vetted and approved by RTO members and stakeholders.  As far back as 1993, the Commission embraced the role of regional transmission groups to "provide mechanisms for encouraging negotiated agreements and resolving transmission issues."[36]  To reinforce the back-and-forth that is the hallmark of any stakeholder process, the Commission's *Policy Statement Regarding Regional Transmission Groups* held that "substantial deference"[37] would be afforded to outcomes that are a product of a regional transmission group's dispute resolution or stakeholder process.  A decade later, when accepting revisions to New England Power Pool's ("NEPOOL") transmission cost allocation revisions, the Commission wrote approvingly of the stakeholder process and specifically NEPOOL's Participants Committee.  The Commission noted that the Participants Committee is comprised of five separate sectors: generation, transmission, supplier, end user and publicly-owned entities – sound familiar – and is "broadly representative" of member interests.[38]  For that reason, the stakeholder process exercised by NEPOOL in this instance was one the Commission "will not disturb."[39]  Similarly, in *Southwest Power Pool, Inc.*, the Commission chose to "accord an appropriate degree of deference to RTO stakeholder processes"[40] in finding that a proposal is just and reasonable.  Federal appellate courts have also supported the importance of and deference for the stakeholder process, even when the outcome "may not represent complete stakeholder

---

[36] FERC Stats. & Regs., Regulations Preambles January 1991-June 1996 ¶ 30,976 (1993).

[37] *Id.*

[38] *New England Power Pool*, 105 FERC ¶ 61,300, P 34 (2003),

[39] *Id.*

[40] 127 FERC ¶ 61,283, P 33 (2009).

Document Accession #: 20200706-5234     Filed Date: 07/06/2020

consensus" so long as there is no "evidence of majority overreaching" or that "the process was not open or did not allow for extensive participation."[41]

PJM's CBIR stakeholder process, a "structured problem-solving process in which stakeholders attempt to develop and achieve consensus around a proposal in the best interest of the whole,"[42] clearly meets the criteria for an *open* stakeholder process that allows for *extensive participation* by all parties. Likewise, actions by the MC, which is composed of all PJM Members, are *broadly representative* of the policy choices of PJM Members and should be given *substantial deference* when they are just and reasonable. In approving the Joint Stakeholder Proposal, the Commission will *accord an appropriate degree of deference to RTO stakeholder processes*.

## II.     THE PJM TO PROPOSAL IGNORES THE STAKEHOLDER PROCESS AND VIOLATES SEVERAL PJM GOVERNING DOCUMENTS.

### A. *The PJM TO Proposal Circumvents the Stakeholder Process and Ignores the Commission's Guidance on the Importance of Stakeholder Collaboration.*

As previously discussed, during the seven Transparency and End of Life Planning special MRC meetings PJM and stakeholders participated in discussions around different solutions to address EOL transmission planning with three packages, from AMP/ODEC, LS Power, and PJM, respectively, emerging. At the April 2020 MRC, packages from the Joint Stakeholders (which represented the combined efforts of AMP/ODEC and LS Power) and PJM were given First Readings.[43] The PJM TOs also provided a "Statement of Legal and Contractual Issues and Reservation of Rights," in which they essentially disavowed PJM's well-established stakeholder

---

[41] *Pub. Serv. Comm'n of Wisconsin v. FERC*, 545 F.3d 1058, 1062-63 (D.C. Cir. 2008) (internal quotes removed).

[42] Joint Stakeholder Proposal, fn. 23.

[43] PJM Interconnection, L.L.C., April 30, 2020 Markets and Reliability Committee, Agenda, https://www.pjm.com/-/media/committees-groups/committees/mrc/2020/20200430/20200430-agenda.ashx.

process, at least as far as transmission planning goes.[44]  In their statement, the PJM TOs threatened to not only raise "objections to any further consideration of [the Joint Stakeholder] package or any similar proposal in the stakeholder process," but also to "raise additional issues and objections with respect to the subject matter of this process in any and all future PJM processes and any regulatory or judicial proceedings."[45]

A week later, on May 7, 2020, the PJM TOs provided their required 30-day notice under the Consolidated Transmission Owners Agreement ("CTOA") of their intent to file the PJM TO Proposal.[46]  While the PJM TO Notice approvingly cites the PJM Package presented at the April 2020 MRC, the PJM TOs decided not to wait for PJM Members to weigh in on either the PJM or Joint Stakeholder Packages at the May 2020 MRC.  Instead, the PJM TOs announced their intent to ignore the views of their fellow Members and to move forward with a proposal that, in their words, "would expand the scope … to cover certain asset management projects."[47]  Even after Members rejected the PJM Package at the May 2020 MRC by a margin of nearly two to one, the PJM TOs made no substantive changes to their Notice to make it more reflective of broader Member concerns.  Likewise, stakeholder feedback provided to the PJM TOs through both written submissions and at the CTOA-required June 1, 2020 webinar, yielded minimal changes.  Finally, although the Joint Stakeholder Package was properly noticed for a vote at the June 2020 MC on June 11, 2020, the PJM TO Proposal was filed the very next day, June 12, 2020, by the PJM TOs

---

[44] PJM Interconnection, L.L.C., April 30, 2020 Markets and Reliability Committee, Item 8 - PJM TO Legal Statement & Reservation of Rights, https://www.pjm.com/-/media/committees-groups/committees/mrc/2020/20200430/20200430-item-08-pjm-to-legal-statement-and-reservation-of-rights.ashx.

[45] Id.

[46] PJM Interconnection, L.L.C., June 1, 2020 Transmission Owners Agreement-Administrative Committee, Item 3 - Amendments Attachment M-3 – Notice, https://www.pjm.com/-/media/committees-groups/committees/toa-ac/2020/20200601-special/20200601-item-03-amendments-attachment-m-3-notice.ashx. ("PJM TO Notice").

[47] Id.

and at PJM's discretion.[48]    In deciding not to wait the additional week until the MC had an opportunity to consider the Joint Stakeholder Package the PJM TOs engaged in one final attempt to avoid accountability to the rest of the PJM membership.  The PJM TO Proposal is not the product of an extensive stakeholder process but is rather a deliberate series of actions designed to avoid and ignore input from other PJM Members and stakeholders.  For that reason alone it should be rejected.

  B. *The PJM TO Proposal was Filed in Violation of the CTOA.*

  The PJM TO Proposal arrived at FERC by short-circuiting the stakeholder process and violating the very agreement that provides for certain transmission owner Section 205 filing rights. As extensively discussed in AMP and ODEC's Motion to Dismiss,[49] in their rush to circumvent the stakeholder process the PJM TOs ignored various provisions of the CTOA.  Specifically, the Transmission Owners Agreement-Administrative Committee ("TOA-AC") did not provide the proper notice, open meeting, or vote prior to the "act" of issuing the PJM TO Notice on May 7, 2020 to "initiate[] consultation with the PJM Members Committee with regard to proposed changes to Attachment M-3."[50]  Whatever consultative process the TOA-AC undertook was done without either AMP or ODEC, both parties to the CTOA, and in violation not only of the CTOA but PJM's Antitrust Code of Conduct.[51]  The Commission should either grant the Motion to Dismiss or, because the PJM TO Notice is an integral first step preceding the filing of the PJM TO

---

[48] Tariff § 9.1(b), "…the Office of Interconnection may, *but shall not be required to*, make the Section 205 filing with FERC on behalf of the Transmission Owners" (emphasis added).

[49] Motion to Dismiss Filing, Without Prejudice, and Suspend Procedural Schedule until Ruling on Motion to Dismiss, eLibrary No. 20200618-5187 (June 18, 2020) ("Motion to Dismiss").

[50] *Id.*, p. 3.

[51] *Id.*, p 6.

Document Accession #: 20200706-5234     Filed Date: 07/06/2020

Proposal, reject the PJM TO Proposal on the grounds that the actions surrounding its submission violate the governing documents that serve as the basis for the filing.

## III.   THE PJM TO PROPOSAL UNDERMINES THE COMMISSION'S POLICY GOALS REGARDING REGIONAL TRANSMISSION PLANNING AS ARTICULATED IN ORDER NOS. 890 AND 1000.

Because the decisions on EOL planning will impact the PJM transmission grid for the next half-century, it is important to place both the PJM TO Proposal and the Joint Stakeholder Proposal in the larger context of the Commission's transmission policy goals.  For nearly thirty years the Commission has extolled the benefits of regional transmission planning to "serve the public interest by enabling the market for electric power to operate in a more competitive, and thus more efficient manner, and by providing coordinated regional planning of the transmission system to assure that system capabilities are adequate to meet system demands."[52]  To facilitate these goals the Commission issued the landmark Order No. 888[53] which provided for non-discriminatory, open-access transmission service.

Order No. 890[54], issued in 2007, built on this foundation by requiring, among other things: (i) "a process that allows for a reasonable and meaningful opportunity to meet or otherwise interact meaningfully" between transmission providers and customers;[55] (ii) "meaningful input and

---

[52] FERC Stats. & Regs., Regulations Preambles January 1991-June 1996 ¶ 30,976 (1993).

[53] *Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Servs. by Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils.*, Order No. 888, FERC Stats. & Regs. Preambles ¶ 21,541, 61 Fed. Reg. 21,540 (May 10, 1996), *clarified*, 76 FERC ¶¶ 61,009 and 61,347 (1997), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. Preambles ¶ 31,048, 62 Fed. Reg. 12,274 (Mar. 14, 1997), *order on reh'g*, Order No.888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd, Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[54] *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, FERC Stats. & Regs. 31,241 (2007)

[55] *Id*., P 453

participation" by customers "into the development of transmission plans;"[56] (iii) disclosure of "the basic criteria, assumptions, and data that underlie their transmission system plans;"[57] and (iv) "a regional participation principle."[58]  Order No. 890 represented a significant step forward towards increasing transparency, stakeholder participation, and regional coordination in transmission planning.

In 2011, the Commission promulgated Order No. 1000[59] to codify and implement the full benefits of regional transmission planning by requiring transmission providers, including RTOs, to participate in a regional transmission planning process that satisfies the principles of Order No. 890[60] and to develop a regional transmission plan.[61]  Additionally, the Commission directed RTOs to remove from their Commission–jurisdictional tariffs and agreements language granting a right of first refusal ("ROFR") to transmission providers vis-à-vis facilities that are selected in regional transmission plans.[62]   ROFRs, the Commission found, "have the potential to undermine the identification and evaluation of a more efficient or cost-effective solution to regional transmission needs, which in turn can result in rates for Commission-jurisdictional services that are unjust and unreasonable or otherwise result in undue discrimination by public utility transmission providers."[63]

---

[56] *Id.*, P 454

[57] *Id.*, P 471

[58] *Id.*, P 523

[59] *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, FERC Stats. & Regs. ¶ 31,323 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012).

[60] *Id.*, P 146.

[61] *Id.*, P 66.

[62] *Id.*, P 392.

[63] *Id.*, P 7.

Document Accession #: 20200706-5234    Filed Date: 07/06/2020

The PJM TO Proposal would undo many of the policy goals listed in Orders No. 890 and 1000. It would significantly reduce transparency and limit meaningful stakeholder participation, contrary to the requirements of Order No. 890. Because of the prevalence of EOL projects in the PJM footprint, allowing the transmission owner to address them through the Attachment M-3 Process all but guarantees that PJM will be unable to develop the type of regional planning envisioned under Order No. 1000. Instead, PJM will continue to have a balkanized transmission topology that will leave it unprepared to adapt to the dynamic technologies and markets that will continue to transform the power market over the coming decades. For these reasons the PJM TO Proposal is neither just nor reasonable and must be rejected by the Commission.

Only the Joint Stakeholder Proposal effectively incorporates the goals of Order Nos. 890 and 1000. It provides for the transparency and meaningful participation Order No. 890 requires and will allow PJM to meet its regional transmission planning obligations under Order No. 1000. Simply put, the Joint Stakeholder Proposal is just and reasonable and should be accepted because it adheres to and furthers these long established Commission policy goals, the Joint Stakeholder Proposal is just and reasonable and should be accepted.

JA0137

## IV.    CONCLUSION

For the foregoing reasons the Commission should reject the PJM TO Proposal as unjust

and unreasonable and accept the Joint Stakeholder Proposal.

Respectfully submitted,

*/s/ Sandra Mattavous-Frye*
Sandra Mattavous-Frye
People's Counsel for the District of Columbia
Karen R. Sistrunk
Deputy People's Counsel
Anjali G. Patel
Frederick (Erik) Heinle III
Assistant People's Counsel
Office of the People's Counsel for the District
of Columbia
1133 15th Street, N.W., Suite 500
Washington, DC 20005-2710
202-261-1182
fheinle@opc-dc.gov

*/s/ Regina A. Iorii*
Regina A. Iorii
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 4th Floor
Wilmington, DE  19801
(302) 577-8159
(302) 893-0279 (cell)
Regina.iorii@delaware.gov

In the Capacity of Counsel for the
Delaware Division of the Public
Advocate Only

*/s/ Adrienne E. Clair*
Adrienne E. Clair
Thompson Coburn LLP
1909 K Street NW
Suite 600
Washington, DC 20006
Phone: (202) 585-6919
aclair@thompsoncoburn.com
Counsel to Old Dominion Electric Cooperative

19

# CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing document to be served upon each person designated on the official service list compiled by the Secretary in this proceeding.

Dated on this 6th day of July, 2020.

/s/ Frederick (Erik) Heinle III
Frederick (Erik) Heinle III
Assistant People's Counsel
Office of the People's Counsel for the District of Columbia
1133 15th Street, N.W., Suite 500
Washington, DC 20005-2710
202-261-1182
fheinle@opc-dc.gov

Document Accession #: 20200706-5234    Filed Date: 07/06/2020

Document Content(s)

Interested Parties Protest.PDF...........................................1

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | Docket No. ER20-2046 |
| | ) | |
| American Transmission Systems, | ) | |
|    Incorporated, et al. | ) | |

PROTEST OF THE
NEW JERSEY BOARD OF PUBLIC UTILITIES

Pursuant to Rule 211[1] of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("Commission" or "FERC"), the New Jersey Board of Public Utilities ("NJBPU" or "Board") submits this protest in opposition to the M-3 amendments filed by the PJM Transmission Owners.[2] The Commission must reject the filing as it is unjust, unreasonable, and unduly discriminatory for limiting competition. The proposal also violates the transparency requirements of Order 890[3] and the cost causation principle of Order 1000.[4] For these reasons, the Commission should reject the amendments and, in so doing, coordinate its action in this docket with related dockets.

## COMMENTS

The Board urges the Commission to reject the Transmission Owners' proposal as unjust and unreasonable. Under Section 205 of the Federal Power Act ("FPA") FERC may only accept

---

[1] 18 C.F.R. § 385.211

[2] *American Transmission Systems, Inc., and PJM Interconnection, L.L.C.*, Amendments to Attachment M-3 to the PJM Interconnection, L.L.C. Open Access Transmission Tariff, Docket No. ER20-2046 (June 12, 2020) ("TO Filing").

[3] *Preventing Undue Discrimination and Preference in Transmission System Service,* Order No. 890, FERC Stats. & Regs. ¶ 31,241 ("Order No. 890"), order on reh'g, Order No. 890-A, FERC Stats. & Regs. ¶ 31,261 (2007), order on reh'g, Order No. 890-B, 123 FERC ¶ 61,299 (2008), order on reh'g, Order No. 890-C, 126 FERC ¶ 61,228, order on clarification, Order No. 890-D, 129 FERC ¶ 61,126 (2009) (hereinafter "Order 890").

[4] *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011), order on reh'g, Order No. 1000-A, 139 FERC ¶ 61,132, order on reh'g and clarification, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC, 762 F.3d 41 (D.C. Cir. 2014) (hereinafter "Order 1000").

1

or reject a utility's tariff filing in accord with the just and reasonable standard.[5]  Because the Transmission Owners propose amendments to Attachment M-3 of the PJM Open Access Transmission Tariff ("Tariff"), they have the legal burden of demonstrating that the proposed amendments are just and reasonable.  The Board's comments explain how the Transmission Owners have failed to carry this burden.  First, the Board contends that the proposal will unjustly and unreasonably limit competition.  The Board will then address the transparency issues with the Transmission Owners' proposal.  Next, the Board's comments explain how application of the amendments will ultimately violate the cost-causation principle.  Finally, the Board will note overlapping proceedings for the Commission's consideration, which should be reviewed in coordination with this proceeding.  Ultimately, these arguments weigh in favor of the Commission's rejection of the Transmission Owners' amendments to Attachment M-3.

## A. The Transmission Owners' Proposed Amendments Will Unjustly and Unreasonably Limit Competition.

The Transmission Owners' proposed amendments to Attachment M-3 will limit competition.  The FPA requires that FERC ensure just, reasonable, and non-discriminatory rates.[6] The Commission issued Order 1000 to open up transmission planning to competition in order to ensure that rates would be just, reasonable, and not unduly discriminatory.[7]  In Order 1000, the Commission used its authority under Section 206 to eliminate federal rights of first refusal, which the Commission found "create[d] opportunities for undue discrimination and preferential treatment against nonincumbent transmission developers."[8]  The Commission explained that it is unjust and

---

[5] *NRG Power Marketing, L.L.C. v. FERC,* 862 F.3d 108, 113 (D.C. Cir. 2017).
[6] 16 U.S.C. §§ 824d, 824e.
[7] *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011), order on reh'g, Order No. 1000-A, 139 FERC ¶ 61,132, order on reh'g and clarification, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC, 762 F.3d 41 (D.C. Cir. 2014).
[8] Order 1000, 76 Fed. Reg. 49,842 at P 286.

unreasonable to restrict "the universe of transmission developers offering potential solutions," because it could "result in the failure to consider more efficient or cost-effective solutions to regional needs."[9]   In Order 1000, the Commission acknowledged its "duty to maintain competition."[10]

The Commission has identified that PJM has a problem with competition.[11]  Where the Commission sought to eliminate the right of first refusal, PJM sought an exemption.[12]  Where the Commission granted that exemption, in very limited circumstances, PJM and the Transmission Owners allowed that exemption to swallow the rule.[13]  PJM must now submit a compliance filing that increases transparency and enables greater competition in the region.[14]

Planning end-of-life projects outside of the competitive process will create an opportunity for undue discrimination and exacerbate PJM's competition issues.  By PJM's own admission, end-of-life needs represented over a quarter of transmission owner-driven planning in the PJM region in 2019.[15]  Preferential treatment for the incumbent Transmission Owners likely results in a failure to consider more efficient or cost-effective solutions for these projects.  The Commission has recognized competition as a just and reasonable solution to this problem.  As the Commission articulated in Order 1000, it is unjust and unreasonable to restrict the number of developers offering solutions to projects because doing so may result in failure to consider the more efficient or cost-effective solution.  Thus, the Commission should reject the filing.

---

[9] *Id.* at P 284.
[10] *Id.* at P 286.
[11] *PJM Interconnection, L.L.C.*, Order on Section 206 Investigation and Directing Compliance, Docket No. EL19-91, 171 FERC ¶ 61,212 (2020).
[12] *Id.* at P 3.
[13] *Id.* at P 1.
[14] *Id.*
[15] *See* Mark Sims, PJM RTEP Update (May 18, 2020) at slide 4.

**B. The Commission Must Reject the Transmission Owners' Proposed Amendments Because They Do Not Satisfy the Transparency Requirements of Order 890.**

The proposal limits stakeholder opportunities for meaningful input in at least three ways, as described below. In the end, the proposal reduces much of the end-of-life planning process to a closed-door consultation between PJM and the Transmission Owner.

The Commission issued Order 890 to address deficiencies and undue discrimination in transmission planning.[16] The Commission characterized some of these deficiencies as a lack of transparency that arose as the wholesale industry became more open to competition in the 1980s. Specifically, the Commission stated that "the [then] existing [PJM Tariff] provides [customers] very little information on how transmission plans are developed."[17] The Commission acted "to remedy these deficiencies by requiring transmission providers to *open* their transmission planning process to customers, *coordinate* with customers regarding future system plans, and *share* necessary planning information with customers."[18] Transparency has been, and continues to be, a challenge in the PJM region, as evidenced by the process to add Attachment M-3 to the Tariff[19] and the Commission's recent Order in Docket No. EL19-91[20].

The transparency principle, as recently reaffirmed by the Commission,[21] "require[s] transmission providers to disclose to all customers and other stakeholders the basic criteria, assumptions, and data that underlie their transmission system plans."[22] Transmission providers are further required to "reduce to writing and make available the basic methodology, criteria, and

---

[16] Order 890 at P 1, 3, 23.
[17] *Id.* at P 3.
[18] *Id.* (emphasis added).
[19] *See, e.g.*, *Monongahela Power Company, et al.*, 162 FERC ¶ 61,129 at P 73 (2018) ("Show Cause Order").
[20] *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,212 (2020).
[21] Show Cause Order at P 73.
[22] Order No. 890 at PP 461, 471.

4

JA0144

processes [] use[d] to develop their transmission plans."[23]  It is not enough for the process to satisfy the requirements of Order 890 "on its face," when, in practice, stakeholders are not afforded the necessary transparency to avoid undue discrimination.[24]

Stakeholders must receive the opportunity for meaningful input, or the planning process violates Order 890.[25]  The objective of these requirements are to "enable customers, other stakeholders, or an independent third party *to replicate the results* of planning studies and thereby reduce the incidence of after-the-fact disputes regarding whether planning has been conducted in an unduly discriminatory fashion."[26]  Without adequate transparency, stakeholders are unable "to determine whether the plan developed by the transmission provider in isolation is unduly discriminatory" other than through "after-the-fact" disputes.[27]

The Commission previously investigated whether the procedures for planning Supplemental Projects in PJM complied with the transparency requirements of Order 890.[28]  In response to the Order to Show Cause, the Transmission Owners filed the first iteration of Attachment M-3 under Section 205.[29]  This filing was rejected.[30]  Separately, under Section 206, the Commission determined that the "PJM Operating Agreement and OATT, as applied by the PJM Transmission Owners, did not fully comply with Order 890 and were therefore unjust and unreasonable and unduly discriminatory and preferential."[31]  The Commission then established a

---

[23] *Id.* at P 471.
[24] *See* Show Cause Order at PP 86-87 ("…may have contributed to a situation in which the PJM Operating Agreement appears, on its face, to comply with Order No. 890, even though, in practice, stakeholders do not receive the opportunity for meaningful input that it might appear to provide. Based on this evidence, we find that the PJM Transmission Owners are implementing the transmission planning process for Supplemental Projects in a manner that is inconsistent with Order No. 890's coordination principle.") (internal citations omitted).
[25] *See id.*
[26] *Id.* (emphasis added).
[27] Order 890 at P 424; Show Cause Order at P 73 n.159.
[28] Show Cause Order PP 2-8.
[29] *Monogahela Power Co. et al.*, 164 FERC 61,217 at P 5 (2018) ("Order on Rehearing and Compliance").
[30] *Id.* at P 7.
[31] *Id.*

5

replacement rate that accepted, in part, and rejected, in part, the Transmission Owners' Attachment M-3 filing and directed revisions to the PJM Operating Agreement and Attachment M-3 to the Tariff.[32]

On rehearing, the Commission confirmed that the planning process for Supplemental Projects, through Attachment M-3, complied with the transparency requirements of Order 890.[33] In making this determination, the Commission noted that customers must be included in early stages of development of the transmission plan and not merely provided with an opportunity to comment on transmission plans that were developed without their input.[34]  The Commission noted that it is more concerned with the "substance" of transmission providers' coordination with stakeholders, and less concerned with the "form" of that communication.[35]

Similarly, the Commission recently concluded another investigation by finding, among other things, that PJM's planning process was not adequately transparent.[36]  With regard to "immediate need" projects, the Commission found "one-line labels (e.g., "short circuit," "end-of-life," "overstressed") identifying a reliability violation driving the immediate need reliability project insufficient to comply with [Commission criteria]."[37]  The Commission further found "sufficient evidence in the record to demonstrate that PJM does not . . . provide to stakeholders and post on its website a full and supported written description explaining" why an incumbent Transmission Owner was designated construction responsibility and why the need was immediate, and not identified earlier.[38]  The Commission also held that PJM's implementation of the

---

[32] *Id.*
[33] *Id.* at P 41 ("We accept the Attachment M-3 Compliance Filing. . . . [W]e find that PJM and the PJM Transmission Owners have complied with . . . Order No. 890.").
[34] Order on Rehearing and Compliance, at P 81.
[35] *Id.*
[36] *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,212 (2020).
[37] *Id.* at P 50.
[38] *Id.* at P 51.

immediate need exemption is unjust and unreasonable in part because stakeholders must be permitted time to provide comments in response to the project description, and that PJM must make such comments publicly available.[39]  "With respect to [ ] transparency," the Commission found that "PJM must do more."[40]

While this investigation was pending at the Commission, PJM and the Transmission Owners developed the proposal to amend Attachment M-3.  Just as it has before, the Commission must reject the Transmission Owners' proposal.[41]  This proposal fails to satisfy the transparency requirements of Order 890, because it limits the stakeholders' opportunities for meaningful comment in at least three critical ways.

*First*, the Transmission Owners will provide to PJM, and only PJM, a Candidate EOL Needs List comprising the non-public confidential, non-binding projection of up to 5 years of EOL Needs that it identified through the Transmission Owners' processes for identification of EOL Needs.[42]  Disclosure of the Candidate EOL Needs List is limited to PJM, which must keep the list confidential.[43]  "The only exception to this limitation is the need to disclose a projected EOL Need in connection with the planning to address an identified overlap between the projected EOL Need and a PJM Planning Criteria Need under the RTEP Planning Process under section (d)(2) of the Proposed Revisions."[44]  Following this determination, if PJM believes an overlap exists, it will first consult with the transmission owner regarding the overlap.[45]  Only after satisfaction of that consultation requirement, and three additional conditions, will the Transmission Owner provide documentation to stakeholders on the rationale supporting its determination at the next appropriate

---

[39] *Id.* at P 53 (requiring more than three days and recognizing that Attachment M-3 provides 10 days).
[40] *Id.* at 55.
[41] *See, e.g., Monongahela Power Co. et al.*, 164 FERC ¶ 61,217, at P 7 (2018).
[42] TO Filing, Exhibit A, Attachment M-3 § (d)(2)(i).
[43] TO Filing at 17-18.
[44] *Id.* at 18.
[45] *See* TO Filing, Exhibit A, Attachment M-3 § (d)(2)(i).

7

meeting of the Transmission Expansion Advisory Committee or Subregional RTEP Committee meeting.[46] There appear to be no temporal limits on the time it could take to satisfy the consultation or other conditions, thus creating an uncertain delay before stakeholders might review this narrow subset of projects. And the Board does anticipate that the number of projects opened to some form of stakeholder review will be a small percentage of the overall projects identified on the Transmission Owners' EOL Candidate Needs Lists. The transmission planning process is not open and devoid of discrimination when everyone except for PJM and the Transmission Owner are shut out. Thus, the proposal falls short of Order 890's requirements to afford the necessary transparency to avoid undue discrimination.

*Second*, the Transmission Owners' did not even deign to explicitly open their process to state utility commissions.[47] The Transmission Owners claim that "state regulators are not prohibited from requesting, nor is a Transmission Owner prohibited from providing its projected EOL Needs to its state commission or other governmental agencies with responsibilities in the area in which the projected EOL Needs exist."[48] If state regulators are not intended to be limited by the Tariff language, the Transmission Owners could have accepted the OPSI language.[49] Instead, the Transmission Owners put the onus on the state commissions to request the information. The Board fully intends to exercise its general regulatory authority over electric public utilities, which includes all of the Transmission Owners in New Jersey, to seek the EOL Candidate Needs Lists and other information.[50] However, a truly transparent process would not cut the Board, or any

---

[46] *Id.* at § (d)(2)(ii).
[47] TO Filing at P 18.
[48] *Id.*
[49] Letter from Gregory V. Carmean, Executive Director, OPSI, to Transmission Owners (June 8, 2020), *available at* https://www.pjm.com/-/media/committees-groups/committees/toa-ac/2020/20200610/20200610-comments-provided-by-opsi.ashx
[50] N.J. Stat. Ann. § 48:2-13(a); 48:3-51; *New Jersey Energy Master Plan*, Strategy 5.2.1, at 181-82, NJ.gov (2019), *available at* https://www.nj.gov/emp/docs/pdf/2020_NJBPU_EMP.pdf.

other state regulatory authority, out of the process in an area where it is required to regulate. This lack of prohibitive language in the proposed M-3 attachment falls short of Order 890's transparency requirement.[51]

*Finally*, Transmission Owners' are given a significant advantage over stakeholders, who will be less likely to replicate results of planning studies in order to determine whether planning has been done in a discriminatory fashion. Stakeholders' ability to replicate results will likely be impacted because they will not be presented with the same information as PJM. Indeed stakeholders may only receive altered information after the consultation has occurred. Under the proposal, stakeholders are only guaranteed ten days to provide comments on the Local Plan after the solutions selected by the Transmission Owner in the Local Plan are posted. If PJM and the TO both begin the planning process ahead of the regional (Form 715) or subregional (M-3) projects, stakeholders are inherently disadvantaged. An acceptable Tariff provision provides for meaningful input throughout the planning process. Stakeholders must be presented with needs, have opportunity to comment, and then be presented with solutions.

By so limiting this process, the Transmission Owners' have presented an unjust and unreasonable amendment to the Tariff. This Commission has recently ordered PJM to increase transparency in the context of immediate need projects.[52] Similarly, the Commission has required transparency in Supplemental Projects.[53] In that prior case, the Commission rejected a Transmission Owners' proposal when they failed to sufficiently carry their burden.[54] The same remedy is appropriate in this case.[55]

---

[51] Show Cause Order at PP 86-87.
[52] *PJM Interconnection, LLC¸* 171 FERC ¶ 62,212, ¶¶ 47-55 (2020).
[53] Show Cause Order at P 7.
[54] *Id.*
[55] The Board is not opposed to the Commission opening a Section 206 proceeding to evaluate the justness and reasonableness of the current Tariff and fashion an appropriate replacement rate – rather than accepting the Transmission Owners' filing under Section 205.

9

### C.  The Transmission Owners' Proposed Amendments Will Violate the Cost-Causation Principle.

The Transmission Owners' filing recognizes two planning paths for EOL Needs.  First, the filing defines "Form No. 715 EOL Planning Criteria," because the filing "recognizes that some Transmission Owners have included EOL Need planning criteria in their FERC Form No. 715."[56] Second, the filing defines "Attachment M-3 EOL Planning Criteria," which are "PJM Transmission Owner planning criteria to address EOL Needs" under the pending proposal.   The definitions may sound the same, but they can result in different cost allocations.  Attachment M-3 Projects, such as Supplemental Projects, are allocated to the local zone.  Form No. 715 projects are allocated to the beneficiaries, not necessarily the local zone.

Cost allocation matters.  Under the Federal Power Act, electric utilities must charge rates that are "just and reasonable."[57]  Under Section 205, the utility has the burden to prove the justness and reasonableness of the Tariff amendments.[58]  Where, as here, the Transmission Owners do not address the cost allocation implications of their filing, they have failed to carry their burden.

The Commission issued Order 1000 to promote more efficient coordination among electric utilities.[59]  Order 1000 requires utilities in PJM to jointly produce a regional transmission plan to determine what new facilities would best meet regional needs for electricity.[60]  It also requires utilities to include in their tariffs a formula "for allocating the costs of new transmission facilities selected in the regional transmission plan for purposes of cost allocation."[61]  The formula must satisfy the Commission's six general cost allocation principles, the first of which is the cost-

---

[56] TO Filing at 14.
[57] 16 U.S.C. § 824d(a).
[58] *NRG Power Marketing, L.L.C. v. FERC,* 862 F.3d 108, 113 (D.C. Cir. 2017)
[59] Order 1000, 136 FERC ¶ 61,051.
[60] *Id.* at P 148.
[61] *Id.* at P 558.

JA0150

causation principle.[62]  Order 1000's fifth cost allocation principle requires a transparent method for determining benefits and identifying beneficiaries for both regional and interregional cost allocation.[63]  Each utility must show, through compliance filings, that its cost-allocation formula is consistent with the six specified principles.[64]

To comply with the regional planning requirement of Order 1000, PJM maintains a Regional Transmission Expansion Plan ("RTEP").[65]  Three categories of projects are included in this plan: "(1) projects to satisfy PJM's own planning and reliability criteria; (2) projects to satisfy reliability criteria . . . ; and (3) projects to satisfy planning criteria established by individual utilities."[66]  Projects to satisfy local planning criteria are submitted to the Commission and to PJM on Form 715.[67]  As the Transmission Owners' acknowledge, "some Transmission Owners have included EOL Need planning criteria in their FERC Form No. 715."[68]  "These are planned by PJM under Schedule 6 of the Operating Agreement."[69]

Schedule 12 of the Tariff addresses the cost-sharing requirements of Order 1000.[70]  The RTEP includes certain types of reliability projects, such as Regional Facilities, Necessary Lower Voltage Facilities, and Lower Voltage Facilities.  PJM allocated cost responsibility for these RTEP projects pursuant to the cost allocation method that the Commission accepted as part of PJM's Order 1000 compliance filing.[71]  For Regional Facilities and Necessary Lower Voltage Facilities, costs are allocated pursuant to a hybrid cost allocation

---

[62] *Id.* at P 622.
[63] *Id.* at P 665-67.
[64] *Id.* at P 603.
[65] *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1256 (D.C. Cir. 2018) (hereinafter *ODEC*).
[66] *Id.*
[67] *Id.*
[68] TO Filing at 14.
[69] TO Filing at 13.
[70] *ODEC*, 898 F.3d at 1256.
[71] *PJM Interconnection L.L.C.*, 171 FERC ¶ 61,013 at P 7 (2020).

11

method in which 50% of the costs of those facilities are allocated on a load-ratio share basis and the other 50% are allocated to the transmission owner zones based on the solution-based distribution factor (DFAX) method.[72]  All of the costs of Lower Voltage Facilities are allocated using the solution-based DFAX method.[73]

In *ODEC*, the court considered the Commission's approval of a Tariff amendment requiring allocation of the costs of projects included in the Regional Plan to satisfy only Form 715 planning criteria entirely to the zone of the utility that filed the criteria, "[n]otwithstanding" other provisions of Schedule 12.[74]  Petitioners challenged that the cost allocation violated the cost causation principle established in Order 1000.[75]  The court agreed, finding the Commission acted arbitrarily and capriciously in approving the tariff amendment.[76]  The court remanded the matter for further proceedings.[77]

On remand, the Commission rejected the tariff amendment.[78]  The Commission noted that the PJM Transmission Owners "continue[d] to believe that allocation of the costs of high-voltage projects solely to address a transmission owner's Form No. 715 local planning criteria to the transmission zone of the individual transmission owner whose Form No. 715 local planning criteria underlie each project is reasonably commensurate with the benefits they provide and that there are valid reasons to distinguish such projects from those needed to satisfy PJM's regional reliability criteria."[79]  However, the Commission was unpersuaded by the Transmission Owners'

---

[72] *Id.*
[73] *Id.*
[74] *ODEC*, 898 F.3d at 1259.
[75] *Id.*
[76] *Id.* at 1264
[77] *Id.*
[78] *PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,133 at P 2 (2019).
[79] *Id.* at P 19.

12

argument.[80]  PJM was ordered to make a compliance filing and to refile assignment of cost responsibility for Form No. 715 projects that were previously allocated incorrectly.[81]

In its compliance filing, PJM explained that it reviewed the cost responsibility assignments for 443 Form No. 715 transmission projects and determined that revisions were needed for only 44 projects, the so-called "Remand Projects."[82]  Of the 44 Remand Projects, PJM proposed cost allocation revisions for 11 Regional Facilities and 33 Lower Voltage Facilities.[83]  Included among those projects is the PSE&G Metuchen-Trenton-Burlington Project ("MTB Project").  In that filing, the Metuchen-Trenton-Burlington ("MTB") project's cost was allocated using the DFAX methodology, not exclusively to the local zone comprised of solely New Jersey ratepayers.[84]  Notably, LIPA and Neptune argued that the MTB project should not be included in regional cost allocation, because it was only needed to address PSEG end of life criteria and not PJM or reliability criteria.[85]  Ultimately, the Commission accepted the compliance filing, including the reallocation of the MTB Project.[86]

The Remand Projects were thus reallocated to align with the cost causation principle of Order 1000.  Although PSE&G's MTB line was an end-of-life project, the DFAX calculations determined that there were other beneficiaries of the project, outside of the PSE&G zone.  Indeed, despite being included in PSE&G's end-of-life planning criteria, its costs were justly and reasonably allocated to the identified beneficiaries.[87]

---

[80] *Id.* at P 28.
[81] *Id.* at PP 28-31.
[82] *PJM Interconnection L.L.C.*, 171 FERC ¶ 61,013 at P 12 (2020).
[83] *Id.* at P 13.
[84] *See id.* at P 18.
[85] *Id.* at P 20.
[86] *Id.* at P 37.
[87] *Id.* at P 37.

13

In *ODEC*, the court was "sensitive to the concern . . . that individual utilities should not have free rein to impose unjustified costs on an entire region by unilaterally adopting overly ambitious planning criteria."[88]  However, the court explained that its holding did not prevent PJM or its member utilities "from amending the Tariff, the Operating Agreement, or PJM's own planning criteria to address any problem of prodigal spending, to establish appropriate end-of-life planning criteria, or otherwise to limit regional cost sharing—*as long as any amendment respects the cost-causation principle.*"[89]  "Indeed, the cost-causation principle, by allocating project costs consistent with project benefits, creates the best incentives for PJM member utilities themselves to agree on when to invest their scarce resources in transmission improvements."[90]

The Transmission Owners now come before the Commission with their amendments for end-of-life planning criteria. These amendments are neither appropriate nor consistent with the cost causation principle.  As proposed, some end of life projects may be allocated using the corrected Form No. 715 cost allocation methodology, but others will be allocated, like Supplemental Projects, to the local zone.  The Transmission Owners' proposal does not accord with the *ODEC* decision.

The MTB Project provides a prime example of the flaw in the Transmission Owners' proposal.  Having heard the court in *ODEC*, the Commission, on remand, ordered PJM to identify projects needing reallocation to align with the cost causation principle of Order 1000.  The MTB Project was identified as one of the Remand Projects.  As such, its costs were reallocated beyond the local zone.  If PSE&G had planned the same MTB project under the proposed "Attachment M-3 EOL Planning Criteria," its cost would be allocated to the local zone comprised solely of New

---

[88] *ODEC*, 898 F.3d at 1263.
[89] *Id.* (emphasis added).
[90] *Id.*

Jersey ratepayers.  The Transmission Owners that continued to seek local allocation of Form No. 715 projects even after the remand have found a new means of getting that local allocation.  The Commission may rightly view the amendment as an effort to circumvent its orders.

In its filing with the Commission, the Transmission Owners are notably silent as to the cost allocation implications of their amendments.  In the stakeholder process, in response to the cost-causation concerns, the Transmission Owners complained of stakeholders combining the planning and cost allocation process.  But that is precisely what the court did when it stated that PJM and the Transmission Owners were free to amend the Tariff "to establish appropriate end-of-life planning criteria . . . as long as any amendment respects the cost-causation principle."[91]  It is the Transmission Owners' burden to show that their Section 205 filing is "appropriate" and "respects the cost-causation principle."  It is the Transmission Owners' burden to demonstrate the justness and reasonableness of their proposed rate.  The Transmission Owners' silence shows that they have failed to carry their burden.  Therefore, the Commission should reject the filing.

**D.  The Commission Should Address Related Proceedings in a Coordinated Fashion.**

The Board urges the Commission to address related proceedings in a coordinated fashion. In light of the foregoing, the Commission must recognize the relationship between this proceeding and its ongoing proceedings regarding Form 715.  In addition, on July 2, PJM filed amendments to its Operating Agreement at the behest of its members, but over the thunderous objections of the Transmission Owners.[92]  Where matters are interrelated, but distinct, the Board has previously encouraged the Commission to take necessary procedural steps to dispose of all related issues in a coordinated fashion.[93]  This coordination can advance the public interest and promote

---

[91] *Id.*
[92] This filing has been assigned Docket No. ER20-2308.
[93] *See NJBPU v. PJM Interconnection, L.L.C., et al.*, Complaint of the New Jersey Board of Public Utilities, Docket No. EL18-54 (December 22, 2017) at 2  (urging the Commission to take the necessary procedural steps to handle the

15

administrative efficiency by reducing confusion and room for error or after-the-fact litigation by stakeholders.

A coordinated approach is important, because the instant filing arose from the same PJM stakeholder process that the other filing, in Docket No. ER20-2308, arose from.[94]  In fact, the two filings were developed as competing solution packages to the same problem statement and issue charge directing PJM to examine transparency in end-of-life transmission planning.[95]  Under the Operating Agreement filing, the Transmission Owners would make decisions regarding when facilities reach end-of-life, but PJM would then govern the planning process after this decision is made.  By contrast, under the Transmission Owners' filing in the within docket, the Transmission Owners would both make end-of-life decisions _and_ govern the subsequent planning process.  The Commission is now in a position to choose one solution package over the other, or institute a Section 206 proceeding and determine the appropriate rate for itself.  Coordinating its approach to these two filings will enable the Commission to do so.  Therefore, the Board urges the Commission to coordinate its review of these proceedings.

.

---

related issues in several of these dockets in a coordinated fashion); _see also PJM Interconnection, L.L.C._, Comments of the New Jersey Board of Public Utilities, Docket No. ER19-469 (Feb. 7, 2019) at 7 ("there are several other matters closely linked to the disposition of this case that the Commission should consider to reach a just and reasonable outcome").

[94] _See PJM Interconnection, L.L.C._, End of Life Joint Stakeholder Proposal, Docket No. ER20-2308 (July 2, 2020).
[95] See _Issue Details, Transparency and End of Life Planning_, PJM, https://pjm.com/committees-and-groups/issue-tracking/issue-tracking-details.aspx?Issue={23B82425-6796-4B0C-8C4A-5FF9B6B5F061}.

16

## CONCLUSION

For the foregoing reasons, the Board urges the Commission to reject PJM's amendments to the M-3 attachment.  In the alternative, the Board urges the Commission to direct PJM to adopt changes consistent with this protest, to address the concerns related to transparency, and submit a compliance filing.

**NEW JERSEY BOARD OF PUBLIC UTILITIES**

By:  */s/*Cynthia L. M. Holland
Cynthia L. M. Holland
Director, Office of Federal and
Regional Policy
New Jersey Board of Public Utilities
44 South Clinton Ave.
Trenton, NJ 08609
Tel: (609) 292-1629
cynthia.holland@bpu.nj.gov

**GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY**

By: */s/*Brandon C. Simmons
Brandon C. Simmons
Deputy Attorney General
New Jersey Office of the Attorney General
Department of Law & Public Safety,
Division of Law
R.J. Hughes Justice Complex, 7th Floor West
Trenton, NJ 08625
Tel: (609) 376-3370
brandon.simmons@law.njoag.gov

*Attorney for the New Jersey Board of
Public Utilities*

**DATE:** July 6, 2020

Document Accession #: 20200706-5235     Filed Date: 07/06/2020

## CERTIFICATE OF SERVICE

I hereby certify that, on this 6th day of July 2020, I have caused the foregoing document to be served upon each party designated on the official service list compiled by the Secretary in this proceeding, by email.

*/s/ Brandon Simmons*
Brandon C. Simmons
Deputy Attorney General
New Jersey Office of the Attorney General
Department of Law & Public Safety
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
(609) 376-3370
Brandon.simmons@law.njoag.gov

Document Content(s)

final M-3 comments 7.6 clean.DOCX......................................1

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| American Transmission Systems, Incorporated, | ) | Docket No. ER20-2046-000 |
| PJM Interconnection, L.L.C. | ) | |

JOINT PROTEST
OF AMERICAN MUNICIPAL POWER, INC., OLD DOMINION
ELECTRIC COOPERATIVE, PJM INDUSTRIAL CUSTOMER
COALITION, PUBLIC POWER ASSOCIATION OF NEW JERSEY,
PEOPLE'S COUNSEL FOR THE DISTRICT OF COLUMBIA, WEST
VIRGINIA CONSUMER ADVOCATE, BLUE RIDGE POWER AGENCY

On June 12, 2020, the PJM Transmission Owners ("PJM TOs") filed pursuant to section

205 of the Federal Power Act,[1] Section 35.13 of the Rules and Regulations of the Federal Energy

Regulatory Commission ("Commission"), Section 9.1(a) of the PJM Interconnection, L.L.C.

("PJM") Open Access Transmission Tariff ("Tariff"), acting through the PJM Consolidated

Transmission Owners Agreement ("CTOA") proposed modifications to Attachment M-3 of the

Tariff ("TO Proposal"). The PJM TOs propose in the June 12 filing to create a new, expansive

application of the transmission planning procedures in Attachment M-3 that would authorize

Transmission Owners, rather than PJM, to plan for all new transmission projects that expand or

enhance the Transmission System[2] with the limited exception of projects to address NERC

Reliability Standards, State Public Policies, Transmission Owner FERC Form 715 criteria,[3] or

---

[1] 16 U.S.C. § 824d (2020).

[2] "Transmission System" is defined as "the facilities controlled or operated by the Transmission Provider within the PJM Region that are used to provide transmission service under Tariff, Part II and Part III." PJM Tariff, I. Common Service Provisions.

[3] The TO Proposal does include new requirements as part of the Attachment M-3 planning process for FERC Form 715 Projects. *See, for example,* TO Proposal at Exhibit A, Paragraph (d).

1

projects to relieve economic constraints (Market Efficiency Projects).  The TO Proposal also adds a new category of projects to the Attachment M-3 transmission planning process, under an umbrella label of "Asset Management Projects," for maintenance activities and new transmission that replaces existing Transmission Facilities that are not expansions or enhancements of the Transmission System.[4]  As proposed, the described purpose of an Asset Management Project is virtually unlimited and can be any maintenance or new transmission replacement for any aging infrastructure drivers, security, reliability, automation, or to meet regulatory compliance requirements.[5]  To determine whether a transmission-related project (whether maintenance or new transmission) is an expansion or enhancement of the Transmission System, the Transmission Owner must determine whether the project will result in an Incidental Increase, which is a new term included in the TO Proposal.[6]  Specifically, an Incidental Increase is an increase in transmission capacity that results from updated technology or replacements to meet Transmission Owner design standards, industry standards, codes, laws or regulations.[7]  The PJM Transmission Owners attempt to make all of these changes through a FPA section 205 filing.  The PJM Transmission Owners request that the Commission accept the TO Proposal for filing and allow the proposed Tariff modifications to become effective sixty days from the filing, on August 11, 2020.

For the reasons set forth below, American Municipal Power, Inc. ("AMP"), Old Dominion Electric Cooperative ("ODEC"), the PJM Industrial Customer Coalition, Public Power Association of New Jersey, People's Counsel for the District of Columbia, Delaware Division of the Public

---

[4] TO Proposal Exhibit A at Paragraph (b)(1).

[5] *Id.*

[6] *Id.* at Paragraph (b)(3).

[7] *Id.*

2

JA0161

Advocate, West Virginia Consumer Advocate, Indiana Office of Utility Consumer Counselor, Blue Ridge Power Agency, and Central Virginia Electric Cooperative (collectively, the "Load Group") hereby protests the PJM TO Proposal pursuant to Rule 211 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.211 (2020).   The Load Group's review of the PJM TOs' filing has identified a number of respects in which the TO Proposal fails to adhere to established Commission precedent or practice or is otherwise unjust, unreasonable or unlawful.  Accordingly, and because the Commission does not have the opportunity to condition acceptance upon substantial reforms to the filing, the PJM TOs' proposed Tariff modifications should be rejected.[8]

The Load Group's objections to the PJM TOs' filing are set forth below.

## I.    BACKGROUND

As the Commission is well aware, PJM stakeholders, including the Load Group, have been attempting since at least 2015 to get additional clarity, transparency and accountability in the PJM transmission planning process, particularly as it regards end of life transmission facilities.  The Load Group will not rehash the entire history here; however, the fact is that the main driver of transmission development and construction in the PJM footprint for the foreseeable future is likely to be replacing aging infrastructure (colloquially referred to as "End of Life" or "EOL" projects).[9]

---

[8] *NRG Power Mktg., LLC, & GenOn Energy Mgmt., LLC v. Fed. Energy Regulatory Comm'n*, 862 F.3d 108, 110 (D.C. Cir. 2017) (When reviewing a utility's filing under FPA Section 205, FERC may not "transform the proposal into an entirely new rate of FERC's own making.")*; see also*, *Midcontinent Independent System Operator, Inc.*, 167 FERC ¶ 61,258 at P 66 (The Commission determined that because one aspect of a proposal was unjust and unreasonable, it must reject the filing as a whole.).

[9] Cost Savings Offered by Competition in Electric Transmission Experience to Date and the Potential for Additional Customer Value at 43, available at: https://brattlefiles.blob.core.windows.net/files/16726_cost_savings_offered_by_competition_in_electric_transmission.pdf ("Brattle Study").

In fact, PJM reported that "[t]wo-thirds of all system assets in PJM are more than 40 years old; over one-third are more than 50 years old."[10]

The reality is that the PJM Region has experienced severe imbalance in PJM transmission planning as compared to PJM TO-only transmission planning, with the latter undertaking the vast majority of new transmission investment.  According to PJM's presentation at the May 4, 2020 Annual Members Committee, in 2018, over 76 percent of the project expenses within the PJM RTEP were Supplemental Projects ($6.5 billion) as opposed to regionally planned projects ($2.0 billion).  The largest component of the spending on Supplemental Projects in 2018 was on projects that were claimed to be necessary due to EOL conditions.  The statistics for 2019 also show that the vast majority of projects were based on claims of EOL conditions and were not subject to regional planning pursuant to the PJM RTEP.[11]  In fact, as can be determined from the data extracted from PJM information in Table 1 below, new transmission projects that expand or enhance the Transmission System driven by EOL conditions have made up the largest category of transmission being planned and built in the PJM footprint for most of the last five years and are on target to be the same this year.

---

[10] *See "The Benefits of the PJM Transmission System"* PJM Interconnection at 5 (April 16, 2019), available at: https://www.pjm.com/-/media/about-pjm/newsroom/fact-sheets/the-value-of-transmission.ashx.

[11] *See* 2019 Project Statistics presented at the May 12, 2020 PJM Transmission Expansion Advisory Committee, available at: https://www.pjm.com/~/media/committees-groups/committees/teac/2020/20200512/20200512-item-10-2019-project-statistics.ashx.

**Table 1**



From 2015 through June 2020, $17.7 billion of EOL projects have been proposed.[12] Trending the 2010-2019 cost data forward through 2028, the cost of EOL projects would total $46.52 billion from 2020 through 2028.[13]

---

[12] Affidavit of Edward D. Tatum supporting the basis for the calculations in Table 1.

[13] *Id.*

5

Document Accession #: 20200706-5236     Filed Date: 07/06/2020

**Table 2**



Thus, replacement projects for Transmission Facilities with EOL conditions comprise the largest component of transmission additions; additions that will determine whether the Transmission System is planned and operated with an eye towards the next 50 years, or one built through balkanized, piecemeal replacements of assets built for the world of 50 (or more) years ago. The PJM TOs' Proposal would have the Commission bless the latter, which results in an unjust and unreasonable outcome for consumers across the PJM Region. The Load Group urges the Commission to consider and adopt the former, by rejecting the PJM TOs' Proposal.[14]

Not only does PJM, as the regional transmission organization ("RTO"), have the broader regional view, more comprehensive information regarding new generation in the interconnection queue, congestion and other market data to plan the transmission system of the future on a coordinated basis, but planning needed new transmission projects through the RTEP would open

---

[14] *See* Joint Stakeholder Proposal.

Document Accession #: 20200706-5236     Filed Date: 07/06/2020

such projects to competition that is precluded by the TO Proposal. The cost impact of competitive transmission is significant. In an April 2019 report from the Brattle Group, using competitive solicitations in transmission development is estimated to save 20% to 30% of project costs compared to traditionally developed transmission projects.[15] As shown in Table 3 below, applying Brattle's estimated savings of 30% had the existing EOL projects been open to competition through PJM's RTEP process, a customer savings of $5.9 billion could have been realized from 2010 through 2019. Astonishingly, having PJM, instead of the TOs, plan EOL projects could save customers between $8.91 and $13.36 billion from 2021 through 2028, or an average of between $1.11 billion and $1.67 billion each year, based on current projections, also as shown in Table 3.

There is no argument that the expected magnitude of EOL projects will have regional impacts on the Transmission System. In fact, at least one PJM Transmission Owner has stated that "[t]he age and condition of the transmission system in the PJM region poses a significant risk to reliability."[16] Given the volume, cost, and importance for reliability of new transmission required to replace existing Transmission Facilities with EOL conditions, the planning responsibility should be PJM's.

---

[15] Cost Savings Offered by Competition in Electric Transmission Experience to Date and the Potential for Additional Customer Value at 43, available at: https://brattlefiles.blob.core.windows.net/files/16726_cost_savings_offered_by_competition_in_electric_transmission.pdf.

[16] *See* FERC Technical Conference, Panel 4, Written Introductory Remarks as Filed with FERC, FERC Docket AD20-17 at 2 (July 2, 2020).

Document Accession #: 20200706-5236     Filed Date: 07/06/2020

**Table 3:  EOL Project Savings If Open to Competition**

| Year | Actuals ($B) | Forecast-Linear ($B) |
|------|-------------|----------------------|
| 2010 | $ 0.26 | |
| 2011 | $ 0.73 | |
| 2012 | $ 0.87 | |
| 2013 | $ 0.43 | |
| 2014 | $ 0.98 | |
| 2015 | $ 2.78 | |
| 2016 | $ 0.67 | |
| 2017 | $ 3.41 | |
| 2018 | $ 6.18 | |
| 2019 | $ 3.54 | |
| 2020 | $ 1.99 | $ 1.99 |
| 2021 | | $ 4.25 |
| 2022 | | $ 4.62 |
| 2023 | | $ 5.00 |
| 2024 | | $ 5.38 |
| 2025 | | $ 5.76 |
| 2026 | | $ 6.13 |
| 2027 | | $ 6.51 |
| 2028 | | $ 6.89 |

| | |
|---|---|
| **Total Estimated Savings At 20%** | $ 8.91 |
| **Total Estimated Savings At 30%** | $ 13.36 |

| | |
|---|---|
| **Total Estimated Annual Savings At 20%** | $ 1.11 |
| **Total Estimated Annual Savings At 30%** | $ 1.67 |

At the PJM Markets and Reliability Committee ("MRC") meeting on December 5, 2019, the committee members approved an issue charge sponsored by AMP and ODEC, the stated purpose of which was to develop PJM governing document changes to establish requirements for an EOL planning determination process; improve transparency in the TO EOL determination

8

JA0167

process such that stakeholders can confirm that EOL processes were followed; establish requirements for EOL replacement planning process in the RTEP, including specification of the planning horizon requirements for end of life projects; and improve consistency by having PJM review, plan and ultimately approve EOL replacement projects as part of the RTEP approved by the PJM Board. The stakeholders utilized PJM's consensus-based issue resolution ("CBIR") process to develop two distinct solution packages to address the issues set forth in the issue charge: one supported primarily by PJM staff and the other by a diverse group of PJM stakeholders. At the May 21, 2020 MRC meeting, following discussion, both proposals failed in sector-weighted votes, with the joint stakeholders' proposal receiving 3.23 in favor (65% in support) and the PJM proposal receiving only 1.77 in favor (35% in favor, 65% against). However, at the June 18, 2020 meeting, by a 69% sector-weighted supermajority vote, the Members Committee voted to approve the stakeholder proposal to modify the PJM Operating Agreement regarding planning of transmission projects to replace Transmission Facilities under PJM's control that the Transmission Owners determine have reached the end of their operational lives. On July 2, 2020, PJM submitted in Docket No. ER20-2308-000, the proposal developed by joint stakeholders to provide for transparency in end of life transmission planning ("Joint Stakeholder Proposal").[17]

In complete disregard of the ongoing stakeholder process, on June 12, 2020, the PJM Transmission Owners made a unilateral filing with the Commission to amend Attachment M-3 to the PJM Tariff for the purported purpose of: (1) expanding the scope of Tariff Attachment M-3 to include limited PJM Transmission Owner maintenance or "asset management activities" and projects that are not otherwise required to be included in an Order No. 890-compliant transmission planning process; and, (2) improving coordination between the Transmission Owners' planning

---

[17] *PJM Interconnection, L.L.C.,* FERC Docket ER20-2308-000 (July 2, 2020)("Joint Stakeholder Proposal").

Document Accession #: 20200706-5236    Filed Date: 07/06/2020

for Transmission Facilities to replace facilities nearing the end of their operational lives with PJM's development of baseline RTEP projects by giving the TOs the authority to supersede PJM's determination that the baseline RTEP project resolves the EOL need.

As a result of the TOs' blatant attempt to circumvent the PJM Stakeholder process, now before the Commission are two very different transmission planning proposals, both filed under Section 205 of the Federal Power Act.  One is the Joint Stakeholder Proposal, supported by a supermajority of PJM Members that proposes to modify Schedule 6 of the Operating Agreement, where the RTEP Protocols reside.[18]  The other is the TO Proposal, a unilateral attempt to circumvent the will of the PJM Members with a proposal that was never part of the CBIR process and vetted only through a consultation process whereby the PJM Transmission Owners could and did reject or ignore nearly all recommendations for improvements.  The TO Proposal changes are solely to the Tariff Attachment M-3 that are based upon a PJM proposal that was soundly rejected by the majority of PJM Members, and that has been modified in a way that renders it unjust, unreasonable and unlawful.

The Commission should reject the TO Proposal because it is unjust, unreasonable and otherwise unlawful, as discussed herein.  Instead, the Commission should approve the Joint Stakeholder Proposal, which is a just and reasonable resolution of the long-contested issues regarding planning for expansions and enhancements resulting from Transmission Facilities reaching an EOL condition.   In the event the Commission does not reject the TO Proposal outright, then it should consolidate the proceedings.

---

[18] Joint Stakeholder Proposal.

## II.     PROTEST

### A.     The PJM TO Proposal exceeds the PJM Transmission Owners' authority to unilaterally file.

The PJM Transmission Owners have special rights to modify certain portions of the PJM Tariff.  However, those rights are not unlimited.  The June 12 filing by the PJM Transmission Owners exceeded the limited authority and, thus, the Commission should dismiss the TO Proposal.

Section 9.1(a) of PJM's Tariff gives the Transmission Owners the exclusive and unilateral right to file FPA section 205 filings relating to "the establishment and recovery of the Transmission Owners' transmission revenue requirements or the transmission rate design under the PJM Tariff, and such filing rights shall also encompass any provisions of the PJM Tariff governing the recovery of transmission-related costs incurred by the Transmission Owners."  The Tariff specifies that the Transmission Owners can "only file under Section 205 to change the transmission rate design for the PJM Region pursuant to a filing approved in accordance with Section 8.5.1 of the CTOA."[19]

This exclusive and unilateral right to retain the authority under FPA section 205 (16 U.S.C. 824d) to seek recovery from the RTO of the revenue requirements associated with the transmission facilities that they own serves as an important check and balance to RTOs' independence requirement.[20]  It ensures that Transmission Owners, who turned over operational control and the majority of planning responsibilities to the RTO, still have the ability to recover their costs of

---

[19] Section 8.5.1(e) of the CTOA requires a vote of two-thirds of the total individual votes of CTOA signatory Transmission Owners for approval of "changes in or relating to Joint Transmission Rate or the PJM Regional Rate Design, or any provisions governing the recovery of transmission-related costs incurred by the Transmission Owners."

[20] *Public Utility District No. 1 of Snohomish County, Washington v. FERC,* 272 F.3d 607, 611-612 (2001).

11

transmission ownership, particularly when the RTO has the authority to require the Transmission Owner to construct new transmission.[21] But the Transmission Owners' authority stops there.

With the exception of the recently approved and limited transmission planning process for local Supplemental Projects contained in Tariff Attachment M-3, the regional transmission planning process is set forth in Schedule 6 to the PJM Operating Agreement. The PJM Operating Agreement specifies what is included in the RTEP criteria: (1) "PJM's planning procedures;" (2) NERC Reliability Standards; (3) Regional Entity reliability principles and standards; and, (4) "the individual Transmission Owner FERC filed planning criteria as filed in FERC Form No. 715."[22] PJM planning procedures include the methods PJM uses to conduct modeling and the details of data collection, among other things. Additionally, "Supplemental Project" is defined only in the Operating Agreement.

Unlike the limited Tariff provisions under which the PJM Transmission Owners have FPA section 205 rights, the PJM Members have authority to change the Operating Agreement through FPA section 205 filing rights. Specifically, Section 8.8 of the PJM Operating Agreement provides that the Members Committee shall have the power to take actions specified in the Operating Agreement, including, in accordance with Section 18.6 of the Operating Agreement, amending any portion of the Operating Agreement. Section 18.6, in turn, provides in part that the Operating Agreement may be amended only upon (i) submission to Board for its review and comments; (ii) approval of the amendment or new Schedule by the Members Committee, after consideration of the comments of the PJM Board; and, (iii) approval and/or acceptance for filing of the amendment by FERC." This division of authority was not an oversight in the formation of PJM. Rather, it

---

[21] *See* Operating Agreement, Schedule 6, Section 1.7 Obligation to Build.

[22] Operating Agreement, Schedule 6, Section 1.2(e).

12

was well recognized that competitive markets would require an independent RTO planning the future grid lest incumbent TOs conduct planning in favor of their generation affiliates. This essential ingredient to successful competitive markets is as compelling today as it was in 1997 when it was first adopted by the PJM members and approved by the Commission.

Although the Show Cause Order recognized that the PJM TOs "retain primary authority for planning local Supplemental Projects" and that it is "just and reasonable for the Supplemental Projects planning process to be contained in the PJM OATT,"[23] the TO Proposal is not limited to modification of the Supplemental Project planning process in Attachment M-3.

As the TOs explain, the TO Proposal, "significantly expand[s] the scope of the Attachment M-3 process to include asset management projects that affect PJM's modeling of the Transmission."[24] More significant is the PJM TO Proposal's attempt to dramatically expand the applicability of the Attachment M-3 process and explicitly limit PJM's flexibility to improve its structure and operations to meet demands by restricting the PJM planning criteria. The TO Proposal achieves this monumental change to the PJM RTEP by adding an "applicability" provision to Attachment M-3 such that the Transmission Owners have authority to plan both Supplemental Projects and "any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more" of a limited list of PJM planning criteria, including: NERC Reliability Standards, State Public Policies, Transmission Owner FERC Form 715 criteria, or projects to relieve economic constraints.[25] Notably absent from the TO

---

[23] *See Monongahela Power Co., et al.,* Order to Show Cause, 156 FERC 61,134 (2016); *order accepting in part proposed tariff revisions and requiring tariff revisions pursuant to section 206,* 162 FERC 61,129 (2018) ("M-3 Order"), *order on rehearing and compliance,* 164 FERC 61,217 at P13 (2018) ("Show Cause Order on Rehearing").

[24] TO Proposal, Transmittal Letter at 3.

[25] *Id.*, Exhibit A at Paragraph (a).

Proposal list of regional transmission planning criteria that is not within the TOs' rights under Attachment M-3 is "Office of the Interconnection planning procedures," which is currently part of the Operating Agreement list of RTEP planning criteria.[26]

It is important to note that in defining Supplemental Projects as a "transmission expansion or enhancement that is not required for compliance with the following PJM criteria,"[27] "PJM criteria" is not a defined term under the Operating Agreement. Likewise, "system reliability, operational performance or economic criteria"[28] are not specifically defined in the PJM Operating Agreement. This is not surprising because those terms are intended to be flexible to reflect the changing determinations by PJM and its stakeholders as to the regional criteria that PJM should be addressing. Indeed, this is precisely why the definition of Supplemental Projects was further restricted to exclude "state public policy project pursuant to Operating Agreement, Schedule 6, section 1.5.9(a)(ii)" after that category of PJM planned facilities was added as part of PJM's Order No. 1000 compliance filing in 2014.[29] It is also reflected in the fact that the definition requires "a determination by the Office of the Interconnection" that the proposed Supplemental Project does not meet any of the referenced PJM criteria – which criteria are determined by PJM and its stakeholders, not the PJM Transmission Owners.[30] Again, the authority of the independent RTO was carefully crafted in support of competitive markets.

---

[26] Operating Agreement, Schedule 6, 1.2(3)

[27] *Id.,* Section 1, Definitions S-T.

[28] *Id*.

[29] *PJM Interconnection, L.L.C.,* 147 FERC ¶ 61,128 at P 69 (2014).

[30] Operating Agreement, Schedule 6, Section 1.5.6(n).

14

JA0173

But the TO Proposal's addition of the above-referenced new terms in Attachment M-3 flips on its head the division of planning authority allocated to PJM versus the Transmission Owners. Whereas under the current Attachment M-3 process and the RTEP Protocols, the Transmission Owners' planning authority is limited to a narrow category of local Supplemental Projects, under the TO Proposal, the TOs would have planning authority over *all* "Attachment M-3 Projects," which includes: (1) Supplemental Projects, (2) Asset Management Projects, and (3) "*any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3*" through the applicability provisions. (emphasis added).

By including the PJM planning criteria in the Tariff section over which the Transmission Owners have exclusive authority to change through an FPA section 205 filing, the TO Proposal prohibits PJM or PJM Members from ever expanding the PJM planning criteria absent Transmission Owner acquiescence. This attempt to rewrite the Operating Agreement exceeds the Transmission Owners' authority regarding amendments that the Transmission Owners may make unilaterally through an FPA section 205 filing.

While PJM Transmission Owners may retain authority to plan the narrow list of local projects that Supplemental Projects represent under prior Commission orders, the list of RTEP planning criteria resides in the Operating Agreement, a document controlled by PJM and the PJM stakeholders. PJM stakeholders have full authority to change the referenced RTEP planning criteria at any time based on their desires as to the scope of regional planning.

Contrary to the TO Proposal, the Transmission Owners cannot turn Attachment M-3 into an expansive catchall that allows the PJM Transmission Owners to declare whatever they choose to be an "Attachment M-3 Project" absent defined PJM criteria. Nor may the Commission approve a Section 205 filing that reflects an expansion of the Transmission Owner transmission planning

15

responsibility beyond the holding of prior Commission orders or the wishes of PJM stakeholders absent a finding pursuant to an FPA section 206 complaint that the existing Operating Agreement is unjust and unreasonable.  Instead, the Supplemental Project definition and the RTEP, both in the Operating Agreement, allow PJM and its stakeholders to declare what Supplemental Projects can (and cannot) be and the Attachment M-3 is limited to Supplemental Projects.

**B.    Even if the TO Proposal did not exceed the PJM TOs' authority, the Proposal is unjust and unreasonable.**

**1.    PJM, and not the individual PJM TOs, has the right and obligation to plan regional and subregional transmission projects.**

The TO Proposal attempts to add to Attachment M-3 a new category of transmission projects to be included in Attachment M-3 – asset management – which the Transmission Owners contend need not comply with the transmission planning requirements of Order No. 890, and which would encompass replacement of Transmission Facilities that have an EOL condition.[31]  As noted above, given the volume and magnitude of EOL projects, effectively rebuilding the integrated Transmission System and impacting reliability, the planning for the new transmission to replace existing Transmission Facilities is transmission planning for regional and subregional projects and that is beyond the Transmission Owners' rights and authority.

The purpose of the CTOA is to facilitate coordination of planning and operating of Transmission Facilities and to transfer certain planning and operating responsibilities from the PJM Transmission Owners to PJM.[32]  The PJM Transmission Owners reserved the authority and responsibility to operate and maintain the transmission facilities they own.[33]  However, the CTOA

---

[31] TO Proposal, Transmittal Letter at 2.

[32] CTOA Article 2.

[33] *Id.* at Section 4.5.

16

imposes on PJM the responsibility to prepare the RTEP.[34]   The RTEP includes, among other things, Regional and Subregional RTEP projects developed to comply with all applicable reliability and other delineated criteria, including, for example, market efficiency projects and Public Policy Requirements.[35]

The Transmission Owners conflate CTOA Section 4.1 as support for the view that they may conduct transmission planning essentially as they see fit absent a specific PJM RTEP criterion.  That section, however, addresses operation and maintenance – not planning.  They also reference CTOA Sections 5.1-5.6, but those sections also fail to identify planning rights retained by the Transmission Owners.[36]   Rather, the CTOA explicitly transfers the RTEP responsibility to PJM and there is nothing referenced by the Transmission Owners in the CTOA that permits them to conduct transmission planning.  In fact, the CTOA does not even describe or authorize the Transmission Owners to plan for Supplemental Projects.  Rather, Supplemental Project is defined in the Operating Agreement and the limited right to plan for local Supplemental Projects was exclusively embedded in the Operating Agreement until the Show Cause Orders permitted the Transmission Owners to add Attachment M-3 to the Tariff.[37]   Quite simply, maintenance ends when a TO makes the determination that it is no longer cost effective to maintain the asset.  That's where planning begins.

---

[34] *Id.* at Section 4.1.4.

[35] Operating Agreement, Article I, Definitions, 3.1.0.

[36] Specifically, CTOA Section 5.1 addresses the prevention of physical damage to persons or property; Section 5.2 retains the right to build, finance, own, acquire, sell, dispose, retire, merge or otherwise transfer transmission facilities; Section 5.3 permits the PJM TOs to take actions they deem necessary to fulfill local, state or federal law; Section 5.4 retains the respective rights of PJM and the PJM TOs as set forth in the Federal Power Act and the Commission's rules and regulations thereunder to the extent not provided for in the CTOA; Section 5.5 expressly permits the parties to enforce their obligations; and, Section 5.6 retains rights not transferred to PJM to the PJM TOs.

[37] Operating Agreement, Article 1, Definitions.

Although the Show Cause Order recognized that the PJM TOs "retain primary authority for planning local Supplemental Projects" and that it is "just and reasonable for the Supplemental Projects planning process to be contained in the PJM OATT,"[38] the authority granted by the Show Cause Orders to the Transmission Owners is not unfettered. The Commission's acceptance of the PJM TOs' M-3 proposal through the Show Cause Order proceedings was on the basis that the Attachment M-3 process would be a stand-alone transmission planning process for *local Supplemental Projects* that complies with the requirements of Order No. 890.[39] Specifically, the Commission found that while Order No. 890 requires individual transmission owners' local planning processes to comply with specified requirements, even when transmission owners participate in an RTO, they are not required to allow the RTO to do all planning for local or Supplemental Projects. Therefore, so long as the individual Transmission Owners' local planning process is compliant with the Order No. 890 requirements, the PJM Transmission Owners may retain primary authority for planning *local Supplemental Projects*.[40]

That PJM is the regional entity responsible for transmission planning, as opposed to the PJM Transmission Owners, is evidenced by the fact that the transmission planning provisions are included in the Operating Agreement - which can only be revised by super-majority vote of the PJM Members - as opposed to the Tariff which can be unilaterally modified by the Transmission Owners. As discussed above, although the Commission permitted the Transmission Owners to place their planning for Supplemental Projects in Tariff Attachment M-3, the TO Proposal here goes well beyond what the Commission permitted in approving Attachment M-3. The import of

---

[38] Show Cause Order on Rehearing at P 13.

[39] *Id.*

[40] *Id.*

18

these extensive proceedings is that the Commission has consistently held firm that in order to comply with Order No. 890 and Order No. 1000, local and regional transmission planning must be fully integrated into PJM's overall transmission planning process, not treated as a one-off process to be developed by the Transmission Owners alone.

### 2. The TO Proposal Will Unreasonably Limit the Scope of PJM's RTEP Process

The TO Proposal will exempt from the PJM RTEP planning process a significant amount of transmission projects. In the past three years (2017-2019), the PJM Transmission Owners have proposed $13.13 billion in end of life related projects, out of a total $21.44 billion in total projects.[41] While this includes both Baseline and Supplemental Projects, the TO Proposal will impact planning for a significant amount of transmission facilities in PJM. The TO Proposal would exempt from PJM's RTEP planning process certain "Asset Management Projects" and even for "Asset Management Projects" that would not qualify as Attachment M-3 Projects, the TO Proposal gives the Transmission Owners the ultimate authority over planning – not PJM. As transmission customers "embedded within the service areas of individual transmission owners,"[42] the lack of open, coordinated, and transparent planning for projects as proposed by the Transmission Owners is an issue of critical importance to the Load Group.

Despite the Commission's efforts in the Attachment M-3 proceeding to bring the PJM Transmission Owners' transmission planning into compliance with Order No. 890 and Order No.

---

[41] *See* Table 1, *supra.*

[42] *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, FERC Stats. & Regs. ¶ 31,241, at P 440; *order on reh'g*, Order No. 890-A, FERC Stats. & Regs. ¶ 31,261 (2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009) ("Order No. 890").

19

1000, there is mounting evidence that the majority of transmission planning in PJM is not occurring on a regional basis.[43]

The Transmission Owners' representation that their proposal "will improve planning coordination between Transmission Owners and PJM"[44] and that the proposal will "enhance transparency and the opportunity for stakeholder comment"[45] with respect to their asset management projects, is inaccurate.  In fact, the TO Proposal would take significant planning authority *away from* PJM, at a critical time when PJM should be responsible for planning the Grid of the Future and to the detriment of transmission customers whose interests in non-discriminatory access to transmission the Commission sought to protect in Order No. 890 and Order No. 1000.

As an example, the TO Proposal revises the very scope of the Transmission Owners' planning authority as compared to PJM's.  The existing Attachment M-3 "provides additional details of the process that *PJM and the PJM Transmission Owners will follow in connection with planning Supplemental Projects . . .*"[46]  As a replacement, for this coordinated approach, the TO Proposal states that "[e]*ach Transmission Owner shall be responsible for planning and constructing* in accordance with Schedule 6 of the Operating Agreement as provided in this Attachment M-3, to the extent applicable, (i) Asset Management Projects . . . (ii) Supplemental Projects . . . and (iii) any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more of the following criteria:

> 1. NERC Reliability Standards (which includes Applicable Regional Entity reliability standards);

---

[43] *See* Tables 1-3, *supra.*

[44] TO Proposal, Transmittal Letter at page 3.

[45] *Id.*

[46] PJM Tariff, Attachment M-3, Applicability.

20

2. Individual Transmission Owner planning criteria as filed in FERC Form No. 715 and posted on the PJM website, provided that the Additional Procedures for the Identification and Planning of EOL Needs, set forth in section (d) shall apply, as applicable;

3. Criteria to address economic constraints in accordance with section 1.5.7 of the Operating Agreement or an agreement listed in Schedule 12-Appendix B;

4. State Agreement Approach expansions or enhancements in accordance with section 1.5.9(a)(ii) of the Operating Agreement; or

5. An expansion or enhancement to be addressed by the RTEP Planning Process pursuant to section (d)(2) of this Attachment M-3 in accordance with RTEP Planning Process procedures in Schedule 6 of the Operating Agreement."[47]

Under the TO Proposal, a PJM Planning Criteria Need is defined as "a need to plan a transmission expansion or enhancement of Transmission Facilities *other than those reserved to each Transmission Owner in accordance with section (a) [above]."* Thus, the PJM Transmission Owners clearly want the Commission to approve a transmission planning structure where the Transmission Owners, not PJM, have the responsibility for planning and constructing a broad range (and likely the majority) of transmission projects, with PJM's responsibility limited to only specific categories.

Moreover, as ODEC and AMP have expressed in the past, having these critical planning provisions in Attachment M-3 to the PJM Tariff as opposed to the Operating Agreement, gives the PJM Transmission Owners control and veto authority over adding additional regional planning categories to the PJM RTEP, because their proposed Attachment M-3 reserves for the Transmission Owners authority over planning and constructing all but those limited enumerated

---

[47] TO Proposal, Exhibit A at Paragraph (a).

21

JA0180

areas for PJM planning.[48]  The Commission's assurance that any changes to Attachment M-3 must nevertheless be found to be just and reasonable does not address this concern, because if Attachment M-3 is approved as proposed by the TOs, PJM will only have planning authority over the enumerated items in Attachment M-3, as opposed to authority as provided and may be set forth in the future in the RTEP provisions of the Operating Agreement.  The TO Proposal is a fundamental shift away from the assurances and division of PJM responsibility for independently planning the transmission system in the PJM region, to the Transmission Owners as the primary authority over the scope and process for transmission planning.  This defeats the purpose of an RTO in the first place.

There is a critical need for PJM's role as the entity responsible for regional and sub-regional transmission planning. The Commission and PJM have been focused on efforts toward building a grid of the future, to accommodate not only the 15-year planning horizon, but also helping the power grid adapt to change, address aging and end of life infrastructure, grid resilience and the shifting fleet of generation resources.[49]  A regional organization with a long term planning horizon is best suited to plan for our energy future in determining how best to accommodate renewables, distributed resources, microgrids, and storage.  Permitting the Transmission Owners to usurp PJM's role in the planning process as well as the open, transparent and coordinated process with interested stakeholders, will critically threaten those goals.

---

[48] *See* Request for Rehearing filed by the Load Group in Docket Nos. ER17-179, *et al.* on March 19, 2018 at 6-12; *Monongahela Power Co.*, 162 FERC ¶ 61,129 at P 58 n.132 (citing AMP, Motion to Dismiss and Answer filed November 15, 2016 in Docket No. EL16-71 at 8; ODEC Protest filed in Docket No. EL16-71 on November 22, 2016 at 10; AMP Protest filed in Docket No. EL16-71 on November 22, 2016 at 3-4).

[49] *See* https://insidelines.pjm.com/how-pjms-regional-planning-process-prepares-the-grid-for-the-future/.

## 2.   The TO Proposal prohibits PJM from complying with FERC Rules.

Transmission planning and expansion is one of eight essential, *minimum* functions of an RTO as determined in Order No. 2000.[50]  In Order No. 2000, the Commission concluded, "the RTO must have ultimate responsibility for both transmission planning and expansion within its region that will enable it to provide efficient, reliable and non-discriminatory service and coordinate such efforts with the appropriate state authorities."[51]  This requirement is memorialized in the Commission's Rules at Section 35.43(k).   Another essential function of an RTO is an "open architecture" policy to allow the RTO the flexibility to improve its structure and operations to meet demands.[52]

Specifically, the "open architecture" rule requires that "any proposal to participate in a RTO must not contain any provision that would limit the capability of the RTO to evolve in ways that would improve its efficiency, consistent with the requirements in paragraphs (j) and (k) of this section."[53] Further, under this rule, RTOs must have the ability to "evolve with respect to its organizational design, market design, geographic scope, ownership arrangements, or methods of operational control, or in other appropriate ways if the change is consistent with the requirements of this section".[54]

---

[50] *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,163 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001)("Order No. 2000").

[51] 18 C.F.R. § 35.34(k)(7) (2018); Order No. 2000 (affirming that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region").

[52] *See id.* § 35.34(*l*).

[53] *Id.*

[54] Order 2000.

As discussed herein, the TO Proposal changes the PJM RTEP by adding an "applicability" provision to Attachment M-3 that gives the Transmission Owners exclusive authority to plan both Supplemental Projects and "any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more" of a truncated list of PJM planning criteria.[55]  This limits PJM's ability to add additional regional planning categories to the PJM RTEP absent Transmission Owners approval to modify the tariff, thus preventing PJM from independently making changes to the RTEP deemed necessary.  This is the exact opposite of the spirit and letter of Order 2000 and the Commission's rules for RTOs.  A transmission planning system that puts the Transmission Owners in complete control of future transmission planning preempts open architecture and PJM's ability to evolve.

### 3.    The PJM TOs' reliance on the California Orders is misplaced.

The TO Proposal attempts to create asset management as a category of transmission projects separate and apart from Supplemental Projects, and to apply proposed Attachment M-3 to Asset Management  Projects.  The TO Proposal purports to be based on the Commission's orders regarding asset management activities for two Participating Transmission Owners ("PTOs") in the CAISO – Pacific Gas & Electric Company ("PG&E" and Southern California Edison Company ("SoCal Edison").  However, their reliance on those unrelated proceedings is misplaced and, in any event, the Orders do not apply to the breadth of projects included in the Transmission Owners' definition of Asset Management Projects.

---

[55] TO Proposal, Exhibit A at Paragraph (a).

### a. California Orders are expressly not applicable to PJM.

The TO Proposal for asset management projects relies heavily on the California Orders for both the proposed language in Attachment M-3 and for authority.[56]  However, the Commission made clear that its rulings in the California Orders were based on the specific circumstances of those proceedings.  In the orders regarding PG&E's transmission planning, the Commission specifically based its findings regarding PG&E's asset management activities on the information in the record of the proceeding and the specific activities at issue in that proceeding.[57]  The Commission rejected arguments seeking to align the CAISO Participating Transmission Owners' ("PTOs") asset management activities with the Commission's orders on PJM's Supplemental Project planning.[58]  To be clear, the Commission stated as follows:

> The Commission did not address the question whether Supplemental Projects must be included in PJM's Order No. 890-compliant transmission planning process in either the PJM Show Cause Order or the February 15 PJM Order.  Rather, those orders addressed the question whether Supplemental Projects were being treated in accordance with PJM's Order No. 890-compliant transmission planning process once PJM had elected to include them in that process.  *Thus the Commission stated in the Order on Complaint, "[t]he question of whether asset management projects and activities that do not increase the capacity of the grid must go through an Order No. 890-compliant transmission planning process <u>was not at issue</u> in the February 15 PJM Order.*[59]

The Commission further stated that "[i]n light of the specific criteria set forth in the definition of Supplemental Projects in the PJM Tariff, there is no basis to conclude that based on their definition,

---

[56] *See* PJM TO Proposal, Transmittal Letter at 3-5.

[57] *California Pub. Utils. Comm'n, et al. v. Pacific Gas and Elec. Co.*, 164 FERC ¶61,161 at P 67 (2018) ("Based on the information in the record, we find that the specific asset management projects and activities at issue here do not, as a general matter, expand the CAISO grid."); *see also id.* at P 73 ("[T]he scope of this proceeding is therefore limited to whether PG&E's self-approval of asset management projects and activities violates the requirements of Order No. 890.").

[58] *California Pub. Utils. Comm'n, et al. v. Pacific Gas and Elec. Co.*, 168 FERC ¶ 61,171 at PP 51-59 (2019) ("PG&E Rehearing Order").

[59] *Id.* at P 54 (emphasis added).

25

Supplemental Projects are in many cases identical to asset management projects[.]"[60]  Similarly, in an order on SoCal Edison's proposal to create an asset management review process, the Commission rejected attempts to apply orders regarding PJM transmission planning practices to the CAISO asset management issues.[61]

Thus, the Commission has made clear that the CAISO asset management orders were limited to those proceedings.  Nothing in those orders indicates that the Commission intended to broaden the applicability of its asset management determinations.  The Commission should not simply import and impose its determinations in the California Orders, which were based on the specific circumstances of those proceeding, on PJM's transmission planning process as the PJM TOs would inappropriately suggest occur.

### b.    Even if applicable, which they are not, the California Orders do not stand for what the PJM TOs represent in their proposal.

In addition to the fact that the Commission explicitly specified that the California Orders were limited to their facts, the Transmission Owners have exaggerated what the Commission did in those orders.

First, the Transmission Owners' mischaracterize the California Orders by claiming that the Commission adopted a definition of "asset management." The TO Proposal states that they "engage in asset management activities, which the Commission defines as 'activities necessary to maintain a safe, reliable, and compliant grid, based on existing topology.'"[62]  In support, they cite

---

[60] *Id.* at P 59.

[61] *See Southern California Edison Co.*, 164 FERC ¶ 61,160 at P 37 (2018)("We are also not persuaded by Protesters' assertions that the transmission planning practices in other ISOs/RTOs are instructive here.")("SoCalEd Order"); *order on reh'g*, 168 FERC ¶ 61,170 at PP 51-59 (2019) ("SoCal Ed Rehearing Order").

[62] TO Proposal, Transmittal Letter at 3.

26

the PG&E Rehearing Order at paragraph 7, note 19.[63]  However, this is not the Commission's definition at all.  Instead, in that footnote, the Commission referred to the initial Order on Complaint in the PG&E proceeding, in which the Commission made clear that the definition of asset management came from the transmission owners.[64]  The Commission was simply summarizing its prior determination in the proceeding."[65]

Next, in the California Orders, the Commission addressed the "specific asset management projects and activities at issue" as "items such as maintenance, compliance, work on infrastructure at the end-of-useful life, and infrastructure security[.]"[66]  The Transmission Owners here go well beyond anything in the California Orders even as they claim that their Proposal is consistent with those Orders.  For example, the TO Proposal does not include a proposed definition for "Asset Management," but defines an "Asset Management Project" as "any modification or replacement of a Transmission Owner's Transmission Facilitates that results in no more than an Incidental Increase in transmission capacity undertaken to perform maintenance, repair and replacement work, to address an EOL Need, or to effect infrastructure security, system reliability, and automation projects the Transmission Owner undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements."[67]  This definition far exceeds

---

[63] TO Proposal, Transmittal Letter at 3, n. 7, citing *California Pub. Utils. Comm'n, et al. v. Pacific Gas and Elec. Co.*, 168 FERC ¶ 61,171 at P 7, n. 19 (2019).

[64] PG&E Complaint Order, 164 FERC ¶ 61,161 at P 46 ("During discussions, *the PTOs utilized the term 'asset management*' to encompass the transmission-related maintenance and compliance projects at issue in the proceedings. *According to the PTOs*, asset management refers to the activities necessary to maintain a safe, reliable, and compliant grid, based on existing grid topology.  These activities include operations and maintenance and capital expenditure activities as part of the PTOs' compliance with the TCA.  CAISO reiterated that the TCA does not require non-expansion, non-reinforcement, maintenance, or compliance-type projects that do not change the topology of the grid to be approved through the TPP.") (emphasis added).

[65] PG&E Rehearing Order at P 7.

[66] SCE Order, 164 FERC ¶ 61,160 at P 33.

27

what the Commission considered in the California Orders.  The TO Proposal also misinterprets the California Orders with regard to the line the Commission drew between asset management projects, which might have an incidental increase in capacity and are not subject to regional planning, and expansions, which are subject to the regional planning process.  In the PG&E Rehearing Order, the Commission noted that "[a]ccording to the CAISO and the PTOs, an asset management project that involves an incidental increase in capacity is not required to be reviewed and approved through CAISO's TPP because the incidental increase in capacity is a function of the more advanced technology of the equipment rather than the driver for the project."[68]  On the basis of such representations, the Commission determined as follows:

> We recognize that there may be instances in which a PTO's asset management project or activity may result in an incidental increase in transmission capacity that is not reasonably severable from the asset management project or activity[.] . . .Such an increase in transmission capacity would be incidental to, and not reasonably severable from, the asset management project or activity required to meet the PTO's need.  We find that this type of incidental increase in transmission capacity that is a function of advancements in technology of the replaced equipment, and is not reasonably severable from the asset management project or activity, would not render the asset management project or activity in question a transmission expansion that is subject to the transmission planning requirements of Order No. 890.[69]

The TO Proposal includes a new term, Incidental Increase, defined as follows:

> "Incidental Increase" shall mean an increase in transmission achieved by advancements in technology and/or replacements consistent with current Transmission Owner design standards, industry standards, codes, laws or regulations which is not reasonably severable from an Asset Management project. A transmission project that results in more than an Incidental Increase in transmission capacity is an expansion or enhancement of Transmission Facilities.[70]

---

[67] TO Proposal, Exhibit A at Paragraph (b)(1).

[68] PG&E Complaint Order, 164 FERC ¶ 61,161 at P 48 (citations omitted).

[69] *Id.* at P 68.

[70] TO Proposal, Exhibit A at Paragraph (b)(3).

28

The Transmission Owner definition adds "replacements" as well as "current Transmission Owner design standards, industry standards, codes, laws or regulations" as reasons for "achievement" of an increase in capacity which would take a project out of being considered an expansion or enhancement of Transmission Facilities.   The inclusion of new standards, particularly Transmission Owner design standards, means that just adding new transmission to meet updated standards that are developed exclusively by the individual Transmission Owners and do not have any review and approval process or other regulatory oversight, could significantly increase the transmission capacity to meet those standards.  For example, replacing 1/0 copper with 795 ACSR conductor (the new standard) at 69 kilovolts to comply with updated Transmission Owner standards would increase the line carrying capability by 4-5 times.  Similarly, if the new standard was determined to require all 138 kilovolt transmission (no more 69 kilovolt transmission), this "incidental increase" could be 8-11 times the current standard.  This definition threatens to swallow the years-long efforts PJM, stakeholders, the Commission and even Transmission Owners have invested in achieving compliance with the Commission's transmission planning principles.  It's broad, non-quantifiable and apparently self-policing nature makes it likely that far more transmission projects will be removed from PJM-facilitated open, transparent and coordinated transmission planning.

Another distinction between the California Orders and the PJM TOs Proposal is the consideration of transmission "enhancements."  The California Orders used "expansions" as the indicator of transmission planning as opposed to maintenance.[71]  There is no consideration of how "enhancements" should be treated for purposes of asset management in those Orders because the planning structures are distinctly different.  In PJM, enhancements are a critical yet undefined

---

[71] *California Pub. Utils. Comm'n, et al. v. Pacific Gas and Elec. Co.*, 164 FERC ¶ 61,161 at PP 66, 67 (2018).

component of the PJM RTEP process, and could be described exactly as the Transmission Owners have defined "Incidental Increases" in the TO Proposal.[72]  The precedent of the California Orders is inapplicable because the California Orders did not, and would not have been expected to, account for this fundamental category of transmission planning unique to PJM *vis-à-vis* California. The Transmission Owners, PJM, and the Commission cannot simply ignore the inclusion of "enhancements" throughout the PJM governing documents.

### 4.    The PJM TO rights are limited to existing transmission facilities – not planning future facilities.

The PJM Transmission Owners claim that, through the CTOA, they retained the "responsibility for planning and constructing their own facilities, including expansions not delegated to PJM."[73]  The Transmission Owners assert that the only right transferred to PJM through the CTOA is the responsibility to prepare a "Regional Transmission Expansion Plan" and that PJM's planning role is limited exclusively to expanding the Transmission System.[74]  The inference of the Transmission Owners' argument, which is never stated explicitly, is that new transmission projects to replace existing facilities are not expansions or enhancements of the Transmission System.   This argument doesn't hold water.

While there is no argument that the PJM Transmission Owners have the right and obligation to maintain their respective Transmission Facilities as well as plan Supplemental Projects pursuant to PJM OATT Attachment M-3, they do not have a perpetual right to rebuild every asset they brought into PJM.  The Transmission Owners create an inextricable identity between original transmission facilities—those that may have been planned many decades ago

---

[72] TO Proposal, Exhibit A at Paragraph (b)(3).

[73] TO Proposal, Transmittal Letter at 8.

[74] *Id.*

30

under a single-system paradigm and which were in existence when PJM was formed as an RTO with regional planning responsibility—and the EOL projects that replace original facilities at the end of their operational lives.  Their error is their belief that the link between an EOL project and the original facilities it replaces mandates that the transmission owner that owns the original transmission facility necessarily has the right to plan for its replacement.  This error follows from the Transmission Owners' view that the CTOA prohibits PJM from planning projects to replace transmission originally built for service limited to a vertically integrated transmission owner's own load regardless of any role the facilities have come to play in regional operations since the original facilities were planned and built and irrespective of the fact that replacement facilities are planned to meet current and future system needs.  But the Transmission Owners' position, as reflected in the TO Proposal, is both unsupported by the CTOA and counter to Commission precedent and law.  Such an outcome would have us rebuilding the balkanized, uncoordinated grid of the past.

Transmission planning and expansion is one of eight essential, *minimum* functions of an RTO as determined in Order No. 2000.[75]  In Order No. 2000, the Commission concluded that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region that will enable it to provide efficient, reliable and non-discriminatory service and coordinate such efforts with the appropriate state authorities."[76]  This requirement is memorialized in the Commission's Rules at Section 35.43(k).[77]   In addition to expanding the transmission

---

[75] *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,163 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

[76] 18 C.F.R. § 35.34(k)(7) (2018); *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,163 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) (affirming that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region").

[77] 18 C.F.R. § 35.34(k)(7) (2018);

31

system, PJM and the Transmission Owners have made PJM responsible for planning for transmission facilities that *enhance* the transmission system in addition to expansion throughout the Tariff, Operating Agreement and CTOA.  In fact, CTOA Section 4.1, entitled "Rights and Responsibilities Transferred to PJM" clearly transfers to PJM the responsibility for transmission planning for expansions and enhancements to the Transmission System.  Specifically, CTOA Section 4.1.4 transfers to PJM the responsibility to prepare the RTEP, which is defined in CTOA Section 1.22 as it is defined in the PJM Tariff: as "the plan prepared by PJM pursuant to Operating Agreement, Schedule 6 for the enhancement and expansion of the Transmission System in order to meet the demands for firm transmission service in the PJM Region."  Thus, PJM has both the right and the obligation to plan new transmission that expands or enhances the transmission grid.

The TO Proposal, however, would seize control of planning responsibilities for transmission expansions and enhancements for future transmission facilities in contravention of the CTOA delineation of responsibilities and the RTEP planning responsibilities in the Operating Agreement.  Specifically, the TO Proposal expands the applicability of the Attachment M-3 transmission planning process, over which the Transmission Owners have exclusive control, to include: **"**any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more" of a limited list of PJM planning criteria, including: NERC Reliability Standards, State Public Policies, Transmission Owner FERC Form 715 criteria, or projects to relieve economic constraints.[78]  Nothing in the referenced sections of the CTOA provides the Transmission Owners with a definitive right to determine what future assets will make up the PJM-administered Transmission System.

---

[78] TO Proposal at Exhibit A, Paragraph (a).

The TO Proposal produces untenable results. In essence, the result of the TO Proposal is that the planning process for replacing existing facilities that are no longer cost-effective to maintain would not take into account the future needs of the system. Transmission system planners, however, plan the system to meet *current and future needs,* which are significantly different than the needs that existed when the original facilities (those being replaced) were planned. By fixating exclusively on historical customer needs that may have necessitated construction of a transmission facility decades ago, the Transmission Owners disregard the fundamental changes in the industry and marketplace that have occurred since PJM was formed. Today, a vast array of capacity, energy and ancillary services products are traded in PJM through centrally operated day-ahead and real-time markets that aim to make the most efficient uses of resources. Those operations are made possible by the integration of *all elements* of the network, not simply those that happened to be planned under PJM's post-formation RTEP process. The line drawn by the TO Proposal between existing/EOL facilities on the one hand and "RTEP-planned" facilities on the other assumes a sharp division or dichotomy in market operations that simply does not exist.

Although the issue being addressed was cost allocation, the Commission recognized the diminishing role of existing transmission facilities over time as PJM plans more regional and subregional Transmission Facilities. As stated in paragraph 47 of Opinion 494 issued April 19, 2007:

> We add that, in the future, PJM's continued use of a zonal rate design to allocate the costs of existing transmission facilities will be of declining significance. Under PJM's market rules, as PJM pursues region-wide transmission planning and as more centrally-planned transmission facilities are built, utilities will pay for new transmission increasingly in proportion to benefits they realize from new transmission. As new facilities are added, and as existing facilities depreciate, such

an allocation will move cost allocation increasingly towards a sharing of costs based on benefits received.[79]

Moreover, prohibiting EOL projects from being planned regionally through the PJM RTEP ignores that the role particular facilities play in today's marketplace is very different from the role played by the facilities an EOL project replaces. Pretending otherwise simply to balkanize transmission planning by the "original" zone disserves the economic efficiency goals that (in addition to equity) also lie at the heart of centralized transmission planning. The result of the PJM TO approach is that loads in zones with higher-cost transmission facilities would be locked into bearing those higher costs for the foreseeable future, even as the facilities are replaced at the end of their useful lives, notwithstanding contributions the facilities make to enable the efficient operation of PJM's centralized markets. Instead, EOL projects should be planned with an eye toward the needs of what the system requires for the operational life of the replacement facility and thus must be planned in accordance with the RTEP methodology the PJM TOs have already agreed to and that the Commission has determined is just and reasonable.

### 5. The PJM TO Proposal would reduce transparency in the Attachment M-3 Process, counter to Order No. 890 and Order No. 1000 requirements.

The Commission made clear in Order No. 890 that individual Transmission Owners in an RTO or ISO must also comply with the planning principles set forth in that Order.[80] The Commission explained that this requirement means that transmission providers must facilitate the timely and meaningful input and participation of customers in the development of transmission

---

[79] *PJM Interconnection, L.L.C.,* 119 FERC ¶ 61,063 at P 47 (2007). In footnote 56 to P 47, the Commission notes that for "new transmission facilities that are planned by individual utilities for local purposes and that do not directly advance PJM's objectives as an RTO," (*i.e.,* Supplemental Projects), the use of a zonal rate design to allocate the costs is just and reasonable.

[80] Order No. 890 at P 440 (emphasis added).

34

plans and, more specifically, that "customers must be included at the early stages of the development of the transmission plan and not merely given an opportunity to comment on transmission plans that were developed in the first instance without their input."[81]  In short, Order No. 890 requires that transmission planning "not [be] limited to the mere exchange of information and then review of transmission provider plans after the fact."[82]  Instead, stakeholders must have "a meaningful opportunity to engage in planning along with their transmission providers."

Order No. 1000 requires transmission providers "to evaluate, in *consultation with stakeholders, alternative transmission solutions* that might meet the needs of the transmission planning region more efficiently or cost-effectively than solutions identified by individual public utility transmission providers in their local transmission planning process."[83]  This requirement applies equally to baseline RTEP projects and Local Plans, including Supplemental Projects.[84]

The TO Proposal would introduce a veil of secrecy that does not currently exist, making the Attachment M-3 process non-compliant with the requirements of Order No. 890 and Order No. 1000.  Specifically, and mystifyingly for the purpose of increasing transparency, the TO Proposal only requires Transmission Owners to provide to PJM, and then only on a confidential basis, up to five years of projected replacements that a Transmission Owner has identified.[85]  Creating secret lists as part of the Attachment M-3 process certainly does not increase transparency; rather, it

---

[81] *Id.* at P 454.

[82] *Id.* at P 488.

[83] Order No. 1000 at P 6 (emphasis added).

[84] *Id.* at P 148.

[85] TO Proposal, Transmittal Letter at 11.

JA0194

creates opportunities for abuse.  Secret transmission projects do not comply with the openness and transparency requirements of Order No. 890 and Order No. 1000.

## III.    ALTERNATIVE

The Commission should dismiss the TO Proposal because it exceeds the Transmission Owners' authority and because it is unjust and unreasonable.  Moreover, a superior proposal, thoughtfully developed and supported by a super-majority of PJM Members, has been filed for the Commission's consideration in Docket No. ER20-2308-000.  This, member-supported proposal is the proposal that should be approved by the Commission.  The Load Group does not believe that normal maintenance or asset management of Transmission Facilities in keeping with good utility practice has any place in the transmission planning realm.  While it may be useful to better understand Transmission Owner maintenance programs, the Transmission Owners are mistaken if they believe that this is what stakeholders have been requesting for the last six years.  Rather, stakeholders seek to have the regional transmission organization use all of its tools and insights to centrally plan, on a regional and cost effective basis, for new transmission expansions and enhancements that are required to replace Transmission Facilities that have reached the end of their operational lives for the grid of the future.  The TO Proposal conflates true "asset management" projects (repairs, individual component replacement) which are not currently part of planning and should not be, with building new transmission, at today's industry standards.

As a prime example of the Transmission Owners' obfuscation of the issue, the Transmission Owners rely on analogies like the following:

> A good analogy to help dispel that myth is homeownership. Say you've got an old roof that's leaking, and it's over 40 years old, like most PJM transmission assets. You can keep patching it, or you can replace the roof and preserve the integrity of the house. If you don't replace the aging roof and it fails, then you don't just have a roof problem anymore; you've got floor damage and foundation issues, too. That's what we're trying to avoid

36

JA0195

on our transmission system. We're replacing deteriorating assets before they fail in order to preserve the structural integrity and reliability of the whole system.

And like homeowners, who are best positioned to manage their own homes, transmission owners are best positioned to understand the condition of their assets and determine the need for maintenance, replacement and improvement. Asset management is a living, breathing, ever-changing process, and it's [sic] transmission owners who operate their systems every day and carry the legacy knowledge required to make decisions that impact the performance of the electric grid. It's essential that we continue to depend on their expertise in asset management and cost-effective transmission planning.[86]

No one is asking the PJM Transmission Owners to stop or even change their maintenance programs and activities, which they fully recover through rates. No one is suggesting that the Transmission Owners are not best positioned to determine when Transmission Facilities can no longer be cost-effectively maintained and need to be replaced. However, when every house in a community is going to reach the end of its operational life at the same time and needs to be torn down, the community planning department may want to examine whether each house should simply be rebuilt exactly as it was designed 50 years ago, or whether more modern homes with open floor plans and walk-in closets should replace the old homes. Or, whether condos, duplexes, apartments, or something else would better suit the current and future needs of the community. Just like community planning, PJM, as the regional transmission organization, should be the entity planning the current and future transmission needs in the PJM footprint.

The Commission should reject the TO Proposal and accept the Stakeholder Proposal.

---

[86] *See* FERC Technical Conference, Panel 4, Written Introductory Remarks of Charles E. Jones, Chief Executive Officer, FirstEnergy, as Filed with FERC, FERC Docket AD20-17 at 2 (July 2, 2020).

## IV.  SPECIFIC ERRORS OF THE PROPOSED ATTACHMENT M-3 CHANGES

For the reasons set forth above, the TO Proposal is unjust, unreasonable and unlawful.  In addition, the Load Group specifically identifies the errors in each proposed change in the redline of Attachment M-3 that was attached to the transmittal letter as Exhibit A, as summarized below.

Paragraph A (Applicability):  The proposed addition of the applicability paragraph is unlawful because it modifies the RTEP planning criteria in the Operating Agreement and the PJM Transmission Owners may not unilaterally modify the Operating Agreement through an FPA Section 205 filing.  It is also unlawful as it is in contravention of the Commission's Rules at Section 35.43(k) and Order No. 2000's requirement that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region that will enable it to provide efficient, reliable and non-discriminatory service and coordinate such efforts with the appropriate state authorities."[87]  Finally, it is also unjust and unreasonable as it expands Transmission Owner authority to plan transmission projects beyond local Supplemental Projects.

Paragraph B (Definitions):

1.     The proposed definition of "Asset Management Project" is unjust and unreasonable as it seeks to apply an interpretation of a Commission Order that is explicitly inapplicable to PJM.[88]

2.     The proposed definition of "Attachment M-3 Project" is unjust, unreasonable and unlawful because it confers authority for transmission planning beyond local Supplemental Projects to the Transmission Owners.[89]

3.     The proposed definition of "Incidental Increase" is unjust and unreasonable as it seeks to apply an interpretation of a Commission Order that is explicitly inapplicable to PJM. Additionally, by including a Transmission Owner's design standards, which is not defined, the definition is unreasonably broad and susceptible to manipulation through a modification of Transmission Owner design standards.

4.     The definition of Transmission Facilities is unnecessary as it is already defined in the Tariff.

---

[87] 18 C.F.R. § 35.34(k)(7) (2018); *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,163 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) (affirming that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region").

[88] *See* discussion, *supra*, at Paragraph 4.

[89] Show Cause Order on Rehearing at P 13.

38

5.    The proposed definition of "EOL Need" is unjust and unreasonable because it confers authority for transmission planning, beyond local Supplemental Projects, to the Transmission Owners.

6.    The proposed definition of "Candidate EOL Needs List" is unjust and unreasonable because it is not transparent in contravention of Order No. 890 requirements.

7.    The proposed definition of "Form No. 715 EOL Planning Criteria" is unjust, unreasonable and unlawful because it modifies the RTEP and, thus exceeds the authority of the Transmission Owners to modify through a FPA Section 205 filing.

8.    The proposed definition of "Attachment M-3 EOL Planning Criteria" is unjust and unreasonable because it confers authority for transmission planning beyond local Supplemental Projects to the Transmission Owners.[90]

9.    The proposed definition of "PJM Planning Criteria" is unjust and unreasonable because it confers authority for transmission planning beyond local Supplemental Projects to the Transmission Owners and modifies the RTEP, which is beyond the Transmission Owners' authority.

10.    The definition of RTEP Planning Process is unnecessary as it is already defined in the Tariff.

**Paragraph C (Procedures for Review of Attachment M-3 Projects)**.    The revisions to Paragraph C(7), which expand the use of Attachment M-3 to other undefined "Transmission Projects," is unjust and unreasonable because it confers authority for the Transmission Owners to use the Attachment M-3 transmission planning process beyond local Supplemental Projects.[91]

## V.    MOTION TO CONSOLIDATE

As demonstrated above, the TO Proposal is unjust, unreasonable and otherwise unlawful.

Therefore, the Commission should reject it outright.  Instead, the Commission should approve the

Joint Stakeholder Proposal, as filed in Docket No. ER20-2308-000.  However, if the Commission

does not reject the TO Proposal outright, then the Load Group moves to consolidate this

---

[90] *Id.*

[91] *Id.*

proceeding with Docket No. ER20-2308-000. Consolidation is appropriate where the proceedings involve common issues of law and fact.[92]

## VI.    CONCLUSION

WHEREFORE, the Load Group respectfully requests that the Commission: (1) reject the June 12 filing and (2) grant such further relief as the Commission may deem appropriate.

Respectfully submitted,


/s/ Lisa G. McAlister
Lisa G. McAlister
General Counsel for Regulatory Affairs
Gerit F. Hull
Deputy General Counsel for Regulatory Affairs
American Municipal Power
1111 Schrock Road, Suite 100
Columbus, Ohio 43229
614.540.6400 (office)
614.325.6395 (cell)
lmcalister@amppartners.org


/s/ Adrienne E. Clair
Adrienne E. Clair
Thompson Coburn LLP
1909 K Street NW
Suite 600
Washington, DC 20006
Phone: (202) 585-6919
aclair@thompsoncoburn.com


Counsel to Old Dominion Electric Cooperative

/s/ Robert A. Weishaar, Jr.
Robert A. Weishaar, Jr.
McNees Wallace & Nurick LLC
1200 G Street, NW
Suite 800
Washington, DC 20005
Phone: (202) 898-0688
bweishaar@mcneeslaw.com


Susan E. Bruce
Kenneth R. Stark
McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA  17101
Phone: (717) 237-8000
sbruce@mcneeslaw.com
kstark@mcneeslaw.com


Counsel to the PJM Industrial Customer Coalition

/s/ Brian M. Vayda
Brian M. Vayda
Executive Director
Public Power Association of New Jersey
One Ace Road
Butler, NJ 07043
(732) 236-7241
bvayda@ppanj.net

---

[92] See, e.g., California Independent System Operator Corp., 94 FERC ¶ 61,147 at 61,558 (2001); Pacific Gas and Elec. Co, 106 FERC ¶ 61,036 at P 20 (2004); Seminole Elec. Cooperative, Inc., 149 FERC ¶ 61,210 at P 29 (2014).

/s/ Sandra Mattavous-Frye
Sandra Mattavous-Frye
People's Counsel for the District of
Columbia Karen R. Sistrunk
Deputy People's Counsel
Anjali G. Patel
Frederick (Erik) Heinle III
Assistant People's Counsel
Office of the People's Counsel for the
District of Columbia
1133 15th Street, N.W., Suite 500
Washington, DC 20005-2710
202-261-1182
fheinle@opc-dc.gov


/s/ Jacqueline Lake Roberts
Jacqueline Lake Roberts, Esq.
West Virginia Consumer Advocate
300 Capitol Street, Suite 810
Charleston, WV 25301
304.558.0526
jroberts@cad.state.wv.us


/s/ Regina A. Iorii
Regina A. Iorii
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 4th Floor
Wilmington, DE 19801
(302) 577-8159 (Office)
(302) 893-0279 (Cell)
regina.iorii@delaware.gov


In the Capacity of Counsel to the Delaware
Division of the Public Advocate Only

/s/ Arthur W. Iler
Arthur W. Iler
Deputy Consumer Counselor – Federal
Indiana Office of Utility Consumer
Counselor
115 W. Washington St., Ste. 1500 South
Indianapolis, IN 46204
(317) 233-3234
ailer@oucc.in.gov


/s/ Alice Wolfe
Alice Wolfe
General Manager
Blue Ridge Power Agency
PO Box 2310
730 W Main St
Salem, VA 24153
540-739-5899
awolfe@brpa.org


/s/ Bruce Maurhoff
Bruce Maurhoff
Sr. VP & Chief Operating Officer
Central Virginia Electric Cooperative
PO Box 247
Lovington, VA 22949
434-263-7622
bmaurhoff@mycvec.com

41

JA0200

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this date caused a copy of the foregoing document to be served on each person included on the official service list maintained for this proceeding by the Commission's Secretary, by electronic mail or such other means as a party may have requested, in accordance with Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.2010.

Dated this the 6th day of July, 2020.

*/s/ Lisa G. McAlister*
Lisa G. McAlister

42

Document Accession #: 20200706-5236    Filed Date: 07/06/2020

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| American Transmission Systems, Incorporated, | ) | Docket No. ER20-2046-000 |
| PJM Interconnection, L.L.C. | ) | |

## AFFIDAVIT OF EDWARD D. TATUM. JR.

### I.    QUALIFICATIONS AND PURPOSE

Q1.    PLEASE STATE YOUR NAME, PROFESSIONAL POSITION AND BUSINESS

ADDRESS.

A1.    My name is Edward D. Tatum, Jr. I am Vice President of Transmission for American

Municipal Power, Inc. ("AMP"). My business address is 1111 Schrock Road, Suite 100,

Columbus, Ohio 43229.

Q2.    PLEASE SUMMARIZE YOUR PROFESSIONAL QUALIFICATIONS.

A2.    I have significant professional knowledge and experience with electric power markets that

includes competitive power market design and transmission planning. Before joining

AMP, I spent 29 years at Old Dominion Electric Cooperative, where I served in a variety

of positions, the last of which was as Vice President of RTO & Regulatory Affairs.  I have

over 40 years working in the energy industry with public power, in system planning

(transmission, generation and distribution), forecasting, environmental licensing and

compliance, and competitive wholesale and retail markets. I have spent over 30 years

developing utility industry federal policy, including open access transmission, competitive

markets (generation interconnection, energy markets, resource adequacy constructs, RTO

governance), transmission planning and demand response.    I have been an active

participant in the PJM stakeholder process for over 22 years and served as a sector representative on the Finance, Nominating and Liaison Committees, as the Vice-Chair then Chair of the Reliability Assurance Agreement Reliability Committee, the Vice-Chair, then Chair of the Members Committee and the Chair of the Liaison Committee. I also served on the MAAC Board. I hold a B.S. degree in electrical engineering from the University of Virginia and a Master of Business Administration from the University of Richmond.

Q3.    ON WHOSE BEHALF ARE YOU OFFERING THIS AFFIDAVIT, AND WHAT IS ITS PURPOSE?

A3.    I am submitting this affidavit on behalf of the intervenors in this case that are jointly supporting a protest against the Transmission Owners' Proposal, which includes, American Municipal Power, Inc. ("AMP"), Old Dominion Electric Cooperative ("ODEC"), the PJM Industrial Customer Coalition, Public Power Association of New Jersey, People's Counsel for the District of Columbia, Delaware Division of the Public Advocate, West Virginia Consumer Advocate, Indiana Office of Utility Consumer Counselor, Blue Ridge Power Agency, and Central Virginia Electric Cooperative (collectively, the "Load Group"). I was asked by these parties to review publicly available information on the PJM website regarding the number and cost of transmission projects that have an end of life ("EOL") condition listed as a driver and to quantify both the historical projects and forecast the future projects.    This affidavit presents the analysis and methodology regarding the historical and forecasted EOL projects in the PJM Interconnection, L.L.C. footprint that was conducted under my direction.

Document Accession #: 20200706-5236    Filed Date: 07/06/2020

Q4.    WHERE DID YOU OBTAIN THE INFORMATION ON HISTORICAL EOL PROJECTS?

A4.    The information was obtained from the PJM website at:

- https://www.pjm.com/pub/account/gen-queues/TOUP_planned_baseline.xml
- https://www.pjm.com/pub/account/gen-queues/TOUP_post_baseline.xml
- https://www.pjm.com/pub/account/gen-queues/TOUP_planned_TO.xml
- https://www.pjm.com/pub/account/gen-queues/TOUP_post_TO.xml
- https://www.pjm.com/pub/account/gen-queues/TOUP_post_TO.xml

However, PJM's tracking of the designations of the transmission projects based on the drivers is not consistently represented in one consolidated publicly available data set, but rather, multiple data sets that must be aggregated. Accordingly, each Baseline and Supplemental project was reviewed and assigned as "EOL-driven" if: (1) the driver of the "TO Criteria Violation" project was associated with Dominion's or PSEG's End-Of-Life criteria, or (2) if the TO Supplemental driver was listed as "Equipment Material Condition."

Q5.    PLEASE EXPLAIN HOW THE HISTORICAL, ACTUAL COST OF THE EOL PROJECTS WAS DETERMINED.

A5.    The historical cost of EOL projects resulted from simply summing the cost of each of the projects assigned with an EOL driver, by year, starting with 2010 through year to date for June 2020. The results of this process are summarized in the table below.

-3-

JA0204

Document Accession #: 20200706-5236       Filed Date: 07/06/2020

| Year | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actuals ($B) | $0.26 | $0.73 | $0.87 | $0.43 | $0.98 | $2.78 | $0.67 | $3.41 | $6.18 | $3.54 | $1.99 | | | | | | | | |
| Forecast-Linear ($B) | | | | | | | | | | | $1.99 | $4.25 | $4.62 | $5.00 | $5.38 | $5.76 | $6.13 | $6.51 | $6.89 |

Q6.    PLEASE EXPLAIN HOW THE FORECASTED COSTS OF EOL PROJECTS FROM
2020 THROUGH 2028 WAS DETERMINED.

A6.    For July through December 2020, the difference between the yearly averages and the
current six-month 2020 totals was added to the actual six-month total. To populate the table
for years 2021 through 2028, a simple linear regression in Excel was applied to the ten
years of actual EOL project costs from 2010 through June 2020 plus the forecasted period
of July through December 2020.  See the prior table.

Q7.    PLEASE EXPLAIN HOW THE EOL PROJECT COSTS COMPARE TO THE TOTAL
TRANSMISSION PROJECT COSTS FOR THE SAME TIME PERIOD.

A7.    The following table summarizes the EOL project costs compared to the total transmission
costs with the blue bars representing the EOL project costs and the orange bar representing
the non-EOL project costs.

JA0205

Document Accession #: 20200706-5236     Filed Date: 07/06/2020



Q8.    PLEASE SUMMARIZE THE CONCLUSIONS REACHED FROM YOUR REVIEW OF HISTORICAL, ACTUAL COST DATA AND FORECASTED COSTS OF EOL PROJECTS.

A8.    The conclusions are demonstrated in the chart below.  Specifically, the chart demonstrates that EOL project costs are expected to increase from current levels over roughly the next decade.



**Q9.** DO YOU BELIEVE THAT THE CHARTS PROVIDE A REALISTIC PREDICTION OF THE PROJECTED EOL PROJECT COST IN THE PJM FOOTPRINT?

**A9.** Yes. This projected buildout is consistent with forecasts conducted by Brattle (July, 2015 "Investment Trends and Fundamentals in US Transmission and Electricity Infrastructure" and April 2019 "Cost Savings Offered by Competition in Electric Transmission") as well as 2019 data cited by PJM (available at: https://pjm.com/-/media/committees-groups/committees/teac/2020/20200512/20200512-item-10-2019-project-statistics.ashx).

According to Brattle, given the dearth of transmission investment between 1985-2005, one may expect anywhere from $5-$10B annual investment in replacing aging infrastructure over the next decade (2015-2025). The PJM analysis reveals approximately two thirds of all transmission assets in the PJM region are more than 40 years old and approximately half are over 50 years old (*See* PJM Value of Transmission, Spring 2019).

-6-

Q10.    BASED UPON THE FORECASTED EOL PROJECT COSTS AND BRATTLE'S PRIOR

ANALYSIS, WHAT WOULD BE THE UNREALIZED FORECASTED COST

SAVINGS FOR RATEPAYERS IF FERC WERE TO APPROVE THE TRANSMISSION

OWNER'S PROPOSAL?

A10.    Applying Brattle's 2019 analysis that concluded that ratepayers under a FERC Order No.

1000 competitive paradigm could realize an estimated 30% savings if aging infrastructure

projects were subject to competition, PJM ratepayers would save, on average $1.67 billion

annually. This annual savings equates to a net total of $13.36 billion over an eight-year

period of 2021-2028.

-7-

Document Accession #: 20200706-5236    Filed Date: 07/06/2020

| Year | Actuals ($B) | Forecast-Linear ($B) |
|------|-------------|----------------------|
| 2010 | $ 0.26 | |
| 2011 | $ 0.73 | |
| 2012 | $ 0.87 | |
| 2013 | $ 0.43 | |
| 2014 | $ 0.98 | |
| 2015 | $ 2.78 | |
| 2016 | $ 0.67 | |
| 2017 | $ 3.41 | |
| 2018 | $ 6.18 | |
| 2019 | $ 3.54 | |
| 2020 | $ 1.99 | $ 1.99 |
| 2021 | | $ 4.25 |
| 2022 | | $ 4.62 |
| 2023 | | $ 5.00 |
| 2024 | | $ 5.38 |
| 2025 | | $ 5.76 |
| 2026 | | $ 6.13 |
| 2027 | | $ 6.51 |
| 2028 | | $ 6.89 |

| | |
|---|---|
| Total Estimated Savings At 20% | $ 8.91 |
| Total Estimated Savings At 30% | $ 13.36 |

| | |
|---|---|
| Total Estimated Annual Savings At 20% | $ 1.11 |
| Total Estimated Annual Savings At 30% | $ 1.67 |

Q11.   DOES THIS CONCLUDE YOUR AFFIDAVIT?

A11.   Yes, it does.

-8-

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**


American Transmission Systems, Incorporated,    )        Docket No. ER20-2046-000
PJM Interconnection, L.L.C.                                      )

**AFFIDAVIT OF EDWARD D. TATUM. JR.**


I, Edward D. Tatum, do hereby swear and affirm under penalty of law that the statements

in the foregoing affidavit are true to the best of my knowledge, information and belief.


Executed this 6th day of July, 2020


                                                        */s/ Edward D. Tatum, Jr.*
                                                        Edward D. Tatum, Jr.


-9-

Document Accession #: 20200706-5236    Filed Date: 07/06/2020

Document Content(s)

Joint Protest (ER20-2046-000).PDF......................................1

JA0211

Document Accession #: 20200706-5238     Filed Date: 07/06/2020

UNITED STATES OF AMERICA
BEFORE THE
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | |
| | ) | Docket No. ER20-2046-000 |
| American Transmission Systems, | ) | |
| Incorporated, et al | ) | |

### PROTEST OF LSP TRANSMISSION HOLDINGS II, LLC

Pursuant to Rule 211 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("FERC" or "Commission"),[1] LSP Transmission Holdings II, LLC ("LS Power")[2] protests the June 12, 2020 filing by PJM Interconnection, L.L.C. ("PJM") in the above captioned proceeding. PJM made this filing under Section 205 of the Federal Power Act ("FPA")[3] on behalf of the PJM Transmission Owners[4] seeking to amend Attachment M-3 ("TO Filing").[5] The Commission should reject the TO Filing as unjust and unreasonable and accept the Stakeholders Operating Agreement proposal filed in Docket No. ER20-2038.[6]

In addition, LS Power, with an affiliate that is now a signatory to the Consolidated Transmission Owners Agreement ("CTOA),[7] supports the AMP and ODEC Motion to Dismiss

---

[1]     18 CFR § 385.211.

[2]     LS Power filed a doc-less motion to intervene on June 17, 2020.

[3]     16 U.S.C. § 824d.

[4]     For purposes of this Protest, the sponsoring PJM Transmission Owners are referred to as the "Sponsoring Transmission Owners." "PJM Transmission Owners" refers to the transmission owners in PJM generically, and is used only to refer to the transmission owners collectively.

[5]     *Amendments to Attachment M-3 to PJM Interconnection L.L.C. Open Access Transmission Tariff*, filed June 12, 2020 by PJM on behalf of the PJM Transmission Owners.

[6]     *See PJM Interconnection, L.L.C.*, Tariff Filing per 35.13(a)(2)(iii): End of Life Joint Stakeholder Proposal Filing, Docket No. ER20-2308-000 (filed July 2, 2020)("Stakeholder OA Filing").

[7]     Rate Schedule FERC No. 42 ("CTOA"). Silver Run Electric, LLC, a LS Power affiliate, became a PJM Transmission Owner on May 1, 2020.

1

the TO Filing, as based on an improperly-issued Notice of Consultation ("Notice") with the PJM

Members Committee.[8]  LS Power is very concerned about the precedent set by the actions that

led to this filing.  A super-majority voting bloc of the PJM Transmission Owners[9] met in secret,

without the benefit and protection of PJM antitrust code of conduct rules, and directed the

Transmission Owners Agreement - Administrative Committee ("TOA-AC") Chair to take action

on behalf of all PJM Transmission Owners, on a proposal to which only a select few

Transmission Owners were privy.  That action (of issuing the Notice on behalf of the TOA-AC

of mandatory consultation with PJM and the Members Committee) directly led to this unjust and

unreasonable filing.[10]

---

[8]    On June 18, 2020, two PJM Transmission Owners, AMP Transmission, LLC. ("AMPT") and Old
Dominion Electric Cooperative ("ODEC"), filed a Motion to Dismiss the TO Filing for violating
the CTOA Sections 8.4 and 8.5 because the Transmission Owners Agreement – Administrative
Committee ("TOA-AC") issued a Notice on May 7, 2020 without holding a meeting or a vote of
the PJM Transmission Owners to authorize that action.

[9]    "PJM Transmission Owners" refers to the transmission owners in PJM generically, and is used
only to refer to the transmission owners collectively.

[10]   Section 9.1(b) of the OATT outlines that a minimum 30-day Members Committee and PJM
consultation is required prior to PJM making a Section 205 filing on behalf of the Transmission
Owners.  The minority members of the TOA-AC only learned about the "action" of the TOA-AC
when the Notice was provided to the entirety of the PJM Members Committee on May 8, 2020.
From a PJM governance standpoint, PJM (as a signatory to the CTOA) and the PJM Members
Committee both should have checked to ensure that the TOA-AC had followed its rules before
starting the 30-day clock required by Section 9.1(b).  Neither PJM nor the PJM Members
Committee has formal processes to deal with Section 205 consultations with the PJM Members
Committee.  It is not only a governance problem, it is a legally fatal flaw for the entirety of this
TO Filing.  A super-majority of the TOA-AC members cannot be permitted to secretly ask the
TOA-AC Chair to take the formal action of initiating the required consultation with the PJM
Members Committee on behalf of the TOA-AC, absent the TOA-AC following the CTOA
requirements for such action.  The 30-day Notice to the PJM Members Committee prior to a
proposed group Section 205 filing is a significant action of the TOA-AC and a Tariff
requirement.  As LS Power's affiliate is the newest minority member of the TOA-AC, we look at
this situation with grave legal concern for the rights of minority transmission owners of the TOA-
AC.  While our LS Power affiliate was a signatory of the CTOA and a member of the TOA-AC
as of May 1, 2020, the first that we too learned of the Section 205 proposal was the general email
to the entirety of the PJM Members Committee on May 8, 2020, asserting that the TOA-AC was
providing Notice of the initiation of the required Section 205 consultation process with the PJM
Members Committee.

The Sponsoring Transmission Owners that secretly plotted to move forward a Section 205 filing by having the TOA-AC Chair provide notice on behalf of the committee committed serious violations.  The issue is not that that the Sponsoring Transmission Owners meeting in secret had a sufficient amount of votes to support an action.  LS Power's transmission owning affiliate is willing to accept that it can sometimes lose on a vote.  But such acceptance is subject to one important caveat -- the process required prior to taking a vote must be followed.  The TOA-AC exists for a reason and have meetings so that important matters can be deliberated on and debated by all of the committee's members, ensuring that all voices and perspectives are heard and taken into account before official action is taken, in this case to move forward with a TO FERC filing.  To that end, a vote cannot be taken until members have the opportunity to vote at the meeting by giving them notice of the meeting and the items to be discussed.  Moreover, the meeting is to be public, with the ability of the entities that have signed the Operating Agreement and PJM personnel to attend.  The ability of others to observe the meeting deters antitrust violations, deterrence so critical when competitors are involved.  Yet in this case a meeting that was not noticed and not public, resulted in a group of transmission owners initiating a FERC filing limiting the ability of other transmission owners to compete without the ability of those with different views on competition to participate.  This is more than a formality.  These are serious matters that require further review by PJM.[11]

---

[11]    While the actions of the involved entities raise legal concerns, LS Power is also concerned that PJM (as a signatory to the CTOA) and the Members Committee (as the designated PJM Members voice for Section 205 consultation) offered little review of the legality of the TOA-AC Notice provided to the PJM Members Committee and whether the TOA-AC had followed the CTOA requirements and PJM antitrust procedures related to the Notice action.  FERC should ask PJM detailed questions relating to the extent of the PJM and PJM Members Committee review of the May 8, 2020 Notice to PJM Members before they started the 30-day Members Committee consultation clock, and ask PJM and the Members Committee to outline their specific procedures for dealing with Section 205 consultations in PJM.  LS Power does not believe there were any

3

On the substance, the TO Filing represents a concerted effort by the Sponsoring Transmission Owners to circumvent the PJM regional planning process as laid out in Amended and Restated Operating Agreement of PJM Interconnection, L.L.C. ("Operating Agreement") by revising Tariff provisions to remove the ability of PJM Stakeholders to determine the scope of regional planning within the Operating Agreement.  Under the TO Filing, the PJM Transmission Owners would have a veto right on any change in PJM regional planning criteria and on some regional planning decisions.  The TO Filing continues the transition in PJM to move local and short-term planning to the forefront, while relegating regional planning to an afterthought.[12]

There should be no confusion that the TO Filing represents a significant grab by the Sponsoring Transmission Owners desperately seeking to avoid even the specter of competition

---

checks on the TOA-AC actions by PJM or the Members Committee to ensure that the TOA-AC action was first consistent with the Tariff and CTOA requirements.

[12]  Since the issuance of Order No. 1000, there has been an increase in investment in projects planned locally by certain PJM Transmission Owners outside the regional planning process, *i.e.* Supplemental Projects, and a general decrease in investment in regionally planned projects.  A chart prepared by AMP that reviews RTEPs from 2005-2019 show a trend in PJM of increasing investment in Supplemental Projects and a decreasing investment in regional projects.



Majority of Projects Driven by TO Needs

PJM has also planned an alarming number of immediate-need reliability projects, over 300 projects between the years 2014-2019.  While this is in part due to the unjust and unreasonable manner in which PJM implemented the immediate need reliability exception, it also reflects a shift from long-term to short-term planning, *see PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,212, at P 1 (2020), and the failure of the PJM planning process to require timely identification of Transmission Facilities reaching the end of life.

4

for the billions in future transmission additions needed in PJM to address aging infrastructure.[13] But it is those billions in end of life ("EOL") projects that ratepayers have already incurred, projects that have regional benefits but are locally cost allocated and built as Supplemental Projects that led a broad coalition of PJM Members to approve with a super-majority (69%) vote changes to the Operating Agreement that place planning for EOL Transmission Facilities in PJM's regional planning bucket rather than local planning.[14]  PJM already undertakes EOL planning for those Transmission Owners that include EOL criteria in their Form No. 715 planning criteria,[15] and the Stakeholder OA Filing would expand that EOL planning to all PJM Transmission Owners (for Transmission Facilities under PJM operational control).

The dichotomy between the TO Filing and the Stakeholder OA Filing is clear.  Under the TO Filing, incumbent PJM Transmission Owners would have a perpetual right to rebuild their existing transmission facilities, regardless of regional needs or benefits, and cost allocation for each such rebuild would be 100 percent to the local zone.  In addition, under the TO Filing, the incumbent transmission owner would exclusively determine, through local planning, what Transmission Facilities are developed to address needs arising as a result of Transmission Facilities that have reached the end of their useful life, and the incumbent PJM Transmission

---

[13]    In a 2019 report, PJM noted that two-thirds of transmission assets in PJM are more than 40 years old and over one-third are more than 50 years old, while some lower-voltage transmission assets are approaching 90 years old.  PJM Interconnection, L.L.C., "The Benefits of the PJM Transmission System," at page 5 (released on Apr. 16, 2019), *available at*, https://www.pjm.com/-/media/library/reports-notices/special-reports/2019/the-benefits-of-the-pjm-transmission-system.pdf.  PJM also noted in this same report and page that "these days, instead of expanding the grid to accommodate more and more consumer demand, transmission investment [in PJM] tends to be focused on aging infrastructure… and often, projects identified to solve one issue help address other system needs as well."

[14]    *See PJM Interconnection, L.L.C.*, Tariff Filing per 35.13(a)(2)(iii): End of Life Joint Stakeholder Proposal Filing, Docket No. ER20-2308-000 (filed July 2, 2020)("Stakeholder OA Filing").

[15]    As discussed below, all PJM Transmission Owners should include EOL criteria in their Form No. 715 submissions, if they do not already, as Form No. 715 clearly covers such criteria.

Owner would in each case exclusively build and own those facilities. In essence, the TO Filing attempts to create a new federal right of first refusal in the Tariff for incumbent PJM Transmission Owners to build and own all new transmission in PJM addressing Transmission Facilities reaching the end of their operational life.[16] Indeed, the Applicability Section and new definitions in the TO Filing would create a right of first refusal that reaches even beyond EOL projects. The entirety of the Applicability Section would give the PJM Transmission Owners the exclusive right "to plan and to construct" all Transmission Facilities in PJM except those that the revised Attachment M-3 allows PJM to regionally plan, an affront to Order No. 1000.[17] Under Order No. 1000, the local planning process cannot override the regional planning process. The TO Filing provides that Attachment M-3 now defines the regional planning process, while adding back in a right of first refusal construct from pre-Order No. 1000 days.

If these policy errors were not enough, the TO Filing has direct conflicts with the PJM Operating Agreement, in addition to conflicts with the requirements of Order No. 890, Order No. 1000, Commission Orders in various proceedings, recent Commission show cause orders and appellate court precedent. The TO Filing claims to be laid squarely on the foundation of Commission precedent related to California (even though that precedent specifically noted that it does not apply in PJM), but then conflicts with the actual precedent by going further and greatly

---

[16]    As discussed below, the TO Filing essentially gives the incumbent transmission owner a veto over any regionally planned project that would incorporate needs arising from EOL Transmission Facilities.

[17]    *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011)("Order No. 1000"), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132 ("Order No. 1000A"), *order on reh'g*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S. C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014)("Order No. 1000").

**expanding** the allegedly relevant California Orders.[18]  The TO Filing also attempts to change the

rules in PJM related to PJM's regional planning of Form No. 715 projects, a category that is

clearly under PJM Regional Planning in Schedule 6 of the Operating Agreement.  The TO Filing

would also undermine four years of stakeholder process related to Supplemental Projects and the

changes to Manual 14B that decisively passed the PJM Markets and Reliability Committee in

2019.

Thus, the TO Filing is wrong on the law and wrong on the policy.  As such, if the AMPT

and ODEC Motion to Dismiss is not granted, then the TO Filing it must be rejected on the

merits, with prejudice.  LS Power views this Section 205 filing as a blatant attempt to frustrate

regional planning in PJM and further restrict transmission competition.  The Commission must

scrutinize every sentence of the TO Filing, especially the Applicability Section and the 10 new

definitions proposed to be added to the PJM Tariff which would limit, confuse, rewrite, and

conflict with definitions in the Operating Agreement.  Conversely, the Stakeholder OA Filing

would strengthen PJM's regional planning role while ensuring that only the more efficient or

cost-effective Transmission Facilities are built to replace, if necessary, Transmission Facilities

reaching the end of useful life.

The TO Filing clearly is not the choice of the PJM Members.  The PJM Members

Committee—which represents the entire spectrum of PJM stakeholders (including the PJM

Transmission Owners)— passed, by super-majority vote, the Stakeholder OA Filing, after PJM's

alternative proposal was shelved when it received only 35% of stakeholder support at a lower

---

[18]  *Cal. Pub. Utils. Comm'n, et al v. Pacific Gas & Elec.*, 164 FERC ¶ 61,161 (2018)("California
Complaint Order"), *order denying reh'g*, 168 FERC ¶ 61,171, at P 7 n.19
(2019)(2019)("California Complaint Rehearing Order")(collectively, "the California Complaint
Proceeding"); *see also S. Cal. Edison Co*., 164 FERC ¶ 61,160 (2018) ("SCE Order"), *order
denying reh'g*, 168 FERC ¶ 61,170, at P 7 n.15 (2019)("SCE Rehearing Order")(collectively,
"California Orders").

7

PJM Markets and Reliability Committee.  The TO Filing supports an expansion of local planning while the PJM Members Committee supports, as the Commission does as well, strong regional planning.  The Commission should reject the TO Filing as unjust and unreasonable, and in Docket No. ER20-2308-000 accept the Stakeholder OA Filing as just and reasonable.

## I.    FACTUAL BACKGROUND

### A.    PJM Stakeholder Process

In December 2019, the PJM Members Committee passed an Issue Charge on Transparency and End of Life Planning.[19]  The work was assigned to the Markets and Reliability Committee and the Issue Content was to "develop specific governing document language to establish criteria that will apply to all transmission projects that address end of life drivers on PJM Tariff transmission assets, address planning horizon requirements, and improve overall transparency, consistency, and clarity in the RTEP planning process."[20]  The Key Work Activities included:

    a.   Establish requirements for an EOL determination process;

    b.   Improve transparency in the TO EOL determination process such that Stakeholders can confirm that EOL processes were followed (e.g., development or adoption of TO EOL criteria, development of minimum requirements for EOL determinations, etc.);

    c.   Establish requirements for EOL replacement planning process in the RTEP plan, including specification of the planning horizon requirements and;

    d.   Improve consistency by having PJM review, plan and ultimately approve as part of the RTEP approved by the PJM Board EOL replacement projects.

---

[19]    A copy of the Issue Charge is available at https://pjm.com/-/media/committees-groups/committees/mrc/20191218-special-trans/20191218-item-01-issue-charge.ashx.

[20]    *Id.*

The Expected Deliverables included only 1 item: "Governing Document Changes as appropriate."

A group of Joint Stakeholders[21] developed a proposal, as a precursor to the Stakeholder OA Filing, that put PJM in charge of planning, through the regional planning process, to meet needs arising from Transmission Facilities reaching the end of their operational life. Given the integrated nature of the Transmission Facilities under PJM operational control, the changing resource mix and a multitude of other matters that impact the PJM region as a whole, the majority of PJM Stakeholders saw the benefit of regionally planning needs arising from Transmission Facilities reaching the end of operational life. The Joint Stakeholders developed revisions to the Operating Agreement that would require PJM Transmission Owners to notify PJM that Transmission Facilities were reaching the end of operational life, and then require PJM to determine how to address needs arising from those Transmission Facilities through its holistic regional planning process.

PJM developed an alternative proposal ("PJM Proposal") that was essentially the status quo but with the addition of a 5-year non-binding look ahead for Transmission Facilities reaching the end of their operational life, which would be confidential between the PJM Transmission Owner and PJM. Because of the short notice period, however, the PJM Proposal would have had the troubling effect of creating more Immediate Need Reliability Projects[22] in

---

[21]    As reflected in the Stakeholder OA Filing at footnote 4, the Joint Stakeholders were American Municipal Power, Inc. ("AMP"), ODEC, LS Power, the PJM Industrial Customer Coalition, Blue Ridge Power Agency, Delaware Municipal Electric Corporation, Inc., Public Power Association of New Jersey, Office of People's Counsel for the District of Columbia, and the Delaware Division of the Public Advocate.

[22]    The Commission recently found that PJM did not comply with the criteria for designating a project as an Immediate Need Reliability Project, and thus required PJM to revise its criteria to increase transparency. *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,212 (2020). That proceeding is ongoing.

PJM and was shelved when it received only 35% of stakeholder support at a lower PJM Markets and Reliability Committee.[23]  The Sponsoring Transmission Owners attended every meeting but neither collectively nor individually offered a proposal of their own in the PJM stakeholder process.  Rather than participate fully in the stakeholder process and in an effort to short-circuit the PJM Stakeholder supported Operating Agreement changes that were moving to final consideration of approval or rejection by the PJM Members,[24] a secret group of Sponsoring Transmission Owners, with super-majority weighted TOA-AC voting rights, caused the TOA-AC Chair to improperly act by issuing a Notice, and a written proposal of a prospective Section 205 filing, to both PJM and the PJM Members Committee on May 8, 2020.  Prior to issuance of the Notice, purportedly on behalf of the TOA-AC, there was no notice of action, meeting notice, or consultation with the minority TOA-AC members related to the Members Committee notice or existence or the substance of the written proposal itself occurred, and therefore no opportunity whatsoever for the at large membership of the TOA-AC to discuss or deliberate the merits of the written proposal prior to its finalization.[25]  On June 12, 2020, PJM, on behalf of the Sponsoring

---

[23]     The PJM Proposal only had the support of PJM Transmission Owners and the Financial Transmission Rights traders in PJM.

[24]     On May 12, 2020, the Joint Stakeholders provided the Stakeholder OA language to the PJM Board for review.  The letter can be found at, https://www.pjm.com/-/media/committees-groups/committees/mc/2020/20200618/20200618-item-02-3a-letter-to-pjm-board-on-eol-transmission-planning.ashx.

[25]     LS Power's affiliate became a signatory to the CTOA on May 1, 2020, and LS Power confirms the statements of AMP and ODEC that there was no notice of action, no notice of a meeting to discuss the potential notice to the PJM Members Committee and no notice that a written proposal existed, and no discussion of the substance of the written proposal with LS Power or any minority CTOA signatories prior to its issuance.  The Notice therefore could not have represented an authorized action of the TOA-AC, and the action taken by the super-majority TOA-AC members on May 8, 2020 in their attempt to fulfill the action requirements of Section 9.1(a) of the OATT for 30-day advance notice to the Members Committee was unauthorized and clearly improper.

10

Transmission Owners, PJM used its discretion[26] to submit the TO Filing in this Docket.[27]  The agenda for the June 18, 2020 Members Committee vote was properly posted on June 11, 2020, and the Stakeholder OA Filing language was before the Members Committee for final vote. Both PJM and the PJM Transmission Owners were aware of the upcoming Members Committee vote when the TO Filing was submitted to the Commission on June 12.

On June 18, 2020, the PJM Member's Committee passed, by super majority, the Stakeholders OA Filing.  There were record levels of Stakeholder participation in the vote, and in the end, 94 PJM Members representing all PJM Sectors, including 2 PJM Transmission Owners, approved the revisions.[28]

The end of life planning process in the Stakeholder OA Filing sets a new and vastly improved standard for EOL planning.  These revisions require PJM Transmission Owners to identify their EOL Look-ahead Program,[29] identify those Transmission Facilities expected to

---

[26]    Section 9.1(b) of the OATT stating "the Office of Interconnection may, but shall not be required to, make the Section 205 filing with FERC on behalf of the Transmission Owners."

[27]    As noted above, on June 18, 2020 AMPT and ODEC filed a Motion to Dismiss the TO Filing for violating their contractual rights under the CTOA.  *See supra* footnote 7.

[28]    The Members Committee voting report is available at:  https://www.pjm.com/-/media/committees-groups/committees/mc/2020/20200618/20200618-voting-report.ashx.

[29]    The Stakeholder OA Filing defines EOL Look-Ahead Program to mean "Transmission Owner designed, specific program for transparently applying EOL Criteria to determine and to prioritize EOL Conditions and to make EOL Notifications for all Transmission Facilities.  The EOL Look-ahead Program must cover a minimum of 10 years from the date of submission and be comprehensive and complete for the Transmission Facilities owned by the Transmission Owner."

reach EOL Condition[30] during the CTOA mandated PJM 10 year planning horizon,[31] and to provide EOL Notification[32] at least six years in advance of facilities that will reach their EOL. Once PJM receives the EOL Notification, PJM incorporates it into the regional planning criteria to identify needs arising from the Transmission Facilities reaching the end of its useful life.

### B.    TO Filing

Although the Sponsoring Transmission Owners assert that their proposal is based on the proposal that PJM offered in the stakeholder process described above, the TO Filing goes substantially beyond the PJM Proposal.  PJM acknowledged its proposal could be implemented with no tariff or Operating Agreement changes at all.[33]  In contrast, the TO Filing has 10 new definitions and multiple pages of new procedures that directly interact and override PJM's role as regional planner.

---

[30]    The Stakeholder OA Filing defines EOL Condition to mean "the state of Transmission Facilities that are determined by a Transmission Owner, in accordance with the applicable EOL Look-ahead Program and EOL Criteria, to be such that it is not prudent to continue to maintain, repair or refurbish the Transmission Facilities and the Transmission Facilities are therefore projected to reach the end of operational life within the EOL Look-ahead Program period. End of operational life shall not be, for purposes of EOL Condition, determined by the Transmission Facilities' service life for accounting or depreciation purposes."

[31]    CTOA Article 6.3.4 provides that PJM shall: "Conduct its planning for the expansion and enhancement of transmission facilities based on a planning horizon of at least ten years, or such longer period as may be required by the PJM Tariff or Operating Agreement, including the Regional Transmission Expansion Planning Protocol."

[32]    The Stakeholder OA Filing defines EOL Notification to mean "the notification, binding on the Transmission Owner for PJM planning purposes, and documentation required in Operating Agreement, Schedule 6 to be given by Transmission Owners to the Office of the Interconnection and stakeholders declaring Transmission Facilities to have reached the end of operational life and for which the Office of Interconnection shall plan an EOL Project, if necessary. Any EOL Notification is subject to Operating Agreement, Schedule 6, section 1.5.8(p)."

[33]    *See* PJM EOL Planning Package Presentation at Special Markets and Reliability Committee session on May 15, 2020 at page 2, *available at*, https://www.pjm.com/-/media/committees-groups/committees/mrc/2020/20200515-special-trans/20200515-item-03-pjm-eol-package-follow-up-presentation.ashx.

Further, the TO Filing changes the title of Attachment M-3 from "Attachment M-3 Additional Procedures for Planning Supplemental Projects" to add "And Asset Management Projects." This change conflicts with the Operating Agreement which only recognizes Attachment M-3 as addressing Supplemental Projects.[34] Throughout the remainder of the revisions, the Sponsoring Transmission Owners change Supplemental Projects to Attachment M-3 Projects, notwithstanding that Schedule 6 of the Operating Agreement neither recognizes nor has any mechanism to include any project by that name in the regional planning process. The TO Filing, however, did not conform these changes to the Operating Agreement because amendments to the Operating Agreement would have required Stakeholder approval,[35] approval that the Sponsoring Transmission Owners could not obtain. Instead, during the June 1, 2020 Transmission Owner conference on the soon to be filed TO Filing, outside counsel for the PJM Transmission Owners said that any conflict between the TO Filing and the Operating Agreement could be resolved by the Commission issuing a Show Cause Order, rather than through the stakeholder process.

In the revisions themselves, straight out of the gate, the TO Filing makes clear its intent by writing a new right of first refusal into the PJM Tariff for PJM Transmission Owners nine years after the Commission mandated removal of such provisions. The TO Filing proposes:

---

[34]    *See, e.g.*, Section 1.3(d) of the OA which provides, in part, "the Subregional RTEP Committees will provide sufficient opportunity to review and provide written comments to the Transmission Owners on any Supplemental Projects included in the Local Plan, in accordance with Additional Procedures for Planning of Supplemental Projects set forth in Tariff, Attachment M-3."

[35]    The Sponsoring Transmission Owners would instead shift the burden to the Commission to require "conforming changes" to the OA. When asked about this at the June 1, 2020 Transmission Owner webinar on the TO Filing, the outside counsel for the PM Transmission Owners responded that any conflict between the TO Filing and the Operating Agreement could be resolved by the Commission issuing a Show Cause Order, rather than the Members Committee reaching agreement on revisions to the Operating Agreement.

13

**(a) Applicability.** Each Transmission Owner ***shall be responsible for planning and constructing*** in accordance with Schedule 6 of the Operating Agreement as provided in this Attachment M-3, to the extent applicable, (i) Asset Management Projects, as defined herein, (ii) Supplemental Projects, as defined in section 1.42A.02 of the Operating Agreement, and (iii) **any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more of the following planning criteria**:

1.  NERC Reliability Standards (which includes Applicable Regional Entity reliability standards);

2.  Individual Transmission Owner planning criteria as filed in FERC Form No. 715 and posted on the PJM website, **provided that the Additional Procedures for the Identification and Planning of EOL Needs, set forth in section (d), shall apply, as applicable**;

3.  Criteria to address economic constraints in accordance with section 1.5.7 of the Operating Agreement or an agreement listed in Schedule 12-Appendix B;

4.  State Agreement Approach expansions or enhancements in accordance with section 1.5.9(a)(ii) of the Operating Agreement; or

5.  An expansion or enhancement to be addressed by the RTEP Planning Process pursuant to section (d)(2) of this Attachment M-3 in accordance with RTEP Planning Process procedures in Schedule 6 of the Operating Agreement.

The additions to Attachment M-3 do a number of things, all inappropriate. It establishes a right of first refusal for a group of transmission owner self-defined projects categories outside of the Operating Agreement and then subjugates Schedule 6 of the Operating Agreement to that declaration.[36] Next, Attachment M-3(a)(iii) takes Operating Agreement's intentionally undefined PJM planning criteria, which are referenced in the definition of Supplemental Projects in the Operating Agreement as "the following PJM criteria: system performance, operational

---

[36]     See specific language from the Applicability Section, "in accordance with Schedule 6 of the Operating Agreement as provided in this Attachment M-3," which effectually writes in language that Attachment M-3 overrules the regional planning process.

14

JA0225

performance or economic criteria, *pursuant to a determination by the Office of the Interconnection*," and defines them in terms that allow the Sponsoring Transmission Owners to restrict the Operating Agreement's "determination of the Office of the Interconnection" as to what is covered by PJM criteria.  This is done by restricting "system reliability, operational performance" to "NERC Reliability Standards (which includes Applicable Regional Entity reliability standards)."  The second clause takes Form No. 715 planning criteria, which are currently included in the Regional Transmission Expansion Plan criteria pursuant to Section 1.2 of Schedule 6, and subjugates PJM's planning of those facilities to Attachment M-3 section (d) and Attachment M-3(a)(ii)(2).  Last, by declaring that the Transmission Owner shall be responsible for **planning and constructing** those projects that do not fit in defined categories, it restricts future changes to the Operating Agreement, by either giving the Transmission Owners an automatic right to build those projects, or a veto right on the change.  To cement their grab to control all transmission planning, the TO Filing defines Attachment M-3 Projects, in part, as "(iii) any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 under any of clauses (1) through (5) of section (a)."

As noted above, the TO Filing would add 10 definitions to Attachment M-3, which had no definitions previously because the only projects it covered, Supplemental Projects, were defined in the Operating Agreement.  All projects appropriate for inclusion in the local or regional planning process that are not PJM planned fit within the Operating Agreement definition of Supplemental Project.  The new definitions are designed to override the Operating Agreement definition of Supplemental Projects because it only covers what PJM does not plan whereas the new definitions would define what PJM could plan[37].  In addition, many of the new

---

[37]    A key example of this "Applicability" restriction is the new definition of PJM Planning Criteria Need that also conflicts with the PJM Operating Agreement.  "PJM Planning Criteria Need" shall

15

definitions are designed to put the Sponsoring Transmission Owners' spin on Commission precedent and then insert that spin into the Tariff, put restrictions on the Operating Agreement by placing restrictive provisions in the Tariff, or define terms so broadly as to allow the PJM Transmission Owners to build anything they chose as a broadly-defined Attachment M-3 Project.

Finally, the TO Filing includes new procedures that dictate how PJM's regional planning, which is conducted under Schedule 6, must interact with Attachment M-3 Projects, subordinating regional planning to local planning. Specifically, even if PJM determines that a regional need overlaps with an Attachment M-3 Project, the PJM Transmission Owner with the Attachment M-3 Project can reject PJM's determination of a more efficient or cost-effective regional project and move forward with its locally planned project.[38]

## II.   THE TO FILING IS UNJUST AND UNREASONABLE, CONFLICTS WITH THE OA, COMMISSION PRECEDENT AND SOUND POLICY AND MUST BE REJECTED

As described above, the TO Filing takes a discrete Tariff addition, Attachment M-3, which was included in the Tariff in 2018 to address a Commission show clause action related to Order No. 890 principles for Supplemental Projects (which are defined in the Operating Agreement),[39] and uses it as a vehicle to provide the PJM Transmission Owners with the unilateral Tariff protected right to determine, in perpetuity, what Transmission Facilities are planned to address PJM's extensive aging infrastructure problem. In doing so, the Sponsoring Transmission Owners build the foundation of their filing on incorrect assertions as to their rights,

---

mean a need to plan a transmission expansion or enhancement of Transmission Facilities *other than those reserved to each Transmission Owner in accordance with section (a)*."

[38]   TO Filing at Attachment M-3(d)(2)(ii).

[39]   *Monongahela Power Co., et al*, 156 FERC ¶ 61,134 (2016)(The Commission issued a show cause order to determine whether the PJM transmission owners were complying with their Order No. 890 obligations.).

16

to the exclusion of PJM Stakeholders rights, using expansive reading of Commission orders such that those orders are unrecognizable, and erroneous assertions as to their contractual rights. Each of these factors warrants a rejection of the TO Filing as unjust and unreasonable.  As discussed below, some of the failings of the TO Filing are more fundamental and warrant the Commission rejecting the TO Filing outright as exceeding the TO Filing rights.

### A.   PJM Transmission Owners Do Not Have Unilateral Rights To Make Section 205 Filings Related To Planning Matters

The Sponsoring Transmission Owners assert that their filing is made pursuant to Section 9.1(a) of the PJM Tariff.  Section 9.1 of the PJM Tariff does not provide PJM Transmission Owners the right to make collective filings related to region-wide PJM planning matters, even local planning matters.  By its clear language, Section 9.1 is limited to "changes in or relating to the establishment and recovery of the Transmission Owners' transmission **revenue requirements or the transmission rate design** under the PJM Tariff, and such filing rights shall also encompass **any provisions of the PJM Tariff governing the recovery of transmission-related costs incurred by the Transmission Owners.**"[40]  The TO Filing does not address rate or rate design matters.[41]  The entire focus of Section 9.1 is related to the recovery of rates, for existing assets, and cannot be read to cover filings related to which entity will plan and develop future assets.

The focus on revenue requirements and rate design is unsurprising as the provision arose out of the Transmission Owner and PJM settlement that itself arose out of the court

---

[40]   PJM Tariff Section 9.1(a).

[41]   The Applicability Section under Attachment M-3(a), Attachment M-3(d)(2), and new definitions of PJM Planning Criteria, Attachment M-3 Project, Form No. 715 EOL Planning Criteria, RTEP Planning Process, and EOL Need are particularly glaring in terms of the lack of relevance to rate or rate design matters, in addition to their clear conflict with, and re-write of, the existing PJM Operating Agreement.

determination in *Atlantic City Electric et al v. FERC*.[42]  In *Atlantic City,* the PJM Transmission Owners challenged the Commission's requirement that they transfer rate related Section 205 rights to PJM from the Transmission Owners.  As the Court noted, the "utility petitioners contend that FERC exceeded its statutory authority by requiring the owners of transmission assets to cede their statutory right to file rate changes under section 205 of the Act."[43]  The Court focused on the fact that "Section 205 of the Federal Power Act gives a utility the right to file *rates and terms for service* rendered with *its assets*."[44]  Thus, the fact that transmission planning for future assets is not referenced at all in the entirety of Section 9.1, nor are PJM's planning rules as set forth in the Operating Agreement, including Schedule 6, referenced among the multitude of provisions as also within the transmission owners' unilateral filing rights is not surprising.

The Consolidated Transmission Owner Agreement offers the Transmission Owners no additional filing rights.  Article 7, which provides Transmission Owners with certain filing rights, addresses exclusively rate and rate design issues and is titled "Changes To Rate Design And Tariff Terms And Conditions; Distribution Of Revenues."[45]

> Article 7.2.1 - Section 205 filings to change the PJM Regional
> Rate Design or file for Joint Transmission Rates may only be made

---

[42]     295 F. 3d 1 (D.C. Cir. 2002).

[43]     *Id.* at 3.

[44]     *Id*. at 4 [emphasis added].  The Commission reiterated the rate related focus of *Atlantic City Elec.* In response to PJM's Order No. 1000 compliance filing.  In requiring PJM to clarify the scope of its OATT and agreements, the Commission required that "such clarification must include revision to any provision that could purport to preclude the section 205 filing rights of nonincumbent utilities without their consent, in a manner inconsistent with *Atlantic City*."  *PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214, P 222 (2013).

[45]     Rate Design is defined in the CTOA as: "Rate Design shall mean the design of the rates to recover a Transmission Owner's revenue requirement with respect to its Transmission Facilities or other amounts as authorized by FERC, including without limitation applicable incentives and a reasonable return."  This definition cannot expand rate design into transmission planning.

18

by the Parties, acting collectively, pursuant to a filing approved in accordance with Section 8.5.1 of this Agreement.

Article 7.3.1 - The Transmission Owners shall have the exclusive and unilateral rights to file pursuant to Section 205 of the Federal Power Act and the FERC's rules and regulations thereunder for any changes in or relating to the establishment and recovery of the Transmission Owners' transmission revenue requirements or the PJM Regional Rate Design, and such filing rights shall also encompass any provisions of the PJM Tariff governing the recovery of transmission-related costs incurred by the Transmission Owners.

Article 7.3.4 references several provisions of the PJM Tariff as within the Transmission Owners' exclusive right, but there is no reference to transmission planning, local planning, and no reference to Schedule 6 at all.

It is no surprise that transmission planning is not among the list of areas where the PJM Transmission Owners retained unilateral filing rights. Transmission planning is one of the core functions of an independent regional transmission organization. As the Commission held in Order No. 2000, "[w]e reaffirm the NOPR proposal that the RTO must have ultimate responsibility for both transmission planning and expansion within its region that will enable it to provide efficient, reliable and non-discriminatory service and coordinate such efforts with the appropriate state authorities."[46] While local planning remains relevant in a regional transmission organization, it should be relevant only on a limited basis and based on specific needs of transmission owner that cannot be addressed at a regional level. As the Commission went on to state in Order No. 2000:

the RTO should have **ultimate responsibility for both transmission planning and expansion within its region**. The rationale for this requirement is that a single entity must coordinate these actions to ensure a least cost outcome that maintains or

---

[46] *Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,284, at P 485, *order on reh'g*, Order No. 2000-A, (2000), *aff'd sub nom., Pub. Util. Dist. No. 1. Of Snohomish County, Washington v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

19

> improves existing reliability levels. In the absence of a single
> entity performing these functions, there is a danger that separate
> transmission investments will work at cross purposes and possibly
> even hurt reliability.[47]

The TO Filing, especially the Applicability section, flips these requirements upside down, placing the PJM Transmission Owners largely in charge of declaring how and what PJM can plan on a regional basis and what the Transmission Owners will plan locally, and declaring the Transmission Owners the arbiter of any dispute as to which is better.

Reading the PJM OATT to allow the PJM Transmission Owners any "unilateral right" to make Tariff filings to implement PJM-wide rules related to alleged "local" planning that implicate and conflict with the regional planning obligations of PJM is arbitrary and capricious, given that the PJM Tariff offers no support for the existence of that unilateral right.[48]  It is not within the legal standard for reasoned decision-making to read the PJM Tariff as giving the PJM Transmission Owners any such unilateral right when neither the Tariff nor the CTOA provide any support for such a right, and granting Transmission Owners unilateral filing rights would conflict with the Commission requirements for minimum functions of a Regional Transmission Organization ("RTO").[49]

---

[47]      *Id*. at 486 [emphasis added].

[48]      To the extent that local planning requires transmission owner specific reforms, those reforms should be made on a transmission owner specific basis.

[49]      *See* 5 U.S.C. § 706(2)(A).  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, *offered an explanation for its decision that runs counter to the evidence before the agency*, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." [emphasis added]); *Tarpon Transmission Co. v. FERC*, 860 F.2d 439 (D.C. Cir. 1988)(rejecting FERC's interpretation of a tariff provision because the Commission failed to engage in reasoned decision-making to support its interpretation).

**B.      PJM Planning Rules Are Set Forth In The Operating Agreement And The TO Filing Infringes On Stakeholder Rights**

Consistent with the minimum functions of an RTO, PJM's transmission planning rules are set forth in PJM's Operating Agreement.  The Sponsoring Transmission Owners have no unilateral rights to change the Operating Agreement or to make Tariff changes that would infringe upon Stakeholder rights with respect to the Operating Agreement.  The PJM Operating Agreement is explicit in Section 18.6:

> (a) Except as provided by law or otherwise set forth herein, **this Agreement, including any Schedule hereto, may be amended, or a new Schedule may be created**, **only** upon: (i) submission of the proposed amendment to the PJM Board for its review and comments; (ii) **approval of the amendment or new Schedule by the Members Committee, after consideration of the comments of the PJM Board,** in accordance with Operating Agreement, section 8.4, or written agreement to an amendment of all Members not in default at the time the amendment is agreed upon; and (iii) approval and/or acceptance for filing of the amendment by FERC and any other regulatory body with jurisdiction thereof as may be required by law.

Part of the effort to stop the Stakeholders from amending the Operating Agreement are a series of false or misleading assertions by the Sponsoring Transmission Owners and PJM itself, including an assertion, based on PJM statements, that Stakeholders cannot change the scope of PJM planning.  This assertion is misguided as Section 18.6 shows.  PJM regional planning is addressed in the Operating Agreement and the definition of Supplemental Projects, also in the Operating Agreement, merely catches any unaddressed needs.[50]  Stakeholders hold exclusive rights to amend the Operating Agreement, as would be appropriate to retain the RTO's minimum planning actions.  Nothing in the CTOA or any other relevant PJM governing document places

---

[50]      The California Compliant Orders stated that Supplemental Projects were a product of PJM choice, not Commission mandate.

21

JA0232

Document Accession #: 20200706-5238    Filed Date: 07/06/2020

restrictions on the ability of PJM Stakeholders to define, or redefine, the scope of PJM regional planning. In response to the PJM Transmission Owners moving forward with billions in new end-of-life Supplemental Projects, PJM Stakeholders adopted a series of revisions to the Operating Agreement to confirm that end-of-life transmission planning would be undertaken as part of PJM's regional planning and as not part of the Supplemental Project bucket so that PJM would "have ultimate responsibility for both transmission planning and expansion within its region."[51] However, as noted above, in a race to implement preemptive Tariff revisions, the TO Filing would conflict with not just those prospective revisions, but with existing Operating Agreement regional planning requirements.

### 1. The TO Filing Applicability Section Would Override The Operating Agreement

As described above, the proposed Applicability Section of Attachment M-3 provides that "Each Transmission Owner shall be responsible for planning and constructing . . .(iii) any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more of the following planning criteria . . .." Thus, even if planned by PJM, but not planned by PJM to address one of the 5 criteria in the Applicability Section, the Transmission Owners retain the right to build. And the five categories themselves restrict PJM *regional planning*, even for the facilities covered.

Although PJM planning criteria covers "system performance, operational performance" among other things, the Attachment M-3 exclusion does not reference these criteria but instead it references exclusively "NERC Reliability Standards." Likewise, although Form No. 715 projects are excluded because they are PJM regionally planned under Schedule 6 of the

---

[51]      Order No. 2000 at P 486.

Operating Agreement, the TO Filing would make that PJM planning subject to the requirement that "the Additional Procedures for the Identification and Planning of EOL Needs, set forth in section (d), shall apply, as applicable[.]"  In this regard, the Attachment M-3 revisions conflict with PJM regional planning under Schedule 6 with respect to both PJM criteria and Form No. 715 criteria.

The Applicability Section is also conspicuous in what is missing.   The Commission required in Order No. 1000 that both local and regional transmission planning processes plan for transmission needs driven by Public Policy Requirements.[52]  Currently, PJM satisfies that requirement by identifying Public Policy Requirements and Public Policy Objects and incorporating them into PJM's sensitivity studies, modeling and scenario analyses.[53]  PJM also has the State Agreement Approach that permits individual states to request that PJM study particular public policy requirements and then voluntarily assume responsibility for a project needed to meet the public policy requirement (assuming the project does not qualify as a reliability or market efficiency project).[54]  The Applicability Section only carves out State Agreement Approach project.

Because the proposed Applicability Section would limit the projects that PJM can plan to the five criteria in the Applicability Section, Stakeholders will be unable in the future to broaden public policy planning.  This is a live issue as recently there have been questions about whether public policy planning is working in PJM, and whether there need to be improvements.  If the

---

[52]    Order No. 1000 at P 203.

[53]    *See* PJM First Compliance Order at PP 75-76.

[54]    Operating Agreement, Schedule 6 at Section 1.5.9.

JA0234

TO Filing is approved, it ensures that any changes will require approval from the PJM Transmission Owners.

The Applicability Section also does not carve out Multi-Driver Projects, which are "a transmission enhancement or expansion that addresses more than one of the following: reliability violations, economic constraints or State Agreement Approach initiatives."[55]  As noted previously, the Applicability Section reserves to the PJM Transmission Owners the right to plan and construct all projects that are not planned by PJM to address specific criteria.  Multi-Driver Projects are not included on the list, leaving ambiguity as to whether a PJM Transmission Owner could assert a right to plan and construct a Multi-Driver Project.  For instance, the definition of a Multi-Driver Project uses different terms than are used in criteria 1-5 of the Applicability Section.  While the Applicability Section uses the phrase, "NERC Reliability Standards," the definition of Multi-Driver Project uses the phrase "reliability violations."[56]

The TO Filing is unjust and unreasonable as the Applicability section conflicts with the existing requirements for PJM regional planning in Schedule 6 and would restrict PJM's Stakeholders' exclusive rights to amend the OA, including Schedule 6.

### 2. The TO Filing Shifts RTEP Project Definitions From The Operating Agreement To The Tariff

The Operating Agreements includes definitions of the transmission project categories in PJM, from regional project categories to the sole local project category, Supplemental Projects.[57]

---

[55]     *Id.*  Definitions section.

[56]     Reliability project is not a defined term in the PJM Operating Agreement, rather reliability projects fall under the general definition of a RTEP Project.   The TO Filing improperly attempts to create a Operating Agreement definition of reliability in Attachment M-3, rather than the PJM Operating Agreement.

[57]     *See* Operating Agreement Definitions for Regional RTEP Project, Subregional RTEP Project and Supplemental Project.

24

JA0235

Document Accession #: 20200706-5238     Filed Date: 07/06/2020

Schedule 6 of the Operating Agreements defines the planning committees and their responsibilities and the process for reviewing Local Plans and developing the RTEP. Attachment M-3, part of the PJM Tariff, includes merely "additional procedures for planning Supplement Projects" that supplement the planning process in Schedule 6 of the Operating Agreement.  It is clear from the current opening of Attachment M-3 that it is subject to Schedule 6 of the Operating Agreement: "This document provides *additional details* of the process that PJM and the PJM Transmission Owners will follow in connection with planning Supplemental Projects, as defined in section 1.42A.02 of the Operating Agreement, *in accordance with Schedule 6 of the Operating Agreement*."[58]

The Operating Agreement defines those transmission addition project categories that are includable in the RTEP.  The Operating Agreement has no mechanism to accommodate "Asset Management Projects" or "Attachment M-3 Project" as defined by the TO Filing.  The Operating Agreement references only "any Supplemental Projects included in the Local Plan, in accordance with Additional Procedures for Planning of Supplemental Projects set forth in Tariff, Attachment M-3."[59]  Only Supplemental Projects are referenced in other parts of Schedule 6.  The TO Filing would purport to bind the PJM RTEP to include additional categories of projects without Stakeholder agreement to amend the Operating Agreement in that regard.

---

[58]     Existing Attachment M-3 [emphasis added].   By adding "as provided in this Attachment M-3" to Attachment M-3(a), "Each Transmission Owner shall be responsible for planning and constructing in accordance with Schedule 6 of the Operating Agreement  as provided in this Attachment M-3", the TO Filing attempts to undo the current regime.

[59]     Operating Agreement, Schedule 6, Section 1.3(d).

###### 3. Proposed Definitions For PJM Planning Criteria Need And Attachment M-3 Section (d) Conflicts With PJM Regional Planning Under The Operating Agreement

The TO Filing attempts to usurp regional planning by restricting the scope of PJM planning and allowing the PJM Transmission Owners to reject PJM's regional determinations. The TO Filing adds a definition to the Tariff that restricts PJM Planning Criteria Need to a need to "plan a transmission expansion or enhancement of Transmission Facilities other than those reserved to each Transmission Owner in accordance with section (a)." Thus, where the only existing local planning category, Supplemental Projects, provides the Transmission Owners the right to construct only projects that are not part of PJM criteria, as determined by PJM, the TO Filing flips that definition to restrict PJM Planning Criteria Needs to only those needs defined by Attachment M-3. Even assuming for argument that the PJM Transmission Owners have unilateral rights to file Tariff changes related to local planning, they have no right to restrict Schedule 6 regional planning though those Tariff changes. The definition of "PJM Planning Criteria Need" inappropriately restricts Schedule 6 regional planning, resulting in the M-3 revisions being unjust and unreasonable.

The TO Filing takes the restriction on regional planning a step further through the provisions of Attachment M-3 (d)(2) that purport to dictate the "Coordination of EOL Need Planning With PJM Planning Criteria Needs." The sum and substance is that notwithstanding PJM's regional planning role, the TO Filing dictates that PJM Transmission Owners can reject PJM's determination at the regional level of the more efficient or cost effective project to address all RTEP needs, including EOL needs, simply by declaring that it has "determine[d] that the projected EOL Need is not met by the proposed Required Transmission Enhancement and determines that it will plan an Attachment M-3 Project to address the projected EOL Need or

26

**propose a project to address the Form No. 715 EOL Planning Criteria**."[60]  These veto rights conflict with Schedule 6, including the Commission's requirement in 2019 that PJM remove competition exemptions for Form No. 715 PJM planned projects.

Section 1.5.8(b) of Schedule 6 provides that PJM "shall publicly post on the PJM website **all transmission need information**, including violations, system conditions, and economic constraints, and Public Policy Requirements . . .."  The reference to "all transmission needs information is not restricted to simply PJM planned regional needs.  In fact, Section 1.5.8(b) goes on to note "Such posting shall support the role of the Subregional RTEP Committees in the development of the Local Plans and support the role of the Transmission Expansion Advisory Committee in the development of the Regional Transmission Expansion Plan."

In Order No. 1000, the Commission expressed concern that the "existing requirements of Order No. 890 are inadequate to ensure that public utility transmission providers in each transmission region, in consultation with stakeholders, identify and evaluate transmission alternatives **at the regional level that may resolve the region's needs more efficiently or cost-effectively than solutions identified in the local transmission plans of individual public utility transmission providers."**[61]  To remedy these concerns, the Commission placed an affirmative

---

[60]    Proposed Attachment M-3(d)(ii).  The TO Filing added a restriction to the definition of Attachment M-3 Project that it is not a project to address Form No. 715 Planning Criteria, but then under Attachment M-3(d)(ii) provides for the possibility that a generic, locally planned and cost-allocated project could be proposed to address Form No. 715 EOL Planning Criteria, despite the fact that PJM plans Form No. 715 projects.

[61]    Order No. 1000 at P 78 [emphasis added].  The Commission said the existing requirements of Order No. 890 do not necessarily result in the development of a regional transmission plan that reflects the identification by the transmission planning region of the set of transmission facilities that are more efficient or cost-effective solutions for the transmission planning region, Order No. 1000 at P 78, and expressing concern "that public utility transmission providers may not adequately assess the potential benefits of alternative transmission solutions at the regional level that may meet the needs of a transmission planning region more efficiently or cost-effectively than solutions identified by individual public utility transmission providers in their local transmission planning process." *Id*. at P 81.

27

obligation on public utility transmission providers such as PJM to regionally plan, if they did not already do so.[62]

More specific to the issue of determining whether an RTEP Project, in whole or in part, can more efficiently or cost-effectively address or combine both the regional needs and the identified drivers for projects proposed in the local plan, Order No. 1000 required that the regional plan explore whether "the development of transmission facilities that span the service territories of multiple public utility transmission providers may obviate the need for transmission facilities identified in multiple local transmission plans while simultaneously reducing congestion across the region."[63] In this regard, Order No. 1000 requires that PJM must *evaluate*, in consultation with stakeholders, alternative transmission solutions that might meet the needs of the transmission planning region more efficiently or cost-effectively than solutions identified by individual public utility transmission providers in their local transmission planning process. As the Commission concluded:

> If the public utility transmission providers in the transmission planning region [PJM] in consultation with stakeholders, determine that an alternative transmission solution is more efficient or cost-effective than transmission facilities in one or more local transmission plans, then the transmission facilities associated with that more efficient or cost-effective transmission can be selected in the regional transmission plan for purposes of cost allocation.[64]

The TO Filing gives the individual Transmission Owners the right to make the decision to move forward with their local project, regardless of PJM's decision.

PJM Manual 14B, Section 1.4.2.1 also provides that when a Supplemental Project may overlap with a regional need "PJM can consider proposals, including proposals in its open

---

[62]     *Id.* at P 149 (noting that some regions may already meet the requirements).

[63]     *Id.*

[64]     *Id.* at P 148. (emphasis added.)

(Page 249 of Total)                                                                                 JA0239

proposal window that more efficiently and cost-effectively address both the identified baseline need(s) and any related needs identified in the Attachment M-3 Process."[65]  Schedule 6, Section 1.5.8 (d) provides that

> The Office of the Interconnection **shall post** on the PJM website and present to the Transmission Expansion Advisory Committee for review and comment descriptions of the **proposed enhancements and expansions, including any proposed Supplemental Projects** or state public policy projects identified by a state(s). . . . After consultation with the Transmission Expansion Advisory Committee, **the Office of the Interconnection shall determine the more efficient or cost-effective transmission enhancements and expansions for inclusion in the recommended plan** consistent with this Operating Agreement, Schedule 6.

Taking their effort to establish veto rights over PJM's RTEP determinations one step further, the TO Filing would give the PJM Transmission Owners the same veto rights regarding the end of life projects planned by PJM itself under Transmission Owner Form No. 715 criteria which is part of the PJM planning criteria.  Specifically, proposed Attachment M-3(d)(ii) allows a Transmission Owner to determine that the PJM identified project does not address the "projected EOL need . . . [and] propose a project to address the Form No. 715 EOL Planning Criteria."  The TO Filing hardwires this limitation on PJM Form No. 715 planning into the Tariff by purporting to exclude Form No. 715 planning criteria from the Applicability Section, but then adding "provided that the Additional Procedures for the Identification and Planning of EOL Needs, set forth in section (d), shall apply, as Applicable."  Those additional procedures allow the PJM Transmission Owner to reject PJM's planned project as not meeting the transmission owner need

---

[65]     Manual 14B, Section 1.4.2.1, p. 26, available at https://www.pjm.com/~/media/documents/manuals/m14b.ashx.  *See also id*. seat p. 24 (However, a Transmission Owner, or any other pre-qualified Designated Entity, may submit a project proposal for consideration in the proposal window to address a posted violation that would also address a related need identified in the Attachment M-3 Process.).

29

and to itself plan a project to meet the Form No. 715 need outside the PJM planning process. The proposal of Transmission Owner veto rights to PJM planning of Form No. 715 projects would act as a replacement for former Operating Agreement Section 1.5.8(o) which the Commission required PJM to remove, along with problematic automatic local cost allocation.[66] This addition means that the inclusion is not an exemption at all.

### 4.   Projects Addressing End Of Life Transmission Facilities And Relevant "Asset Management" Are Supplemental Projects Under The Existing Operating Agreement

A fundamental flaw in the TO Filing is the assertion that transmission facilities needed to address end of life Transmission Facilities, or other asserted asset management needs, are not Supplemental Projects under the Operating Agreement definition and therefore new Tariff rules and definitions are necessary.[67]  The TO Filing and its 10 new definitions is wholly unnecessary as under the currently effective definition of Supplemental Project, facilities needed to replace Transmission Facilities reaching the end of useful life are Supplemental Projects (unless they are planed as part of PJM's regional planning in which case they are Regional RTEP Projects of Subregional RTEP Projects).  Because end of life and other asserted "asset management" projects fit under the definition of Supplemental Projects in the Operating Agreement and are covered by the existing Attachment M-3 requirements, the TO Filing is unnecessary, a point PJM made in asserting that no Operating Agreement or Tariff changes were needed to implement its proposal.  To get around this, the TO Filing conflates true "asset management" projects (such as repairs and component replacement) which are not currently part of planning, and should not be,

---

[66]     *PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,133, at P 14 (2019).

[67]     TO Filing at 3 (asserting that "asset management activities include projects required to maintain, repair, or replace transmission facilities, including those approaching the end of their useful lives, in order to maintain the Transmission Owner's existing electric transmission system and meet regulatory compliance requirements.").

with building new transmission, at today's industry standards and other actions to maintain system reliability.  Instead, those are Supplemental Projects.

That new transmission is an "enhancement or expansion" of the grid and thus a Supplemental Project should be unquestioned.  In this regard, including such end of life replacement facilities in the newly defined "Asset Management Project" creates a confusing overlap of definitions and is unjust and unreasonable.  As the PJM Board Letter notes, in discussing "End of Life Replacement Projects – Supplemental Projects"[68] the "other category or type of end of life replacement projects can be found in Supplemental Projects."[69]  The dictionary definition of "enhancement" would cover replacement projects to address aging infrastructure, whether there is an increase in transfer capability or not.  Enhance is defined as "to increase or improve in value, quality, desirability, or attractiveness."[70]  The TO Filing reads "enhancement" completely out of the definition, arguing "even though they do not expand the capability of the transmission system (and hence are not Supplemental Projects under the PJM Tariff.)"[71]  Even here they misrepresent the PJM governing documents as the definition of Supplemental Projects is in the Operating Agreement, not in the Tariff.

The Transmission Owners have always treated projects to replace EOL facilities as Supplemental Projects when not covered by Form No. 715 criteria.  PJM included this specification in Manual 14B, calling out a Supplemental Category of EOL replacement projects.  For example, Section 1.4.1.5 provides:

### 1.4.1.5 Supplemental Project Planning

---

[68]     Board Letter at 6, attached to TO Filing as Exhibit 4.

[69]     *Id*.  The Board was distinguishing the EOL Supplemental Projects with Form No. 715 projects.

[70]     https://www.merriam-webster.com/dictionary/enhance.

[71]     TO Filing at 3.

JA0242

Transmission Owner may identify a need associated with a transmission expansion or enhancement not required to comply with the PJM reliability, operational performance, FERC Form No. 715 or economic criteria. The PJM Transmission Owners plan Supplemental Projects in accordance with the Attachment M-3 Process. Projects planned through the Attachment M-3 Process could include those that: (i) expand or enhance the transmission system; (ii) address local reliability issues; (iii) maintain the existing transmission system; (iv) comply with regulatory requirements; or (v) implement Transmission Owner asset management activities (which could include needs related to a transmission facility approaching the end of its useful life, which, in accordance with good utility practice, is not determined by the facility's service life for accounting or depreciation purposes).

In addition, Section 1.5.4 identifies Supplemental Project Planning and states

The criteria driving the need for Supplemental Projects (which could include criteria required to address end of useful life of existing transmission facilities, and which, in accordance with good utility practice, is not determined by the facility's service life for accounting or depreciation purposes) are provided by each Transmission Owner consistent with the OATT Attachment M-3 process.[72]

As these sections note, any project that would be covered under the new proposal process PJM has already treated as a Supplemental Project, and thus no changes are needed at all to M-3. This is precisely the point PJM made in asserting that no Operating Agreement or Tariff changes were needed to implement its proposal.

### C.    The Individual Components Of The TO Filing Are Unjust And Unreasonable

Although the TO Filing as a whole is unjust and unreasonable, numerous individual components are unjust and unreasonable in their own right.

#### 1.    The Applicability Section Violates Order No. 1000 And Cost Causation Principles

The proposed Applicability Section of the TO Filing runs afoul of several Order No. 1000 requirements in large part because it stops PJM from conducting regional transmission

---

[72]    PJM Manual 14B at 30.

32

planning by not allowing PJM, the regional planning entity, to consider and plan for all regional

needs. Denying PJM the ability to plan for the retirement of Transmission Facilities prevents it

from planning for a significant driver of transmission in PJM, which effectively prevents PJM

from conducting regional planning that results in the more efficient or cost-effective solutions to

the region's needs.

The TO Filing establishes a new right of first refusal and gives the PJM Transmission

Owners a veto right on project selection. The Transmission Facilities in PJM are aging.

Currently two-thirds of Transmission Facilities in PJM are more than 40 years old, and one-third

between 40-50 years old.[73] In a 2019 report, PJM stated that as load growth has decreased as a

predominant driver of new transmission facilities and been replaced by "aging infrastructure,

grid resilience and the shift in generation resources. PJM further stated that

> These days, instead of expanding the grid to accommodate more
> and more customer demand, transmission investment tends to be
> focused on aging infrastructure (some approach 90 years old) and
> upgrades to ensure reliability, improve transfer capability, and
> comply with local load-serving criteria. These system
> enhancements help avoid equipment failure and blackouts, and
> often, projects identified to solve one issue help address other
> system needs as well. [74]

There is no question that the issue of Aging Infrastructure is a particular reliability and resource

issue affecting the PJM region, as it has become a material and growing part of the PJM RTEP.

Denying PJM the ability to plan for the retirement of Transmission Facilities prevents it from

planning for a significant driver of transmission in PJM, which effectively prevents PJM from

conducting regional planning that results in the more efficient or cost-effective solutions to the

---

[73]    Regional Transmission Expansion Planning: Planning the Future of the Grid, Today at page 4 (2019), *available at* https://www.pjm.com/-/media/library/reports-notices/2019-rtep/regional-transmission-expansion-planning-planning-the-future-of-grid-today.ashx?la=en.

[74]    *Id.*

Document Accession #: 20200706-5238     Filed Date: 07/06/2020

region's needs.[75]  The Sponsoring Transmission Owners are proposing to remove from the

regional planning process one of the "particular reliability and resource issues affecting" the PJM

region, aging infrastructure.  The Sponsoring Transmission Owners' proposal undermines the

requirement that the geographic scope of the region, here PJM, be based on the particular

reliability and resource issues affecting individual regions.  In doing so it violates both Order No.

890 and Order No. 1000 requirements that for the regional planning process reflect the particular

reliability and resource issues affecting the Order No. 1000 region and its fundamental

definition.

In addition, Order No. 1000 required the removal of rights of first refusal.  The TO Filing

would add a new right of first refusal to a wide category of new projects referred to as

"Attachment M-3 Project". Additional violations of Order No. 1000 stem from the inclusion of a

new right of first refusal in the Applicability Section and inhibiting the ability of PJM

Stakeholders to improve the public policy planning process.[76]

In Order No. 1000, the Commission linked the requirement to remove a right of first

refusal to whether the project has regional benefits.[77]  If a project is allocated outside of the zone

---

[75]     In Order No. 890, the Commission explained that the "scope of a particular planning region should be governed by the integrated nature of the regional power grid and the particular reliability and resource issues affecting individual regions and sub-regions."  Order No. 890 at P 527.

[76]     Attachment M-3(a)(4) is written to apply only to the existing State Agreement Approach for public policy projects in PJM, but if future designs related to Public Policy Requirements are devised, they would be omitted from Attachment M-3(a)(4).  It should have referred to the PJM Operating Agreement definition of "Public Policy Requirements."  This is a clear violation of Order No. 1000 as Order No. 1000 was explicit that PJM must engage in public policy planning as part of its Order No. 1000-compliant planning process, not just through the State Agreement Approach.  There have been no public policy projects approved to-date under the State Agreement Approach.  The issue of how to improve the public policy planning process under Order No. 1000 is ripe for PJM Member review and reform.

[77]     Order No. 1000 at P 313.

34

where it is located, then there can be no right of first refusal for the project.[78]  The Sponsoring

Transmission Owners have not established that the projects resulting from the five criteria listed

in the Applicability Section do not have regional benefits.  To the contrary, PJM's recent filing

revising the cost allocation method for certain Form 715 projects demonstrates the opposite.

There were several projects allocated outside of the zone where the project was located.[79]

Given that the Applicability Section of Attachment M-3 reserves to the PJM

Transmission Owners the right to plan and construct Attachment M-3 Projects, Order No. 1000

requires that Attachment M-3 Projects be allocated solely to the zone where the project is

located.[80]  There is no information in the record to justify allocating the costs of every

Attachment M-3 Project solely to the zone where the project is located, especially related to the

new categories of Applicability exceptions  (i) and (iii).  To the contrary, review of previous end

of life projects in PJM indicates that some projects will have regional benefits, *i.e.* will benefit a

transmission zone outside of the zone where the project is located.  Exhibit A to this Protest is a

list of $3.488 billion in examples of high-voltage Asset Management (as defined by the TO

Filing) transmission line projects that have been approved to-date and that, based on LS Power's

analysis, could have regional benefits, but which were cost allocated to a single zone.  The

---

[78]     *Id.* at P 430.

[79]     *See PJM Interconnection, L.L.C.*, Compliance Filing, Docket No. ER15-1344-007 (filed on October 29, 2019).

[80]     In Order No. 1000-A, the Commission clarified that the term "regional" generally applies to any transmission facility the costs of which were allocated outside of a single transmission owner's retail distribution service territory or footprint. Order No. 1000-A, 139 FERC ¶ 61,132 at P 430 ("we clarify that if any costs of a new transmission facility are allocated regionally or outside of a public utility transmission provider's retail distribution service territory or footprint, then there can be no federal right of first refusal associated with such transmission facility, except as provided in this order.").

Document Accession #: 20200706-5238        Filed Date: 07/06/2020

nebulous Applicability Section (iii) catch-all right of first refusal and catch-all local cost allocation is also problematic related to cost causation and free-rider principles.[81]

Allocating the costs of a new Tariff definition Attachment M-3 Project or Asset Management Project that has regional benefits, solely to the transmission owner zone where the project is located, is inconsistent with long-standing cost allocation precedent that requires that beneficiaries of a project pay the cost of the project. Of particular relevance is the United States Court of Appeals for the District of Columbia Circuit ("Court" or "D.C. Circuit") review of the Commission's approval of a location-based cost allocation method for Form No. 715 projects, the same method that is expected to apply to Attachment M-3 Projects.[82] The court found that when significant benefits (as much as 43% in the projects reviewed by the Court) flowed to zones other than where the projects were located, such a cost allocation scheme:

> does not amount to a quibble about 'exacting precision,' Midwest ISO Transmission Owners, 373 F.3d at 1369, or a tempering of the cost-causation principle in pursuit of 'competing goals,' S.C. Pub. Serv. Auth. v. FERC, 762 F.3d 41, 88 (D.C. Cir. 2014). Rather, it involves a wholesale departure from the cost-causation principle, which would 'shift a grossly disproportionate share of [the] costs' of these high-voltage projects into a single zone.[83]

---

[81]   *El Paso Elec. Co. v. Fed. Energy Regulatory Comm'n*, 832 F.3d 495, 505 (5th Cir. 2016)(FERC cannot meet its obligation to ensure just and reasonable rates by effectively assuring that many of the costs of new development will be imposed on only half of the utilities in the WestConnect region.).

[82]   *Old Dominion Elect. Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir.), *reh'g denied*, 905 F.3d 671 (D.C. Cir. 2018)("ODEC v. FERC"). As the United States Court of Appeals for the District of Columbia Circuit stated, there is no prohibition against "PJM or its member utilities from **amending the Tariff**, the Operating Agreement, or PJM's own planning criteria to address any problem of prodigal spending, to establish appropriate end-of-life planning criteria, or otherwise to limit regional cost sharing—**as long as any amendment respects the cost-causation principle**."

[83]   *Id.* at 1262.

36

The court rejected the argument that the projects at issue were 'local projects' because they arose from an individual transmission owner's planning criteria.[84]  Further, the projects at issue were end of life projects.  There should be no distinction from a cost causation perspective whether a project was an EOL project arising from Form No. 715 end of life criteria or end of life criteria that the transmission owner failed to include in its Form No. 715 criteria.  The projects are the same.  An example of this disjointed planning is telling.  PJM's upcoming immediate need window is for Dominion's 3-mile portion of the Doubs-Goose Creek 500 kV transmission line as the end of life need was part of Dominions Form No. 715 criteria.  At the same time, APS (FE) has included its 15-mile portion of the Doubs-Goose Creek 500 kV as a Supplemental Project.  Both pieces are the same end of life project.[85]  The Dominion portion will be cost allocated region-wide based on its regional benefits because Dominion's end of life criteria are filed with its Form No. 715 criteria.  The APS section will be cost allocated only to the zone in which the project is located because it is a Supplemental Project, notwithstanding that its benefits are identical.  As the Court in *ODEC* found, cost causation principles prohibit treating one transmission facility differently than another based on how they were planned.  This is particularly true when the facilities are part of the same end of life determination.[86]  Only though consistent regional planning of end of life facilities will there be consistent cost allocation.

The adjustment in cost allocation following the DC Circuit's *ODEC* decision resulted in 44 projects having their cost allocation corrected explicitly because they had regional benefits,

---

[84]     *Id.*

[85]     Because of the difference in planning, the Dominion portion of the line is subject to competition under Order No. 1000 but the APS portion is not.

[86]     The Transmission Facilities reviewed by the Court in ODEC were end of life facilities.

37

not local benefits.[87]  PJM filed the revised cost allocation schedules for these 44 projects in

Docket No. ER18-680.[88]  These 44 projects were just the end of life projects addressed through

Form No. 715 end of life planning, but clearly this shows that Asset Management Projects have

regional benefits as clearly demonstrated by the 44 Form 715 EOL projects that required

correction of cost allocation, due to their regional benefits.  For end of life projects moved

forward as Supplemental Projects, hundreds of projects, the only consumers paying for the

facilities are those in the transmission owner's zone in which the project was located regardless

of beneficiaries.  The cost allocation for Supplemental Projects was derived when they were

intended to be purely local and of little consequence.[89]  It was not designed for a wholesale

rebuilding of the grid, or now for an expansive new definition of Attachment M-3 Projects.  The

TO Filing does not address cost allocation, notwithstanding that it is creating multiple new

categories of projects, and its local planning emphasis will ensure that neither the optimal grid

nor cost allocation consistent with cost causation principles are achieved.

---

[87]     Given the upheaval created at PJM due to the Form No. 715 Projects having to correct their cost allocation after the DC Circuit remand on the topic, this is another reason to ensure that the cost allocation to a single zone is appropriate for the TO Filing's new definitions of Asset Management Project and Attachment M-3 Project.  Each should be reviewed in accordance with cost causation principles.  The TO Filing fails on this review.   https://www.pjm.com/-/media/committees-groups/subcommittees/mss/2020/20200413/20200413-item-01-ferc-order-requiring-reallocations-and-refunds.ashx.  The Commission clarified that the August 30, 2019 order on Form 715 No. Order on Remand required PJM to rebill parties with interest back to May 25, 2015.  *PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,133, at P 2 (2019).

[88]     *See PJM Interconnection, L.L.C.*, Compliance Filing, Docket No. ER18-680, Attachment A (filed on June 1, 2020).

[89]     *See* PSEG Companies Protest to the addition of the Supplemental Project category, PSEG sought confirmation that Supplemental Projects are of an exclusively local nature, requesting "that, for sake of clarity, PJM should be required to provide examples of projects that would fall within the 'Supplemental' category, such as reconductoring of circuits and wave trap replacements." PSEG Companies, Motion to Intervene and Protest, filed January 7, 2008 in Docket No. OA08-32-000.

## 2.     The Definitions In The TO Filing Are Unjust And Unreasonable

In addition to the unjust and unreasonable nature of the Attachment M-3 Project definition referenced above, the additional proposed definitions are unjust and unreasonable. As discussed below, the definitions add certain definitions that already exist in the Operating Agreement, define RTEP processes contained in the OA in a manner not approved by Stakeholders, and include vague phrases that go beyond the limited nature of local planning.

### a)     Planning For Needs Resulting From Retirement Of Transmission Facilities That Have Reached The End Of Their Useful Life Is Not "Asset Management"

The definition for "Asset Management Project," in addition to being improperly placed in the Tariff rather than the OA, is unjust and unreasonable as it is unreasonably broad and impermissibly vague.[90]  The PJM Transmission Owners' proposal is built on a false narrative that "asset management" includes completely replacing transmission facilities that have reached the end of their useful life.  The definition provides:

> shall mean any modification or replacement of a Transmission Owner's Transmission Facilities that results in no more than an Incidental Increase in transmission capacity undertaken to perform maintenance, repair, and replacement work, to address an EOL Need, or to effect infrastructure security, system reliability, and automation projects the Transmission Owner undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements.

The term "asset management" is not a defined term at FERC, NERC, or PJM.  The phrase does not appear in the Federal Power Act, the Commission's regulations, any Commission rulemaking that sets the standards for transmission planning or the NERC reliability standards.  The phrase is not used in any of the PJM governing documents, including the PJM Tariff, Operating

---

[90]     *See, e.g.*, *Westar Energy, Inc.*, 131 FERC ¶ 61,183, at P 30 (2010)(rejecting a tariff revision as impermissibly vague because it "will lead to unnecessary disputes as to the interpretation of the provision.").

39

Agreement, or CTOA.  The TO Filing is improperly expanding management of assets by including "replacement work."  It is a made-up phrase that the transmission owners have used to confuse two disparate types of activities – the maintenance and care of existing transmission facilities (asset management), with the construction of entirely new transmission facilities when existing transmission facilities are retired (development of new assets).  "Replacement work" falls into this latter category.

The TO Filing relies on the fact that the Commission referenced the phrase "asset management" in an order denying a complaint against Pacific Gas & Electric ("PG&E") related to whether certain activities were subject to Order No. 890.[91]  The PJM transmission owners have latched onto the phrase and the Commission's decision in that proceeding as the basis for their proposal.  But the PJM transmission owners misunderstand the Commission's decision in the California Complaint Order as its holding is not as broad as the PJM transmission owners assert.

In the California Complaint Complaint, several state and local agencies brought a complaint against PG&E arguing that PG&E failed to comply with the transmission planning requirements of Order No. 890, which focus on transparency and Stakeholder participation, because roughly 80% of PG&E's capital transmission expenditure was not reviewable by Stakeholders.[92]  The Commission denied the complaint on the basis that the *requirements of Order No. 890* do not apply to all "asset management projects and activities" in CAISO, only those that expand the grid.[93]  The Commission used the phrase, asset management, as short-hand

---

[91]     California Complaint Order at P 65.

[92]     *Cal. Pub. Utils. Comm'n, et al v. Pacific Gas & Elect.*, Complaint, Docket No. EL17-45-000 (Aug. 31, 2018).

[93]     California Complaint Order at P 65.

Document Accession #: 20200706-5238    Filed Date: 07/06/2020

for the activities at issue in that proceeding – "maintenance, repair and replacement work *done on existing transmission facilities . . .*"[94]

But "asset management" ends when the "asset" is retired. By way of example, if the utility asset were a truck, repairing that truck, replacing the transmission, or even the engine, is asset management. When the truck is put in the junk yard and a new truck is purchased, that is not "asset management" of the retired truck.

It is simply nonsensical to assert that "asset management" continues *after* that asset is retired. An asset may require "management" in terms of maintenance or repair, and a repair may involve replacing component parts of an existing transmission facility, but once the asset is retired, there is no asset to manage, the asset no longer exists.

What the TO Filing refers to as asset management is "rate base management" or more bluntly protection of their rate base. What *may* exist after a transmission asset is retired is a transmission need. Once the transmission asset is removed from planning models upon notice of its pending retirement, there could be a new reliability or economic transmission need, or both. Although the transmission owner owned the asset, there is no basis to assert that the transmission owner owns any transmission needs resulting following the retirement of an existing transmission facility, particularly in an integrated grid. Thus, it is misleading to think of a transmission facility needed following the retirement of an existing transmission facility as a "replacement work" or asset management. It is a new transmission facility meeting a new transmission need.

Furthermore, a new transmission facility is a new investment that binds ratepayers for 40 years or more. The decision to invest in a new transmission facility must be judged just as the

---

[94]        *Id.* at n.119.

41

                                                                                    JA0252

original investment was 40-90 years prior – is it a *prudent investment* that will support the existing and future needs of the transmission grid?  Simply rebuilding Transmission Facilities that were needed in the past is neither automatically prudent nor good policy.  Furthermore, requiring that such a decision be made on a transmission owner by transmission owner basis as a local planning need is neither prudent nor good policy.

What was also not at issue in the California Complaint proceeding is whether Order No. 1000 allows transmission owners to preserve the exclusive authority to plan for what happens after the retirement of existing Transmission Facilities.  As explained in this Protest, the TO Filing will give the PJM transmission owners the right to decide what project will replace a retiring Transmission Facilities.  Under the TO Filing PJM is denied the opportunity to determine what, if any, regional needs may result from the retirement of an existing Transmission Facility and to plan for that need.  PJM is also denied the opportunity to determine if a regional solution can meet the need more efficiently or cost-effectively than a local solution. At most, PJM can inform a transmission owner that PJM has identified an overlap between a regional need and the Transmission Owners' determination of a need resulting from the retirement of an existing Transmission Facilities.  Even then, however, the PJM transmission owners' proposal gives the transmission owner discretion over whether PJM's solution solves the need.  Setting aside that such an outcome is contrary to the affirmative obligation to plan on a regional basis requirement in Order No. 1000, nothing in the California Complaint proceeding addresses the scope of Order No. 1000's requirement to plan on a regional basis or whether transmission needs resulting from the retirement of an existing transmission facility are transmission needs reserved solely to incumbent transmission owners.[95]

---

[95]    The Commission's only Order No. 1000-related finding was that the Commission's orders accepting CAISO's compliance filings with Order Nos. 890 and 1000 did not "indicate[] that

42

Document Accession #: 20200706-5238     Filed Date: 07/06/2020

Instead, PJM should be responsible for identifying if there is a regional need resulting from the retirement of an existing transmission facility and how the need should be met. It could be a new transmission facility is needed but should include different technology or operate at a higher voltage level. Perhaps load has shifted in the region or the grid topology is different now that it was 40 years ago. It could be that there is no need at all. PJM, as the region's independent planner, should have the opportunity to determine whether there is a need and what solution meets the need as required by Order No. 1000.

### b) The Definition Of Attachment M-3 Project Is Unreasonably Vague

The definition of Attachment M-3 Project provides that it means a new Asset Management Project that "significantly changes the impedance of Transmission Facilities." Projects that do not significantly change the impedance would not be covered by the revisions and, in the Sponsoring Transmission Owners' views, not be an Asset Management Project or a Supplemental Project. The definition of Supplemental Project in the Operating Agreement has no such restriction. What constitutes significantly changing the impedance also will be subjectively determined by individual Transmission Owner definitions, not determined by PJM uniformly. The TO Filing provides no information on how transparent or non-discriminatory standards for "significantly changes" will be established and enforced nor any basis why significant impedance changes only are beneficial to the local zone, as these Attachment M-3 Project are locally cost allocated.

---

CAISO would evaluate non-expansion transmission-related work." California Complaint Order at P 70. Order No. 1000 is not referenced at all in the California Complaint Rehearing Order.

### c)    The Definition Of Incidental Increase Is Unjust and Unreasonable

The definition of "incidental increase," a key phrase in the proposed Attachment M-3 revisions, is so expansive as to have no legitimate meaning.  The TO Filing focuses on "incidental increase" because an incremental increase was the mechanism by which the CAISO rules determined whether a transmission addition was an "expansion" of the grid and thus met the CAISO planning standard.  But the phrase "incremental increase" was not defined in the California Orders.  Further, the focus on incidental increase ignores that in PJM, both PJM regional Planning and Supplemental Projects cover **expansions and enhancements**, such that incremental increase is not a relevant determinate if the transmission addition is an enhancement, as would be the case for every end of life replacement.  The California Orders noted this distinction between PJM planning and CAISO planning in rejecting the Complainant effort to rely on the Commission's PJM Orders.[96]

The definition is also entirely too expansive as to what would be considered an incidental increase.  The definition of Asset Management Project includes any "replacement of a Transmission Owners Transmission Facilities that results in no more than an Incidental Increase in transmission capacity . . .." The definition of Incidental Increase then provides:

> "Incidental Increase" shall mean an increase in transmission capacity **achieved by advancements in technology and/or replacements consistent with current Transmission Owner design standards, industry standards, codes, laws or regulations, which is not reasonably severable from an Asset Management Project.**  A transmission project that results in more than an Incidental Increase in transmission capacity is an

---

[96]    California Complaint Order at P 72.  Furthermore, in the *California Complaint Order,* the Commission included a caveat that when "a transmission owner determines that it can address an RTO's identified need by expanding the scope of an asset management project or activity to result in a capacity increase, such additional work would be incremental to the asset management project or activity and would represent an expansion of the transmission system." *Id.* at PP 68-69.  The Sponsoring Transmission Owners did not include this caveat in their filing.

expansion or enhancement of Transmission Facilities. [emphasis added]

First, there is no definition of "advancements in technology" and whether it merely means more efficient equipment or the inclusion of new energy storage technology.  Second, by asserting that "A transmission project that results in more than an Incidental Increase in transmission capacity is an expansion or enhancement of Transmission Facilities," the TO Filing conflates expansions, which relate exclusively to increases in delivery potential with "enhancements," which can mean new facilities that result in no capacity increase.  There is no effort to reconcile or restrain "advancements in technology" with "no grid expansion" in the California Orders.

Third, the definition includes no tangible or verifiable way to determine whether an increase is "incidental" or "not reasonably severable from an Asset Management Project" and leaves it completely up to the transmission owner's discretion.  It is a matter of the individual transmission owner's current "design standards, industry standards, codes, laws or regulations . . .."[97]  It is unclear what is meant by a transmission owner's design standards and whether a transmission owner could simply change its design standard to ensure that project results in only an "incidental increase."[98]  The definition of Incidental Increase is proposed to be different for every Transmission Owner in PJM and would not be applied consistently across PJM.  This point alone raises many concerns.

---

[97]     Design and replacement standards across PJM can vary greatly.  Attached is a link to a 6-hour video Education Day that PJM held on May 23, 2016 in the PJM transmission replacement senior task force that educated stakeholders that the design standards across PJM vary widely and materially.  Transmission Owners throughout PJM outlined their various EOL planning processes and needs.  *See* https://videos.pjm.com/media/0_ncpoxh4i.

[98]     Stakeholders noticed this flaw during the Sponsoring Transmission Owners' June 2020 Webinar.  When asked whether the definition was broad enough to include a transmission owner replacing a retiring 115 kV line with a 230 kV or 345 kV line, the answer was yes, that the intent was to include these transmission owner design standards.  Building an entirely new line that doubles the operating limit of the retired line is hardly an "incidental increase."  This result would likely be inconsistent with Order No. 1000 and prior Commission precedent.

45

- The Sponsoring Transmission Owners have not established how the Incidental Increase definition would be administered in a fair and non-discriminatory manner.

- The proposed PJM definition would give individual PJM Transmission Owners discretion to change their standards and determine which projects are subject to the regional planning process and which ones are not.

- It would give individual PJM Transmission Owners discretion on what projects are subject to regional cost allocation and which projects are not.  Projects that are not an Incidental Increase are locally cost allocated, and projects that are an Incidental Increase are regionally planned.

- The Sponsoring Transmission Owners have not demonstrated that the Incidental Increase definition appropriately establishes just and reasonable cost allocation for projects falling under Incidental Increase definition versus those that do not.   The application of the definition of Incidental Increase would dictate whether an Asset Management Project is eligible for regional cost allocation.  In addition, the definition would vary from PJM Transmission Owner to PJM Transmission Owner and the Sponsoring Transmission Owners have not been established how this variation between the PJM Transmission Owners would also respect cost causation principles.[99]

- Transmission Owners have not put clear requirements and protections in their proposed definition that Incidental Increase cannot expand the transmission grid.  The Incidental Increase definition is inconsistent with Order No. 890.   In Order No. 890, the Commission stated it "cannot rely on the self-interest of transmission providers to expand the grid in a nondiscriminatory manner".[100]

In summary, the Sponsoring Transmission Owners have not established that the definition of Incidental Increase will not be used in a discriminatory manner or that it is consistent with the cost-causation principles.  While LS Power disputes that the precedent in the California Orders supports the Sponsoring Transmission Owners' definition of Incidental Increase, even if it did apply, the definition would be inconsistent with the California Orders and unjust and unreasonable.  The TO Filing also does not address the flip-side of the California

---

[99]    As the United States Court of Appeals for the District of Columbia Circuit stated, there is no prohibition against "PJM or its member utilities from amending the Tariff, the Operating Agreement, or PJM's own planning criteria to address any problem of prodigal spending, to establish appropriate end-of-life planning criteria, or otherwise to limit regional cost sharing—as long as any amendment respects the cost-causation principle.  *ODEC v. FERC*, 898 F.3d 1254 at 1263.  The DC Circuit was clear that cost causation principles apply to both the PJM Operating Agreement and PJM Tariff.

[100]    Order No. 890 at P 422.

Orders, *i.e.*, that a project that results in an incremental increase in transmission capacity is subject to the planning process in CAISO's TPP.[101] The Incidental Increase definition does not start with the premise in the California Orders that if the asset management project would affect the topology of the system or system capacity, then the asset management replacement is subject to the PJM regional planning process.[102] Instead, it carves out large potential increases to the system as "Incidental Increase," which also impacts the "Asset Management" and Attachment M-3 Project definitions."

Even in the event that there is Incidental Increase under the robust definition proposed in the TO Filing, the resulting project is not regionally planned as in CAISO. Instead, it becomes an Attachment M-3 Project that falls to the incumbent PJM Transmission Owner and all costs are allocated to the local zone, under the broad definition of Asset Management Project, Subsection (i) as an Asset Management Project that affects the connectivity of Transmission Facilities that are included in the Transmission System, affects Transmission Facility ratings, or significantly changes the impedance of the Transmission Facilities. This is allowed because of the second part of the Asset Management definition does not have an Incidental Increase catch. This second part reads "or to effect infrastructure security, system reliability, and automation projects the Transmission Owner undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements." The current Operating Agreement definition of Supplemental Projects excludes projects needed for system reliability, but the phrase "system reliability" in the Asset Management definition then conflicts with the Operating Agreement

---

[101]    California Complaint Order at P 69.

[102]    Also note that the Attachment M-3 Project definition (i) says "significantly changes the impedance" versus California Orders "affect the topology of the system or system capacity". There is no significance standard in the California Orders related to impedance or topology.

JA0258

Supplemental Project exception, which then the TO Filing grabs under the new Asset

Management and Attachment M-3 Project definitions.  In any case, the TO Filing does not

establish a just and reasonable cost allocation method for projects with an Incidental Increase

such as a significant change in impedance as there has been no showing that they indeed only

have local benefits.

### d)     The Definition Of EOL Need Is Unjust And Unreasonable

The definition of "EOL Need" lacks sufficient specificity to be just and reasonable.  EOL

Need is defined in the TO Filing as:

> a need to replace a transmission line between breakers operating at
> or above 100 kV or a transformer, the high side of which operates
> at or above 100 kV and the low side of which is not connected to
> distribution facilities, which the Transmission Owner has
> determined to be near the end of its useful life, the replacement of
> which would be an Attachment M-3 Project.

The definition restricts EOL Needs to only transmission lines operating above 100 kV whether

PJM Transmission Facilities or not, and transformers regardless of voltage that are not connected

on the low side to distribution.  This definition comes into play in Attachment M-3 Section

(d)(2)(ii) and in the Applicability Section (a)(2) related to Form 715 projects.  The application of

the EOL Needs definition there could limit the regional planning process to only planning EOL

Needs, which provides another backdoor right of first refusal on substations and any other non-

line transmission equipment.  This is inconsistent with Schedule 6 of the Operating Agreement,

which already includes in Section 1.5.8(p) a well-defined limitation on competition related to in-

kind substation equipment.  Furthermore, adding this definition to the PJM Tariff limits the

regional planning process in the Operating Agreement related to replacement of substations, a

key driver for PJM regional needs ahead, and greatly expands the limitations in today's PJM

Operating Agreement but through the PJM Tariff.

48

JA0259

Further the EOL Need definition limits EOL Needs to just transmission lines, this also means that replacements of substations in PJM would no longer be subject to the regional planning process or cost allocation.  There is no outright limitation on substation competition in the PJM Operating Agreement; the TO Filing has not established why a limitation on substation replacement or non-transmission Transmission Facilities such as fixed series capacitors should be limited to competition.  The EOL Need definition, which would limit the regional planning process to transmission lines 100 kV or above, also runs afoul of appropriate cost causation principles.  The TO Filing has not established why it is appropriate for replacement high voltage substations and non-transmission line Transmission Facilities to be locally cost allocated by restricting the EOL Need definition, and therefore regional cost allocation, to just transmission lines 100 kV and above.[103]  In fact, courts have found no prohibition against "PJM or its member utilities from amending the Tariff, the Operating Agreement, or PJM's own planning criteria to address any problem of prodigal spending, to establish appropriate end-of-life planning criteria, or otherwise to limit regional cost sharing—as long as any amendment respects the cost-causation principle."[104]

Restricting regional cost-sharing for high-voltage replacement substations must be consistent with the cost causation principle, and the TO Filing has not established that high-voltage EOL substation projects do not have regional benefits.  There are many examples of regionally beneficial substations in PJM; there is no reason that end of life replacement substation projects, which under the *ODEC* precedent must be consistent with cost causation

---

[103]    For instance, the following projects that involve replacing substations, s0468, s0764 , s0951.4, and s1426.1, may have regional benefits.  Together the projects represent $120 million in new transmission investment.

[104]    *ODEC v. FERC*, 898 F.3d 1254 at 1263.

principles, would also not have regional benefits.[105]   Project 9A, the largest market efficiency project in PJM history, is currently under development in both Maryland and Pennsylvania, and with benefits in numerous PJM transmission zones with clear regional benefits.  With the recent project settlement, the Eastern Portion of 9A has essentially turned into a regional market efficiency substation only project.  The 9A beneficiaries are below, as outlined in Maryland CPCN case 9471 and based on PJM Analysis Dated September 29, 2019:

| PJM ZONE | NLP NPV ($) | % PER ZONE |
|---|---|---|
| AEP | ($83,844,189) | 9.92% |
| APS | ($60,259,292) | 7.13% |
| BGE | ($106,852,669) | 12.65% |
| DAY | ($9,392,909) | 1.11% |
| DOM | ($406,173.109) | 48.08% |
| EKPC | ($7,057,159) | .84% |
| OVEC | ($312,551) | .04% |
| PEPCO | ($170,915,031) | 20.23% |
| TOTAL | ($844,806,909) | 100% |

As with the Incidental Increase, the EOL Need definition leaves complete discretion to the transmission owner to determine whether a facility is reaching the end of its useful life – "which the Transmission Owner has determined to be near the end of its useful life . . .." Moreover, there is no time horizon included in the definition, just a vague reference to "near," leaving the transmission owner's discretion essentially unreviewable.  In contrast, PJM

---

[105]    For examples, see Exhibit B attached to this Protest.

50

Stakeholders established language in Manual 14B that a transmission owner is required to use good utility practice when making an end of life determination and further specified that a transmission cannot use accounting definitions in making its determination.[106]  Here, there is no reference to even "good utility practice," or another standard such as reasonableness or transparency under Order No. 890.[107]  The EOL Need definition undoes roughly a year or more of stakeholder process and resulting revisions to Manual 14B approved by the Markets and Reliability Committee.[108]

> **e)    The Definitions of Transmission Facilities And Form 715 Planning Criteria Are Inappropriately Included In The TO Filing**

The definition for Form No. 715 EOL Planning Criteria is inappropriate because Form No. 715 planning criteria is defined by the Commission through Order No. 558[109] but the TO Filing restricts the scope of Form No. 715 EOL Planning Criteria to the limited definition of "EOL Needs" as defined by the TO Filing.  As outlined above, this has clear inconsistencies with Section 1.5.8(p) of the Operating Agreement, and further limits competitive opportunities for Form 715 projects to the new definition of EOL Projects, also conflicting with the existing Schedule 6 which puts all Form 715 project into the regional planning process.  Once a

---

[106]    Manual 14B, see https://www.pjm.com/-/media/committees-groups/committees/mrc/20181220/20181220-item-08b-transmission-replacement-process-manual-14b-revisions-presentation.ashx

[107]    ODEC provides a reasonable proposal in the stakeholder process, and even this 2017 concept related to reasonableness standard is dismissed.   https://www.pjm.com/-/media/committees-groups/task-forces/trpstf/20171129/20171129-item-04-potential-end-of-life-definition.ashx

[108]    https://www.pjm.com/-/media/committees-groups/committees/mrc/20181220/20181220-item-08b-transmission-replacement-process-manual-14b-revisions-presentation.ashx

[109]    *New Reporting Requirement Implementing Section 213(b) of the Federal Power Act and Supporting Expanded Regulatory Responsibilities under the Energy Policy Act of 1992, and Conforming and Other Changes to Form No. FERC-714*, Order No. 558, 64 FERC 61,369 (1993) 58 FR 52436, Oct. 8, 1993.

transmission owner files any end of life criteria as part of its Form No. 715 criteria, that criteria

becomes PJM planning criteria, regardless of the nature of the Transmission Facilities to which it

applies.  In addition, the assertion in the Form No. 715 EOL Planning Criteria definition that "No

Transmission Owner may be compelled to file a Form No. 715 EOL Planning Criteria not

required to be filed pursuant to FERC regulations applicable to Form No. 715" is unnecessary

given that only the Commission could "require" a party to make a filing mandated by the

Commission.

### 3.  The Procedures For A Transmission Owner To Coordinate With PJM On EOL Needs Are Inconsistent With The Operating Agreement And Inconsistent With Order No. 1000

Equally problematic is the Sponsoring Transmission Owners' proposal to keep

confidential from PJM Stakeholders, including state commissions, the Candidate EOL Needs

List that identifies EOL Needs expected in the next five years.  The proposal should be rejected

because there is no justification for keeping this list a secret.  It runs afoul of the Commission's

efforts to ensure that transmission planning is transparent and permits Stakeholder

participation.[110]  It is also inconsistent with Order No. 1000 in that the TO Filing would limit

coordination between local and regional planning such that PJM will be unable to determine

whether a regional solution is more efficient or cost-effective than a local solution.[111]  The

Sponsoring Transmission Owners' proposal prevents EOL Needs from being posted during a

---

[110]     In Order No. 1000, the Commission stated that it was building on the requirement in Order No. 890 that transmission providers participate in "a coordinated, open and transparent regional transmission planning process."  Order No. 1000 at P 1.  *See also* Order No. 890 at P 488 (requiring that transmission planning processes give stakeholders "a meaningful opportunity to engage in planning along with their transmission providers."); *Monongahela Power Co., el al*, 156 FERC 61,134 (2016)(establishing a show cause order to ensure that stakeholders have an opportunity to meaningfully participate in planning for Supplemental Projects).

[111]     Order No. 1000 requires transmission providers to participate in a regional planning process that creates a plan that identifies "transmission facilities that more efficiently or cost-effectively met the region's reliability, economic and Public Policy Requirements."  *See* Order No. 1000 at P 11.

Document Accession #: 20200706-5238    Filed Date: 07/06/2020

competitive window as required by Schedule 6, Section 1.5.8(b) as discussed above, which

ensures that no Stakeholder or non-incumbent developer will have the opportunity to propose a

project that more efficient or cost-effectively meets the EOL Need, including a project that may

meet the EOL Need and another need.  In fact, the only role for PJM in the process is to review

EOL Needs and alert a transmission owner if there is potential overlap between a regional need

and an EOL Need.  If PJM identifies a project that could meet the EOL Need and regional need,

the transmission owner still has the opportunity to reject the potential project.  This is not

effective regional planning and it will not lead to just and reasonable rates.  Finally, because the

"candidates" list is nonbinding, the Transmission Owners can simply remove facilities from the

list if a more efficient or cost-effective project is proposed.  The non-binding nature of the

transmission owner's list of potential retirements/EOL Needs also impacts the accuracy of

generation interconnection queue studies and BRA auctions.

### 4.    The Sponsoring Transmission Owners' Proposal Conflicts With PJM's Role As The Order No. 1000 Planning Entity For The Region

The Transmission Owners in PJM have designated PJM as their Order No. 1000 entity

for regional planning purposes.  The TO Filing, however, would stymie PJM from conducting

regional planning consistent with Order No. 1000 by preventing PJM from considering certain

needs during the regional planning process.  Under Order No. 1000, transmission providers

cannot reserve exclusively to the transmission owners planning for the region's needs effectively

precluding consideration of some of the region's needs as part of the Order No. 1000-compliant

planning process.  The TO Filing would also prohibit Stakeholders from improving regional

planning rules without Transmission Owner approval, while allowing Transmission Owners to

establish new categories of projects reserved exclusively to the Transmission Owners.  Thus, the

TO Filing provides the Transmission Owners a right of first refusal for anything that they decide

to plan locally instead of regionally. Order No. 1000 does not permit this type of back door right of first refusal.

The TO Filing, and the PJM Board letter, assert that the CTOA supports this exclusion of regionally beneficial projects from the regional planning process. The CTOA does not, and any reading of it to do so would be inconsistent with the conclusion that there was no right of first refusal in PJM and would place the current CTOA as unjust and unreasonable. As noted above, Article 4.1.3 of the CTOA placed PJM in charge of regional planning. Article 6.3.4 provides that PJM shall: "Conduct its planning for the expansion and enhancement of transmission facilities based on a planning horizon of at least ten years, or such longer period as may be required by the PJM Tariff or Operating Agreement, including the Regional Transmission Expansion Planning Protocol." Even this provision notes that the requirements for PJM regional planning as reflected in the CTOA could be enhanced by the Operating Agreement. The CTOA has no restriction on the regional planning mandate. The provision cited by Transmission Owners, Article 5.2, does not address planning at all and does not limit the scope of regional planning. The provision states:

> **5.2 Facility Rights** Each Party shall have the right to build, finance, own, acquire, sell, dispose, retire, merge or otherwise transfer or convey all or *any part of its assets*, including any Transmission Facilities, such right to include, but not be limited to the right, individually or collectively, to terminate the relationship with PJM in accordance with Section 3.2 or in connection with the transfer to or creation of another entity (including a joint venture or an ITC pursuant to Attachment U to the PJM Tariff) of the right to *own and/or operate its Transmission Facilities*. PJM shall not challenge any such sale, disposition, retirement, merger, or other action under this Section 5.2 on the basis that they are a signatory to this Agreement.[112]

---

[112]     CTOA Article 5.2 [emphasis added].

54

Document Accession #: 20200706-5238    Filed Date: 07/06/2020

The provision, by its terms, relates only to the Transmission Facilities brought into PJM, not to the planning of future facilities. The provision offers no support for the conclusion that it restricts PJM's role as the regional planner.

Article 5.6 is a basic reservation of rights provision and says merely that any rights not transferred to PJM are retained by the Parties to the agreement. Of course, since regional planning was transferred to PJM, the provision does nothing to answer the question as to whether the Sponsoring Transmission Owners have the unilateral right to hamstring PJM's regional planning by restricting the most significant driver of transmission spend in PJM for the foreseeable future.

To the extent that the Commission reads either of these provisions as granting incumbent transmission owners a perpetual right to locally plan and rebuilt the existing transmission system in perpetuity, the provisions are unjust and unreasonable. As discussed below, the TO Filing would give the Transmission Owners that right. Such a perpetual right to rebuild Transmission Facilities and burden consumers with the cost, without those consumers having the ability to reject the perpetual rebuild opportunity by amending regional planning, is contrary to the Federal Power Act and the Commission's obligation to ensure just and reasonable rates. Order No. 1000 recognized that the regional planning is an essential component of the Commission's ability to determine just and reasonable rates.

### 5.    The TO Filing Would Expand The Scope Of Local Planning Contrary To The Commission's Goal Of Expanding Regional Planning

The TO Filing elevates local planning over regional planning contrary to Commission precedent on transmission planning. The Commission has been on a steady march towards regional planning for two decades. In Order No. 888-A, the Commission encouraged transmission providers to engage in regional planning with transmission customers to "ensur[e]

that regional transmission needs are met efficiently."[113]  Later, in Order No. 890, the

Commission took the next step of requiring participation in regional planning processes.[114]  The

Commission found that "[t]he coordination of planning on a regional basis will also increase

efficiency through the coordination of transmission upgrades that have region-wide benefits, as

opposed to pursuing transmission expansion on a piecemeal basis."[115]  Subsequently the

Commission embarked on Order No. 1000, which significantly expanded the requirements for

regional planning to include (1) an affirmative obligation to plan for reliability, economic and

public policy needs; (2) a process for competitive selecting transmission projects to meet those

needs; and (3) *ex ante* cost allocation methods for selected projects.[116]

Of particular relevance here is the affirmative obligation to plan on a regional basis.  In

Order No. 1000 the Commission "conclude[d] that it is necessary to have an affirmative

obligation in these transmission planning regions to evaluate alternatives that may meet the

needs of the region more efficiently or cost-effectively."[117]  Order No. 1000 required

---

[113]     *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, at 30,311, *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

[114]     *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119, at P 523 (The Commission required transmission providers "to coordinate with interconnected systems to (1) Share system plans to ensure that they are simultaneously feasible and otherwise use consistent assumptions and data and (2) identify system enhancements that could relieve congestion or integrate new resources."), *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297(2007), *order on reh'g and clarification*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C,126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

[115]     *Id.* at P 524.

[116]     Order No. 1000 at PP 6-9.

[117]     *Id.* at P 80.

transmission providers to participate in a regional planning process that explores whether "the development of transmission facilities that span the service territories of multiple public utility transmission providers may obviate the need for transmission facilities identified in multiple local transmission plans while simultaneously reducing congestion across the region."[118]  The types of needs that transmission providers must plan for include (1) reliability, (2) economic and (3) Public Policy Requirements, and there is no carve out for certain drivers of those needs.  For instance, there is no carve out for reliability needs driven by the retirement of existing transmission facilities.  Through regional planning to meet the region's needs, transmission providers can holistically plan to meet those needs resulting in more efficient or cost-effective solutions and therefore just and reasonable rates.

On compliance, the Commission found that PJM complied with the regional planning requirements because PJM's planning process, which is in the Operating Agreement, "culminates in the RTEP, a regional transmission plan that reflects PJM's determination of the set of transmission facilities that more efficiently or cost-effectively meet the transmission needs of the PJM Region."[119]  The Sponsoring Transmission Owners' proposal, however, would deprive PJM of its ability to holistically plan on a regional basis and determine whether a regional solution would more efficiently or cost-effectively meet the region's needs because it prevents PJM from planning for any needs not listed in 1-5 of the Applicability Section.

In particular, it denies PJM the opportunity to plan for needs resulting from the retirement of an existing transmission facility.  While the proposal requires individual transmission owners to notify PJM when transmission facilities are reaching the end of their useful life, it reserves to

---

[118]      Order No. 1000 at P 81.

[119]      PJM First Compliance Order at P 65.  The Commission also found that PJM region qualified as a planning region.  *Id.* at P 30.

Document Accession #: 20200706-5238    Filed Date: 07/06/2020

individual transmission owners the right to plan to replace the to-be-retired transmission

facilities.  In effect, PJM is precluded from determining, based on a holistic view of the regional

transmission system, whether there is a need if a transmission facility is retired, what type of

need there may be (*i.e.*, reliability or economic with consideration of public policy

requirements), and what transmission solution more efficiently or cost-effectively meets the

need, including the potential for a transmission solution to solve multiple types of needs.

The only planning-related activity that PJM is permitted under this proposal is reviewing

whether there is "a substantial electrical **overlap**" between a regional need and a projected end of

life need.[120]  Even if PJM does happen to find such an overlap, the proposal essentially allows a

PJM transmission owner to veto PJM's determination that a single solution would satisfy both a

regional need and an end of life need.[121]  Thus, if the PJM transmission owners' proposal is

approved, the RTEP will no longer reflect *PJM's determination* of the set of transmission

facilities that more efficiently or cost-effectively meet the transmission needs of the PJM Region,

and instead will only reflect the set of transmission facilities that more efficiently or cost-

effectively meet the transmission needs that the Sponsoring Transmission Owners allow PJM to

plan.[122]

### 6.    The Sponsoring Transmission Owners' Proposal Denies PJM Stakeholders' Role In Developing Transmission Project Categories

The TO Filing usurps the PJM Stakeholders' recognized role in developing project

definitions under the Operating Agreement.[123]  Currently, all of the transmission project

---

[120]    Proposed Attachment M-3, Section (d)(2)(i).

[121]    *Id*. at Section (d)(2)(ii).

[122]    This is the very self-interest that the Commission was concerned about in Order Nos. 888, 890 and 1000.  *See* Order No. 888 at 31,682; Order No. 890 at P 524; Order No. 1000 at PP 254, 256.

[123]    *See* Operating Agreement, Section 8.8 of the, "Powers of the Members Committee".

categories and other key planning terms and processes are defined in the Operating Agreement,

including Supplemental Projects.[124]  The Sponsoring Transmission Owners, however, propose to

bypass the Operating Agreement, which can only be amended by the Members Committee, and

insert into Attachment M-3 two new category of projects, Attachment M-3 Projects and Asset

Management Projects, and restrict those projects to the PJM Transmission Owners.

Only the Members Committee, which represents the various Stakeholder interests in

PJM, has the authority to change those definitions, including adding, removing or modifying

definitions and planning processes.[125]  Specifically, Section 8.8 of the Operating Agreement

grants the Members Committee authority to "amend any portion of [the Operating agreement],

including the Schedules hereto, or create new Schedules, and file any such amendments or new

Schedules with FERC or other regulatory body of competent jurisdiction."  Nowhere in the

Operating Agreement or other governing documents are PJM or the PJM transmission owners

granted unilateral authority to amend the Operating Agreement.[126]  This is by design as it is

---

[124]    *See* Definitions Section of the Operating Agreement for the definitions of (1) Multi-Driver Projects; (2) Regional RTEP Project; (3) Immediate-need Reliability Projects; (4) Short-term Projects; (5) Long-lead projects; (6) Subregional RTEP Project; and (7) Economic-based Enhancements or Expansions.  The Operating Agreement also defines other key planning terms, such as Local Plan.

[125]    *See Pennsylvania-New Jersey-Maryland Interconnection, et al*, 81 FERC ¶ 61,257 at 62,263 (Nov. 25, 1997); *see also* Order No. 888, 61 FR 21540-01, 21596 (Principle One of the ISO Principles adopted in Order No. 888 states that "governance should be structured in a fair and non-discriminatory manner" and "independent of any individual market participant or any one class of participants (e.g. transmission owners or end-users).") .

[126]    If PJM opts to move forward with a proposal that does not receive a two-thirds majority vote from the Members Committee, then PJM files it under Section 206 of the FPA.  *See, e.g.*, *PJM Interconnection, L.L.C.*, Maintenance Adder Revisions to the Amended and Restated Operating Agreement, Docket No. EL19-8-000 at 19-20 (filed on Oct. 29, 2018)(noting that PJM made the filing under Section 206 of the FPA because "Operating Agreement changes must be approved by a two-thirds majority sector vote of the Members Committee" and therefore "PJM is not authorized to file the Operating Agreement changes under section 205 . . ..").

meant to ensure that, as a Commission-approved independent system operator, PJM is independent from the transmission owners.[127]

Instead of following the process to amend the Operating Agreement, the Sponsoring Transmission Owners are proposing to circumvent the Operating Agreement, and by extension PJM Stakeholders, by amending and expanding the existing Attachment M-3 without also amending the Operating Agreement. A majority of Stakeholders have rejected the Sponsoring Transmission Owners' limits on regional planning. The Member Committee vote demonstrates a clear preference by a majority of PJM Stakeholders for regional planning.[128] In spite of, or perhaps because of, the lack of Stakeholder support, the PJM transmission owners rushed forward with their self-interested proposal.

**D.    The Filing Demonstrates That Certain Transmission Owners Have Been Violating the Requirements Of Form No. 715 With Regard To End Of Life Planning Criteria**

FERC Form No. 715 requires transmitting utilities to file their transmission planning criteria. The Commission created Form No. 715 in response to Congressional action requiring "that information be submitted annually to the Commission by transmitting utilities which is

---

[127]    *See Pennsylvania-New Jersey-Maryland Interconnection, et al*, 81 FERC ¶ 61,257 at 62,263 (Nov. 25, 1997); *see also* Order No. 888, 61 FR 21540-01 at 21596. Independent transmission planning is particularly important given the Commission's recognition that it "could not rely on the self-interest of transmission providers to expand the grid in a not unduly discriminatory manner." Order No. 1000 at P 17 (discussing the need for the transmission planning reforms adopted in Order No. 890).

[128]    The Commission has found that "stakeholder consensus is an important factor to be considered" when evaluating whether a proposal is just and reasonable. *See, e.g.*, *PJM Interconnection, L.L.C.*, 117 FERC ¶ 61,179, at P 43 (2006)("The Commission continues to believe that the stakeholder process helps to resolve disputes between parties and is entitled to due weight. However, the Commission nevertheless must address each filing on its merits and be able to find the proposal just and reasonable.").

adequate to inform[129] potential transmission customers, State regulatory authorities, and the public of potentially available transmission capacity and known constraints."[130]  In response, in Order No. 558,[131] the Commission created Form No. 715.[132]

In creating Form No. 715, the Commission's intended that "transmitting utilities file the substantive criteria and planning procedures that they follow in the normal course of business,"[133] including system-specific planning criteria.[134]  Form No. 715 includes three parts relevant to the Commission's intent.

> ➢ Part 4 of Form No. 715 requires transmission owners to "submit a detailed description of the transmission planning reliability criteria used to evaluate system performance for time frames an planning horizons used in regional and corporate planning;"

> ➢ Part 5 of Form No. 715 requires transmission owners to submit a detailed description of the Respondent's transmission planning assessment practices (including, but not limited to, how reliability criteria are applied and the steps taken in performing transmission planning studies); and

> ➢ Part 6 of Form No. 715 Part transmission owners to submit a detailed evaluation of the Respondent's anticipated system performance as

---

[129]   In the Notice of Proposed Rulemaking, the Commission interpreted the phrase "adequate to inform" as requiring the filing of the "fundamental information used and assumptions made by the transmitting utility to perform its planning and operating studies." 58 FR at 17548

[130]   Pub. L. No. 102-486, 106 Stat. 2276 (1992) codified in 16 U.S.C. § 824*l*.

[131]   Order No. 558, 58 FR 52420.

[132]   18 C.F.R. § 141.300

[133]   Order No. 558, 58 FR at 52425 (The Commission's intention is that transmitting utilities file the substantive criteria and planning procedures that they follow in the normal course of business.)

[134]   *Id.* at 52433 ("In addition to their regional criteria, Respondents must submit system specific planning criteria. Unless Respondents make such criteria publicly available, a potential user of the system will have little idea of system specific criteria that might limit transmission availability. As stated above, the Commission's intention is that transmitting utilities file the substantive criteria and planning procedures that they follow in the normal course of business.")

61

measured against its stated reliability criteria using its stated assessment practices.[135]

Once the transmission provider files its Form 715 criteria, PJM's Order Nos. 890 and 1000 compliant transmission planning process develops plans that meet all the needs arising the criteria in the Form No. 715. The Commission has said:

> PJM sets forth a coordinated, open, and transparent process for the consideration of needs driven solely by individual transmission owner Form No. 715 local planning criteria and projects to address those needs. Specifically, transmission needs driven solely by individual transmission owner Form No. 715 local planning criteria are identified through PJM's Order No. 890 and Order No. 1000-compliant transmission planning process set forth in sections 1.5.1 through 1.5.6 of Schedule 6 of the PJM Operating Agreement; such needs are subsequently posted for review and comment; and descriptions of projects to address transmission needs driven solely by individual transmission owner Form No. 715 local planning criteria are posted for review and comment, subject to further study, evaluation, and revision as based on comments received.[136]

The TO filing demonstrates that many transmitting utilities in PJM have failed to file their end of life planning criteria in compliance with the requirement to file planning criteria on Form No. 715. This failure to file end of life planning in the Form 715 has resulted in PJM TOs building billions of new transmission outside of the PJM regional planning process required by Order Nos. 890 and 1000, including the competitive processes required.

If End of Life planning is not part of PJM's planning criteria through the EOL OA changes approved by Stakeholders, it should be filed on Form No. 715. End of life planning criteria defines the point at which infrastructure is at risk of failure, and continued maintenance and/or refurbishment of the infrastructure is no longer a valid option to extend the life of the facilities consistent with Good Utility Practice and transmission planning criteria. Under end of

---

[135]     https://www.ferc.gov/filing-form-no-715-annual-transmission-planning-and-evaluation-report.

[136]     *PJM Interconnection, LLC,* 162 FERC ¶ 61033 at P 22 (2018).

life criteria, there are two decision points; (1) the facility is nearing its end of life, and 2) continued maintenance and operation risks negatively impacting reliability of the transmission system.  As is apparent from Supplemental Project spending for EOL projects, and the TO Filing, the TOs have criteria by which they make end of life determinations.  Thus, their end of life criteria should have been filed with the Commission with the Form No. 715 because they are "transmission planning reliability criteria used to evaluate system performance for time frames and planning horizons used in regional and corporate planning, (Part 4 of Form 715), "part of transmission planning assessment practices" (Part 5 of Form 715), "anticipated system performance as measured against its stated reliability criteria using its stated assessment practices" (Part 6 of Form 715), and followed in the normal course of the TOs' business.

The TO Filing, and other sources, demonstrate that the majority of the PJM transmitting utilities have not included their end of life criteria in their Form No. 715.  The TO Filing says only "some" Transmission Owners have included end of life planning criteria in their FERC Form No. 715.[137]  Similarly, the PJM Market Monitor confirmed that only "[s]ome Transmission Owners include end of life transmission projects in their Transmission Owner Form 715 Planning Criteria."[138]

Only some TOs have filed their end of life criteria in Form No. 715.[139]  Apparently certain TOs believe that a Transmission Owner can "chose[]" to include end of life replacement

---

[137]    TO Filing at 14.

[138]    2019 State of the Market Report for PJM, 2019, Monitoring Analytics, March 12, 2020, Volume 2 at 70.

[139]    As a result of the Commission's decision on Form No. 715 cost allocation, Dominion removed from its Form No. 715 criteria its end of life criteria for Transmission Facilities below 230 kV.

criteria in its FERC Form No. 715[140] even though the Commission's Order implementing the

Form No. 715 requirement did not address the requirement as voluntary.  Further, by not

including end of life planning criteria in its Form No. 715, the nonconforming Transmission

Owners can avoid competition for end of life projects.  Of course, if the Transmission Owner

includes end of life criteria in Form No. 715, then PJM plans for end of life projects as part of its

Order Nos. 890 and 1000 compliant transmission planning process.  In that case, such projects

would be planned by PJM and could be subject to competition.[141]  By withholding end of life

planning criteria from its Form No. 715 submission, the Transmission Owner can build end of

life projects without competition as a Supplemental Project – end of life projects are a subset of

Supplemental Projects.  In 2019, the PJM RTEP listed 383 in Supplemental Projects including

end of life projects.  Since 1999, the PJM RTEP has included $37.6 billion in Supplemental

Projects   With the ability to build such a significant level of transmission without competition,

it is not surprising that the TOs have chosen not to include its end of life planning criteria in

Form No. 715.[142]

---

[140]   *See* May 27, 2020 PJM Letter to Stakeholders --End of Life Conditions and Replacement Projects at 6, including as Exhibit D to TO Filing.

[141]   In many instances, however, these projects are directly assigned to the transmission owner because they are reliability projects needed within three years or less and thus categorized as 'immediate need reliability projects.'  Currently, PJM has no established practice requiring a transmission owner to advise PJM sufficiently in advance that a facility is reaching the end of its useful life, leaving it to the discretion of transmission owners who, because they will be assigned a project needed in three years or less, has an incentive to wait to inform PJM that a facility is reaching the end of it useful life.

[142]   See for example the Dominion example on page 6 of the Dominion presentation, *available at*, https://www.pjm.com/-/media/committees-groups/committees/pc/2020/20200512/20200512-item-12-dominion-planning-criteria-updates.ashx.

Document Accession #: 20200706-5238    Filed Date: 07/06/2020

## III.    CONCLUSION

As set forth fully above, the Commission should reject the TO Filing as unjust and

unreasonable and accept the Stakeholders Operating Agreement proposal filed in Docket No.

ER20-2038.  FurThesether the Commission should review the compliance by PJM Transmission

Owners with including end of life criteria in their Form No. 715 filings.

Respectfully submitted,

By: */s/ Michael R. Engleman*
Michael R. Engleman
Robert C. Fallon
Christina Switzer
Engleman Fallon, PLLC
1717 K Street, NW
Suite 900
Washington, DC 20006
202-464-1332
mengleman@efenergylaw.com
cswitzer@efenergylaw.com

***Counsel for LSP Transmission Holdings II,
LLC***

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document upon each person designated

on the official service list compiled by the Secretary in this proceeding.

Dated at Washington, DC this 6th day of July 2020.

By: */s/ Christina Switzer*

# Exhibit A

| UpgradeId | SubRegion | Description | ProjectType | Voltage | Cost Estimate ($million) | TransmissionOwner | State | Equipment | Task |
|---|---|---|---|---|---|---|---|---|---|
| s0555 | West | Rebuild the Jug - Kirk 345kV single circuit line as a double circuit line. One side will remain 345kV between Jug and Kirk 345/138kV stations while the other side will be strung as a new 138kV circuit to pick up new customers | Supplemental | 345/138 | $41 | AEP | OH | Transmission Line (Double Circuit) | Rebuild |
| s1191 | West | Rebuild the Corridor – Jug Street 345 kV line as a double circuit line with one side served at 345 kV and the other at 138 kV to provide a third source to Jug Street station. | Supplemental | 345/138 | $28 | AEP | OH | Transmission Line | Rebuild |
| s2054 | Mid-Atlantic | Rebuild and reconductor approximately 33.0 miles of the Armstrong – Homer City 345 kV Line, of wood pole construction | Supplemental | 345 | $138 | PENELEC | PA | Transmission Line | Rebuild |
| s0645 | West | Reconductor 13 miles of the Kammer - West Bellaire 345 kV circuit | Supplemental | 345 | $20 | AEP | OH | Transmission Line | Reconductor |
| s1267 | Mid-Atlantic | Replace underground submarine cables portion of the Brandon Shores - Riverside 230 kV circuits #2344 and #2345 with overhead conductors on towers | Supplemental | 230 | $236 | BGE | MD | Transmission Line | Replace |
| s0291 | Mid-Atlantic | Replace the V-2222 (Hillsdale to New Milford) circuit | Supplemental | 230 | $36 | PSEG | NJ | Transmission Line | Replace |
| s0569 | Mid-Atlantic | Rebuild approximately 10 miles of an existing 230kV double circuit tower line extending from Burtonsville to Takoma substation | Supplemental | 230 | $34 | PEPCO | MD | Transmission Line | Replace |
| s0951.2 | Mid-Atlantic | Rebuild Brunner Island - South Manheim 230 kV (17.8 mi) | Supplemental | 230 | $31 | PPL | PA | Transmission Line | Rebuild |
| s0945.8 | Mid-Atlantic | Rebuild the Juniata - Cumberland 230 kV Line (14.2 mi) | Supplemental | 230 | $31 | PPL | PA | Transmission Line | Rebuild |
| s0232 | Mid-Atlantic | Rebuild Manor – Graceton 230 kV line | Supplemental | 230 | $28 | PPL | PA | Transmission Line | Rebuild |
| s1455 | Mid-Atlantic | Rebuild line 23070 circuit between Cool Spring and Indian River 230 kV substations. All structures, conductor, and static wire will be replaced with new steel poles, conductor, and OPGW | Supplemental | 230 | $28 | DPL | DE | Transmission Line | Rebuild |
| s1100 | Mid-Atlantic | Rebuild the existing Foxhill-Shawnee 230 kV line (Approximately 8.25 Miles). | Supplemental | 230 | $25 | PPL | PA | Transmission Line | Rebuild |
| s0290 | Mid-Atlantic | Replace the J-2236 (New Milford to Maywood) circuit | Supplemental | 230 | $23 | PSEG | NJ | Transmission Line | Replace |
| s0955.5 | Mid-Atlantic | Rebuild West Hempfield - Manor 2 230 kV line (9.1 mi) | Supplemental | 230 | $23 | PPL | PA | Transmission Line | Rebuild |
| s0819 | Mid-Atlantic | Rebuild approximately 15.3 miles of the Red Lion - Cedar Creek 230 kV circuit '23030' | Supplemental | 230 | $21 | DPL | DE | Transmission Line | Rebuild |
| s0948.1 | Mid-Atlantic | Rebuild Hummelstown - Middletown Junction #1 230 kV line (7 mi) | Supplemental | 230 | $19 | PPL | PA | Transmission Line | Rebuild |
| s0233 | Mid-Atlantic | Rebuild Otter Creek – Conastone 230 kV line | Supplemental | 230 | $19 | PPL | PA | Transmission Line | Rebuild |
| s0273 | Mid-Atlantic | Rebuild Hosensack – Wescosville # 3 230 kV line | Supplemental | 230 | $18 | PPL | PA | Transmission Line | Rebuild |
| s0948.2 | Mid-Atlantic | Rebuild Hummelstown - Steelton 230 kV line (6.8 mi) | Supplemental | 230 | $18 | PPL | PA | Transmission Line | Rebuild |
| s0274 | Mid-Atlantic | Rebuild Martins Creek – Siegfried # 2 230 kV line | Supplemental | 230 | $16 | PPL | PA | Transmission Line | Rebuild |
| s1838.2 | South | Re-conductor 230 kV Line No.227 Cochran Mill – Ashburn and Ashburn – Beaumeade line | Supplemental | 230 | $15 | Dominion | VA | Transmission Line | Reconductor |
| s0275 | Mid-Atlantic | Rebuild Whitpain – Buxmont 230 kV line | Supplemental | 230 | $13 | PPL | PA | Transmission Line | Rebuild |
| s0493 | Mid-Atlantic | Reconductor the Susquehanna - Harwood 230 kV circuits #1 and #2 | Supplemental | 230 | $11 | PPL | PA | Transmission Line | Reconductor |
| s1718 | West | Rebuild Holloway-Nottingham-Knox 138 kV line | Supplemental | 138 | $170 | ATSI | OH | Transmission Line | Rebuild |
| s2014 | West | Rebuild the 62 mile College Corner – Jay 138 kV line as single circuit 138 kV. New conductor will be 795 ACSR. | Supplemental | 138 | $114 | AEP | IN | Transmission Line | Rebuild |
| s1599.1 | West | Rebuild two 138kV transmission lines between Hillsboro and Hutchings Tap as double circuit construction. Construct the 19-mile AEP segment from Middleboro to Hutchings Tap as a single circuit line using 954 ACSR conductor. | Supplemental | 138 | $113 | AEP | OH | Transmission Line | Rebuild |
| s0320 | West | Rebuild aging double circuit 138 kV tower line between Brunot Island and Crescent substations with 138 kV tower line. | Supplemental | 138 | $105 | DL | PA | Transmission Line | Rebuild |
| s1070 | West | Rebuild the South Bluefield – Bland – Wythe 69kV line to 138kV operation. Re-route the Wythe termination point into the Progress Park station and terminated into a single 138kV circuit breaker. Rebuil | Supplemental | 138 | $100 | AEP | VA | Transmission Line | Rebuild |
| s1336 | West | Rebuild approximately 65 miles of 138 kV double circuit tower line between Twin Branch and Robison Park stations using 795 ACSR overhead conductor (251 MVA rating). | Supplemental | 138 | $99 | AEP | IN | Transmission Line | Rebuild |
| s2189 | West | Rebuild ~27.8 miles of the existing Baileysville – Hales Branch 138kV circuit. | Supplemental | 138 | $99 | AEP | VA; WV | Transmission Line | Rebuild |
| S1622.1 | West | Rebuild the roughly 43 miles from the Twin Branch to Riverside station with double circuit 138kV 1033.5 ACSR (296 MVA rating). | Supplemental | 138 | $94 | AEP | IN; MI | Transmission Line | Rebuild |
| s2201.1 | West | Rebuild 43.4 miles single circuit line between Hillsboro – South Lucasville with 1033 ACSR. | Supplemental | 138 | $93 | AEP | OH | Transmission Line | Rebuild |
| S1495.1 | West | Rebuild ~32 miles of the Delaware – Sorenson & Sorenson – Deer Creek 138kV double circuit line using 795ACSR (257 MVA rating). | Supplemental | 138 | $83 | AEP | IN | Transmission Line | Rebuild |

| ID | Region | Description | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| s1201 | West | Rebuild West Mount Vernon-South Kenton 138kV Line between West Mount Vernon and North Waldo (477ACSR). | Supplemental | 138 | $70 | AEP | OH | Transmission Line | Rebuild |
| s2021.3 | West | Rebuild the ~38.5 mile Jay – Allen 138 kV line from Pennville to the juncture west of Allen station. This line is a single circuit 138 kV line using 795 ACSR. | Supplemental | 138 | $70 | AEP | IN | Transmission Line | Rebuild |
| s1487 | West | Rebuild 54.4 miles of line between Harrison and Poston 138kV stations with 1033 ACSR (296 MVA rating) and steel poles | Supplemental | 138 | $62 | AEP | OH | Transmission Line | Rebuild |
| s1855.1 | West | Rebuild ~19.8 miles of the Deer Creek – Delaware double circuit 138 kV line from structure 16 to structure 127 | Supplemental | 138 | $56 | AEP | IN | Transmission Line | Rebuild |
| S1498.1 | West | Rebuild the ~19 miles of the Delaware – Madison double circuit 138kV line utilizing double circuit 556.5 ACSR 26/7 (SN:204 SE:284 WN: 258 WE: 319) | Supplemental | 138 | $54 | AEP | IN | Transmission Line | Rebuild |
| s1425 | West | Rebuild the Carrollton-Sunnyside 138kV circuit. Install double-circuit steel poles with 6-wired 1234 ACSS/TW Yukon conductor. Future circuit rating = 335 MVA SN / 392 MVA SE (non-conductor limited). | Supplemental | 138 | $50 | AEP | OH | Transmission Line | Rebuild |
| s2092.1 | West | Rebuild 16.5 miles of the Deer Creek - Makahoy 138 kV line using 795 ACSR Drake conductor. Rebuild 3.9 miles of the Deer Creek - Makahoy 138 kV line as double circuit using 795 ACSR Drake conductor west from Deer Creek. Operate as double circuit to allow for bringing the Grant line into Deer Creek eliminating the 3 terminal line. | Supplemental | 138 | $46 | AEP | IN | Transmission Line | Rebuild |
| s1611.5 | West | Rebuild existing double circuit  South Bend - New Carlisle 138 kV line asset with 795 ACSR (257 MVA rating), approximately 18.74 miles. | Supplemental | 138 | $45 | AEP | IN | Transmission Line | Rebuild |
| s2186 | West | Rebuild the existing 138kV line with 19.4 miles of new 1033 ACSR. | Supplemental | 138 | $42 | AEP | OH | Transmission Line | Rebuild |
| s1859 | West | Rebuild the 29-mile Gable-Carrollton 138 kV circuit. Remove doublecircuit lattice towers with 6-wired 200 kcmil CU. Install double-circuit steel poles with 6-wired 1234 ACSS/TW Yukon conductor. | Supplemental | 138 | $42 | AEP | OH | Transmission Line | Rebuild |
| S1621.1 | West | Rebuild the 138kV line from Waverly to Adams utilizing 1033.5 ACSR (296  MVA).  The rebuild will begin at structure 22 west of Waverly where the line changes to the Waverly-Ross line and continue 24.3 miles to Adams Substation. The remaining 3.1-mile section from structure 22 to Waverly is newer double ckt construction and was not identified for renewal at this time. Remove old line after rebuild complete. | Supplemental | 138 | $42 | AEP | OH | Transmission Line | Rebuild |
| s0289 | Mid-Atlantic | Replace the M-1339-1 (Bergen to Saddle Brook) circuit | Supplemental | 138 | $37 | PSEG | NJ | Transmission Line | Replace |
| s0821 | Mid-Atlantic | Rebuild the  Church - Steele 138 kV circuit ' 13701' | Supplemental | 138 | $36 | DPL | MD | Transmission Line | Rebuild |
| s2192.1 | West | Rebuild 11.6 mile section of the Reusens-Altavista 138 kV line asset from Reusens to New London.  Approximately 5.5 miles consists of double circuit 138 kV construction and approximately 6 miles consists of single circuit 138 kV construction between Reusens and New London. | Supplemental | 138 | $36 | AEP | VA | Transmission Line | Rebuild |
| s0687 | Mid-Atlantic | Reconductor the N-1366 (Doremus Place - Newark Sw. 138 kV circuit) | Supplemental | 138 | $36 | PSEG | NJ | Transmission Line | Reconductor |
| s2058 | West | Rebuild 12 miles of the Allen – Robison Park double circuit 138 kV line using 795 ACSR Drake conductor. | Supplemental | 138 | $35 | AEP | IN | Transmission Line | Rebuild |
| s0294 | Mid-Atlantic | Replace the L-1364 (Kuller Road to Fairlawn) circuit | Supplemental | 138 | $35 | PSEG | NJ | Transmission Line | Replace |
| s2201.2 | West | Rebuild 8.5 miles double circuit between Millbrook Park – South Lucasville with 1033 ACSR. | Supplemental | 138 | $34 | AEP | OH | Transmission Line | Rebuild |
| s0288 | Mid-Atlantic | Replace the Bergen to East Rutherford portion of the R-1344 circuit | Supplemental | 138 | $33 | PSEG | NJ | Transmission Line | Replace |
| s2190 | West | Rebuild approximately 15 miles of the AEP-owned portion of the 138 kV line between Fieldale and Dan River stations (AEP/Duke ownership changes at the VA/NC border). | Supplemental | 138 | $32 | AEP | VA | Transmission Line | Rebuild |
| s0292 | Mid-Atlantic | Replace the M-1339-3 (Saddle Brook to Fairlawn) circuit | Supplemental | 138 | $31 | PSEG | NJ | Transmission Line | Replace |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| s1801 | West | Hanna-Newton Falls 138 kV Line * Rebuild/reconductor ~20 miles of the existing Hanna-Newton Falls 138 kV Line with 795 ACSR (existing conductor 477 ACSR and 605 ACSR) Hanna 138 kV Substation - Terminal equipment to be replaced includes: * Circuit breaker B4, CCVT's, disconnect switches, line relaying, and line metering Newton Falls 138 kV Substation - Terminal equipment to be replaced includes: * Substation conductor, disconnect switches, and line relaying * Existing line rating: 169 MVA SN / 208 MVA SE * New line rating: 275 MVA SN / 333 MVA SE | Supplemental | 138 | $29 | ATSI | OH | Transmission Line | Rebuild |
| S1497.1 | West | Rebuild ~16.6 miles of the Baileysville-Bolt line with 795 ACSR conductor to 138 kV standards (energized at 46 kV, 86 MVA rating). Existing ROW will be used when possible but supplemental ROW may be needed in order to build to 138kV standards. ADSS will be installed on the new line | Supplemental | 138 | $26 | AEP | WV | Transmission Line | Rebuild |
| S1563.2 | West | North Delphos – Rockhill 138kV: Rebuild 15.4 miles of double circuit 138kV line utilizing 1033 ACSR 1033 ACSR conductor (296 MVA rating) | Supplemental | 138 | $25 | AEP | OH | Transmission Line | Rebuild |
| s0978 | Mid-Atlantic | Rebuild the 1404 and 1405 138 kV double circuit from Deepwater – Upper Pittsgrove (17.47 mi) | Supplemental | 138 | $24 | AEC | NJ | Transmission Line (Double Circuit) | Rebuild |
| S1621.2 | West | Rebuild two independent lines, less than 1/2 mile apart between Seaman and Adams, one 138kV and one 69kV, as a double circuit for approximately 8.5 miles using 1033.5 ACSR. Remove old lines after rebuild complete.  There will also need to be a short single ckt tap for Lawshe 69kV. | Supplemental | 138 | $23 | AEP | OH | Transmission Line | Rebuild |
| s1700 | West | Angola-Eber-Vulcan 138 kV Three-Terminal Line Elimination Project | Supplemental | 138 | $21 | ATSI | OH | Transmission Line | Rebuild |
| s0293 | Mid-Atlantic | Replace the S-1345 Athenia to East Rutherford | Supplemental | 138 | $20 | PSEG | NJ | Transmission Line | Replace |
| s1479 | West | Rebuild Lemoyne-Midway 138 kV line with 477 kcmil ACSS (24.5 miles) | Supplemental | 138 | $19 | ATSI | OH | Transmission Line | Rebuild |
| s1323 | West | Rebuild 16.62 miles of  the Hocking-Poston 138 kV line with 1033 ACSR (296 MVA rating) on steel poles. | Supplemental | 138 | $17 | AEP | OH | Transmission Line | Rebuild |
| S1622.2 | West | Rebuild the 6 mile double circuit Benton Harbor 138kV extension with double circuit 138kV 1033.5 ACSR. | Supplemental | 138 | $17 | AEP | MI | Transmission Line | Rebuild |
| s0782 | West | Rebuild the Allen Junction - East Fayette (AJ - Lyons) 138 kV line | Supplemental | 138 | $17 | ATSI | OH | Transmission Line | Rebuild |
| S1622.3 | West | Rebuild the 5 mile double circuit Hickory Creek 138kV Extension with double circuit 138kV 1033.5 ACSR. | Supplemental | 138 | $17 | AEP | MI | Transmission Line | Rebuild |
| s1485 | West | Rebuild 5.8 miles of feeder between Warren and Nickel 138kV substations with 76 new structures, hardware, and conductor.  Capacity of the line will increase from 198MVA to 300MVA | Supplemental | 138 | $15 | DEOK | OH | Transmission Line | Rebuild |
| s0822 | Mid-Atlantic | Rebuild the Hares Corner – Red Lion 138 kV circuit ' 13812 ' | Supplemental | 138 | $12 | DPL | DE | Transmission Line | Rebuild |
| s1702 | West | Lemoyne-Woodville-Fostoria 138 kV Four-Terminal Line Elimination Project | Supplemental | 138 | $11 | ATSI | OH | Transmission Line | Rebuild |
| s0960 | Mid-Atlantic | Rebuild  the underground cable sections of Wescosville - Central Allentown #2 (1.3 mi) and Allentown - Central Allentown #1 & #2 (0.8 mi) 138 kV lines | Supplemental | 138 | $11 | PPL | PA | Transmission Line (Underground) | Rebuild |
| s1698 | West | Richland-Wauseon-Midway 138 kV Three-Terminal Line Elimination Project | Supplemental | 138 | $11 | ATSI | OH | Transmission Line | Rebuild |
| s1672 | Mid-Atlantic | Rebuild Seward-Glory-Piney 115 kV line: rebuild ~66 miles of 115 kV line using double circuit 230 kV construction, install 1033 ACSR conductor (six-wired) energized at 115 kV. | Supplemental | 115 | $200 | PENELEC | PA | Transmission Line | Rebuild |
| s1725.1 | Mid-Atlantic | Loop the Hunterstown – Lincoln (963) 115 kV line ~9 miles into Orrtanna substation | Supplemental | 115 | $31 | ME | PA | Transmission Line | Rebuild |
| s2209 | Mid-Atlantic | Rebuild two single circuit 115kV wood h-frame circuits (110617/110618) as one double circuit steel pole line | Supplemental | 115 | $21 | BGE | MD | Transmission Line | Rebuild |
| s1154 | Mid-Atlantic | Reconductor the PPL portion (8.5 miles) of the Face Rock - Five Forks 115 kV tie-line as a 3-conductor line with a modern high capacity conductor. Evaluate all lattice steel towers for condition and determine structure member repair and remediation | Supplemental | 115 | $20 | PPL | PA | Transmission Line | Reconductor |
| s1391 | South | Rebuild Hickory Grove (MEC), 115kV Line #31 (to be #1022), 8.25 miles | Supplemental | 115 | $15 | Dominion | VA | Transmission Line | Rebuild |
| s1399 | South | Rebuild Mt. Jackson (SVEC), 115kV Line #128, 0.05 mile | Supplemental | 115 | $13 | Dominion | VA | Transmission Line | Rebuild |
| s0625 | South | Redhouse Tap (Sugar Hill and Hancock) (SEC), 115 kV Line 84, 5.2 miles | Supplemental | 115 | $12 | Dominion | VA | Transmission Line | Rebuild |

| | |
|---|---|
| Total | $3,488 |

Document Accession #: 20200706-5238    Filed Date: 07/06/2020

# Exhibit B

JA0282

*Regional benefits of substations*

Version 16.1.0

Effective Date: January 1, 2018

**Atlantic City Electric Company (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0281.2 | Install 15 MVAR capacitor at Shipbottom 69 kV substation | | AEC (100%) |
| b0281.3 | Install 8 MVAR capacitors on the AE distribution system | | AEC (100%) |
| b0142 | Reconductor Landis – Minotola 138 kV | | AEC (100%) |
| b0143 | Reconductor Beckett – Paulsboro 69 kV | | AEC (100%) |
| b0210 | Install a new 500/230kV substation in AEC area. The high side will be tapped on the Salem - East Windsor 500kV circuit and the low side will be tapped on the Churchtown - Cumberland 230kV circuit. | | **Load-Ratio Share Allocation:** AEC (1.66%) / AEP (14.16%) / APS (5.73%) / ATSI (7.88%) / BGE (4.22%) / ComEd (13.31%) / Dayton (2.11%) / DEOK (3.29%) / DL (1.75%) / DPL (2.50%) / Dominion (12.86%) / EKPC (1.87%) / JCPL (3.74%) / ME (1.90%) / NEPTUNE* (0.44%) / PECO (5.34%) / PENELEC (1.89%) / PEPCO (3.99%) / PPL (4.84%) / PSEG (6.26%) / RE (0.26%) |
| | | | **DFAX Allocation:** AEC (63.29%) / JCPL (36.71%) |
| b0210.1 | Orchard – Cumberland – Install second 230 kV line | | AEC (65.23%) / JCPL (25.87%) / Neptune * (2.55%) / PSEG (6.35%)†† |
| b0210.2 | Install a new 500/230kV substation in AEC area, the high side will be tapped on the Salem - East Windsor 500kV circuit and the low side will be tapped on the Churchtown - Cumberland 230kV circuit. | | AEC (65.23%) / JCPL (25.87%) / Neptune* (2.55%) / PSEG (6.35%)†† |

\* Neptune Regional Transmission System, LLC
\*\*East Coast Power, L.L.C
†Cost allocations associated with Regional Facilities and Necessary Lower Voltage Facilities associated with the project
††Cost allocations associated with below 500 kV elements of the project

The Annual Revenue Requirement associated with the Transmission Enhancement Charges are set forth and determined in Appendix A to Attachment H-1.

JA0283

Version 16.2.0

Effective Date: January 1, 2019

**Atlantic City Electric Company (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0281.2 | Install 15 MVAR capacitor at Shipbottom 69 kV substation | | AEC (100%) |
| b0281.3 | Install 8 MVAR capacitors on the AE distribution system | | AEC (100%) |
| b0142 | Reconductor Landis – Minotola 138 kV | | AEC (100%) |
| b0143 | Reconductor Beckett – Paulsboro 69 kV | | AEC (100%) |
| b0210 | Install a new 500/230kV substation in AEC area. The high side will be tapped on the Salem - East Windsor 500kV circuit and the low side will be tapped on the Churchtown - Cumberland 230kV circuit. | | **Load-Ratio Share Allocation:** AEC (1.61%) / AEP (14.10%) / APS (5.79%) / ATSI (7.95%) / BGE (4.11%) / ComEd (13.24%) / Dayton (2.07%) / DEOK (3.22%) / DL (1.73%) / DPL (2.48%) / Dominion (13.17%) / EKPC (2.13%) / JCPL (3.71%) / ME (1.88%) / NEPTUNE* (0.42%) / PECO (5.34%) / PENELEC (1.86%) / PEPCO (3.98%) / PPL (4.76%) / PSEG (6.19%) / RE (0.26%)  **DFAX Allocation:** AEC (100%) |
| b0210.1 | Orchard – Cumberland – Install  second 230 kV line | | AEC (65.23%) / JCPL (25.87%) / Neptune * (2.55%) / PSEG (6.35%)†† |
| b0210.2 | Install a new 500/230kV substation in AEC area, the high side will be tapped on the Salem - East Windsor 500kV circuit and the low side will be tapped on the Churchtown - Cumberland 230kV circuit. | | AEC (65.23%) / JCPL (25.87%) / Neptune* (2.55%) / PSEG (6.35%)†† |

* Neptune Regional Transmission System, LLC
**East Coast Power, L.L.C.
†Cost allocations associated with Regional Facilities and Necessary Lower Voltage Facilities
    associated with the project
††Cost allocations associated with below 500 kV elements of the project

The Annual Revenue Requirement associated with the Transmission Enhancement Charges are set forth and determined in Appendix A to Attachment H-1.

JA0284

USCA Case #21-1246       Document #1962371         Filed: 09/06/2022        Page 295 of 602

Version 17.1.0

Effective Date: January 1, 2020

**Atlantic City Electric Company (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0281.2 | Install 15 MVAR capacitor at Shipbottom 69 kV substation | | AEC (100%) |
| b0281.3 | Install 8 MVAR capacitors on the AE distribution system | | AEC (100%) |
| b0142 | Reconductor Landis – Minotola 138 kV | | AEC (100%) |
| b0143 | Reconductor Beckett – Paulsboro 69 kV | | AEC (100%) |
| b0210 | Install a new 500/230kV substation in AEC area.  The high side will be tapped on the Salem - East Windsor 500kV circuit and the low side will be tapped on the Churchtown - Cumberland 230kV circuit. | | **Load-Ratio Share Allocation:** AEC (1.72%) / AEP (14.18%) / APS (6.05%) / ATSI (7.92%) / BGE (4.23%) / ComEd (13.20%) / Dayton (2.05%) / DEOK (3.18%) / DL (1.68%) / DPL (2.58%) / Dominion (12.56%) / EKPC (1.94%) / JCPL (3.82%) / ME (1.88%) / NEPTUNE* (0.42%) / OVEC (0.08%) / PECO (5.31%) / PENELEC (1.90%) / PEPCO (3.90%) / PPL (5.00%) / PSEG (6.15%) / RE (0.25%) |
| | | | **DFAX Allocation:** AEC (100%) |
| b0210.1 | Orchard – Cumberland – Install  second 230 kV line | | AEC (65.23%) / JCPL (25.87%) / Neptune * (2.55%) / PSEG (6.35%)†† |
| b0210.2 | Install a new 500/230kV substation in AEC area, the high side will be tapped on the Salem - East Windsor 500kV circuit and the low side will be tapped on the Churchtown - Cumberland 230kV circuit. | | AEC (65.23%) / JCPL (25.87%) / Neptune* (2.55%) / PSEG (6.35%)†† |

\* Neptune Regional Transmission System, LLC
\*\*East Coast Power, L.L.C.
†Cost allocations associated with Regional Facilities and Necessary Lower Voltage Facilities
      associated with the project
††Cost allocations associated with below 500 kV elements of the project

The Annual Revenue Requirement associated with the Transmission Enhancement Charges are
set forth and determined in Appendix A to Attachment H-1.

Document Accession #: 20200706-5238     Filed Date: 07/06/2020

Version 17.1.0

Effective Date: January 1, 2020

## Atlantic City Electric Company (cont.)

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0211 | Reconductor Union - Corson 138kV circuit | | AEC (65.23%) / JCPL (25.87%) / Neptune* (2.55%) / PSEG (6.35%) |
| b0212 | Substation upgrades at Union and Corson 138kV | | AEC (65.23%) / JCPL (25.87%) / Neptune* (2.55%) / PSEG (6.35%) |
| b0214 | Install 50 MVAR capacitor at Cardiff 230kV substation | | AEC (100%) |
| b0431 | Monroe Upgrade New Freedom strand bus | | AEC (100%) |
| b0576 | Move the Monroe 230/69 kV to Mickleton | | AEC (100%) |
| b0744 | Upgrade a strand bus at Mill 138 kV | | AEC (100%) |
| b0871 | Install 35 MVAR capacitor at Motts Farm 69 kV | | AEC (100%) |
| b1072 | Modify the existing EMS load shedding scheme at Cedar to additionally sense the loss of both Cedar 230/69 kV transformers and shed load accordingly | | AEC (100%) |
| b1127 | Build a new Lincoln-Minitola 138 kV line | | AEC (100%) |
| b1195.1 | Upgrade the Corson sub T2 terminal | | AEC (100%) |
| b1195.2 | Upgrade the Corson sub T1 terminal | | AEC (100%) |

JA0286

Version 10.2.0
Effective Date: January 1, 2018

**Baltimore Gas and Electric Company (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1253 | Replace the existing Northeast 230/115 kV transformer #3 with 500 MVA | | BGE (100%) |
| b1253.1 | Replace the Northeast 230 kV breaker '2317/315' | | BGE (100%) |
| b1253.2 | Revise reclosing on Windy Edge 115 kV breaker '110515' | | BGE (100%) |
| b1253.3 | Revise reclosing on Windy Edge 115 kV breaker '110516' | | BGE (100%) |
| b1253.4 | Revise reclosing on Windy Edge 115 kV breaker '110517' | | BGE (100%) |
| b1254 | Build a new 500/230 kV substation (Emory Grove) | | APS (4.07%) / BGE (53.19%) / ComEd (3.71%) / Dayton (0.50%) / Dominion (16.44%) / PENELEC (0.59%) / PEPCO (21.50%) |
| b1254.1 | Bundle the Emory – North West 230 kV circuits | | BGE (100%) |
| b1267 | Rebuild existing Erdman 115 kV substation to a dual ring-bus configuration to enable termination of new circuits | | BGE (100%) |
| b1267.1 | Construct 115 kV double circuit underground line from existing Coldspring to Erdman substation | | BGE (100%) |
| b1267.2 | Replace Mays Chapel 115 kV breaker '110515A' | | BGE (100%) |
| b1267.3 | Replace Mays Chapel 115 kV breaker '110579C' | | BGE (100%) |

**Baltimore Gas and Electric Company (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0497 | Install a second Conastone – Graceton 230 kV circuit | | AEC (9.00%) / DPL (16.85%) / JCPL (9.64%) / ME (1.48%) / Neptune* (0.95%) / PECO (30.79%) / PPL (16.41%) / ECP** (0.29%) / PSEG (14.07%) / RE (0.52%) |
| b0497.1 | Replace Conastone 230 kV breaker #4 | | BGE (100%) |
| b0497.2 | Replace Conastone 230 kV breaker #7 | | BGE (100%) |
| b0500.2 | Replace wavetrap and raise operating temperature on Conastone – Otter Creek 230 kV line to 165 deg | | AEC (6.27%) / DPL (8.65 %) / JCPL (14.54%) / ME (10.59%) / Neptune* (1.37%) / PECO (15.66%) / PPL (21.02%) / ECP** (0.57%) / PSEG (20.56%) / RE (0.77%) |
| b0512.33 | MAPP Project Install new Hallowing Point – Calvert Cliffs 500 kV circuit and associated substation work at Calvert Cliffs substation | | AEC (1.72%) / AEP (14.18%) / APS (6.05%) / ATSI (7.92%) / BGE (4.23%) / ComEd (13.20%) / Dayton (2.05%) / DEOK (3.18%) / DL (1.68%) / DPL (2.58%) / Dominion (12.56%) / EKPC (1.94%) / JCPL (3.82%) / ME (1.88%) / NEPTUNE* (0.42%) / OVEC (0.08%) / PECO (5.31%) / PENELEC (1.90%) / PEPCO (3.90%) / PPL (5.00%) / PSEG (6.15%) / RE (0.25%) |

* Neptune Regional Transmission System, LLC

Effective Date: January 1, 2018

## SCHEDULE 12 – APPENDIX

(3)    **Delmarva Power & Light Company**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0144.1 | Build new Red Lion – Milford – Indian River 230 kV circuit | | DPL (100%) |
| b0144.2 | Indian River Sub – 230 kV Terminal Position | | DPL (100%) |
| b0144.3 | Red Lion Sub – 230 kV Terminal Position | | DPL (100%) |
| b0144.4 | Milford Sub – (2) 230 kV Terminal Positions | | DPL (100%) |
| b0144.5 | Indian River – 138 kV Transmission Line to AT-20 | | DPL (100%) |
| b0144.6 | Indian River – 138 & 69 kV Transmission Ckts. Undergrounding | | DPL (100%) |
| b0144.7 | Indian River – (2) 230 kV bus ties | | DPL (100%) |
| b0148 | Re-rate Glasgow – Mt. Pleasant 138 kV and North Seaford – South Harrington 138 kV | | DPL (100%) |
| b0149 | Complete structure work to increase rating of Cheswold – Jones REA 138 kV | | DPL (100%) |
| b0221 | Replace disconnect switch on Edgewood-N. Salisbury 69 kV | | DPL (100%) |
| b0241.1 | Keeny Sub – Replace overstressed breakers | | DPL (100%) |
| b0241.2 | Edgemoor Sub – Replace overstressed breakers | | DPL (100%) |
| b0241.3 | Red Lion Sub – Substation reconfigure to provide for second Red Lion 500/230 kV transformer | | DPL (84.5%) / PECO (15.5%) |
| b0261 | Replace 1200 Amp disconnect switch on the Red Lion – Reybold 138 kV circuit | | DPL (100%) |

Effective Date: January 1, 2018

### (5) Mid-Atlantic Interstate Transmission, LLC for the Metropolitan Edison Company Zone

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1366 | Reconductor the Collins – Cly – Newberry 115 kV (975) line 5 miles with 795 ACSR | | ME (100%) |
| b1727 | Reconductor 2.4 miles of existing 556 and 795 ACSR from Harley Davidson to Pleasureville 115 kV with 795 ACSS to raise the ratings | | ME (100%) |
| b1800 | Install a 500 MVAR SVC at the existing Hunterstown 500kV substation | | **Load-Ratio Share Allocation:** AEC (1.66%) / AEP (14.16%) / APS (5.73%) / ATSI (7.88%) / BGE (4.22%) / ComEd (13.31%) / Dayton (2.11%) / DEOK (3.29%) / DL (1.75%) / DPL (2.50%) / Dominion (12.86%) / EKPC (1.87%) / JCPL (3.74%) / ME (1.90%) / NEPTUNE* (0.44%) / PECO (5.34%) / PENELEC (1.89%) / PEPCO (3.99%) / PPL (4.84%) / PSEG (6.26%) / RE (0.26%)<br><br>**DFAX Allocation:** APS (0.01%) / DPL (55.56%) / ME (44.42%) / PSEG (0.01%) |
| b1801 | Build a 250 MVAR SVC at Altoona 230 kV | | AEC (6.47%) / AEP (2.58%) / APS (6.88%) / BGE (6.57%) / DPL (12.39%) / Dominion (14.89%) / JCPL (8.14%) / ME (6.21%) / Neptune* (0.82%) / PECO (21.56%) / PPL (4.89%) / PSEG (8.18%) / RE (0.33%) / ECP** (0.09%) |

JA0290

## SCHEDULE 12 – APPENDIX

**(7) Mid-Atlantic Interstate Transmission, LLC for the Pennsylvania Electric Company Zone**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0284.1 | Build 500 kV substation in PENELEC – Tap the Keystone – Juniata and Conemaugh – Juniata 500 kV, connect the circuits with a breaker and half scheme, and install new 400 MVAR capacitor | | AEC (1.66%) / AEP (14.16%) / APS (5.73%) / ATSI (7.88%) / BGE (4.22%) / ComEd (13.31%) / Dayton (2.11%) / DEOK (3.29%) / DL (1.75%) / DPL (2.50%) / Dominion (12.86%) / EKPC (1.87%) / JCPL (3.74%) / ME (1.90%) / NEPTUNE* (0.44%) / PECO (5.34%) / PENELEC (1.89%) / PEPCO (3.99%) / PPL (4.84%) / PSEG (6.26%) / RE (0.26%) |
| b0284.3 | Replace wave trap and upgrade a bus section at Keystone 500 kV – on the Keystone – Airydale 500 kV | | AEC (1.66%) / AEP (14.16%) / APS (5.73%) / ATSI (7.88%) / BGE (4.22%) / ComEd (13.31%) / Dayton (2.11%) / DEOK (3.29%) / DL (1.75%) / DPL (2.50%) / Dominion (12.86%) / EKPC (1.87%) / JCPL (3.74%) / ME (1.90%) / NEPTUNE* (0.44%) / PECO (5.34%) / PENELEC (1.89%) / PEPCO (3.99%) / PPL (4.84%) / PSEG (6.26%) / RE (0.26%) |

\* Neptune Regional Transmission System, LLC
\*\* East Coast Power, L.L.C.
\*\*\*Hudson Transmission Partners, LLC

Document Accession #: 20200706-5238     Filed Date: 07/06/2020
USCA Case #21-1246     Document #1962371     Filed: 09/06/2022     Page 302 of 602

Version 22.1.0

Effective Date: January 1, 2019

**Mid-Atlantic Interstate Transmission, LLC for the Pennsylvania Electric Company Zone (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1607 | Reconductor the New Baltimore - Bedford North 115 kV | | PENELEC (100%) |
| b1608 | Construct a new 345/115 kV substation and loop the Mansfield - Everts 115 kV | | APS (8.61%) / PECO (1.72%) / PENELEC (89.67%) |
| b1609 | Construct Four Mile Junction 230/115 kV substation. Loop the Erie South - Erie East 230 kV line, Buffalo Road - Corry East and Buffalo Road - Erie South 115 kV lines | | APS (4.86%) / PENELEC (95.14%) |
| b1610 | Install a new 230 kV breaker at Yeagertown | | PENELEC (100%) |
| b1713 | Install a 345 kV breaker at Erie West and relocate Ashtabula 345 kV line | | PENELEC (100%) |
| b1769 | Install a 75 MVAR cap bank on the Four Mile 230 kV bus | | PENELEC (100%) |
| b1770 | Install a 50 MVAR cap bank on the Buffalo Road 115 kV bus | | PENELEC (100%) |
| b1802 | Build a 100 MVAR Fast Switched Shunt and 200 MVAR Switched Shunt at Mansfield 345 kV | | AEC (6.47%) / AEP (2.58%) / APS (6.88%) / BGE (6.57%) / / DPL (12.39%) / Dominion (14.89%) / JCPL (8.14%) / ME (6.21%) / NEPTUNE* (0.82%) / PECO (21.56%) / PPL (4.89%) / PSEG (8.18%) / RE (0.33%) / ECP** (0.09%) |

* Neptune Regional Transmission System, LLC
**East Coast Power, L.L.C.

JA0292

**PPL Electric Utilities Corporation (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0284.2 | Replace two wave traps at Juniata 500 kV – on the two Juniata – Airydale 500 kV | | **Load-Ratio Share Allocation:** AEC (1.66%) / AEP (14.16%) / APS (5.73%) / ATSI (7.88%) / BGE (4.22%) / ComEd (13.31%) / Dayton (2.11%) / DEOK (3.29%) / DL (1.75%) / DPL (2.50%) / Dominion (12.86%) / EKPC (1.87%) / JCPL (3.74%) / ME (1.90%) / NEPTUNE* (0.44%) / PECO (5.34%) / PENELEC (1.89%) / PEPCO (3.99%) / PPL (4.84%) / PSEG (6.26%) / RE (0.26%) |
| | | | **DFAX Allocation:** AEC (5.35%) / BGE (19.46%) / DL (0.25%) / JCPL (19.57%) / ME (6.75%) / NEPTUNE (2.17%) / PECO (20.81%) / PSEG (24.65%) / RE (0.99%) |
| b0284.4 | Changes at Juniata 500 kV substation | | PPL (100%) |
| b0293.1 | Replace wavetrap at the Martins Creek 230 kV bus | | PPL (100%) |
| b0293.2 | Raise the operating temperature of the 2-1590 ACSR to 140C for the Martins Creek – Portland 230 kV circuit | | PPL (100%) |
| b0440 | Spare Juniata 500/230 kV transformer | | PPL (100%) |
| b0468 | Build a new substation with two 150 MVA transformers between Dauphin and Hummelstown 230/69 kV substations by sectionalizing the Middletown Junction – New Lebanon 230 kV line | | JCPL (4.55%) / Neptune* (0.37%) / PECO (1.79%) / PENELEC (0.33%) / PPL (86.63%) / ECP** (0.18%) / PSEG (5.93%) / RE (0.22%) |

\* Neptune Regional Transmission System, LLC
\*\* East Coast Power, L.L.C.
\*\*\* Hudson Transmission Partners, LLC

Version 15.1.0

Effective Date: January 1, 2018

## PPL Electric Utilities Corporation (cont.)

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1533 | Rebuild Lycoming-Lock Haven #1 and Lycoming-Lock Haven #2 69kV lines | | PPL (100%) |
| b1534 | Rebuild 1.4 miles of the Sunbury-Milton 69kV | | PPL (100%) |
| b1601 | Re-configure the Breinigsville 500 kV substation with addition two 500 kV circuit breakers | | AEC (1.66%) / AEP (14.16%) / APS (5.73%) / ATSI (7.88%) / BGE (4.22%) / ComEd (13.31%) / Dayton (2.11%) / DEOK (3.29%) / DL (1.75%) / DPL (2.50%) / Dominion (12.86%) / EKPC (1.87%) / JCPL (3.74%) / ME (1.90%) / NEPTUNE* (0.44%) / PECO (5.34%) / PENELEC (1.89%) / PEPCO (3.99%) / PPL (4.84%) / PSEG (6.26%) / RE (0.26%)† |
| b1602 | Re-configure the Elimsport 230 kV substation to breaker and half scheme and install 80 MVAR capacitor | | PPL (100%) |
| b1740 | Install a 90 MVAR cap bank on the Frackville 230 kV bus #207973 | | PPL (100%) |
| b1756 | Install a 3rd West Shore 230/69 kV transformer | | PPL (100%) |
| b1757 | Install a 230 kV motor-operated air-break switch on the Clinton - Elimsport 230 kV line | | PPL (100%) |

* Neptune Regional Transmission System, LLC
**East Coast Power, L.L.C.
*** Hudson Transmission Partners, LLC

JA0294

Effective Date: January 1, 2020

## PPL Electric Utilities Corporation (cont.)

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b2005 | Replace the CTs and switch in SAKR Bay 3 to increase the rating of the Millwood-South Akron 230 kV Line and of the rating in Bay 3 | | PPL (100%) |
| b2006 | Install North Lancaster 500/230 kV substation (below 500 kV portion) | | AEC (1.10%) / ECP** (0.37%) / HTP (0.37%) / JCPL (9.61%) / ME (19.42%) / Neptune* (0.75%) / PECO (6.01%) / PPL (50.57%) / PSEG (11.35%) / RE (0.45%) |
| b2006.1 | Install North Lancaster 500/230 kV substation (500 kV portion) | | **Load-Ratio Share Allocation:** AEC (1.72%) / AEP (14.18%) / APS (6.05%) / ATSI (7.92%) / BGE (4.23%) / ComEd (13.20%) / Dayton (2.05%) / DEOK (3.18%) / DL (1.68%) / DPL (2.58%) / Dominion (12.56%) / EKPC (1.94%) / JCPL (3.82%) / ME (1.88%) / NEPTUNE* (0.42%) / OVEC (0.08%) / PECO (5.31%) / PENELEC (1.90%) / PEPCO (3.90%) / PPL (5.00%) / PSEG (6.15%) / RE (0.25%) **DFAX Allocation:** PPL (100%) |
| b2006.2 | Construct a new 230/69 kV North Lancaster substation. The sub will be supplied from the SAKR-BERK 230kV Line | | PPL (100%) |
| b2006.3 | Construct new 69/138 kV transmission from North Lancaster 230/69 kV sub to Brecknock and Honeybrook areas | | PPL (100%) |

* Neptune Regional Transmission System, LLC
** East Coast Power, L.L.C.
*** Hudson Transmission Partners, LLC

JA0295

**Public Service Electric and Gas Company (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1304.2 | Expand existing Bergen 230 kV substation and reconfigure the Athenia 230 kV substation to breaker and a half scheme | | AEC (0.23%) / BGE (0.97%) / ComEd (2.32%) / Dayton (0.13%) / JCPL (1.17%) / Neptune (0.07%) / HTP (16.05%) / PENELEC (2.97%) / PEPCO (1.04%) / ECP (2.11%) / PSEG (70.16%) / RE (2.78%) |
| b1304.3 | Build second 230 kV underground cable from Bergen to Athenia | | AEC (0.23%) / BGE (0.97%) / ComEd (2.32%) / Dayton (0.13%) / JCPL (1.17%) / Neptune (0.07%) / HTP (16.05%) / PENELEC (2.97%) / PEPCO (1.04%) / ECP (2.11%) / PSEG (70.16%) / RE (2.78%) |
| b1304.4 | Build second 230 kV underground cable from Hudson to South Waterfront | | AEC (0.23%) / BGE (0.97%) / ComEd (2.32%) / Dayton (0.13%) / JCPL (1.17%) / Neptune (0.07%) / HTP (16.05%) / PENELEC (2.97%) / PEPCO (1.04%) / ECP (2.11%) / PSEG (70.16%) / RE (2.78%) |

## Public Service Electric and Gas Company (cont.)

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1156.16 | Replace New Freedom 230 kV breaker '50H' with 63 kA | | PSEG (100%) |
| b1156.17 | Replace New Freedom 230 kV breaker '41H' with 63 kA | | PSEG (100%) |
| b1156.18 | Replace New Freedom 230 kV breaker '51H' with 63 kA | | PSEG (100%) |
| b1156.19 | Rebuild Camden 230 kV to 80 kA | | PSEG (100%) |
| b1156.20 | Rebuild Burlington 230 kV to 80 kA | | PSEG (100%) |
| b1197.1 | Reconductor the PSEG portion of the Burlington – Croydon circuit with 1590 ACSS | | PSEG (100%) |
| b1228 | Re-configure the Lawrence 230 kV substation to breaker and half | | HTP (0.14%) / ECP (0.22%) / PSEG (95.83%) / RE (3.81%) |
| b1255 | Build a new 69 kV substation (Ridge Road) and build new 69 kV circuits from Montgomery – Ridge Road – Penns Neck/Dow Jones | | PSEG (96.18%) / RE (3.82%) |
| b1304.1 | Convert the existing 'D1304' and 'G1307' 138 kV circuits between Roseland – Kearny – Hudson to 230 kV operation | | AEC (0.23%) / BGE (0.97%) / ComEd (2.32%) / Dayton (0.13%) / JCPL (1.17%) / Neptune (0.07%) / HTP (16.05%) / PENELEC (2.97%) / PEPCO (1.04%) / ECP (2.11%) / PSEG (70.16%) / RE (2.78%) |

USCA Case #21-1246    Document #1962371    Filed: 09/06/2022    Version 21.1.0

Effective Date: January 1, 2020

## Public Service Electric and Gas Company (cont.)

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b2039 | Replace Bayonne 138 kV breaker '11P' | | PSEG (100%) |
| b2139 | Reconductor the Mickleton - Gloucester 230 kV parallel circuits with double bundle conductor | | PSEG (61.11%) / PECO (36.45%) / RE (2.44%) |
| b2146 | Re-configure the Brunswick 230 kV and 69 kV substations | | PSEG (96.16%) / RE (3.84%) |
| b2151 | Construct Jackson Rd. 69 kV substation and loop the Cedar Grove - Hinchmans Ave into Jackson Rd. and construct Hawthorne 69 kV substation and build 69 kV circuit from Hinchmans Ave - Hawthorne - Fair Lawn | | PSEG (100%) |
| b2159 | Reconfigure the Linden, Bayway, North Ave, and Passaic Valley S.C. 138 kV substations. Construct and loop new 138 kV circuit to new airport station | | PSEG (72.61%) / HTP (24.49%) / RE (2.90%) |

*Neptune Regional Transmission System, LLC

USCA Case #21-1246    Document #1962371    Filed: 09/06/2022    Page 309 of 602

Version 22.1.0

Effective Date: January 1, 2018

**Monongahela Power Company, The Potomac Edison Company, and West Penn Power Company, all doing business as Allegheny Power (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0675.3 | Convert Ringgold - Catoctin 138 kV to 230 kV | | AEC (1.02%) / APS (81.96%) / DPL (0.85%) / JCPL (1.75%) / ME (6.37%) / NEPTUNE* (0.15%) / PECO (3.09%) / PPL (2.24%) / PSEG (2.42%) / RE (0.09%) / ECP** (0.06%) |
| b0675.4 | Convert Catoctin - Carroll 138 kV to 230 kV | | AEC (1.02%) / APS (81.96%) / DPL (0.85%) / JCPL (1.75%) / ME (6.37%) / NEPTUNE* (0.15%) / PECO (3.09%) / PPL (2.24%) / PSEG (2.42%) / RE (0.09%) / ECP** (0.06%) |
| b0675.5 | Convert portion of Ringgold Substation from 138 kV to 230 kV | | AEC (1.02%) / APS (81.96%) / DPL (0.85%) / JCPL (1.75%) / ME (6.37%) / NEPTUNE* (0.15%) / PECO (3.09%) / PPL (2.24%) / PSEG (2.42%) / RE (0.09%) / ECP** (0.06%) |
| b0675.6 | Convert Catoctin Substation from 138 kV to 230 kV | | AEC (1.02%) / APS (81.96%) / DPL (0.85%) / JCPL (1.75%) / ME (6.37%) / NEPTUNE* (0.15%) / PECO (3.09%) / PPL (2.24%) / PSEG (2.42%) / RE (0.09%) / ECP** (0.06%) |
| b0675.7 | Convert portion of Carroll Substation from 138 kV to 230 kV | | AEC (1.02%) / APS (81.96%) / DPL (0.85%) / JCPL (1.75%) / ME (6.37%) / NEPTUNE* (0.15%) / PECO (3.09%) / PPL (2.24%) / PSEG (2.42%) / RE (0.09%) / ECP** (0.06%) |
| b0675.8 | Convert Monocacy Substation from 138 kV to 230 kV | | AEC (1.02%) / APS (81.96%) / DPL (0.85%) / JCPL (1.75%) / ME (6.37%) / NEPTUNE* (0.15%) / PECO (3.09%) / PPL (2.24%) / PSEG (2.42%) / RE (0.09%) / ECP** (0.06%) |

*Neptune Regional Transmission System, LLC
**East Coast Power, L.L.C.

JA0299

**Monongahela Power Company, The Potomac Edison Company, and West Penn Power Company, all doing business as Allegheny Power (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1840 | Construct a 138 kV line between Buckhannon and Weston 138 kV substations | | APS (100%) |
| b1902 | Replace line trap at Stonewall on the Stephenson 138 kV line terminal | | APS (100%) |
| b1941 | Loop the Homer City-Handsome Lake 345 kV line into the Armstrong substation and install a 345/138 kV transformer at Armstrong | | APS (67.86%) / PENELEC (32.14%) |
| b1942 | Change the CT ratio at Millville to improve the Millville – Old Chapel 138 kV line ratings | | APS (100%) |
| b1964 | Convert Moshannon substation to a 4 breaker 230 kV ring bus | | APS (41.06%) / DPL (6.68%) / JCPL (5.48%) / ME (10.70%) / Neptune* (0.53%) / PECO (15.53%) / PPL (20.02%) |
| b1965 | Install a 44 MVAR 138 kV capacitor at Luxor substation | | APS (100%) |
| b1986 | Upgrade the AP portion of the Elrama – Mitchell 138 kV line by replace breaker risers on the Mitchell 138 kV bus on the Elrama terminal | | APS (100%) |
| b1987 | Reconductor the Osage-Collins Ferry 138 kV line with 795 ACSS. Upgrade terminal equipment at Osage and Collins Ferry | | APS (100%) |

JA0300

USCA Case #21-1246        Document #1962371        Filed: 09/06/2022        Version 23.1.0

Effective Date: January 1, 2019

**Monongahela Power Company, The Potomac Edison Company, and West Penn Power Company, all doing business as Allegheny Power (cont.)**

| Required Transmission Enhancements | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|
| b0347.3 | Build new 502 Junction 500 kV substation | As specified under the procedures detailed in Attachment H-18B, Section 1.b | **Load-Ratio Share Allocation:** AEC (1.61%) / AEP (14.10%) / APS (5.79%) / ATSI (7.95%) / BGE (4.11%) / ComEd (13.24%) / Dayton (2.07%) / DEOK (3.22%) / DL (1.73%) / DPL (2.48%) / Dominion (13.17%) / EKPC (2.13%) / JCPL (3.71%) / ME (1.88%) / NEPTUNE* (0.42%) / PECO (5.34%) / PENELEC (1.86%) / PEPCO (3.98%) / PPL (4.76%) / PSEG (6.19%) / RE (0.26%) |
| | | | **DFAX Allocation:** APS (65.36%) / PEPCO (34.64%) |
| b0347.4 | Upgrade Meadow Brook 500 kV substation | As specified under the procedures detailed in Attachment H-18B, Section 1.b | **Load-Ratio Share Allocation:** AEC (1.61%) / AEP (14.10%) / APS (5.79%) / ATSI (7.95%) / BGE (4.11%) / ComEd (13.24%) / Dayton (2.07%) / DEOK (3.22%) / DL (1.73%) / DPL (2.48%) / Dominion (13.17%) / EKPC (2.13%) / JCPL (3.71%) / ME (1.88%) / NEPTUNE* (0.42%) / PECO (5.34%) / PENELEC (1.86%) / PEPCO (3.98%) / PPL (4.76%) / PSEG (6.19%) / RE (0.26%) |
| | | | **DFAX Allocation:** APS (40.83%) / Dominion (59.17%) |

* Neptune Regional Transmission System, LLC

Version 23.1.0

Effective Date: January 1, 2019

**Monongahela Power Company, The Potomac Edison Company, and West Penn Power Company, all doing business as Allegheny Power (cont.)**

| | Required Transmission Enhancements | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1840 | Construct a 138 kV line between Buckhannon and Weston 138 kV substations | | APS (100%) |
| b1902 | Replace line trap at Stonewall on the Stephenson 138 kV line terminal | | APS (100%) |
| b1941 | Loop the Homer City-Handsome Lake 345 kV line into the Armstrong substation and install a 345/138 kV transformer at Armstrong | | APS (67.86%) / PENELEC (32.14%) |
| b1942 | Change the CT ratio at Millville to improve the Millville – Old Chapel 138 kV line ratings | | APS (100%) |
| b1964 | Convert Moshannon substation to a 4 breaker 230 kV ring bus | | APS (41.06%) / DPL (6.68%) / JCPL (5.48%) / ME (10.70%) / Neptune* (0.53%) / PECO (15.53%) / PPL (20.02%) |
| b1965 | Install a 44 MVAR 138 kV capacitor at Luxor substation | | APS (100%) |
| b1986 | Upgrade the AP portion of the Elrama – Mitchell 138 kV line by replace breaker risers on the Mitchell 138 kV bus on the Elrama terminal | | APS (100%) |
| b1987 | Reconductor the Osage-Collins Ferry 138 kV line with 795 ACSS. Upgrade terminal equipment at Osage and Collins Ferry | | APS (100%) |

JA0302

USCA Case #21-1246    Document #1962371    Filed: 09/06/2022    Page 313 of 602

Effective Date: January 1, 2018

**AEP Service Corporation on behalf of its Affiliate Companies (AEP Indiana Michigan Transmission Company, AEP Kentucky Transmission Company, AEP Ohio Transmission Company, AEP West Virginia Transmission Company, Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company and Wheeling Power Company) (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b0840 | String a second 138 kV circuit on the open tower position between Twin Branch and East Elkhart | | AEP (100%) |
| b0840.1 | Establish a new 138/69-34.5kV Station to interconnect the existing 34.5kV network | | AEP (100%) |
| b0917 | Replace Baileysville 138 kV breaker 'P' | | AEP (100%) |
| b0918 | Replace Riverview 138 kV breaker '634' | | AEP (100%) |
| b0919 | Replace Torrey 138 kV breaker 'W' | | AEP (100%) |
| b1032.1 | Construct a new 345/138kV station on the Marquis-Bixby 345kV line near the intersection with Ross - Highland 69kV | | AEP (89.97%) / Dayton (10.03%) |
| b1032.2 | Construct two 138kV outlets to Delano 138kV station and to Camp Sherman station | | AEP (89.97%) / Dayton (10.03%) |
| b1032.3 | Convert Ross - Circleville 69kV to 138kV | | AEP (89.97%) / Dayton (10.03%) |
| b1032.4 | Install 138/69kV transformer at new station and connect in the Ross - Highland 69kV line | | AEP (89.97%) / Dayton (10.03%) |
| b1033 | Add a third delivery point from AEP's East Danville Station to the City of Danville. | | AEP (100%) |

Effective Date: January 1, 2018

**AEP Service Corporation on behalf of its Affiliate Companies (AEP Indiana Michigan Transmission Company, AEP Kentucky Transmission Company, AEP Ohio Transmission Company, AEP West Virginia Transmission Company, Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company and Wheeling Power Company) (cont.)**

| Required Transmission Enhancements | | Annual Revenue Requirement | Responsible Customer(s) |
|---|---|---|---|
| b1502 | Reconductor the Conesville East – Conesville Prep Plant Tap 138 kV section of the Conesville – Ohio Central to fix Reliability N-1-1 thermal overloads | | AEP (100%) |
| b1659 | Establish Sorenson 345/138 kV station as a 765/345 kV station | | AEP (93.61%) / ATSI (2.99%) / ComEd (2.07%) / HTP (0.03%) / PENELEC (0.31%) / ECP** (0.03%) / PSEG (0.92%) / RE (0.04%) |
| b1659.1 | Replace Sorenson 138 kV breaker 'L1' | | AEP (100%) |
| b1659.2 | Replace Sorenson 138 kV breaker 'L2' breaker | | AEP (100%) |
| b1659.3 | Replace Sorenson 138 kV breaker 'M1' | | AEP (100%) |
| b1659.4 | Replace Sorenson 138 kV breaker 'M2' | | AEP (100%) |
| b1659.5 | Replace Sorenson 138 kV breaker 'N1' | | AEP (100%) |
| b1659.6 | Replace Sorenson 138 kV breaker 'N2' | | AEP (100%) |
| b1659.7 | Replace Sorenson 138 kV breaker 'O1' | | AEP (100%) |
| b1659.8 | Replace Sorenson 138 kV breaker 'O2' | | AEP (100%) |
| b1659.9 | Replace Sorenson 138 kV breaker 'M' | | AEP (100%) |
| b1659.10 | Replace Sorenson 138 kV breaker 'N' | | AEP (100%) |

*Neptune Regional Transmission System, LLC

Document Accession #: 20200706-5238     Filed Date: 07/06/2020

Document Content(s)

Final Protest.PDF.......................................................1

JA0305

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

|  |  |  |
|---|---|---|
| American Transmission Systems, Inc., *et al.,* | ) | |
| PJM Interconnection, L.L.C. | ) | Docket No. ER20-2046-000 |
| | ) | |
| | ) | |

**ANSWER OF THE PJM TRANSMISSION OWNERS**
**TO PROTESTS AND COMMENTS AND MOTION FOR CONSOLIDATION**

July 21, 2020

## TABLE OF CONTENTS

I.    Introduction and Executive Summary ................................................... 3

II.   Response to Protests ......................................................................... 9

    A.    The Transmission Owners' Proposal Submitted Pursuant to FPA Section 205 Must Be Considered on Its Own Merits, Without Regard to Comparisons to a Different Proposal. ...................................................... 9

          1.    The Transmission Owners Properly Exercised Their Rights Under Section 205 to File the Proposed Revisions. ................................... 9

          2.    Section 205 Does Not Authorize the Commission to Change the Proposed Revisions to Adopt Protestors' Preferences. ........................... 12

          3.    Other Concerns Raised by Protestors Are Not Relevant to the Commission's Consideration of the Proposed Revisions. ...................... 15

    B.    The Attachment M-3 Amendments Expand Stakeholder Transparency and Meaningful Opportunities for Participation and Are Just and Reasonable. ........................................................................................ 18

          1.    The Transmission Owners Retain the Right to File Procedures for Planning EOL and Other Asset Management Projects. ......................... 19

          2.    The Attachment M-3 Order No. 890-Compliant Process Will Be Expanded to Cover Asset Management Projects, Including EOL Needs. ................................................................................................ 25

          3.    The Attachment M-3 Amendments Will Improve Coordination Between EOL Needs and PJM Planning Under Schedule 6. .................. 31

    C.    The Attachment M-3 Amendments Make No Changes to PJM Planning Responsibility or Processes, Cost Allocation or the Recovery of Transmission Costs ............................................................................. 39

          1.    There Is No Reduction to the Level Of Stakeholder Participation. ......... 40

          2.    There Is No Change In The Ability of Stakeholders To Question The Need For An EOL Project or To Challenge Its Prudence. .............. 41

          3.    The Proposed Revisions Provide No Veto Or Delaying Power Over PJM Planning Decisions. .............................................................. 43

          4.    There Is No Change to Form No. 715 Project Planning. ....................... 44

          5.    There Is No Change in the Schedule 12 Cost Allocation Rules. ............ 44

6.    There is No Right of First Refusal .......................................................... 46

7.    There Is No Change in the Applicability of Attachment M-3 to
Supplemental Projects.............................................................................. 50

8.    There Is No Change to the Authority of State Commissions or
Their Access to Transmission Owner Planning Data. ............................. 50

9.    There Is No Impact on the Interconnection Process. .............................. 51

10.    There Is No Change to the Obligation of Transmission Owners to
Include EOL Criteria in Their Form 715 Filings, Nor Is Any Such
Change Required....................................................................................... 52

11.    There Is No Change to Duquesne's Rights as a Transmission
Owner........................................................................................................ 54

III.    Consolidation or Further Process Is Not Needed For the Commission to Find the
Proposed Revisions Are Just And Reasonable And Would Unreasonably Delay
Implementation. ................................................................................................... 56

IV.    Conclusion .......................................................................................................... 59

(Page 318 of Total)

JA0308

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

American Transmission Systems, Inc.*, et al.,*      )
PJM Interconnection, L.L.C.              )         Docket No. ER20-2046-000
                                    )
                                    )

**ANSWER OF THE PJM TRANSMISSION OWNERS**
**TO PROTESTS AND COMMENTS AND MOTION FOR CONSOLIDATION**

Pursuant to Rule 213 of the Rules of Practice and Procedure of the Federal Energy

Regulatory Commission ("Commission"), the PJM Transmission Owners ("Transmission

Owners") respectfully submit this answer to protests and comments, as well as the motion to

consolidate or requests for additional procedures, filed on July 6, 2020, in the above referenced

docket.

On June 12, 2020, the Transmission Owners, acting through the PJM Consolidated

Transmission Owners Agreement ("CTOA"), filed proposed amendments to Attachment M-3 of

the Open Access Transmission Tariff ("Tariff") of PJM Interconnection L.L.C. ("PJM"). The

proposed amendments expand the scope of the planning procedures set forth therein to

encompass certain Transmission Owners' asset management activities that would improve

transparency and coordination in the planning to replace Transmission Facilities nearing the end

of their useful lives.[1]  Seven parties or groups filed protests and comments.[2]  Two parties filed

comments in support of the Proposed Revisions,[3] and one party filed comments taking no

position.[4]  One party also requested consolidation of this proceeding with Docket No. ER20-

2308-000,[5] in which PJM filed proposed amendments to the PJM Operating Agreement, while

two parties requested additional procedures related to that docket.[6]

The objections raised fail to provide any valid reason why the Commission should not

approve the Proposed Revisions and find them just and reasonable.  In addition, the protests, in

many respects, assert positions that have no basis in law or fact.[7]  Moreover, the Commission

---

[1] *PJM Interconnection, L.L.C.*, Amendments to Attachment M-3 to the PJM Interconnection, L.L.C. Open Access Transmission Tariff, Docket No. ER20-2046 (filed June 12, 2020).  For ease of reference, this Answer refers to the initial filing as a whole as "Transmittal Letter" and the proposed amendments as "Proposed Revisions."   As used in this Answer, where a term is capitalized it is intended to have the meaning ascribed to it under the CTOA, Tariff, the Amended and Restated Operating Agreement Of PJM Interconnection, L.L.C. ("Operating Agreement") or the Proposed Revisions.

[2] American Municipal Power, Inc. ("AMP"), Old Dominion Electric Cooperative ("ODEC"), PJM Industrial Customer Coalition, Public Power Association of New Jersey, People's Counsel for the District of Columbia, Delaware Division of the Public Advocate, West Virginia Consumer Advocate, Indiana Office of Utility Consumer Counselor, Blue Ridge Power Agency, and Central Virginia Electric Cooperative (collectively, the "Load Group"); Duquesne Light Company ("Duquesne"); LSP Transmission Holdings II, LLC ("LS Power"); New Jersey Board of Public Utilities ("NJBPU"); Office of the Ohio Consumers' Counsel ("OCC"); Office of the People's Counsel for the District of Columbia, Delaware Division of the Public Advocate, and ODEC (collectively, the "Interested Parties"); and Public Utilities Commission of Ohio's Office of the Federal Energy Advocate ("Ohio FEA").

[3] Edison Electric Institute ("EEI") and WIRES.

[4] J-POWER USA Development Co., Ltd. ("J-POWER").

[5] Load Group at 39-40.

[6] J-POWER at 5-6; NJBPU at 16 (suggesting that the Commission "coordinat[e] its approach" to the filings).

[7] To the extent that this answer responds to protests and comments, the Transmission Owners respectfully request leave to answer pursuant to Rule 212.  18 C.F.R. § 385.212 (2020).  The Commission allows otherwise prohibited answers when the movant demonstrates good cause.  *See, e.g.*, *Morgan Stanley Capital Grp., Inc. v. N.Y. Indep. Sys. Operator, Inc.*, 93 FERC ¶ 61,017, at 61,036 (2000) (accepting an answer to an answer that was "helpful in the development of the record . . . .").  *See also Carolina Power & Light Co.*, 97 FERC ¶ 61,048, at 61,278 (2001) (finding good cause to waive Rule 213 when a pleading helped to ensure a complete and accurate record); *N.Y. Indep. Sys. Operator, Inc.*, 91 FERC ¶ 61,218, at 61,797 (2000) (allowing an answer to a protest considered "useful in addressing the issues arising in these proceedings."); *Cent. Hudson Gas & Elec. Corp.*, 88 FERC ¶ 61,138, at 61,381

should also reject the requests to consolidate this proceeding with the proceeding in Docket No. ER20-2308-000 or for additional procedures. Rather, the Commission should accept the Proposed Revisions without hearing, modification, or condition, effective on August 11, 2020, so that stakeholders can benefit from the improvements in transparency and coordination contained therein in the upcoming PJM transmission planning cycle.

## I.     INTRODUCTION AND EXECUTIVE SUMMARY

The Proposed Revisions will enhance transparency by extending the existing Commission-approved Attachment M-3 process to create new opportunities for stakeholder input into Transmission Owner asset management projects and activities, including the replacement of Transmission Facilities nearing the end of their useful lives ("EOL"), that go well beyond the procedures required by Commission regulations or precedents. The Proposed Revisions also provide PJM with new information that will enhance PJM's ability to coordinate the regional expansion and enhancement planning responsibilities it agreed to undertake under the CTOA with the Transmission Owners' programs to address EOL needs. The Proposed Revisions achieve these improvements without seeking to alter or interfere with PJM's exercise of its transmission planning responsibilities. This is the crux of what troubles those objecting to the Proposed Revisions.

Protestors generally do not take issue with the Proposed Revisions' carefully crafted and efficiently achieved improvements to stakeholder input into asset management programs and activities in PJM. Rather, the protestors' objections largely ignore these benefits, but criticize the Proposed Revisions because they are not what the protestors prefer – an unprecedented, and

_____

(1999) (accepting an otherwise impermissible answer to a protest because it helped clarify complex issues).

ill-considered transformation of PJM from a Regional Transmission Operator ("RTO") to, in effect, a region-wide operating utility managing local transmission planning and replacement in every zone in PJM.  As PJM has repeatedly advised the protestors and other stakeholders,[8] transferring responsibility to PJM for EOL and other asset management planning is unlawful, because it is beyond the responsibilities that have been transferred to PJM under the CTOA, and ill-advised, because Transmission Owners are best positioned to manage their assets to the benefit of their customers and in furtherance of fulfilling their obligation to provide reliable electric service in a cost effective and efficient manner.[9]  Even if that were not the case, however, the protestors' preference for *different* revisions to the process for addressing EOL needs in the region is beside the point.  The Commission must address the Proposed Revisions in this docket and determine on the merits whether the reforms and improvements they represent are just and reasonable, *not* whether they are better or worse than some other proposal.[10]  The Commission should accept the Proposed Revisions because, as demonstrated in the Transmittal Letter and explained below, the Proposed Revisions are just and reasonable and their acceptance by the Commission will enhance transparency for stakeholders and improve coordination between the Transmission Owners and PJM.

The Commission's consideration must start from the fact that extending the Order No. 890-compliant[11] open and transparent Attachment M-3 planning procedures applicable to

---

[8] *See, e.g.,* Transmittal Letter, Exhibits D, E.

[9] The protestors' proposal to strip the Transmission Owners of responsibility for EOL planning and shift that responsibility to PJM is pending in Docket No. ER20-2308.  Its lawfulness and wisdom will be addressed there.

[10] *See, e.g.,* *Cities of Bethany v. FERC*, 727 F.2d 1131, 1136 (D.C. Cir. 1984).

[11] *See also Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 72 FR 12266 (March 15, 2007) ("Order No. 890"), FERC Stats. & Regs. ¶ 31,241, *order on reh'g*, Order No. 890-A, 73 FR 2984 (January 16, 2008), FERC Stats. & Regs. ¶ 31,261 (2007), *order on reh'g*,

Supplemental Projects[12] to asset management projects is unprecedented and will likely make the

asset management and EOL transmission planning process in PJM one of the most transparent

and inclusive in the country.  The Proposed Revisions will add to the Tariff meaningful

opportunities for stakeholders to review and comment on (1) the criteria, assumptions, and

models used to plan and identify asset management projects, (2) the asset management project

needs identified by Transmission Owners and stakeholders; and (3) potential solutions to those

needs.  These proposed improvements are not a prerequisite for compliance with Commission

requirements; to the contrary, the Commission has repeatedly found that asset management

projects and activities that do not expand the transmission system (or result in only an incidental

expansion) are not subject to the transmission planning requirements of Order No. 890.[13]  In

proposing revisions that exceed the Commission's requirements, the Transmission Owners have

offered unprecedented transparency into their asset management activities.

The only question the Commission must decide in this case is whether the Proposed

Revisions themselves are just and reasonable.  To make that determination the Commission must

consider the Proposed Revisions on their own merits, and reject attempts to compare the

Proposed Revisions to the different proposal that those protestors prefer.  (Section II.A.1).  The

mere fact that these protestors simply prefer a different approach does not support a Commission

---

Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g and clarification*, Order No. 890-C, 126 FERC ¶ 61,228 (2009), *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

[12] *See* PJM Operating Agreement, Section 1, Definitions S-T (defining "Supplemental Projects" as a transmission expansion or enhancement that is not required for compliance with certain PJM criteria). Capitalized terms used, but not defined, in this answer are defined in the Transmittal Letter, the PJM Tariff, or the CTOA.

[13] *S. Cal. Edison Co.*, 164 FERC ¶ 61,160 (2018) ("SCE Order"), *order on reh'g*, 168 FERC ¶ 61,170 (2019); *Cal. Pub. Utils. Com'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161 (2018) ("PG&E Order"), *order on reh'g,* 168 FERC ¶ 61,171 (2019) ("PG&E Rehearing Order") (collectively, the "California Orders").

Document Accession #: 20200721-5166    Filed Date: 07/21/2020

finding that the Proposed Revisions are unjust and unreasonable, nor do their preferences support rejection of the Proposed Revisions. (Section II.A.2.) Further, these protestors' assertions about costs and cost-savings projections for the replacement of EOL transmission facilities, intended to solicit support for their preferred proposal, are neither relevant nor accurate. Rather, those projections are speculative and unreliable, and they do not support rejection of the proposal to expand the open and transparent Attachment M-3 process that the Transmission Owners are poised to provide. (Section II.A.3.)

The enhancements to Attachment M-3 that the Transmission Owners propose expand the transparency that the existing Attachment M-3 already provides, adding certain asset management projects and activities to its coverage, even though that is not required by Order No. 890. (Section II.B.) Protestors' assertions that the Transmission Owners do not have the right to file tariff provisions governing asset management planning, including EOL projects, do not stand up against PJM's history, its governing documents or prior Commission decisions. The Transmission Owners have retained their Section 205 rights to make such filings, including the *exclusive* right to propose modifications to Attachment M-3. Those rights are explicit in PJM's governing documents, confirmed by multiple Commission decisions and acknowledged by PJM. The CTOA firmly establishes and reserves to Transmission Owners the rights and associated responsibilities to determine when, whether, and how to replace any of their transmission assets that are nearing the end of their useful lives, and other asset management functions, in the CTOA. (Section II.B.1).

The Protestors incorrectly claim that the Commission's holding in the California Orders that asset management projects and activities that do not expand the transmission system (or result in only an incidental expansion) are not subject to the transmission planning requirements

of Order No. 890 does not apply to the PJM Transmission Owners. Protestors' objections, however, are based on geography, not reason. The Commission's interpretation of Order No. 890 obviously applies to all public utility transmission providers. Protestors mount various objections to the scope of the Proposed Revisions and several of the definitions employed. However, none of these objections has merit. The Proposed Revisions' definitions appropriately expand the coverage of the Attachment M-3 process to create opportunities for stakeholder input into asset management and EOL project planning, are consistent with the language of the California Orders, and do not exceed the Transmission Owners' retained planning responsibilities. (Section II.B.2).

Complaints about the process set out in the Proposed Revisions to expand stakeholder input into EOL Needs planning and improve coordination between PJM planning and EOL Needs planning are similarly misplaced. Contrary to the protestors' view, it is neither reasonable nor even possible to impose a uniform set of planning criteria for EOL Needs. Similarly, arguments against the contents or confidentiality of proprietary, five-year nonbinding projections of EOL Needs provided to PJM do not show how they interfere with EOL planning. In fact, stakeholders will have all the information needed to address a proposed EOL Need when that need is presented either under the expanded Attachment M-3 process or when PJM identifies an overlap project for possible inclusion in the Regional Transmission Expansion Plan ("RTEP"), *which-ever occurs first*. Moreover, PJM will have the information it needs to identify the type of replacement facilities likely to be addressed by a possible overlap project. Concerns about the non-binding nature of the projection of EOL Needs also fail to recognize that the condition of facilities can change, as can the appropriate timing for their replacement, demonstrating the

7

protesters' lack of understanding of or disregard for industry-wide asset management practices. (Section II.B.3).

Protestors make numerous unsupported assertions of the harms that the Proposed Revisions would cause to stakeholders and the regional transmission planning process. To be clear, contrary to many of these allegations, the Proposed Revisions are carefully crafted to "stay in the Transmission Owners' lane" and avoid interfering with PJM's regional planning responsibilities. The Proposed Revisions will not cause any of the protestors' "parade of horribles:"

- The Proposed Revisions do not reduce stakeholder participation, (Section II.C.1);

- The Proposed Revisions do not change stakeholders' ability to challenge the need for and prudence of an EOL project, (Section II.C.2);

- The Proposed Revisions do not give Transmission Owners the power to delay PJM planning decisions, or otherwise prevent PJM from moving forward with an RTEP project, (Section II.C.3);

- The Proposed Revisions do not change the RTEP Planning Process, (Section II.C.4);

- The Proposed Revisions do not have any impact on the allocation of cost responsibility for EOL projects under Schedule 12's cost allocation rules, (Section II.C.5);

- The Proposed Revisions do not create a right of first refusal ("ROFR") or otherwise limit proposal window opportunities, (Section II.C.6);

- The Proposed Revisions do not change the applicability of Attachment M-3 to Supplemental Projects or limit the types of Supplemental Projects to which Attachment M-3 applies, (Section II.C.7);

- The Proposed Revisions do not limit the authority of state commissions, nor limit access to information available to state commissions, (Section II.C.8);

- The Proposed Revisions do not interfere with or cause delays in the interconnection process, (Section II.C.9);

- The Proposed Revisions do not impose any requirement that Transmission Owners include EOL Planning Criteria in their FERC Form No. 715, nor is such change required. (Section II.C.10); and

- The Proposed Revisions do not impose unreasonable burdens on Transmission Owners, (Section II.C.11).

Finally, the Commission should deny requests for further procedural process, such as consolidation of the instant case with Docket No. ER20-2308-000.  (Section III).  No additional process is necessary; the evidentiary record developed in this proceeding is sufficient for the Commission to find that the Proposed Revisions are just and reasonable and distinct from the legal and other controversial issues in Docket No. ER20-2308-000.  Furthermore, consolidation would delay the timely implementation of enhanced processes and accompanying benefits in the upcoming transmission planning cycle that the Proposed Revisions will provide.

In sum, the Commission should accept the Proposed Revisions because they are just and reasonable.  They go above and beyond the Commission's requirements to provide new opportunities for stakeholder input into Transmission Owner asset management projects and activities that will benefit all stakeholders and will give PJM additional tools to facilitate coordinated regional transmission planning.

## II.     RESPONSE TO PROTESTS

### A.     The Transmission Owners' Proposal Submitted Pursuant to FPA Section 205 Must Be Considered on Its Own Merits, Without Regard to Comparisons to a Different Proposal.

#### 1.     The Transmission Owners Properly Exercised Their Rights Under Section 205 to File the Proposed Revisions.

Section 205 of the Federal Power Act ("FPA") gives the Transmission Owners the right to file with the Commission changes to rates and terms for service rendered with their assets subject to agreements they have entered into regarding their Section 205 filing rights.[14]  The Commission's review of filed rates, tariffs, and contracts is limited to consideration of the

---

[14] "Section 205 of the [FPA] gives a utility the right to file rates and terms for services rendered with its assets. . . . FERC [may not] prohibit public utilities from filing changes in the first instance."  *Atl. City Elec. Co. v. FERC*, 295 F. 3d 1, 9-10 (D.C. Cir 2002).

9

justness and reasonableness of a filer's "confined proposal."[15]  As long as the Commission finds a proposed methodology to be just and reasonable, that methodology "need not be the only reasonable methodology."[16]  Stated another way, the Transmission Owners are not obligated to show – and the Commission is not required to find – that the Proposed Revisions are superior to any alternatives that an intervenor may prefer, but only that the Proposed Revisions are just and reasonable.[17]  The Commission, therefore, is not "in a position to choose one solution package over the other" as some suggest,[18] because "[E]ven if an intervenor develops an alternative proposal, the Commission must accept a section 205 filing if it is just and reasonable, regardless of the merits of the alternate proposal."[19]

---

[15] *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) ("When acting on a public utility's rate filing under section 205, the Commission undertakes 'an essentially passive and reactive role' and restricts itself to evaluating the confined proposal.") (quoting *City of Winnfield v. FERC*, 744 F.2d 871, 875-76 (D.C. Cir. 1984)).

[16] *Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) ("FERC is not required to choose the best solution, only a reasonable one."); *Oxy USA, Inc. v. FERC*, 64 F.3d 679, 692 (D.C. Cir. 1995) (finding that the proposed changes "need not be the only reasonable methodology, or even the most accurate").

[17] *Cities of Bethany v. FERC*, 727 F.2d at 1136 ("FERC has interpreted its authority to review rates under [the FPA] as limited to an inquiry into whether the rates proposed by a utility are reasonable-and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs."), *cert. denied*, 469 U.S. 917 (1984); *Oxy USA*, 64 F.3d at 692 (D.C. Cir. 1995).

[18] NJBPU at 16.

[19] *PJM Interconnection, L.L.C.*, 127 FERC ¶ 61,197, at P 38 (2009).  *See e.g., Appalachian Power Co.*, 170 FERC ¶ 61,196, at P 70 (2020) ("Appalachian Power Order") ("[A] stakeholder process does not supersede the PJM Transmission Owners' right to file this proposal pursuant to section 205, nor the ability of the Commission to find that the proposal is just and reasonable.").  In 2018, the Commission stated:

> [T]he Commission's charge under section 205 of the FPA is to determine whether a proposal is just and reasonable and not unduly discriminatory.  The courts have described this role as essentially passive and reactive, restricted to evaluating the confined proposal. The Commission need only find that the proposal is just and reasonable, not that it is the only or even the most just and reasonable proposal.  Thus, having found the [] Proposal to be just and reasonable, the Commission was not required to consider whether protestors' alternative proposals were superior.

The Proposed Revisions are just and reasonable and the Commission should accept them. As discussed below, the Proposed Revisions effect a salutary expansion of the existing Attachment M-3 process that the Commission has ruled is just and reasonable[20] and provide new opportunities for stakeholder participation in the Transmission Owners' processes for replacing Transmission Facilities nearing the end of their useful lives.  Within this set of well-defined and focused-scope changes, the Proposed Revisions add more transparency, stakeholder input, and planning coordination to the existing Attachment M-3 process.  The Commission should find that these changes are just and reasonable and, on that basis, should accept the Proposed Revisions.

As noted herein, the Proposed Revisions make no changes to the Operating Agreement, the process for preparation of the RTEP, or the transmission planning responsibilities of PJM. The Proposed Revisions are narrowly crafted to impact only the Transmission Owners' planning responsibilities under the CTOA that the Commission has recognized.[21]  Some intervenors' attempts to relitigate issues already settled by the Commission[22] present no valid obstacle to approval of the Proposed Revisions.[23]  None of these protestors show that the enhancements

---

*PJM Interconnection, L.L.C.,* 164 FERC ¶ 61,170, at P 28 (2018) (denying rehearing and declining to consider alternative proposals).  *See also S. Cal. Edison Co.*, 73 FERC ¶ 61,219 at 61,608 n.73 (1995) ("Having found the plan to be just and reasonable, there is no need to consider in any detail the alternative plans proposed by the Joint Protesters.") (citing *Cities of Bethany*, 727 F.2d at 1136).

[20] *See Monongahela Power Co.*, 162 FERC ¶ 61,129 (2018) ("Monongahela Order"), *reh'g and compliance*, 164 FERC ¶ 61,217 (2018) ("Monongahela Rehearing Order").

[21] *See* Transmittal Letter at 5-9.

[22] *See, e.g.,* Load Group at 18-19; LS Power at 39-43; Interested Parties at 8-10.

[23] These arguments collaterally attack the Commission's prior decisions and should be disregarded.  *See, e.g.*, *S. Co. Servs., Inc.*, 129 FERC ¶ 61,253, at P 37 (2009) (finding protesting parties' arguments to be collateral attacks on the prior-issued orders, and noting that protestors have not demonstrated "why the Commission should re-examine tariff language that it previously accepted . . . Collateral attacks on final orders and relitigation of applicable precedent, especially by parties that were active in the earlier case, impede the finality and repose in agency decisions that are essential to administrative efficiency, and are therefore strongly discouraged.").

11

provided through the Proposed Revisions fundamentally change the Attachment M-3 process, rendering it unjust and unreasonable, or that specific components of the additional processes provided are defective and will not provide greater opportunities for input from stakeholders and state commissions.  The Commission need not address arguments questioning its approval of the existing Attachment M-3 process, nor do the protests credibly question the benefits from increased input into EOL planning and coordination with PJM.  Fundamentally, the protestors' objections reflect simply their preference for a different proposal, not a valid claim that the Proposed Revisions are unjust and unreasonable.  As such, those objections have no bearing on the issues before the Commission in this proceeding.

> **2.    Section 205 Does Not Authorize the Commission to Change the Proposed Revisions to Adopt Protestors' Preferences.**

The protests express a preference that PJM plan EOL projects rather than Transmission Owners.  Importantly, PJM, itself, has stated explicitly that it is not qualified to assume this responsibility and, under its governing documents, cannot accept it.[24]  Moreover, the Commission cannot reject the Proposed Revisions simply because some protestors prefer their own approach.  Likewise, Section 205 does not authorize the Commission to change the Proposed Revisions to adopt protestors' preferences or to impose a new planning scheme of its own making.[25]  Commission-directed changes to accommodate such changes would be beyond

---

[24] *See, e.g.,* Transmittal Letter, Exhibits D and E; *PJM Interconnection, L.L.C.*, Comments of PJM Interconnection, L.L.C., Docket No. ER20-2308-000 (filed July 2, 2020) ("PJM ER20-2308 Comments").

[25] *NRG Power Mktg., LLC v. FERC*, 862 F.3d 108, 115 (D.C. Cir. 2017) (describing how the Commission may not direct modifications that would result in an entirely different rate design than the filing utility's proposal) (citing *City of Winfield*, 744 F.2d at 876 (D.C. Cir. 1984) and *W. Res. v. FERC*, 9 F.3d 1568 (D.C. Cir. 1993)).

the Commission's statutory authority.[26]  When the same arguments were presented in prior

litigation concerning the new Attachment M-3, the Commission rejected them and, accordingly,

it should do so again in these proceedings.[27]

　　　　The Load Group complains that the Proposed Revisions are not compatible with "Grid of

the Future" planning it envisioned.  The Load Group's vision, however, reflects nothing more

than their preference for PJM to assume responsibility for EOL planning instead of the

Transmission Owners' addressing EOL needs as part of their asset management processes.[28]

First, there is no cognizable standard under the FPA or the Commission's regulations or

precedents requiring the Transmission Owners to accede to this preference or enabling the

Commission to grant it.  Second, as PJM has recognized, PJM lacks authority and capability to

address asset management.  Third, the Load Group's premise does not support its conclusion; the

goal of forward-looking planning does not mean that all planning in the PJM Region must be

performed exclusively by PJM.  As discussed further below,[29] the Commission has recognized

---

[26] *NRG Power Marketing*, 862 F.3d at 115-16 (holding that the Commission acted beyond the scope of its Section 205 authority where its "proposed modifications resulted in an 'entirely different rate design' than PJM's proposal").

[27] *See Monongahela Order* at P 117 (rejecting protestors' alternative proposal to revise the PJM Operating Agreement to require responses from transmission owners to stakeholder comments, further PJM involvement in planning for and selecting certain Supplemental Projects and EOL planning, and PJM review and approval of Local Plans) (citing *Petal Gas Storage, L.L.C. v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) ("FERC is not required to choose the best solution, only a reasonable one."); *Oxy USA, Inc. v. FERC*, 64 F.3d 679, 692 (D.C. Cir. 1995)).

[28] *See* Load Group at 20 (arguing that EOL planning authority would be taken "*away from* PJM" and that "PJM should be responsible for planning the Grid of the Future"), 22, 36 (stakeholders would like the RTO to "centrally plan" transmission replacements for the "grid of the future").  Planning the grid of the future is not a legislative mandate, nor is it a requirement under Order No. 890 and Order No. 1000 rulemakings.  *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, FERC Stats. & Regs. ¶ 31,323 (2011) ("Order No. 1000"), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014);

[29] *See infra* at section II.B.1.

both in Order No. 890 and in PJM-specific orders that planning responsibility is appropriately

shared between PJM, which focuses on regional planning of necessary expansions and

enhancements to the transmission system, and the Transmission Owners, who meet local needs,

including through asset management, i.e., maintaining, replacing and expanding zonal

transmission infrastructure though asset management activities and Supplemental Projects.[30]

Transmission Owners are also engaged with state commissions, PJM and others to provide the

infrastructure necessary to reliably support state policy objectives for distributed renewable

generation, storage, microgrids, electrification of the transportation sector, development of

significant offshore wind capacity, and other "Grid of the Future" technologies.[31]  Finally, it is

worth noting that PJM's performance during the challenging COVID-19 pandemic illustrates

that that the current allocation of planning responsibilities has performed well in preparing PJM

to meet both expected and unexpected challenges to the PJM Transmission System.[32]

---

[30] Order No. 890, 72 FR 12266; *Monongahela Order* at 97; *PG&E Order* at 65-74; *PG&E Rehearing Order* at 18-59.

[31] *See, e.g.*, *Unlocking the Benefits of Microgrids,* EDISON ELEC. INST. (Feb. 2019), https://www.eei.org/issuesandpolicy/Energy%20Storage/Unlocking%20the%20Benefits%20of%20Microgrids.pdf; *Electric Transportation Benefits Customers, Communities and the Environment,* EDISON ELEC. INST. (Sept. 2019), https://www.eei.org/issuesandpolicy/electrictransportation/Documents/Electric_Transportation_Benefits_Customers_and_Communities.pdf.  The Commission is also considering these issues, recently announcing a technical conference to discuss whether transmission, interconnection, and merchant transmission facility frameworks in RTOs/ISOs will be suited accommodate the anticipated growth in offshore wind.  *See* Notice of Technical Conference, Docket No. AD20-18-000 (issued June 17, 2020).  *See also Eastern Wind Integration Transmission Study*, NAT'L RENEWABLE ENERGY LAB. 94 (Feb. 2011), https://www.nrel.gov/docs/fy11osti/47078.pdf ("[I]t is a near certainty that significant new transmission would be necessary to accommodate the much higher amounts of wind generation" potentially to be developed in the eastern United States).

[32] In fact, over the past decade, the PJM grid has seen significant reliability enhancements while incorporating a more diverse resource mix of intermittent and baseload generation along with the lowest energy prices since the RTO was created two decades ago.

14

### 3. Other Concerns Raised by Protestors Are Not Relevant to the Commission's Consideration of the Proposed Revisions.

Protestors raise several additional untrue or misleading concerns that are also irrelevant to the Commission's consideration of the Proposed Revisions. The Commission should disregard them.

The Load Group expresses concern with the cost of replacing aging transmission facilities.[33] But claims of big cost increases are not relevant to the planning required to address individual EOL Needs that may be identified when a Transmission Facility is nearing the end of its useful life. Rather, the Load Group's arguments are a thinly disguised attempt by the Load Group to advocate its own alternative solution that is not before the Commission in this case. Providing increased opportunities for stakeholders' input into EOL replacement decisions will have a beneficial impact on project timing and selection and there is no reason to expect that it will increase costs.[34] Moreover, the cost figures that the Load Group presents illustrate nothing more than the unremarkable, but well-understood, fact that the demand for electric power increased substantially in the years following World War II, driving a significant build-out of the transmission system.[35] Now, over 50 years later, these facilities are reaching the end of their useful lives and many likely need to be replaced. The Load Group's concern with the cost of

---

[33] *See* Load Group at 34.

[34] *See generally* Load Group at 4-6. The Load Group's attempt to project the cost of EOL projects through 2028 based on "[t]rending . . . cost data" is at best speculative, and the Commission should not give evidentiary weight to this projection. For example, the Load Group does not purport to take into account the multiple considerations that go into the decision to replace Transmission Facilities. Moreover, the Tatum affidavit employs a simple linear projection of Transmission Facility replacement cost that, as is well known, very sensitive to the selection of the data points upon which the projection is based. *See* Load Group at 4-5, Affidavit of E. Tatum at 6 ("Tatum Aff.") (attached to Load Group).

[35] *See, e.g.*, *The Changing Structure of the Electric Power Industry: An Update*, ENERGY INFO. ADMIN. (Dec. 1996), https://www.eia.gov/electricity/archive/056296.pdf.

replacing this aging infrastructure is beyond the scope of this proceeding and is properly addressed elsewhere.[36]

The Load Group's speculation about cost savings[37] has also been shown to be unreliable.[38]  It assumes that all EOL replacements would be subject to Order No. 1000 proposal windows and all EOL replacements would be replaced by substantially cheaper alternatives, which is not necessarily the case.[39]  Its sweeping macro projections fail to address the process by which individual Transmission Facility replacements are planned.  However, that is precisely what the Proposed Revisions seek to do: provide expanded opportunities for stakeholder input regarding the decision to replace individual facilities using a process that the Commission has already found to be just and reasonable.

---

[36] *See also Appalachian Power Order* at P 62 (rejecting claims that concerns with the prudency of investments to eliminate CIP-014-02 facilities must be considered in a Section 205 proceeding to assess whether the procedures under which such facilities are planned are just and reasonable since "the currently effective cost recovery process provides sufficient safeguards against these concerns [and] the costs are subject to the normal prudency review before the Commission").

[37] *See* Load Group at 7-8; Tatum Aff. at A10.

[38] The 30% savings factor suggest by the Load Group is taken from a defective analysis using insufficient data reported in a whitepaper authored by the Brattle Group that LS Power sponsored.  The analytical shortcomings were recently explained in a whitepaper report.  Dr. Emma Nicholson, *et al.*, *Building New Transmission: Experience To-Date Does not Support Expanding Solicitations*, CONCENTRIC ENERGY ADVISORS, (June 2019), https://ceadvisors.com/wp-content/uploads/2019/06/CEA_Order1000report_final.pdf ("Concentric Report").

[39] The Concentric Report finds that the methodology used in the Brattle whitepaper to estimate cost savings is "flawed" and "should not be relied upon for decision-making purposes."  *Id*. at 15; *see generally, id.* at 14-24.  As a threshold concern, it is not possible to draw conclusions about final project costs and cost savings with a data set in which only one project has been placed in service and the others have been canceled or are at various stages of development.  *Id*. at 14-15.  The Concentric Report's close examination of the assumptions and methodology applied to upper and lower bound savings estimates prepared by Brattle show fatal defects, such as reliance on cherry-picked projects, inconclusive cost data, and inaccurate data about cost overruns.  The conclusions drawn, the Concentric Report finds, are "inaccurate and as such, provide no basis to expand the scope of competitive solicitations in FERC-jurisdictional ISOs/RTOs."  *Id.* at 38.

Some protestors complain that the Transmission Owners did not follow the PJM stakeholder process or allege that they violated the CTOA.[40]  These accusations, which misunderstand the PJM governance process and reflect protestors' preference for a different process, are baseless.[41]  The Transmission Owners participated fully in the stakeholder process, raising each of their legal, factual and responsibility concerns well before the initial stakeholder votes on the proposal supported by the Load Group, LS Power and others.[42]  When these concerns went unacknowledged, the Transmission Owners pivoted to address the reasonable substantive concerns raised by stakeholders in a lawful manner consistent with PJM governing documents.[43]  Transmission Owners "consult[ed] with PJM and the PJM Members Committee beginning no less than thirty (30) days prior" to the submission of the Proposed Revisions, as the CTOA and the PJM Tariff require.[44]  Only three comments were submitted to the Transmission

---

[40] *See, e.g.*, Interested Parties at 13-14; LS Power at 10.

[41] *See Am. Transmission Sys., PJM Interconnection, L.L.C.,* Answer of Indicated Transmission Owners to Motion to Dismiss, Docket No. ER20-2046-000 (filed June 25, 2020) ("Indicated Transmission Owner Answer").  The answer responds to misguided assertions that a vote of the TOA-AC was required to vote on a notice prior to submission of the Attachment M-3 Filing, and walks through the process and governing documents to show procedures and process had been followed and were indeed consistent with past practice.

[42] *See* Indicated PJM Transmission Owners' Statement of Legal and Contractual Issues and Reservation of Rights (Apr. 20, 2020) (submitted to PJM Markets and Reliability Committee), https://www.pjm.com/-/media/committees-groups/committees/mrc/2020/20200430/20200430-item-08-pjm-to-legal-statement-and-reservation-of-rights.ashx.  The legal and substantive deficiencies with the Load Group-LS Power Proposal will be addressed in Docket ER20-2308-000.

[43] Contrary to the allegations spun by the LS Power at 3 n.11, the Transmission Owners' actions leading to filing the Proposed Revisions with the Commission complies fully with the stakeholder process.  *See* Indicated Transmission Owner Answer.  Moreover, it is not unlawful anticompetitive conduct for competitors to cooperate and reach agreements in pursuit of governmental action, such as the submission to the Commission and its approval of the Proposed Revisions.  Rather, it has long been held that such activity is protected by the First Amendment under the *Noerr-Pennington* doctrine.  *See E. R.R. Presidents' Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).

[44] *See* CTOA § 7.3.2; OATT § 9.1(b).  A notice to the Members Committee issued on May 7, 2020 initiated the consultation and solicited comments on the proposal.  *See* Notice of Transmission Owners Consultation with the Members Committee Regarding Proposed Amendments to Attachment M-

Owners Agreement-Administrative Committee ("TOA-AC").[45]  The Transmission Owners'

consultation and adoption of the Proposed Revisions for filing complied with section 9.1 of the

PJM Tariff and section 7.62 of the CTOA.  Contrary to Protestors' complaints, the consideration

of changes to the PJM Tariff provisions governing the Transmission Owners retained

responsibilities under these provisions are an equally valid and appropriate part of the PJM

governance and stakeholder process.

### B.    The Attachment M-3 Amendments Expand Stakeholder Transparency and Meaningful Opportunities for Participation and Are Just and Reasonable.

While the protests focus largely on alternatives preferred by some stakeholders or

challenge the right of the Transmission Owners to file the Proposed Revisions, few, if any, are

critical of the benefits that the Proposed Revisions would bring to the planning of asset

management projects, including EOL Projects, in PJM.[46]  The right of the Transmission Owners

to file to expand the coverage of Attachment M-3 to asset management projects, including those

addressing EOL Needs, is well grounded in PJM's governing agreements as well as Commission

precedent.  As discussed above, the Commission must consider the merits of the changes

proposed, rather than whether those changes could do something more or different that might be

---

3 of the PJM Tariff (May 7, 2020), https://www.pjm.com/-/media/committees-groups/committees/mc/2020/20200528/20200528-informational-posting-proposed-amendments-to-attachment-m-3-of-the-pjm-tariff.ashx.

[45] Only the Organization of PJM States, Inc. ("OPSI"), which has not intervened in this case, commented on the substantive provisions of the proposal.  OPSI's comments sought access to Candidate EOL Needs List.  As noted below in section II.C.8, state commissions' access to this information is not changed by the Proposed Revisions.  The remaining two comments are nearly identically worded and do not address the substance of the proposal.  *See* Comments of OPSI (June 9, 2020); Comments of the Joint Consumer Advocates (June 9, 2020) and Comments of ODEC, AMP, PJM ICC, and LS Power (June 9, 2020) (materials for the June 10, 2020 CTOA-AC meeting), https://www.pjm.com/committees-and-groups/committees/toa-ac.aspx.

[46] *See, e.g.*, Interested Parties at 19 (urging the Commission to reject the Proposed Revisions and accept the Joint Stakeholder Proposal); LS Power at 8, 65 (same).  Of the nineteen pages of the Interested Parties' protest, only three pages address the merits of the Proposed Revisions.

18

preferred by the protestors.  Thus, the Commission should accept the Proposed Revisions based on their specific and salutary benefits and the absence of any well-founded objection.

### 1.  The Transmission Owners Retain the Right to File Procedures for Planning EOL and Other Asset Management Projects.

LS Power, the Load Group, and other protestors claim that the Transmissions Owners do not have the right to file the Proposed Revisions because, they contend, PJM should plan EOL Projects and any procedures governing that planning should be in the Operating Agreement.[47] While that may be their preference, that is inconsistent with the PJM governing documents and prior Commission has rulings.  Asset management projects, which include EOL planning, are not required to be regionally planned projects and may be planned under procedures filed and administered by transmission owners.[48]  In PJM, the Transmission Owners retained the responsibility for planning the retirement and replacement of their Transmission Facilities, unless a Transmission Owner voluntarily files Form No. 715 EOL Planning Criteria or a PJM Planning Criteria Need must also be addressed by the replacement.  Where the Transmission Owners retained the right to plan Transmission Facilities, they have the right to file the procedures under which those Transmission Facilities will be planned.[49]

---

[47] LS Power at 13-16, 21-32; Load Group at 11-16; Interested Parties at 15.  Specifically, protestors object to the Applicability section and several of the definition sections of the Proposed Revisions, including "Asset Management Project," "EOL Need" and "Incidental Increase."

[48] In fact, in the California Orders, the Commission found that asset management projects and activities that do not expand the transmission system (or result in only incidental expansion) need not even be planned through an Order No. 890-compliant transmission planning process.  *SCE Rehearing Order* at PP 48-49, 55; *PG&E Rehearing Order* at PP 7, 49, 55.

[49] It is not disputed that the Transmission Owners have the exclusive right to modify Attachment M-3.  The existing text provides: "Modifications. This Attachment M-3 may only be modified under section 205 of the Federal Power Act if the proposed modification has been authorized by the PJM Transmission Owners Agreement-Administrative Committee in accordance with section 8.5 of the Consolidated Transmission Owners Agreement."  PJM Tariff, Att. M-3.

In approving Attachment M-3, the Commission specifically recognized that the Transmission Owners retained the responsibility to plan Supplemental Projects, which are expansions or enhancements of the Transmission System not required to satisfy PJM regional planning criteria:

> The record in this proceeding indicates that the planning for Supplemental Projects is done almost entirely by the PJM Transmission Owners, with PJM playing a relatively minor role in which it reviews the proposed Supplemental Projects only to ensure that they do not have adverse reliability impacts.[50]

On rehearing, the Commission confirmed that even though Supplemental Projects expand or enhance Transmission Facilities and thus are subject to Order No. 890's transmission planning requirements, transmission owners participating in an RTO are not required to have the RTO perform all planning for local or Supplemental Projects:

> When transmission owners participate in an RTO, the Commission did not require them to allow the RTO to do all planning for local or Supplemental Projects. Rather, the Commission recognized RTO planning processes may focus principally on regional problems and solutions, not local planning issues that may be addressed by individual transmission owners.[51]

Since the Transmission Owners did not transfer Supplemental Project planning responsibility to PJM, the Commission concluded that "it is just and reasonable for the PJM Transmission Owners to establish the process for planning these transmission projects and to initiate under section 205 any proposed revisions."[52]  Indeed, in *Monongahela Power Co.*, the Commission rejected arguments very similar, if not identical, to the argument made by protestors here to the

---

[50] *Monongahela Power Order* at P 97.

[51] *Monongahela Rehearing Order* at P 13 (quotations omitted).

[52] *Id.* at P 14.  *See also Appalachian Power Order* at PP 57-59 (affirming the Transmission Owners' right to add planning procedures for a subset of Supplemental Projects (*i.e.,* CIP-014 Mitigation Projects) as Attachment M-4 to the PJM Tariff).

effect that PJM, not the Transmission Owners, should plan EOL and Supplemental Projects under procedures set forth in the Operating Agreement.[53]

As noted in the Transmittal Letter, the Transmission Owners similarly did not transfer to PJM planning responsibility for asset management projects, including EOL projects to replace transmission facilities.[54]  Before the creation of PJM, the Transmission Owners, like other public utilities around the country, were responsible for planning expansions to and replacements of their transmission facilities to serve load.  When PJM was formed the Transmission Owners only transferred to PJM the responsibility to prepare the RTEP to plan for the "enhancement and expansion" of the PJM Transmission System.[55]  The focus of PJM's role on planning for the expansion of the transmission system it operates was confirmed in 2006, when PJM became a party to the CTOA, under provisions that remain in force today.[56]

---

[53] *Monongahela Order* at PP 30-31, 117 (rejecting arguments that PJM should plan EOL projects).  *See* Initial Comments of American Municipal Power, Inc., *Monongahela Power Co.*, Docket No. EL16-71-000 at 9-10 (October 25, 2016) ("As discussed below, as part of the PJM stakeholder process to address *aging infrastructure*[,] . . . it has become apparent that each TO has some process, documented or not, to determine which facilities are no longer economically efficient to maintain.  There is no reason these processes cannot be documented and published and the resulting projects be categorized as baseline [PJM-planned RTEP] projects pursuant to either individual TO or PJM criteria. . . . AMP believes this goal can be achieved through modifications to the PJM Operating Agreement . . . .") (emphasis added).  *See also* LS Power at 26-30; Load Group at 16-19.

[54] Transmittal Letter at 7-9.

[55] *PJM Interconnection, L.L.C.*, 81 FERC ¶ 61,257 at 62,236, 62,266, 62,275 (1997) ("November 1997 Order"); *see Atl. City Elec. Co.*, Filing of the PJM Supporting Companies, Docket No. ER97-3189, *et al.* at Attachment F, Transmission Owners Agreement dated as of June 2, 1997 at § 2.3.7 ("Original TOA"), Amended and Restated Operating Agreement Of PJM Interconnection, L.L.C., Schedule 6, § 1.1 (filed June 2, 1997) ("This Regional Transmission Expansion Planning Protocol shall govern the process by which the Members shall rely upon the Office of the Interconnection to prepare a plan for the enhancement and expansion of the Transmission Facilities in order to meet the demands for firm transmission service in the PJM Control Area.").

[56] Transmittal Letter at 9 n.32.  In approving the CTOA, the Commission noted, "the Consolidated TO Agreement largely tracks the [superseded] Agreements and will be beneficial to all market participants to the extent it provides a single articulation of the parties' respective rights and obligations."  *PJM Interconnection L.L.C. and the PJM Transmission Owners*, 114 FERC ¶ 61, 283, at P 10 (2006).  *See also* CTOA, § 9.22.

(Page 339 of Total)                                          JA0329

The CTOA only transferred to PJM the responsibility to prepare a "Regional Transmission *Expansion* Plan."[57] The RTEP is the plan "for the *enhancement and expansion* of the Transmission System in order to meet the demands for firm transmission service in the PJM Region."[58] PJM accepted the responsibility to prepare the RTEP for that stated purpose, agreeing in the CTOA to "[c]onduct its planning *for the expansion and enhancement of transmission facilities*."[59]

This was a limited transfer of planning responsibilities. The Transmission Owners retained all other responsibilities relating to transmission planning and transmission asset management. The Transmission Owners specifically retained "the right to *build*, acquire, sell, dispose, *retire*, merge or otherwise transfer or convey all or any part of its assets, including any Transmission Facilities . . . ."[60] Each Transmission Owner also retained the responsibility to "physically operate and maintain all Transmission facilities that it owns."[61] The right and responsibility to decide when a Transmission Facility must be "retire[d]" due to its age or condition, and to decide what to "build" in place of that facility, *i.e.,* the right and responsibility to plan and implement EOL projects, thus remained with the Transmission Owners.[62] If there

---

[57] CTOA, § 4.1.4 (emphasis added). *See also id.*, at §§ 6.3.3 (PJM to administer the RTEP Protocol), 6.3.4 (PJM to "[c]onduct its planning for the expansion and enhancement of transmission facilities based on a planning horizon of at least ten years, or such longer period as may be required")

[58] Section 1.22 of the CTOA incorporates the definition of the RTEP from the Tariff. The quoted language is from Tariff § 1.37A (emphasis added).

[59] CTOA, § 6.3.4 (emphasis added). In the California Orders the Commission clearly distinguished between transmission enhancement and asset management activities, including EOL planning, which does no more than incidentally increase transmission capacity. *SCE Order* at P 33; *PG&E Order* at P 68.

[60] Original COA § 2.2.3 (emphasis added); CTOA, § 5.2.

[61] *Id*., § 4.5

[62] The only limitations on these rights to which the Transmission Owners agreed are to provide PJM with "reasonable advance notice" prior to permanently taking Transmission Facilities out of service,

were any ambiguity on this score – which there is not – it is removed by section 5.6 of the

CTOA, where each Transmission Owner expressly reserves for itself all "[r]ights not specifically

transferred . . . to PJM pursuant to [the CTOA] or any other agreement . . . ."[63]  The

Transmission Owners' CTOA counterparty, PJM, agrees.[64]

    As in the case of Supplemental Projects, the Transmission Owners' contractual right to

determine when, whether, and how to replace facilities that have reached the end of their useful

lives carries with it the right to make Section 205 filings to govern how and when Transmission

Owners receive stakeholder input, as well as measures to facilitate coordination of EOL Needs

with PJM responsibilities.[65]  That is precisely what the Proposed Revisions do.[66]

    The Commission's rulings on the Transmission Owners' retained planning and filing

rights also dispose of LS Power's arguments that the CTOA and Section 9 of the PJM Tariff do

---

CTOA § 4.4, and coordinating planned outages, which would likely be necessary where a Transmission Facility is replaced.  *Id.*, § 4.8.

    [63] *Id.*, § 5.6. ("Except as otherwise provided in this Agreement, each Party retains its rights pursuant to the Federal Power Act and the FERC's rules and regulations thereunder.").  In an appeal from the November 1997 Order, the court of appeals ruled that when the Transmission Owners joined PJM "there was no transfer of ownership or even physical operation of their facilities . . . [and] each of the [transmission owners] retained both ownership and physical control of their facilities[.]"  *Atl. City Elec. Co.*, 295 F.3d at 6.

    [64] *See, e.g.,* Transmittal Letter at Exhibit D.  PJM recognizes that planning asset management projects and activities requires extensive knowledge about the material conditions of assets, the risks of failure and any mitigating factors, and local operational issues, and it is the Transmission Owners and not PJM that have the specialized knowledge of their systems and their customers needed to cost-effectively manage their assets.  *See id.* at Exhibit C.

    [65] *Monongahela Rehearing Order* at P 14.  *See also* CTOA, § 5.4 ("Except as otherwise provided in this Agreement, each Party retains its rights pursuant to the Federal Power Act and the FERC's rules and regulations thereunder.").

    [66] Nothing in the Proposed Revisions prevents PJM from fully exercising planning responsibilities under Schedule 6.  *See* Load Group at 23 (asserting that the Proposed Revisions "prohibit[] PJM from complying with FERC Rules[,]" including Section 35.43(k)), 30 (asserting Transmission Owners "do not have a perpetual right to rebuild"; erroneously characterizing asset management and EOL activities as transmission expansions and enhancements subject to Section 35.43(k)).  As noted *supra,* at § II.C.3, the Proposed Revisions were carefully designed to govern only Transmission Owner planning activity.

not grant the Transmissions Owners the right to file the Proposed Revisions.[67]  Moreover, LS

Power's cramped reading of the court's *Atlantic City* decision is also belied by the actual words

the court used when it held that Commission public utilities retained the rights given to them by

Congress: "Section 205(d) provides that a public utility may file changes to rates, charges,

classification, or service at any time upon 60 days notice."[68]  That right is not limited to rates and

rate design as LS Power alleges, but includes, as the Commission has explained, the right to file

processes and procedures governing stakeholder input into the retained planning decisions

regarding their assets.[69]

LS Power and the Load Group try to distinguish "expansion" from "enhancement" in an

effort to diminish the impact of the Commission's *Monongahela* holding.[70]  But that effort fails

since in the PG&E Rehearing Order the Commission drew no distinctions between the two

terms, regarding both as encompassing non-incidental increases in transmission capacity.  The

Commission added emphasis to both terms in quoting the Operating Agreement definition of

Supplemental Project to point out that the definition "shows that activities that expand the grid

are an element of the definition of Supplemental Projects."[71]  The Commission concluded that

"replacements of assets" fall within its definition of asset management projects and accordingly

---

[67] LS Power at 16-20.

[68] *Atl. City Elec. Co.,* 295 F. 3d at 10.

[69] LS Power's arguments that the Proposed Revisions do not fall within the Transmission Owners'
rate design authority under CTOA § 7.3.1 are also undermined by its own (but incorrect) argument at 37-
38 that the Proposed Revisions do have an impact on the cost allocation of Attachment M-3 Projects.

[70] LS Power at 45; Load Group at 29-30.

[71] *PG&E Rehearing Order* at P 58-59 (quoting Operating Agreement, OA Definitions S – T
("Supplemental Project")).

are not subject to Order No. 890's transmission planning requirements, and thus remained with the transmission owners.  This same distinction is reflected in the CTOA.[72]

2.      **The Attachment M-3 Order No. 890-Compliant Process Will Be Expanded to Cover Asset Management Projects, Including EOL Needs.**

Attachment M-3, as approved by the Commission in the *Monongahela Rehearing Order,* establishes Order No. 890-compliant procedures for obtaining and considering stakeholder input into Transmission Owner planning of Supplemental Projects.[73]  However, since asset management projects and activities do not expand or enhance Transmission Facilities, Attachment M-3 does not currently require Transmission Owners to apply the Attachment M-3 stakeholder process to asset management projects and activities, including EOL Projects.[74]  If the Commission accepts the Proposed Revisions, however, that would change.

The Proposed Revisions would apply the Order No. 890 template of assumptions/needs/potential solutions input and review to any Transmission Owner identified asset management need where the solution could have an impact on PJM's modeling of the

---

[72] CTOA, §§ 4.1.4, 6.34.  *See also* Schedule 6, § 1.1.  LS Power at 7 argues that because the PJM Markets and Reliability Committee "decisively passed" the PJM Manual 14B, which addresses EOL Need project planning, the PJM Transmission Owners are "attempt[ing] to change the rules in PJM related to PJM's regional planning of Form No. 715 projects."  *See id.* at 28-32.  But, manuals are not filed with the Commission and must yield to filed tariffs and Commission precedent.  *See Midwest Indep. Transmission Sys. Operator, Inc.*, 122 FERC ¶ 61,172, at P 490 (2008) ("To the extent the Business Practice Manuals contain greater detail than the tariff[,] . . . the greater detail supplements the tariff and does not override the tariff."); *PacifiCorp*, 70 FERC ¶ 61,322 at 61,984-85 (1995) (holding that the region's reliability council need not file documents that simply "recommend[ ]" operating practices, but must file those that require transmission procedures).  Also, there is nothing in the Proposed Revisions that is inconsistent with Manual 14B.  *See supra* at n.121.

[73] *Monongahela Rehearing Order* at P 41.

[74] Although not required to do so, many Transmission Owners already use the Attachment M-3 process to obtain stakeholder input into asset management projects, including EOL Projects.  When they do so, projects emerging from the process are included in the Local Plan as Supplemental Projects, even though such projects do not expand or enhance Transmission Facilities.

Transmission System, even though a potential solution to that need would not expand

Transmission Facilities.  This increase in transparency and opportunity for stakeholder input

goes beyond what the Commission has required of transmission-owning public utilities whether

part of an RTO or not, and beyond what the Commission has found to be a just and reasonable

approach for receiving stakeholder input in asset management planning activities, such as

Southern California Edison's transmission maintenance and compliance review process.[75]

The protests, however, largely ignore or belittle this significant expansion of

transparency.  There is little, if any, direct criticism of the overall impact of expanding

Attachment M-3 to include certain asset management projects and activities.  The protesting

parties complain that they did not get everything they would prefer – full assumption by PJM of

responsibility for EOL Project planning[76] – rather than concede the clear benefits of the

Proposed Revisions.

The Proposed Revisions achieve this significant expansion of opportunities for

meaningful stakeholder input into asset management project planning in a straight-forward and

efficient manner.  There are no changes to the procedures or processes set forth in Attachment

M-3 (which the Commission previously approved).  As can be seen from the marked version of

the Proposed Revisions, there are very few changes to section (c) which constitutes the existing

text of Attachment M-3.  The only language changes proposed are those to expand its coverage

and clarify three provisions.[77]

---

[75] *SCE Order* at P 40.

[76] *See, e.g.,* Load Group at 7, 20; LS Power at 43; Interested Parties at 8-10.

[77] Each of the three clarifying changes facilitate stakeholder input and take nothing away from the existing requirements.  Section (c)(1) will now specify that when the Transmission Expansion Advisory Committee considers Attachment M-3 projects, it is subject to Attachment M-3.  Section (c)(5) adds a procedure to require posting of the projects selected in the Local Plan, thus clearly initiating a stakeholder comment period on the Solutions proposed to be included in the Local Plan, an improvement to the

While failing to acknowledge the expansion of opportunities for meaningful stakeholder input under Attachment M-3, several protests did criticize some of the definitions utilized to achieve it.[78]  Again, these criticisms have nothing to do with the Proposed Revisions and just represent the protestors' preferred alternative.  Both LS Power and the Load Group criticize the definition of "Asset Management Project" *because* that definition employs the approach the Commission took in the California Orders.[79]  In other words, they do not claim the definition is inaccurate; rather, they assert that the California Orders are not applicable to PJM.

This claim is unfounded.  There is no legal dispute that Order No. 890 applies to PJM, and the California Orders define the scope of Order No. 890.  PJM agrees.[80]  There is no factual dispute that the Transmission Owners, like the transmission owners in California Independent System Operator ("CAISO"), engage in "maintenance, compliance, work on infrastructure at the end-of-useful life, and infrastructure security . . . to maintain [their] existing electric transmission system[s] and meet regulatory compliance requirements."[81]  The California Orders are also clear that asset management includes replacing aging transmission facilities.[82]  Moreover, as the protests concede, there is no question that the Transmission Owners, like their CAISO counterparts, engage in "replacement work to address an EOL Need."[83]  Finally, there is no

---

current text.  Section (c)(7) clarifies that Transmission Owners may use the Attachment M-3 process even if not required to do so to receive input, also improving the current text.  The Load Group at 39 criticizes this third change, but its criticism is based on a misreading of the new language.  It only addresses projects that are subject neither to Order No. 890 nor the expanded coverage of Attachment M-3, and does not expand Transmission Owner planning authority.

[78] LS Power at 31, 39-43; Load Group at 24-30.

[79] LS Power at 31, 39-43; Load Group at 24-30.

[80] PJM ER20-2308 Comments at 3; Transmittal Letter Exhibits C, D and E.

[81] *SCE Order* at P 32; *PG&E Order* at P 67.

[82] *SCE Order* at P 33; *PG&E Order* at P 68.

[83] Proposed Revisions, § (b)(i).

question that when asset management involves EOL replacement work where there is no need to expand transmission capacity, the replacement facilities could nonetheless result in an "incidental increase" in transmission capacity for various reasons (discussed below) that "is not reasonably severable from the asset management project or activity."[84]  Thus, efforts to distinguish the Commission's words simply because they were written in the context of agreements and tariffs of the CAISO utilities must fail.  The Commission's words describing asset management projects and activities apply equally to AEP, PPL Electric or any other Transmission Owner, including AMP, ODEC and Silver Run Electric.[85]

The Load Group complains that the definition of Asset Management Project is "virtually unlimited."[86]  Maintaining the performance, reliability and security of a complex transmission system with thousands of miles of lines and hundreds of substations inherently involves numerous activities and equipment, this fact has no practical impact on the operation of the Proposed Revisions.  Thus, the operative provisions in section (c) apply only to "Attachment M-3 Projects" and only to Asset Management Projects that affect PJM modeling of the transmission system are included in this definition.[87]  Attachment M-3 Projects are the types of projects that could have an impact on stakeholder needs or affect other pending projects in PJM and are appropriately included in the Attachment M-3 process.

---

[84] *Id.*

[85] Silver Run Electric, LLC, a corporate affiliate of LS Power, is the newest Transmission Owner in PJM.  *PJM Interconnection, L.L.C.*, Letter Order Accepting Revisions to the PJM Consolidated Transmission Owners Agreement for Silver Run Electric, LLC, Docket No. ER20-1132-000 (issued Apr. 3, 2020).

[86] Load Group at 2.

[87] As noted in the Transmittal Letter at 13, in engineering terms, this is expressed as "projects that affect the connectivity of Transmission Facilities or significantly affect Transmission Facility ratings or impedance."

LS Power, while recognizing that the Attachment M-3 Project definition limits the scope of projects that must be planned under Attachment M-3, complains that the limiting language provides too much discretion since it will be determined by "individual Transmission Owners definitions"[88] and not determined by PJM uniformly.  This complaint is groundless.  First, the defining language, "projects that affect the connectivity of Transmission Facilities or significantly affect Transmission Facility ratings or impedance," is uniform, applies to all Transmission Owners, and is not – as alleged by LS Power – confined to local zonal impacts.  Moreover, under the California Orders, asset management projects are not subject to Order No. 890's transmission planning requirements, so any application of the definition language to exclude an asset management project cannot be unjust and unreasonable.  If there is any concern that the definition Attachment M-3 Project will not be applied uniformly, stakeholders will have ample opportunity to raise those concerns given that under the Proposed Revisions Asset Management Projects will now be subject to stakeholder scrutiny under Attachment M-3.

Protestors also attack the definition of "Incidental Increase" as too expansive or giving Transmission Owners too much discretion.[89]  The Transmission Owners did not create that definition.  It comes directly from the California Orders.[90]  Again, these attacks are based upon the untenable assumption that there is one interpretation of Order No. 890 that applies in California and another interpretation, much more to the protestors' liking, that applies in PJM.  There is only one interpretation of Order No. 890 and it applies consistently to all public utilities.

---

[88] LS Power at 43; Load Group at 28-29.

[89] LS Power at 27-30; Load Group at 44-48.

[90] *SCE Order* at P 33; *PG&E Order* at P 68.

29

The plain language of the Proposed Revisions, however, demonstrates that the protestors' complaints about the definition of Incidental Increase are unfounded.

Under the California Orders, Order No. 890 applies to projects that *expand or enhance* Transmission Facilities. In PJM that could be either a PJM-planned RTEP project or a Transmission Owner-planned Supplemental Project under Attachment M-3. Under the Proposed Revisions, the definition "Incidental Increase" serves one purpose: to distinguish the types of projects not formerly covered under Attachment M-3 from those already covered. The definition follows the California Orders' finding that the broad category of "asset management project or activity" could include increases in transmission capacity: "[T]here may also be instances in which a [transmission owner's] asset management project or activity may result in an increase in transmission capacity that is not incidental . . . ."[91] To distinguish activities subject to Order No. 890's transmission planning requirements from those that are not, the Commission noted that Order No. 890 was intended to address "undue discrimination in expansion of the transmission grid."[92] However, under the Proposed Revisions, *both* projects that expand and enhance the grid and projects that do not are subject to Order No. 890-compliant procedures. Projects in the former group will be subject to Attachment M-3 as Supplemental Projects; those in the latter group will be subject to Attachment M-3 as Asset Management Projects. Thus, LS Power's and the Load Group's complaints about the definition of "Incidental Increase" are pointless. Regardless of whether an asset management project results in an Incidental Increase in the capacity of the Transmission System, stakeholders will still be able to provide input into the planning of projects covered by the Proposed Revisions.

---

[91] *Id.* at P 69.

[92] *Id.* at P 66 (citing Order No. 890 at PP 57-58, 421-422) (emphasis omitted).

Even if the complaints about the definition of Incidental Increase made a material difference, those complaints are misplaced. First, whether one calls the description in the California Orders a definition of Incidental Increase or not, the definition in the Proposed Revisions comes directly from the identical paragraphs 33 of the SCE Order and 68 of the PG&E Order, and the 1940s aging transformer example these orders describe. If the protesters are concerned that the definition is too vague or open-ended, their problem is not with the Proposed Revisions, but with Commission precedents.[93]

### 3. The Attachment M-3 Amendments Will Improve Coordination Between EOL Needs and PJM Planning Under Schedule 6.

The Proposed Revisions substantially enhance transparency and coordination of EOL planning in PJM. As discussed in the Transmittal Letter, the Proposed Revisions require Transmission Owners to (1) document and annually present their EOL Planning Criteria, including such criteria applicable to projects that are not currently subject to Attachment M-3; (2) create for PJM a five-year projection of EOL Needs to facilitate PJM's planning and anticipation of situations in which a PJM Planning Criteria Need and an EOL Need could be addressed by a single project; and, (3) where such situations that are identified, submit single project through the RTEP Planning process, including soliciting proposals under section 1.5.8 of Schedule 6 (*i.e.,* PJM's Order No. 1000 proposal window process). Finally, the Proposed Revisions impose on Transmission Owners the requirement to document any decision to proceed with an EOL Project[94] where PJM has selected a project through the RTEP Planning Process that

---

[93] PJM agrees that the meaning of the words "incidental increase" from the California Orders are clear and can be applied in PJM. *See* PJM ER20-3208 Comments at 16-17; Transmittal Letter, Exhibit D at 7-8 and Exhibit E at 20.

[94] In the case of an identified EOL Need of a Transmission Owner with a Form No 715 EOL Planning Criteria, the Transmission Owner must document its decision to propose that PJM plan a separate project to address that EOL Need. Proposed Revisions, § (d)(2)(iii).

PJM believes addresses the EOL Need.  These enhancements to EOL planning transparency and coordination are not enough for some protestors; they want nothing less than a forced confiscation of the planning and ownership rights retained by the Transmission Owners' when each joined PJM.[95]  The Proposed Revisions, on the other hand, reflect the measured and lawful EOL planning approach suggested by PJM in the stakeholder process.

Many EOL Needs can be addressed without requiring expansion or enhancement of Transmission Facilities and thus are not currently subject to Attachment M-3 since the resultant project would not be a Supplemental Project.  Many of these EOL Needs will now be subject to Attachment M-3 under the Proposed Revisions.  The first step in that Attachment M-3 process is the development, documentation and annual presentation of EOL Planning Criteria,[96] which normally occurs as part of the Attachment M-3 Assumptions Meeting process.[97]  This implements PJM's recommendations:  "Annual presentation of the details of TO EOL Program promoting transparency and understanding."[98]  Several protestors complain, however, that the Transmission Owners will not be required to adopt uniform EOL Needs Planning Criteria[99] or that PJM will not be establishing the EOL Needs Planning Criteria.[100]  As noted in the Transmittal Letter, it makes no sense to require uniform EOL Planning Criteria given that each Transmission Owner's transmission system reflects differing customer requirements, engineering approaches and decisions, technical standards, economic judgments, risk assessments and

---

[95] *See, e.g.,* LS Power at 16-24; Load Group at 11-16.

[96] Proposed Revisions, § (d)(1)(i), (ii).

[97] Attachment M-3, § 2.  *See* Proposed Revisions, § (c)(2).

[98] Transmittal Letter, Exhibit E at 6.

[99] *See e.g.,* Ohio FEA at 9-10; OCC at 12.

[100] *See e.g.*, LS Power at 26-30; Load Group at 15.

32

JA0340

prioritizations, local needs, operating conditions, system designs and topologies that have driven its development over time.[101] What is new is that stakeholders will now be given an opportunity to review and comment on these differences. Since these criteria must be presented annually to stakeholders, the Proposed Revisions provide an important opportunity for stakeholders to provide their views on each Transmission Owner's EOL planning criteria.

The second significant revision involves greater coordination with the RTEP Planning Process through the requirement that Transmission Owners provide PJM with a Candidate EOL Needs List. This is a five-year non-binding projection of each Transmission Owner's EOL Needs identified under its documented Attachment M-3 EOL Planning Criteria.[102] Despite what several protestors' desire,[103] Transmission Owners must be permitted to make updates and modifications to their EOL Candidate Needs List since numerous factors affect Transmission Owner asset management activities. These can include weather, materials condition, maintenance programs, work scheduling priorities and the timing and availability of capital. Making this list "binding," as PJM pointed out, risks unnecessarily accelerating expenditure or, at worse, a "run-to-failure" scenario: "Transmission Owners also need the flexibility to both expedite replacement projects to avoid run-to-failure scenarios and to delay replacement projects when condition assessments indicate that the continued operation of the facilities can be done without jeopardizing reliability."[104] Nor is there any benefit to PJM of a projection of more than five years. As PJM informed stakeholders, "requiring each Transmission Owner to provide advance notice of its potential end of life facilities (i.e., "candidates") five years forward at the

---

[101] Transmittal Letter, Exhibit E at 17.

[102] *Id*. at 17-18; Proposed Revisions, § (d)(1)(iii).

[103] *See, e.g.,* LS Power at 53; NJBPU at 8-9; Load Group at 39.

[104] Transmittal Letter, Exhibit D at 5-6.

JA0341

start of an annual RTEP cycle is appropriate because it aligns with PJM's planning process."[105] Although some protestors prefer to see a longer projection of EOL Needs,[106] PJM made it clear that "[t]here is little value to PJM to attempt to identify end of life facilities ten years forward because of the uncertainty of any determination made that far ahead and, such an advance notice would not be utilized in PJM's five-year forward planning process."[107]

Several protestors object to the provision limiting the availability of the Candidate EOL List to PJM.[108]  These objections are without merit.  First, the purpose of the list is to provide PJM with information to identify possible overlaps with PJM Planning Criteria Needs, such as a reliability or economic project.  It is not intended to be a forecast of Transmission Owner spending on EOL Projects.  Indeed, it cannot be such a forecast because, until the EOL Needs are identified and reviewed with stakeholders through Attachment M-3, a Transmission Owner cannot identify the solutions to those needs, let alone their costs.  Moreover, because of the nature of the determination of potential EOL Needs five years in the future, the Candidate EOL List is inherently uncertain and subject to change based on unforeseen events and the success or lack thereof of maintenance programs.  In addition, the precise timing of the replacement of a transmission line or transformer depends on a Transmission Owner's capital budgets, resource availability and synergistic efficiencies in scheduling work.[109]

---

[105] *Id.*, Exhibit D at 5.

[106] LS Power at 11 n.29.

[107] Transmittal Letter, Exhibit D at 5.

[108] *See, e.g.,* NJBPU at 7-8; LS Power at 52.  Contrary to LS Power's unsupported assertions, nothing in the Proposed Revisions limits state commission access to information from Transmission Owners within their respective jurisdictions.  *See infra* Section II.C.8.

[109] Transmission outages are often required to replace a transmission line or other equipment. These must be coordinated with PJM.  CTOA, § 4.8.  Moreover, transmission outages are market sensitive information and are posted on OASIS only after formal notice is provided.  *Id.*, § 4.8.6.

JA0342

Second, these complaints ignore the fact the Proposed Revisions require Transmission

Owners to identify specific EOL Needs at the "Needs Meeting" stage of the Attachment M-3

process. All the information stakeholders need to participate in Order No. 890-compliant

transmission planning will be provided to them when a Transmission Owner presents the EOL

Need at the Needs Meeting under the Attachment M-3 process.[110] Stakeholders will be

presented with the EOL Need based on the Attachment M-3 EOL Planning Criteria presented at

the Assumptions Meeting. Under Attachment M-3, they will have a full opportunity to submit

comments and identify related transmission needs for Transmission Owner consideration. This

will occur *before* a proposed solution is presented at the Solutions Meeting.

Protestors' arguments against the confidentiality of the Candidate EOL Needs List are

also inconsistent with the Commission-approved process under Attachment M-3 that

transmission needs not be identified before Transmission Owners receive comments first on the

criteria, assumptions, methodology, and models that will be used to identify transmission needs

at the Need Meeting. Under the Proposed Revisions the Attachment M-3 framework will govern

the development of EOL Needs to which Solutions are proposed.

In the event that PJM identifies a possible overlap between an EOL Need on the

Candidate EOL Needs List and PJM Planning Criteria Needs[111] before that EOL Need is

presented at the Attachment M-3 Needs Meeting, stakeholders will be apprised of the EOL Need

---

[110] The Ohio FEA at 11-12 is concerned that Transmission Owners can prevent PJM from identifying an overlap project by objecting to its inclusion. There is no such right built into the Proposed Revisions. *See* Ohio FEA at 11-12. While the contents of the Candidate EOL Needs List can vary as EOL Needs are reexamined and updated, if an EOL Need is on the list, it will be available to PJM to determine if could be addressed by an overlap project. While Transmission Owners are required to consult with PJM, there is no veto over selection of confirmed EOL Need for inclusion in an overlap project.

[111] *See* Proposed Revisions, § (d)(2), discussed *supra,* at section II.B.3.

35

JA0343

at the same time as the overlapping PJM Planning Criteria Need is identified to stakeholders under the RTEP Planning procedures set out in Schedule 6 of the Operating Agreement. The overlap need will be subject to *all* of the Order No. 890 and Order No. 1000-compliant planning rules and procedures under Schedule 6, including where appropriate, the opening of a proposal window.

The Proposed Revisions thus present a transparent process, fully compliant with Order No. 890 for EOL Needs and other asset management needs even though Order No. 890's transmission planning requirements do not apply to asset management projects and activities. Indeed, the disclosure that will occur with respect to EOL Needs and other asset management needs not only goes far beyond anything required by Order No. 890, but also exceeds anything approved by the Commission in other regions, when submitted on a voluntary basis.[112] The protestors have identified no requirement or need for additional disclosure of tentative EOL Needs years in advance, particularly given the confidentiality concerns underlying the EOL Need projections.

LS Power complains that the definition of "EOL Need" is too vague in that it gives the transmission owner too much discretion to determine when a facility it owns and maintains needs replacement.[113] LS Power is again complaining about a fact it would prefer to ignore: each Transmission Owner, including LS Power's affiliate Silver Run Electric, has retained in section 5.2 of the CTOA the right and responsibility to decide when to retire its facilities, subject to

---

[112] *See SCE Order* at P 40. Since there is no need to disclose the Candidate EOL Needs List, there is no reason to consider disclosure under either Critical Energy Infrastructure Information or non-disclosure agreement protections.

[113] LS Power at 50-51.

reasonable notice to PJM.[114]  LS Power's claim that the Good Utility Practice standard is absent from the definition ignores the obligation that each Transmission Owner assumed in section 4.5 of the CTOA to operate and maintain its Transmission Facilities in accordance with applicable reliability standards and *Good Utility Practice*.[115]  Moreover, the definition employs the term, "end of its useful life."  That is *not* an accounting term, but rather the term used by the Commission to describe asset management activities that apply to decisions driven by physical condition.[116]

LS Power's concerns with the limitation of EOL Needs to transmission lines and transformers not connected to distribution[117] misapprehends Zonal transmission planning.  Under the Proposed Revisions, EOL Needs are defined as "a need to replace a transmission line between breakers operating at or above 100 kV or a transformer, the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities, which the Transmission Owner has determined to be near the end of its useful life, the replacement of which would be an Attachment M-3 Project."[118]  This definition reflects substantial experience and practicality regarding the types of facilities likely to be addressed by an overlap with a PJM Planning Criteria Need.  Contrary to LS Power's insinuations, they are not a "back door" ROFR or an attempt to expand the exemption from competition of substation equipment in section 1.5.8(p) of Schedule 6.  For example, it is highly unlikely that a Transmission Owner would be able to retire a transformer connected to end-users it is required to serve in favor of some other

---

[114] *See* CTOA, § 4.4.

[115] Original TOA, §§ 2.3.3, 4.5 (emphasis added).

[116] *SCE Order* at PP 32-33.

[117] LS Power at 48.

[118] Proposed Revisions, § (b)(5).

project identified by PJM in response to its planning criteria. Of course, under the Proposed

Revisions any issues LS Power has with how a Transmission Owner is determining an "EOL

Need" can be raised when the Transmission Owner presents its Attachment M-3 EOL Planning

Criteria to stakeholders at the annual Attachment M-3 Assumptions Meeting – another one of the

improvements in the EOL planning process included in the Proposed Revisions.[119]

 Finally, once PJM selects a RTEP project (a "Required Transmission Enhancement") to

address both an EOL Need and a PJM Planning Criteria Need, the Transmission Owner that

identified the EOL Need will not plan an Attachment M-3 Project to address that need unless its

determines that the RTEP project will not address that need.[120] But first, the Transmission

Owner must present documentation to PJM and stakeholders on the reasons why it has decided

that the EOL Need is not addressed.[121] Under the CTOA, Transmission Owners are responsible

for maintaining their transmission facilities in accordance with Good Utility Practice.[122]

Transmission Owners also bear primary responsibility for providing safe and reliable service to

end-use customers in their Zones, as well as liability that could arise from equipment failure.

This is not a responsibility that has been, or should be, transferred to PJM. Notwithstanding LS

---

[119] *See* Proposed Revisions, § (c). Both the Load Group and LS Power claim that certain definitions are unnecessary or duplicative. However, these definitions apply to the additions to Attachment M-3 to be added by the Proposed Revisions and contrary to LS Power at 39, duplicate no other definitions in the PJM Tariff or Operating Agreement, except in the case of "Transmission Facilities," which, given that Attachment M-3 applies to Transmission Owner planning, appropriately refers to the CTOA definition.

[120] *See* Proposed Revisions, § (d)(2). If the EOL Need was identified pursuant a Transmission Owner's Form No. 715 EOL Planning Criteria, the Transmission Owner will not plan the project to address that need, but it may request PJM plan a separate project to address that need.

[121] *See* Proposed Revisions, § (d)(2)(ii). This process is comparable to that set out in PJM Manual 14B. *See* Transmittal Letter at 19 (citing PJM Manual 14B, § 1.4.2.2).

[122] CTOA, § 4.5.

Power's objection,[123] since Transmission Owners bear this responsibility, it is reasonable for Transmission Owners to retain the ability to fulfil their obligations to their customers and state commissions.[124]  However, it also is reasonable, as provided in the Proposed Revisions, for Transmission Owners to document and explain their decisions to PJM and stakeholders in the interest of greater transparency.

### C.    The Attachment M-3 Amendments Make No Changes to PJM Planning Responsibility or Processes, Cost Allocation or the Recovery of Transmission Costs

Protestors make numerous claims that the Proposed Revisions will cause a laundry list of harms to the stakeholder process and PJM transmission planning.[125]  These claims are all specious.  Although some of the protestors' "parade of horribles" appear to result from a misreading of the Proposed Revisions, most appear grounded in the protestors' preference for PJM to assume these planning responsibilities.[126]  As explained above, this is not a valid objection, since the Commission must judge the Proposed Revisions on their own merits, not in comparison to another proposal.[127] The Proposed Revisions are carefully crafted to "stay in the Transmission Owners' lane" and not alter or interfere with PJM's ability to carry out its planning responsibilities.  Protestors' major claims regarding the alleged harms caused by the Proposed Revisions are addressed and rebutted below.

---

[123] LS Power at 16, 26.

[124] A Transmission Owner's decision to proceed with an EOL project is, of course, still subject to any applicable state siting requirements and a prudency challenge at the time it seeks to recover the costs of the project.

[125] *See, e.g.,* LS Power at 7, 15, 18, 19-20; Load Group at 15-16, 21-24; Ohio FEA 7-12.

[126] *See e.g.,* Load Group at 21; LS Power at 43.

[127] *See supra* section II.A.2.

JA0347

### 1.     There Is No Reduction to the Level Of Stakeholder Participation.

Several of the protestors claim that the Proposed Revisions would reduce the level of stakeholder input into the planning of projects to address EOL Needs.[128]  In fact, the opposite is true.  Nothing in the Proposed Revisions limits or reduces stakeholder opportunities for input.[129] To the contrary, the Proposed Revisions extend the Order No. 890-compliant provisions of Attachment M-3 to Asset Management Projects, including annual review of Transmission Owners' EOL criteria.[130]  Additionally, stakeholders will have opportunities for input into the planning of projects that address both a Transmission Owner EOL Need and a PJM Planning Criteria Need, as these "overlap projects" are submitted for review under Schedule 6 of the Operating Agreement by the TEAC or relevant Subregional RTEP Committee.[131]  Since opportunities for stakeholder input under Attachment M-3 in its current form are just and reasonable, the expansion of those opportunities under the Proposed Revisions is also just and reasonable.

---

[128] *See* NJBPU at 4-5; Load Group at 15-16; LS Power at 58-60.  *Cf.* Ohio FEA at 8-12.

[129] The NJBPU at 9 complains about the notice and minimum ten-day period added to the Attachment M-3 procedure permit stakeholders to comment on the Local Plan before the ten-day period for the Transmission Owner to consider comments on the selected Solutions.  Prior to this addition, there was no provision for any notice to stakeholders when the comment period on the Local Plan began or any minimum period for submitting comments.  Moreover, the ten-day period is consistent with the other minimum comment periods the Commission approved in Attachment M-3.  The Commission found that the comments periods included in Attachment M-3 were "appropriately calibrated, given the PJM Transmission Owners' stated objective of aligning the Supplemental Projects planning process with PJM's RTEP process."  *Monongahela Rehearing Order* at P 46.

[130] Proposed Revisions, §§ (b)(1), (2), (d)(1)(i).

[131] *See* Operating Agreement, Schedule 6, § 1.3.

Document Accession #: 20200721-5166    Filed Date: 07/21/2020

### 2. There Is No Change In The Ability of Stakeholders To Question The Need For An EOL Project or To Challenge Its Prudence.

A primary focus of numerous protests appears to be on controlling the overall costs of EOL projects.[132]  Nothing in the Proposed Revisions will alter, let alone diminish, appropriate opportunities to question the costs or necessity of any specific EOL project.  Indeed, if anything they will increase those opportunities since EOL projects will now be considered under Attachment M-3 regardless of whether those projects expand or enhance Transmission Facilities.[133]

As discussed above, generalized concerns about the cost of replacing aging infrastructure are outside the scope of specific planning procedure proposals under Order No. 890 and containing transmission costs is not an appropriate goal of the PJM planning process.[134]  The protestors here make the very same claims that the Commission rejected in the California Orders.[135]  There the Commission held that "concern about self-interest as a cause of imprudent investment" were not the subject of the Order No. 890 planning requirements:

---

[132] Load Group at 24, 32; Ohio FEA at 9-13; OCC at 7-8, 11-12; Interested Parties at 16-17; NJBPU at 3.

[133] *See supra* § II.B.2,3.

[134] *See supra* § II.A.3.  Also, as discussed above the generalized concerns raised are without merit.

[135] *PG&E Rehearing Order* at P 34 (highlighting that complainants did not focus on planning that optimizes the non-discriminatory transmission access of customers, "but rather on what Complainants view as the potential for self-interested conduct that accompanies 'investing billions of dollars annually in [asset management projects] with no opportunity for third party review of the cost and need for the projects'").

JA0349

> In Order No. 890, the Commission stated that . . . "the planning obligations included in [Order No. 890] do not address whether or how investments identified in a transmission plan should be compensated." Complainants' concerns focus directly on compensation in rates for investments that the Commission stipulated is not part of the transmission planning process and therefore is not encompassed by the requirement set forth in section 28.2 of the *pro forma* OATT that transmission providers plan for network customer needs.[136]

The Commission similarly rejected the claims that prudency concerns are relevant in approving the planning of CIP-014-02 mitigation facilities under Attachment M-4.[137]

The primary and most appropriate forum to raise concerns about the prudence of transmission investment is the formula rate proceeding or Section 205 cost recovery filing of an individual Transmission Owner, not the Attachment M-3 planning process. Each of the Transmission Owner formula rate protocols included in Attachment H of the PJM Tariff expressly incorporates prudence matters into the review of formula rate updates and provides opportunities for customers and other interested parties to seek information relevant to prudency from the Transmission Owner.[138] Alternatively, if a Transmission Owner has in place a stated rate for Network Integrated Transmission Service, no costs of a replacement facility may be recovered without a Section 205 filing. PJM has no role in approving transmission investment outside the RTEP Planning Process and stakeholder efforts to reinterpret the Attachment M-3 process as a preliminary prudency review are misguided. Thus, concerns raised about excessive spending on Transmission Facility replacement are beyond the scope of this proceeding and are "better addressed elsewhere."[139]

---

[136] *Id.* (footnotes omitted), *quoting* Order No. 890 at P 438.

[137] *Appalachian Power Order* at P 62.

[138] *See, e.g.,* PJM Tariff, Attachment H-8H, §§ V(D)(f), VI(A)(1)(h),(i); Attachment H-28B, §§ III(A)(5), IV(C)(1)(c)(v), (D)(3).

[139] Order No. 890 at P 453.

However, even if the cost of asset management activities were an issue in this proceeding, protestors cannot show that the Proposed Revisions do anything to diminish their opportunities to raise those concerns. Stakeholders will have at least the same opportunity they had before to raise the need for a project at the Attachment M-3 Needs meeting and to challenge whether a proposed solution addresses a need at the Solutions meeting. Nothing in the Proposed Revisions curtails those opportunities and protestors fail to point to any specific provision that does.

>        **3.      The Proposed Revisions Provide No Veto Or Delaying Power Over PJM Planning Decisions.**

LS Power misreads section (d)(2)(ii) of the Proposed Revisions as giving a Transmission Owner the ability to prevent PJM from moving forward with an RTEP project designed to address both an EOL Need and a PJM Planning Criteria Need.[140] This provision does nothing of the sort. As discussed above, section (d)(2)(ii) only establishes a requirement that a Transmission Owner document why it has determined it must go ahead with an EOL project (or, if the Transmission Owner has EOL criteria in its Form No. 715, propose one to PJM). Such a determination by a Transmission Owner would not prevent PJM from proceeding with the transmission enhancement that it selected. Section (d)(2)(ii) simply imposes on a Transmission Owner that decides to move forward with a project to address an EOL need a requirement to explain its decision, nothing more. The burden would be on the Transmission Owner, not PJM, to explain why it has concluded that an EOL Project is needed in addition to the transmission enhancement PJM has selected. And in no case can the Transmission Owner stop PJM from proceeding with the RTEP project. This increases transparency and, like all other provisions in

---

[140] LS Power at 16, 26-27.

Document Accession #: 20200721-5166     Filed Date: 07/21/2020

the Proposed Revisions, its reach is confined to the Transmission Owners.  It imposes no obligations or limitations on PJM.

### 4.    There Is No Change to Form No. 715 Project Planning.

Protestors also assert that the Proposed Revisions modify the Form 715 criteria planning process,[141] even though section (a)(2) expressly acknowledges that Form 715 planning has been transferred to PJM.  In order to improve transparency, the Proposed Revisions do impose certain obligations on Transmission Owners with Form No. 715 EOL Planning Criteria.  These include the obligation to document such criteria and present them to stakeholders annually,[142] and to provide PJM with a Candidate EOL Needs List.[143]  Finally, if a Form No. 715 Transmission Owner believes that an overlap project selected by PJM does not address its identified EOL Need, it may *propose, but not plan*, a separate project addressing that need.  This last provision does not change PJM's planning responsibilities with respect to Form No. 715 planning criteria, nor do any of the other sections of the Proposed Revisions that create new Transmission Owner obligations.

### 5.    There Is No Change in the Schedule 12 Cost Allocation Rules.

Several protesters assert that the Proposed Revisions would have an impact on the allocation of cost responsibility for EOL Projects.[144]  This assertion is incorrect.  There is nothing in the Proposed Revisions that changes existing cost allocation rules in Schedule 12 of the PJM Tariff.  Neither the costs of Supplemental Projects nor the costs of Asset Management Projects are allocated under Schedule 12.  Thus, those projects are not currently selected in the

---

[141] NJBPU at 14-15; Load Group at 1, 39; LS Power at 51-52, 62.

[142] Proposed Revisions, § (d)(1)(i), (ii).

[143] *Id.*, § (d)(1)(iii).

[144] *See, e.g.*, NJBPU at 10-15; LS Power at 32-38; OCC at 13-16.

regional plan for purposes of cost allocation.  The costs of Supplemental Projects will continue to be assigned to the zone of the constructing Transmission Owner.[145]  The costs of EOL Projects that are not included in the RTEP will continue to be assigned to the zone of the loads responsible for the facilities being replaced.[146]  An EOL Need that is addressed by an overlap project will be subject to the cost allocation rules applicable to the PJM Planning Criteria Need that the project satisfies.  This is not a change in the cost allocation rules, but a correct application of the existing provisions of Schedule 12 in circumstances where a separate EOL project will be not be constructed.  As the Commission held in Approving Attachment M-4, since no change is proposed to the currently effective cost allocation methodology, claims regarding the cost allocation of Attachment M-3 Projects are beyond the scope of this proceeding.[147]

LS Power cites the recent decision of the court of appeals in *Old Dominion Electric Cooperative v. FERC*[148] to argue that the costs of certain Supplemental Projects and EOL Projects should be allocated under Schedule 12 just because they are similar to the projects planned by PJM in response to Form No. 715 Transmission Owner planning criteria.[149]  These contentions are similarly beyond the scope of this proceeding.[150]  Form No. 715 projects are

---

[145] PJM Tariff, Schedule 12, § (a)(3).

[146] *Id.,* § (b)(xiii).

[147] *Appalachian Power Order* at P 61.

[148] 898 F.3d 1254 (D.C. Cir.), *reh'g denied,* 905 F.3d 671 (D.C. Cir. 2018) ("*ODEC*").

[149] LS Power at 36-38.

[150] Moreover, LS Power is incorrect in asserting that the Proposed Revisions create "multiple new categories of projects."  LS Power at 38.  While the Proposed Revisions do employ some new descriptive definitions, the activities described, EOL projects and other asset management projects and activities, have been the mainstay of public utility maintenance since the beginning of the industry.  The Transmission Owners also take issue with LS Power's conjecture that the cost allocation rules for Supplemental Projects were intended to be purely local and of little consequence.  Those rules, which have been in place in one form or another since the formation of PJM as an independent entity, are based

planned by PJM and the Commission ruled that projects proposed in response to Form No. 715

planning criteria are included in the RTEP and thus subject to the cost allocation rules of

Schedule 12.[151]  Nothing in the Proposed Revisions changes this.  EOL Projects and

Supplemental Projects planned by individual Transmission Owners were not at issue in *ODEC*

and are not included in the RTEP, except for informational purposes.

### 6.    There is No Right of First Refusal

Several protestors are concerned that the Proposed Revisions would limit opportunities

for Order No. 1000 proposal window project solicitation under section 1.5.8(c) of Schedule 6.[152]

LS Power believes that the Proposed Revisions are a backdoor attempt to restore a ROFR for

incumbent Transmission Owners prohibited by Order No. 1000.  LS Power's concerns are

unjustified, notwithstanding their repetition.[153]  The Proposed Revisions expand, not contract,

opportunities for non-incumbent participation in the RTEP.

LS Power starts by claiming that the applicability section of the Proposed Revisions is a

ROFR.[154]  However, as discussed below, that section simply describes the transmission

expansion and enhancement planning responsibilities that PJM and the Transmission Owners

agree have been transferred to PJM.[155]  Contrary to LS Power's view, the phrase in the Operating

Agreement definition of Supplemental Project, "pursuant to a determination by the Office of the

Interconnection," is not a general delegation to PJM to expand its planning authority beyond

---

not on geography or consequence, but on who does the planning, PJM or the Transmission Owner, and
are consistent with Order No. 1000.  Order No. 1000 at P 564.

[151] *PJM Interconnection, L.L.C.,* 171 FERC ¶ 61,013, at P 40 (2020).

[152] *See, e.g.*, NJBPU at 2-3; Interested Parties at 17-18; OCC at 16.

[153] *See* LS Power at 6, 13-14, 33-36, 48, 53-54.

[154] LS Power at 14-16.

[155] *See* Transmittal Letter, Exhibit D at 4-8; *supra* section II.B.1.

what was transferred under the CTOA, but rather it is a simple reference to the fact that the Operating Agreement describes the process under which PJM fulfills the planning responsibilities that the Transmission Owners transferred to it in the CTOA.  The listing in section (a) of the planning responsibilities that were *not* transferred, but were retained by the Transmission Owners, in no way constitutes a ROFR to build an expansion or enhancement that PJM determines to be needed to satisfy its RTEP planning criteria.  Nor do the Proposed Revisions impose a ROFR on the planning of expansions and enhancements to address "operational performance."[156]  Such projects have always been considered Reliability Projects planned by PJM, as confirmed by Schedule 12 of the PJM Tariff, which assigns the costs of operational performance projects as Reliability Projects.[157]  Nothing in the Proposed Revisions gives the Transmission Owners a ROFR for such projects.

LS Power also claims that the definition of Attachment M-3 Project is a ROFR because its third clause covers any expansion or enhancement of Transmission Facilities that PJM does not plan.[158]  Yet this provision does nothing more than clarify that any Transmission Owner-planned project that expands or enhances Transmission Facilities will be subject to Attachment M-3.  This is not a ROFR; it simply reinforces the Transmission Owners' commitment that when they plan expansions or enhancements, they do so in compliance with Order No. 890, as the Commission required.[159]

---

[156] LS Power at 14-15.

[157] PJM Tariff, Schedule 12, § (b)(i)(A)(2)(a).

[158] LS Power at 15.

[159] *Monongahela Power Co.,* 156 FERC ¶ 61,134, at P 15 (2016).  Section II.C.4, *supra,* addressed LS Power's blatant mischaracterization of the Proposed Revisions, § (a)(2).  The Proposed Revisions assign additional transparency and coordination obligations to Transmission Owners with Form No. 715 EOL Planning Criteria, but make no change to PJM's planning responsibilities for planning Form No. 715 projects.  Section II.C.3, *supra,* corrected LS Power's mischaracterization of the Proposed

LS Power's next ROFR claim is based on its view that since Form 715 Projects and Supplemental Projects could have similar regional benefits, under Order No. 1000 there should be no ROFR applicable to Supplemental Projects.[160]  This argument, too, is wrong.  LS Power misquotes Order No. 1000.  Paragraph 313 of Order No. 1000 bans ROFRs for projects "selected in a regional transmission plan for purposes of cost allocation."  Supplemental Projects are not selected in the regional plan for purposes of cost allocation,[161] but rather their costs are assigned to the zone of the constructing Transmission Owner.  While Form No. 715 Projects are planned by PJM and selected in the RTEP, the Commission has already decided that Transmission Owners retain planning responsibility for Supplemental Projects,[162] and nothing in the Proposed Revisions changes that.  The definition of Attachment M-3 Projects does expand the coverage of Attachment M-3 to include Asset Management Projects, but these projects are not and never have been subject to Order Nos. 890's and 1000's transmission planning requirements.  Nor are they selected in the regional plan for purposes of cost allocation, and thus, they cannot be subject to Order No. 1000's requirement to eliminate a federal ROFR.

---

Revisions, § (d)(2)(ii) as a veto power over PJM RTEP overlap projects.  To reiterate, nothing in the Proposed Revisions gives a Transmission Owner the power to veto a PJM-planned RTEP project.

[160] LS Power at 34-35; *see also id.* at 55-58 (arguing that the Proposed Revisions "elevates local planning over regional planning," contrary to Order No. 1000).

[161] Contrary to LS Power at 55-57, planning responsibility in PJM is not based on geographic impact, but on whether planning responsibility has been transferred to PJM or retained by the Transmission Owners, *see supra,* section II.B.1.  LS Power's characterization of recent Commission seminal orders as a "steady march toward regional planning," LS Power at 55, ignores the Commission's post-Order No. 1000 determinations in the California Orders that Order No. 890 does not extend to asset management projects and activities and in *Monongahela Power Co.* that the Transmission Owners retain responsibility for planning Supplemental Projects.

[162] *See supra* at II.B.1.

LS Power next claims that the Proposed Revisions create a ROFR by permitting Transmission Owners to veto project selection.[163]  Not only does LS Power not cite the specific sections of the Proposed Revisions that create this "veto" power, but also it fails to explain how a ROFR (the right to build a project) can be a right to prevent a project from being built.  It also wrongly asserts that the Transmission Owners gave themselves a blanket ROFR over Public Policy Projects.[164]  Again, no such ROFR exists.  As LS Power recognized, PJM includes public policy in all of its RTEP project planning.[165]  Where public policy is the sole project driver, it is addressed either through a Transmission Owner-planned Supplemental Project or a State Agreement Approach project.[166]  The latter is specifically referenced in the Operating Agreement definition of "Supplemental Project" and section (a)(4) of the Proposed Revisions.[167]

In sum, the Proposed Revisions create no ROFR and seek no change to PJM's Order No. 1000 proposal window project selection rules, except to the extent that they expand opportunities to solicit project proposals where *in PJM's judgment* an EOL Needs project may

---

[163] LS Power at 33.

[164] *Id*. at 23.

[165] *Id.  See PJM Interconnection L.L.C.*, 142 FERC ¶ 61,214 at PP 109-12 (2013) ("By incorporating public policy requirements and initiatives at the assumptions stage of the RTEP process and as part of its enhancement and expansion studies, PJM considers how public policy requirements and initiatives contribute to transmission system needs."); *see, e.g.,* Operating Agreement, Schedule 6, § 1.4(a) ("The Regional Transmission Expansion Plan shall consolidate the transmission needs of the region into a single plan which is assessed on the bases of . . . and (iv) considering federal and state Public Policy Requirements.").  LS Power's assertion without any reference that "there is a live issue about whether public policy planning is working in PJM," LS Power at 23, is beyond the scope of this proceeding.

[166] Operating Agreement, Schedule 6, § 1.5.9(a).

[167] LS Power also claims that Multi-Driver Projects have been excluded from section (a) of the Proposed Revisions.  LS Power at 24.  Multi-Driver Projects, which are planned by PJM under section 1.5.10 of Schedule 6, must include at least two of PJM's exiting project drivers, *e.g.*, reliability and economic, and are thus already covered by section (a).  Further, the definition of "Supplemental Project" under the Operating Agreement does not include Multi-Driver Projects.

49

also be addressed by a project addressing a PJM Planning Criteria Need.[168]  Where PJM

identifies such an overlap, non-incumbents will have the opportunity, consistent with section

1.5.8 of Schedule 6, to submit proposals to address the overlapping need.

### 7.    There Is No Change in the Applicability of Attachment M-3 to Supplemental Projects.

LS Power claims that the definition of Attachment M-3 Project in the Proposed Revisions

limits the type of Supplemental Projects that are covered by Attachment M-3.[169]  LS Power

simply misreads the definition.  The relevant text of the definition reproduced below shows that

only Asset Management Projects are so limited:

> "Attachment M-3 Project" means (i) *an Asset Management Project that affects the connectivity of Transmission Facilities that are included in the Transmission System, affects Transmission Facility ratings or significantly changes the impedance of Transmission Facilities*; (ii) a Supplemental Project; or (iii) any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 under any of clauses (1) through (5) of section (a).[170]

All Supplemental Projects remain covered by Attachment M-3.

### 8.    There Is No Change to the Authority of State Commissions or Their Access to Transmission Owner Planning Data.

Protests by parties representing state commissions and state consumer advocates object

that the Candidate EOL Needs List and other EOL planning information is not explicitly made

available to state commissions.[171]  Nothing in the Proposed Revisions affects state agency access

---

[168] LS Power at 9 also attacked the PJM proposal presented in the recent stakeholder process as creating more Immediate Need Reliability Projects.  Regardless of the merits of that attack, the Commission should be assured that nothing in the Proposed Revisions has any impact on the creation of Immediate Need projects nor are they affected by the Immediate Need project reforms recently ordered by the Commission, since they make no changes in any PJM planning under Schedule 6.  *See PJM Interconnection, L.L.C.,* 171 FERC ¶ 61,212 (2020).

[169] LS Power at 43.

[170] Proposed Revisions, § (b)(2).

[171] NJBPU at 8-9; Protest at 9-11; OCC at 8-11.

to information regarding their jurisdictional Transmission Owners.  Moreover, the Transmission

Owners remain committed to fulfilling any and all obligations that exist under local laws and

regulations for providing such asset management data to state commissions and siting agencies.

The PJM Tariff, however, is not the appropriate mechanism to manage state political/legal

processes associated with information regarding asset management activities.  In addition to any

state and local process, state agencies are welcome to participate in the Attachment M-3 planning

process and benefit from the proposed increases in transparency.

### 9.    There Is No Impact on the Interconnection Process.

J-POWER's comments are focused entirely on its concerns with the PJM interconnection

process.[172]  It takes no position on the Proposed Revisions,[173] but urges the Commission to

establish additional procedures to obtain information regarding the Proposed Revisions and the

stakeholder proposal filed by PJM in Docket No. ER20-2308-000.  J-POWER describes

substantial growth and concomitant delays in the interconnection process, and asks the

Commission to require the Transmission Owners and PJM to provide information regarding the

interaction between EOL planning procedures and the interconnection study process.[174]

Nothing in the Proposed Revisions purports to have or will have an impact on the

interconnection process.  The interconnection process is managed by PJM, as Tariff

administrator, not the Transmission Owners.  While Transmission Owners perform the

---

[172] *See generally,* J-POWER.  LS Power at 53 also raises a concern regarding the interconnection process based on the non-binding nature of the Candidate EOL Needs List.  However, since the Candidate EOL Needs List does not now exist and thus had no impact on the interconnection queue, the addition of the list, even if non-binding, should improve PJM's ability to manage the interconnection process.  In addition, the requirement that EOL Needs projects be presented through the transparent Attachment M-3 Process will also aid interconnection planning.

[173] J-POWER at 3.

[174] *Id*. at 5.

engineering studies supporting that process, the additional procedures proposed to address EOL planning will not affect the Transmission Owners' performance of these studies. Additionally, the Proposed Revisions do not create additional EOL Needs that must be addressed by Transmission Owners as planners. Those needs are a product of customer demands, physical conditions and other factors that will not change with the Commission's approval of the Proposed Revisions. [175] Accordingly, the Commission should find that J-POWER's concerns with the interconnection process are beyond the scope of this proceeding. For the same reason, the Commission should reject J-POWER's request for additional procedures to address issues that are not presented by the Proposed Revisions.[176]

**10. There Is No Change to the Obligation of Transmission Owners to Include EOL Criteria in Their Form 715 Filings, Nor Is Any Such Change Required.**

Section (b)(7) of Attachment M-3 preserves a Transmission Owners' right to decide whether to include EOL Planning Criteria in its Form No. 715 consistent with the Commission's regulations. LS Power, however, asserts Transmission Owners are required to include EOL Planning Criteria in Form No. 715 consistent with its view that all EOL planning should be transferred to PJM.[177] LS Power's assertion is not only wrong, it is undeniably beyond the scope

---

[175] Under the RTEP Planning Process, interconnection requests are evaluated based on the PJM baseline analysis approved each year by the PJM Board. That baseline includes PJM Board-approved RTEP projects as well as any transmission projects resulting from the Attachment M-3 process prior to the Board review. *See* PJM Manual 14B, § 2.1 at p. 34 ("This baseline system, without any criteria violations, is then used for subsequent interconnection queue studies."). Asset Management Projects included in the Attachment M-3 process by the Proposed Revisions will similarly be included in the baseline upon which PJM studies interconnection requests. EOL Needs on the Candidate EOL Needs List that are not submitted for stakeholder review either through Attachment M-3 or the RTEP Planning Process, cannot be included in the baseline and thus can have no impact on interconnection planning studies.

[176] J-POWER Protest at 5-6. *See infra* n.190.

[177] LS Power at 60-62.

of this proceeding.  Form No. 715 has been required since 1993.  There is no requirement that Form No. 715 include transmission owner EOL planning criteria.  A simple examination of the purpose of Form No. 715 confirms this.

Form No. 715 was adopted to address the requirements of Section 213(b) of the FPA to require "transmitting utilities" to provide potential transmission customers, state commissions, and the public with information concerning potentially available transmission capacity and known constraints.[178]  It was adopted to serve two purposes: to alert *potential transmission customers* and others of (i) the availability of transmission capacity for the desired transmission service and (ii) to establish the procedure that a transmission provider will follow in assessing whether capacity exists or needs to be expanded to provide the new service.[179]  The only information relevant to such potential customers seeking new transmission service would be the procedure employed to *expand* the Transmission Facilities if capacity is unavailable.  That has nothing to do with EOL Criteria, which are designed to assess whether existing facilities providing *existing* transmission service need to be replaced.[180]

In PJM, of course, transmission service is provided by PJM, not individual Transmission Owners.[181]  The PJM Tariff lays out the procedures for requesting new transmission service and

---

[178] *New Reporting Requirement Implementing Section 213(b) of the Federal Power Act and Supporting Expanded Regulatory Responsibilities Under the Energy Policy Act of 1992, and Conforming and Other Changes to Form No. FERC-714*, 58 Fed. Reg. 52422 (Oct. 8, 1993).  *See also* 16 U.S.C. § 824*l*(b).

[179] *New Reporting Requirement Implementing Section 213(b) of the Federal Power Act and Supporting Expanded Regulatory Responsibilities Under the Energy Policy Act of 1992, and Conforming and Other Changes to Form No. FERC-714*, 58 Fed. Reg.  52425 (Oct. 8, 1993).

[180] Maintaining the facilities to provide existing transmission service is one of a Transmission Owner's obligations under the CTOA.  *See* CTOA, § 4.5.

[181] *Id*., § 4.1.1.

how the costs will be assessed.[182]  Moreover, in the California Orders, the Commission

distinguished asset management projects and activities from transmission expansion planning.

Identifying the need to expand Transmission Facilities was one of the key purposes of Form No.

715.  LS Power's allegations are nothing more than a product of its wishful thinking rather than

sound interpretation of the Commission's regulations.

### 11.  There Is No Change to Duquesne's Rights as a Transmission Owner.

Duquesne raises concerns that the Proposed Revisions go too far and interfere with

Transmission Owners' rights to manage their assets, particularly to address local needs, and

gives PJM too much control over planning responsibilities.[183]  The Proposed Revisions give PJM

no oversight role in asset management.  The decision to identify an EOL Need remains

exclusively with the Transmission Owner.  Each Transmission Owner develops and applies its

own Attachment M-3 EOL Criteria.  Additionally, while the Transmission Owner does receive

input into its criteria presented annually[184] and the needs identified under those criteria at the

Attachment M-3 Needs Meeting,[185] the Transmission Owner remains the final decision maker on

EOL Planning Criteria and projects.[186]  Also, as noted above,[187] the Candidate EOL Needs List

that each Transmission Owner would prepare is non-binding.  The Transmission Owner retains

---

[182] *See, e.g.,* PJM Tariff, §§ 17-25, 32, 200-237.

[183] Duquesne at 7-8, 10.

[184] Proposed Revisions, § (d)(1)(ii).

[185] *Id*., § (c)(3).

[186] Order No. 890 was designed to foster input into transmission owner planning decisions, not supplant transmission owner decision making or require "co-planning."  *See* Order No. 890 at 12267-68.

[187] *See supra* § II.B.3.

JA0362

the right to update the list based on its determination of the condition of its assets and its asset management activities.[188]

Duquesne is also concerned that if it identifies a better solution than an overlap project after the project is identified by PJM and posted for consideration in the RTEP, it will not be able to implement that solution.[189]  Even after PJM has identified and posted an overlap need such that a single solution may address both an RTEP Criteria Need and an EOL Need, the Transmission Owner will have the opportunity to participate fully in the development of the RTEP and can propose the solution to the EOL Need that it believes to be the most efficient and cost effective.

Duquesne also questions the necessity of including EOL Needs in Attachment M-3, citing the additional burden on Duquesne of compliance.  The Transmission Owners appreciate concerns about the additional burdens they are proposing to undertake.  However, the benefits the Proposed Revisions provide – addressing concerns raised by PJM during the stakeholder process and opening the process to receive additional stakeholder input on EOL and other significant asset management decisions – outweighs the additional burdens.  In addition, since the Commission has already approved Attachment M-3, extending its reach to Asset Management Projects is the most efficient process to expand transparency.

---

[188] The Duquesne at 8 is also concerned with the additional burden of justifying a decision to proceed with an EOL project that it thinks is necessary once PJM identifies an overlap RTEP project. While this may add some administrative burden, it is not a new burden.  A similar obligation with respect to overlaps with Supplemental Projects is currently included in PJM Manual 14.B, § 1.4.2.2.

[189] Duquesne at 8-9.

III.    **CONSOLIDATION OR FURTHER PROCESS IS NOT NEEDED FOR THE COMMISSION TO FIND THE PROPOSED REVISIONS ARE JUST AND REASONABLE AND WOULD UNREASONABLY DELAY IMPLEMENTATION.**

The Load Group requests that, if the Commission does not reject the Proposed Revisions "outright," it consolidate these proceedings with the proceedings in Docket ER20-2308.[190]  As explained above, protestors' criticisms of the Proposed Revisions are without merit, misplaced or just legally or factually wrong.  As explained below, the Load Group's efforts to amend the Operating Agreement and oppose the Proposed Revisions does not justify consolidation of proceedings, and their request should be denied.

The Commission generally considers consolidation only when a trial-type evidentiary hearing is required to resolve common issues of law and fact, and where consolidation will ultimately result in greater administrative efficiency.[191]  Here, the Transmission Owners are

---

[190] Load Group at 10; 39-40 (citations omitted).  The NJBPU at 16 suggests that the Commission should "coordinate its review of these proceedings" but does not move to consolidate.  *See id.* at 2, 15-16. This recommendation is vague and the Commission should not consider it.  Further, arguing that coordination is warranted because the Proposed Revisions arose from the same PJM stakeholder process inappropriately disregards the confined scope of a Section 205 review.  *See supra* § II.A.2.  J-POWER suggests that the Commission could "ensure that it has a full record regarding the issues" addressed in this docket and Docket ER20-2308, by "requesting additional information from the Transmission Owners and PJM or by initiating paper hearing procedures."  J-POWER Protest at 5; *see generally id.* at 5-6.  For the reasons explained in section II.C.9, *supra*, concerns with "the ability of PJM to manage its interconnection process" raise issues that are outside the scope of this proceeding, and consequently, such procedures to gather such additional information are neither warranted, relevant nor appropriate.  Such further process would not be an effective use of administrative resources and would unnecessarily delay implementation of planning enhancements proposed for PJM's upcoming planning cycle.

[191] *See, e.g., Midcontinent Indep. Sys. Operator, Inc.*, 170 FERC ¶ 61,241, at P 43 (2020) (denying LS Power's motion to consolidate, explaining that "[i]n general, the Commission formally consolidates matters only if a trial-type evidentiary hearing is required to resolve common issues of law and fact, and if consolidation will ultimately result in greater administrative efficiency"); *Tenn. Gas Pipeline Co., L.L.C.*, 156 FERC ¶ 61,156, at P 16 (2016) (denying request to consolidate proceedings where no hearing was required); *Midcontinent Express Pipeline, LLC*, 124 FERC ¶ 61,089, at P 27 (2008) (denying a motion to consolidate two certificate proceedings where no hearing was required); *Startrans IO, L.L.C.*, 122 FERC ¶ 61,253, at P 25 (2008) ("In general, the Commission consolidates matters only if a trial-type evidentiary hearing is required to resolve common issues of law and fact and consolidation will ultimately result in greater administrative efficiency.").

entitled to a determination under Section 205 that the Proposed Revisions are just and

reasonable.  The fact that a proposal to amend the Operating Agreement is also pending before

the Commission at the same time does not demand consolidation of the two dockets.  As

explained above, the issue before the Commission in this proceeding is confined to the

examination of whether the Proposed Revisions are just and reasonable.[192]  The Operating

Agreement amendments at issue in Docket No. ER20-2308 that PJM filed, but which it opposes,

are not before the Commission in this proceeding.  Rather, the issues in that proceeding concern

PJM's right to file Operating Agreement amendments that violate the Transmission Owners'

rights to decide when and how to retire and replace their transmission facilities and whether

provisions through which PJM would make those decisions are just and reasonable.

Contrary to what the protestors would like the Commission to think, the two proceedings

are entirely distinct.  The Load Group does not describe a specific need for or even identify the

issues that they believe support their consolidation requests, nor have they asserted that trial-type

procedures are needed develop an evidentiary record required for the resolution of this case.

Consolidation would serve no purpose other than to delay timely resolution and delay the

benefits stakeholders would realize in the upcoming planning cycle that the enhanced

Attachment M-3 processes will provide.[193]  If approved on the normal 60-day notice schedule,[194]

the Attachment M-3 Amendments could bring immediate benefits to the upcoming RTEP

---

[192] *See PJM Interconnection, L.L.C.*, 164 FERC ¶ 61,073, at P 44 (2018) (denying AMP's motion to consolidate because "[t]he fact that there are other proceedings with issues related to the issues PJM seeks to address in the instant filing does not limit the Commission's ability to render a decision on this filing").

[193] *United Gas Pipeline Co.*, 34 FERC ¶ 61,282, at 61,503 (1986) (finding that consolidation of two distinct matters "would necessarily delay, and might in fact effectively deny" the benefits of a new rate schedule).

[194] Transmittal Letter at 2.

planning cycle.  That opportunity is lost, however, if this proceeding is consolidated with the Stakeholder Proposal.

Further, the Stakeholder Proposal proceeding presents a different set of unique issues and challenges for resolution that are unrelated to the substantive transmission planning objectives to be achieved through the Proposed Revisions.  The Transmission Owners submit that the Proposed Revisions should not be held hostage to a controversy over whether it was appropriate in the first place for PJM to file the Stakeholder Proposal or the manner in which it filed it, let alone the underlying legal infirmities and substantive deficits in the Stakeholder Proposal.[195]  A Commission decision on the Proposed Revisions does not require resolution of the substantive planning problems inherent in the Stakeholder Proposal,[196] and they would not provide an efficient administrative solution or an expedient resolution of common issues that the Commission has found appropriate for consolidation in other cases.  The Commission should deny the motion for consolidation and accept the Transmission Owners' Proposed Revisions.

---

[195] *See* Transmittal Letter, Exhibits D and E; *see also PJM Interconnection, L.L.C.*, Motion of the Indicated Transmission Owners for Summary Rejection, Docket No. ER20-2308-000 (filed July 21, 2020).

[196] *See* PJM ER20-2308 Comments.

## IV.     CONCLUSION

None of the protests or other comments submitted in this proceeding presents any reason why the Commission should not find the Proposed Revisions just and reasonable.  Accordingly, the Transmission Owners respectfully request that the Commission accept the Proposed Revisions to the PJM Tariff without hearing, modification or condition, and allow these changes to become effective sixty (60) days from the date of the Transmittal Letter, as requested therein.

Respectfully submitted,

*/s/ Kenneth G. Jaffe*                                     */s/ Donald A. Kaplan*

Kenneth G. Jaffe                                           Donald A. Kaplan
Richard P. Sparling                                       Kimberly B. Frank
Alston & Bird LLP                                         K&L Gates LLP
950 F Street, N.W.                                        1601 K Street, N.W.
Washington, D.C. 20004                                    Washington, D.C. 20006
Telephone:  202-239-3300                                  Telephone: 202-778-9000
Kenneth.Jaffe@alston.com                                  don.kaplan@klgates.com
Richard.Sparling@alston.com                               kimberly.frank@klgates.com


*Counsel for the FirstEnergy*                             *Counsel for PPL Electric Utilities*
*Companies*                                               *Corporation*


*On behalf of the PJM Transmission Owners*


59

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 21st day of July 2020 upon

each person designated on the official service list compiled by the Secretary in this proceeding.


_/s/ Abraham F. Johns III_
Abraham F. Johns III

Document Content(s)

PJM TOs Answer to Protests.PDF..........................................1

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | |
| | ) | |
| American Transmission Systems, | ) | Docket No. ER20-2046-000 |
| Incorporated, et al | ) | |

**MOTION FOR LEAVE TO ANSWER AND LIMITED ANSWER**
**OF LSP TRANSMISSION HOLDINGS II, LLC**

Pursuant to Rules 212 and 213 of the Rules of Practice and Procedure of the Federal

Energy Regulatory Commission ("FERC" or "Commission"),[1] LSP Transmission Holdings II,

LLC ("LS Power") requests leave to submit this limited answer ("Limited Answer") to the

Sponsoring Transmission Owners'[2] answer ("TO Answer") filed in this docket on July 21,

2020.[3]  The Sponsoring Transmission Owners continue to downplay concerns about the cost

allocation problems raised by their proposed revisions to Attachment M-3 of the PJM Open

Access Transmission Tariff ("PJM Tariff") filed in this docket on June 12, 2020 ("TO Filing").[4]

Under the TO Filing, although no cost allocation methodology was filed, it is presumed

that the transmission owners propose that projects identified through Attachment M-3 will be

allocated solely to the zone where the project is located, as is currently the case for Supplemental

Projects.  Cost allocation for Supplemental Projects, and to the extent applicable to the new

---

[1]     18 C.F.R. §§ 385.212 and .213 (2020).

[2]     For purposes of this Limited Answer, the sponsoring PJM Transmission Owners are referred to as
        the "Sponsoring Transmission Owners."  "PJM Transmission Owners" refers to the transmission
        owners in PJM generically, and is used only to refer to the transmission owners collectively.

[3]     *Answer of the PJM Transmission Owners to Protests and Comments and Motion for
        Consolidation*, Docket No. ER20-2046-000 (filed on July 21, 2020).  PJM filed the revisions
        under Section 205 of the Federal Power Act on behalf of the PJM Transmission Owners.

[4]     *PJM Interconnection, L.L.C.*, "Amendments to Attachment M-3 to the PJM Interconnection,
        L.L.C. Open Access Transmission Tariff," Docket No. ER20-2046-000 (filed on June 12, 2020).

Attachment M-3 transmission project cost categories and definitions (including, but not limited to, each new proposed definition: Asset Management Project, Attachment M-3 Project, Incidental Increase, Applicability, EOL Need, and PJM Planning Criteria Need), undergoes no analysis as to whether new Attachment M-3 project categories have regional benefits, *i.e.*, benefits more than one zone. The TO Filing includes no evidence that allocating the costs of end of life projects, as set forth in its new categories and definitions (including, but not limited to, each new proposed definition: Asset Management Project, Attachment M-3 Project, Incidental Increase, Applicability, EOL Need, and PJM Planning Criteria Need), solely and exclusively to the zone where the project is located is consistent with cost allocation principles and is just and reasonable.

Each new Attachment M-3 definition and its resulting cost allocation must be established as just and reasonable. The Sponsoring Transmission Owners have not. LS Power provided evidence in its Protest, filed on July 6, 2020 ("LS Power Protest"), that at least some of the projects that would be identified pursuant to Attachment M-3, whether Supplemental Projects or the proposed new categories and definitions, are likely to have regional benefits.[5] LS Power submits, as part of this Limited Answer, Pterra, LLC's ("Pterra") analysis of nineteen previously-approved Supplemental Projects that were put forward to address end of life Transmission Facilities.[6] The Pterra Analysis demonstrates that although each of the nineteen Supplemental

---

[5]     *Protest of LSP Transmission Holdings II, LLC*, Docket No. ER20-2046-000 (filed on July 6, 2020).

[6]     LS Power submitted the Pterra Analysis as Exhibit 3 to its comments in support of PJM's July 2, 2020 filing in Docket No. ER20-2308-000 of revisions approved by a supermajority of PJM Stakeholders to planning for Transmission Facilities reaching the end of their useful life ("Stakeholder Filing"). *LSP Transmission Holdings II, LLC and Central Transmission, LLC Comments in Support of Stakeholder Approved Section 205 Filing*, Docket No. ER20-2308-000 (filed on July 23, 2020). For convenience, it is also attached to this Limited Answer as Exhibit A.

2

Projects (with specific Asset Management and Aging Infrastructure drivers) have regional benefits, if the existing cost allocation methodology is applied to end of life projects in the categories included in the TO Filing, each project would be allocated to a single zone, a clear violation of cost causation principles.[7] These cost allocation issues cannot be avoided.[8] Allowing every end of life project to automatically be allocated to a single zone is inconsistent with cost causation principles and court precedent related to free ridership, leads to unjust and unreasonable rates, and thus violates the Federal Power Act.[9] The TO Filing is fatally flawed and must be rejected on this basis alone.

## I.    MOTION FOR LEAVE TO ANSWER

LS Power requests leave to file a limited answer to the TO Answer filed in this docket. The Commission generally prohibits answers to answers, unless otherwise ordered by the decisional authority, except when specifically authorized by Rule 213 of the Commission's Rules of Practice and Procedure. The Commission accepts answers in circumstances where doing so will clarify the issues and otherwise assist the Commission in its decision-making.[10] This Answer provides additional information that that will assist the Commission in carrying out

---

[7]    *See, e.g.*, *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992) (At its core, the cost-causation principle requires that "all approved rates reflect to some degree the costs actually caused by the customer who must pay them."); *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004)(courts evaluate compliance with the cost causation principle by "comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party."); *Illinois Commerce Commission v. FERC*, 576 F.3d 470, 477 (D.C. Cir. 2009)(the Commission must have "an articulable and plausible reason" to believe that the benefits are at least roughly commensurate with costs); *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1262 (D.C. Cir. 2018)("*ODEC v. FERC*"), *reh'g denied*, 905 F.3d 671 (D.C. Cir. 2018).

[8]    *ODEC v. FERC*, 898 F.3d at 1262.

[9]    16 U.S.C. §§ 824d, 824e.

[10]   *See, e.g.*, *Midcontinent Indep. Sys. Operator, Inc.*, 158 FERC 61,128, at P 5 (2017); *Va. Elec. & Power Co*., 124 FERC ¶ 61,207, at P 22 (2008).

3

its duty to assess whether the TO Filing is just and reasonable.  Therefore, LS Power requests

that the Commission accept the following Limited Answer to the TO Answer.

## II.    LIMITED ANSWER

The TO Filing proposes to revise Attachment M-3 of the PJM Tariff, which currently sets

out the planning process for Supplemental Projects, to create new categories and definitions of

new locally-cost allocated projects (including, but not limited to, each new proposed definition:

Asset Management Project, Attachment M-3 Project, Incidental Increase, Applicability, EOL

Need, and PJM Planning Criteria Need).  If approved, any project that is not planned by PJM

under the criteria in the Applicability section (which is inconsistent with Schedule 6 of the

Operating Agreement) will be categorized as an "Attachment M-3 Project."  LS Power raised the

numerous problems with the project categories and definitions in its Protest.  Relevant to this

Limited Answer is the fact that the proposed project categories and definitions include entirely

new transmission facilities that presumably the TO Filing anticipates will be allocated solely to

the zone(s) where the project is located, although the TO Filing does not address cost allocation

or establish that each of these new proposed definitions and project categories only have local

zone benefits.[11]  For each of these new proposed definitions, Asset Management Project,

Attachment M-3 Project, Incidental Increase, Applicability, EOL Need and PJM Planning

Criteria Need, the cost causation analysis and free ridership analysis is missing and devoid.

For instance, the definition of Asset Management Projects goes beyond recognizing that a

PJM Transmission Owner is responsible for maintaining and repairing its existing transmission

assets to giving a PJM Transmission Owner a right of first refusal to construct an *entirely new*

---

[11]    Schedule 12 of the PJM OATT does not contain any references to the proposed project categories.

4

JA0373

transmission facility when existing Transmission Facilities are retired.  The only restriction on

the definition of Asset Management Projects – if the replacement results in "more than an

Incidental Increase in transmission capacity" then it is not an Asset Management Project – is not

an effective limitation because the definition of Incidental Increase is so expansive as to have no

legitimate meaning.  Under the TO Filing, an Asset Management Project resulting in Incidental

Increase as defined by the transmission owner itself could become an Attachment M-3 Project,

which would have exclusively local cost allocation, regardless of beneficiaries.[12]  Similarly, the

definition of EOL Need is not sufficiently specific and creates a backdoor right of first refusal on

substations and any other non-line transmission equipment, even though substations in PJM

today are clearly regionally cost allocated.[13]

     In its Protest, in addition to raising concerns regarding this overly expansive definitions,

LS Power raised the issue of how the costs of any new transmission facilities will be allocated.[14]

As confirmed by the TO Answer, the Sponsoring Transmission Owners believe it is sufficient to

simply declare that these are local projects that have always been planned by transmission

---

[12]   *See* LS Power Protest at 44-48.  The TO Filing does not explain how a project that creates an "Incidental Increase" from "advancements in technology and/or replacements consistent with current Transmission Owner design standards, industry standards, codes, laws or regulations . . . " only has local zone benefits.  There is no regional cost allocation methodology provided for an Attachment M-3 Project that "affects the connectivity of Transmission Facilities that are included in the Transmission System, affects Transmission Facility ratings or **significantly changes the impedance of Transmission Facilities**" or that result from Incidental Increase, even though the Sponsoring Transmission Owners freely acknowledged that an Incidental Increase might include upgrades from 115kV to 345 kV to account for "current Transmission Owner design standards."  The TO Filing similarly does not explain how the PJM Planning Criteria Need definition does not have regional beneficiaries, and how the vague catch-all definition of Attachment M-3 Project of "(iii) any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 under clauses (1) through (5) of section (a)" does not have regional beneficiaries.

[13]   *See id.* at 48-49.

[14]   *See id.* at 35-38.

                                            JA0374

Document Accession #: 20200730-5057    Filed Date: 07/30/2020

owners and that that is the end of the cost allocation inquiry.[15]  But recent cost allocation precedent makes it clear that it is not the end of the inquiry under cost causation principles.  In *ODEC v. FERC*, the Court stated that "the cost-causation principle focuses on project benefits, not on how particular planning criteria were developed."[16]  Thus, for the Commission to accept the TO Filing, there must be evidence in the record that the cost allocation methodology applicable to the new project categories is just and reasonable.[17]  This is especially true as the DC Circuit case specifically related to end of life projects in PJM.

Long-standing cost allocation precedent requires that costs be allocated roughly commensurate with the benefits received from that project.[18]  Recent cost allocation precedent is illustrative in this proceeding.  In *ODEC v. FERC*,  the Court vacated a Commission Order accepting a single zone cost allocation method, the same cost allocation that would be used for an Attachment M-3 Project or Asset Management Project, for an entire category of transmission projects, including some end of life projects.[19]  The Court found the failure to analyze regional benefits violated the cost causation principle.[20]  The TO Filing suffers the same fatal flaw that the Court, and ultimately the Commission, recognized.[21]  As discussed in the LS Power Protest and shown in the Pterra Analysis, some projects in the proposed Attachment M-3 Project category likely will have regional benefits.  This is consistent with the revised cost allocation for

---

[15]     TO Answer at 44-45.

[16]     898 F.3d at 1262.

[17]     16 U.S.C. §§ 824d, 824e.

[18]     *See, supra* footnote 7.

[19]     Indeed the two particularly projects at issue in that case were end of life projects.

[20]     *Id.*

[21]     *PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,133 (2019).

6

44 projects following the Commission's rejection of a single zone cost allocation for end of life projects planned under Form No. 715.[22]  The TO Filing presents no evidence to the contrary.

A separate but related flaw is that the TO Filing does not address concerns over free ridership.  As courts and the Commission have recognized, the free ridership problem is an important one.[23]  In *El Paso Elec. Co. v. FERC*, the Fifth Circuit Court of Appeals remanded a Commission Order accepting a cost allocation methodology that would have only allocated costs to half the utilities in the WestConnect region regardless of the fact that other utilities would benefit.[24]  As demonstrated in the Pterra Analysis, it is likely that projects included under the Attachment M-3 Project category will have regional benefits but, under the presumed cost allocation method, *all of the costs will be allocated to only one zone*.  The other zones that benefit will *pay nothing*.  This permits utilities that benefit to escape responsibility for paying for those benefits, *i.e.* free ride on the investment of another zone.  Unlike the situation addressed by the Court in *El Paso Elec.*, it is the effort to circumvent the regional cost allocation methodology that creates the free rider issue.  Applying the regional cost allocation method would mitigate the free rider problem.  The Pterra Analysis demonstrates this fact.  The regional cost allocation methodology cannot be utilized through the M-3 revisions.

---

[22]    *See PJM Interconnection, L.L.C.*, Compliance Filing, Docket No. ER18-680, Attachment A (filed on June 1, 2020).  LS Power also noted that the EOL Needs definition is limited to transmission lines and thus excludes substations.  LS Power Protest at 49.  However, as LS Power pointed out in Protest, Project 9A, a market efficiency project currently under development, has become essentially a substation project and the project has regional benefits.  *Id.* at 49-50.

[23]    *See, e.g.*, *El Paso Elec. Co. v. FERC*, 832 F.3d 495, 505-506 (5th Cir. 2016); Order No. 1000 at 534 ("Transmission services create an opportunity for free ridership because the nature of power flows over an interconnected transmission system does not permit a public utility transmission provider to withhold service from those who benefit from those services but have not agreed to pay for them.").

[24]    832 F.3d at 505-506.

7

LS Power now has evidence that some Attachment M-3 Projects and Asset Management Projects are likely to have regional benefits. The attached Pterra Analysis shows that nineteen Supplemental Projects that are also aging infrastructure replacement projects located throughout PJM have regional benefits.[25] Pterra's Analysis demonstrates that when the current single zone cost allocation is analyzed against PJM's region-wide dfax method for numerous end of life replacement projects, the error in cost allocation can be 100%, and there are specific examples[26] of 100 percent cost allocation to zones with no (zero percent) benefit.[27] Eight Supplemental Projects relating to Asset Management Projects and Attachment M-3 Projects had costs erroneously allocated by more than 70%, and ten by more than the 47%, which the D.C. Circuit found violative of cost causation in *ODEC v. FERC*.[28] This Analysis of nineteen projects highlights the potential extent of the free-rider problem in PJM. The Analysis of projects identical to ones that would be implicated under the new Asset Management and Attachment M-3 Project definitions also showed that at least $361 million of the total cost of $779 million being misallocated. Hardly, a quibbling over benefits.

The Pterra Analysis also demonstrates that a project's voltage level is a not an accurate predictor of whether a project will have regional benefits. For instance, the Pterra Analysis shows that, under a dfax analysis, project s0782, a rebuild of a 138 kV line, the zone where the

---

[25]     Pterra's analysis is consistent with the analysis of end of life beneficiaries for projects planned by PJM under Form No. 715.

[26]     See projects S0645, S0233, S0555 in Exhibit A that are 100% cost allocated to the AEP and PPL zones, but the zones receive zero percent of the benefits.

[27]     *Ill. Commerce Comm'n vs. FERC*, 576 F.3d at 476. The Commission is "not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits or benefits that are trivial in relation to the costs to be shifted to its members."

[28]     *ODEC v. FERC*, 898 F.3d at 1262.

8

Document Accession #: 20200730-5057     Filed Date: 07/30/2020

project is located receives 72.54% of the benefits while another zone receives 27.46% of the benefits.

As LS Power noted in its Protest, aging infrastructure is a growing driver of investment in new transmission in PJM.[29]  The chart below represents the projected investment in asset replacement projects for just one transmission owner, although the proposed investments are through an affiliate.[30]



---

[29]     LS Power Protest at 4-5.

[30]     *See* 2019 AEP Fact Book at Slide 100 from an AEP presentation at the 54th EEI Financial Conference (Nov. 10-12, 2019), *available at* https://www.aep.com/Assets/docs/investors/eventspresentationsandwebcasts/2019Factbook_All%20Sections_FINAL.pdf.  It is unclear how the AEP Transco is permitted to participate in Supplemental Projects, which by definition are projects needed solely by the existing

9

Document Accession #: 20200730-5057    Filed Date: 07/30/2020

Many of the facilities to be replaced will be high-voltage projects that are known to have regional benefits.[31]  The TO Filing applies local zone cost allocation to all Asset Management and Attachment M-3 Projects, regardless of voltage and its cost allocation is also inconsistent with higher voltage (at or above double circuit 345 kV) regional cost allocation frameworks today in PJM.

PJM has aging infrastructure needs at all voltage levels, even at or above 345 kV and as high as 765 kV.  These future needs would be captured and presumably locally allocated under the TO Filing.  For instance, there are transmission facilities operating at 765 kV in the AEP zone that likely will need to be replaced in the next five to ten years that are being planned now.  A good example is the Kammer-Mountaineer 765 kV project that is currently under discussion.  The project's benefits are spread widely throughout the region, and the local AEP zone only benefits 16.75% from such rebuild.[32]  This is a clear violation of the cost causation principle and permits other zones to avoid their share of hundreds of millions, if not billions, in costs.  As the Court in *ODEC v. FERC* stated succinctly, "Application of the cost-causation principle is simple here, because this critical point is undisputed: high-voltage power lines produce significant regional benefits within the PJM network, yet the amendment categorically prohibits any cost

---

transmission owner, or how the AEP Transco anticipates $4.7 billion in local and asset replacement projects for facilities it does not own.  LS Power observes no protections in the TO Filing against the transmission owners retiring plant in regulated utilities, but rebuilding the asset in a new Transco.  PJM Transmission Owners argue that *Atlantic City* precedent applies to the replacement and rebuilding of entirely new facilities.  LS Power strongly disagrees.  However, it is a new level of *Atlantic City* hyperbole to argue that these exclusive regulated utility CTOA rights, if they exist, apply to projects rebuilt in new utility Transcos.

[31]    *ODEC v. FERC*, 898 F.3d at 1260.

[32]    *See* Exhibit A at Page 2.

JA0379

sharing for high-voltage projects like those at issue here."[33]  The same is no less true here related to the Attachment M-3 Project, Asset Management Project, Applicability Section, EOL Need, and PJM Planning Criteria Need definitions and project categories, as well as due to the improper filing of this proposal amendment through the PJM Tariff with no means to regionally cost allocate regionally beneficial projects.  The TO Filing has not been shown to be just and reasonable and must be rejected.

## III.    CONCLUSION

LS Power respectfully requests that the Commission accept this Limited Answer and issue an order rejecting the TO Filing.

July 29, 2020

Respectfully submitted,

By: */s/* **Michael R. Engleman**
Michael R. Engleman
Christina Switzer
Engleman Fallon, PLLC
1717 K Street, NW
Suite 900
Washington, DC 20006
Tel. (202) 464-1332
E-mail:  mengleman@efenergylaw.com

***Counsel for LSP Transmission Holdings II, LLC***

---

[33]      898 F.3d at 1260.

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served the foregoing document upon each person

designated on the official service list compiled by the Secretary in this proceeding.

Dated at Washington, DC this 29th day of July.


By: *<u>/s/ Christina Switzer</u>*

Document Accession #: 20200730-5057    Filed Date: 07/30/2020

# Exhibit A

JA0382



Pterra LLC was engaged by Central Transmission to evaluate the cost allocation of selected Supplemental Projects as Required Transmission Enhancements applying the cost allocation methodology as specified in PJM OATT Schedule 12.

| SUMMARY | |
|---|---|
| Projects with Regional Benefits and Not De Minimus | 19 |
| Total of Estimated Cost of Projects Reallocated ($mil) | $779 |
| Total Estimated Costs Re-allocated ($mil) | $393 |
| Total Re-Allocation Exclusively Related to DFAX | $361 |

| | PJM Data | | | | Pterra Re-Allocation of Supplementary Projects as Required Transmission Enhancements | | | |
|---|---|---|---|---|---|---|---|---|
| Upgrade ID | Selected Supplemental Projects* | Type of Project | Cost Estimate ($mil) | Transmission Owner and Zone to which 100% of Cost is allocated | Reallocation by DFAX Method (see Legend below) | Reallocation by Load Ratio Share | % DFAX Costs Re-allocated | Amount of Re-allocated in millions |
| s0645 | Reconductor 13 miles of the Kammer - West Bellaire 345 kV circuit | Lower Voltage Facility | $ 20.00 | AEP | DAYTON (14.83%) / DEOK (26.55%) / DL (50.00%) / EXPC (8.63%) | | 100.00% | $ 20.00 |
| s0233 | Rebuild Otter Creek – Conastone 230 kV line | Lower Voltage Facility | $ 18.50 | PPL | BGE (5.00%) / ME (95.00%) | | 100.00% | $ 18.50 |
| s0555 | Rebuild the Jug - Kirk 345kV single circuit line as a double circuit line. One side will remain 345kV between Jug and Kirk 345/138kV stations while the other side will be strung as a new 138kV circuit to pick up new customers | Lower Voltage Facility | $ 41.00 | AEP | DEOK (94.99%) / OVEC (5.01%) | | 100.00% | $ 41.00 |
| s1382 | Replace Jacksons Ferry 765/500 kV 500 MVA Transformer #1 and 138kV Circuit Breaker 'R1', 'P', and 'P2' with 3000A  63kA Circuit Breakers | Regional Facility | $ 27.00 | AEP | -- | AEC (1.67%) / AEP (14.53%) / APS (5.75%) / ATSI (7.81%) / BGE (4.07%) / ComEd (12.94%) / Dayton (2.02%) / DEOK (3.47%) / DL (1.77%) / DPL (2.59%) / Dominion (13.40%) / EKPC (1.36%) / JCPL (3.74%) / ME (1.98%) / NEPTUNE (0.43%) / OVEC (0.06%) / PECO (5.38%) / PENELEC (1.81%) / PEPCO (3.72%) / PPL (4.80%) / PSEG (6.45%) / RE (0.26%) | 85.47% | $ 23.08 |
| s0473 | Replace static wire at New Freedom - East Windsor - Deans 500 kV | Regional Facility | $ 20.00 | PSEG | AEC (32.40%) / DPL (17.60%) / JCPL (16.66%) / NEPTUNE (3.50%) / PPL (6.56%) / PSEG_RECO (23.28%) | AEC (1.67%) / AEP (14.53%) / APS (5.75%) / ATSI (7.81%) / BGE (4.07%) / ComEd (12.94%) / Dayton (2.02%) / DEOK (3.47%) / DL (1.77%) / DPL (2.59%) / Dominion (13.40%) / EKPC (1.36%) / JCPL (3.74%) / ME (1.98%) / NEPTUNE (0.43%) / OVEC (0.06%) / PECO (5.38%) / PENELEC (1.81%) / PEPCO (3.72%) / PPL (4.80%) / PSEG (6.45%) / RE (0.26%) | 85.01% | $ 17.00 |
| s0286 | Replace the New Freedom 500-4 transformer phase 1 and phase 2 | Lower Voltage Facility | $ 10.20 | PSEG | AEC (13.45%) / DPL (50.00%) / JCPL (5.69%) / NEPTUNE (0.37%) / PPL (12.67%) / PSEG_RECO (17.83%) | | 82.17% | $ 8.38 |
| s2054 | Rebuild and reconductor approximately 33.0 miles of the Armstrong – Homer City 345 kV Line, of wood pole construction | Lower Voltage Facility | $ 138.00 | PENELEC | ATSI (72.54%) / PENELEC (27.46%) | | 72.46% | $ 99.99 |
| s0232 | Rebuild Manor-Graceton 230 kV | Lower Voltage Facility | $ 27.69 | PPL | BGE (50%) / JCPL (3%) / ME (19%) / PPL (28%) | | 72.00% | $ 19.94 |
| s0472 | Replace New Freedom 500/230 kV transformers #2 & 3, and associated SL&P equipments | Lower Voltage Facility | $ 38.50 | PSEG | AEC (27.10%) / JCPL (11.46%) / PECO (25.52%) / PSEG_RECO (35.92%) | | 64.08% | $ 24.67 |
| s0298 | Replace the Deans 500-1 and 500-3, 500/230 kV transformers and associated equipment | Lower Voltage Facility | $ 48.00 | PSEG | AEC (50.00%) / NEPTUNE (1.33%) / PSEG_RECO (48.67%) | | 51.33% | $ 24.64 |
| s0659 | Replace failed Branchburg 500-3 Transformer-Phase C | Lower Voltage Facility | $ 8.25 | PSEG | JCPL (30.34%) / NEPTUNE (8.17%) / PSEG_RECO (61.48%) | | 38.52% | $ 3.18 |
| s1267 | Replace underground submarine cables portion of Brandon Shores-Riverside 230 kV circuits | Lower Voltage Facility | $ 236.00 | BGE | BGE (71%) / ME (29%) | | 29.00% | $ 68.44 |
| s0782 | Rebuild the Allen Junction- East Fayette (AJ-Lyons) 138 kV line | Lower Voltage Facility | $ 16.70 | ATSI | ATSI (72.54%) / PENELEC (27.46%) | | 27.46% | $ 4.59 |
| s0945.8 | Rebuild the Juniata - Cumberland 230 kV Line (14.2 mi) | Lower Voltage Facility | $ 30.60 | PPL | ME (24.69%) / PPL (75.31%) | | 24.69% | $ 7.56 |
| s0955.5 | Rebuild West Hempfield - Manor 2 230 kV Line (9.1 mi) | Lower Voltage Facility | $ 22.70 | PPL | BGE (20.00%) / PPL (80.00%) | | 20.00% | $ 4.54 |
| s0384 | Install two single phase 500/230 kV transformers at Waugh Chapel substation as a result of a BGE spare equipment requirement (not a PJM PRA spare transformer) | Lower Voltage Facility | $ 14.70 | BGE | BGE (84.18%) / PEPCO_SMECO (15.82%) | | 15.82% | $ 2.33 |
| s0819 | Rebuild 15.3 miles of Red Lion- Cedar Creek 230 kV circuit | Lower Voltage Facility | $ 20.80 | DPL | AEC (12%) / DPL (88%) | | 12.00% | $ 2.50 |
| s1191 | Rebuild the Corridor – Jug Street 345 kV line as a double circuit line with one side served at 345 kV and the other at 138 kV to provide a third source to Jug Street station. | Lower Voltage Facility | $ 28.00 | AEP | AEP (92.13%) / DEOK (7.48%) / OVEC (0.39%) | | 7.87% | $ 2.20 |
| s0275 | Rebuild Whitpain – Buxmont 230 kV line | Lower Voltage Facility | $ 12.53 | PPL | AEC (0.61%) / PECO (4.39%) / PPL (95.00%) | | 5.00% | $ 0.63 |



*Pterra LLC was engaged by Central Transmission to evaluate the cost allocation of selected Supplemental Projects as Required Transmission Enhancements applying the cost allocation methodology as specified in PJM OATT Schedule 12.*

| SUMMARY | |
|---|---|
| Projects with Regional Benefits and Not De Minimus | 19 |
| Total of Estimated Cost of Projects Reallocated ($mil) | $779 |
| Total Estimated Costs Re-allocated ($mil) | $393 |
| Total Re-Allocation Exclusively Related to DFAX | $361 |

| PJM Data | | | | | Pterra Re-Allocation of Supplementary Projects as Required Transmission Enhancements | | | |
|---|---|---|---|---|---|---|---|---|
| Upgrade ID | Selected Supplemental Projects* | Type of Project | Cost Estimate ($mil) | Transmission Owner and Zone to which 100% of Cost is allocated | Reallocation by DFAX Method (see Legend below) | Reallocation by Load Ratio Share | % DFAX Costs Re-allocated | Amount of Re-allocated in millions |
| Discussion stages | KAMMER-MOUNTAINEER 765KV | Regional Facility | | AEP | AEP (16.75%) / APS (5.77%) / ATSI (21.63%) / BGE (5.33%) / DAYTON (3.35%) / DEOK (13.23%) / DL (8.53%) / DVP (15.50%) / EKPC (5.25%) / OVEC (0.32%) / PEPCO_SMECO (4.34%) | AEC (1.67%) / AEP (14.53%) / APS (5.75%) / ATSI (7.81%) / BGE (4.07%) / ComEd (12.94%) / Dayton (2.02%) / DEOK (3.47%) / DL (1.77%) / DPL (2.59%) / Dominion (13.40%) / EKPC (1.36%) / JCPL (3.74%) / ME (1.98%) / NEPTUNE (0.43%) / OVEC (0.06%) / PECO (5.38%) / PENELEC (1.81%) / PEPCO (3.72%) / PPL (4.80%) / PSEG (6.45%) / RE (0.26%) | Project Not included in Summary Calculations, but provides illustration of the significant regional benefits of 765kV replacement projects | |

**Assumptions**
- De Minimus DFAX = 0.01
- Directional Flow 50/50 Positive/Negative unless values are known
- Transactions and zonal loads are per PJM 2020 filing
- All projects selected will be designated as Reliability Projects

* Projects in red are operating below 200 kV

Document Content(s)

Final Limited Answer ER20-2046.PDF......................................1

# UNITED STATES OF AMERICA
# BEFORE THE
# FEDERAL ENERGY REGULATORY COMMISSION

American Transmission Systems, Incorporated,   )          Docket No. ER20-2046-000
PJM Interconnection, L.L.C.                    )

## MOTION FOR LEAVE TO ANSWER AND ANSWER
## OF THE LOAD GROUP

## I.    INTRODUCTION AND OVERVIEW

On July 21, 2020, the PJM Transmission Owners ("PJM TOs") submitted an Answer to Protest and Comments and Motion for Consolidation ("TOs' Answer") in the above-referenced proceeding. With the exception of a few pages of their Answer that address a motion to consolidate, the TOs' Answer is impermissible and should be rejected as such.  In the event the Commission does not reject the TOs' Answer to Protests and Comments, and in order to correct misstatements of fact and law in the TOs' Answer, American Municipal Power, Inc. ("AMP"), Old Dominion Electric Cooperative ("ODEC"), the PJM Industrial Customer Coalition, Office of the People's Counsel for the District of Columbia, Delaware Division of the Public Advocate, Indiana Office of Utility Consumer Counselor, Blue Ridge Power Agency, and Public Power Association of New Jersey (collectively, the "Load Group") hereby seek leave to respond to the TOs' Answer.  This Motion and Response are submitted pursuant Rules 212 and 213 of the Commission's Rules of Practice and Procedure, 18 C.F.R. §§ 385.212, 213 (2020).

At issue in this proceeding is the PJM TOs' filing pursuant to Federal Power Act section 205[1] to modify Attachment M-3 of the PJM Interconnection, L.L.C. ("PJM") Open Access

---

[1] 16 U.S.C. § 824d (2020).

1

Document Accession #: 20200731-5324       Filed Date: 07/31/2020

Transmission Tariff ("Tariff") (the "TOs' Proposal").[2]   The TOs' Proposal would modify Attachment M-3 so that, instead of PJM remaining responsible for regional transmission planning, the PJM TOs would have authority to plan all new transmission projects including those that expand or enhance the Transmission System,[3] with limited exceptions.  The TOs' Proposal also includes a new, broad category of projects -- Asset Management Projects – which would include projects "for maintenance activities and new transmission that replaces existing Transmission Facilities that are not expansions or enhancements of the Transmission System.[4]

While the PJM TOs maintain that their June 12 Filing in this proceeding was within their reserved rights, that is not the case.[5] The TOs also maintain that their Proposal "improves transparency and coordination in the planning to replace Transmission Facilities nearing the end of their useful lives."[6]  However, as discussed in more detail in the Load Group Protest, the PJM TOs' Proposal does not offer any such improvements in transparency and coordination in planning for end of life Transmission Facilities.  Quite to the contrary, the PJM TOs' Proposal is unjust and unreasonable for the reasons detailed in Load Group Protest, including that the TOs' Proposal:

(1)     exacerbates the increased costs of replacing aging infrastructure;

(2)     violates the Consolidated Transmission Owners Agreement ("CTOA") and FERC

precedent by taking away from PJM its regional transmission planning duties;

---

[2] The PJM TOs' filing was submitted June 12, 2020 in this proceeding, Accession No. 20200612-5124. ("June 12 Filing").

[3] "Transmission System" is defined as "the facilities controlled or operated by the Transmission Provider within the PJM Region that are used to provide transmission service under Tariff, Part II and Part III." PJM Tariff, I. Common Service Provisions.

[4] TOs' Proposal, Exhibit A at Paragraph (b)(1).

[5] *See* Load Group Protest at 11-16.

[6] *Id.* at 1-2.

(3)     limits the scope of PJM's Regional Transmission Expansion Plan ("RTEP")

process by claiming the PJM TOs retained the responsibility to plan for the

retirement and replacement (including expansion and enhancement) of their

Transmission Facilities, as well as the new and broadly defined Asset Management

Projects, and relegating PJM's planning responsibility to only Transmission

Facilities that the PJM TOs are not reserving for themselves in their proposed

revisions to Attachment M-3;

(4)     limits stakeholder participation in regional planning, which is inconsistent with

Commission rulings;

(5)     increases the likelihood of cost allocation disputes and unreasonable cost

allocations by characterizing their new Asset Management Project category as a

type of Supplemental Project, which will be allocated zonally despite having

regional benefits;

(6)     limits opportunities for competitive transmission planning under Order No. 1000;

and

(7)     impedes the regional and holistic development of the "Grid of the Future."

For all of these reasons, the Commission should reject the PJM TOs' Proposal outright.

Alternatively, if the Commission does not reject the TOs' Proposal filing outright, the Commission

should consolidate the TOs' Proposal with a Joint Stakeholders Proposal pending in Docket No.

ER20-2308-000.  In that proceeding, PJM submitted on July 2, 2020, a filing under FPA section

205 to modify the PJM Operating Agreement, Schedule 6, which governs PJM's Regional

Transmission Expansion Planning Protocols ("RTEP").  Unlike the TOs' Proposal, which resulted

from their unilateral decision to submit changes to Attachment M-3,[7] the proposal reflected in PJM's July 2 filing was developed through PJM's Consensus Based Issue Resolution ("CBIR") stakeholder process and was supported by a sector-weighted supermajority of PJM members. (Hence, PJM referred to the filing as the "Joint Stakeholders Proposal.")

The Joint Stakeholders Proposal "seeks to increase transparency and competition in the planning of Transmission Facilities to replace aging transmission infrastructure by having PJM, as the regional transmission organization ("RTO"), plan the replacement projects after a PJM TO indicates that a Transmission Facility[8] can no longer be cost-effectively maintained and must be replaced. Because the Joint Stakeholders Proposal is within the bounds of the PJM governing documents and provides a just and reasonable process for planning end of life Transmission Facilities in a manner that complies with the Commission's precedent, the Commission should adopt the Joint Stakeholders Proposal. At the very least, the Commission should consider these proposals together.

In support of this filing, the Load Group states as follows:

## II.     MOTION FOR LEAVE TO ANSWER

---

[7] The TOs' June 12 Filing in this proceeding resulted from actions by certain Sponsoring TOs (or a group thereof) that were outside the terms of the CTOA with respect to the provision of notice. Therefore, on June 18, 2020, AMP Transmission, LLC, and ODEC submitted a joint Motion to Dismiss Filing, Without Prejudice, and Suspend Procedural Schedule Until Ruling on Motion to Dismiss and Motion for Shortened Answer Period. The motion remains pending before the Commission.

[8] The PJM Operating Agreement defines "Transmission Facilities" as "facilities that: (i) are within the PJM Region; (ii) meet the definition of transmission facilities pursuant to FERC's Uniform System of Accounts or have been classified as transmission facilities in a ruling by FERC addressing such facilities; and (iii) have been demonstrated to the satisfaction of the Office of the Interconnection to be integrated with the PJM Region transmission system and integrated into the planning and operation of the PJM Region to serve all of the power and transmission customers within the PJM Region." PJM Operating Agreement, Common Service Provisions, Definitions S-T.

4

JA0389

The Load Group respectfully requests leave to answer the TOs' Answer. Rule 213(a)(2) of the Commission's Rules of Practice and Procedure normally prohibits answers to answers, unless such answers have been authorized by the decisional authority.[9] However, the Commission exercises its discretion to grant motions for leave to submit answers when doing so will clarify the issues, assist in the Commission's decision-making processes, or otherwise ensure an accurate and complete record.[10] As explained in further detail below, the TOs' Answer includes misleading arguments, further confuses the issues, and fails to demonstrate that the proposed revisions to Attachment M-3 are just and reasonable. Accordingly, the Commission should disregard the TOs' Answer. However, if the Commission accepts the TOs' Answer, then it should grant leave to accept this answer thereto in order to clarify the issues in this proceeding, assist in the Commission's decision-making process, and ensure a complete decision-making record.

## III.    ANSWER

### A.    The PJM TOs Did Not Have Authority to File Their FPA Section 205 Proposal to Amend the PJM Tariff.

The Load Group Protest demonstrated that the PJM TOs' Proposal exceeds the TOs' authority to unilaterally file to revise the PJM Tariff.[11] Significantly, the PJM TOs' exclusive and unilateral right to file FPA section 205 filings is limited to those relating to "the establishment and recovery of the Transmission Owners' transmission revenue requirements or the transmission rate design under the PJM Tariff, and such filing rights shall also encompass any provisions of the PJM

---

[9] 18 C.F.R. § 385.213(a)(2) (2019).

[10] *See, e.g.*, *PJM Interconnection, L.L.C.*, 145 FERC ¶ 61,035, at P 32 (2013); *Wisconsin Pub. Serv. Corp.*, 144 FERC ¶ 61,093, at P 27 (2013); *Iberdrola Renewables, Inc., et al.*, 137 FERC ¶ 61,185, at P 17 (2011); and *Virginia Elec. and Power Co.*, 125 FERC ¶ 61,391, at P 26 (2008).

[11] Load Group Protest at 10-16.

5

Tariff governing recovery of transmission-related costs incurred by the Transmission Owners."[12]
The Tariff specifies that the TOs can "only file under Section 205 to change the transmission rate
design for the PJM region pursuant to a filing approved in accordance with Section 8.5.1 of the
CTOA.[13]  Quite simply and clearly, the PJM TOs' authority to unilaterally submit changes to the
Tariff stops at the authority to make filings to recover their costs of transmission ownership.[14]  The
Load Group has explained that the PJM TOs' June 12 Filing in this proceeding exceeds their
unilateral filing authority and should be rejected on that basis alone.[15]

In their Answer, the PJM TOs first generally cite to the precedent of *Atlantic City Elec. Co.
v. FERC*.[16]  The TOs state their "right to file with the Commission changes to rates and terms for
service rendered with their assets *subject to agreements they have entered into regarding their
Section 205 filing rights*."[17]  As cited above and discussed in detail in the Load Group Protest, the
PJM Tariff and CTOA limit the TOs' right to make unilateral revisions to the Tariff, and do not
extend to the transmission planning matters contemplated in the TOs' Proposal.  Thus, reference
to the *Atlantic City* case does nothing to help the TOs' argument; rather, it actually proves the Load
Group's position.

Next, the TOs seek to make their prohibited filing permissible, by citing the Commission's
policy and precedent that in acting on a FPA section 205 filing, the Commission need only
determine that their filing is just and reasonable, not that it is superior to any alternatives that an

---

[12] *Id.*, citing PJM Tariff Section 9.1(a).

[13] *Id.*, citing PJM Tariff Section 8.5.1(e).

[14] *Id.*

[15] *Id.* at 10-16.

[16] *Atlantic City Elec. Co. v FERC*, 295 F.3d 1, 9-10 (D.C. Cir. 2002) ("*Atlantic City*").

[17] TOs' Answer at 9 (emphasis added).

6

intervener may prefer.[18]  Of course, the Commission's authority to consider a FPA section 205

filing and the precedent for how it must go about doing so has nothing at all to do with the issue

at hand, which is underlined whether or not the TOs have the authority in the first place to submit the FPA

section 205 filing to revise Attachment M-3 to the PJM Tariff.  The TOs have said nothing in their

Answer to remedy the fact that their June 12 Filing is an impermissible exercise of their limited

right to make unilateral FPA section 205 filings to revise the PJM Tariff.  Therefore, the Load

Group reiterates its request that the Commission reject the PJM TOs' impermissible June 12 Filing.

### B. The PJM TOs' FPA Section 205 Proposal Is Unjust and Unreasonable and Should be Rejected.

#### 1. The increased costs of replacing aging transmission infrastructure would be exacerbated under the TOs' Proposal and demonstrates that the TOs' Proposal is not just and reasonable.

In their Answer, the PJM TOs characterize the Joint Stakeholders Proposal as "ill-advised,"

arguing that the PJM TOs "are best positioned to manage their assets to the benefit of their

customers and in furtherance of fulfilling their obligation to provide reliable electric service in a

cost effective and efficient manner."[19]  The PJM TOs also postulate that only they, not PJM or

other stakeholders, "have the specialized knowledge of their systems and their customers needed

to cost-effectively manage their assets."[20]  Aside from these conclusory statements, nowhere in

either their Answer or in their Proposal do the PJM TOs actually demonstrate their exclusive and

innate ability to provide the cost-efficient management of the PJM transmission grid that they

claim.  But even if they had such "specialized knowledge," nothing in the Joint Stakeholders

Proposal will diminish this expertise or the ability to exercise it.  Once a TO has made the decision

---

[18] TOs' Answer at 9-11.

[19] TOs' Answer at 4.

[20] TOs' Answer at n. 64.

that a Transmission Facility has reached the end of its operational life, based on the TO's "specialized knowledge" and expertise, planning that replacement will be the responsibility of PJM under the Joint Stakeholder Proposal. This planning process will be consistent with the current PJM RTEP process, in which the PJM TOs, as well as any other stakeholders, are able to offer their "specialized knowledge" for the benefit of PJM and all stakeholders, that has been employed for years.

The PJM TOs claim that "big cost increases are not relevant to the planning"[21] of EOL Projects.  From the PJM TOs' perspective, the dramatic increase in transmission spending in the PJM region is "nothing more than  . . . unremarkable" and concerns regarding the "costs of replacing this aging infrastructure [are] beyond the scope of this proceeding."[22]  Perhaps most telling, for the PJM TOs, "containing transmission costs is not an appropriate goal of the PJM planning process."[23]  That is patently not the case: under Order No. 1000, questions of cost go to the very heart of determining if a proposed transmission planning process is just and reasonable.[24] And while the PJM TOs attempt to dismiss the potential savings from the Joint Stakeholders Proposal as "unreliable,"[25] the Brattle Report[26] provides detailed support for the cost benefits of

---

[21] TOs' Answer at 15.

[22] TOs' Answer at 15-16.

[23] TOs' Answer at 41.

[24] *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, Order No. 1000*, FERC Stats. & Regs. ¶ 31,323 at P 78 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012)("Order 1000").(For example, Order No. 1000 focuses on an evaluation of regional transmission alternatives to resolve transmission needs more "cost-effectively than solutions identified in the local transmission plans of individual public utility transmission providers.")

[25] TOs' Answer at 16.

[26] Johannes P. Pfeifenberger, *et al.*, Cost Savings Offered by Competition in Electric Transmission Experience to Date and the Potential for Additional Customer Value, THE BRATTLE GROUP (April 2019),                    available                    at:

8

addressing EOL Projects through the PJM RTEP process, rather than as Supplemental Projects.

At the end of the day, the only refutation that the PJM TOs can muster is that the Load Group's estimates *might* be "unreliable"[27] and that the potential savings to consumers that the Joint Stakeholders Proposal offers *might* be higher than what is actually realized. That is because a TO-prepared study acknowledges savings of over seven percent in the PJM region if policies similar to those in the Joint Stakeholders Proposal were implemented.[28]   Seven percent may not sound like much, but considering the amount of Supplemental Project spending in PJM in the last few years, seven percent is substantial. At the January 10, 2019 Transmission Expansion Advisory Committee ("TEAC") meeting, PJM presented a slide the illustrating that in 2018 over eighty percent (80%) of Supplemental Project costs totaling $4.61 *billion,* proposed by PJM TOs were associated with EOL drivers.[29]   Seven percent of $4.61 billion is $322,270,000.  At the May 12,

---

https://brattlefiles.blob.core.windows.net/files/15987_brattle_competitive_transmission_report_final_with_data_tables_04-09-2019.pdf#:~:text=Cost%20Savings%20Offered%20by%20Competition%20in%20Electric%20Transmission,Michael%20Hagerty%20Simon%20Levin%20Wren%20Jiang%20April%202019 ("Brattle Report").

[27] TOs' Answer at 16.

[28] Dr. Emma Nicholson, *et al.*, *Building New Transmission: Experience To-Date Does not Support Expanding Solicitations*, CONCENTRIC ENERGY ADVISORS (June 2019), https://ceadvisors.com/wp-content/uploads/2019/06/CEA_Order1000report_final.pdf, p 12; stating that "updated project cost estimates for PJM incumbent TOs exceeded initial cost estimates by 7.0%" for the years 2014-2017. Even assuming the seven percent estimate, which the Commission *should not*, that still equates to over $1.2 billion in savings. As the old saw goes, "[a] billion here, a billion there, and pretty soon you're talking about real money." *See, e.g.*, Senator Everett Dirksen. In a response to the TO-prepared study, Brattle found its "criticisms are based on inappropriate and misleading cost comparisons, a misrepresentation of the available transmission cost data and facts, and a misunderstanding of our analysis." Moreover, Brattle demonstrated that its methodology, relying on a project's initial cost estimates, are the best basis for comparison of estimated cost savings from competitive solicitations.

[29] PJM Interconnection, L.L.C., Jan. 10, 2019 Transmission Expansion Advisory Committee, 2018 Project Statistics, https://www.pjm.com/-/media/committees-groups/committees/teac/20190110/20190110-project-statistics-2018.ashx, p. 10. This figure includes all Supplemental Projects classified as "Equipment Material Condition, Performance and Risk" and Supplemental Projects classified under "Multiple Drivers" with the exception of those listed as "Operational Flexibility and Efficiency/Customer Service."

9

2020 TEAC meeting, RTEP statistics for 2019 were presented with EOL drivers totaling *only* $2.137 billion, or approximately sixty-three percent of Supplemental Project costs for that year.[30] Seven percent of $2.137 billion is $149,590,000.

Without question, EOL needs are the primary driver of Supplemental Project costs, and with Supplemental Projects accounting for the majority of transmission costs for four of the previous five years,[31] EOL needs represent the largest portion of growth in a ratepayer's transmission bill.  Moreover, these spending patterns are unlikely to decrease, and will almost certainly increase, in the near to mid-term, as PJM has noted that "[t]wo-thirds of all system assets in PJM are more than 40 years old; over one-third are more than 50 years old."[32]  In other words, much of the PJM transmission grid will reach EOL status in the coming decade.

The Brattle Report finds that "[h]aving a larger share of transmission investments developed through competitive processes would yield significant customer savings."[33]  Brattle reached this conclusion through rigorous analysis, not "speculation."[34]  For example, in

---

[30] PJM Interconnection, L.L.C., May 12, 2020 Transmission Expansion Advisory Committee, 2019 Project Statistics,  https://www.pjm.com/-/media/committees-groups/committees/teac/2020/20200512/20200512-item-10-2019-project-statistics.ashx ("May 12 TEAC Presentation"), p. 6.  This figure includes all Supplemental Projects classified as "Equipment Material Condition, Performance and Risk" and Supplemental Projects classified under "Multiple Drivers" with the exception of those listed as "Infrastructure Resilience/Customer Service," "Operational Flexibility and Efficiency/Customer Service," "Operational Flexibility and Efficiency/ Infrastructure Resilience," and "Operational Flexibility and Efficiency/ Infrastructure Resilience/Customer Service."

[31] This statistic alone does not recognize the vast difference in Supplemental Project versus Baseline spending.  In three of the last five years, Supplemental Project spending has been *at least twice* the amount of Baseline spending and in 2018 it was *more than three times* the amount.  Since 2015 Supplemental Project spending has totaled $19.951 billion compared to Baseline spending of $9.923 billion.  *See*, May 12 TEAC Presentation, p. 3.

[32] PJM Interconnection, L.L.C., The Benefits of the PJM Transmission System (April 16, 2019), https://www.pjm.com/-/media/about-pjm/newsroom/fact-sheets/the-value-of-transmission.ashx, p 5.

[33] Brattle Report at 45.

[34] TOs' Answer at 16.

demonstrating a twenty-two percent (22%) savings in historical cost escalation for Baseline and Network projects in PJM, Brattle compares the Latest TO Cost Estimate over the Initial TO Cost Estimate minus one.[35]  In other words, Brattle uses the PJM TOs' own numbers to determine its findings.  And when Brattle finds potential savings of twenty to thirty percent (20%-30%) through increased competition, it is not based on hollow platitudes of cost-efficiency, but rather is grounded in "the experience with competitive projects in the U.S. to date" and "consisten[cy] with savings achieved with similar competitive transmission processes in Canada, the U.K., and Brazil."[36]

If anything, Brattle's 20-30% estimates of cost savings are *conservative* when compared to the experience of competitive transmission in PJM.  Based on Brattle's analysis of already-completed projects' selected proposal cost (including necessary incumbent upgrades) compared to the lowest-cost solution offered by an incumbent in the initial proposal window, and assuming a range of cost escalation between zero and the historical average cost escalation of transmission projects in PJM (+22%), Brattle concludes that competitive bidding could have potentially saved ratepayers a staggering sixty to seventy percent – by far the greatest potential for savings of any of the regions analyzed.[37]

Order No. 1000 directs the RTO, PJM, in consultation with stakeholders, to "identify and evaluate transmission alternatives at the regional level that may resolve the region's needs more efficiently or *cost-effectively* than solutions identified in the local transmission plans of individual public utility transmission providers."[38]  Order No. 1000 envisions a transmission planning

---

[35] Brattle Report, figure 24.

[36] Brattle Report, p. 1.

[37] Brattle Report, Figure 19.

[38] Order No. 1000 at P 78 (emphasis added).

11

"process" that "evaluates the various alternatives available to determine a set of solutions that meet the system's needs more efficiently or *cost-effectively* than other proposed solutions."[39] Order No. 1000 concludes that "it is necessary to have an affirmative obligation"[40] in the RTO planning process to not only consider costs, but seek out the most *cost-effective* solutions for a region's transmission needs.  Contrary to the protestations of the PJM TOs, transmission costs *are* indeed "relevant," and containing costs *is* "an appropriate goal" of a transmission planning process; in fact, doing so is an Order No. 1000 requirement.

Given the evidence provided by the Brattle Report and the mandates of Order No. 1000, any just and reasonable transmission planning process must include competition among different transmission solutions as a tool to mitigate costs.  Unfortunately, not only does the PJM TOs' Proposal fail to do this, it moves decidedly in the opposite direction.  By adding EOL Needs into the Attachment M-3 criteria, the TOs' Proposal undermines PJM's administration of Schedule 6 of its Operating Agreement by granting solely to the PJM TOs the ability to unilaterally remove from PJM's (and stakeholders') review EOL projects if a PJM TO "determines that the projected EOL Need is not met by the proposed Required Transmission Enhancement and determines that it will plan an Attachment M-3 Project to address the projected EOL Need."[41]  This provision will effectively allow PJM TOs to evade the PJM regional planning process, contrary to Order No. 1000, and will prevent PJM and its stakeholders from enjoying the benefits of competition demonstrated in the Brattle Report.  Because the planning process offered in the PJM TOs' Proposal will not only fail to mitigate, but likely exacerbate, the costs associated with EOL

---

[39] Order No. 1000 at P 79 (emphasis added).

[40] Order No. 1000 at P 80.

[41] Proposed Attachment M-3(d)(ii).

replacement while undermining PJM's authority to regionally plan its transmission system, it is not just and reasonable.

### 2. The TOs' Proposal to amend Attachment M-3 of the Tariff violates the CTOA and FERC precedent by transferring regional planning duties from PJM to the TOs

In their Answer, the PJM TOs argue that the CTOA "firmly establishes and reserves to Transmission Owners the rights and associated responsibilities to determine when, whether, and how to replace any of their transmission assets that are nearing the end of their useful lives."[42] Given the PJM TOs' reliance on the CTOA for their June 12 Filing and their Answer, it is worth carefully examining what that agreement actually does and does not require.

Article 2 of the CTOA defines four purposes and objectives of the CTOA:

(i) facilitate the *coordination* of planning and operation of their respective Transmission Facilities within the PJM Region;
(ii) *transfer* certain planning and operating responsibilities to PJM;
(iii) provide for *regional transmission service* pursuant to the PJM Tariff and subject to administration by PJM; and
(iv) establish certain rights and *obligations* that will apply to the [PJM TOs] and PJM.[43]

While the PJM TOs may characterize this as "limited transfer of planning responsibilities,"[44] a plain text reading makes clear that the CTOA envisions *coordinated* planning between PJM and the PJM TOs to ensure a *regional approach to transmission service*, and that to effectuate this regional planning and operation, *obligations* would be placed on the PJM TOs and certain responsibilities would be *transferred* to PJM. In other words, a proposal such as the one offered by the PJM TOs, which unilaterally removes significant areas of regional coordination and

---

[42] TOs' Answer at 6.

[43] CTOA Article 2 (emphasis added).

[44] TOs' Answer at 22.

JA0398

planning responsibility from PJM, is wholly incompatible with the purposes and objectives of the CTOA. The Joint Stakeholders Proposal, on the other hand, acknowledges and builds on that careful balance of rights and responsibilities between PJM and its TOs.

The PJM TOs argue that under the CTOA, they, and they alone, "retained the responsibility for planning the retirement and replacement of their Transmission Facilities."[45]  But that is not what the CTOA says.  Section 4.1.4 of the CTOA directs each PJM TO to "*transfer* to PJM, pursuant to this Agreement and in accordance with the Operating Agreement, the responsibility to prepare a Regional Transmission Expansion Plan"[46]  In other words, the CTOA requires that PJM, as the regional planner in charge of the RTEP, have a role in addressing EOL needs along with other planning responsibilities.  While the CTOA does not define the term "Regional Transmission Expansion Plan," the Tariff defines it as "the plan prepared by the Office of the Interconnection *pursuant to Operating Agreement, Schedule 6* for the enhancement and expansion of the Transmission System."[47]  The CTOA also recognizes this assignment of responsibility, stating that the "Regional Transmission Expansion Planning Protocol shall mean Schedule 6 of the Operating Agreement."[48]

The PJM TOs also claim that the CTOA and the Tariff grant them the exclusive "right to file the procedures under which those Transmission Facilities will be planned."[49]  This is not so, but even if it were accurate, it is irrelevant.  Section 18.6 of the Operating Agreement is clear that it is the PJM Members Committee that retains the right to amend the Operating Agreement,

---

[45] TOs' Answer at 19.

[46] CTOA § 4.1.4 (emphasis added).

[47] Tariff § 1 (emphasis added).

[48] CTOA § 1.23.

[49] TOs' Answer at 19.

JA0399

"including any Schedule hereto."[50]  The process for amending the Operating Agreement includes three steps: submission of the changes to the PJM Board for review, but not approval; (ii) a vote of the Members Committee using the procedures described in Section 8.4 of the Operating Agreement, including sector-weighted voting if necessary; and, (iii) approval by the Commission.[51]  The Joint Stakeholders Proposal has cleared the first two requirements, and now awaits approval by this Commission.

The PJM TOs insist that CTOA Section 5.6 reserves for them "*all* '[r]ights not specifically transferred . . . to PJM pursuant to [the CTOA] or any other agreement.'"[52]  However, by using a boilerplate reservation of rights provision to prohibit changes properly approved through the Operating Agreement, the PJM TOs overplay their hand.  The PJM TOs fail to identify any specific "right" to regional planning because, as explained above, that role has been properly transferred to PJM and, through the Operating Agreement, to PJM Members.  And as noted above, a sector-weighted majority of the more than 1,000 PJM Members, not just the dozen or so PJM Members that supported the TOs' Proposal, that retain the right to amend the Operating Agreement.

Finally, the PJM TOs assert that Supplemental Projects are "different" and that the CTOA affords the PJM TOs the "contractual right to determine when, whether, and how to replace facilities that have reached the end of their useful lives carries with it the right to make Section 205 filings to govern how and when Transmission Owners receive stakeholder input, as well as

---

[50] Operating Agreement § 18.6.

[51] It is important to note that Section 18.6 states that "[i]f and as necessary, the Members Committee may file with FERC … any amendment to this Agreement or to its Schedules," making clear that the right to amend the Operating Agreement rests not with PJM but the Members themselves.

[52] TOs' Answer at 23.

15

JA0400

measures to facilitate coordination of EOL Needs with PJM responsibilities."[53]   Yet the term "Supplemental Projects" never appears in the CTOA.   And while the Tariff lays out the process for reviewing Supplemental Projects and addresses cost allocation and certain public policy projects that are not part of the RTEP, it says nothing about any possible contractual rights of the PJM TOs to "determine when, whether, and how to replace facilities."   TOs have the right to retire facilities.[54]  Instead it is the Operating Agreement that defines Supplemental Projects, and under the Operating Agreement amending or revising that definition remains the right of PJM Members.

### 3.   The TOs' Attachment M-3 Proposal Unjustly and Unreasonably Limits the Scope of PJM's RTEP Process.

#### a.   The TOs' rights are limited to existing transmission facilities, not planning future facilities.

The TOs' Answer confirms the unreasonable overreach of their proposal to expand the Attachment M-3 planning process to authorize the PJM TOs, not PJM, to plan for all new transmission projects that expand or enhance the Transmission System, with limited exceptions.[55]  As the Load Group discussed in its Protest, the TOs' planning authority is not unfettered.   Instead, the Commission accepted the PJM TOs' Attachment M-3 on the basis that it applied to *local Supplemental Project planning.*[56]   The PJM TOs baldly assert that they "retained the responsibility for planning the retirement and replacement of their Transmission Facilities, unless a Transmission Owner voluntarily files Form No. 715 EOL Planning Criteria or a PJM Planning Criteria Need

---

[53] TOs' Answer, p. 23.

[54] CTOA, Section 5.2.  Per its planning authority under OA Schedule 6, PJM will take any such reliability impacts of retirement into account in transmission planning.

[55] The limited exception to the PJM TOs' expanded authority over transmission planning in PJM is for projects to address NERC Reliability Standards, State Public Policies, TO FERC Form 715 criteria, or projects to relieve economic constraints (Market Efficiency Projects). *See* Load Group Protest at 1-2.

[56] *See* Load Group Protest at 18-19.

16

must also be addressed by the replacement." The TOs further state, "[w]here the Transmission Owners retained the right to plan Transmission Facilities, they have the right to file the procedures under which those Transmission Facilities will be planned."[57] The PJM TOs' disregard for the Commission's orders limiting the scope of the PJM TO's planning authority over Supplemental Projects must be rejected in order to maintain the Commission's division of authority for TOs to plan local Supplemental Projects and PJM to plan for regional transmission expansions and enhancements, consistent with Order Nos. 890 and 1000,[58] as well as the requirement in Order No. 2000 that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region that will enable it to provide efficient, reliable and non-discriminatory service and coordinate such efforts with the appropriate state authorities."[59]

In support of their attempted power-grab over regional planning, the PJM TOs cite to the Commission's Orders approving PJM Tariff Attachment M-3.[60] Apparently, the PJM TOs believe that because the Commission approved Attachment M-3, and Attachment M-3 allows the TOs to plan Supplemental Projects, then any project category they create to fit the definition of a

---

[57] TOs' Answer at 19.

[58] *See Monongahela Power Co., et al.,* 162 FERC ¶ 61,129 at PP 6-7 (2018) (describing the requirement in Order No. 890 for transmission-owning members of an RTO to participate in an Order No. 890-compliant transmission planning process, and PJM's explanation that its transmission planning procedures comply with Order No. 890 for its TOs, and Supplemental Projects would be "developed under the local transmission owner planning processes" then "incorporated into the PJM planning process in a manner consistent with Order No. 890." *Id.* (citations omitted); *see also Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119, at P 440; *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297(2007), *order on reh'g and clarification*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C,126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

[59] *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,163 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) ("Order No. 2000"); *see also* 18 C.F.R. § 35.34(k)(7) (2018).

[60] *Id.* at 20.

17

Supplemental Project can be planned by the TOs, not PJM. But the Attachment M-3 Orders do not grant the PJM TOs such unbounded and unilateral authority over transmission planning in PJM. Even the passage from the Attachment M-3 Order that the PJM TOs cite in their Answer makes this clear. The Commission stated as follows:

> When transmission owners participate in an RTO, the Commission did not require them to allow the RTO to do all planning for local or Supplemental Projects. Rather, the Commission recognized *RTO planning processes may focus principally on regional problems and solutions, not local planning issues that may be addressed by individual transmission owners.*[61]

While the PJM TOs apparently focus only on the first sentence of the above-quoted discussion in the Attachment M-3 Order, the Commission must not lose sight of the emphasized sentence which clarifies the Commission's requirement and continued expectation that regional planning remain with PJM, the RTO. As explained in the Load Group Protest, the TOs' Proposal is *per se* unjust and unreasonable because it expands the PJM TOs' authority to plan transmission projects well beyond local Supplemental Projects.[62] The TOs' Proposal includes definitions for "Attachment M-3 Planning Criteria" and "PJM Planning Criteria" that extend the TOs authority beyond simply local Supplemental Projects, and which actually modify the RTEP, which is clearly beyond the TOs' authority. The Commission should reject the PJM TOs' attempt to escape the Commission's clear delegation of regional planning authority to PJM. Instead, the Commission should look to the substance of what the PJM TOs propose (regional transmission planning for EOL), as opposed to the form of their proposal (regional transmission planning labeled as a Supplemental Project).

Further, the PJM TOs' planning authority is limited to existing facilities, not planning future facilities. Their argument regarding rights retained in the CTOA does not dictate a different

---

[61] TOs' Answer at 20, citing *Monongahela Power Co., et al.*, 164 FERC ¶ 61,217 at P 13 (emphasis added).

[62] Load Group Protest at 64-65 (citations omitted).

Document Accession #: 20200731-5324    Filed Date: 07/31/2020

result.[63]    As the Load Group previously explained, there is a distinction between original transmission facilities that were planned decades ago, and regional planning responsibility for expansions and enhancements.  The planning authority for EOL projects that replace original facilities at the end of their operational lives falls squarely within PJM's planning responsibility because PJM, not the PJM TOs, has planning responsibility for non-local expansions and enhancements.[64]  The PJM TOs' Proposal exceeds the PJM TOs' authority by broadening their exclusive control over planning to include "any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more" of a limited list of PJM planning criteria.[65]

> **b. The PJM TOs' claims of improved coordination between EOL Needs and PJM Planning under Operating Agreement Schedule 6 are incorrect and do not remedy their impermissible proposal to usurp PJM's planning authority.**

The PJM TOs repeat their claim that their proposed Attachment M-3 amendments will "substantially enhance transparency and coordination of EOL planning in PJM."[66]  The TOs' Proposal does not simply provide greater transparency for projects that would not be subject to Attachment M-3, as the PJM TOs represent; it is actually a fundamental and impermissible change in the responsibility for planning expansions and enhancements from PJM to the PJM TOs.  As the Load Group detailed in its Protest, the PJM TOs' Proposal revises the very scope of the PJM

---

[63] *See* TOs' Answer at 22-23.

[64] *See* Load Group Protest at 31-33 ("CTOA Section 4.1, entitled 'Rights and Responsibilities Transferred to PJM' clearly transfers to PJM the responsibility for transmission planning for expansions and enhancements to the Transmission System.  Specifically, CTOA Section 4.14 transfer to PJM the responsibility to prepare the RTEP which is . . . "the plan prepared by PJM pursuant to Operating Agreement, Schedule 6 for the enhancement and expansion of the Transmission System . . .").

[65] *See id.*, citing TOs' Proposal at Exhibit A, Paragraph (a).

[66] TOs' Answer at 31-39.

19

TOs' planning authority as compared to PJM's.[67]   The Applicability provision of existing Attachment M-3 specifies the coordinated approach to transmission planning: it "provides additional details of the process that *PJM and the PJM Transmission Owners will follow in connection with planning Supplemental Projects*. . ."[68] Under the PJM TOs' Proposal, this coordinated approach would be written out of Attachment M-3, it would provide that

> [e]ach *Transmission Owner shall be responsible for planning and constructing* in accordance with Schedule 6 of the Operating Agreement as provided in this Attachment M-3, to the extent applicable, (i) Asset Management Projects . . . (ii) Supplemental Projects . . . and (iii) any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more of the following criteria . . ."[69]  Further, the PJM TOs' Proposal would define a PJM Planning Criteria Need as "a need to plan a transmission expansion or enhancement of Transmission Facilities *other than those reserved to each Transmission Owner in accordance with section (a) [above]*."[70]

The PJM TOs' Proposal is not about transparency or "improved coordination between EOL Needs and PJM Planning Under Schedule 6,"[71] as the PJM TOs would have the Commission believe.   Instead, it is the TOs' attempt to use a Tariff provision that was based on the Commission's FPA section 206 investigation and approved for the specific, limited category of locally planned transmission facilities, to swallow the Commission's general policy directives regarding the RTO as regional transmission planner.  Even if they were true, which the PJM TOs have not demonstrated to be so, the TOs' claims of improved coordination do nothing to remedy or justify their impermissible attempt to seize planning authority from PJM.

---

[67] Load Group Protest at 20.

[68] *See* Load Group Protest at 20, citing PJM Tariff. Attachment M-3, Applicability.

[69] TOs' Proposal, Exhibit A at Paragraph (a).

[70] *Id.*

[71] TOs' Answer at 20.

**c. The TOs' Proposal limits the potential for stakeholder participation in regional planning contrary to Commission orders.**

In response to concerns that their proposal will reduce the potential for stakeholder participation in regional planning as required by the Commission in Order Nos. 890 and 1000,[72] the PJM TOs claim that "there is no reduction to the level of stakeholder participation" and that "[n]othing in the Proposed Revisions limits or reduces stakeholder opportunities for input."[73] The PJM TOs note that the existing opportunities for stakeholders to participate in the Needs meeting and Solutions meeting will not be curtailed by their Proposal, and contend that "protesters fail to point to any specific provision that does."[74]

While the TOs' Proposal maintains the Assumptions and Needs meetings set forth in the existing Attachment M-3, that is far from the end of the story. The TOs' Proposal includes an entirely new Attachment M-3, section d, titled "Additional Procedures for the Identification and Planning of EOL Needs."[75] As the Load Group stated in its Protest, this provision:

> would introduce a veil of secrecy that does not currently exist, making the Attachment M-3 process non-compliant with the requirements of Order No. 890 and Order No. 1000. Specifically, and mystifyingly for the purpose of increasing transparency, the TO Proposal only requires Transmission Owners to provide to PJM, and then only on a confidential basis, up to five years of project replacements that a Transmission Owner has identified. Creating secret lists as part of the Attachment M-3 process certainly does not increase transparency; rather, it creates opportunities

---

[72] *See* Load Group Protest at 35 ("In short, Order No. 890 requires that transmission planning 'not [be] limited to the mere exchange of information and then review of transmission provider plans after the fact.' Instead, stakeholders must have 'a meaningful opportunity to engage in planning along with their transmission providers.'") (Order No. 890 at PP 454, 488); ("Order No. 1000 requires transmission providers 'to evaluate, in *consultation with stakeholders, alternative transmission solutions* that might meet the needs of the transmission planning region more efficiently or cost-effectively than solutions identified by individual public utility transmission providers in their local transmission planning process.' This requirement applies equally to baseline RTEP projects and Local Plans, including Supplemental Projects.") (citing Order No. 1000 at PP 6, 148) (emphasis added).

[73] TOs' Answer at 40.

[74] *Id.* at 43.

[75] TOs' Proposal, Exhibit A, Section (d).

for abuse.  Secret transmission projects do not comply with the openness and transparency requirement of Order Nos 890 and Order No. 1000.[76]

Thus, the Load Group has clearly and specifically demonstrated that the TOs' Proposal curtails stakeholders' ability to participate meaningfully in the transmission planning process.

Further, the PJM TOs have failed to justify their proposal to keep the Candidate EOL Needs List secret.  The PJM TOs assert that: (1) arguments over the confidentiality of the EOL Needs do not show how those provisions interfere with EOL planning;[77] (2) arguments against the confidentiality of the Candidate EOL Needs List are "inconsistent with the Commission-approved process under Attachment M-3 that transmission needs need not be identified before Transmission Owners receive comments first on the criteria, assumptions, methodology, and models that will be used to identify transmission needs at the Need Meeting;"[78] and (3) "the protestors have identified no requirement or need for additional disclosure of tentative EOL Needs years in advance, particularly given the confidentiality concerns underlying the EOL Need projections."[79]  The PJM TOs then summarily claim that since the existing Attachment M-3 stakeholder input provisions are just and reasonable, "the expansion of those opportunities under the Proposed Revisions is also just and reasonable."[80]  Even if true, none of these makes the secret list reasonable or consistent with the requirement for open, coordinated and transparent transmission planning.  As the Load Group explained in its Protest, the secrecy of transmission planning information violates the Commission's requirements for openness and transparency in transmission planning.  The PJM

---

[76] Load Group Protest at 35-36 (citations omitted).

[77] TOs' Answer at 8.

[78] *Id.* at 35.

[79] *Id.* at 36.

[80] *Id.* at 40.

22

TOs have not explained why the information cannot be made public, or why measures such as a non-disclosure agreement would not suffice.[81]

Moreover, the PJM TOs' contention that it would be inconsistent with Attachment M-3 to provide transparency and openness for their Candidate EOL Needs List before they receive comments on the criteria, assumptions, methodology, and models, defies logic. Under their Proposal, the PJM TOs will: (1) develop documentation for their Attachment M-3 EOL Planning Criteria and/or Form 715 EOL Planning Criteria; (2) delineate and present those criteria at least once annually; and (3) provide a Candidate EOL Needs List on a confidential basis to PJM, based on the PJM TO's Attachment M-3 EOL Planning Criteria and/or Form 715 EOL Planning Criteria.[82] Apparently, the PJM TOs plan to skip the requirement to share their criteria with stakeholders and receive comments on these criteria *before* developing their EOL Needs List. This sort of after-the-fact sharing of needs, based on undefined criteria that will not be shared with stakeholders, is the very practice the Commission rejected and directed be remedied in the Show Cause proceedings that resulted in Attachment M-3.[83] The Commission should not approve the

---

[81] The Load Group notes that the circumstances here are distinct from those at issue in the PJM TOs' confidential Attachment M-4 Tariff provisions, where the Commission found that disclosure of information regarding CIP-014 Mitigation Projects would be inappropriate in light of the reliability standard, even with a non-disclosure agreement process. *Appalachian Power Co.*, 170 FERC ¶ 61,196 at P 68 (2020).

[82] TOs' Proposal, Exhibit A, proposed Attachment M, section (d)(1)(i) through (iii).

[83] *See Monongahela Power Co., et al.*, 162 FERC ¶ 61,129 at P 77 ("Based on this evidence, we find that the PJM Transmission Owners are implementing the transmission planning process for Supplemental Projects in a manner that is inconsistent with Order No. 890's transparency principle. The record indicates that, in practice, the PJM Transmission Owners are providing transmission planning information, including models, criteria, and assumptions, that is inadequate to allow stakeholders to replicate their planning studies, as Order No. 890 requires. In addition, we find that this information is often provided too late in the transmission planning process for stakeholders to participate before the PJM Transmission Owners have taken significant steps toward developing Supplemental Projects. "

PJM TOs' attempt to maintain secretive transmission planning practices in a different guise. A transmission planning process that is not open and transparent is not just and reasonable.

### 4. The Commission should adhere to its determination that the rulings regarding asset management activities in the California Orders are limited to those proceedings.

The PJM TOs continue to rely on the Commission's orders in specific proceedings regarding a FPA section 206 complaint and a FPA section 205 proceeding involving Participating Transmission Owners ("PTOs") in the California ISO, despite the Commission's explicit statements that those circumstances were not comparable to PJM.[84] The Load Group Protest detailed the fallacy of the TOs' position.[85] The inapplicability of the California Orders[86] to EOL planning in PJM was also demonstrated in the Supporting Comments of the Joint Stakeholders in Docket No. ER20-2308-000.[87] Without repeating those discussions in their entirety, the following key distinctions are fatal to the PJM TOs' attempt to justify their Proposal on the basis of the California Orders:

- There is no definition of "asset management" in PJM, and the TOs' Proposal does not provide such definition.

- The Commission specifically rejected arguments seeking to align the CAISO PTO asset management activities with Supplemental Project planning in PJM.[88]

---

[84] TOs' Answer at 27-31.

[85] Load Group Protest at 25-30.

[86] References herein to the "California Orders" include the following: *California Pub. Utils. Comm'n v. Pac. Gas and Elec. Co.*, 164 FERC ¶ 61,161 (2018) ("PG&E Order"), *order on reh'g*, 168 FERC ¶ 61,171 (2019) ("PG&E Rehearing Order"); *S. California Edison Co.*, 164 FERC ¶ 61,161 (2018) ("SoCal Ed Order"), *order on reh'g*, 168 FERC ¶ 61,170 (2019) ("SoCal Ed Rehearing Order").

[87] Supporting Comments of the Joint Stakeholders, submitted in Docket No. ER20-2308-000, at 10-11, 50-57.

[88] SoCal Ed Order at P 67 ("Based on the information in the record, we find that the specific asset management projects and activities at issue here do not, as a general mater expand the CAISO grid."); *see*

24

- The Commission has already determined that "[i]n light of the specific criteria set forth in the definition of Supplemental Projects in the PJM Tariff, there is no basis to conclude that based on their definition, Supplemental Projects in many cases are identical to asset management projects."[89]

- In the California Orders, the Commission addressed "the specific asset management projects and activities at issue" as "items such as maintenance, compliance, work on infrastructure at the end-of-useful life, and infrastructure security."[90] The PJM TOs' Asset Management Project proposal far exceeds the activities at issue in the California Orders.[91]

- The TOs' Proposal for Incidental Increase includes items such as "replacements" and TO-specific standards as increases in capacity which would take a project out of consideration as an enhancement, which is beyond the incidental increase at issue in the California Orders.[92]

- The TOs are wrong in their claim that "under the California Orders, Order No. 890 applies to projects that *expand or enhance* Transmission Facilities." The California Orders specifically did not address "enhancements," which are a fundamental element of Supplemental Projects in PJM.[93]

The Commission should reject the PJM TOs' attempt to ignore the Commission's limited applicability of the California Orders and instead find that: (1) the California Orders do not apply beyond those specific cases; and (2) even if the California Orders did provide precedent, the TOs' Proposal goes well beyond any reasonable application of the California Orders.

---

*also id.* at P 73 ("[T]he scope of this proceeding is therefore limited to whether PG&E's self-approval of asset management projects and activities violates the requirements of Order No. 890.")

[89] PG&E Rehearing Order at P 59.

[90] SoCal Ed Order at P 33.

[91] *See* Load Group Protest at 27-28.

[92] *See id.* at 28-29.

[93] *See id.* at 29-30; *see also* Joint Stakeholders' Comments in Docket No. ER20-2038-000 at 53-54 ("The CAISO has 'clarified that the CAISO's TPP addresses expansion and reinforcement of the transmission system, as opposed to enhancements . . .').

### 5. The Attachment M-3 Proposal increases the likelihood of cost allocation disputes, and unjust and unreasonable cost allocations.

In its Protest, LS Power raised the concern that the TOs' Proposal will likely result in unreasonable allocation of Asset Management Projects and other new categories of projects that will result from the TOs' Proposal, and an increase in disputes over cost allocation.[94]  LS Power explained that because the TOs' Proposal adds new categories of costs to Attachment M-3, the costs associated with these projects would be subject to the existing, zonal Attachment M-3 cost allocation.[95]  The Attachment M-3 zonal cost allocation would apply despite the fact that some of the Transmission Facilities planned and constructed pursuant to the TOs' Proposal will confer regional benefits. This is a significant concern and a likely source of future disputes because, pursuant to the opinion of the U.S. Court of Appeals for the D.C. Circuit in *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018), zonal allocation of projects that likely confer regional benefits violates the cost causation principle.[96]

LS Power has now provided an analysis by Pterra, LLC that proves this point.  The Pterra analysis, included with LS Power's Answer filed in this proceeding on July 29, 2020, demonstrates that although nineteen Supplemental Projects (with specific Asset Management and Aging Infrastructure drivers) analyzed have regional benefits, "if the existing cost allocation methodology is applied to end of life projects in the categories included in the TO [June 12] Filing, each project would be allocated to a single zone, a clear violation of cost causation principles."[97]

---

[94] *See* Protest of LSP Transmission Holdings II, LLC, filed in this proceeding on July 6, 2020 at 36-38.

[95] *Id.* at 35 ("Given that the Applicability Section of Attachment M-3 reserves to the PJM Transmission Owners the right to plan and construct Attachment M-3 Projects, Order No. 1000 requires that Attachment M-3 Projects be allocated solely to the zone where the project is located.") (citations omitted).

[96] *Id.* at 36-38.

[97] LS Power Answer at 1-2 (citations omitted).

The Commission should reject the TOs' insistence that such cost allocation matters are irrelevant here. Instead, the Commission should find the TOs' Proposal is unjust and unreasonable because it does not ensure that when EOL replacement Transmission Facilities that confer regional benefits are not zonally cost allocated, resulting in Attachment M-3 violating principles of cost causation.

### 6. The PJM TOs' response regarding the "Grid of the Future" is without merit.

The Load Group noted in its Protest that "the TOs' Proposal would take significant planning authority *away from* PJM, at a critical time when PJM should be responsible for planning the Grid of the Future and to the detriment of transmission customers whose interests in non-discriminatory access to transmission the Commission sought to protect in Order No. 890 and Order No. 1000."[98] In response, the TOs diminish the importance of such planning for the future, and argue yet again against PJM serving as the regional transmission planner for all transmission projects. Contrary to the PJM TOs' characterization, the Load Group has not argued that PJM must be responsible for *"all* planning in the PJM Region."[99] Instead, the Load Group urged the Commission to honor its determinations that PJM, as the RTO, must retain its planning authority for regional transmission even while permitting the TOs to continue to exercise authority over local planning.

The PJM TOs' claim that "[p]lanning the grid of the future is not a legislative mandate, nor is it a requirement under Order Nos. 890 and Order No. 1000 rulemakings,"[100] misses the point.

---

[98] Load Group Protest at 20.

[99] TOs' Answer at 13.

[100] *Id.* at n. 28.

The issue is whether the TO Proposal, which would enshrine a fiefdom approach to transmission facility replacement, is just and reasonable when evaluated relative to the needs being placed on the grid going forward. The TOs' "you can't make me" position contributes to a finding that the TOs' Proposal is not just and reasonable. The Commission should reject the PJM TOs' attempt to expand their authority over transmission planning in PJM in a manner that will undermine, not advance, the grid's ability to accommodate future demands.

### C. The Commission Should Reject the PJM TOs' Request That the Commission Ignore the Pending Joint Stakeholders Proposal.

As discussed above, both the TOs' Proposal and the Joint Stakeholders Proposal address planning for Transmission Facilities that have reached the end of their operational lives. The TOs insist, however, that the Commission should deny the Load Group's motion to consolidate the two proceedings. The PJM TOs argue that "the two proceedings are entirely distinct."[101] The Load Group agrees that the actual *proposals* are entirely distinct. However, the two different proposals address *the same issue*: who should plan EOL transmission projects that have regional benefits. As the Commission has done in other instances where there are pending, competing proposals to address the same issue, the proceedings here should be consolidated or, in the very least, considered together. The TOs' attempt to confine this proceeding to only their filing might work to their benefit, but is illogical. Further, there is no merit to the PJM TOs' argument that considering these related filings together "would serve no purpose other than to delay timely resolution and delay the benefits stakeholders would realize in the upcoming planning cycle that the enhanced Attachment M-3 processes will provide."[102] The PJM Joint Stakeholders Proposal

---

[101] TOs' Answer at 57.

[102] *Id.*

28

Document Accession #: 20200731-5324      Filed Date: 07/31/2020

was submitted close enough in time to the TOs' Proposal that they can be taken up together – the Comment Date for each filing has already passed, and initial responsive pleadings as well as some responsive pleadings have been submitted. Both proceedings will soon be ripe for a decision by the Commission. There is no reason the Commission should rule on the TOs' Proposal in a vacuum while the Joint Stakeholders Proposal remains pending.

To be clear, this is not an instance where an FPA section 205 filing has been submitted and an intervenor, protester, or commenter has requested that the Commission consider their alternative proposal. The Load Group of course submits that its proposal should be accepted as just and reasonable, and the TOs' Proposal must be rejected as beyond their authority and otherwise unjust and unreasonable. However, beyond the protest in this proceeding, there is a competing FPA section 205 filing that has been submitted by PJM in Docket No. ER20-2308-000. Just as the TOs insist that they are "entitled to a determination under Section 205 that the Proposed Revisions are just and reasonable," so too are the Joint Stakeholders entitled to a determination that the Joint Stakeholders Proposal is just and reasonable. What the PJM TOs actually want, as evidenced by their rush to submit their unilateral filing without the required notice and with full knowledge of the ongoing CBIR process to address the very issues addressed by their filing, is a procedural bar to the Commission meaningfully considering the Joint Stakeholders Proposal. There is no justification for the Commission to allow the TOs to do so. Instead, the two filings should be taken up together for decision by the Commission, whether through formal consolidation or otherwise.

Consolidation or joint consideration of the two dockets would follow the approach the Commission took in the Attachment M-3 proceeding, Docket No. EL16-761. There, the

Document Accession #: 20200731-5324     Filed Date: 07/31/2020

Commission initially issued the Order to Show Cause.[103]  The PJM TOs submitted a response to the Order to Show Cause Order, but then in another proceeding, Docket No. ER17-179-000, PJM and the TOs jointly submitted revisions to the Tariff to add Attachment M-3, which they offered "in conjunction" with the Show Cause Order proceeding.[104]  The Commission did not formally consolidate the proceedings, but issued a single order where it first addressed the TOs' response to the Show Cause Order, then addressed the Docket No. ER17-179-000 filing.[105]  In the same manner, it makes sense here to take up the two related yet competing FPA section 205 proposals submitted in this proceeding and Docket No. ER20-2308-000 at once and together.

## IV.  CONCLUSION

WHEREFORE, the Joint Stakeholders respectfully request that the Commission: (1) grant leave to accept this Answer; (2) reject the TOs' June 12 Filing or, in the alternative, consider the TOs' Proposal together with the Joint Stakeholders Proposal; and (3) grant such further relief as the Commission may deem appropriate.

---

[103] *PJM Interconnection, L.L.C.*, 156 FERC ¶ 61,134 (2016) ("Show Cause Order").

[104] PJM and the TOs' filings were submitted on October 25, 2016, in Docket No. ER17-179-000.

[105] *Monongahela Power Co.*, *et al.*, 162 FERC ¶ 61,129 (2018); *order on reh'g and compliance*, 164 FERC ¶ 61,217 (2018).

30

JA0415

Respectfully submitted,

/s/ Lisa G. McAlister
Lisa G. McAlister
General Counsel for Regulatory Affairs
Gerit F. Hull
Deputy General Counsel for Regulatory
Affairs
American Municipal Power
1111 Schrock Road, Suite 100
Columbus, Ohio 43229
614.540.6400 (office)
614.325.6395 (cell)
lmcalister@amppartners.org

/s/ Adrienne E. Clair
Adrienne E. Clair
Thompson Coburn LLP
1909 K Street NW
Suite 600
Washington, DC 20006
Phone: (202) 585-6919
aclair@thompsoncoburn.com

Counsel to Old Dominion Electric
Cooperative

/s/ Brian M. Vayda
Brian M. Vayda
Executive Director
Public Power Association of New Jersey
One Ace Road
Butler, NJ 07405
(732) 236-7241
bvayda@ppanj.net

/s/ Robert A. Weishaar, Jr.
Robert A. Weishaar, Jr.
McNees Wallace & Nurick LLC
1200 G Street, NW
Suite 800
Washington, DC 20005
Phone: (202) 898-0688
bweishaar@mcneeslaw.com

Susan E. Bruce
Kenneth R. Stark
McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA  17101
Phone: (717) 237-8000
sbruce@mcneeslaw.com
kstark@mcneeslaw.com

Counsel to the PJM Industrial Customer
Coalition

31

JA0416

*/s/ Sandra Mattavous-Frye*
Sandra Mattavous-Frye
People's Counsel for the District of
Columbia Karen R. Sistrunk
Deputy People's Counsel
Anjali G. Patel
Frederick (Erik) Heinle III
Assistant People's Counsel
Office of the People's Counsel for the
District of Columbia
1133 15th Street, N.W., Suite 500
Washington, DC 20005-2710
202-261-1182
fheinle@opc-dc.gov

*/s/ Alice Wolfe*
Alice Wolfe
General Manager
Blue Ridge Power Agency
PO Box 2310
730 W Main St
Salem, VA 24153
540-739-5899
awolfe@brpa.org

*/s/ Arthur W. Iler*
Arthur W. Iler
Deputy Consumer Counselor – Federal
Indiana Office of Utility Consumer
Counselor
115 W. Washington St., Ste. 1500 South
Indianapolis, IN 46204
(317) 233-3234
ailer@oucc.in.gov

*/s/ Regina A. Iorii*
Regina A. Iorii
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 4th Floor
Wilmington, DE 19801
(302) 577-8159 (Office)
(302) 893-0279 (Cell)
regina.iorii@delaware.gov

In the Capacity of Counsel to the Delaware
Division of the Public Advocate Only

Dated: July 31, 2020

Document Accession #: 20200731-5324    Filed Date: 07/31/2020

CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2020, I have caused a copy of the foregoing

to be served upon each person designated on the Official Service List in this proceeding.


*Adrienne E. Clair*

Document Content(s)

ER20-2046 Load Group Answer.PDF..........................................1

Document Accession #: 20200811-3078          Filed Date: 08/11/2020

172 FERC ¶ 61,136
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Neil Chatterjee, Chairman;
　　　　　　　　　　　Richard Glick, Bernard L. McNamee,
　　　　　　　　　　　and James P. Danly.

PJM Interconnection, L.L.C.                          Docket No. ER20-2046-000
American Transmission Systems Inc.

ORDER ACCEPTING PROPOSED TARIFF REVISIONS

(Issued August 11, 2020)

1.　　　On June 12, 2020, PJM Interconnection, L.L.C. (PJM) filed, on behalf of the PJM Transmission Owners (PJM TOs),[1] pursuant to section 205 of the Federal Power Act (FPA), section 35.13 of the Rules and Regulations of the Commission, and section 9.1(a) of the PJM Open Access Transmission Tariff (Tariff), proposed revisions to Attachment M-3[2] of the PJM Tariff (Attachment M-3 Revisions Filing)[3] to (1) identify and include Asset Management Projects within the existing planning procedures of Attachment M-3 of the PJM Tariff, and (2) include procedures for the identification and planning for end-of-life needs (EOL Needs).[4]

---

[1] PJM filed the proposed revisions pursuant to Order No. 714, on behalf of PJM TOs, as provided by the Consolidated Transmission Owners Agreement (CTOA).  *See Elec. Tariff Filings*, 124 FERC ¶ 61,270 (2008) (Order No. 714); PJM Rate Schedules, TOA-42 § 4.1.3 PJM Tariff, 0.0.0 ("Each Party shall transfer to PJM … responsibility for administering the PJM Tariff").

[2] Currently, Attachment M-3 provides additional details of the process that PJM and the PJM TOs will follow in connection with planning Supplemental Projects, as defined in the Operating Agreement, in accordance with Schedule 6 of the Operating Agreement.  PJM, Intra-PJM Tariffs, OATT ATT M-3, OATT Attachment M-3, 0.1.0.

[3] PJM, Intra-PJM Tariffs, OATT ATT M-3, OATT Attachment M-3, 1.0.0.

[4] "EOL Need" is defined as a need to replace a transmission line between breakers operating at or above 100 kV or a transformer the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities, which the Transmission Owner has determined to be near the end of its useful life, the replacement

2.      In this order, we accept the Attachment M-3 Revisions Filing, effective August 12, 2020, as requested.

## I.    **Background**

### A.    **PJM Consolidated Transmission Owners Agreement**

3.      The PJM TOs[5] entered into the Consolidated Transmission Owners Agreement (CTOA)[6] to: "(i) facilitate the coordination of planning and operation of their respective Transmission Facilities within the PJM Region; (ii) transfer certain planning and operating responsibilities to PJM; (iii) provide for regional transmission service pursuant to the PJM Tariff and subject to administration by PJM; and (iv) establish certain rights and obligations that will apply to the Parties and PJM." [7]

4.      Article 4 of the CTOA contains the Parties' commitments to PJM which, in turn, permit PJM to fulfill the objectives of the CTOA. Article 4.1 lists the Parties' rights and responsibilities transferred to PJM. Under Article 4.1.4 of the CTOA, the PJM TOs agree to "transfer to PJM … the responsibility to prepare a Regional Transmission Expansion Plan [RTEP] and to provide information reasonably requested by PJM to prepare the [RTEP] and shall otherwise cooperate with PJM in such preparation."[8] Further, under Article 4.5 of the CTOA, each Party "shall operate and maintain its Transmission

---

of which would be an Attachment M-3 project. PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attachment M-3, 1.0.0.

     [5] Transmission Owner is defined as a member that owns or leases with rights equivalent to ownership transmission facilities and is a signatory to the CTOA. Taking transmission service is not sufficient to qualify a member as a Transmission Owner. PJM Intra-PJM Tariffs, T-U-V, OATT Definitions – T – U - V, 20.0.0.

     [6] The CTOA is made by and among the PJM TOs (hereinafter referred to collectively as Parties and individually as a Party. *See PJM Interconnection, L.L.C.*, 114 FERC ¶ 61,283 (2006) (accepting CTOA revisions to include PJM). The CTOA is defined as a certain Consolidated Transmission Owners Agreement dated as of December 15, 2005, by and among the Transmission Owners and by and between the Transmission Owners and PJM Interconnection, L.L.C. on file with the Commission, as amended from time to time. PJM, Intra-PJM Tariffs, C-D, OATT Definitions – C-D, 25.0.0.

     [7] PJM Rate Schedules, TOA-42, Article 2.

     [8] PJM Rate Schedules, TOA-42, Article 4 Parties' Commitments (0.0.0), TOA-42, 4.1 Rights and Responsibilities Transferred to PJM (0.0.0); TOA-42 4.1.4 Planning Information (0.0.0).

Document Accession #: 20200811-3078     Filed Date: 08/11/2020

Facilities in accordance with:  (i) the terms of this Agreement; (ii) applicable reliability principles, guidelines, and standards of the Applicable Regional Reliability Council and NERC; (iii) the PJM Manuals; (iv) the direction of PJM consistent with this Agreement; and (v) Good Utility Practice."[9]

5.      Article 5 of the CTOA describes the Parties' retained rights over their respective transmission facilities.  Article 5.2 states that each Party "shall have the right to build, finance, own, acquire, sell, dispose, retire, merge or otherwise transfer or convey all or any part of its assets, including any Transmission Facilities."[10]  Article 5.6, however, reserves to the TOs rights not specifically granted to PJM.[11]

6.      Article 6 addresses PJM's rights and commitments to permit PJM to fulfill the objectives and purposes of the CTOA.  Article 6.3.1 requires PJM to "Direct the operation and coordinate the maintenance of the Transmission Facilities of the Parties in accordance with:  (i) the Operating Agreement; (ii) the PJM Tariff; (iii) Good Utility Practice; and (iv) NERC and Applicable Regional Reliability Council operation and planning standards, principles and guidelines."[12]  Article 6.3.4 contains a provision stating that PJM's obligation under the agreement is to "[c]onduct its planning for the expansion and enhancement of transmission facilities …."[13]

7.      Article 7 of the CTOA contains the Parties' rate and rate design rights.  Article 7.2.1 provides for changes to the regional rate design and terms and conditions.  Specifically, "Section 205 filings to change the PJM Regional Rate Design or file for Joint Transmission Rates may only be made by the Parties, acting collectively, pursuant to a filing approved in accordance with Section 8.5.1 of this Agreement. …"  Article 7.3.1 further provides that the Transmission Owners shall have the exclusive and

---

[9] PJM Rates Schedules, TOA-42, Article 4 Parties' Commitments (0.0.0), TOA-42, 4.5 Operation and Maintenance (0.0.0).

[10] PJM Rates Schedules, TOA-42, Article 5 Parties' Retained Rights (0.0.0), TOA-42, 5.2 Facility Rights (0.0.0).

[11] PJM Rates Schedules, TOA-42, Article 5 Parties' Retailed Rights (0.0.0), TOA-42, 5.6 Reservation of Rights (0.0.0).

[12] PJM Rates Schedules, TOA-42, Article 6 PJM's Rights and Commitments (0.0.0), TOA-42 6.3 Obligations of PJM under this Agreement (0.0.0), TOA-42 6.3.1 (0.0.0).

[13] PJM Rates Schedules, TOA-42, Article 6 PJM's Rights and Commitments (0.0.0), TOA-42 6.3 Obligations of PJM under this Agreement (0.0.0), TOA-42, 6.3.4 (0.0.0).

unilateral rights to file pursuant to Section 205 of the FPA and the FERC's rules and regulations thereunder for any changes in or relating to the establishment and recovery of the Transmission Owners' transmission revenue requirements or the PJM Regional Rate Design, …."[14]  Additionally, Article 7.3.3 states that "nothing in this Section 7.3 is intended to limit the rights of any Party or other person to oppose such a Section 205 filing pursuant to Section 206 or any other applicable provision of the [FPA], or to limit the right of any Party or other person to make filings under Section 206 of the [FPA]."[15]

### B.    PJM RTEP Planning Criteria

8.    Under PJM's RTEP process, PJM plans for the expansion and enhancement of transmission facilities in PJM to meet system reliability, operational performance, or economic criteria. PJM's RTEP reliability planning criteria includes PJM planning procedures, NERC Reliability Standards, Regional Entity reliability principles and standards, and individual PJM TO local planning criteria as filed with the Commission in FERC Form No. 715.[16]

9.    PJM TOs plan Supplemental Projects[17] to meet local needs in their respective zones.  Supplemental Projects are planned through the Order No. 890 compliant procedures set forth in Attachment M-3.  For instance, PJM TOs are required to provide the models used in developing their local plans and enable stakeholder participation to

---

[14] PJM Rates Schedules, TOA-42 Article 7, Changes To Rate Design And Tariff Terms (0.0.0), TOA-42, 7.2 PJM Regional Rate Design and Joint Transmission (0.0.0), TOA-42 7.2.1 (0.0.0); and TOA-42 7.3 Filing of Transmission Rates and Rate Design (0.0.0), TOA-42 7.3.1 (0.0.0.).

[15] PJM Rates Schedules, TOA-42 Article 7, Changes To Rate Design And Tariff Terms (0.0.0), TOA-42, 7.3 Filing of Transmission Rates and Rate Design (0.0.0).

[16] PJM, Intra-PJM Tariffs, Operating Agreement, Schedule 6, § 1.2(e) (2.0.0). Form No. 715 is the Annual Transmission Planning and Evaluation Report that a transmitting utility that operates integrated transmission facilities at or above 100 kilovolts must file with the Commission on or before April 1 of each year.

[17] PJM, Intra-PJM Tariffs, Operating Agreement, Section I, Definitions S-T (defining a "Supplemental Project" as "a transmission expansion or enhancement that is not required for compliance with the following PJM criteria: system reliability, operational performance or economic criteria, pursuant to a determination by the Office of the Interconnection and is not state public policy project pursuant to Operating Agreement, Schedule 6, section 1.5.9(a)(ii)"). *See Appalachian Power Co.*, 170 FERC ¶ 61,196, at P 1 (2020).

review and comment on their plans.  Additionally, Supplemental Projects do not qualify for region-wide cost allocation under Schedule 12 of the PJM Tariff.[18]

### C.    Order No. 890

10.    In Order No 890, the Commission reformed the *pro forma* open access transmission tariff to clarify and expand the obligations of transmission providers to ensure that transmission service is provided on a basis that is just, reasonable and not unduly discriminatory or preferential.  Among other things, in Order No. 890, the Commission directed all transmission providers to develop a transmission planning process that satisfied nine transmission planning principles:  (1) coordination; (2) openness; (3) transparency; (4) information exchanges; (5) comparability; (6) dispute resolution; (7) regional participation; (8) economic planning studies; and (9) cost allocation for new projects.[19]  The Commission explained that, collectively, these principles would reduce "opportunities for undue discrimination in transmission planning" by requiring transmission providers to facilitate the timely and meaningful input and participation of stakeholders in the development of transmission plans.[20]  The Commission further explained that doing so would help to avoid "after-the-fact" litigation by stakeholders regarding "transmission plans that were developed in the first instance without their input."[21]

### D.    PJM Attachment M-3 Supplemental Projects

11.    On August 26, 2016, the Commission, pursuant to section 206 of the FPA, established a proceeding to determine whether the PJM TOs were complying with their Order No. 890 obligations related to openness, transparency, and information exchange with respect to planning Supplemental Projects.[22]  PJM filed, on behalf of the PJM TOs, pursuant to section 205 of the FPA, an amendment to Attachment M-3 and a revision to Schedule 6 of the PJM Operating Agreement in response to the Show Cause Order.  On

---

[18] PJM Intra-PJM Tariffs, Schedule 12, OATT Schedule 12, 12.0.0, (14.0.0).

[19] *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119, at P 444, *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297 (2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

[20] *Id.* P 425.

[21] *Id.* PP 425, 454.

[22] *Monongahela Power Co.*, 156 FERC ¶ 61,134 (2016) (Show Cause Order).

February 15, 2018, Commission determined that the PJM TOs had not demonstrated that their filing was just and reasonable,[23] and pursuant to section 206 the Commission established a just and reasonable set of tariff provisions which now comprises the Order No. 890-compliant Attachment M-3 process, and on September 26, 2018, the Commission accepted the current Attachment M-3 planning process.[24]

### E.    California Orders

12.    In a series of orders, the *California Orders*, the Commission found that Order No. 890's transmission planning requirements do not apply to a transmission owner "asset management project or activity" even if the project or activity results in an "incidental increase in transmission capacity."[25]  The Commission in the *California Orders* stated that although California Independent System Operator Corporation (CAISO) transmission owners' definitions of asset management projects and activities varied slightly, "they all encompass the maintenance, repair, and replacement work done on existing transmission facilities as necessary to maintain a safe, reliable, and compliant grid based on existing topology."[26]  The Commission noted that, in some instances, an asset management project or activity may result in an incidental increase in transmission capacity that is not reasonably severable from the asset management project or activity. However, the Commission found that an incidental increase in transmission capacity that is a function of advancements in technology of the replaced equipment, and is not reasonably severable from the asset management project or activity, would not render the asset management project or activity in question a transmission expansion that is subject to the transmission planning requirements of Order No. 890.[27]

13.    The Commission in the *California Orders* also recognized that there may also be instances in which a transmission owner's asset management project or activity may

---

[23] *Monongahela Power Co.*, 162 FERC ¶ 61,129 (2018).

[24] *Monongahela Power Co.*, 164 FERC ¶ 61,217 (2018) (Attachment M-3 Order).

[25] *So. Cal. Edison Co*, 164 FERC ¶ 61,160, at P 33 (2018); *Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161, at P 68 (2018) [hereinafter *California Orders*].

[26] *So. Cal. Edison Co*, 164 FERC ¶ 61,160 at n.55; *Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161 at n.119.

[27] *So. Cal. Edison Co*, 164 FERC ¶ 61,160 at P 33; *Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161 at P 68.

result in an increase in transmission capacity that is not incidental.[28]  For example, where a transmission owner determines that it can address a CAISO-identified transmission need by expanding the scope of an asset management or activity to result in a capacity increase the additional work would not be incidental to but would be incremental to the asset management project or activity and would represent an expansion of the CAISO grid.[29]  Such expansions would need to be planned under an Order No. 890-compliant transmission planning process.

## II.    **Filing Summary**

14.    PJM TOs state the existing provisions of Attachment M-3 provide only for the planning of Supplemental Projects[30] and that the proposed revisions expand the applicability of Attachment M-3.[31]  Specifically, the PJM TOs state the proposed revisions require each PJM TO to present its criteria for assessing whether a need exists to replace an existing transmission facility for stakeholder input at least annually.  The PJM TOs state their filing seeks to achieve two goals.  First, by expanding the scope of the Attachment M-3 process, the PJM TOs state the filing will enhance transparency and the opportunity for stakeholder review of EOL Needs.  Second, the PJM TOs state the proposed revisions will better coordinate the Transmission Owners' end of useful life asset management activities with PJM's planning to address RTEP[32] planning criteria.  The PJM TOs note that the filing also increases transparency regarding the process that the PJM TOs use to evaluate the need to replace transmission facilities and provide PJM up to five years of projected replacements that a Transmission Owner has identified (on a confidential basis).[33]

---

[28] *Cal. Pub. Util. Comm'n*, 164 FERC ¶ 61,161 at PP 68, 72.

[29] *So. Cal. Edison Co*, 164 FERC ¶ 61,160 at P 34; *Cal. Pub. Util. Comm'n*, 164 FERC ¶ 61,161, at P 69 (2018).

[30] PJM, Intra-PJM Tariffs, OATT ATT M-3, OATT Attachment M-3, 0.1.0.

[31] PJM TOs do not address or modify any Tariff provisions related to the cost allocation provisions of Schedule 12 of the PJM Tariff.

[32] RTEP is defined as the plan prepared by the Office of the Interconnection pursuant to Operating Agreement, Schedule 6 for the enhancement and expansion of the Transmission System in order to meet the demands for firm transmission service in the PJM Region.  PJM, Intra-PJM Tariffs, OATT Definitions – R - S, OATT Definitions – R - S, 23.0.0.

[33] PJM TOs Transmittal at 11.

Document Accession #: 20200811-3078    Filed Date: 08/11/2020

15.     The PJM TOs propose revisions to add numerous definitions related to the expanded applicability of the existing Attachment M-3 provisions.[34]

16.     Asset Management Projects are defined as "any modification or replacement of a [TO]'s Transmission Facilities that results in no more than an Incidental Increase in transmission capacity undertaken to perform maintenance, repair, and replacement work, to address an EOL Need, or to effect infrastructure security, system reliability, and automation projects the [TO] undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements."

17.     An EOL Need is defined as "a need to replace a transmission line between breakers operating at or above 100 kV or a transformer, the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities, which the [TO] has determined to be near the end of its useful life, the replacement of which would be an Attachment M-3 Project."

18.     Attachment M-3 Projects are defined as "(i) an Asset Management Project that affects the connectivity of Transmission Facilities that are included in the Transmission System, affects Transmission Facility ratings or significantly changes the impedance of Transmission Facilities; (ii) a Supplemental Project; or (iii) any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 …. 'Attachment M-3 Project' does not include a project to address Form No. 715 EOL Planning Criteria."

19.     Form No. 715 EOL Planning Criteria is defined as "planning criteria filed by a [TO] in FERC Form No. 715[35] to address EOL Needs.  No Transmission Owner may be compelled to file a Form No. 715 EOL Planning Criteria not required to be filed pursuant to FERC regulations applicable to Form No. 715."

20.     Incidental Increase is defined as "an increase in transmission capacity achieved by advancements in technology and/or replacements consistent with current Transmission Owner design standards, industry standards, codes, laws or regulations, which is not reasonably severable from an Asset Management Project.  A transmission project that

---

[34] Attachment M-3 Revisions Filing, Exh. A, (b) Definitions.

[35] Form No. 715 is the Annual Transmission Planning and Evaluation Report that any transmitting utility that operates integrated transmission facilities at or above 100 kilovolts must file with the Commission on or before April 1 of each year.  *See* 18 C.F.R. § 141.300 (2019).  *PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,133 (2019).

Document Accession #: 20200811-3078   Filed Date: 08/11/2020

results in more than an Incidental Increase in transmission capacity is an expansion or enhancement of Transmission Facilities."[36]

21.     PJM TOs state the proposed revisions for Attachment M-3 Projects revise the existing planning process for Supplemental Projects, and as noted above, an Attachment M-3 Project does not include a project to address Form No. 715 EOL Planning Criteria. Instead, the proposed revisions require that each PJM TO develop documentation for its EOL Planning Criteria, present its EOL Planning Criteria at least once annually, and annually provide PJM a Candidate EOL Needs List comprising a non-binding five-year projection of its EOL Needs.  PJM TOs note that the proposed revisions to Attachment M-3 include additional provisions for the identification and planning of EOL Needs pursuant to the Attachment M-3 EOL Planning Criteria and/or the Form No. 715 EOL Planning Criteria, and coordination with the existing PJM RTEP planning processes in the PJM Operating Agreement.

22.     The PJM TOs have proposed a mechanism to address the possible situation of any potential electrical overlap between an Attachment M-3 Project that is designed to address an EOL Need that a PJM TO plans under the expanded Attachment M-3 process and a transmission project that PJM plans and selects in the RTEP process.  Specifically, the PJM TOs propose that if PJM determines that a transmission project that is a more efficient and cost-effective solution to a regional need in PJM's RTEP would also address a PJM TO's EOL Need, and the PJM TO disagrees with PJM's determination that its EOL Need is met by the selected RTEP transmission project, then the PJM TO may decide to continue to develop the Attachment M-3 Project.  However, the PJM TO must provide PJM and stakeholders with its rationale for developing the Attachment M-3 Project that addresses the EOL Need notwithstanding PJM's determination that the RTEP transmission project would address the EOL Need.[37]

23.     The PJM TOs contend that section 4 of the CTOA, which states that PJM "[c]onduct its planning for the expansion and enhancement of transmission facilities," limits PJM's planning responsibilities to only transmission projects that expand or enhance transmission facilities, and that the PJM TOs retain responsibility for planning and constructing their own transmission facilities.[38]  The PJM TOs also note that their role was to address the needs unique to their Transmission Zones and to maintain and build their transmission facilities consistent with the findings in *Atlantic City Electric*

---

[36] Attachment M-3 Revisions Filing, Exh. A, (b) Definitions.

[37] PJM TOs Transmittal at 18.

[38] *Id.* at 7-8 (citing *PJM Interconnection L.L.C.*, 114 FERC ¶ 61,283, at P 10 (2006); PJM Rates Schedules, 6.3.4, TOA-42 6.3.4, 0.0.0.

Document Accession #: 20200811-3078     Filed Date: 08/11/2020

*Co., v. FERC*.[39]  Moreover, the PJM TOs state that the Commission already has found that asset management activities are not subject to the transmission planning requirements of Order No. 890.[40]  However, PJM TOs state that they have agreed to include these requirements in Attachment M-3 to (1) increase the transparency of PJM TO asset management activities and projects and (2) improve coordination of the PJM TOs' planning for certain Asset Management Projects to address EOL Needs with the development of the RTEP.

24.     The PJM TOs request an effective date of August 12, 2020 in anticipation of preparation activities for the 2021 planning year.

## III.     Notice and Interventions

25.     Notice of the PJM TOs' filing was published in the *Federal Register*, 85 Fed. Reg. 36,842 (June 18, 2020), with interventions and protests due on or before July 6, 2020.  Appendix A to this order lists the entities that filed notices of intervention, timely-filed motions to intervene, and out of time motions to intervene.

26.     Comments were filed by LS Power, Load Group,[41] NJ BPU, Interested Parties,[42] WIRES, J-POWER, OCC, Ohio FEA, Duquesne, and EEI.

---

[39] *Id.* at 7-8 (citing *Atlantic City Electric Co., v. FERC*, 295 F.3d 1, 6 (D.C. Cir. 2002) ("there was no transfer of ownership or even physical operation of their facilities . . . [and] each of the [transmission owners] retained both ownership and physical control of their facilities[.]").

[40] *Id.* at 3 (citing *Calif, Publ. Util. Comm'n.*, 164 FERC ¶ 61,161, *reh'g denied*, 168 FERC ¶ 61,171, at P 7, n.19 (2019); *So. Calif. Edison Co.*, 164 FERC ¶ 61,160 (2018), *reh'g denied*, 168 FERC ¶ 61,170, at P 7 n.15 (2019)).

[41] Load Group includes:  American Municipal Power, Inc., Old Dominion Electric Cooperative, PJM Industrial Customer Coalition, Public Power Association of New Jersey, People's Counsel for the District of Columbia, Delaware Division of the Public Advocate, West Virginia Consumer Advocate, Indiana Office of Utility Consumer Counselor, Blue Ridge Power Agency, and Central Virginia Electric Cooperative.

[42] Interested Parties' includes:  Office of the Peoples Counsel for the District of Columbia, Delaware Division of the Public Advocate, and Old Dominion Electric Cooperative.

27.     On June 18, 2020, AMPT and ODEC (collectively, Movants) filed a motion to dismiss the Attachment M-3 Revisions Filing (Motion).  On June 26, 2020, the Indicated PJM TOs filed an answer.[43]

28.     On July 21, 2020, PJM filed a limited answer, and the PJM TOs filed an answer to the protests and comments.  On July 29, 2020, LS Power filed an answer, and on July 31, 2020, the Load Group filed an answer.  On August 3, 2020, PJM TOs filed a motion for leave to answer and limited answer to LS Power and Load Group.  On August 5, 2020, J-Power and NJ BPU filed answers to the PJM TOs' July 21, 2020 answer.

### A.     <u>Motion to Dismiss</u>

29.     Movants contend that the Attachment M-3 Revisions Filing should not have been made because the PJM TOs did not adhere to the procedural requirements of the CTOA.[44]  While Movants agree that on May 7, 2020, pursuant to section 9.1(b) of the PJM Tariff, the PJM TOs initiated consultation with PJM and with the PJM Members Committee by providing notice of the proposed revisions, Movants contend that the CTOA-Administrative Committee (Administrative Committee)[45] failed to hold a meeting and take a formal vote before initiating the consultation process.[46]  Movants state that section 8.5[47] of the CTOA provides "*any action taken by the Administrative Committee*

---

[43] The Indicated Transmission Owners are:  American Electric Power Corporation; Dayton; Duke Energy Corporation; East Kentucky Power Cooperative; Exelon Corporation; FirstEnergy Service Company; PPL Electric Utilities Corporation; Public Service Electric and Gas Company; and Virginia Electric and Power Company.

[44] Motion at 2.

[45] The Administrative Committee shall have the authority to propose policies and recommendations to PJM as to any matters relating to the Parties' Transmission Facilities; provided, however, that PJM shall not be required to adopt such policies or recommendations and that the Administrative Committee shall not exercise any control over functions and responsibilities transferred to PJM pursuant to this Agreement, the PJM Tariff or the Operating Agreement.  PJM Rate Schedules, 8.1, TOA-42 8.1 Duties and Responsibilities (0.0.0).

[46] *Id.* at 3.

[47] Subject to the limitations of section 9.7.1(a), any action taken by the Administrative Committee shall require a combination of the concurrence of the representatives' Individual Votes of the representatives of those Parties entitled to vote on such matters and Weighted Votes as specified in this section 8.5.  PJM Rate Schedules, 8.5, TOA-42 8.5 Manner of Acting, 1.0.0.

Document Accession #: 20200811-3078          Filed Date: 08/11/2020

shall require a combination of the concurrence of the representatives' Individual Votes of the representatives of those Parties entitled to vote on such matters."[48]  Accordingly, Movants contend that the notification to commence the consultation process should have been preceded by a vote, and because no vote was taken by the Administrative Committee prior to providing notice to PJM and the PJM Members Committee that the PJM TOs contemplated a filing pursuant to section 205 of the FPA, Movants request that the Attachment M-3 Revisions Filing be dismissed.[49]

30.      In the alternative, Movants request that the Commission suspend the date for intervention and comments during the pendency of this motion, and issue a deficiency letter requiring that the PJM TOs refile the proposed revisions once they have cured any deficiency in the meeting and voting requirements of the CTOA.[50]

31.      In answer to the Motion, Indicated PJM TOs contend that nothing in the CTOA or the Tariff requires the Administrative Committee to take a formal vote to issue a notice to initiate consultation regarding a potential section 205 filing.[51]  Indicated PJM TOs contend that, unless exempted, all that the CTOA and the Tariff require is that consultation take place beginning at least 30 days prior to the filing,[52] and that notice of initiation of consultation is not a formal action of the Administrative Committee that requires approval through the voting process set forth in the CTOA.[53]  Indicated PJM TOs maintain that since neither the CTOA nor the Tariff explicitly require an Administrative Committee notice or vote before consultation commences on a proposed section 205 of the FPA filing, the Commission should decline to impose such a requirement.[54]

32.      Indicated PJM TOs contend that section 7.3.2[55] of the CTOA and section 9.1(b) of the Tariff states that any such changes must be in accordance with section 8.5.1 of the

---

[48] *Id.* at 4 (citing PJM, Rate Schedules, 8.5, TOA-42 8.5 Manner of Acting, 1.0.0).

[49] *Id.* at 5-6.

[50] *Id.* at 8-9.

[51] Indicated PJM TOs Answer at 3-4.

[52] *Id.* at 5.

[53] *Id.*

[54] *Id.* at 7.

[55] Section 7.3.2 of the CTOA states, "The Transmission Owners shall consult with PJM and the PJM Members Committee beginning no less than thirty (30) days prior to the

Document Accession #: 20200811-3078     Filed Date: 08/11/2020

CTOA, which requires approval of a two-thirds majority of individual Transmission Owner votes and votes weighted by net transmission investment, and that pursuant to section 9.1(b) of the Tariff, before making such a filing the Transmission Owners "shall consult with PJM and the PJM Members Committee beginning no less than 30 days prior to any [such] [s]ection 205 filing."[56]

33.     Indicated PJM TOs contend that both requirements in connection with the proposed revisions were satisfied.[57]  Specifically, they assert that PJM TOs began the consultation process on May 7, 2020, when, at their request, PJM issued notice of consultation process and a June 10, 2020 meeting, and the Administrative Committee authorized the submission of the FPA section 205 filing.

34.     Indicated PJM TOs further contend that the action referred to in section 8.5 of the CTOA is an authorization for the submission of an FPA section 205 filing, and that the notice required to start that consultation process is ministerial.[58]  Indicated PJM TOs contend that under Movants' reading, every preliminary step that may lead to an Administrative Committee vote would itself be an Administrative Committee action requiring an Administrative Committee vote, and such an interpretation of the CTOA is simply not workable.[59]

---

any section 205 filing hereunder, but neither PJM (except as provided for in Section 7.6) nor the PJM Members Committee shall have any rights to veto or delay the Transmission Owners' section 205 filing hereunder; provided that the Transmission Owners may file with less than a full 30 day advance consultation in circumstances where imminent harm to system reliability or imminent severe economic harm to electric consumers requires a prompt section 205 filing; provided further that the Transmission Owners shall provide as much advance notice and consultation with PJM and the PJM Members Committee as is practicable in such circumstances and no such filing shall be made with less than 24 hours' advance notice." PJM Rate Schedules, 7.3, TOA-42 7.3 Filing of Transmission Rates and Rate Design (0.0.0).

[56] *Id.* at 4 (citing PJM, Rate Schedules, 7.3.2, TOA-42 7.3.2, 0.0.0; PJM, Intra-PJM Tariffs, 9.1, OATT 9.1 Rights of the Transmission Owners, 2.1.0).

[57] *Id.*

[58] *Id.* at 7.

[59] *Id.*

Document Accession #: 20200811-3078    Filed Date: 08/11/2020

### B.    **Pleadings**

#### 1.    **PJM CTOA**

35.    In support of the Attachment M-3 Revisions Filing, WIRES and EEI argue that the CTOA leaves the responsibilities of planning for Asset Management or EOL Need projects to the PJM TOs.[60]  EEI claims that only Transmission Owners have the specialized knowledge necessary to plan for asset replacement, including EOL determinations, and that the sole responsibility for decisions about when and how to replace an asset lies with the Transmission Owner.  WIRES also argues that the Attachment M-3 Revisions Filing appropriately recognizes the rights and responsibilities of all Transmission Owners as asset owners and the role of Regional Transmission Organizations/Independent System Operators (RTOs/ISOs) as regional planners.

36.    Conversely, Ohio FEA, LS Power, and Load Group argue that PJM is in the best position to plan for Asset Management or EOL Need projects.[61]  Ohio FEA asserts that PJM is in the best position to identify a cost-effective solution to replace a transmission facility for an EOL Need or to identify the intersection of a potential EOL Need and a regional planning need.  LS Power asserts that, if the Attachment M-3 Revisions Filing is accepted, it would stymie PJM from conducting regional transmission planning by allowing Transmission Owners to exclusively reserve certain planning activities for the region's needs while also prohibiting stakeholders from improving regional planning rules.  Further, LS Power argues the sections of the CTOA on which the PJM TOs rely upon to support their filing, do not limit the scope of regional planning.  LS Power argues that these provisions only pertain to transmission facilities that were brought into PJM as a result of a transmission owner joining PJM, not future facilities.  Load Group states that the PJM TOs conflate certain sections of the CTOA as support for the view that they may conduct transmission planning essentially as they see fit absent a specific PJM RTEP criterion; however, Load Group explains that this section addresses operation and maintenance, not transmission planning.  Load Group argues the Attachment M-3 Revisions Filing goes well beyond what the Commission permitted in approving Attachment M-3.

37.    LS Power argues that PJM TOs' reliance on section 9.1 of the PJM Tariff and the court's determination in *Atlantic City v. FERC*, is misplaced.  LS Power states that while both the PJM Tariff and *Atlantic City v. FERC* established certain FPA section 205 filing rights for Transmission Owners regarding rates and revenue requirements, both remained

---

[60] WIRES Comment at 4-5; EEI Comment at 5.

[61] Ohio FEA comments at 8; LS Power Protest at 53; Load Group Protest at 17-18.

Document Accession #: 20200811-3078     Filed Date: 08/11/2020

silent on transmission planning.[62]  Rather, LS Power offers that transmission planning is one of the core functions of an RTO or ISO.  LS Power adds that Order No. 2000 found that RTOs/ISOs "have ultimate responsibility for both transmission planning and expansion within its region…"[63]  As such, LS Power states, accepting the Attachment M-3 Revisions Filing, would grant PJM TOs unilateral filing rights for transmission projects for which the RTOs/ISOs should hold responsibility.[64]

38.     Duquesne argues that the Attachment M-3 Revisions Filing imposes several new mandatory obligations on Transmission Owners, including requiring Asset Management Projects to be included and subject to stakeholder comment in the Attachment M-3 process, that encroach upon Duquesne's right under the CTOA.  Duquesne asserts that asset management activities do not expand the transmission system and are not subject to the transmission planning requirements of Order No. 890, consistent with the Commission's findings in the *California Orders*.  Duquesne argues that the proposal fundamentally deviates from this allocation of responsibility, noting that PJM would be required to look for overlap with EOL Need projects to determine if the EOL Need could be met by an RTEP project, even though EOL Need projects are Asset Management Projects required to meet local needs.[65]  Finally, Duquesne argues that the proposal is an improper attempt to circumvent the process to amend the CTOA and is therefore unjust and unreasonable.[66]

39.     Interested Parties and Load Group argue that the Attachment M-3 Revisions Filing was filed in violation of the CTOA.[67]  Interested Parties contend the Attachment M-3 Revisions Filing arrived at the Commission by short-circuiting the stakeholder process and violating the very agreement that provides for certain Transmission Owner section 205 filing rights.  Interested Parties assert that the PJM TOs ignored various provisions of

---

[62] LS Power Protest at 17-19 (citing PJM Tariff section 9.1(a); *Atl. City Elec., et al v. FERC* 295 F. 3d 1 (D.C. Cir. 2002)).

[63] LS Power Protest at 19-20 (citing *Reg'l Transmission Organs.*, Order No. 2000, 89 FERC ¶ 61,284, at P 485, *order on reh'g*, Order No. 2000-A, (2000), *aff'd sub nom., Pub. Util. Dist. No. 1. Of Snohomish Cty., Wash. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001)).

[64] *Id.* at 19-20 (citations omitted).

[65] Duquesne Protest at 4-8.

[66] *Id.* at 9-11.

[67] Interested Parties Protest at 15-16; Load Group Protest at 11-13.

Document Accession #: 20200811-3078   Filed Date: 08/11/2020

the CTOA in their rush to circumvent the stakeholder process.[68]  Load Group asserts that section 9.1(a) of the Tariff specifies that the PJM TOs can "only file under Section 205 to change the transmission rate design for the PJM Region pursuant to a filing approved in accordance with Section 8.5.1 of the CTOA."  Load Group emphasizes that the PJM TOs' authority ends there, as PJM's regional transmission planning process, with the exception of the local transmission planning process for Supplemental Projects, is set forth in Schedule 6 to the PJM Operating Agreement.

40.     Ohio FEA states that the Commission should eliminate any ambiguity regarding the scope of PJM's authority that results in no or a deficient review of Transmission Owner transmission investment proposals and confirm PJM's responsibility to equip itself with the required expertise to function comprehensively and effectively as a regional planner.[69]

## 2.    PJM Joint Stakeholder Proposal

41.     Load Group recommends that the Commission reject the Attachment M-3 Revisions Filing and instead approve the proposal developed and approved by a super-majority of PJM Members filed in Docket No. ER20-2308-000 (Joint Stakeholder Proposal).[70]  Load Group explains that stakeholders seek to have PJM use all of its tools and insights to centrally plan, on a regional and cost effective basis, for new transmission expansions and enhancements that are required to replace transmission facilities that have reached the end of their operational lives for the grid of the future.

42.     Interested Parties argue that approval of the Joint Stakeholder Proposal is consistent with established Commission preference for a stakeholder vetted and approved approach.[71]  Interested Parties contend it provides for the transparency and meaningful participation Order No. 890 requires and will allow PJM to meet its regional transmission planning obligations under Order No. 1000.[72]  Interested Parties further contend that the

---

[68] Interested Parties Protest at 15.

[69] Ohio FEA Comments at 9.

[70] Load Group Protest at 36-37.

[71] Interested Parties Protest at 12-13.

[72] *Id.* at 16 (citing *Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051 (2011) (Order No. 1000), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g & clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

Joint Stakeholder Proposal is just and reasonable and should be accepted because it adheres to and furthers these long established Commission policy goals.[73]

### 3. EOL Terms and Process

43.    Regarding the Attachment M-3 Revisions Filing's provisions on notifications and forecasts for future EOL Need projects, Ohio FEA supports the identification of EOL projects through the PJM TOs' proposed 5-year forecast and their incorporation into PJM's transmission planning framework. Additionally, Ohio FEA states that five years represents the minimum notification time that would be necessary for a project to be incorporated into the RTEP.[74]

44.    Load Group and LS Power argue that the definitions governing the expanded Attachment M-3 process are vague and, therefore, are unjust and unreasonable. Specifically, Load Group argues the following definitions in the Attachment M-3 Revisions Filing are unjust and unreasonable: Asset Management Project, Attachment M-3 Project, Form No. 715 EOL Planning Criteria, EOL Need, Attachment M-3 EOL Planning Criteria, Candidate EOL Needs List, and PJM Planning Criteria.[75] LS Power argues that the definitions that underlie the Attachment M-3 Revisions Filing are unjust and unreasonable. LS Power states that the definition of "asset management" is not defined by the Commission, North American Electric Reliability Corporation (NERC), or PJM. LS Power notes that the *California Orders* stated that "asset management" is "maintenance, repair and replacement work *done on existing transmission facilities.*" LS Power states that this definition does not apply to retiring transmission facilities that will be governed by the revisions for EOL drivers.[76] LS Power argues that the proposed definition of "EOL Need" in the Attachment M-3 Revisions Filing, by only applying to transmission facilities greater than 100 kV, provides another backdoor right of first refusal (ROFR) on substations and any other non-line transmission equipment. Further, LS Power notes, the definition of "EOL Need" limits EOL Needs to just transmission lines, meaning that replacements of substations in PJM would no longer be subject to the regional planning process or cost allocation.[77]

---

[73] *Id.* at 18.

[74] Ohio FEA Comments at 11-12.

[75] Load Group Protest at 38.

[76] LS Power Protest at 39-42 (citations omitted).

[77] *Id.* at 48-51.

45.    Load Group claims the Attachment M-3 Revisions Filing's reliance on the *California Orders* is misplaced and those orders do not apply to the breadth of projects under consideration in these proposed tariff revisions.[78]  Further, Load Group argues the Commission made it clear in the *California Orders* that its determination was based on the specific circumstances of those proceedings, so the Commission should not import and impose those determinations in this proceeding.  Though the PJM TOs claim their proposal is consistent with the *California Orders*, Load Group states the Attachment M-3 Revisions Filing goes well beyond the *California Orders*, including the PJM TOs' proposed definition for Asset Management Projects and conflates the Commission's guidance on incidental increases to transmission system capacity.

46.    LS Power and Load Group also protest the PJM TOs' proposed definition of "Incidental Increase."[79]  LS Power notes that while the term "Incidental Increase" was the mechanism by which the *California Orders* determined whether a transmission project was an "expansion" of the transmission system, the Attachment M-3 Revisions Filing ignores PJM's transmission planning structure in which both regional planning and Supplemental Projects cover expansions and enhancements.  LS Power argues PJM TOs' proposed definition conflates expansions, which relate exclusively to increases in delivery potential with "enhancements," which can mean new facilities that result in no capacity increase.  Due to this lack of clarity on the PJM TOs' proposed definition for "Incidental Increase," LS Power argues, it will be applied discriminatorily across the PJM region since Transmission Owners' design standards differ.  Load Group states the proposed definition of Incidental Increase is unjust and unreasonable as it is unreasonably broad and susceptible to manipulation through a modification of Transmission Owner design standards and it seeks to apply an interpretation of a Commission Order that is explicitly inapplicable to PJM.

47.    Ohio FEA, Load Group, LS Power, NJ BPU, and OCC argue that the Attachment M-3 Revisions Filing should be more transparent than as-filed.[80]  Ohio FEA argues that the proposal could be strengthened such that stakeholders may provide input when the Transmission Owners are developing their planning criteria and not just on the final decisions made utilizing such criteria.  Load Group warns that having these critical planning provisions in Attachment M-3 to the PJM Tariff as opposed to the Operating Agreement, gives the PJM TOs control and veto authority over adding additional regional planning categories to the PJM RTEP.  NJ BPU states that under the Attachment M-3 Revisions Filing, stakeholders will only have ten days to review and provide input on

---

[78] Load Group Protest at 24-30.

[79] LS Power Protest at 44-48; Load Group Protest at 38-39.

[80] Ohio FEA Comments at 6-10; Load Group Protest at 21-22; LS Power Protest at 4; NJ BPU Protest at 4-9; OCC Protest at 8-12.

Document Accession #: 20200811-3078    Filed Date: 08/11/2020

EOL Needs projects.  OCC states that the proposal is fundamentally deficient because it fails to include all Asset Management Projects within the scope of the transmission planning process and fails to provide for any regulatory oversight of the selection and cost of projects.

48.    LS Power, NJ BPU, and OCC argue that the Attachment M-3 Revisions Filing, by permitting PJM TOs to provide PJM, and only PJM, a Candidate EOL Needs List comprising the non-public confidential, non-binding projection of up to five years of EOL Needs, deprives stakeholders (including consumer advocate groups) the necessary transparency to avoid undue discrimination.[81]  LS Power states the Attachment M-3 Revisions Filing's proposal to share the Candidate EOL Needs List with PJM, and not stakeholders or state commissions, should be rejected because there is no justification for keeping this list a secret and is inconsistent with the Commission's efforts to ensure that transmission planning is transparent and permits stakeholder participation.

49.    LS Power argues that the Attachment M-3 Revisions Filing represents an effort by PJM TOs to circumvent PJM's regional transmission planning processes by removing the ability of PJM Stakeholders to determine the scope of regional planning within the Operating Agreement.  LS Power asserts the impact of the Attachment M-3 Revisions Filing would continue the transition in PJM to move local and short-term planning to the forefront, while relegating regional planning to an afterthought.[82]  Similarly, Interested Parties argue the Attachment M-3 Revisions Filing is not the product of an extensive stakeholder process but is rather a deliberate series of actions designed to avoid and ignore input from other PJM Members and stakeholders.[83]

50.    Ohio FEA supports identification of Transmission Owner EOL projects that also overlap with PJM RTEP projects.[84]  However, Ohio FEA contends that in order to strengthen this requirement, and avoid duplication of projects, the PJM TOs should not be permitted to proceed with a project that overlaps with a PJM RTEP project.  Ohio FEA argues that if PJM TOs object to the findings of the RTEP planning process as it pertains to their project candidates, the PJM TOs will be under no obligation to abide by the findings.  Ohio FEA contends that to facilitate meaningful improvement in the planning process, Transmission Owners must be bound by the findings based upon the information they provided.

---

[81] LS Power Protest at 52-53; NJ BPU Protest at 7-8; OCC Protest at 8-12.

[82] LS Power Protest at 4.

[83] Interested Parties Protest at 13-16.

[84] Ohio FEA comments at 7, 11-12.

Document Accession #: 20200811-3078    Filed Date: 08/11/2020

51.     LS Power argues that the Attachment M-3 Revisions Filing, if accepted, would conflict with existing Operating Agreement transmission planning requirements. Specifically, LS Power argues the following: (1) the proposed tariff revisions do not respect PJM's existing provisions related to transmission projects driven by Public Policy Requirements or Multi-Driver transmission projects; (2) inappropriately expands the definition of Supplemental Projects without corresponding revisions to Schedule 6 of the Operating Agreement; (3) effectively establishes Transmission Owner veto rights to PJM's determination of projects that can be included in PJM's Order No. 1000-compliant transmission planning process; and (4) since EOL or Asset Management Projects qualify as Supplemental Projects under the existing Operating Agreement, the Attachment M-3 Revisions Filing is unnecessary.[85]

### 4.    <u>Expanded Attachment M-3 Impacts</u>

52.     Ohio FEA supports that Asset Management and EOL projects be vetted through the Attachment M-3 process. However, Ohio FEA contends that more should be done to align the PJM regional transmission planning process with the Attachment M-3 process due to the recent escalation in transmission investment driven primarily by Transmission Owners' projects that occur independent of RTEP review.[86]

53.     Interested Parties argue that the Attachment M-3 Revisions Filing completely avoids the non-binding, ten-year look-ahead and replaced the required six-year notification of EOL Need status with a voluntary five-year notice that would only be shared with PJM.[87] Rather than enhancing transparency to allow stakeholders to better align their own commercial and regulatory activities with the changing topography of the grid, Interested Parties contend, the Attachment M-3 Revisions Filing creates a black box around transmission planning into which only the Transmission Owner and PJM may look. Furthermore, Interested Parties contend, it is not entirely clear what PJM would do with its increased "transparency," as Attachment M-3 Revisions Filing still leaves the vast majority of EOL planning to the Transmission Owner.[88] Interested Parties contend only when there is a related PJM reliability open window violation *and* the EOL need can be combined with a PJM open window reliability violation *and* the EOL Need project is

---

[85] LS Power Protest at 21-32 (internal citations omitted).

[86] Ohio FEA Comments at 5-6 & 7-8.

[87] Interested Parties Protest at 8-9.

[88] *Id.* at 8.

Document Accession #: 20200811-3078     Filed Date: 08/11/2020

over 200 kV *and* the EOL project relates only to poles and wires (i.e., no substation equipment, including transformers) would PJM plan the EOL project.[89]

54.     Interested Parties, Load Group, and LS Power contend that the Attachment M-3 Revisions Filing undermines the Commission's policy goals regarding regional transmission planning as articulated in Order Nos. 890, 1000, and 2000.[90]  Interested Parties argue it would significantly reduce transparency and limit meaningful stakeholder participation, contrary to the requirements of Order No. 890.  Interested Parties argue because of the prevalence of EOL projects in the PJM footprint, allowing the Transmission Owner to address them through the Attachment M-3 Process all but guarantees that PJM will be unable to develop the type of regional planning envisioned under Order No. 1000.  Load Group also suggests that the proposed applicability provision limits PJM's ability to add additional regional transmission planning categories to the PJM RTEP absent PJM TOs' approval to modify the Tariff, which Load Group explains would prevent PJM from independently making changes to the RTEP and is the exact opposite of the spirit and letter of Order No. 2000.  LS Power states, the Commission found in Order No. 1000 that, "it is necessary to have an affirmative obligation in these transmission planning regions to evaluate alternatives that may meet the needs of the region more efficiently or cost-effectively."[91]  Given the Commission's statement in Order No. 1000, LS Power argues that the Attachment M-3 Revisions Filing would deprive PJM of its ability to holistically plan on a regional basis and determine whether a regional solution would more efficiently or cost-effectively meet the region's needs.

55.     LS Power argues that the Attachment M-3 Revisions Filing elevates local planning over regional planning contrary to Commission precedent on transmission planning.  Specifically, LS Power argues that the Attachment M-3 Revisions Filing is inconsistent with Order No. 888-A's guidance that encouraged transmission providers to engage in regional planning with transmission customers to "ensur[e] that regional transmission needs are met efficiently."[92]  LS Power further states the Attachment M-3 Revisions Filing conflicts with the Commission's finding in Order No. 890 that, "[t]he coordination of planning on a regional basis will also increase efficiency through the coordination of transmission upgrades that have region-wide benefits, as opposed to pursuing transmission expansion on a piecemeal basis."  LS Power adds that the impacts of the

---

[89] *Id.* at 8-9.

[90] Interested Parties Protest at 16-18; Load Group Protest at 24; LS Power Protest at 55-58.

[91] Order No. 1000 at P 80.

[92] LS Power Protest at 55 (citations omitted).

Document Accession #: 20200811-3078          Filed Date: 08/11/2020

Attachment M-3 Revisions Filing would create a perpetual right to locally plan and rebuild the existing transmission system in perpetuity.

56.    LS Power and NJ BPU argue that EOL Need transmission projects developed under the expanded Attachment M-3 process should be subject to competitive solicitation windows.[93]  LS Power asserts that the real-world impacts of the Attachment M-3 Revisions Filing is to institute a new ROFR in the PJM Tariff nine years after the Commission mandated the removal of ROFRs.  The NJ BPU asserts the Attachment M-3 Revisions Filing, by not permitting EOL Need projects to be subject to competition, creates preferential treatment for the PJM TOs and likely results in a failure to consider more efficient or cost-effective solutions for these projects and runs counter to the Commission's findings in Order No. 1000.

## 5.    Attachment M-3 Supplemental Projects

57.    Interested Parties, OCC, and LS Power make arguments opposing EOL Need projects being developed under the expanded Attachment M-3 process compared to the existing Attachment M-3 Supplemental Projects process.[94]  Interested Parties argue EOL projects are often addressed as either Supplemental Projects or FERC Form 715 criteria projects, minimizing any effective oversight by either PJM or stakeholders.  Rather than addressing these deficiencies, Interested Parties argue, the PJM TO Proposal compounds them, unlawfully expanding the reach of its Supplemental Projects Attachment M-3 Process.  LS Power states that as is apparent from Supplemental Project spending for EOL projects, and the Attachment M-3 Revisions Filing, Transmission Owners have criteria by which they make EOL Need determinations.  LS Power states by withholding EOL Need planning criteria from its Form No. 715 submission, a Transmission Owner can build EOL Need projects without competition as a Supplemental Project – EOL Need projects are a subset of Supplemental Projects.

58.    Load Group notes that the proposed revisions of the Attachment M-3 Revisions Filing are not limited to modifications to the Supplemental Project planning process in Attachment M-3 and includes expansive modifications to Attachment M-3.  Load Group also states the Attachment M-3 Revisions Filing explicitly limits PJM's flexibility to improve its structure and operations to meet demand by restricting the PJM planning criteria.  Load Group argues that the PJM TOs cannot turn Attachment M-3 into an

---

[93] *Id*. at 13-14; NJ BPU Protest at 2-3 (citations omitted).

[94] Interested Parties Protest at 4; OCC Protest at 16; LS Power Protest at 62-64.

Document Accession #: 20200811-3078          Filed Date: 08/11/2020

expansive catchall that allows the PJM TOs to declare whatever they choose to be an "Attachment M-3 Project" absent defined PJM criteria.[95]

### 6.    Cost Causation Principles

59.    LS Power and NJ BPU both contend that the Attachment M-3 Revisions Filing is inconsistent with cost causation principles.  LS Power states that, if accepted, the Attachment M-3 Revisions Filing would violate the long-standing cost allocation precedent that requires that beneficiaries of a project pay the cost of the project.[96] NJ BPU argues that the Attachment M-3 Revisions Filing violates cost causation principles.  Specifically, NJ BPU argues the court's findings in *ODEC v. FERC* which stated "the cost-causation principle, by allocating project costs consistent with project benefits"[97] signaled that the Attachment M-3 Revisions Filing is not consistent with this principle since EOL Need projects that PJM TOs develop under the expanded Attachment M-3 process will receive local cost allocation to the transmission zone where the project is located.

60.    NJ BPU offers the example of PSEG's Metuchen-Trenton-Burlington Project (MTB Project) which addressed end-of-life transmission needs.  NJ BPU states that the MTB Project received proper cost allocation under PJM's Order No. 1000-compliant RTEP process, but had the MTB Project been developed under the Attachment M-3 Revisions Filing, it would have only received local cost allocation.  NJ BPU concludes that since the PJM TOs failed to address the cost causation principles in their filing, they have not meet the FPA section 205 filing burden.[98]

### 7.    Miscellaneous

61.    J-POWER claims that it does not take a position on the proposed revisions or an alternate proposal, but instead urges the Commission to request additional information regarding the process for EOL transmission replacements to avoid creating additional roadblocks for merchant generators trying to interconnect to the PJM system.[99]

---

[95] Load Group Protest at 13-15.

[96] LS Power Protest at 35-36 (citing *Old Dominion Elect. Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir.), *reh'g denied*, 905 F.3d 671 (D.C. Cir. 2018) [hereinafter *ODEC*].

[97] *ODEC*, 898 F.3d 1254 at 1263.

[98] NJ BPU Protest at 10-15.

[99] J-POWER Comment at 1.

62.     OCC states that the instant proposal lacks recommendations of effective regulation of costs to protect consumers because it does not provide for any timely review of the need for and cost of proposed Supplemental Projects including Asset Management and EOL projects.  OCC notes that even if the Commission were to require PJM to be responsible for determining the most cost effective solution for reliability concerns driven by end-of-life considerations, that solution will not necessarily guarantee a cost-efficient transmission grid and PJM's independent and timely review of the estimated costs of those projects is necessary.  OCC states that the Commission should require a third party or PJM to review Supplemental Projects for a demonstration of need to maintain reliability and costs.[100]

## C.    Responsive Pleadings

63.     In their limited answer, PJM responds to J-Power's concerns.  Specifically, PJM states the Commission's acceptance of the Attachment M-3 Revisions Filing is not anticipated to affect interconnection costs.  PJM explains that the Attachment M-3 Revisions Filing merely provides more transparency to an existing process to avoid uncertainty when PJM develops the RTEP.  PJM states J-Power's concerns pertain to interconnection issues which are beyond-the-scope of this proceeding.[101]

64.     In their answer, the PJM TOs respond to several arguments made in the pleadings.  First, the PJM TOs state that the Attachment M-3 Revisions Filing must be considered on its own merits.[102]  The PJM TOs argue that the Commission is under no obligation to determine whether the Attachment M-3 Revisions Filing is superior to other proposals offered by the pleadings and that the Commission only needs to determine whether the instant proposal is just and reasonable.  The PJM TOs note that the Commission is not authorized, per section 205, to change the Attachment M-3 Revisions Filing to adopt protestors' alternatives, some of which, the PJM TOs assert, are beyond-the-scope of this proceeding.[103]

---

[100] OCC Protest at 13-16.

[101] PJM Limited Answer at 2-4.

[102] PJM TOs Answer at 9-11 (citing *Cities of Bethany v. FERC*, 727 F.2d at 1136 ("FERC has interpreted its authority to review rates under [the FPA] as limited to an inquiry into whether the rates proposed by a utility are reasonable and not to extend to determining whether a proposed rate schedule is more or less reasonable than alternative rate designs."), *cert. denied*, 469 U.S. 917 (1984); *Oxy USA,* 64 F.3d at 692 (D.C. Cir. 1995)).

[103] *Id.* at 12-14, 16-17 (citing *NRG Power Marketing*, 862 F.3d at 115-16 (holding that the Commission acted beyond the scope of its section 205 authority where its

Document Accession #: 20200811-3078          Filed Date: 08/11/2020

65.     Second, the PJM TOs reiterate that the Attachment M-3 Revisions Filing has been shown to be just and reasonable as it enhances transparency and opportunities for stakeholder input.  In response to arguments by LS Power and the Load Group regarding the PJM TOs' rights to file changes, the PJM TOs claim that since the PJM TOs did not turn over the responsibility for Supplemental Projects to PJM, the PJM TOs maintain the right to propose revisions under section 205.  The PJM TOs note that the Commission rejected similar arguments in the Attachment M-3 Order.[104]  In response to protestors' arguments regarding the PJM TOs responsibilities under the CTOA, the PJM TOs argue that the transfer of certain transmission planning responsibilities to PJM was limited and the PJM TOs retained "the right to *build*, acquire, sell, dispose, *retire*, merge or otherwise transfer or convey all or any part of its assets, including any Transmission Facilities."[105]

66.     In further support that the Attachment M-3 Revisions Filing is just and reasonable, the PJM TOs challenge LS Power and the Load Group's arguments regarding definitions contained in the Attachment M-3 Revisions Filing.  The PJM TOs argue that the proposed definition of "Asset Management Project" is consistent with the Commission's findings in the *California Orders* and note that Order No. 890 requirements do not apply to "Asset Management Projects".[106]  Similarly, the PJM TOs argue that the Attachment M-3 Revisions Filing's proposed definition of "Incidental Increase" is consistent with Commission precedent.[107]  In response to concerns from several protestors that the PJM TOs will not adopt uniform EOL Needs Planning Criteria, the PJM TOs argue that stakeholders will be able to review and comment on EOL Needs Planning Criteria annually so there is no need for uniformity across the PJM TOs.[108]  Regarding protestors' objections to the provisions limiting EOL Candidate Needs List to PJM only, the PJM TOs argue the protestors ignore that under the Attachment M-3 Revisions Filing, the PJM

---

"proposed modifications resulted in an 'entirely different rate design' than PJM's proposal").

[104] *Id.* at 19-21 (citing Attachment M-3 Order at P 14).

[105] *Id.* at 21-23 (citing PJM Rates Schedules, TOA-42, 5.2, TOA-42, 5.2 Facility Rights, 1.0.0).

[106] *Id.* at 25-26.

[107] *Id.* at 27-31.

[108] *Id.* at 32-34.

Document Accession #: 20200811-3078     Filed Date: 08/11/2020

TOs will have to review EOL Needs during the Attachment M-3 process and that the EOL Candidate Needs List is not a forecast of costs and is subject to changes.[109]

67.    The PJM TOs counter protestors' assertions regarding the process by which PJM and a specific PJM TO will coordinate on electrically overlapping transmission projects. PJM reiterates that the specific PJM TO responsible for the EOL Need project in question, must present documentation to PJM and stakeholders on the reasons why it has decided that the EOL Need is not addressed.  Moreover, PJM TOs explain, since the CTOA requires each PJM TO to maintain their facilities consistent with Good Utility Practice, it is reasonable for each PJM TO to retain the ability to fulfil their obligations to their customers and state commissions.[110]

68.    Finally, the PJM TOs argue that the Attachment M-3 Revisions Filing makes no changes to PJM planning responsibilities, cost allocation or recovery of costs. Specifically, PJM TOs argue that nothing in the Attachment M-3 Revisions Filing reduces the opportunities for stakeholders to review and comment on EOL Need projects. PJM TOs further note that stakeholders will have at least the same opportunity they had before to raise the need for a project at the Attachment M-3 Needs meeting and to challenge it.[111]  In response to LS Power's concerns that the Attachment M-3 Revisions Filing – effectively – permits PJM TOs "veto" power over certain transmission projects, PJM TOs note there is nothing in their filing that permits an individual PJM TO to block PJM from developing a transmission project.  Similarly, the PJM TOs argue, there are no changes to several other matters raised by protestors such as ROFR, FERC Form No. 715 transmission planning, the applicability of Attachment M-3 to Supplemental Projects, the authority of state commissions to access transmission planning data, or the interconnection process.  The PJM TOs add that nothing in the Attachment M-3 Revisions Filing will impact Duquesne's rights as a party under the CTOA.[112]  Regarding the arguments about cost allocation and recovery of costs, the PJM TOs argue those issues are beyond-the-scope of this proceeding.  The PJM TOs note that the court's

---

[109] *Id.* at 35-37.

[110] *Id.* at 38-39 (citing PJM Rates Schedules, TOA-42 4.5 Operation and Maintenance, 1.0.0).

[111] *Id.* at 41-43.

[112] *Id.* at 44, 46-55.

Document Accession #: 20200811-3078      Filed Date: 08/11/2020

decision in *ODEC v. FERC* did not address projects developed under the Attachment M-3 process.[113]

69.     In its answer, LS Power argues it now has evidence that some Attachment M-3 Projects and Asset Management Projects are likely to have regional benefits, including Supplemental Projects that are also aging infrastructure replacement projects located throughout PJM that have regional benefits.[114]  LS Power states that while Supplemental Projects are allocated to the individual zone, the PJM TOs have provided no evidence that proposed revisions to Attachment M-3 results in a cost allocation that is just and reasonable.[115]  LS Power contends that for the Commission to accept the TO Filing, there must be evidence in the record that the cost allocation methodology applicable to the new project categories is just and reasonable.[116]

70.     In their answer, the Load Group argues that the Attachment M-3 Revisions Filing exceeds the authority to file section 205 filing under both the CTOA and the Tariff.  The Load Group further contends that the Attachment M-3 Revisions violate the CTOA and FERC precedent by transferring regional planning duties from PJM to the PJM TOs, limiting the scope of the PJM RTEP.  The Load Group argues that the PJM TOs' claims of improved coordination between EOL Needs and PJM Planning under Operating Agreement Schedule 6 do not remedy their proposal to transfer PJM's planning authority.  The Load Group further contends that the Commission should reject the PJM TOs' attempt to ignore the Commission's limited applicability of the *California Orders* and instead find that:  (1) the *California Orders* do not apply beyond those specific cases; and (2) even if the *California Orders* did provide precedent, the TOs' Proposal goes well beyond any reasonable application of those orders.

71.     In their answer to LS Power's and Load Group's answer, the PJM TOs argue that LS Power's arguments regarding cost allocation and cost responsibility assignment rules constitutes a collateral attack on the Commission's findings during PJM's Order No. 1000 compliance proceeding.[117]  The PJM TOs contend that LS Power's reliance on *ODEC* is misplaced since the Attachment M-3 Revisions Filing only pertains to

---

[113] *Id.* at 44-45 (citing *ODEC v. FERC,* 898 F.3d 1254 (D.C. Cir., 2018), *reh'g denied,* 905 F.3d 671).

[114] LS Power Answer at 2-3.

[115] *Id.*

[116] *Id.* at 6.

[117] PJM TOs Answer at 5 (citing *PJM Interconnection, L.L.C.,* 142 FERC ¶ 61,214, at 354, 416-46 (2013)).

transmission planning.[118]  In response to LS Power's arguments regarding certain transmission projects having regional benefits but their costs are only allocated to the zone in which the transmission projects are located, the PJM TOs assert that the evidence LS Power relies on is not relevant to this proceeding since it relates to cost allocation.[119]  The PJM TOs finally respond to Load Group's assertions regarding filing rights by arguing that Load Group's views are misinterpretations of the Tariff, CTOA, or the Attachment M-3 Revisions Filing.  Specifically, the PJM TOs state that Load Group's reading of these documents ignores the PJM TOs' rights to make changes to Attachment M-3 through the CTOA and falsely holds that the PJM TOs seek to extend their planning rights beyond local projects.[120]

72.     In their answer, J-Power contests PJM's assertions on the Attachment M-3 Revisions Filing's impacts on interconnection costs.  Specifically, J-Power states, for example, a scenario where an EOL Need project could result in the installation of facilities that could negate the need for transmission upgrades that have been identified as necessary to accommodate an interconnection request.[121]  J-Power asserts that the Commission should not dismiss J-Power concern's since transmission planning and interconnection processes are complex matters.  Accordingly, J-Power states, the Commission should consider the Attachment M-3 Revisions Filing's impacts on interconnection costs.[122]

73.     In their answer, NJ BPU contests the PJM TOs' assertions that the Commission need not consider whether the Attachment M-3 Revisions Filing is superior to other proposals.  NJ BPU reiterates that, rather, the PJM TOs have not shown that the Attachment M-3 Revisions Filing is just and reasonable.[123]  Furthermore, NJ BPU argues that the PJM TOs' claims that cost allocation issues are beyond-the-scope of this proceeding are incorrect.  NJ BPU states that the PJM TOs must demonstrate the Attachment M-3 Revisions Filing is just and reasonable.  By not addressing the cost allocation arguments protestors made, the PJM TOs failed to meet the burden of showing the Attachment M-3 Revisions Filing is just and reasonable.

---

[118] PJM TOs Answer at 7-8.

[119] *Id.* at 9.

[120] *Id.* at 10-13.

[121] J-Power Answer at 2-3.

[122] *Id.* at 4-5.

[123] NJ BPU Answer at 4-5.

74.     Additionally, in their answer, NJ BPU argues that the PJM TOs' reliance on the *California Orders* is misplaced since the *California Orders* do not apply here. NJ BPU states that the transmission planning activities pursuant to the Attachment M-3 Revisions Filing extend beyond those discussed in the *California Orders*. Specifically, NJ BPU states the record in the *California Orders* demonstrates that asset management activities did not include replacements of transmission facilities.[124]   Further, NJ BPU states, the definition of "incidental increase" is not applicable here since upgrades to existing transmission facilities raise a host of questions regarding impacts which can be reasonably severed.[125]

## IV.   **Determination**

### A.   **Procedural Matters**

#### 1.   **Intervention and Pleadings**

75.     Pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2019), the notice of intervention and timely, unopposed motions to intervene serve to make the entities that filed them parties to this proceeding.

76.     Pursuant to Rule 214(d) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214(d) (2019), we grant the late-filed motions to intervene of Long Island Lighting Company, a subsidiary of the Long Island Power Authority, the Illinois Commerce Commission, and NEET given their interest in the proceeding, the early stage of the proceeding, and the absence of undue prejudice or delay.

77.     Rule 213(a)(2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a)(2) (2019), prohibits an answer to a protest unless otherwise ordered by the decisional authority. We accept the answers as they have provided information that assisted us in our decision-making process.

#### 2.   **Motion to Dismiss**

78.     We deny the motion to dismiss. At issue in this proceeding is a filing made pursuant to section 205 of the FPA, section 7.3.2 of the CTOA, and section 9.1(b) of the Tariff. Both section 7.3.2 of the CTOA and section 9.1(b) of the Tariff require that before making a filing pursuant to section 205 of the FPA, the TOs "shall consult with PJM and the PJM Members Committee beginning no less than thirty (30) days prior: to

---

[124]   *Id.* at 8, n. 44 (citing *Cal. Pub. Utils. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161 at P 44).

[125]   *Id.* at 9-10.

Document Accession #: 20200811-3078     Filed Date: 08/11/2020

any [such] Section 205 filing."[126]  The PJM TOs complied with this requirement as they began the consultation process with a notice issued on May 7, 2020, and did not file until June 12, 2020.

79.     Movants contend that the CTOA requires two votes under section 8.5,[127] the first to initiate the consultative process and the second to approve the change after the consultative process.  However, section 8.5 of the CTOA does not require a vote to initiate the consultative process.  Section 8.5 sets out the voting procedures necessary for the PJM TOs to make the section 205 filing with the Commission.  Neither section 7.3.2 of the CTOA nor section 9.1(b) of the Tariff require any formal prerequisite for initiating the consultation with PJM and the PJM Members Committee.  As the Indicated PJM TOs point out, this has been a long-standing understanding of these provisions.[128]  Indeed, initiating the consultation prior to the formal vote ensures that the PJM TOs may consider the opinions of PJM and the Members Committee prior to the formal vote on the proposal under section 8.5 of the CTOA.

## B.     Substantive Matters

80.     We accept the proposed Attachment M-3 Revisions Filing effective August 12, 2020, as requested.  As discussed below, we find that this filing is within the filing rights reserved by the PJM TOs and also is just and reasonable and not unduly discriminatory or preferential.

### 1.     Proposed Revisions Are Within the Transmission Owners' Exclusive Retained Responsibilities

81.     The protesters contend the PJM TOs do not have exclusive filing rights to make this filing, particularly with respect to the EOL projects, and that the PJM stakeholders maintain rights under the Operating Agreement to make filings related to EOL projects.  As discussed below, given the specific facts and circumstances before us, we find that the

---

[126] PJM, Rate Schedules, 7.3.2, TOA-42, 7.3.2, 0.0.0; PJM, Intra-PJM Tariffs, 9.1, OATT 9.1 Rights of the Transmission Owners, 2.1.0.

[127] Section 8.5 of the CTOA provides the manner of action; specifically, "any action taken by the Administrative Committee shall require a combination of the concurrence of the representatives' Individual Votes of the representatives of those Parties entitled to vote on such matters and Weighted Votes as specified in this Section 8.5." PJM, Rate Schedules, 8.5, TOA-42, 8.5 Manner of Acting, 1.0.0.

[128] PJM TOs Answer to Motion to Dismiss at 8-9.

planning activities addressed by the Attachment M-3 Revisions Filing are within the exclusive rights and responsibilities retained by the PJM TOs under the CTOA.

82.    Under the CTOA and the Tariff, the PJM TOs retain all rights that they have not specifically granted to PJM.[129]  Under the CTOA, the PJM TOs agree to "transfer to PJM . . . the responsibility to prepare a Regional Transmission Expansion Plan and to provide information reasonably requested by PJM to prepare the Regional Transmission Expansion Plan and shall otherwise cooperate with PJM in such preparation."[130] Pursuant to the CTOA, PJM is limited to "[c]onduct[ing] its planning for the expansion and enhancement of transmission facilities."[131]  The PJM TOs specifically retain the right to "maintain" their transmission facilities[132] and generally reserve all rights not specifically granted to PJM.[133]

83.    Asset Management Projects do not fit within the categories of projects the CTOAs have transferred to PJM.  These projects do not fall under regional planning under the Operating Agreement as they relate solely to maintenance of existing facilities,[134] and they do not "expand" or "enhance" the PJM grid as the CTOA requires for planning transferred to PJM.  They are solely projects that maintain the existing infrastructure by repairing or replacing equipment.  These projects therefore fall within the category of rights not specifically granted to PJM and therefore reserved to the PJM TOs.

84.    Our interpretation of the CTOA is consistent with the *California Orders*, in which the Commission concluded that it was appropriate to define "asset management" as

---

[129] *See Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 10 (D.C. Cir. 2002). ("[N]othing in section 206 sanctions denying petitioners their right to unilaterally file rate and term changes. . . . Of course, utilities may choose to voluntarily give up, by contract, some of their rate-filing freedom under section 205.").

[130] PJM, Rate Schedules, TOA-42 4.1.4 Planning Information (0.0.0).

[131] *Id.*, TOA-42, 6.3.4 (0.0.0).

[132] *Id.*, TOA-42, 4.5 Operation and Maintenance (0.0.0).

[133] *Id.*, TOA-42, Article 5 Parties' Retailed Rights (0.0.0), TOA-42, 5.6 Reservation of Rights (0.0.0).

[134] Asset Management Projects do not fall under the categories for which PJM plans under the Operating Agreement:  PJM planning procedures, NERC Reliability Standards, Regional Entity reliability principles and standards, and individual PJM TO local planning criteria as filed with the Commission in FERC Form No. 715.  PJM, Intra-PJM Tariffs, Operating Agreement, Schedule 6, § 1.2(e) (2.0.0).

activities that "encompass the maintenance, repair, and replacement work done on existing transmission facilities as necessary to maintain a safe, reliable, and compliant grid based on existing topology," even if these projects result in an "incidental increase in transmission capacity that is not reasonably severable from the asset management or activity."[135]  The Commission explained that an incidental increase in transmission capacity could be associated with, for example, the replacement of an aging 1940-vintage transformer at the end of its useful life with a modern transformer, which could be of higher capacity.  We find that the PJM TOs' proposed revisions in this proceeding are consistent with the type of projects and activities that the Commission found were appropriately considered transmission owner asset management projects in the *California Orders*.

85.    Protesters contend that end of life criteria do not qualify as "maintenance" of facilities under the CTOA since the criteria envisions replacement, not repair of facilities.  However, as the Commission found in *Cal. Pub. Util. Comm'n.*, "these asset management projects and activities include maintenance, repair, and replacement work, and infrastructure security, system reliability, and automation project."[136]  We find that the PJM TOs' proposal to designate these types of projects as "asset management" is just and reasonable.[137]

86.    Moreover, the CTOA does more than just reserve maintenance to the PJM TOs, it grants to PJM only the right to plan for "expansion" and "enhancement" of the grid as part of the RTEP.  As discussed above,[138] the PJM TOs did transfer to PJM the responsibility to plan for criteria included in Form No. 715, and a PJM TO may voluntarily include end of life criteria in its Form No. 715.  However, the PJM TOs have not transferred to PJM planning responsibility for end of life criteria that are not included in Form No. 715.[139]  The PJM TOs, therefore, did not transfer the planning responsibility for all end of life criteria to PJM.

---

[135] *So. Cal. Edison Co*, 164 FERC ¶ 61,160 at P 33; *Cal. Pub. Util. Comm'n.*, 164 FERC ¶ 61,161 at P 68.

[136] *Cal. Pub. Util. Comm'n*, 164 FERC ¶ 61,161 at P 67.

[137] Replacement activities are a logical extension of the decision that it is no longer cost-effective to perform maintenance on a transmission facility.

[138] *Supra* P 8.

[139] As previously noted, Form No. 715 is the Annual Transmission Planning and Evaluation filed by the individual transmission owners, and is not limited to EOL Needs, *e.g.* storm hardening.  "Where a Transmission Owner has included end of useful life criteria in its Form No. 715, projects required to satisfy those criteria will continue to be

87.     Some protestors argue that the Commission should reject the PJM TOs'
Attachment M-3 Revisions Filing and instead accept a proposal put forth by the Joint
Stakeholders.  However, the Joint Stakeholders' proposal is not before us here and does
not alter the FPA section 205 filing rights of the PJM TOs.  As discussed herein, we find
the PJM TOs' Attachment M-3 Revisions Filing just and reasonable and need not
determine whether proposed alternatives are more or less reasonable.  And, again, in this
instance, the alternatives mentioned here consist of a filing made in a different
proceeding, not this proceeding.

## 2.     Proposed Revisions Expand the Existing Just and Reasonable Attachment M-3 Process

88.     Having found above that certain planning activities remain the sole responsibility
of the PJM TOs, we find the revisions proposed in the instant filing are just and
reasonable, given the specific facts and circumstances presented here, because they
maintain the existing just and reasonable Attachment M-3 process and provide greater
transparency into certain planning activities.  The Commission previously found the
Attachment M-3 process for Supplemental Projects just and reasonable and compliant
with Order No. 890.[140]  Having found the existing Attachment M-3 planning process
consistent with the Order No. 890 planning principles, we find the proposed revisions,
which expand the applicability of existing Attachment M-3 Tariff provisions, likewise
just and reasonable.  In addition to expanding the applicability of the existing Attachment
M-3 to include Asset Management Projects, the proposed revisions also include a process
for the identification and planning for EOL Needs.  Significantly, the proposed revisions
provide for coordination of EOL Needs with the PJM RTEP planning criteria needs.  This
provides PJM and stakeholders with increased opportunities to review and comment on
EOL Need transmission projects, and thus provides greater transparency.

89.     We agree with the PJM TOs that where the transmission projects developed under
the expanded Attachment M-3 process result in only incidental expansions of the
transmission system, such asset management activities are not subject to Order No. 890
transmission planning principles.[141]  This is consistent with the finding in the *California
Orders* that the Order No. 890 planning principles apply only to transmission projects

---

planned through PJM's regional transmission planning process; the Proposed Revisions
do not bring them into the Attachment M-3 process."  PJM TOs Transmittal at 4 n.10.

     [140] Attachment M-3 Order, 164 FERC ¶ 61,217 at P 59.

     [141] We make no determination here as to whether EOL Needs or any of these Asset
Management Projects, and in particular specific replacement activities, are subject to the
transmission planning requirements of Order No. 890, as the PJM TOs proposed to
include these types of projects in the Order No. 890 planning process in Attachment M-3.

involving grid expansion, and where Supplemental Projects result in only incidental expansions of the transmission system, do not apply to asset management activities.

90.     Protesters raise concerns that the majority of transmission planning in PJM is occurring outside the purview of the PJM RTEP process.  We find these arguments to be beyond the scope of this specific FPA section 205 proceeding.

### 3.     Cost Causation Concerns

91.     Protesters raise concerns that the proposed revisions result in a cost allocation that is not consistent with cost causation.  The cost allocation provisions of Schedule 12 of the PJM Tariff assign cost responsibility for Required Transmission Enhancements.[142]  The proposed revisions to Attachment M-3 include no revisions to Schedule 12 of the PJM Tariff, and propose no changes to cost allocation.  Since this FPA section 205 filing proposes no change to cost allocation, that issue is beyond the scope of this proceeding.[143]

The Commission orders:

The Attachment M-3 Revisions Filing is hereby accepted for filing, effective August 12, 2020, as discussed in the body of this order.

By the Commission.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

---

[142] Required Transmission Enhancements are defined as "enhancements and expansions of the Transmission System that (1) a [RTEP] developed pursuant to Operating Agreement, Schedule 6 or (2) any joint planning or coordination agreement between PJM and another region or transmission planning authority set forth in Tariff, Schedule 12-Appendix B ('Appendix B Agreement') designates one or more of the Transmission Owner(s) to construct and own or finance."  PJM, Intra-PJM Tariffs, OATT Definitions – R - S, OATT Definitions – R - S, 18.2.0.

[143] See ANR Pipeline Co. v. FERC, 771 F.2d 507, 514 (D.C. Cir. 1985) (finding the Commission cannot revise an "unchanged part" of a rate under section 4 of the Natural Gas Act, the counterpart to section 205 of the Federal Power Act).

Document Accession #: 20200811-3078     Filed Date: 08/11/2020
Docket No. ER20-2046-000                                                      - 35 -

# Appendix A – Intervenors

American Electric Power Service Corporation
American Municipal Power, Inc.
AMP Transmission, LLC (AMP)
Blue Ridge Power Agency
Buckeye Power, Inc.
Calpine Corporation
The Dayton Power and Light Company
Delaware Division of the Public Advocate
Dominion Energy Services, Inc.
Duke Energy Corporation
Duquesne Light Company (Duquesne)
East Kentucky Power Cooperative, Inc.
Edison Electric Institute (EEI)
EDP Renewables North America LLC
Exelon Corporation
GridLiance Holdco LP
Hudson Transmission Partners, LLC
Illinois Commerce Commission (out of time)
Indiana Office of Utility Consumer Counselor
ITC Interconnection LLC
J-POWER USA Development Co., Ltd. (J-POWER)
Long Island Lighting Company, a subsidiary of the Long Island Power Authority (out of time)
LSP Transmission Holdings II, LLC (LS Power)
Monitoring Analytics, LLC
Neptune Regional Transmission System, LLC
New Jersey Board of Public Utilities (NJ BPU)
New Jersey Division of Rate Counsel
North Carolina Electric Membership Corporation
NRDC/FERC Project
NRG Power Marketing LLC
Office of the Ohio Consumers' Counsel (OCC)
Office of the People's Counsel for the District of Columbia
Old Dominion Electric Cooperative (ODEC)
Pennsylvania Public Utility Commission

PJM Industrial Customer Coalition
PJM Interconnection, L.L.C.
PPL Electric Utilities Corporation
Public Power Association of New Jersey.
Public Service Electric and Gas Company
Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (Ohio FEA)
Rockland Electric Company
Southern Maryland Electric Cooperative, Inc.
WIRES
NextEra Energy Transmission MidAtlantic Indiana, Inc (NEET), (out of time)

Document Content(s)

ER20-2046-000.DOCX...................................................1

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | Docket No. ER20-2046-000 |

**REQUEST FOR REHEARING**
**OF THE PROTESTING PARTIES**

On August 11, 2020, the Federal Energy Regulatory Commission ("FERC" or "Commission") issued an order ("August 11 Order" or "Order") approving a new transmission planning process in PJM Interconnection, L.L.C. ("PJM") proposed by a group of PJM Transmission Owners in the above-referenced proceeding ("TO Proposal").[1] Pursuant to section 313 of the Federal Power Act ("FPA")[2] and Rule 713 of the Rules of Practice and Procedure of the Commission,[3] the Protesting Parties identified herein ("Protesting Parties") hereby seek rehearing of the August 11 Order.

The Protesting Parties appreciate the importance of transmission planning for PJM Transmission Facilities that are approaching the end of their useful lives. In fact, a supermajority of PJM Members voted in support of a different transmission planning proposal, also filed with the Commission, to address the very issue of planning for new Transmission Facilities to replace existing Transmission Facilities at the end of life ("EOL").[4] The August 11 Order errs, however, in finding that the TO Proposal is just and reasonable. As demonstrated herein, the August 11 Order is arbitrary and capricious and does not reflect reasoned decision-making because it fails to

---

[1] *PJM Interconnection, L.L.C,* 172 FERC ¶ 61,136 (2020) (hereinafter "August 11 Order" or "Order").

[2] 16 U.S.C. § 825*l*.

[3] 18 C.F.R. § 385.713.

[4] *PJM Interconnection, L.L.C.,* FERC Docket No. ER20-2308-000.

1

recognize that the TO Proposal does not simply encompass a planning process for maintenance projects that could have some minor incidental increases in capacity. Rather, the TO Proposal that the Commission approved in the August 11 Order is a fundamental and unlawful shift in transmission planning responsibility from the Regional Transmission Organization ("RTO"), PJM, to the PJM Transmission Owners ("PJM TOs"). Specifically, the TO Proposal

· empowers the TOs with unilateral authority and exclusive responsibility to propose revisions related to transmission planning;
· unlawfully restricts PJM's role as the regional planner;
· unlawfully provides the TOs with veto authority over future planning methodologies;
· unjustly and unreasonably limits the participation rights of PJM stakeholders in regional transmission planning; and
· unjustly and unreasonably limits transparency and coordination in planning and constructing transmission projects.

The August 11 Order fails to engage protesters' arguments concerning the division of planning authority between PJM and the TOs.

The August 11 Order errs in applying orders governing planning in the California Independent System Operator ("CAISO") region to PJM. The August 11 Order did not provide a reasoned explanation for departing from Order No. 2000 principles and other precedent that establishes the predominance of regional planning. The August 11 Order further errs by not addressing the record evidence demonstrating that the TO Proposal would categorically and arbitrarily prohibit regional cost allocation for projects that provide regional benefits.

The August 11 Order does not demonstrate that the TO Proposal is just and reasonable. Not only is the Order's decision to accept the TO Proposal not supported by substantial evidence, the TO Proposal is contrary to the plain language of the governing documents upon which it is based. The August 11 Order fails to reconcile the TO Proposal's conflicts with regional transmission planning protocols and procedures established in the PJM Operating Agreement.

2

JA0458

Procedurally, the August 11 Order errs in denying the Motion to Dismiss the TO Proposal and errs in failing to adjudicate the motion to consolidate the TO Proposal in Docket No. ER20-2046 with the related proposal in Docket No. ER20-2308 that received supermajority stakeholder support. The August 11 Order also errs in finding that including End of Life Criteria in FERC Form No. 715 is voluntary.

For those reasons, and as discussed more fully herein, the Protesting Parties request rehearing of the August 11 Order.  For purposes of this rehearing request, the Protesting Parties are comprised of the following:

American Municipal Power, Inc. ("AMP")

AMP Transmission, LLC ("AMPT")

Blue Ridge Power Agency

Delaware Division of the Public Advocate ("Delaware Public Advocate")

District of Columbia Office of People's Counsel ("DC OPC")

Indiana Office of Utility Consumer Counsel ("Indiana OUCC")

LSP Transmission Holdings II, LLC ("LS Power")

New Jersey Division of Rate Counsel ("NJ Rate Counsel")

Old Dominion Electric Cooperative ("ODEC")

PJM Industrial Customer Coalition ("PJMICC")

Public Power Association of New Jersey ("PPANJ")

The Public Utilities Commission of Ohio's Office of The Federal Energy Advocate

West Virginia Consumer Advocate

JA0459

## I.     **BACKGROUND**

On June 12, 2020, the PJM TOs, pursuant to section 205 of the FPA,[5] Section 35.13 of the

Commission's Rules and Regulations, Section 9.1(a) of the PJM Open Access Transmission Tariff

("Tariff"),[6] and acting through the PJM Consolidated Transmission Owners Agreement

("CTOA"), proposed significant modifications to Attachment M-3 of the Tariff (the TO Proposal),

which effectively created a new Attachment M-3.  The PJM TOs proposed in the June 12 filing to

create a new, expansive application of the transmission planning procedures in Attachment M-3

that would authorize the PJM TOs, rather than PJM, to plan for all new transmission projects that

expand or enhance the Transmission System[7] with the limited exception of projects to address

NERC Reliability Standards, State Public Policies, Transmission Owner FERC Form 715 criteria,[8]

or projects to relieve economic constraints (Market Efficiency Projects).

The new Attachment M-3 also adds new categories of projects to the Attachment M-3

transmission planning process under an umbrella label of "Attachment M-3 Projects" that include

"Asset Management Projects," Supplemental Projects, and any other expansion or enhancement

not planned by PJM.  Asset Management Projects cover maintenance activities and entirely new

Transmission Facilities that replace existing Transmission Facilities that are not expansions or

enhancements of the Transmission System.[9]  The described purpose of an Asset Management

---

[5] 16 U.S.C. § 824d (2020).

[6] As discussed *infra*, Section 9.1(a) does not grant the PJM TOs a unilateral right to file a Section 205 filing that alters the regional transmission planning in PJM.

[7] "Transmission System" is defined as "the facilities controlled or operated by the Transmission Provider within the PJM Region that are used to provide transmission service under Tariff, Part II and Part III." PJM Tariff, I. Common Service Provisions.

[8] The TO Proposal does include new requirements as part of the Attachment M-3 planning process for FERC Form 715 Projects.  *See, for example,* TO Proposal at Exhibit A, Paragraph (d).

[9] TO Proposal Exhibit A at Paragraph (b)(1).

Project is virtually unlimited and could encompass any maintenance or new transmission replacement for any aging infrastructure drivers, security, reliability, automation, or to meet regulatory compliance requirements.[10]  To determine whether a transmission-related project (whether maintenance or new transmission) is an expansion or enhancement of the Transmission System, the PJM TO must determine whether the project will result in an Incidental Increase, which is a new term included in the new Attachment M-3.[11]  Specifically, an Incidental Increase is an increase in transmission capacity that results from updated technology or replacements to meet Transmission Owner design standards, industry standards, codes, laws or regulations.[12]

The TO Proposal includes other definitions that create limits on regional planning, including EOL Need, PJM Planning Criteria Need, and Form 715 EOL Planning criteria.  For instance, the definition of EOL Need is limited to transmission lines, thereby excluding substations and creating the opportunity for the PJM TOs to resort to a new right of first refusal.[13]  As newly defined in Attachment M-3, PJM Planning Criteria Need also limits PJM's regional planning process to only those needs defined in the Applicability section of new Attachment M-3.

The TO Proposal was made pursuant to a unilateral FPA Section 205 filing to modify the PJM Tariff without requesting any modifications to the PJM Operating Agreement or any other governing documents.  The August 11 Order accepted the new Attachment M-3, effective August 12, 2020.

---

[10] *Id.*

[11] *Id.* at Paragraph (b)(3).

[12] *Id.*

[13] LS Power Protest at 48.

5

## II.    **STATEMENT OF ISSUES/SPECIFICATIONS OF ERRORS**

The Protesting Parties respectfully submit that the August 11 Order is arbitrary and capricious, does not reflect reasoned decision-making, is insufficiently supported, and results in a transmission planning outcome that is unjust, unreasonable, unduly discriminatory, and preferential.  Due to the specific errors identified herein and the Order's general failure to engage arguments and evidence contrary to the TO Proposal,[14] the Order should be modified on rehearing and the TO Proposal should be rejected.

In compliance with Rules 713(c)(1) and (2) of the Commission's Rules of Practice and Procedure, 18 C.F.R. §§ 385.713(c)(1), 385.713(c)(2)(2020), the Protesting Parties respectfully provide the following specifications of error and statement of issues:

1.    Whether the August 11 Order's holding that section 8.5 of the CTOA[15] does not require a vote prior to the CTOA Administrative Committee ("TOA-AC")  initiating a consultative process is arbitrary, capricious and contrary to the plain language of the CTOA and ignores contractual rights of PJM TOs who are parties to the CTOA?
Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); *Iberdrola Renewables v. FERC*, 597 F.3d 1299, 1304 (2010) ("If a contract is not ambiguous, extrinsic evidence cannot be used as an aid to interpretation." *Consol. Gas Transmission Corp. v. FERC,* 771 F.2d 1536, 1544 (D.C.Cir.1985). "[I]f the intent of the parties on the particular issue is clearly expressed in the document, 'that is the end of the matter.' " *Nat'l Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1572 (D.C.Cir.1987) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

2.    Whether the August 11 Order is arbitrary and capricious because it approved the PJM TOs' overreach into regional planning matters?
Answer: Yes.    *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); Administrative Procedure Act, 5 U.S.C. § 706(2)(A); *Nor Am Gas Transmission*, 148 F.3d 1158, 1165 (1998)(quoting *KN Energy Inc. v. FERC*, 968 F.2d 1295, 1303 (D.C. Cir. 1992)("It is the duty of a reviewing court to make sure that an agency 'engage[s] the

---

[14] *See* May 21 Order, Glick Dissent at P 1.

[15] Section 8.5 of the CTOA provides the manner of action; specifically, "any action taken by the Administrative Committee shall require a combination of the concurrence of the representatives' Individual Votes of the representatives of those Parties entitled to vote on such matters and Weighted Votes as specified in this Section 8.5." PJM, Rate Schedules, 8.5, TOA-42, 8.5 Manner of Acting, 1.0.0.

arguments raised before it.'); *Atl. City Elec., et al v. FERC*, 295 F.3d 1 (D.C. Cir. 2002); *Reg'l Transmission Organs.*, Order No. 2000, 89 FERC 61,284, at P 485, *order on reh'g*, Order No. 2000-A, *aff'd sub nom., Pub. Util. Dist. No. 1 of Snohomish City, Wash. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001); *Midwest Indep. Transmission, Sys. Operator, Inc.*, 115 FERC ¶ 61,108, at P 22 (2006) (quoting *Columbia Gas Transmission Corp.*, 27 FERC ¶ 61,089 at 61,166 (1984)); *S. California Edison Co. Local Transmission Planning Within the California Indep. Sys. Operator Corp.*, 164 FERC ¶ 61,160, at P 10 (2018); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-982 (2005) ("Unexplained inconsistency is. . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 436 U.S. 29, 46-57 (1983)); *United Mun. Distribs. Group v. FERC*, 732 F.2d 202, 210 (D.C. Cir. 1984) ("[A]n agency must conform to its prior practice and decisions or explain the reason for its departure from such precedent."); *Panhandle Eastern Pipe Line Co. v. FERC*, 196 F.3d 1273, 1275 (D.C. Cir. 1999) ("As we have repeatedly reminded FERC, if it wishes to depart from its prior policies, it must explain the reasons for its departure."); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.").

3.   Whether the August 11 Order is arbitrary and capricious by ignoring the plain language of the TO Proposal and failing to address arguments that the definitions do not support a finding that the TO Proposal is within the TOs' authority?
     Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); 5 U.S.C. § 706(2); *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983); *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962); *New England Power Generators Ass'n v. FERC*, 881 F.3d 202 (D.C. Cir. 2018); *Emera Maine v. FERC*, 854 F.3d 662 (D.C. Cir. 2017); *West Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014).

4.   Whether the August 11 Order erred in finding that "Asset Management Projects" are consistent with the type of projects and activities that the Commission found were appropriately considered transmission owner asset management projects in the California Orders?[16]
     Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); *Motor Vehicle Manufacturer's Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that an agency acts arbitrarily and capriciously when it fails to "consider an important aspect of the problem"); *see also KeySpan-Ravenswood, LLC v. FERC*, 348 F.3d 1053, 1056 (2003) (explaining that "unless an agency answers objections that on their face

---

[16] References herein to the "California Orders" include the following: *California Pub. Utils. Comm'n v. Pac. Gas and Elec. Co.*, 164 FERC ¶ 61,161 (2018), *order on reh'g*, 168 FERC ¶ 61,171 (2019); *S. California Edison Co.*, 164 FERC ¶ 61,161 (2018), *order on reh'g*, 168 FERC ¶ 61,170 (2019).

7

appear legitimate, its decision can hardly be said to be reasoned") (internal alterations, quotes and citation omitted).

5.   Whether the August 11 Order is arbitrary and capricious for applying erroneous rulings regarding Order No. 890 to the PJM TOs' Asset Management Projects?
      Answer: Yes.  *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119, *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297 (2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

6.   Whether the Commission erred in finding that incidental expansions of the transmission system are not subject to Order No. 890?
      Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119, *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297 (2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

7.   Whether the August 11 Order is arbitrary and capricious for finding that the California Orders apply to the new Attachment M-3 process?
      Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); *See, e.g., ABM Onsite Servs.-W., Inc. v. Nat'l Labor Relations Bd.,* 849 F.3d 1137, 1142 (D.C. Cir. 2017) ("[A]n agency's unexplained departure from precedent is arbitrary and capricious."); *ANR Pipeline Co. v. FERC,* 71 F.3d 897, 901 (D.C. Cir. 1995) ("[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious.")

8.   Even if the California Orders can appropriately be considered for the new Attachment M-3, whether the Commission erred by failing to consider the specific provisions of the new Attachment M-3 that render it unjust and unreasonable?
      Answer: Yes.  *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); *Motor Vehicle Manufacturer's Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that an agency acts arbitrarily and capriciously when it fails to "consider an important aspect of the problem"); *see also KeySpan-Ravenswood, LLC v. FERC*, 348 F.3d 1053, 1056 (2003) (explaining that "unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned") (internal alterations, quotes and citation omitted).

9.   Whether the August 11 Order's acceptance of the TO Proposal's prohibition of PJM or PJM Members from ever expanding the PJM regional planning criteria absent TO acquiescence fails to provide a reasoned explanation for the Commission's departure from its prior ruling in Order 2000 that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region that will enable it to provide efficient, reliable and non-discriminatory service and coordinate such efforts with the appropriate state authorities"?

8

Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); 18 C.F.R. § 35.34(k)(7) (2018); *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,163 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) (affirming that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region"). *See, e.g., Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co*., 549 U.S. 312 (2007); *Motor Vehicle Manufacturer's Ass'n*, 463 U.S. 29; *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74 (3d Cir. 2014); *KeySpanRavenswood, LLC v. FERC*, 348 F.3d 1053 (D.C. Cir. 2003); *Canadian Ass'n of Petrol. Producers v. FERC*, 254 F.3d 289 (D.C. Cir. 2001); KN Energy, Inc. v. FERC, 968 F.2d 1295 (D.C. Cir. 1992); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158 (D.C. Cir. 1990); *Union Elec. Co. v. FERC*, 890 F.2d 1193 (D.C. Cir. 1989); *ISO New England Inc.*, 158 FERC ¶ 61,138 (2017), pet. for review pending, D.C. Cir. No. 17-1110; *ISO New England Inc.*, 145 FERC ¶ 61,095 (2013).

10.   Whether the Commission erred by failing to provide a reasoned explanation for its departure from precedent that establishes the predominance of regional planning?
Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); *Motor Vehicle Mfs. v. State Farm Mut. Ins. Co*., 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency . . . failed to consider an important aspect of the problem); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998) ("In previous cases, we have rejected agency orders when the Commission neglected to deal with an important part of the problem…")(*citing Laclede Gas Co. v. FERC*, 997 F.2d 936, 945-48 (D.C. Cir. 1993)); *North Carolina Util. Comm'n v. FERC*, 42 F.3d 659 (D.C. Cir. 1994).

11.   Whether the August 11 Order is arbitrary and capricious and contrary to record evidence in its dismissal of the cost allocation issues?
Answer: Yes. *PJM Interconnection, L.L.C. et al., 172 FERC ¶ 61,136 (2020); KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992)(At its core, the cost causation principle requires that "all approved rates reflect to some degree the costs actually caused by the customer who must pay them."); *Illinois Commerce Commission v. FERC*, 576 F.3d 470, 477-478 (7th Cir. 2009); *El Paso Elec. Co. v. FERC*, 832 F.3d 495, 505 (5th Cir. 2016); *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 at P 622 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014); *ODEC v. FERC*, 898 F.3d 1254.

12.   Whether the August 11 Order's failure to adjudicate the motion to consolidate Docket Nos. ER20-2046 and ER20-2308 is arbitrary and capricious, and does not reflect reasoned decision-making?
Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29 (1983); *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014); *Sacramento Mun. Util. Dist. v.*

9

*FERC*, 616 F.3d 520 (D.C. Cir. 2010); *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361 (D.C. Cir. 2004); *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1 (D.C. Cir. 2015); *Cal. Indep. Sys. Op. Corp.*, 94 FERC ¶ 61,147 (2001); *Pacific Gas & Elec. Co.*, 106 FERC ¶ 61,036 (2004); *Seminole Elec. Coop., Inc.*, 149 FERC ¶ 61,210 (2014); *San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Services et al.*, 135 FERC ¶ 61,177 (2011).

13.   Whether the Commission ignored record evidence demonstrating the TO Proposal conflicts with, and limits, the scope of regional transmission planning as set forth in the Operating Agreement?
Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1990) (The Court remanded a Commission decision where the Commission failed to give serious consideration to an argument raised in the proceeding.).

14.   Whether the Commission erred in finding that including End of Life Criteria in Form No. 715 is voluntary?
Answer: Yes. *PJM Interconnection, L.L.C. et al.*, 172 FERC ¶ 61,136 (2020); 5 U.S.C. § 706(2)(A); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-982 (2005)("Unexplained inconsistency is. . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 436 U.S. 29, 46-57 (1983)); *United Mun. Distribs. Group v. FERC*, 732 F.2d 202, 210 (D.C. Cir. 1984)("[A]n agency must conform to its prior practice and decisions or explain the reason for its departure from such precedent."); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute."); *CPUC v. FERC*, 879 F.3d 966, 978 (9th Cir. 2018) (The Commission "merely asserted that it had the authority to grant incentive adders. . . . . . the orders on review were a departure from Order 679's terms and the longstanding policy it incorporates. Without any acknowledgment or explanation of that departure, the orders were arbitrary and capricious.").

## III.   **ARGUMENT**

A Commission order will be reversed on review if it is arbitrary or capricious, reflects an abuse of discretion, is not otherwise in accordance with law, or is not supported by substantial

evidence.[17]    In order to satisfy its obligation to engage in reasoned decision-making, the Commission must examine the relevant data and articulate a rational connection between the facts found and the choices made.[18]    The Commission must reach its conclusion through decision-making that is "reasoned, principled, and based upon the record."[19]    Under the FPA, FERC's factual findings are determinative so long as they are supported by substantial evidence.[20]    The "substantial evidence" standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence."[21]    Substantial evidence is "relevant evidence" that "a reasonable mind might accept as adequate to support a conclusion."[22]    Additionally, to avoid an arbitrary and capricious decision or one that does not reflect reasoned decision-making, the Commission must consider all important aspects of the problem at issue.[23]    It is "well established that the Commission must 'respond meaningfully to the arguments raised before it.'"[24]

---

[17] *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 55 (D.C. Cir. 2014); *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 528 (D.C. Cir. 2010).

[18] *Sacramento*, 616 F.3d at 528; *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983)).

[19] *New Eng. Power Generators Ass'n v. FERC*, 881 F.3d 202, 210-11 (D.C. Cir. 2018); *West Deptford Energy, LLC*, 766 F.3d 10, 20 (D.C. Cir. 2014); *ExxonMobil Oil v. FERC*, 487 F.3d 945, 953 (D.C. Cir. 2007); *see New York v. FERC*, 535 U.S. 1, 36 (2002); *see also Transmission Access Policy Group v. FERC*, 225 F.3d 667, 705, 716 (D.C. Cir. 2000) (citing *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1021 (D.C. Cir. 1987)); *Colo. Interstate Gas Co. v. FERC*, 146 F.3d 889, 893 (D.C. Cir. 1998).

[20] Section 313(b) of the FPA, 16 U.S.C. § 825l(b).

[21] *See N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, at 97 (3d Cir. 2014) (*NJBPU*) (quoting *La. PSC v. FERC*, 522 F.3d 378, 395 (D.C. Cir. 2008)).

[22] *NJBPU*, 744 F.3d 74, at 97 (3d Cir. 2014) (quoting *Mars Home for Youth v. NLRB*, 666 F.3d 850, 853 (3d Cir. 2011)).

[23] *See e.g. Motor Vehicle Mfs. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency . . . failed to consider an important aspect of the problem); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998) ("In previous cases, we have rejected agency orders when the Commission neglected to deal with an important part of the problem…") (*citing Laclede Gas Co. v. FERC*, 997 F.2d 936, 945-48 (D.C. Cir. 1993)); *North Carolina Util. Comm'n v. FERC*, 42 F.3d 659 (D.C. Cir. 1994).

[24] *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015).

The August 11 Order is arbitrary and capricious because it is neither the product of reasoned decision-making nor based on substantial evidence. The specific errors in the August 11 Order are detailed below.

### A. The Commission erred in denying the ODEC/AMPT Motion to Dismiss. (Statement of Error #1)

ODEC and AMPT moved to dismiss the TO Proposal because the PJM TOs failed to establish that the TOA-AC complied with provisions of the CTOA prior to initiating action, thereby violating the CTOA and the rights of the transmission owning parties to the CTOA. The August 11 Order denied the motion to dismiss. In doing so, the Commission noted that movants argued that CTOA section 8.5 requires a vote for the TOA-AC to initiate the consultative process that is required prior to making a section 205 filing with the Commission.[25] Notwithstanding the clear language requiring a vote before TOA-AC action, the Commission incorrectly found, "section 8.5 of the CTOA does not require a vote to initiate the consultative process."[26] Without explanation or reference to the actual contract language, the Commission asserted that section 8.5 of the CTOA "sets out the voting procedures necessary for the PJM TOs to make the section 205 filing with the Commission."[27] The Commission also accepted certain PJM TOs' argument that it "has been a long-standing understanding of these provisions" to not have a vote prior to the TOA-AC initiating a consultative process.[28] The August 11 Order's holding that section 8.5 of the CTOA does not require a vote prior to the TOA-AC initiating a consultative process is arbitrary,

---

[25] August 11 Order at P 79.

[26] *Id.* at P 78.

[27] *Id.*

[28] *Id.*

12

capricious and contrary to the plain language of the CTOA and ignores contractual rights of PJM TOs who are parties to the CTOA.

The August 11 Order is simply wrong that section 8.5 of the CTOA does not require a vote to initiate the consultative process required prior to the PJM TOs making a FPA section 205 filing. Section 8.5, as its title implies, governs *all manner of acting of the TOA-AC*, including but not limited to the voting procedures for the PJM TOs to make a FPA section 205 filing. CTOA section 8.5 specifically states that, subject to the limitations of Section 9.7.1(a), which are not relevant here, "*any action* taken by the Administrative Committee shall require a combination of the concurrence of the representatives' Individual Votes of the representatives of those Parties entitled to vote on such matters and Weighted Votes as specified in this Section 8.5."[29]  Contrary to the August 11 Order's implication, there is no limitation in CTOA section 8.5 to voting on FPA section 205 filings.  In fact, section 8.5.1 identifies the actions of the TOA-AC that require two-thirds majority, including modification of the CTOA, termination of a party to the CTOA, development of comments and recommendations for the Regional Transmission Expansion Plan, approval of assignment of the CTOA and, "[a]pproval of changes in or relating to Joint Transmission Rate or the PJM Regional Rate Design, or any provisions governing the recovery of transmission-related costs incurred by the Transmission Owners."[30]  By contrast, CTOA section 8.5.2 requires a vote supported by a simple majority of the votes cast at a meeting for "[a]ction by the Administrative Committee on *any matter* other than those specified in Section 8.5.1…."[31]

---

[29] CTOA section 8.5. [emphasis added].

[30] *Id.* at section 8.5.1. [emphasis added].

[31] *Id.* at section 8.5.2. [emphasis added].

13

The initiation of consultation with the PJM Members Committee was an action taken by the TOA-AC. The May 7, 2020 Notice states "the CTOA Administrative Committee hereby initiates consultation with the PJM Members Committee with regard to proposed changes to Attachment M-3 of the PJM Tariff ("Proposed Attachment M-3 Amendments")."[32] Although the Notice unequivocally states that the TOA-AC is initiating the required consultation, the TOA-AC held no meeting nor took any vote authorizing the TOA-AC to initiate such action. The Movants were given no prior notice that the TOA-AC would send notice or otherwise take Committee action that could be construed as being taken on behalf of all PJM Transmission Owners, including the Movants.

Given the clear and plain language in CTOA section 8.5.2 that requires a vote prior to any action of the TOA-AC, the fact that CTOA section 7.3.2 requires the PJM TOs to consult with PJM and the PJM Members Committee but does not reference a voting requirement prior to the initiation of consultation is irrelevant. The Commission's reference to section 7.3.2 appears to confuse actions that the Transmission Owners (a defined term under the CTOA) may take, with the separate and distinct requirements for actions taken by the CTOA "Administrative Committee" (another defined term under the CTOA). Although it may be true that under section 7.3.2 one or more "Transmission Owners" could have initiated consultation with stakeholders, that is not the issue raised here. Instead, a group of Transmission Owners pushed the TOA-AC to take official Administrative Committee action without following the required contractual formalities. Section 7.3.2 provides no exception for meeting the very specific requirements of Article 8.

---

[32] A copy of the Notice is attached to the Motion to Dismiss as Exhibit 1.

14

Also irrelevant is the PJM TOs' assertion that there was a long-standing understanding that the TOA-AC would not vote prior to initiating consultation with PJM and the Members Committee as it is contrary to the clear and plain language of the CTOA.   "[I]f the intent of the parties on the particular issue is clearly expressed in the document, 'that is the end of the matter.'"[33]  Such is the case here.  The contract's plain language settles this matter - the TOA-AC must take a vote before the TOA-AC takes *any* action.  Having breached their contractual obligations to other transmission owners, the Notice of Consultation from the TOA-AC to stakeholders was a nullity.   The Commission's decision to ignore the breach notwithstanding the unambiguous contract language was therefore arbitrary and capricious.  Further, the Commission's reliance on past practice to override the express contract language is also arbitrary and capricious.  "If a contract is not ambiguous, extrinsic evidence cannot be used as an aid to interpretation."[34]

In addition to not holding a vote prior to initiating consultation, actions taken through the TOA-AC ran afoul of several other CTOA requirements regarding TOA-AC procedures, including: that all meetings of the Administrative Committee are to be "open to entities that are signatories to the Operating Agreement and to personnel of PJM, and all matters upon which the representatives vote shall be open to such entities and to such personnel" (CTOA section 8.4.4); that notice be provided at least ten days prior to the meeting (CTOA section 8.4.1); that the notice include an agenda "sufficient to notify the representatives of the substance of the matters to be considered at the meeting" (CTOA section 8.4); and, that notice of all meetings be provided over the PJM website at the same time as it is provided to the representatives (CTOA section 8.4.1).

---

[33] *Nat'l Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1572 (D.C.Cir.1987) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

[34] *Iberdrola Renewables v. FERC*, 597 F.3d 1299, 1304 (2010).  *See also, Consol. Gas Transmission Corp. v. FERC,* 771 F.2d 1536, 1544 (D.C.Cir.1985).

The TOA-AC violated every one of the above enumerated requirements by issuing the Notice on behalf of the TOA-AC without noticing or holding a meeting, simply because a handful of transmission owners with sufficient votes to compel such action asked that the Committee chair take that action. The PJM TOs filing offered no contractual exception that would allow a handful of Transmission Owners to convince the TOA-AC to take official action without following the required contractual formalities.[35] The Commission's assertion that initiating the consultation prior to the formal vote "ensures that the PJM TOs may consider the opinions of PJM and the Members Committee prior to the formal vote on the proposal under section 8.5 of the CTOA" also misses the point. It is ODEC, AMPT and other transmission owning parties to the CTOA whose contractual rights were violated by the Indicated PJM TOs' breach of the CTOA. The Commission cannot simply waive those contractual rights by observing that other parties received appropriate notice.[36] The Commission's failure to acknowledge the contractual violation and reject the PJM TOs' inappropriate filing causes irreparable harm to ODEC, AMPT and any other minority Transmission Owner whose contractual rights were infringed.

---

[35] As a Party to the CTOA, it is also unclear why PJM accepted the Notice notwithstanding that contractual requirements had not been met.

[36] Given the nature of the PJM TOs' filing, money damages for the contract breach cannot address the harm suffered, nor can the Commission return ODEC, AMPT and other Transmission Owners whose rights were violated back to their pre-breach position if the Commission's arbitrary determination that no rights were violated is overturned upon judicial review.

16

**B.     The August 11 Order arbitrarily and capriciously approved the TO Proposal's overreach into Regional Planning. (Statement of Error #2)**

**1.     The Commission erred as a matter of law in finding that the PJM TOs have unilateral authority to propose revisions related to transmission planning.**

In Paragraph 81 of the August 11 Order, the Commission concluded that the Attachment M-3 revisions are within the PJM TOs' exclusive rights and responsibilities.[37]  This finding is erroneous as a matter of law as it is both contrary to PJM's governing documents and fails to address the arguments raised by the Load Group or other protesting parties.[38]  PJM's Tariff provides the PJM TOs with limited filing rights outside of PJM's stakeholder process.  In reaching its conclusion, the Commission failed to address arguments raised by the Protesting Parties establishing that the Tariff does not provide the PJM TOs authority to submit a unilateral Section 205 filing that restricts the scope of PJM region-wide planning by expanding the scope of exclusive Transmission Owner planning in Attachment M-3 beyond Supplemental Projects.  Without supporting its finding through defensible and definitive Tariff references demonstrating that the PJM TOs have a specifically provided right to make unilateral FPA Section 205 filings to alter and expand the scope of the transmission planning provisions in Attachment M-3 or to restrict the scope of PJM transmission planning as set forth in the Operating Agreement, the Commission had no statutory basis to accept the proposed revisions.   As such, the Order accepting the FPA Section 205 Filing is arbitrary and capricious.

---

[37] August 11 Order at P 81.

[38] Courts review the Commission's decisions to ensure that the Commission responds to the argument before it.  *See, e.g.*, Administrative Procedure Act, 5 U.S.C. § 706(2)(A); *Nor Am Gas Transmission*, 148 F.3d 1158, 1165 (1998)(quoting *KN Energy Inc. v. FERC*, 968 F.2d 1295, 1303 (D.C. Cir. 1992) ("It is the duty of a reviewing court to make sure that an agency 'engage[s] the arguments raised before it.').  The Commission's failure to address arguments that the PJM TOs do not have a unilateral right to make a FPA Section 205 Filing that alters transmission planning in PJM is not reasoned decision-making.  *Id.*

17

The Protesting Parties fully set forth the restrictions on the PJM TOs' FPA Section 205 filing rights under the PJM Tariff.[39]  As the Protesting Parties established, Sections 9.1 and 9.2 of the PJM Tariff set out the voluntary divide between the limited unilateral Section 205 filing rights retained by the PJM TOs and the broader Section 205 filing rights granted to PJM, and as it relates to the PJM Operating Agreement, PJM stakeholders.

The Tariff language in Section 9.1 demonstrates that the PJM TOs' unilateral Section 205 filing rights are limited to rate matters, specifically "changes in or relating to the establishment and recovery of the Transmission Owners' transmission *revenue requirements or the transmission rate design* under the PJM Tariff, and such filing rights shall also encompass *any provisions of the PJM Tariff governing the recovery of transmission-related costs incurred by the Transmission Owners.*"[40]  None of the subsections within Section 9.1 reference transmission planning.  Section 9.2 grants PJM Section 205 filing rights over all other "changes in or relating to the terms and conditions of the PJM Tariff."[41]  The revisions in the TO Proposal are undisputedly related to

---

[39] *See* LS Power Protest at 17-19 (citing PJM Tariff section 9.1(a); *Atl. City Elec., et al v. FERC*, 295 F.3d 1 (D.C. Cir. 2002)); *id.* at 19-20 (citing *Reg'l Transmission Organs.*, Order No. 2000, 89 FERC 61,284, at P 485, *order on reh'g*, Order No. 2000-A, *aff'd sub nom., Pub. Util. Dist. No. 1 of Snohomish City, Wash. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001)); *id.* at 19-20.

[40] PJM Tariff Section 9.1(a) [emphasis added].  *See also Atlantic City et al v. FERC*, 295 F.3d 1 (D.C. Cir.2002)(holding that the Commission cannot require a transmission owner to cede their statutory right to file "rates and terms for service rendered with its assets").

[41] Previous transmission planning and cost allocation filings provide good examples of how PJM and the PJM transmission owners use their separate filing rights – PJM files revisions to the transmission planning process and the PJM transmission owners file the related cost allocation provisions.  *See PJM Interconnection, L.L.C*, "Compliance Filing," Docket No. ER13-198 (filed on Oct. 25, 2012)(PJM submitted revisions to the planning process detailed in Schedule 6 of the Operating Agreement.); *see PJM Transmissions Owners*, "PJM Open Access Transmission Tariff Revisions to Modify Cost Allocation for PJM Required Transmission Enhancements," Docket No. ER13-90 (Oct. 11, 2012)(The PJM transmission owners submitted the filing to ensure that the costs of new transmission facilities are allocated consistent with the principles in Order No. 1000).

18

transmission planning, and significantly impact the scope of the regional planning process,[42] and not the recovery of a transmission owner's costs of transmission ownership.[43]

In order for a utility or other person to revise an existing tariff under Section 205, it must have a right to do so. It is obvious that the Commission would not permit a stakeholder to unilaterally file under FPA Section 205 to revise a utility's tariff - only the utility may do so. To determine otherwise would allow an end-run around FPA Section 206, which requires that the Commission, whether on its own motion or based on a complaint, first determine that the existing rate is unjust, unreasonable, unduly discriminatory or preferential before establishing the just and reasonable rate.[44] The Commission cited no evidence that Section 9.1 of the PJM Tariff, nor any other provision of the PJM Tariff gives the PJM TOs unilateral FPA Section 205 filing rights to alter transmission planning in PJM, particularly the right to establish planning provisions that alter the scope of the regional planning process. Although the Commission asserts that "[u]nder the CTOA and the Tariff, the PJM TOs retain all rights that they have not specifically granted to PJM"[45] the Commission cites no specific provisions of either the CTOA or Tariff that it contends provide the PJM TOs with unilateral filing rights. Further, because the Tariff specifically limits the areas over which the PJM TOs have a unilateral FPA Section 205 filing right, to the extent that it could be alleged that under the CTOA the PJM TOs granted themselves additional rights,[46] the

---

[42] As discussed in later sections of this Request for Rehearing, the Applicability section in Attachment M-3 shifts from PJM the authority to define the scope of regional planning in addition to altering PJM's existing regional planning process.

[43] Neither the PJM TOs nor PJM asserted that the TO Proposal related to rate matters set forth in Section 9.1(a).

[44] 16 U.S.C. 824e.

[45] August 11 Order at P 82.

[46] *See PJM Interconnection, L.L.C.*, 142 FERC ¶ 61,214 at P 189 (2013) (finding that "the negotiation that led to the provisions at issue here were among parties with the same interest, namely, protecting themselves from competition in transmission development.").

Tariff must prevail.  The August 11 Order wholly failed to establish a basis in the Tariff for the PJM TOs to have made a unilateral filing to change the PJM Tariff.[47]  As such, the Commission had no authority under FPA Section 205 to approve it, rendering the August 11 Order arbitrary and capricious.[48]

Allowing the Attachment M-3 revisions to go into effect notwithstanding the lack of specific tariff language authorizing the filing also puts ratepayers at substantial risk of irreparable harm.  There is no effective way for the Commission to make ratepayers whole if the August 11 Order is vacated on review for the likely billions of dollars of transmission additions built under the expanded Attachment M-3 provisions in the interim.  The August 11 Order fails ratepayers by approving a revision to the PJM Tariff, opposed by the majority of PJM members, with no identifiable right for the PJM TOs to have made the offered filing in the first instance.

## 2. The Commission's reading of the CTOA and Operating Agreement essentially removes the term "enhancement."

Throughout the August 11 Order, the Commission correctly referred to "enhancements" and "expansions" when discussing PJM's planning responsibilities except the Commission never actually considered the term "enhancements" in its analysis.  To support its determination that Asset Management Projects, a category that includes entirely new transmission facilities, are not within PJM's planning responsibility, the Commission pointed to its decisions in the California Orders.[49]  The California Orders, however, focused on whether certain activities, including the

---

[47] The changes to Attachment M-3 also impact PJM's transmission planning process as set forth in the Operating Agreement.  The PJM transmission owners have no filing rights to revise the PJM transmission planning process.

[48] The Commission is a "creature of statute" and has "only those authorities conferred upon it by Congress."  *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1 at 8 (D.C. Cir. 2002) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C.Cir.2001)).  "In the absence of statutory authorization for its act, an agency's 'action is plainly contrary to law and cannot stand.'"  *Id.*

[49] August 11 Order at P 84.

replacement of existing transmission facilities, "expand" the transmission grid.[50]  Applying that

precedent, the Commission concluded that "Asset Management Projects" do not expand the grid.

Nowhere does the Commission actually discuss whether end of life projects "enhance" the grid.

Only by ignoring the term "enhancements" could the Commission reach the conclusion that "Asset

Management Projects" do not fit within the categories of projects that the CTOA transferred to

PJM.[51]

The Commission cannot simply read out of PJM governing documents the word

"enhancement."[52]  When interpreting a tariff, the Commission has stated that:

> In construing what a tariff means, certain general principles apply. One looks first
> to the four corners of the entire tariff, considers the entire instrument as a whole,
> *giving effect so far as possible to every word, clause and sentence, and attributes
> to the words used the meaning which is generally used, understood, and accepted*.[53]

Applying the Commission's rule here requires the Commission to give meaning to the term,

"enhancement."  The common definition of "enhancement" is "to increase or improve in value,

quality, desirability, or attractiveness."[54]   While not all replacement Transmission Facilities

"expand" the transmission system, many clearly "increase or improve" the value or quality of the

Transmission System.  There is value in replacing aging infrastructure.  A new Transmission

Facility necessarily improves the quality of the Transmission System by making it more reliable

and efficient.  The Commission's example in the California Orders – "the replacement of an aging

1940-vintage transformer at the end of its useful life with a modern transformer, which could be

---

[50] *Id*.

[51] *Id.* at P 83.

[52] *See* LS Power Protest at 31.

[53] *Midwest Indep. Transmission, Sys. Operator, Inc.*, 115 FERC ¶ 61,108, at P 22 (2006)(quoting *Columbia Gas Transmission Corp*., 27 FERC ¶ 61,089 at 61,166 (1984)) [emphasis added].

[54] Merriam Webster Dictionary Definition of Enhancement.  *See also* LS Power Protest at 31.

21

JA0477

of higher capacity"[55] – supports a finding that "enhancements" include end of life projects.  The Commission's failure to give full meaning to the term enhancement is arbitrary and capricious and not the result of reasoned decision-making.[56]

### 3. The August 11 Order ignored that the TO Proposal shifts responsibility for determining the scope of regional planning from the PJM Stakeholders to the TOs.

The Commission's approval of the TO Proposal inexplicably ignored the fact that it shifts control over the scope of regional transmission planning from the PJM stakeholders to the PJM TOs.  Protesters explained how the new Applicability section in Attachment M-3 reserves to the PJM TOs control over "any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address . . ." the planning criteria laid out in clauses (1) through (5) of the same section.[57]  Yet the Commission did not address these arguments.[58]  Instead, the Commission made a general statement that "the planning activities addressed by the Attachment M-3 Revisions Filing are within the exclusive rights and responsibility retained by the PJM TOs under the CTOA."[59]

The Operating Agreement can only be amended by the Members Committee, a committee of stakeholders that represent various sectors of PJM.[60]  Specifically, Section 8.8 of the Operating Agreement states that the Members Committee has the authority to amend any portion of the

---

[55] *S. California Edison Co. Local Transmission Planning Within the California Indep. Sys. Operator Corp*., 164 FERC ¶ 61,160, at P 10 (2018).

[56] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.").

[57] *See* LS Power Protest at 58-60; Load Group Protest at 21-22.

[58] While the Commission summarized the issue at Paragraph 4 of the August 11 Order in the summary section of the Order, it did not address it in the substantive section of the August 11 Order.

[59] August 11 Order at P 81.

[60] *See Pennsylvania-New Jersey-Maryland Interconnection*, 81 FERC 61,257 (1997); *see also* Order No. 888, 61 FR 21,257.

Operating Agreement. PJM highlighted this fact in its Order No. 1000 compliance filing, stating: "PJM's stakeholder process requires that all proposed amendments to the Schedule 6 planning process are fully vetted for endorsement before all stakeholders at the Markets and Reliability Committee ("MRC") and Members Committee ("MC") prior to filing . . .."[61] As LS Power stated in its Protest, the division of filing rights is consistent with the Commission's rules requiring PJM to be independent and no one interest dominate.[62]

In addition, in support of its determination, the Commission narrowly interpreted the definition of Asset Management Projects to "not fall under regional planning under the Operating Agreement as they relate solely to maintenance of existing facilities, and they do not 'expand' or 'enhance' the PJM grid as the CTOA requires for planning transferred to PJM."[63] The TO Proposal is broader than simply adding Asset Management Projects to Attachment M-3. Section (i) of the definition of Attachment M-3 Project also includes Asset Management Projects that materially impact the impedance of Transmission Facilities, which by its very definition are regional in nature and impact all of PJM. It now includes any project not planned by PJM to meet the specific criteria listed in the Applicability section as well as certain projects resulting from a transmission provider's Form No. 715 criteria. The Commission cannot rely on the same rationale it used for Asset Management Programs – that they are not expansions or enhancements – to find that the definition of Attachment M-3 Projects are within the PJM TOs' exclusive planning authority because the definition clearly includes "any other *expansion or enhancement* of Transmission

---

[61] *PJM Interconnection, L.L.C.*, Order No. 1000 Compliance Filing at 20 (filed Oct. 25, 2012).

[62] LS Power Protest at 60 (citing *Pennsylvania-New Jersey-Maryland Interconnection, et al*, 81 FERC ¶ 61,257 at 62,263 (1997); Order No. 888, 61 FR 21540-01 at 21596).

[63] August 11 Order at P 83.

23

Document Accession #: 20200910-5284    Filed Date: 09/10/2020

Facilities . . .."[64]  The definition also includes projects that *significantly* impact the impedance of existing regionally beneficial Transmission Facilities or affects Transmission Facility ratings in PJM.  "Impedance changes" and "affecting transmission facility ratings" are evidence of regional benefits.[65]  The Commission must evaluate the entire proposal before it and address all the arguments raised.[66]

### 4. The August 11 Order inexplicably allows the PJM TOs to insert a new Right of First Refusal.

The August 11 Order allows the PJM TOs to insert a new right of first refusal in the PJM Tariff contrary to Order No. 1000, ignoring the Commission's long-established finding that a right of first refusal does not exist in the PJM Tariff or CTOA.[67]  Order No. 1000 required transmission providers to eliminate from Commission jurisdiction tariff and agreements rights of first refusal for an incumbent transmission provider with respect to transmission facilities selected in the regional transmission plan for purposes of cost allocation.[68]  In Order No. 1000-A, the Commission clarified that there can be no right of first refusal for a project if any costs of the project are allocated regionally or outside of a transmission provider's retail distribution service territory or footprint, or in the case of an RTO such as PJM, outside the transmission provider's zone.[69]

On compliance with Order No. 1000, PJM asserted that the PJM Tariff did not include a right of first refusal in favor of the incumbent transmission owners in PJM, while the PJM TOs

---

[64] Attachment M-3 (b)(2)(i) and Attachment M-3(b)(2)(iii) [emphasis added].

[65] *See, e.g., Tampa Elec. Co., et al*, 148 FERC ¶ 61,172, at P 138 (2014).

[66] *Motor Vehicle Mfrs. Assn of the U. S., Inc. v. State Farm Mut. Ins. Co*., 463 U.S. 29, 43 (1983) ("FERC must articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made"); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1990) (holding that an agency has a duty to consider the seriously-pleaded contentions of a party and failure to do so is arbitrary and capricious).

[67] *PJM Interconnection, L.L.C.*, 147 FERC ¶ 61,128 (2014) ("PJM Order 1000 Rehearing Order").

[68] Order No. 1000 at PP 258, 318.

[69] Order No. 1000-A at P 430.

argued that Section 4.2.1 of the CTOA granted them a right of first refusal to build reliability projects.[70] The Commission found that certain provisions were ambiguous and therefore required their removal but found that Section 4.2.1 of the CTOA did not include a right of first refusal and permitted it to remain in the PJM Tariff.[71] Thus, the status quo prior to the PJM TO Proposal was that neither the PJM Tariff nor the CTOA included a right of first refusal.

As explained above, the new Applicability section in Attachment M-3 gives each transmission owner responsibility for *planning and constructing* all transmission expansions or enhancements that are not needed for the five criteria listed in the same section, thus creating a new right of first refusal in the PJM Tariff that limits PJM's ability to create new categories of regional projects.[72] LS Power raised the issue in its Protest but the Commission did not address it in the determination section of the August 11 Order.[73] Because the Commission permitted the PJM TOs to add a new right of refusal without explanation and contrary to Order No. 1000 the August 11 2020 Order is arbitrary and capricious and not the result of reasoned decision-making.[74]

---

[70] *PJM Interconnection, L.L.C.*, "Compliance Filing," Docket No. ER13-189-000 at 49 (filed on Oct. 25, 2012) (citing *Primary Power v. PJM Interconnection, L.L.C.*, 140 FERC ¶ 61,054 (July 19, 2012)(finding the PJM TOs did not have a right of first refusal for economic projects); *PJM Transmission Owners*, "Compliance Filing," Docket No. ER13-195-000 at 5-6 (Oct. 25, 2012)(citing Section 4.2.1 of the CTOA).

[71] PJM Order 1000 Rehearing Order at P 129, n.250. *See also* Brief for the Federal Energy Regulatory Commission as Respondent Brief, *American Transmission System, Inc. et al v. Federal Energy Regulatory Commission*, No. 14-1085 at 15-16 (D.C. Cir. Dec. 4, 2015) (summarizing the Commission's decision in the rehearing order as "reaffirm[ing] that Transmission Owners' cited provision in the Transmission Owners Agreement and the PJM Operating Agreement are not properly read as rights of first refusal and are not entitled to *Mobile Sierra* protection." The Brief also address *Primary Power* and explain that the "Commission, however, specifically rejected Transmission Owners' assertion that Primary Power upheld their interpretation of section 4.2.1 as a right of first refusal for non-economic (i.e. reliability or operational) projects. *Id*. P 223, JA 75. While *Primary Power* found the section 4.2.1 obligation to build inapplicable to economic projects (i.e. projects that reduce energy costs), *id*. (citing Primary Power, 140 FERC ¶ 61,052 P 60), the Commission did not find it constituted a right of first refusal for non-economic projects. *Id*. Rather, the Commission pointed to its finding in Order No. 1000 that an obligation to build does not create a corresponding right of first refusal. *Id*. (citing Order No. 1000 P 261).")

[72] Attachment M-3 (a).

[73] LS Power Protest at P 6, 13-15. The Commission referenced LS Power arguments in Paragraphs 44 and 46, but then failed to provide a substantive response.

[74] Administrative Procedure Act, 5 U.S.C. § 706(2)(A); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967, 981-982 (2005) ("Unexplained inconsistency is. . . a reason for holding an interpretation to be an

25

### C. The August 11 Order ignores the plain language of the TO Proposal and fails to meaningfully address arguments that the definitions do not support a finding that the TO Proposal is within the TOs' authority. (Statement of Error #3)

The August 11 Order held that Asset Management Projects "do not fall under regional planning under the Operating Agreement as they relate solely to maintenance of existing facilities, and they do not 'expand' or 'enhance' the PJM grid as the CTOA requires for planning transferred to PJM."[75] The August 11 Order further elaborates that the CTOA "grants to PJM only the right to plan for 'expansion' and 'enhancement' of the grid as part of the RTEP."[76] Thus, the Commission concedes that, with the exception of Supplemental Projects, which are limited and local, transmission projects that expand or enhance the grid are rightfully planned by PJM through the RTEP. Despite this acknowledgement, however, the Commission did not examine or evaluate any of the numerous new definitions or other provisions in the TO Proposal to determine whether they include transmission planning for projects that expand or enhance the Transmission System that are not Supplemental Projects. Rather, the August 11 Order relies solely on a conclusory statement that all of the proposed revisions in the TO Proposal that "expand the applicability of the existing Attachment M-3 to include Asset Management Projects," are "just and reasonable, given the specific facts and circumstances presented here…."[77] This finding appears to be based

---

arbitrary and capricious change from agency practice under the Administrative Procedure Act.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 436 U.S. 29, 46-57 (1983)); *United Mun. Distribs. Group v. FERC*, 732 F.2d 202, 210 (D.C. Cir. 1984) ("[A]n agency must conform to its prior practice and decisions or explain the reason for its departure from such precedent."); *Panhandle Eastern Pipe Line Co. v. FERC*, 196 F.3d 1273, 1275 (D.C. Cir. 1999)("As we have repeatedly reminded FERC, if it wishes to depart from its prior policies, it must explain the reasons for its departure."); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.").

[75] August 11 Order at P 83.

[76] *Id.* at P 86.

[77] *Id.* at P 88.

26

upon two assertions: (1) the Commission previously found Attachment M-3 to be just and reasonable and since the TO Proposal expands the applicability of Attachment M-3 to Asset Management Projects, it is also just and reasonable; and (2) the TO Proposal includes a "process for the identification and planning for EOL Needs" that "provide[s] for coordination of EOL Needs with the PJM RTEP planning criteria needs" thereby providing "increased opportunities to review and comment on EOL Need transmission projects, and thus provides greater transparency."[78]  But the Commission did not provide any explanation of how these two points contradict the Joint Protestors' position that other definitions and new provisions in Attachment M-3, in addition to "Asset Management Projects" go beyond the PJM TOs' authority.

In addition to arguing that the proposed modifications to Attachment M-3 unlawfully modify the RTEP as set forth in the Operating Agreement or are otherwise beyond the PJM TOs' authority, the Load Group's Protest identified and described the shortcomings of the new definitions and other provisions in the TO Proposal as follows:

·   The new "applicability" section not only dramatically expands the applicability of the Attachment M-3 process but also explicitly limits PJM's flexibility to improve its structure and operations to meet demands by restricting the PJM planning criteria.[79]  The "applicability" provision gives the PJM TOs authority to plan both Supplemental Projects and "*any other transmission expansion or enhancement of Transmission Facilities* that is not planned by PJM to address one or more" of a limited list of PJM planning criteria, including: NERC Reliability Standards, State Agreement Approach expansions or enhancements,[80] Transmission Owner FERC Form 715 criteria provided they meet the

---

[78] *Id.*

[79] Load Group Protest at 13-14; LS Power Protest at 23-24.

[80]*See* LS Power Protest at 23 wherein LS Power argued:

> The Applicability Section is also conspicuous in what is missing. The Commission required in Order No. 1000 that both local and regional transmission planning processes plan for transmission needs driven by Public Policy Requirements. Currently, PJM satisfies that requirement by identifying Public Policy Requirements and Public Policy Objects and incorporating them into PJM's sensitivity studies, modeling and scenario analyses. PJM also has the State Agreement Approach that permits individual states to request that PJM study particular public policy requirements and then voluntarily assume responsibility for a project needed to meet the public policy requirement (assuming the

27

Additional Procedures as set for in the new section (d) of Attachment M-3, or projects to relieve economic constraints.[81]  The Commission failed to explain how this provision, that authorizes the PJM TOs to plan for expansions or enhancements of the Transmission System that are not Supplemental Projects, is consistent with its finding that  the TO Proposal is just and reasonable.

· The proposed definition of "Attachment M-3 Project" is unjust, unreasonable and unlawful because it confers authority for transmission planning beyond local Supplemental Projects to the Transmission Owners[82] by including Asset Management Projects that affect Transmission Facility ratings or significantly change the impedance of regional Transmission Facilities and "*any other expansion or enhancement of Transmission Facilities* that is not excluded from this Attachment M-3 under any of clauses (1) through (5) of section (a)."[83]

· The proposed definition of "Incidental Increase" is unjust and unreasonable as it is unreasonably broad and susceptible to manipulation through unfettered modifications to Transmission Owner design standards.[84]  The definition also references "advancements in technology" but there is no limitation on the phrase.[85]  It could refer to more efficient equipment, replacement from lower voltage to regionally beneficial higher voltage facilities, or the inclusion of new energy storage technology.[86]

· The proposed definition of "EOL Need" is unjust and unreasonable because by including a "test" for regional planning of transmission lines operating at or above 100 kV or a transformer, it is not limited to local Supplemental Projects and, thus, unlawfully confers authority for transmission planning to the PJM TOs.[87]  The EOL Need definition also creates a test that will limit regional planning, by creating a backdoor right of first refusal on substations and anything else that is not a replacement transmission line or transformer.[88]

· The proposed definition of "Candidate EOL Needs List" is unjust  and  unreasonable

---

project does not qualify as a reliability or market efficiency project). The Applicability Section only carves out State Agreement Approach project.

[81] Load Group Protest at 13-14, citing Attachment M-3 at Paragraph (a); LS Power Protest at 26

[82] *Load Group Protest at 13-14,* citing *Monongahela Power Co.*, 156 FERC ¶ 61,134 at P 13 (2016); 162 FERC ¶ 61,129; *order on reh'g*, 164 FERC ¶ 61,217 (2018).

[83] *Id.* at 38, citing Attachment M-3 at Paragraph (b)(2).

[84] *Id.* at 38, citing Attachment M-3 at Paragraph (b)(3).

[85] LS Power Protest at 45.

[86] *Id.*

[87] Load Group Protest at 39, citing Attachment M-3 at Paragraph (b)(5).

[88] LS Power Protest at 48-49.

because it is not transparent in contravention of Order No. 890 requirements.[89]  More specifically, the list is shared only with PJM and only updated annually, although a Transmission Owner may change its projections of candidates on the list at any time. Stakeholders other than PJM are not privy to the Candidate EOL Needs List.

· The proposed definition of "Form No. 715 EOL Planning Criteria" is unjust, unreasonable and unlawful because it modifies the RTEP and, thus exceeds the authority of the Transmission Owners to modify the Operating Agreement through a unilateral FPA Section 205 filing.[90]

· The proposed definition of "PJM Planning Criteria" is unjust and unreasonable because it applies only to needs to plan transmission expansions or enhancements *other than those reserved to each Transmission Owner* in the "applicability" section, which confers authority for transmission planning beyond local Supplemental Projects to the PJM TOs and modifies the RTEP, which is beyond the PJM TOs' authority.[91]

· The revisions to Paragraph C(7) expand the use of Attachment M-3 to other undefined "Transmission Projects," and, thus, is unjust and unreasonable because it confers authority to the PJM TOs to use the Attachment M-3 transmission planning process beyond local Supplemental Projects.[92]

The Commission did not explain why the new project category definitions above and modifications to Attachment M-3 that reserve to the PJM TOs' authority to plan transmission that is not limited to either: (i) local Supplemental Projects or (ii) Transmission Facilities that do not expand or enhance the Transmission System is consistent with its finding that the TO Proposal is just, reasonable and lawful. The Commission made no effort to reconcile its holding that the TO Proposal is just and reasonable with the actual words included in proposed Attachment M-3.  In fact, other than summarizing the definitions in a preliminary section of the Order, the Commission does not refer to any new provision of Attachment M-3 in the TO Proposal at all.  The Commission also abjectly failed to explain how allowing the PJM TOs to reserve transmission planning rights

---

[89] Load Group Protest at 39, citing Attachment M-3 at Paragraph (d)(1)(iii).

[90] *Id.* at 39, citing proposed Attachment M-3 at Paragraph (b)(7); LS Power Protest at 51-52.

[91] Load Group Protest at 39, citing proposed Attachment M-3 at Paragraph (b)(9); LS Power Protest at 26 (also discussing interaction between the coordination of EOL Need Planning with PJM planning criteria needs.

[92] Load Group Protest at 39.

29

to themselves that are not Supplemental Projects but expand or enhance the Transmission System is consistent with the August 11 Order's conclusions that transmission planning for expansions and enhancements to the Transmission System are within the RTEP and PJM's planning authority. The lack of explanation, or even acknowledgement of any new term other than "Asset Management Projects" is far from sufficient to demonstrate a "rational connection between the facts found and the choice made."[93]

The August 11 Order also failed to respond meaningfully to evidence and arguments offered by the Load Group and others demonstrating that, rather than improving coordination and increasing transparency, the TO Proposal will undermine PJM's ability to develop the RTEP, will reduce transparency in the planning process, and will exacerbate issues with the generation interconnection queue, among other negative consequences.

The Load Group argued that the revisions to Attachment M-3 are the antithesis of increasing a coordinated planning approach. Specifically, the Load Group noted that whereas the existing Attachment M-3 described the tariff section as providing "additional details of the process *PJM and the PJM Transmission Owners will follow in connection with planning Supplemental Projects . . .*"[94] as part of a coordinated planning approach, the revised version deletes the reference to PJM and coordination and states only that "[e]*ach Transmission Owner shall be responsible for planning and constructing*" transmission projects as described therein. In other words, the

---

[93] *FERC v. Elec. Power Supply Ass'n,* 577 U.S. ___, 136 S.Ct. 760, 782 (2016) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).

[94] PJM Tariff, Attachment M-3, Applicability.

revisions literally change the process from one involving both PJM and the PJM TOs to just the PJM TOs.[95]

The Load Group also argued that the new definition of "Incidental Increase" will likely dramatically reduce coordination between PJM and the PJM TOs. The inclusion of replacements that result from changes to "Transmission Owner design standards" in the definition of "Incidental Increase" authorizes any PJM TO to add any new transmission to meet updated standards that are developed exclusively by the individual TO and do not have any review, approval process or other regulatory oversight. The example provided was that if a PJM TO changes its design standard to require 1/0 copper to be replaced with 795 ACSR conductor (the new standard) at 69 kilovolts, it would increase the line carrying capability by 4-5 times (likely more than the incidental increase the Commission envisioned). It would also significantly increase the volume of transmission replacement projects for which the PJM TO would have sole planning authority. The Commission did not address the argument that this definition's broad, non-quantifiable and apparently self-policing nature makes it likely that far more transmission projects will be removed from PJM-facilitated open, transparent and coordinated transmission planning.

Similarly, several parties argued that the secret "Candidate EOL Needs List" reduces both coordination and transparency. For example, the New Jersey Board of Public Utilities ("NJBPU") argued that the "transmission planning process is not open and devoid of discrimination when everyone except for PJM and the Transmission Owner are shut out."[96] One of the bases for the NJBPU's argument is that the "number of projects opened to some form of stakeholder review will

---

[95] *See* LS Power Protest at 14, footnote 36. *See* specific language from the Applicability Section, "in accordance with Schedule 6 of the Operating Agreement as provided in this Attachment M-3," which effectually writes in language that Attachment M-3 provides the authority for the regional planning process.

[96] Protest of the New Jersey Board of Public Utilities at 8.

31

JA0487

be a small percentage of the overall projects identified on the Transmission Owners' EOL Candidate Needs Lists." The NJBPU correctly noted that a PJM TO need only disclose information about an EOL Need if there is an identified overlap between the projected EOL Need and a PJM Planning Criteria Need and only after PJM consults with the PJM TO first and meets several other conditions.  The NJBPU stated that there are "no temporal limits on the time it could take to satisfy the consultation or other conditions, thus creating an uncertain delay before stakeholders might review this narrow subset of projects."[97]  The Commission did not address the NJBPU's conclusion that the TO Proposal falls short of Order No. 890's requirements to afford the necessary transparency to avoid undue discrimination.

J-Power presented arguments that the negative consequences of the TO Proposal could extend beyond transmission planning.  J-Power argued that the proposed transmission planning changes will necessarily impact the timing and results of interconnection studies by adding uncertainty to the transmission planning process, which will "put additional pressure on an already overtaxed interconnection study system.[98]  The uncertainty is created by the PJM TOs' ability to propose but then remove EOL Projects from its plan at any time.  This uncertainty will have negative impacts on PJM's ability to prepare the RTEP as well.

The August 11 Order makes no mention of any of these arguments, let alone responds meaningfully to the evidence and arguments that the TO Proposal will decrease coordination between the transmission planning being done by the PJM TOs and PJM, will reduce transparency in transmission planning, and will have negative implications even beyond transmission planning in PJM.  Rather, without any explanation, the Commission asserts that the TO Proposal's inclusion

---

[97] *Id.*

[98] Comments of J-Power USA Development Co., LTD. ("J-Power Comments") at 5.

of "a process for the identification and planning for EOL Needs" provides for "coordination of

EOL Needs with the PJM RTEP planning criteria needs."[99]  The August 11 Order is arbitrary and

capricious and not the result of reasoned decision-making.

> **D.    The Commission erred in finding that "Asset Management Projects" are consistent with the type of projects and activities that the Commission found were appropriately considered transmission owner asset management projects in the California Orders. (Statement of Error #4)**

In the August 11 Order, the Commission determined that "Asset Management Projects do

not fit within the categories of projects the CTOAs have transferred to PJM," and that its

interpretation "is consistent with the *California Orders*, in which the Commission concluded that

it was appropriate to define 'asset management' as activities that 'encompass the maintenance,

repair, and replacement work done on existing transmission facilities as necessary to maintain a

safe, reliable and compliant grid based on existing topology,' even if these projects result in an

'incidental increase in transmission capacity that is not reasonably severable from the asset

management or activity.'"[100]

The Commission's finding that its conclusion regarding the CTOA is consistent with the

conclusion in the California Orders ignores critical distinctions between the two proceedings –

distinctions the Commission itself recognized but has now abandoned without explanation or

justification.  One such distinction that the Commission erred by failing to address in the August

11 Order is the difference in the scope of the RTO/ISO's authority over transmission planning as

compared to the transmission owners' authority.  In the California Orders, the Commission noted

that the CAISO's Transmission Planning Process ("TPP") did not indicate that the CAISO would

---

[99] August 11 Order at P 88.

[100] August 11 Order at P 84, citing *So. Cal. Edison Co*, 164 FERC ¶ 61,160 at P 33; *Cal. Pub. Util. Comm'n.*, 164 FERC ¶ 61,161 at P 68.

evaluate non-expansion transmission-related work.[101]  In the August 11 Order, the Commission failed to address the Load Group's demonstration that the PJM TOs' proposal to drastically limit PJM's flexibility and role in transmission planning is contrary to the Operating Agreement.  The Load Group explained that PJM's authority over transmission planning as the independent RTO was carefully crafted in the Operating Agreement in support of competitive markets.[102] Specifically, in defining Supplemental Projects as a "transmission expansion or enhancement that is not required for compliance with the following PJM criteria,"[103] "PJM criteria" is not defined, nor are "system reliability, operational performance or economic criteria."[104] The Load Group further explained that these undefined terms reflect the flexibility afforded PJM and its stakeholders as to the regional criteria that PJM should address.  PJM's authority over transmission planning as the independent RTO is also reflected in the fact that Supplemental Projects require a determination by the PJM Office of the Interconnection – not the TOs – regarding whether a proposed Supplemental Project does not meet any of the referenced PJM criteria.[105]

In the August 11 Order, the Commission summarily addressed these violations of the Operating Agreement with a finding that Asset Management Projects "do not fall under regional planning under the Operating Agreement as they relate solely to maintenance of existing facilities . . ."[106] The error in the Commission's determination that Asset Management Projects relate solely to maintenance is discussed Section III.B.3, above.  However, the Commission also erred by failing

---

[101]  *Cal. Pub. Util. Comm'n.*, 164 FERC ¶ 61,161 at P 70.

[102] Load Group Protest at 13-14; *see also* August 11 Order at P 58.

[103] *Id.* at 14, citing Operating Agreement, Schedule 6, 1.2(3).

[104] *Id.* at 14, citing Operating Agreement, Section 1, Definitions.

[105] *Id.*, citing Operating Agreement, Schedule 6, Section 1.5.6(n).

[106] August 11 Order at P 82.

34

to address the Load Group's demonstration that the TO Proposal violates the Operating Agreement, which is a critical distinction between PJM and the CAISO. The Commission's failure to address these arguments is a failure to engage in reasoned decision making.[107]

### E. The Commission erred by applying an erroneous ruling regarding Order No. 890 to the TO Proposal regarding Asset Management Project planning. (Statement of Errors #5, #6, #7 and #8)

In the California Orders, the Commission acknowledged that Order No. 890 did not define "transmission planning."[108] Yet, over a decade after the Final Rule was adopted, the Commission has narrowed the scope of Order No. 890[109] by announcing that it applies only to expansion of the transmission grid.[110] On rehearing in the California Orders, the Commission rejected demonstrations that it erred in narrowly interpreting Order No. 890 such that projects that do not expand the transmission grid are not subject to the requirements of Order No. 890.[111] Instead, the Commission maintained its position that Order No. 890 applies only to projects that expand the transmission grid.[112] The Commission's determination in the California Orders, which it has now

---

[107] *See, e.g., Motor Vehicle Manufacturer's Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that an agency acts arbitrarily and capriciously when it fails to "consider an important aspect of the problem"); *see also KeySpan-Ravenswood, LLC v. FERC*, 348 F.3d 1053, 1056 (2003) (explaining that "unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned") (internal alterations, quotes and citation omitted).

[108] *Cal. Pub. Util. Comm'n*, 164 FERC ¶ 61,161 at P 66.

[109] *Preventing Undue Discrimination and Preference in Transmission Service*, Order No. 890, 118 FERC ¶ 61,119, *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297 (2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

[110] *Cal. Pub. Util. Comm'n*, 164 FERC ¶ 61,161 at P 66 (". . . the transmission planning reforms that the Commission adopted in Order No. 890 were intended to address concerns regarding undue discrimination in grid expansion. Accordingly, to the extent that PG&E asset management projects and activities do not expand the grid, they do not fall within the scope of Order No. 890, regardless of whether they are capitalized in PG&E's transmission rate base.")(citations omitted).

[111] *See California Pub. Utils. Comm'n v. Pac. Gas and Elec. Co.*, 168 FERC ¶ 61,171 at PP 10-15 (the Commission explained that Complainants asserted that the Commission made six specific errors in the Order on Complaint with respect to application of Order No. 890 that warrant granting their request for rehearing).

[112] *Id.* at PP 19-35.

blindly applied to the PJM TOs' planning for Asset Management Projects under their expanded Attachment M-3, is in error and should be reversed on rehearing of the August 11 Order. Even if the Commission does not grant rehearing of its narrowed scope of Order No. 890 in general, it should grant rehearing of that determination as applied to the new Attachment M-3 at issue in this proceeding.

### 1. The Commission erred in finding that incidental expansions of the Transmission System are not subject to Order No. 890.

In the August 11 Order, the Commission applied its narrow view of Order No. 890 to the TOs' proposed Asset Management Projects and revisions to Attachment M-3, and found that ". . . where the transmission projects developed under the expanded Attachment M-3 process result in only incidental expansions of the transmission system, such asset management activities are not subject to Order No. 890 transmission planning principles."[113] Petitions for review of the California Orders are currently pending before the U.S. Court of Appeals for the Ninth Circuit.[114] The Load Group agrees with arguments made on rehearing of the California Orders that the Commission erred in its new-found limitation of the scope of Order No. 890 to only projects that expand the transmission system.[115] More specifically, the Load Group agrees with arguments on rehearing of the California Order that the Commission's narrow scope for Order No. 890 as announced in the California Orders is in error, including the following errors: (1) the Commission incorrectly found that the PJM Show Cause order did not address whether non-grid expansion

---

[113] August 11 Order at P 89 (citations omitted).

[114] *CPUC, et al. v. FERC*, Case No. 19-72886 and *Northern California Power Agency*, Case No. 19-72925. Both cases have been stayed pending settlement discussions. *See* Order issued April 22, 2020 in U.S. Court of Appeals for the Ninth Circuit, Case Nos. 19-72925 ,*et al.*

[115] *See, e.g.,* Request for Rehearing filed by the California Public Utilities Commission, *et al.*, in Docket No. EL17-45-001.

projects now characterized as "asset management" projects must go through an Order No. 890-compliant transmission planning process;[116] (2) the Commission's narrow scope for Order No. 890 is inconsistent with requirements in the Energy Policy Act of 2005;[117] (3) the Commission's ruling "violates longstanding Commission policy regarding the need for coordinated and transparent transmission planning, and it perpetuates undue discrimination that Order No. 890 sought to eradicate;[118] (4) the Commission violated its statutory obligation to remedy undue discrimination; (5) the ruling will result in unjust and unreasonable rates; and (6) the Commission failed to consider the fact that asset management projects require transmission planning and, therefore, must be included in a transmission planning process that complies with Order No. 890.[119]

To the extent the Commission's determination regarding the scope of Order No. 890 as set forth in the California Orders is modified or vacated, the Commission's reliance on the California Orders in this proceeding must also be modified or vacated. On rehearing of the August 11 Order, the Commission should reconsider the arguments raised against narrowing the scope of Order No. 890 such that it applies only to transmission projects that expand the transmission system, and reverse its finding in the August 11 Order that non-grid expansion projects under the new Attachment M-3 are not subject to the requirements of Order No. 890. In any event, given the Commission's reliance in the August 11 Order on its finding in the California Orders, if the California Orders are modified or vacated, the Load Group reserves its right to further challenge the Commission's determination in this proceeding that Order No. 890 is limited to grid-expanding projects.

---

[116] *Id.* at pp 14, 18-21.

[117] *Id.* at 14, 22-24.

[118] *CPUC v. FERC*, 168 FERC ¶ 61,171 at P 12.

[119] *See id.* at PP 10-15.

JA0493

### 2. The August 11 Order is arbitrary and capricious for finding that the California Orders apply to the new Attachment M-3 process.

In protests to the new Attachment M-3, the Load Group and others demonstrated that the rulings regarding asset management activities in the California Orders are limited to those proceedings and even if the California Orders did serve as precedent, the new Attachment M-3 goes well beyond any reasonable application of the California Orders.[120] In the August 11 Order, the Commission summarily "agreed with the PJM TOs that where the transmission projects developed under the expanded Attachment M-3 process result in only incidental expansions of the transmission system, such asset management activities are not subject to Order No. 890 transmission planning principles."[121] The only reasoning offered by the Commission is that it "is consistent with the findings in the California Orders that the Order No. 890 planning principles apply only to transmission projects involving grid expansion, and where Supplemental Projects result in only incidental expansions of the transmission system, do not apply to asset management activities."[122] The Commission's application of the California Orders to the new Attachment M-3 is arbitrary and capricious because it unreasonably departs from Commission precedent without explanation, ignores arguments put forth in this proceeding, and is otherwise unreasonable.

First, the Commission's findings in the August 11 Order are internally inconsistent. On the one hand, the Commission relies on its previous finding that the Attachment M-3 planning process is consistent with Order No. 890 and finds that having done so, the new Attachment M-3 is "likewise just and reasonable."[123] On the other hand, and in order to bless the shift of planning

---

[120] *See* Load Group Protest at 25-30, citing Supporting Comments of the PJM Joint Stakeholders in Docket No. ER20-2308-000 at 10-11, 50-57.

[121] August 11 Order at P 89.

[122] *Id.* at P 89.

[123] *Id.* at P 88.

38

responsibility for Asset Management Projects from PJM to the TOs, the Commission insists that the changes reflected in the new Attachment M-3 "are not subject to Order No. 890 transmission planning principles."[124]  For the reasons discussed above and in the Load Group's prior pleadings, the new Attachment M-3 is *not* just and reasonable and is *not* consistent with Order No. 890. At the very least, the Commission must address its prior finding that the PJM TOs are required to conduct local transmission planning in a manner that complies with Order No. 890, and address the fact that the August 11 Order relieves them of this obligation.[125]  The August 11 Order is arbitrary and capricious for failing to explain this departure from the Commission's Show Cause Orders.[126]

Second, if left unaddressed, the August 11 Order could be interpreted to vacate or at least severely limit the findings in the Show Cause Orders with respect to planning for Supplemental Projects in PJM.  The August 11 Order finds that relieving the PJM TOs of the requirement to comply with Order No. 890 for "such asset management activities" "is consistent with the finding in the *California Orders* that the Order No. 890 planning principles apply only to transmission projects involving grid expansion, *and where Supplemental Projects result in only incidental expansions of the transmission system, do not apply to asset management activities."[127]*  The Commission's reference to Supplemental Projects in the context of the California Orders and incidental expansions of the transmission system is unclear, at best.  The Commission did not make

---

[124] *Id.* at P 89.

[125] *See Monongahela Power Co.*, 162 FERC ¶ 61,129 at P 72, 74.

[126] *See, e.g., ABM Onsite Servs.-W., Inc. v. Nat'l Labor Relations Bd.,* 849 F.3d 1137, 1142 (D.C. Cir. 2017) ("[A]n agency's unexplained departure from precedent is arbitrary and capricious."); *ANR Pipeline Co. v. FERC,* 71 F.3d 897, 901 (D.C. Cir. 1995) ("[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious.")

[127] August 11 Order at P 89 [emphasis added].

any rulings in the California Orders regarding PJM Supplemental Projects that result in only incidental expansions of the transmission system. Quite to the contrary, the Commission was adamant in the California Orders that its rulings regarding CAISO Participating Transmission Owner ("PTO") asset management activities were not aligned with Supplemental Project planning in PJM and that the Commission had not made a determination regarding non-grid expanding Supplemental Projects. The Commission clarified that "[t]he question whether asset management projects and activities that do not increase the capacity of the grid must go through an Order No. 890-compliant transmission planning process was not at issue in the February 15 PJM Order."[128] The Commission also determined that "[i]n light of the specific criteria set forth in the definition of Supplemental Projects in the PJM Tariff, there is no basis to conclude that based on their definition, Supplemental Projects in many cases are identical to asset management projects."[129] It makes no sense for the Commission to now state in the August 11 Order that "where Supplemental Projects result in only incidental expansions of the transmission system," the requirements of Order No. 890 do not apply. Such a finding is directly at odds with the Commission's findings in the Show Cause Orders that transmission planning for Supplemental Projects must comply with Order No. 890. Moreover, as the new Attachment M-3 has been designed, Asset Management Projects are not Supplemental Projects. Notwithstanding the Load Group's disagreement with the notion that Asset Management Projects are not Supplemental Projects, there is no reasonable explanation for the Commission to vacate its prior findings which required planning for Supplemental Projects to comply with Order No. 890, in this proceeding which addresses a new category of projects that the PJM TOs designed to be separate and apart from Supplemental

---

[128] *Cal. Pub. Utils. Comm'n v. Pac. Gas and Elec. Co.*, 168 FERC ¶ 61,171 at P 54 (2019).

[129] *Id.* at P 59; *see also S. California Edison Co.*, 164 FERC ¶ 61,161 at P 67 (2018).

40

Projects.  The August 11 Order could be interpreted as finding that where Supplemental Projects do not expand the transmission system, there is no requirement to comply with Order No. 890 transmission planning principles, which is a finding directly contrary to the Show Cause Orders.

Third, the Commission's exception to its own findings in the August 11 Order warrants rehearing.  The Commission determined that "where transmission projects developed under the expanded Attachment M-3 process result in only incidental expansions of the transmission system, such asset management activities are not subject to Order No. 890 transmission planning principles"[130] and accepts the new Attachment M-3 as filed.  However, in a footnote the Commission creates a gaping hole in its finding.  The Commission states as follows:

> We make no determination here as to whether EOL Needs or any of these Asset Management Projects, and in particular specific replacement activities, are subject to the transmission planning requirements of Order No. 890, as the PJM TOs proposed to includes these types of projects in the Order No. 890 planning process in Attachment M-3.[131]

The very issue in this proceeding is whether the new Attachment M-3 provisions for planning to address EOL Needs, Asset Management Projects and specific replacement activities must comply with Order No. 890 and, if so, whether the TO Proposal does so.  The Commission has specifically declined to address these issues, instead relying on its summary determination that the new Attachment M-3 expands the Order No. 890-compliant planning process.  On rehearing, the Commission should address demonstrations put forth by the Load Group and others that the proposed definitions and planning for EOL Needs, Asset Management Projects and other provisions in the new Attachment M-3 must comply with Order No. 890, and fail to do so.

---

[130] August 11 Order at P 89.

[131] *Id.* at note 141.

41

JA0497

Document Accession #: 20200910-5284    Filed Date: 09/10/2020

Fourth, the August 11 Order is arbitrary and capricious because it ignores the fact that PJM's transmission planning, pursuant to its governing documents, includes not only expansions but also *enhancements*.[132] The Commission failed to address this critical distinction between transmission planning in the CAISO and PJM transmission planning.  As the Load Group demonstrated in pleadings, Supplemental Projects in PJM include "expansions and enhancements," while the CAISO transmission planning process does not make provision for "enhancements."   Indeed, the CAISO "clarifie[d] that the CAISO's TPP addresses 'expansion' and 'reinforcement' of the transmission system, as opposed to 'enhancement' as reflected in the Commission-approved TCA that sets forth the respective roles and responsibilities of the CAISO and PTOs."[133]  There is no discussion in the California Orders of how "enhancements" should be treated for purposes of asset management, and the August 11 Order failed to address demonstrations that because of this distinction, the California Orders do not apply to transmission planning in PJM.

Fifth, the Commission's application of the California Orders departs from the Commission's consistent precedent, reinforced in the California Orders, that transmission planning and compliance with Order No. 890 will be determined on an RTO-specific basis.[134] Even if the Commission determined that the California Orders apply here, which they specifically do not, the Commission still must undertake an analysis of the specific proposals in the new

---

[132] The PJM Operating Agreement defines Supplemental Project to include transmission expansions or enhancements. PJM Operating Agreement, Definitions S-T.

[133] Initial Post-Technical Conference Comments of the California Independent System Operator Corporation, Docket No. EL20-45-000, *et al.*, at 4-5 (May 31, 2018).

[134] *See S. California Edison Co.*, 164 FERC ¶ 61,160 at P 37 (2018) ("We are also not persuaded by Protesters' assertions that the transmission planning practices in other RTOs/ISOs are instructive here . . .whether or not other transmission planning regions are considering asset management projects and activities through their regional transmission planning process does not, in and of itself, determine whether Order No. 890 requires them to do so.").

Attachment M-3, as opposed to simply relying on the California Orders as the basis for accepting the new Attachment M-3. Simply including the phrase, "given the specific facts and circumstances presented here" without more does not amount to an analysis of the unique features and structures of PJM. The Commission's failure to do more is arbitrary and capricious.[135]

### F.     The August 11 Order fails to provide a reasoned explanation for the Commission's departure from Order No. 2000.  (Statement of Error #9)

Order No. 2000 is one of the seminal orders of electric restructuring.[136] Among other things, it codifies minimum characteristics and functions that a transmission entity must satisfy in order to be considered an RTO. The Commission's stated goal of Order No. 2000 was to "promote efficiency in wholesale electricity markets and to ensure that electricity consumers pay the lowest price possible for reliable service."[137] This was achieved by establishing essential, minimum functions of an RTO, of which transmission planning and expansion is one of eight. In Order No. 2000, the Commission concluded, "the RTO must have ultimate responsibility for both transmission planning and expansion within its region that will enable it to provide efficient, reliable and non-discriminatory service and coordinate such efforts with the appropriate state authorities."[138] This requirement is memorialized in the Commission's Rules at Section 35.43(k).

Another essential function of an RTO is an "open architecture" policy to allow the RTO

---

[135] *Motor Vehicle Manufacturer's Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (stating that an agency acts arbitrarily and capriciously when it fails to "consider an important aspect of the problem"); *see also KeySpan-Ravenswood, LLC v. FERC*, 348 F.3d 1053, 1056 (2003) (explaining that "unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned") (internal alterations, quotes and citation omitted).

[136] 18 C.F.R. § 35.34(k)(7) (2018); *Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,163 (1999), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000), *aff'd sub nom. Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001) (affirming that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region").

[137] *Id.*

[138] 18 C.F.R. § 35.34(k)(7) (2018); Order No. 2000 (affirming that "the RTO must have ultimate responsibility for both transmission planning and expansion within its region").

the flexibility to improve its structure and operations to meet demands.[139]  Specifically, the "open architecture" rule requires that "any proposal to participate in a RTO must not contain any provision that would limit the capability of the RTO to evolve in ways that would improve its efficiency, consistent with the requirements in paragraphs (j) and (k) of this section."[140] Further, under this rule, RTOs must have the ability to "evolve with respect to its organizational design, market design, geographic scope, ownership arrangements, or methods of operational control, or in other appropriate ways if the change is consistent with the requirements of this section."[141]

Several protestors raised the argument that the TO Proposal's addition of the "applicability" provision to Attachment M-3, which gives the TOs exclusive authority to plan both Supplemental Projects and "any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more" of a truncated list of PJM planning criteria,[142] unlawfully limits PJM's ability to add new regional planning categories to the PJM RTEP absent TO approval to modify the tariff, thus preventing PJM from independently making changes to the RTEP deemed necessary.[143]  The TO Proposal puts the TOs in complete control of future transmission planning and, thus, preempts open architecture and PJM's ability to evolve in direct contravention of the spirit and letter of Order No. 2000 and the Commission's rules for RTOs.

The Commission references the arguments made regarding the violation of Order No. 2000 in its summary of the arguments but makes no further mention of either the requirements of Order

---

[139] *See id.* § 35.34(*l*).

[140] *Id.*

[141] Order 2000.

[142] Attachment M-3 at Paragraph (a).

[143] Load Group Protest at 23-24; LS Power Protest at 19-20.

44

No. 2000 or the arguments regarding the same. The August 11 Order does not even attempt to provide a reasoned explanation for the Commission's departure from Order No. 2000's requirement that RTOs have open architecture and an ability to evolve. The August 11 Order fails to consider all important aspects of the problem at issue,[144] engage in reasoned decision-making,[145] or respond meaningfully to the arguments raised before it.[146] Therefore the August 11 Order is arbitrary and capricious.

### G. The August 11 Order does not provide a reasoned explanation for the Commission's departure from precedent that establishes the predominance of regional planning. (Statement of Error #10)

Contrary to Commission precedent, the TO Proposal allows the PJM TOs to control through the local planning process aspects of the regional planning process. Certain definitions and provisions in Attachment M-3 allow the PJM TOs to veto regional projects in some instances. Protesters detailed these limitations at length in their pleadings and explained how they prevent PJM from carrying out its responsibility to conduct regional planning and produce a regional plan.[147] Together, these limitations prevent PJM from conducting effective regional planning consistent with Order No. 1000. The August 11 Order, however, arbitrarily and capriciously ignored evidence and arguments that PJM will no longer meet it regional planning obligations under Order No. 1000.[148]

---

[144] *See e.g. Motor Vehicle Mfs. v. State Farm Mut. Ins. Co*., 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency . . . failed to consider an important aspect of the problem); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998) ("In previous cases, we have rejected agency orders when the Commission neglected to deal with an important part of the problem…") (*citing Laclede Gas Co. v. FERC*, 997 F.2d 936, 945-48 (D.C. Cir. 1993)); *North Carolina Util. Comm'n v. FERC*, 42 F.3d 659 (D.C. Cir. 1994).

[145] *Sacramento*, 616 F.3d at 528; *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, (1983)).

[146] *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015).

[147] LS Power Protest at 56-58; Load Group Protest at 21.

[148] *See* August 11 Order at P 49.

In Order No. 1000, the Commission adopted "reforms [that] work together to ensure that public utility transmission providers in every transmission planning region, in consultation with stakeholders, evaluate proposed alternative solutions at the regional level that may resolve the region's needs more efficiently or cost-effectively than solutions identified in the local transmission plans of individual public utility transmission providers."[149] The region's needs include *all* transmission needs. In Paragraph 52 of Order No. 1000-A the Commission found that effective transmission planning means that the region "considers *all* transmission needs of all transmission customers. . .."[150] The Commission made a similar statement in Paragraph 60, stating that, "[a]s an initial matter, we note that, based on our expertise and knowledge of the industry, we do not consider it to be speculation or conjecture to conclude that regional transmission planning is more effective if it results in a transmission plan, is open and transparent, and considers *all* transmission needs."[151] The D.C. Circuit also described Order No. 1000 as requiring transmission planning for *all* transmission needs.[152] Order No. 1000 simply does not tolerate PJM having only partial rights to plan for transmission facilities needed in the PJM region.[153]

On compliance with Order No. 1000, the Commission found that PJM complied with the regional planning requirements because PJM's planning process "culminates in the RTEP, a regional transmission plan that reflects PJM's determination of the set of transmission facilities

---

[149] Order No. 1000-A at P 102.

[150] *Id.* at P 52 [emphasis added].

[151] *Id.* at P 60 [emphasis added].

[152] *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (citing Order No. 1000-A at PP 50, 60, and 98) [emphasis added].

[153] Indeed, the Transmittal Letter that PJM submitted as part of its Order No. 1000 compliance filing highlights the replacement of an aging transmission facility as evidence of the success of PJM's regional planning process. *PJM Interconnection, L.L.C.*, "Compliance Filing," Docket No. ER13-198-000 at 11 (Oct. 25, 2012).

46

Document Accession #: 20200910-5284     Filed Date: 09/10/2020

that more efficiently or cost-effectively meet the transmission needs of the PJM Region."[154]  There were no limitations at the time on PJM's ability to consider different types of needs.  Nothing in the August 11 Order explains why PJM should now be prohibited from considering a fundamental driver of transmission in PJM.  Protesters described at length how aging infrastructure is and will continue to be a significant driver of new transmission facilities in PJM over the next decade.[155]

The Commission pointed to the CTOA in support of its determination that the PJM TOs have the exclusive right to revise Attachment M-3.  But, the CTOA existed at the time that the Commission evaluated whether the PJM TOs and PJM complied with the requirements of Order No. 1000 and it has remained unchanged since then.  The regional planning requirements of Order No. 1000 also have not changed.  Without explanation, the Commission read into the CTOA limitations on PJM's ability to plan on a regional basis for "all transmission needs."  There is no justification for reading the CTOA as a bar to PJM's ability to identify and evaluate whether there are more efficient or cost-effective solutions to the region's needs.  Doing so puts PJM out of compliance with Order No. 1000 and prevents PJM from engaging in transmission planning for all the transmission needs in the PJM Region and producing a regional transmission plan as is required for each Order No. 1000 Region under Order No. 1000.  Order No. 1000's requirements apply equally to all Order No. 1000 regions, regardless of whether the region is an RTO or not.

The Load Group provided substantial evidence that the majority of transmission planning in PJM is occurring outside the purview of the PJM RTEP process.[156]  Specifically, the Load Group demonstrated that the PJM Region has experienced severe imbalance in PJM transmission

---

[154] PJM First Compliance Order at P 65.

[155] *See, e.g.*, LS Power Protest at 33; Load Group Answer at 10.

[156] Load Group Protest at 4-6.

JA0503

planning as compared to PJM TO-only transmission planning, with the latter undertaking the vast majority of new transmission investment (over 76 percent of the project expenses within the PJM RTEP planned as Supplemental Projects ($6.5 billion)) as opposed to regionally planned projects ($2.0 billion). The largest component of the spending on Supplemental Projects in 2018 was on projects that were claimed to be necessary due to EOL conditions. The Load Group explained that projects based on claims of EOL conditions were not subject to regional planning pursuant to the PJM RTEP.[157] However, the Commission summarily dismissed the evidence that the majority of transmission planning in PJM is occurring outside the purview of the PJM RTEP process as beyond the scope of this proceeding.[158]

The dismissal of the evidence and arguments regarding the fact that the majority of transmission planning is occurring outside of the RTEP misses the point and misunderstands the TO Proposal. As noted above, in order to comply with Order No. 1000, RTOs must have effective transmission planning that "considers all transmission needs of all transmission customers. . .."[159] But the evidence shows that already, PJM is not planning the majority of Transmission Planning needed in the PJM region. The TO Proposal will eviscerate the RTEP, which the Commission has accepted as the "regional transmission plan that reflects PJM's determination of the set of transmission facilities that more efficiently or cost-effectively meet the transmission needs of the PJM Region."[160] The Commission's failure to consider all important aspects of a problem at

---

[157] *See* 2019 Project Statistics presented at the May 12, 2020 PJM Transmission Expansion Advisory Committee, available at: https://www.pjm.com/~/media/committees-groups/committees/teac/2020/20200512/20200512-item-10-2019-project-statistics.ashx.

[158] August 11 Order at P 90.

[159] *Id.* at P 52.

[160] PJM First Compliance Order at P 65.

48

issue[161] and respond meaningfully to the arguments raised before it[162] renders the August 11 Order arbitrary and capricious.

### H. The August 11 Order's summary dismissal of the cost allocation issues associated with the TO Proposal is arbitrary and capricious and contrary to substantial record evidence. (Statement of Error #11)

#### 1. The Commission's refusal to consider whether there is a just and reasonable cost allocation method applicable to the new project categories is arbitrary and capricious and contrary to law.

Numerous protestors pointed out that the PJM Tariff does not provide a just and reasonable cost allocation method applicable to the new project categories of high voltage transmission created by the TO Proposal.[163] The August 11 Order did not substantively address this concern. Instead, the Commission found that, because the TO Proposal did not include any changes to Schedule 12, cost allocation issues were beyond the scope of this proceeding.[164] The Commission's dismissal of the cost allocation issues for new project categories is arbitrary and capricious.

The Commission cannot avoid evaluating whether the cost allocation method applicable to the new project categories is just and reasonable. FPA Section 205 requires that "[a]ll rates and charges made, demanded or received by any public utility for or in connection with transmission .

---

[161] *See e.g. Motor Vehicle Mfs. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency . . . failed to consider an important aspect of the problem); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998) ("In previous cases, we have rejected agency orders when the Commission neglected to deal with an important part of the problem…") (*citing Laclede Gas Co. v. FERC*, 997 F.2d 936, 945-48 (D.C. Cir. 1993)); *North Carolina Util. Comm'n v. FERC*, 42 F.3d 659 (D.C. Cir. 1994).

[162] *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015).

[163] LS Power Protest at 36-38; Load Group Answer at 26-27; Protest of the New Jersey Board of Public Utilities at 10-15.

[164] August 11 Order at P 91. In support of its determination that cost allocation issues are beyond the scope of the proceeding, the Commission cited *ANR Pipeline Co. v. FERC*, 771 F.2d 507 (D.C. Cir.1985), The Commission implied that protestors were asking the Commission to revise cost allocation provisions included in Schedule 12. August 11 Order at P 91 n.143. To be clear, protestors argued that the TO Proposal must be rejected because of the absence of a just and reasonable cost allocation method in Schedule 12 that applies to the new project categories. *Id.* (citing *ANR Pipeline Co. v. FERC*, 771 F.2d 507, 514 (D.C. Cir. 1985)).

. . shall be just and reasonable . . ..."[165]  The TO Proposal adds entirely new project categories[166] to the PJM Tariff, the costs of which will be allocated entirely to the zone where the project is located regardless of whether other zones benefit.  The Commission has a duty under Section 205 to evaluate the TO Proposal, including the applicable cost allocation method, to ensure that rates resulting from that proposal are just and reasonable.[167]

The Commission also included a vague reference to the existing cost allocation provision of Schedule 12 for Required Transmission Enhancements, implying that that somehow addressed protestors' concerns.  First, it is difficult to deduce the Commission's reasoning as the new project categories do not meet the definition, which the Commission quotes in a footnote, of Required Transmission Enhancements.[168]  Furthermore, Required Transmission Enhancements are not the only project category referenced in Schedule 12.  Subsection (a)(iii) of Schedule 12 applies to transmission facilities that are not eligible for cost responsibility assignment, including, among other types of projects, Local Upgrades and Supplemental Projects.  Nowhere does Schedule 12

---

[165] 16 U.S.C. 824d(a).

[166] See new Project Categories of Attachment M-3 Project (i), Attachment M-3 Project (iii), Asset Management Project, PJM Criteria Need, Candidate EOL Needs List, EOL Need, and Applicability.   Just and reasonable cost allocation should have been established for each new Project Category definition.

[167] *See* Protest of the New Jersey Board of Public Utilities at 10.  Furthermore, the applicable cost allocation method determines whether the need underlying the project will be in PJM's competitive process.

[168] Required Transmission Enhancements are defined in the PJM Tariff to mean:

> Enhancements and expansions of the Transmission System that (1) a Regional Transmission Expansion Plan developed pursuant to Operating Agreement, Schedule 6 or (2) any joint planning or coordination agreement between PJM and another region or transmission planning authority set forth in Tariff, Schedule 12- Appendix B ("Appendix B Agreement") designates one or more of the Transmission Owner(s) to construct and own or finance.  Required Transmission Enhancements shall also include enhancements and expansions of facilities in another region or planning authority that meet the definition of transmission facilities pursuant to FERC's Uniform System of Accounts or have been classified as transmission facilities in a ruling by FERC addressing such facilities constructed pursuant to an Appendix B Agreement cost responsibility for which has been assigned at least in part to PJM pursuant to such Appendix B Agreement.

50

address the cost allocation of regionally beneficial enhancements or expansions included under Attachment M-3's catchall provision – section (a)(iii).

A review of Commission precedent demonstrates the arbitrariness of the Commission's position that it is not required to consider cost allocation issues.  In Order No. 1000, the Commission held that ". . . there is a *fundamental link between cost allocation and planning*, as it is through the planning process that benefits, which are central to cost allocation, can be assessed."[169]  The Commission also has routinely considered new project categories and their applicable cost allocation methods together.  For instance, in 2013 the PJM TOs filed proposed revisions to the cost allocation method in Schedule 12 for interregional projects between PJM and the Southeastern Regional Transmission Planning region ("SERTP").[170]  PJM separately filed the proposed interregional project category, including the criteria used to identify and evaluate interregional projects.[171]  Because of the interdependency of the planning process and cost allocation method, the Commission accepted and suspended the proposed interregional cost allocation subject to the outcome of the related compliance proceeding.[172]  The Commission's failure to address cost allocation issues when considering a fundamental change to transmission

---

[169] Order No. 1000 at P 559 [emphasis added].  *See also* Order No. 1000 at PP 499-500 (One of the Commission's goals in Order No. 1000 was to "establish[] a closer link between transmission planning and cost allocation [to] ensure that rates for Commission-jurisdictional service appropriately account for benefits associated with new transmission facilities.")

[170] *PJM Transmission Owners*, "PJM Open Access Transmission Tariff Revisions to Modify Cost Allocation for PJM Required Transmission Enhancements," Docket No. ER13-1927 (July 10, 2013).

[171] *PJM Interconnection, L.L.C.*, "Compliance Filing," Docket No. ER13-1936 (July 10, 2013).

[172] *PJM Interconnection, L.L.C., Duquesne Light Company*, 145 FERC ¶ 61,291, at P 31 (2013).  Specifically, the Commission found that:

> proposed interregional cost allocation method is thus interdependent with the separate PJM Compliance Filing and the SERTP Sponsors Compliance Filings.  We therefore cannot find that the PJM Transmission Owners' interregional cost allocation proposal is consistent with the requirements of Order No. 1000, absent a comprehensive evaluation of all the related pending Order No. 1000 interregional compliance proposals . . ..

51

planning in the PJM footprint is arbitrary and capricious and not the result of reasoned decision-making.

2. **The Commission impermissibly failed to consider evidence that the existing cost allocation method applicable to projects resulting from Attachment M-3 will result in unjust and unreasonable rates.**

The PJM TOs had the burden of demonstrating that the TO Proposal will result in a just and reasonable cost allocation method. However, there is no record evidence that the existing cost allocation method is just and reasonable as applied to the new project categories because the PJM TOs offered none. There is substantial record evidence establishing that there will be projects included in Attachment M-3 that have regional benefits that will be allocated to a single transmission zone contrary to cost allocation precedent. Applying the existing cost allocation method to every Attachment M-3 project, including higher voltage transmission facilities that are known to have significant regional benefits, thereby allocating all costs to a single zone is inconsistent with long-standing cost causation principles and precedent and ultimately leads to unjust and unreasonable rates.

Cost allocation principles require that the beneficiaries of a project pay the cost of the project in a manner that is roughly commensurate with the benefits received from the project.[173] A recent cost allocation decision, *ODEC v. FERC*, is particularly relevant in this proceeding. In *ODEC,* the Court vacated a Commission Order that accepted a single zone cost allocation method as unjust and unreasonable - the same method that would apply to projects approved through

---

[173] *See, e.g., KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992)(At its core, the cost causation principle requires that "all approved rates reflect to some degree the costs actually caused by the customer who must pay them."); *Illinois Commerce Commission v. FERC*, 576 F.3d 470, 477-478 (7th Cir. 2009); *El Paso Elec. Co. v. FERC*, 832 F.3d 495, 505 (5th Cir. 2016); *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 at P 622 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g*, Order No. 1000-B, 141 FERC ¶ 61,644 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

Attachment M-3.  The Court noted that projects known to "produce significant regional benefits within the PJM network . . .," *i.e.*, high-voltage projects, would be categorically prohibited from being eligible for cost sharing, and thus, the cost allocation method was unjust and unreasonable.[174] The Court stated that "the cost-causation principle prevents regionally beneficial projects from being arbitrarily excluded from cost sharing – a necessary corollary to ensuring that the costs of such projects are allocated commensurate with their benefits."[175]

LS Power offered ample evidence that there will be projects identified through the new Attachment M-3 process that will have significant regional benefits.  First, LS Power provided an analysis of 19 previously-approved Supplemental Projects that were put forward to address Transmission Facilities reaching the end of their useful life.[176]  The analysis demonstrated that the 19 end of life projects have significant regional benefits.[177]  The DFAX portion of the cost allocation method found 100% of the costs being misallocated for three projects.  For three other projects, the DFAX portion of the cost allocation method resulted in roughly 80% of the costs being misallocated.  By way of comparison, for the Element-Cunningham project, one of the projects at issue in *ODEC v. FERC*, the complaining transmission owner received 47% of the benefits.[178]  For the other project at issue, the Cunningham-Dooms project, the complaining transmission owner received 43% of the benefits of the project.[179]  Just two project examples, both high voltage transmission projects resulting from local planning criteria, led to the vacatur of the

---

[174] *ODEC v. FERC*, 898 F.3d at 1260.

[175] *Id.* at 1263.

[176] Exhibit A of LS Power Limited Answer.

[177] *Id.*

[178] *ODEC v. FERC*, 898 F.3d 1254 at 1261.

[179] *Id.*

cost allocation provisions for the entire category of Form No. 715 projects. The Commission ignored the 10 examples presented in the record with even greater misallocation than the two examples from *ODEC vs. FERC*. Together, the 19 projects total $779,000,000 and more than half, $393,000,000, would be reallocated to other zones under the regional cost allocation methodology. If the Commission requires further evidence, protestors also pointed to the forty-four projects that PJM had to reallocate following the Commission's Order on Remand from *ODEC v. FERC*, many of which were also related to aging infrastructure needs.[180] The Commission's failure to address arguments and substantial evidence of the misallocation of transmission costs is arbitrary and capricious.

In addition, a review of the new project categories and consideration of the types of projects that would be approved under the new categories demonstrates that the TO Proposal is not just, reasonable or compliant with Order No. 1000 because there is not a just and reasonable cost allocation method applicable to the EOL projects under the existing PJM Tariff.

Incidental Increase. The definition of Incidental Increase gives each PJM TO discretion to determine what is an Incidental Increase, which could result in high voltage transmission replacements through, for instance, updating "Transmission Owner design standards." As discussed above, the Commission has found that higher voltage transmission facilities are known to have "significant regional benefits" and as such should be eligible for regional cost allocation.[181] Yet, under the Incidental Increase definition, the Transmission Facility would be categorically excluded from regional cost allocation contrary to *ODEC v. FERC*.[182] Similarly, an in-kind

---

[180] *See* LS Power Protest at 37-38 (citing *PJM Interconnection, L.L.C.*, Compliance Filing, Docket No. ER18-680, Attachment A (filed on June 1, 2020)); New Jersey Board of Public Utilities Protest at 13-15.

[181] *ODEC v. FERC*, 898 F.3d at 1260-61.

[182] *Id.* at 1261.

replacement of a substation also could be categorized as an Attachment M-3 Project because it may have only an Incidental Increase.  In-kind replacements of substations, however, are eligible for regional cost allocation under Section 1.5.8(p) of the Operating Agreement and as Form No. 715 projects.  The Commission should not have ignored this contradiction in cost allocation methodologies.

Asset Management Project.  The definition of an Asset Management Project is even broader in scope than the definition of Incidental Increase and may include infrastructure security projects and system reliability projects.[183]  There is no record evidence in this proceeding that infrastructure security projects and system reliability projects only benefit the zone where the project is located.  Accordingly, the Commission's refusal to address the cost allocation issues results in a methodology found to be unjust and unreasonable.[184]

Attachment M-3 Projects.  Attachment M-3 Projects under Part (i) of the definition clearly have regional benefits as it is "an Asset Management Project that affects the connectivity of Transmission Facilities that are included in the Transmission System, affects Transmission Facility ratings or significantly changes the impedance of Transmission Facilities."[185]

---

[183] For instance, there is an ongoing PJM stakeholder process to address additional CIP 14 Projects that could be regionally allocated and regional planned.  A broad reading of Asset Management Projects qualifying under the *second* prong of Asset Management definition along with Attachment M-3 Definition (i) could result in regionally-beneficial Asset Management/ Attachment M-3 Projects with Incidental Increase from advancing under Attachment M-3, but limited to local cost allocation.

[184] *ODEC v. FERC*, 898 F.3d at 1260-61.

[185] Transmission Facilities is defined by the PJM Operating Agreement as: "facilities that: (i) are within the PJM Region; (ii) meet the definition of transmission facilities pursuant to FERC's Uniform System of Accounts or have been classified as transmission facilities in a ruling by FERC addressing such facilities; and (iii) have been demonstrated to the satisfaction of the Office of the Interconnection to be integrated with the PJM Region transmission system and integrated into the planning and operation of the PJM Region to serve all of the power and transmission customers within the PJM Region."

It also is possible that there could be the replacement of transmission lines operating at 765 kV, which would clearly have significant regional benefits under *ODEC v. FERC*.[186] The examples in Exhibit A of the LS Power Limited Answer also show that there are projects driven by the need to replace aging infrastructure that benefit more than one transmission zone.[187]

Part (iii) of the definition of Attachment M-3 Project is a catch all phrase that includes "any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 under any of clauses (1) through (5) of section (a)." The definition essentially limits regional cost allocation to only projects that result from clauses (1) through (5) of section (a) of the Applicability Section. There is no evidence in this proceeding that only those projects under Attachment M-3 Project (iii) have regional benefits. The definition also leaves open the possibility that there are projects planned by PJM pursuant to criteria not listed in clauses (1) through (5) of the Applicability Section that are not eligible for regional cost allocation.[188]

<u>EOL Need</u>.   While the preceding definitions are broad and encompass projects with regional benefits, the definition of EOL Needs is unreasonably limited. An EOL Need is defined as "a need to replace a transmission line between breakers operating at or above 100 kV or a transformer, the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities, which the Transmission Owner has determined to be near the end of its useful life, the replacement of which would be an Attachment M-3 Project." Under the

---

[186] 898 F.3d at 1260-61.

[187] For example, a future replacement of the AEP Kammer-Mountaineer 765kV line was shown to have local benefits of only 16.75 percent to the local AEP Zone under the new Attachment M-3 Project (i) definition, but 100% cost allocation to AEP zone. The other free-riding zones would be APS (5.77%), ATSI (21.63%), BGE (5.33%), DAYTON (3.35%), DEOK (13.23%), DL (8.53%), DVP (15.50%), EKPC (5.25%), OVEC (.32%), PEPCO-SMECO (4.34%).

[188] For instance, a future proposal could put PJM in charge of planning a new category of projects, such as a new category of public policy projects, but those projects would not be eligible for regional cost allocation because they are not planned pursuant to clauses (1) through (5) of section (a). *See* LS Power Protest at 23-24.

TO Proposal, a PJM TO identifies its EOL Needs and provides a list of its EOL Needs to PJM. PJM may determine during a regional planning cycle that there is a substantial overlap between an EOL Need and a "PJM Planning Criteria Need" or that a Required Transmission Enhancement would more efficiently or cost-effectively address the EOL Need. PJM conducts regional planning "for the enhancement and expansion of the Transmission Facilities . . . in the PJM Region."[189] Transmission Facilities are defined in the Operating Agreement and the definition is not limited to the facilities defined in EOL Needs. The definition of EOL Needs therefore limits, without explanation, projects that could otherwise be eligible for regional cost allocation, including some Form No. 715 projects. The definition also excludes without explanation substations, a category of projects that are currently eligible for regional cost allocation.[190] Had the Commission considered the record evidence demonstrating that the TO Proposal would categorically and arbitrarily prohibit from regional cost allocation projects with regional benefits, it undoubtedly would have rejected the proposal.

The Commission's failure to consider the record evidence demonstrating that the TO Proposal would categorically and arbitrarily prohibit from regional cost allocation projects with regional benefits is arbitrary and capricious.

I.      **The August 11 Order's failure to adjudicate the Motion to Consolidate Docket Nos. ER20-2046 and ER20-2308 Is Arbitrary, Capricious, and Does Not Reflect Reasoned Decision-making. (Statement of Error #12)**

On July 6, 2020, the Load Group filed a protest to the PJM Transmission Owners' June 12 filing. In their protest, the Load Group included a Motion to Consolidate and asked the Commission to consolidate the TO Proposal in Docket No. ER20-2046 with the Joint Stakeholder

---

[189] Operating Agreement at Section 1.1 of Schedule 6.

[190] LS Power Protest at 49.

Proposal in ER20-2308.[191]  The Load Group explained that consolidation is appropriate where the proceedings involve common issues of law and fact.[192]

On July 21, 2020, the TOs filed an answer to the protests, comments, motion for consolidation, and requests for additional procedures.  In their Answer, the TOs expressly answered the Load Group's Motion to Consolidate.[193]  The TOs argued that the motion should be denied and the "fact that a proposal to amend the Operating Agreement is also pending before the Commission at the same time does not demand consolidation of the two dockets."[194]

On July 31, 2020, the Load Group filed a Motion for Leave to Answer and Answer to the Transmission Owners' Answer to the Load Group's Protest.  In their July 31 Answer, the Load Group reiterated their request for the Commission to consolidate Docket Nos. ER20-2046 and ER20-2308 if the Commission does not outright reject the TOs' June 12 filing in ER20-2046.[195]

The Load Group's Motion to Consolidate, the TOs' July 21 Answer requesting denial of that motion, and the Load Group's July 31 Answer created a dispute and controversy that was ripe for consideration and adjudication by the Commission.  In the August 11 Order, the Commission indicated it accepted all the answers in this proceeding, which includes the PJM TOs' July 21 Answer and the Load Group's July 31 Answer.[196]  However, the August 11 Order did not even acknowledge the pending Motion to Consolidate and associated dispute, let alone adjudicate the

---

[191] *See* Load Group Protest, Docket No. ER20-2046, at 39-40.

[192] *See id.* at 40 (citing *Cal. Indep. Sys. Op. Corp.*, 94 FERC ¶ 61,147 at 61,558 (2001); *Pacific Gas & Elec. Co.*, 106 FERC ¶ 61,036 at P 20 (2004); *Seminole Elec. Coop., Inc.*, 149 FERC ¶ 61,210 at P 29 (2014)).

[193] PJM Transmission Owners July 21 Answer, Docket No. ER20-2046, at 56-58.

[194] *Id.* at 57.

[195] *See* Load Group July 31 Answer, Docket No. ER20-2046, at p. 3.

[196] August 11 Order at P 77 (accepting all answers otherwise prohibited because they assisted the Commission in its decision-making process).

Motion to Consolidate. Such failure to engage the Motion to Consolidate is arbitrary and capricious and does not reflect reasoned decision-making.[197] To avoid such an arbitrary and capricious decision, the Commission must consider all important aspects of a problem at issue[198] and respond meaningfully to the arguments raised before it.[199] Here, the Commission did not merely overlook an insignificant argument; the August 11 Order entirely failed to adjudicate a contested motion that raised important procedural issues regarding the underlying proceeding and a closely related proceeding.

The August 11 Order's unstated rejection of the Motion to Consolidate Docket Nos. ER20-2046 and ER20-2308 is unjust and unreasonable because it fails to account for the practical consequences of not consolidating the two proceedings. Acceptance of the TO Proposal in Docket No. ER20-2046 constitutes a tacit endorsement of procedural gaming by the TOs. As explained in this proceeding and in Docket ER20-2308, a group of Joint Stakeholders developed a proposal during the PJM stakeholder process (which resulted in PJM's July 2 filing of the Joint Stakeholder Proposal) well in advance of the TOs' unilateral decision to make their June 12 filing.[200] Stakeholders developed an End of Life ("EOL") problem statement and issue charge before the PJM Planning Committee in the fall of 2019.[201] As stakeholders closed in on finalizing their EOL

---

[197] *See Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, (1983)).

[198] *See e.g. Motor Vehicle Mfs. v. State Farm Mut. Ins. Co*., 463 U.S. 29, 43 (1983) ("an agency rule would be arbitrary and capricious if the agency . . . failed to consider an important aspect of the problem); *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1998) ("In previous cases, we have rejected agency orders when the Commission neglected to deal with an important part of the problem…") (*citing Laclede Gas Co. v. FERC*, 997 F.2d 936, 945-48 (D.C. Cir. 1993)); *North Carolina Util. Comm'n v. FERC*, 42 F.3d 659 (D.C. Cir. 1994).

[199] *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015).

[200] *See* LS Power Protest, Docket No. ER20-2046 at 9; Load Group July 31, 2020 Answer Docket No. ER20-2046 at 3-4.

[201] *See* Supporting Comments of the Joint Stakeholders, Docket No. ER20-2308, at 2-3 (filed July 23, 2020). The history of the Joint Stakeholder Proposal is described on pages 2-7 of the Joint Stakeholders' supporting comments in Docket No. ER20-2308.

proposal, the TOs in early May 2020 posted the required 30-day notice to indicate their intent to modify PJM Tariff Attachment M-3 to instead address EOL planning issues unilaterally.[202]  On May 21, 2020, the Joint Stakeholder Proposal was ready for a vote among PJM Members and received supermajority support, sending a clear signal where the majority of the stakeholders stood with respect to EOL planning issues.[203]  Despite the May 21 vote on the Joint Stakeholder Proposal, the PJM TOs disregarded the PJM stakeholder process and the will of PJM stakeholders and proceeded to make their unilateral Section 205 filing on June 12.[204]  Subsequently, PJM, on behalf of a supermajority of PJM stakeholders, submitted the Joint Stakeholder Proposal on July 2, 2020. As a result, the Commission received dueling Section 205 filings addressing the same issues around EOL planning.

Consolidation is appropriate when two proceedings involve common legal issues and facts and where "consolidation will ultimately result in greater administrative efficiency."[205]  The August 11 Order fails to consider that the proposals in ER20-2046 and ER20-2308 address common issues of law and fact.  Both Section 205 filings address procedures and planning for transmission facilities reaching their end of life.  The TO Proposal proposed revisions to Attachment M-3 of the PJM Tariff to identify certain asset management projects and to include planning procedures for end of life needs (EOL Needs).[206]  The Joint Stakeholder Proposal would revise the Operating Agreement to require PJM TOs to notify PJM that Transmission Facilities

---

[202] Supporting Comments of the Joint Stakeholders, Docket No. ER20-2308, at 5-6.

[203] *Id.* at 5-6.

[204] *Id.* at 6-7.

[205] *San Diego Gas & Elec. Co. v. Sellers of Energy and Ancillary Services et al.* , 135 FERC ¶ 61,177, at P 45 (2011) (citing *e.g., Sw. Power Pool, Inc.*, 125 FERC P 61,001, at P 26 (2008); *Startrans IO L.L.C.*, 122 FERC P 61,306, at P 64 (2008); *PP&L Resources, Inc.*, 90 FERC P 61,203, at 61,653 (2000)).

[206] *See* August 11 Order at P 1.

were reaching the end of operational life, and then require PJM to determine how to address needs arising from those Transmission Facilities through PJM's regional planning process.[207]  Both filings address whether a large and growing group of transmission projects in the PJM region "will be regionally or locally planned, will be open to competition or reserved to incumbent Transmission Owners, and [whether PJM] will use an open, transparent and coordinated process or a balkanized, piecemeal and opaque process."[208]

Both filings also raise important legal procedural issues governing the overlapping FPA Section 205 filing rights in two separate PJM governing documents – the Tariff and the Operating Agreement.  Acceptance of the TOs' Section 205 filing endorses the development of unilateral proposals without any regard to the stakeholder process and will further encourage preemptive unilateral filings by the TOs, resulting in a proliferation of dueling Section 205 proposals.  As in this proceeding, parties that are unhappy with the proposals flowing out of the stakeholder process will "race to FERC" to ensure their proposal is filed in advance of any stakeholder proposal with which they disagree (even if the stakeholder proposal received supermajority support) in order for the 60-day clock in FPA Section 205 to run out first on their proposal.[209]  As a result, affected parties (including the Commission) will need to incur more time and resources attendant to litigating two separate, but related Section 205 proposals.

Despite their common facts and legal issues, the August 11 Order concluded that "the Joint Stakeholders' proposal is not before us *here* and does not alter the FPA section 205 filing rights of

---

[207] *See* LS Power Protest, Docket No. ER20-2046 at 9.

[208] Supporting Comments of the Joint Stakeholders, Docket No. ER20-2308, at 7.

[209] Section 205(d) requires 60 days' notice prior to a change in rates.  16 U.S.C. § 824d(d).  Section 205(g) allows a proposed rate to take effect after 60 days even if the Commission does not issue an order on that proposed rate.  16 U.S.C. § 824d(g).

the PJM TOs."[210]  The August 11 Order asserted that the Commission need not determine in this proceeding whether a filing in another proceeding is more just and reasonable.[211]  However, the Joint Stakeholders were not asking FERC to compare the June 12 filing to the Joint Stakeholder Proposal and select the more just and reasonable proposal.[212]  Moreover, the Joint Stakeholder Proposal was before the Commission, and although the proposal was filed in a separate docket, the Commission was briefed and made aware of the Joint Stakeholder Proposal in this docket.  The August 11 Order failed to acknowledge that Docket Nos. ER20-2046 and ER20-2308 address common facts (*i.e.,* EOL planning), common legal substantive issues (*i.e.,* the scope and authority of PJM's planning compared to the Transmission Owners), and common legal procedural issues (*i.e.,* the overlapping Section 205 rights in PJM governing documents – the Tariff and the Operating Agreement).  Narrowly addressing only the TO Proposal and disregarding the information on the Joint Stakeholder Proposal in ER20-2308 (that was raised in ER20-2046) was unjust and unreasonable.  Because "the Commission does not regulate in a vacuum,"[213] the August 11 Order's failure to adjudicate the Motion to Consolidate and consider the impact of the Joint Stakeholder Proposal in ER20-2308 on the Transmission Owners' proposal in ER20-2046 was arbitrary and capricious and does not reflect reasoned decision-making.

**J.**     **The Commission ignored record evidence demonstrating that the TO Proposal conflicts with and limits the RTEP in the Operating Agreement. (Statement of Error #13)**

Parties in the proceeding raised detailed concerns over the ways in which the new definitions and procedures in the TO Proposal infringe on, and conflict with, the definitions and

---

[210] August 11 Order at P 87 (emphasis added).

[211] *Id.* at P 87.

[212] *Id.* at P 87.

[213] *See ISO New England Inc.*, at 158 FERC ¶ 61,138 at P 68 (2017).

regional planning procedures set forth in the Operating Agreement. Nowhere in the August 11 Order did the Commission address the specific concerns raised by parties regarding the conflicts between the revised Attachment M-3 and the existing regional planning process. Instead, the Commission summarily concluded in Paragraph 88 that the revisions are just and reasonable and "provide[] greater transparency."[214] It is arbitrary for the Commission to ignore the arguments and evidence before it and to not address the issues raised by protestors.[215]

The revisions included in Attachment M-3 shift authority to determine the scope of regional planning from PJM and the Members Committee to the PJM TOs. Although the regional planning process exists in the Operating Agreement, the new definitions in Attachment M-3 essentially write into the PJM Tariff limitations on the regional planning process. This in turn limits stakeholders' ability to revise the regional planning process while at the same time increasing the PJM TOs' authority over the regional planning process.[216] This is a significant issue and one the Commission should have addressed in the August 11 Order as the consolidation of authority over regional planning is contrary to Commission precedent.[217]

The most egregious revision is the new Applicability section, which significantly expands the PJM transmission owners' authority over transmission planning in the PJM region and conflicts with Order No. 1000.[218] Under section (a)(iii), the PJM transmission owners "shall be responsible for planning and constructing . . . any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address . . ." the criteria listed in clauses (1)

---

[214] August 11 Order at P 88.

[215] *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1990)(The Court remanded a Commission decision where the Commission failed to give serious consideration to an argument raised in the proceeding.).

[216] *See, e.g.*, Load Group Protest at 15.

[217] *See, e.g.,* Order No. 1000 at PP 6-9; Order No. 2000, 89 FERC ¶ 61,284 at P 485.

[218] *See, e.g.*, LS Power Protest at 53.

63

through (5) of section (a). In addition, the new phrase, "PJM Planning Criteria Need," similarly restricts the criteria that PJM can plan to planning for needs ". . . other than those reserved to each Transmission Owner in accordance with section (a)."

Prior to the Attachment M-3 revisions, PJM stakeholders, through the Members Committee, could revise the regional planning process to include new categories of projects and planning criteria, the only limitation being the definition of Supplemental Projects. Now the Members Committee cannot propose revisions without the PJM transmission owners making corresponding changes to the Applicability Section of Attachment M-3.[219] If the Members Committee were to create a new category of regional projects without corresponding changes to the PJM Tariff, the PJM transmission owners could assert responsibility over the construction and operation of the new projects by way of Attachment M-3, section (a)(iii).

The TO Proposal also gives the PJM TOs a new veto right over projects planned to meet Form No. 715 criteria. The veto right does not exist in Schedule 6 of the Operating Agreement. Specifically, section (d) of Attachment M-3, coupled with the definition of Form No. 715 EOL Planning Criteria, give the PJM TOs the right to veto end of life projects planned by PJM pursuant to the regional planning process. Attachment M-3 achieves this by allowing TOs to determine that a PJM identified project does not address the "projected EOL need . . . [and] propose a project to address the Form No. 715 EOL Planning Criteria." Thus, while section (a)(2) of Attachment M-3 appears to grant PJM the ability to plan for an individual transmission owner's Form No. 715 planning criteria, it is limited by reference to section (d) of Attachment M-3. Those additional

---

[219] *See, e.g.*, LS Power Protest at 58-60.

64

procedures allow TOs to reject the PJM planned project as not meeting the TO's need and to instead plan a project to meet the Form No. 715 need outside the PJM planning process.[220]

Prior to the TO Proposal, the Operating Agreement contained all the relevant transmission planning definitions, including the definition of Supplemental Projects. Going forward, the relevant planning definitions will be split between the Operating Agreement and Attachment M-3. This creates inconsistencies between the two. For instance, the Operating Agreement defines "Local Plan" and includes procedures for review of Local Plans by the PJM Transmission Expansion Advisory Committee ("TEAC") as well as for the incorporation of Local Plans in the RTEP. Under the definition of Local Plan, only Supplemental Projects and Subregional RTEP projects are included in the Local Plan. There is no reference to Attachment M-3 Projects or Asset Management Projects. Yet section (c) of Attachment M-3 requires the TEAC to review Attachment M-3 Projects and anticipates the inclusion of Attachment M-3 Projects in the Local Plan, which is then integrated with the RTEP. Similarly, section (d) provides for how and to what extent that EOL planning can be incorporated into PJM's regional planning process. This is a prime example of how Attachment M-3 extends beyond "local" planning and reaches into the regional planning process in conflict with the Operating Agreement terms.[221] Furthermore, the Operating Agreement is also explicit that the PJM Board does not approve Supplemental Projects or the Local Plan, however, it is unclear whether the PJM Board must approve Asset Management Projects and/or Attachment M-3 Projects as there is no exception for these projects in the Operating Agreement.

---

[220] *Id.* at 26-27.

[221] *See, e.g.*, LS Power Protest at 25.

There also is inconsistency over whether PJM or PJM TOs are responsible for planning for "system reliability."[222]  Supplemental Projects are defined as "a transmission expansion or enhancement that is not required for compliance with the following PJM criteria: *system reliability* . . .."[223] In contrast, Attachment M-3 section (a)(3) narrowly defines PJM's responsibility for reliability planning to "NERC Reliability Standards (which includes Applicable Regional Entity reliability standards)."[224]  The Commission's failure to address these and other inconsistencies between the Operating Agreement and the TO Proposal Attachment M-3 is arbitrary and capricious.

### K.   The Commission erred in finding that including End of Life Criteria in Form No. 715 is voluntary. (Statement of Error #14)

#### 1.   The PJM TOs do not have unilateral filing rights to revise the regional planning process for Form No. 715 Projects.

As an initial matter, and as discussed in Section B.1. above, the PJM TOs do not have exclusive unilateral filing rights to file changes to the scope and procedures for regional transmission planning in PJM, which includes planning for Form No. 715 projects.  There is no question that PJM, not the TOs, is responsible for planning for Form No. 715 criteria.  Both the Operating Agreement and PJM Tariff acknowledge that PJM is responsible for planning for an individual transmission owner's Form No. 715 criteria.[225]  The Commission also acknowledged in Paragraph 86 of the August 11 Order that the PJM TOs "did transfer to PJM the responsibility to plan for criteria included in Form No. 715 . . .."[226]

---

[222] *See, e.g.*, LS Power Protest at 47-48.

[223] Operating Agreement, Definitions S-T.

[224] Operating Agreement, Definition Section, Supplemental Project [emphasis added].

[225] Operating Agreement, Schedule 6, Section 1.2.

[226] August 11 Order at P 86.

The TO Proposal, however, alters PJM's planning for Form No. 715 criteria by reserving to the PJM TOs the authority to veto PJM's regional solution.[227]  Specifically, Attachment M-3 section (d) coupled with the definition of Form No. 715 EOL Planning Criteria, gives the PJM TOs the right to determine that a PJM identified project does not address the "projected EOL need . . . [and] propose a project to address the Form No. 715 EOL Planning Criteria."  Thus, while Attachment M-3 section (a)(3) appears to recognize PJM's authority to plan to Form No. 715 planning criteria, it is limited by reference to section (d) of Attachment M-3.  In other words, Attachment M-3 allows TOs to reject the PJM planned project as not meeting the TO's need and to instead plan a project to meet the Form No. 715 need outside the PJM planning process.[228]  The Commission had no basis to accept the TO Proposal's alteration of planning for Form No. 715 criteria, as the PJM TOs do not have authority to do so.

### 2. The August 11 Order misinterpreted the Form No. 715 filing requirement as voluntary, thereby creating cost allocation issues.

The Commission concluded without discussion that a TO "may voluntarily include end of life criteria in its Form No. 715."[229]  The Commission provided no citation for this broad determination.[230]  Nothing in the statute underlying Form No. 715 nor the rulemaking creating the Form No. 715 filing requirement supports the Commission's determination that compliance with Form No. 715 is voluntary.  Nor is there any precedent to support the conclusion that a TO may choose to simply not include planning criteria in its mandatory Form No. 715 filing if the criteria

---

[227] Attachment M-3 (d)(2).

[228] *See, e.g.*, LS Power Protest at 26-27.

[229] August 11 Order at P 86.

[230] Pub. L. No. 102-486, 106 Stat. 2276 (1992) codified at 16 U.S.C. § 824*l*.

meet the requirements set forth in Order No. 558.[231]  The Court's discussion in *ODEC v. FERC*,

addressed this very issue, finding that the Form No. 715 filing is not voluntary:

> Moreover, Form 715 is not limited to projects with purely local benefits.  To the contrary, it implements Section 213(b) of the Federal Power Act, which *requires* utilities to inform FERC of *all* "potentially available transmission capacity and known constraints."  16 U.S.C. § 824l(b).  In addition, under FERC regulations, utilities must submit "a detailed description of the transmission planning reliability criteria used to evaluate system performance."  New Reporting Requirement Implementing Section 213(b) of the Federal Power Act, 58 Fed. Reg. 52,420, 52,421 (Oct. 8, 1993) (Form No. 715 Reporting Requirement Order); see 18 C.F.R. § 141.300(a).  Neither the statute nor the implementing regulation limits reportable criteria to those involving projects with only local benefits.[232]

The August 11 Order is a wholesale departure from the requirements of set out in the Form No.

715 Reporting Requirement Order and the *ODEC*.  Without explanation of that departure, the

August 11 Order is arbitrary and capricious.[233]  Because the requirements of Form No. 715

substantially conflict with the Tariff revisions in the TO Proposal, the Commission's failure to

substantively address the issue does not comport with reasoned decision-making.

The Commission also failed to address the evidence included in LS Power's Protest

establishing that end of life criteria must be included in a transmission owner's Form No. 715.[234]

LS Power's evidence demonstrated not only the substance of the Form No. 715 requirement as it

---

[231] Order No. 558, 58 FR 52420.

[232] *ODEC v. FERC*, 898 F.3d at 1262-1263.

[233] 5 U.S.C. § 706(2)(A); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-982 (2005)("Unexplained inconsistency is. . . a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the Administrative Procedure Act.") (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 436 U.S. 29, 46-57 (1983)); *United Mun. Distribs. Group v. FERC*, 732 F.2d 202, 210 (D.C. Cir. 1984) ("[A]n agency must conform to its prior practice and decisions or explain the reason for its departure from such precedent."); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute."); *CPUC v. FERC*, 879 F.3d 966, 978 (9th Cir. 2018) (The Commission "merely asserted that it had the authority to grant incentive adders. . . . . . the orders on review were a departure from Order 679's terms and the longstanding policy it incorporates. Without any acknowledgment or explanation of that departure, the orders were arbitrary and capricious.").

[234] LS Power Protest at 61-63.

relates to the new Attachment M-3 project categories, but also the impact of the failure of some transmission owners to include end of life criteria in their Form No. 715 filings. The consequence of the Commission's determination that it is at the discretion of individual PJM TOs whether to include end of life planning criteria in their Form No. 715 filing goes to the very heart of the D.C. Circuit's determination in *ODEC v. FERC*. In that case, the Court found that end of life projects included in Form No. 715 criteria have regional benefits and cannot be arbitrarily excluded from regional cost allocation. Yet, the August 11 Order allows an identical category of projects, planned for identical reasons, and known to result in the need for regionally beneficial projects,[235] to be treated differently for cost allocation purposes.[236]

> ### 3. The Commission erred in approving revisions to Attachment M-3 section (d) that impose new procedures for regional planning contrary to Order No. 1000.

The TO Proposal impermissibly includes planning procedures for Form No. 715 projects. As noted above, the regional planning process is located in the Operating Agreement, controlled by the Members Committee. The TO Proposal revises PJM's regional planning process by introducing new procedures that PJM must undertake while conducting the regional planning process.[237] The TO Proposal adds a requirement that in planning for Form No. 715 Projects, PJM must consider a TO's "EOL Needs" and engage in a back and forth over the potential solution. It

---

[235] *See PJM Interconnection, L.L.C.*, Compliance Filing, Docket No. ER18-680, Attachment A (filed on June 1, 2020).

[236] LS Power at 37. LS Power included in its Protest an example of a project located in two zones but treated differently for purposes of cost allocation. Dominion is responsible for a 3-mile portion of the Doubs-Goose Creek 500 kV transmission line as the end of life need was part of Dominions Form No. 715 criteria. At the same time, APS (FE) has included its 15-mile portion of the Doubs-Goose Creek 500 kV as a Supplemental Project. Both pieces are the same end of life project. The Dominion portion will be cost allocated region-wide based on its regional benefits because Dominion's end of life criteria are filed with its Form No. 715 criteria. The APS section will be cost allocated only to the zone in which the project is located because it is a Supplemental Project, notwithstanding that its benefits are identical.

[237] *See* Attachment M-3, Applicability (a)(iii)(2). "2. Individual Transmission Owner planning criteria as filed in FERC Form No. 715 and posted on the PJM website, *provided that the Additional Procedures for the Identification and Planning of EOL Needs, set forth in section (d), shall apply, as applicable*."

also authorizes the TOs to reject the PJM planned solution, an opportunity that does not currently exist in Operating Agreement Schedule 6. Revised Attachment M-3 leaves open the possibility that a project planned to address a transmission owner's Form No. 715 planning criteria is categorized as an Asset Management Project. Although Attachment M-3 section (a)(2) purports to exclude criteria filed in a PJM TO's Form No. 715, the procedures in Attachment M-3 section (d) apply. As explained above, the procedures in Attachment M-3 section (d) give the PJM TOs the right to reject the PJM planned solution. If a TO rejects the PJM planned solution, then it could propose an alternative local solution that meets the definition of an Asset Management Project. This result is inconsistent with the Operating Agreement, which requires PJM plan to meet Form No. 715 criteria, including the EOL criteria that some PJM TOs include in their Form No. 715. This simply does not square with the Commission's determination that the revisions to Attachment M-3 are exclusively the authority of the PJM TOs and the Commission offers no explanation for the inconsistency. The Commission's failure to address this inconsistency renders the decision arbitrary and capricious.

## IV.     CONCLUSION

WHEREFORE, for the foregoing reasons, the Protesting Parties request that the Commission grant rehearing of the August 11 Order and reject the TO Proposal in its entirety.

Respectfully submitted,

/s/ Lisa G. McAlister
Lisa G. McAlister
General Counsel for Regulatory Affairs
Gerit F. Hull
Deputy General Counsel for Regulatory Affairs
American Municipal Power
1111 Schrock Road, Suite 100
Columbus, Ohio 43229
614.540.6400 (office)
614.325.6395 (cell)
lmcalister@amppartners.org

/s/ Lisa G. McAlister
Lisa G. McAlister
General Counsel
AMP Transmission, LLC
111 Schrock Road, Suite 100
Columbus, Ohio 43229
614.540.6400 (office)
614.325.6395 (cell)
lmcalister@amppartners.org

/s/ Alice Wolfe
Alice Wolfe
General Manager
Blue Ridge Power Agency
PO Box 2310
730 W Main St
Salem, VA 24153
540-739-5899
awolfe@brpa.org

/s/ Regina A. Iorii
Regina A. Iorii
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 4th Floor
Wilmington, DE 19801
(302) 577-8159 (Office)
(302) 893-0279 (Cell)
regina.iorii@delaware.gov

In the Capacity of Counsel to the Delaware Division of the Public Advocate Only

/s/ Sandra Mattavous-Frye
Sandra Mattavous-Frye
People's Counsel for the District of Columbia
Karen R. Sistrunk
Deputy People's Counsel
Anjali G. Patel
Frederick (Erik) Heinle III
Assistant People's Counsel
Office of the People's Counsel for the District of Columbia
1133 15th Street, N.W., Suite 500
Washington, DC 20005-2710
202-261-1182
fheinle@opc-dc.gov

/s/ Arthur W. Iler
Arthur W. Iler
Deputy Consumer Counselor – Federal
Indiana Office of Utility Consumer Counselor
115 W. Washington St., Ste. 1500 South
Indianapolis, IN 46204
(317) 233-3234
ailer@oucc.in.gov

71

JA0527

/s/ Michael R. Engleman
Michael R. Engleman
Christina Switzer
Engleman Fallon, PLLC
1717 K Street, NW
Suite 900
Washington, DC 20006
Tel. (202) 464-1332
E-mail: mengleman@efenergylaw.com
cswitzer@efenergylaw.com

*Counsel for LSP Transmission Holdings II, LLC*

/s/ Stephanie Brand
Stefanie Brand, Esq., Director
Brian Lipman, Esq.
Felicia Thomas-Friel, Esq.
Henry Ogden, Esq.
New Jersey Division of Rate Counsel
140 East Front Street, 4th Floor
P.O. Box 003
Trenton, NJ 08625
Telephone: (609) 984-1460
Facsimile: (609) 292-2923
sbrand@rpa.nj.gov
blipman@rpa.nj.gov
fthomas@rpa.nj.gov
hogden@rpa.nj.gov

/s/ Adrienne E. Clair
Adrienne E. Clair
Thompson Coburn LLP
1909 K Street NW
Suite 600
Washington, DC 20006
Phone: (202) 585-6919
aclair@thompsoncoburn.com

*Counsel to Old Dominion Electric
Cooperative*

/s/ Jacqueline Lake Roberts
Jacqueline Lake Roberts, Esq.
West Virginia Consumer Advocate
300 Capitol Street, Suite 810
Charleston, WV 25301
304.558.0526
jroberts@cad.state.wv.us

/s/ Robert A. Weishaar, Jr.
Robert A. Weishaar, Jr.
McNees Wallace & Nurick LLC
1200 G Street, NW
Suite 800
Washington, DC 20005
Phone: (202) 898-0688
bweishaar@mcneeslaw.com

Susan E. Bruce
Kenneth R. Stark
McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA 17101
Phone: (717) 237-8000
sbruce@mcneeslaw.com
kstark@mcneeslaw.com

*Counsel to the PJM Industrial Customer
Coalition*

/s/ Brian M. Vayda
Brian M. Vayda
Executive Director
Public Power Association of New Jersey
One Ace Road
Butler, NJ 07405
(732) 236-7241
bvayda@ppanj.net

/s/ Thomas Lindgren
Dave Yost
Ohio Attorney General
John H. Jones
Section Chief
Thomas Lindgren
Assistant Attorney General
Public Utilities Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215-3414
614.466.4395 (telephone)
614.644.8764 (fax)
john.jones@ohioattorneygeneral.gov
thomas.lindgren@ohioattorneygeneral.gov

On Behalf of The Public Utilities Commission
of Ohio's Office of The Federal Energy
Advocate

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date caused a copy of the foregoing document to be

served on each person included on the official service list maintained for this proceeding by the

Commission's Secretary, by electronic mail or such other means as a party may have requested,

in accordance with Rule 2010 of the Commission's Rules of Practice and Procedure, 18 C.F.R. §

385.2010.

Dated this the 10th day of September, 2020.

*/s/ Lisa G. McAlister*
Lisa G. McAlister

Document Content(s)

CLEAN ER20-2046 Joint Protestors Rehearing  9.10.20.PDF...................1

JA0530

**UNITED STATES OF AMERICA**
**BEFORE THE**
**FEDERAL ENERGY REGULATORY COMMISSION**

| | | |
|---|---|---|
| PJM Interconnection, L.L.C. | ) | Docket No. ER20-2046 |
| | ) | |
| American Transmission Systems, | ) | |
|    Incorporated, et al. | ) | |

**REQUEST FOR REHEARING**
**OF THE**
**NEW JERSEY BOARD OF PUBLIC UTILITIES**

Pursuant to Section 313(a) of the Federal Power Act ("FPA") and 18 C.F.R. § 385.713, the New Jersey Board of Public Utilities ("Board" or "NJBPU") requests rehearing of the Order of the Federal Energy Regulatory Commission ("Commission") accepting the PJM Transmission Owners' end of useful life planning revisions to the PJM Open Access Transmission Tariff ("Tariff"), which issued on August 11, 2020 in the above-referenced proceeding.[1]     The Commission's acceptance of the Tariff revisions is unjust and unreasonable for violating the Order 890 transparency principles.     Moreover, the Commission's decision to ignore cost concerns is reversible error.     Finally, the Commission erred for arbitrarily applying reasoning from California to the PJM region.     On these grounds, the Board now requests rehearing of the Order.

## I.     BACKGROUND

On June 12, 2020, PJM Interconnection, L.L.C. ("PJM") filed proposed amendments to the PJM Open Access Transmission Tariff ("Tariff") on behalf of the PJM Transmission Owners, pursuant to section 2105 of the Federal Power Act ("FPA").[2]     The Tariff amendments expand Attachment M-3 to include a new class of projects broadly referred to "asset management

---

[1] *PJM Interconnection, L.L.C.*, Order Accepting Proposed Tariff Revisions, 172 FERC 61,136 (Aug. 11, 2020) ("August 11 Order").

[2] *American Transmission Systems, Inc.*, Amendments to Attachment M-3 to the PJM Interconnection, L.L.C. Open Access Transmission Tariff, Docket No. ER20-2046 (June 12, 2020) ("TO Filing").

projects," which include projects at the end of their useful service lives – or end of life projects. The Board protested those Tariff amendments and filed an Answer urging the Commission to reject the amendments on the grounds that they hindered competition, lacked the required level of transparency under Order 890, and violate the cost-causation principle.[3]  Notwithstanding the Board's protest and others, the Commission issued an Order accepting the Transmission Owners' revisions as just and reasonable on August 11, 2020.[4]

The Board is deeply troubled by rising transmission costs, driven by unchecked Transmission Owner investment.  Across the entire PJM region, spending on transmission infrastructure has steadily increased since 2006.[5] After transmission spending remained between approximately $1.7 billion and $3.7 billion from 2005 to 2009, it rose to approximately $8 billion in 2018.[6]  Transmission owners invested approximately $69.6 billion in baseline and supplemental projects from 2005 through 2019.[7]  New Jersey has been particularly hard hit.  For example, over a third of PJM's total $55.6 billion in transmission between 2015 and 2019 occurred in New Jersey.[8]  PSE&G ratepayers faced transmission rate increases of 124% from 2013 to 2017.[9]  Those transmission rates have only continued to rise in the last three years.[10]  So far in 2020, baseline

---

[3] American Transmission Systems, Inc., and PJM Interconnection, L.L.C., Motion to Leave for Answer and Answer of the New Jersey Board of Public Utilities, Docket No. ER20-2046 (Aug. 5, 2020); American Transmission Systems, Inc., and PJM Interconnection, L.L.C., Protest of the New Jersey Board of Public Utilities, Docket No. ER20-2046 (July 6, 2020).
[4] Order Accepting Proposed Tariff Revisions,
[5] August 11 Order.
[6] See 2019 Project Statistics, Transmission Expansion Advisory Committee, at 3 (May 12, 2020).
[7] Calculation done using data from 2019 Project Statistics, Transmission Expansion Advisory Committee, at 3 (May 12, 2020).
[8] Calculations done using data from PJM Interconnection L.L.C., PJM Update to ISAC at 14 (Jan. 28, 2019).
[9] S*ummary of PJM Transmission Rates and Charges*, Ken Rose for American Municipal Power (Sep. 21, 2017), at 19, *available at:* https://www.amppartners.org/Assets/AMP_Rose_Transmission.pdf.
[10] *See* 2020 Transmission Formula Rate Annual Update, PSE&G (Jan. 17, 2020), *available at* https://www.pjm.com/markets-and-operations/billing-settlements-and-credit/formula-rates.aspx.

Document Accession #: 20200910-5286    Filed Date: 09/10/2020

and Supplemental Projects are nearly neck-to-neck, with $31.1 billion approved in baseline projects and $28.8 billion approved in Supplemental Project planning.[11]

A significant portion of this transmission spending is tied to Supplemental Projects, planned under Attachment M-3 of the Tariff. In New Jersey, PSE&G alone has been responsible for more than $9 billion in investment in Supplemental Projects.[12] Across the entire PJM zone in 2019, $3.4 billion was invested in Supplemental Project planning while only $1.46 billion was invested in baseline project planning.[13] The prior year, those numbers were $6.7 billion compared to a mere $2.1 billion.[14] An important trend that is visible in that data from 2005 to 2019 is that in 2005, in general, more baseline projects than Supplemental Projects were planned; whereas by 2019, that was, in general, reversed.[15] By increasing the number of projects planned under Attachment M-3, these numbers will continue to be skewed. This means that, in general, fewer projects are likely to be planned with the benefit of competition.

The sheer number of transmission projects that will be affected by these end of life Tariff revisions makes this matter especially important. By PJM's own admission, end of life projects in 2019 represented approximately a quarter of all projects driven by Transmission Owner criteria violations.[16] PJM has reported that "[t]wo-thirds of all system assets in PJM are more than 40 years old; over one-third are more than 50 years old."[17] In 2019, EOL end of life conditions formed the largest category of spending for supplemental projects within PJM.[18] That same year, spending

---

[11] See "Annual Approved RTEP Projects," Planning, found at: https://pjm.com/planning.aspx.

[12] *Inquiry Regarding the Commission's Electric Transmission Incentives Policy*, Initial Comments of the New Jersey Board of Public Utilities and the New Jersey Division of Rate Counsel at 17, Docket No. PL19-3 (June 26, 2019) ("Initial Comments of the NJ Parties").

[13] 2019 Project Statistics, Transmission Expansion Advisory Committee, at 3 (May 12, 2020).

[14] 2019 Project Statistics, Transmission Expansion Advisory Committee, at 3 (May 12, 2020).

[15] See, generally, See Mark Sims, PJM RTEP Update at 2, PJM (May 18, 2020).

[16] See Mark Sims, PJM RTEP Update, PJM (May 18, 2020).

[17] PJM, *The Benefits of the PJM Transmission System* at 5 (April 16, 2019), *available at* https://www.pjm.com/-/media/about-pjm/newsroom/fact-sheets/the-value-of-transmission.ashx.

[18] PJM Transmission Expansion Advisory Committee, *2019 Project Statistics* at 6 (May 12, 2020).

for supplemental projects within PJM was approximately $3.4 billion, compared with $1.45 billion for baseline projects.[19] Of the money spent on baseline projects, $243 million was to address end of life criteria violations in 2019.[20] These numbers speak for themselves.

## II. SPECIFICATION OF ERRORS

Pursuant to Rule 713(c)(1) of the Rules of Practice and Procedure of the Commission,[21] the Board submits the following specification of errors with respect to the August 11 Order:

1. The August 11 Order unjustly and unreasonably fails to uphold Order 890 planning principles.

2. The Commission erred for failing to address cost concerns.

    1. The Commission may not simply ignore the cost consequences of a Section 205 Filing.

    2. It is arbitrary and capricious to violate the cost causation principle.

3. The August 11 Order arbitrarily applies reasoning in the *California Orders* to PJM.

## III. STATEMENT OF ISSUES

Pursuant to Rule 713(c)(2) of the Rules of Practice and Procedure of the Commission,[22] the Board submits the following statement of issues with respect to the August 11 Order.

1. Whether the August 11 Order unjustly and unreasonably fails to uphold Order 890 planning principles. *Preventing Undue Discrimination & Preference in Transmission Serv.*, Order No. 890, 118 FERC ¶ 61,119 ("Order No. 890"); *Monongahela Power Company*, 162 ¶ 61,129 (2018); *Monongahela Power Company, et al.*, 156 FERC 61,134 (2016). *PJM Interconnection, L.L.C.*, 171 FERC ¶ 61,212 (2020).

2. Whether the Commission erred in failing to consider cost. *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005). *Penn. Water & Power Co. v. Federal Power Com.*, 343 U.S. 414, 418 (1952).

---

[19] *Id.* at 3.
[20] *Id.* at 5.
[21] 18 C.F.R. § 385.713(c)(1).
[22] 18 C.F.R. § 385.713(c)(2).

1. Whether the Commission may simply ignore the cost consequences of a Section 205 Filing. 16 U.S.C. § 824d. *Ala. Elec. Coop. Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982). *El Paso Elec. Co. v. FERC*, 832 F.3d 495, 502 (5th Cir. 2016). *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1256 (D.C. Cir. 2018).

2. Whether it is arbitrary and capricious to violate the cost causation principle. *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 (2011). *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1256 (D.C. Cir. 2018).

3. Whether the Commission arbitrarily applied reasoning in the California Orders to PJM. *Southern California Edison Co.*, 164 FERC ¶ 61,160 at P 37 (2018); *Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161, at P 68 (2018).

## IV. REQUEST FOR REHEARING

The Board seeks rehearing of the August 11 Order on the following grounds. First, the August 11 Order unjustly and unreasonably fails to uphold Order 890 transparency principles. Second, the Commission erred in failing to consider cost. Finally, the Commission arbitrarily applied the *California Orders* to PJM.

### 1. The August 11 Order Unjustly And Unreasonably Fails To Uphold Order 890 Planning Principles.

The August 11 Order unjustly and unreasonably fails to uphold Order 890 transmission planning principles. The transmission planning principles established in Order 890 were meant to reduce "'opportunities for undue discrimination in transmission planning' by requiring transmission providers to facilitate the timely and meaningful input and participation of stakeholders in the development of transmission plans."[23]  In Order 890, the Commission concluded that inadequate transparency increases opportunity for undue discrimination.[24]  Indeed,

---

[23] *Monongahela Power Co.,* 162 FERC ¶ 61,129 at P 5 (2018) ("*Monongahela*"), *order on reh'g and compliance*, 164 FERC ¶ 61,217 (2018) (citations omitted).

[24] *Preventing Undue Discrimination & Preference in Transmission Serv.*, Order No. 890, 118 FERC ¶ 61,119 at P 51 ("Order No. 890"), *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297 (2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*, Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D, 129 FERC ¶ 61,126 (2009).

the Commission has acknowledged that "[w]e cannot rely on the self-interest of transmission providers to expand the grid in a non-discriminatory way."[25] Thus, the transparency principles are intended to avoid "after-the-fact" litigation by stakeholders over transmission projects that were developed and planned without their input.[26]

The Commission has previously deemed inadequately transparent planning processes to be unjust and unreasonable and ordered that they be modified.[27] In 2016, the Commission issued a Show Cause Order regarding PJM's planning process for Supplemental Projects because of concerns that, as implemented, the transmission planning process was not providing stakeholders with opportunity for early and meaningful input and participation in the transmission planning process, as required by Order No. 890.[28] The Commission specifically identified evidence that, in violation of those transparency principles, (1) a significant amount of planning was occurring before the need for projects was brought to PJM and (2) PJM Transmission Owners were identifying and developing projects before stakeholders had an opportunity to meaningfully participate in the process.[29] In that Order, the Commission ordered the PJM Transmission Owners to demonstrate their compliance with Order 890 transparency principles.[30]

Upon review of the Transmission Owners' compliance filing, the Commission found that the current process was unjust and unreasonable because it violated Order 890's coordination and transparency principles.[31] Specifically, the Commission found that the Transmission Owners were providing planning information such as models, criteria, and assumptions too late in the planning

---

[25] Order 890 at P 422.
[26] Order 890 at P 471.
[27] *Monongahela* at P79-82 (2018) (finding that the local planning process for supplemental projects failed to provide stakeholders with meaningful opportunities to participate, and therefore violated FERC's transmission planning principles).
[28] *See, e.g.*, *Monongahela Power Company, et al.*, 156 FERC 61,134 at P 1 (2016) ("Show Cause Order").
[29] *Show Cause Order* at P 13.
[30] *Id.*
[31] *Monongahela* at P 70.

Document Accession #: 20200910-5286     Filed Date: 09/10/2020

process.[32]  As a result, stakeholders were unable to meaningfully comment on these projects before significant steps had been taken toward developing Supplemental Projects.[33]  When it comes to aging infrastructure, the Commission rejected the PJM Transmission Owners' argument that transparency is pointless when the "most obvious solution" is to rebuild aging infrastructure.[34]  The Commission held that Order 890's transparency principles are, in part, to prevent undue discrimination by ensuring that stakeholders can advocate for alternative solutions – not merely replacement of aging infrastructure by the incumbent utility.[35]

Here, the Transmission Owners' amendments unjustly and unreasonably violate Order 890's transparency requirements.  Stakeholders are unable to meaningfully participate in end of life planning and are unable to fully evaluate alternative solutions.  In fact, much like the Commission identified in its 2016 Show Cause Order, a significant amount of planning for end of life projects occurs before stakeholders are able to participate.  The Transmission Owners are only required to share end of life lists with PJM.[36]  The Candidate Need Lists, which identify end of life needs expected in the next five years, are not directly provided to state commissions.[37]  Moreover, stakeholders' ability to replicate results will likely be impacted because they will not be presented with the same information as PJM.  Despite these plain issues with the Transmission Owners' proposed amendments, the Commission accepted them.

The lack of transparency over end of life projects, which constitute a major portion of all transmission planning in the PJM region, is contrary to the Commission's goals of utilizing Order

---

[32] *Monongahela* at P 77.
[33] *Monongahela* at P 77.
[34] *Monongahela* at P 79.
[35] *Monongahela* at P 79.
[36] TO Filing, Exhibit A, Attachment M-3 § (d)(2)(i).
[37] The Transmission Owners require state commissions to seek the information from them, which indicates an unwillingness to directly provide transparency to state commissions.

890 to ensure that alternative solutions are explored and avoiding after-the-fact litigation.[38]  As stakeholder participation is necessary to create the best solution, the lack of stakeholder input will hinder the development of best solutions and increase after-the-fact litigation for a large number of projects.  That result is unjust and unreasonable.  Ensuring that alternative solutions are fully explored lies at the heart of Order 890's transmission planning principles; and it is critically important when such a large percentage of transmission projects will be affected.

In conclusion, the Commission's finding that Order 890's transparency principles do not apply is unjust and unreasonable because it will result in increased discrimination by hindering meaningful participation, and thereby increase after-the-fact litigation, for a significant number of projects.  The Commission's explanation that this result is somehow offset by the "incidental" expansions caused by these projects – which in and of itself is questionable – is simply not a good enough reason for allowing such broad discrimination.  For that reason, the Commission must grant rehearing of the Order.

## 2.   The Commission Erred In Failing To Consider Cost.

The Commission erred by failing to consider cost.  With respect to cost allocation, the August 11 Order finds "that issue is beyond the scope of this proceeding," because the proposed Tariff revisions "propose no changes to cost allocation."[39]   As described below, this decision is arbitrary and capricious, as it ignores the rate consequences of the tariff revisions, and because it will result in rates that violate the cost-causation principle.

---

[38] *Monogahela* at P 79 ("[T]he most obvious solution will not always be the best solution.").
[39] Order accepting Tariff Revisions at P 91.

### 1. The Commission May Not Simply Ignore the Cost Consequences of a Section 205 Filing.

The Commission may not simply ignore the cost consequences of a party's section 205 filing.  The Commission has a statutory obligation to ensure that transmission rates remain just, reasonable, and not unduly discriminatory or preferential.[40]  Here, the Commission held that cost allocation was beyond the scope of this proceeding, because "[t]he proposed revisions to Attachment M-3 include no revisions to Schedule 12 of the PJM Tariff, and propose no changes to cost allocation."[41]  The cost consequences of the instant filing cannot be summarily overlooked where the Commission is required to accept just and reasonable rates.  For this reason, this Commission must grant rehearing.

The Federal Power Act gives FERC jurisdiction over facilities that transmit electricity in interstate commerce.[42]  The FPA requires the Commission to ensure that utilities charge "just and reasonable" rates.[43]  "Consideration of costs reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* disadvantages of agency decisions."[44]  Where the Commission ignores the cost consequences of its actions, thereby inadvertently creating unjust and unreasonable rates, it acts in an arbitrary and capricious manner.[45]

The Commission did not address cost, finding it to be beyond the scope of the proceeding.[46]  This failure to address cost was in error.  While the Commission correctly noted that the amendments do not expressly amend Schedule 12 of the tariff, dealing with cost allocation, the

---

[40] 16 U.S.C. § 824d.

[41] August 11 Order at P 91.

[42] *See* 16 U.S.C. § 824(b)(1); 42 U.S.C. § 7172(a)(1)(B).

[43] 16 U.S.C. § 824d(a).

[44] *Michigan v. EPA*, 576 U.S. 743, 753 (2015) (emphasis in original); *see also Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 662 (D.C. Cir. 2017) (approving of the Commission's consideration of costs of a new capacity market).

[45] *See El Paso Elec. Co. v. FERC*, 832 F.3d 495, 502 (5th Cir. 2016); *see also ODEC*, 898 F.3d at 1260.

[46] August 11 Order at P 91.

Commission cannot simply ignore the fact that the amendments to attachment M-3 will surely increase the number of projects that will receive local cost allocation pursuant to Schedule 12. That effect impacts ratepayers in the State of New Jersey. That effect is something the Commission is obligated to consider.[47]

It is more than a little arbitrary and capricious for the Commission to assume that because the M-3 revisions make no changes to Schedule 12, there are no cost consequences to the M-3 tariff revisions. For instance, the Metuchen-Trenton-Burlington, a Form 715 transmission project, line project's costs have been allocated according to DFAX methodology, rather than to the local zone.[48] Under the Attachment M-3 amendments, the MTB project, because it addresses end of life criteria, could be planned in accordance with other supplemental projects under Attachment M-3 and subsequently have costs allocated locally, an outcome that this Commission has already rejected.[49] A project planned under Attachment M-3 receives local cost allocation under Schedule 12 of the tariff. Projects which could be planned under the revisions to attachment M-3, however, are not limited to projects that solely benefit local customers, and may have regional benefits. While the M-3 amendments do not change the underlying costs of projects, they have an impact on who will ultimately pay for those projects. The Commission must consider the cost consequences of accepting the M-3 amendments, or must explain why it is not required to do so.

While the Attachment M-3 amendments may not amend Schedule 12 on their face, they clearly control which type of cost allocation under Schedule 12 a project will receive. Therefore, the cost implications of the amendments cannot be fairly divorced from the amendments to M-3

---

[47] *See Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005) (The Commission is obliged to "respond meaningfully to the arguments raised before it.").
[48] *PJM Interconnection L.L.C.*, 171 FERC ¶ 61,013 at P 18 (2020).
[49] *Id.* at P 20 (rejecting arguments raised by Long Island Power Authority and Neptune that the MTB project should not be included in regional cost allocation as it was needed solely to address PSEG end of life criteria).

planning criteria.  The D.C. Circuit has stated that nothing prevents PJM from "amending the Tariff, the Operating Agreement, or PJM's own planning criteria . . . to establish appropriate end-of-life planning criteria . . .*as long as any amendment respects the cost-causation* principle."[50]  In *ODEC*, the D.C. Circuit recognized a fact that the Commission has chosen to ignore in its August 11 order:  changes to planning criteria, including end-of-life planning criteria, may have some effect on costs, and because of that, any changes to planning criteria must comport with the cost-causation principle.  The Commission's refusal to even consider the cost consequences of the Attachment M-3 amendments was arbitrary and capricious.  The amendments to Attachment M-3 will localize costs of addressing the region-wide problem of transmission assets reaching their end of life.  Facilities that confer regional benefits are just as susceptible to wear out over time, and require replacement, as facilities that confer local benefits.  By accepting the tariff amendments, the Commission has decided to localize costs to address end of life concerns, no matter who benefits; this is arbitrary and capricious, and violates the cost-causation principle.

As protesters stated in this proceeding, end of life considerations are likely to be the main driver of transmission development within the PJM zone for the foreseeable future.  The Attachment M-3 amendments localize costs for transmission projects.  The Commission was obligated to consider this likely outcome under the just and reasonable standard.  Because the Commission failed to consider the cost consequences of the Tariff amendments, its Order is arbitrary and capricious.

---

[50] *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1263 (D.C. Cir. 2018) (hereinafter *ODEC*).

## 2. It Is Arbitrary and Capricious To Violate The Cost Causation Principle.

It is arbitrary and capricious to violate the cost-causation principle. Among other things, Order 1000 requires regulated entities to include in their tariffs a formula "for allocating the costs of new transmission facilities selected in the regional transmission plan for purposes of cost allocation."[51] The formula must satisfy the Commission's six general cost allocation principles, the first of which is the cost-causation principle.[52] Order 1000's fifth cost allocation principle requires a transparent method for determining benefits and identifying beneficiaries for both regional and interregional cost allocation.[53] Each RTO, as a regulated entity, must show, through compliance filings, that its cost-allocation formula is consistent with the six specified principles.[54]

PJM maintains a Regional Transmission Expansion Plan ("RTEP") that complies with Order 1000's regional planning requirements and cost allocation principles.[55] Schedule 12 of the Tariff addresses the cost-sharing requirements of Order 1000.[56] RTEP planning includes reliability projects such as Regional Facilities, Necessary Lower Voltage Facilities, and Lower Voltage Facilities. PJM allocates cost responsibility for these RTEP projects pursuant to the cost allocation method that the Commission accepted as part of PJM's Order 1000 compliance filing.[57] For Regional Facilities and Necessary Lower Voltage Facilities, costs are allocated pursuant to a hybrid cost allocation method in which 50% of the costs of those facilities are allocated on a load-ratio share basis and the other 50% are allocated to the transmission owner zones based on the

---

[51] Order 1000 at P 558.
[52] *Id.* at P 622.
[53] *Id.* at P 665-67.
[54] *Id.* at P 603.
[55] *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1256 (D.C. Cir. 2018) (hereinafter *ODEC*).
[56] *Id.* at 1256.
[57] *PJM Interconnection L.L.C.*, 171 FERC ¶ 61,013 at P 7 (2020).

solution-based distribution factor (DFAX) method.[58]  All of the costs of Lower Voltage Facilities are allocated using the solution-based DFAX method.[59]

In *ODEC*, the court considered the Commission's approval of a Tariff amendment requiring allocation of the costs of projects included in the RTEP to satisfy only Form 715 planning criteria entirely to the zone of the utility that filed the criteria, "[n]otwithstanding" other provisions of Schedule 12.[60]  Petitioners challenged that the cost allocation violated the cost causation principle established in Order 1000.[61]  The court agreed, finding the Commission acted arbitrarily and capriciously in approving the tariff amendment.[62]  The court remanded the matter for further proceedings.[63]

On remand, the Commission rejected the tariff amendment.[64]  PJM was ordered to make a compliance filing and to refile assignment of cost responsibility for Form No. 715 projects that were previously allocated incorrectly.[65]  In its compliance filing, PJM explained that it reviewed the cost responsibility assignments for 443 Form No. 715 transmission projects and determined that revisions were needed for only 44 projects, the so-called "Remand Projects."[66]  Of the 44 Remand Projects, PJM proposed cost allocation revisions for 11 Regional Facilities and 33 Lower Voltage Facilities.[67]  Included among those projects is the PSE&G MTB Project.  In that filing, the MTB project's cost was allocated using the DFAX methodology, not exclusively to the local

---

[58] *Id.*

[59] *Id.*

[60] *ODEC* 898 F.3d at 1259.

[61] *Id.*

[62] *Id.* at 1264

[63] *Id.*

[64] *PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,133 at P 2 (2019).

[65] *Id.* at P28-31.

[66] *PJM Interconnection L.L.C.*, 171 FERC ¶ 61,013 at P 12 (2020).

[67] *Id.* at 13.

zone comprised of solely New Jersey ratepayers.[68]  The Commission accepted the compliance filing, including the reallocation of the MTB Project.[69]  The Remand Projects were thus reallocated to align with the cost causation principle of Order 1000.

In *ODEC*, the court was noted that individual market participants "should not have free rein to impose unjustified costs on an entire region by unilaterally adopting overly ambitious planning criteria."[70]  However, the court explained that its holding did not prevent PJM or its member utilities "from amending the Tariff, the Operating Agreement, or PJM's own planning criteria to address any problem of prodigal spending, to establish appropriate end-of-life planning criteria, or otherwise to limit regional cost sharing—*as long as any amendment respects the cost-causation principle.*"[71]

Here, the Commission has accepted Tariff revisions that will likely result in local cost allocation for some high-voltage transmission systems and, in doing so, has violated its own principle.  The August 11 Order offers no reasoned explanation for this departure, instead simply asserting that cost is outside the scope of the proceeding.  That assertion is an inadequate explanation.  The Commission has an obligation to ensure just and reasonable rates.  The Commission cannot simply ignore the cost-causation principle because the cost impact results from amendments to planning criteria, rather than cost allocation criteria.  The amendments to attachment M-3 *will* have some impact on costs, and the Commission must consider those impacts, as required by the D.C. Circuit's opinion in *ODEC*.  An agency may not change its policy without supplying a reasoned analysis indicating why such a policy change is appropriate.[72]  In the August

---

[68] *See id.* at P 18.
[69] *Id.* at P 37.
[70] *ODEC*, 898 F.3d at 1263
[71] *Id*. (emphasis added).
[72] *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

11 Order, the Commission ignored the cost-causation principle altogether, without explaining why consideration of the principle was not required. The Commission's lack of analysis on the cost-causation issue represents an arbitrary change in from the policy reaffirmed by the D.C. Circuit in *ODEC*. Accordingly, the Commission must grant rehearing and dispose of the cost issues raised by the M-3 amendments.

### 3. The Commission Acted Arbitrarily In Applying Reasoning In the California Orders To The PJM Zone.

The Commission acted arbitrarily in applying the reasoning from the *California Orders*[73] to the instant proceeding. The *California Orders* were limited by their terms to the facts before the Commission in those proceedings. With respect to PG&E, the Commission found that "the specific asset management projects and activities at issue here do not, as a general matter, expand the CAISO grid," and the Commission came to this conclusion "[b]ased on the information in the record."[74] In that same proceeding, the Commission rejected arguments analogizing the CAISO participating transmission owners' asset management activities to Commission orders regarding PJM's Supplemental project planning.[75] "In light of the specific criteria set forth in the definition of 'Supplemental Projects in the PJM Tariff, there is no basis to conclude that based on their definition, Supplemental Projects are in many cases identical to asset management projects."[76] Finally, in the *Southern California Edison* order, the Commission was unpersuaded by arguments that various practices in other non-CAISO ISOs/RTOs would be instructive.[77]

---

[73] *So. Cal. Edison Co.*, 164 FERC ¶ 61,160, at P 33 (2018); *Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161, at P 68 (2018) [hereinafter *California Orders*]

[74] *Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161, at P 67 (2018); *see also id. at* P 73 ("the scope of this proceeding is therefore limited to whether PG&E's self-approval of asset management projects and activities violates the requirements of Order No. 890.").

[75] *Id.* at P 51-59.

[76] *Id.* at P 59.

[77] *See Southern California Edison Co.*, 164 FERC ¶ 61,160 at P 37 (2018) ("We are also not persuaded by Protesters' assertions that the transmission planning practices in other ISOs/RTOs are instructive here.")

In the *California Orders*, the Commission made clear that its determination was based on specific facts before it in those proceedings.  The Commission even rejected analogies to practices in other RTOs/ISOs.[78]  Quite ironically, the Commission now relies on the *California Orders* in justifying amendments to the PJM Tariff.[79]  In the *California Orders*, this Commission rejected comparisons to practices in the PJM territory as inapposite to the CAISO territory.[80]  The Commission specifically stated that there is no basis to conclude that, based on the definition of PJM Supplemental Projects, they are identical to asset management projects.  Turning that holding on its head, and importing reasoning from the CAISO territory into the PJM zone without further analysis as to why such an importation was proper, was an arbitrary and capricious.[81]

Even if the *California Orders* did apply to the instant case, they do not support the definition of "Asset Management Project" adopted by the PJM Transmission Owners because the projects at issue here are not the same as the projects at issue in California.  The Transmission Owner Proposal defines "Asset Management Project" as "any modification or replacement of a Transmission Owner's Transmission Facilities that results in no more than an Incidental Increase in transmission capacity undertaken to perform maintenance, repair and replacement work, to address an EOL need, or to effect infrastructure security, system reliability, and automation projects the Transmission Owner undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements."[82]  The participating transmission owners'

---

[78] *See id.*; *see also PG&E*, 164 FERC ¶ 61,161 at P 51-59.

[79] August 11 Order at P 84 ("Our interpretation of the CTOA is consistent with the *California Orders*").

[80] *See Southern California Edison Co.*, 164 FERC ¶ 61,160 at P 37 (2018) ("We are also not persuaded by Protesters' assertions that the transmission planning practices in other ISOs/RTOs are instructive here."); *see also PG&E*, 164 FERC ¶ 61,161 at P 51-59.

[81] *See State Farm* 463 U.S. at 42 (an agency has an obligation to supply a reasoned analysis for a change in policy); *see also Nat'l Fed'n of Fed. Employees v. FLRA*, 412 F.3d 119, 124-25 (D.C. Cir. 2005) (remanding Federal Labor Relations Authority decision because agency had departed from its precedent regarding interference with the right to assign work); *City of Anaheim v. FERC*, 723 F.2d 656, 659 (9th Cir. 1984).

[82] TO Proposal, Exhibit A at ¶ (b)(1).

definition of "asset management" to refer to the "activities to maintain a safe, reliable, and compliant grid, based on existing grid topology" and that they include "operations and maintenance and capital expenditure activities."[83]  The term "Incidental Increase" in the TO Proposal includes an increase in transmission "achieved by advancements in technology and/or replacements consistent with current Transmission Owner design standards, industry standards, codes, laws or regulations which is not reasonably severable from an Asset Management project."[84]

The definition included in the Transmission Owner proposal is broader than the specific asset management activities at issue in the *California Orders*.  In other words, while the words in the *California Orders* and the PJM Transmission Owners' proposal are the same, the concepts and projects at issue are different.  The Commission's analysis equates PJM supplemental projects with CAISO asset management activities, a position it has rejected in the past, based solely on what the project is called, rather than the technical realities of each project.  Giving the same project a different name, and then according that same project different legal treatment as a result of the different name is arbitrary and capricious.  For instance, a specific asset management project under the Attachment M-3 amendments may add capacity to the grid based so long as this is based on Transmission Owner design standards.  These standards are developed exclusively by the applicable Transmission Owner, without any review or regulatory oversight.  Updated Transmission Owner design standards could become a vehicle for substantial increases in grid capacity, which would be shielded from the regional planning process and stakeholder oversight by virtue of the Transmission Owner definition of "Incidental Increase" and "Asset Management Project."  In the *California Orders*, the Commission was confronted with specific asset

---

[83] *PG&E*, 164 FERC ¶ 61,161 at P 46.
[84] TO Proposal, Exhibit A at ¶ (b)(3).

management activities discussed at a technical conference, and concluded that these did not increase the capacity of the grid beyond an incidental amount. The M-3 amendments here, while borrowing a term from the *California Orders*, include a much broader definition of asset management project. Accordingly, the Commission's discussion of a differently-defined category of asset management activities in the CAISO zone is inapposite to this specific Transmission Owner proposal.

The Commission's reliance on the *California Orders'* reasoning to support the expanded M-3 definitions was arbitrary and capricious because, while it uses the same words, the concepts and projects are completely different. By analogizing to orders which, by their terms, are inapplicable to PJM or other RTO territories, and furthermore include a definition of "asset management" unique to the CAISO territory, the Commission committed reversible error. For this reason, the Commission must grant rehearing and explain why it has decided to apply the *California Orders* to PJM despite the terms of those orders limiting their applicability.

## <u>CONCLUSION</u>

For the foregoing reasons, the Board urges the Commission to grant its application for rehearing, and to reject the M-3 amendments.

**NEW JERSEY BOARD OF PUBLIC UTILITIES**

By: */s/*Cynthia L. M. Holland
Cynthia L. M. Holland
Director, Office of Federal and
Regional Policy
New Jersey Board of Public Utilities
44 South Clinton Ave.
Trenton, NJ 08609
Tel: (609) 292-1629
cynthia.holland@bpu.nj.gov

**GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY**

By: */s/*Brandon C. Simmons
Brandon C. Simmons
Deputy Attorney General
New Jersey Office of the Attorney General
Department of Law & Public Safety,
Division of Law
R.J. Hughes Justice Complex, 7th Floor West
Trenton, NJ 08625
Tel: (609) 376-3370
brandon.simmons@law.njoag.gov

*Attorney for the New Jersey Board of
Public Utilities*

**DATE:** September 10, 2020

Document Accession #: 20200910-5286    Filed Date: 09/10/2020

### CERTIFICATE OF SERVICE

I hereby certify that, on this 10th day of September 2020, I have caused the foregoing document to be served upon each party designated on the official service list compiled by the Secretary in this proceeding, by email.

*/s/ Brandon Simmons*
Brandon C. Simmons
Deputy Attorney General
New Jersey Office of the Attorney General
Department of Law & Public Safety
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
(609) 376-3370
Brandon.simmons@law.njoag.gov

Document Accession #: 20200910-5286     Filed Date: 09/10/2020

Document Content(s)

Final NJBPU EOL rehearing request.PDF...................................1

JA0551

173 FERC ¶ 62,021
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

PJM Interconnection, L.L.C.                          Docket No. ER20-2046-001
American Transmission Systems Inc.


NOTICE OF DENIAL OF REHEARINGS BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(October 13, 2020)

Rehearings have been timely requested of the Commission's August 11, 2020 order issued in this proceeding. *PJM Interconnection, L.L.C.*, 172 FERC ¶ 61,136 (2020). In the absence of Commission action on the requests for rehearing within 30 days from the date the requests were filed, the requests for rehearing (and any timely requests for rehearing filed subsequently)[1] may be deemed denied. 16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713; *Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a) (2018), the rehearing requests of the above-cited order filed in this proceeding will be addressed in a future order to be issued consistent with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the Commission may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper. As provided in 18 C.F.R. § 385.713(d), no answers to the rehearing request will be entertained.


Nathaniel J. Davis, Sr.,
Deputy Secretary.

---

[1] *See San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs. Into Mkts. Operated by Cal. Indep. Sys. Operator & Cal. Power Exch.*, 95 FERC ¶ 61,173 (2001).

Document Content(s)

ER20-2046-001 Notice.DOCX...............................................1

JA0553

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

American Municipal Power, Inc.     )
Delaware Division of the Public Advocate  )
District of Columbia Office of the People's )
 Counsel            )
Indiana Office of Utility Consumer   )
 Counselor           )
LSP Transmission Holdings II, LLC   )
New Jersey Division of Rate Counsel   )
Old Dominion Electric Cooperative   )
PJM Industrial Customer Coalition   )
The Public Utilities Commission of Ohio's )
 Office of the Federal Energy Advocate  )
West Virginia Consumer Advocate   )
     Petitioners,    )
      v.        )
Federal Energy Regulatory Commission,  )
     Respondent.    )

Case No. **20-1449**

## PETITION FOR REVIEW

Pursuant to Section 313 of the Federal Power Act, 16 U.S.C. § 825l, and Rule 15(a) of the Federal Rules of Appellate Procedure ("FRAP"), American Municipal Power, Inc., Delaware Division of the Public Advocate ("Delaware Public Advocate"), District of Columbia Office of the People's Counsel ("DC OPC"), Indiana Office of Utility Consumer Counselor ("Indiana OUCC"), LSP Transmission Holdings II, LLC ("LS Power"), New Jersey Division of Rate Counsel ("NJ Rate Counsel"), Old Dominion Electric Cooperative ("ODEC"), PJM Industrial Customer Coalition ("PJMICC"), The Public Utilities Commission of Ohio's Office of The Federal Energy Advocate, and West Virginia Consumer

Advocate (collectively, "Petitioners") hereby petition the Court for judicial review of the following orders issued by Respondent, Federal Energy Regulatory Commission ("Commission"):

1. *PJM Interconnection, L.L.C. and American Transmission Systems Inc.,* Order Accepting Proposed Tariff Revisions, Docket No. ER20-2046-000, 172 FERC ¶ 61,136 (August 11, 2020) ("August 11 Order"); and

2. *PJM Interconnection, L.L.C. and American Transmission Systems Inc.,* Notice of Denial of Rehearings by Operation of Law and Providing for Further Consideration, Docket No. ER20-2046-001, 173 FERC ¶ 62,021 (October 13, 2020) ("Denial Notice").

Copies of the August 11 Order and the Denial Notice are attached hereto as **Exhibit A** and **Exhibit B**, respectively.  The jurisdiction and venue of this Court are established by Federal Power Act ("FPA") Section 313(b), 16 U.S.C. § 825*l*(b).

In the August 11 Order, the Commission accepted a filing by PJM Interconnection, L.L.C. ("PJM") and certain PJM Transmission Owners to revise Attachment M-3 of the PJM Open Access Transmission Tariff ("Tariff") to include new categories of transmission projects and new planning procedures.  On September 10, 2020, Petitioners timely sought rehearing of the Commission's August 11 Order.  On October 13, 2020, the Commission issued the Denial Notice indicating that the Petitioners' request for rehearing may be deemed denied by operation of law.  *See* 16 U.S.C. § 825l(a) (2018); 18 C.F.R. § 385.713 (2019);

*Allegheny Def. Project v. FERC*, 964 F.3d 1 (D.C. Cir. 2020) (en banc).  Petitioners

are thereby aggrieved by the Commission's rulings in the above-referenced orders.

Respectfully submitted,

By: */s/ Gerit F. Hull*
Gerit F. Hull
Deputy General Counsel
 for Regulatory Affairs
American Municipal Power, Inc.
1111 Schrock Rd, Suite 100
Columbus, OH 43229
(614) 540-0852
ghull@amppartners.org

American Municipal Power, Inc.


By: */s/ Sandra Mattavous-Frye*
Sandra Mattavous-Frye
People's Counsel for the District of
Columbia Karen R. Sistrunk
Deputy People's Counsel
Anjali G. Patel
Frederick (Erik) Heinle III
Assistant People's Counsel
Office of the People's Counsel for the
District of Columbia
1133 15th Street, N.W., Suite 500
Washington, DC 20005-2710
202-261-1182
fheinle@opc-dc.gov


District of Columbia Office of
the People's Counsel

By: */s/ Regina A. Iorii*
Regina A. Iorii (De. Bar No. 2600)
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 4th Floor
Wilmington, DE  19801
(302) 577-8159
regina.iorii@delaware.gov

In the Capacity of Counsel to the
Delaware Division of the Public
Advocate Only


By: */s/ Arthur W. Iler*
Arthur W. Iler
Deputy Consumer Counselor, Federal
Affairs
Indiana Office of Utility Consumer
Counselor
115 West Washington Street, Suite
1500 South
Indianapolis, Indiana 46204
(317) 233-3234

Indiana Office of Utility Consumer
Counselor

3

JA0556

By: */s/ Michael R. Engleman*
Michael R. Engleman
Christina Switzer
Engleman Fallon, PLLC
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 464-1330
mengleman@efenergylaw.com
cswitzer@efenergylaw.com


Counsel for
LSP Transmission Holdings II, LLC

By: */s/Stefanie A. Brand*
Stefanie A. Brand, Director
Brian Lipman
Felicia Thomas-Friel
Henry Ogden
140 E. Front Street, 4th Floor
P.O. Box 003
Trenton, New Jersey 08625
(609) 984-1460
sbrand@rpa.nj.gov
blipman@rpa.nj.gov
fthomas@rpa.nj.gov
hogden@rpa.nj.gov


Counsel for
New Jersey Division of Rate Counsel


By: */s/ Adrienne E. Clair*
Adrienne E. Clair
Rebecca L. Shelton
Thompson Coburn LLP
1909 K Street, N.W., Suite 600
Washington, D.C.  20006-1167
(202) 585-6900
(202) 585-6969 (fax)
aclair@thompsoncoburn.com
rshelton@thompsoncoburn.com


Attorneys for Old Dominion Electric
Cooperative

By: */s/ Robert A. Weishaar, Jr.*
Robert A. Weishaar, Jr.
McNees Wallace & Nurick LLC
1200 G. Street, NW, Suite 800
Washington, DC 20005
202-898-5700
bweishaar@mcneeslaw.com


Kenneth R. Stark
McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA 17101
717-237-5378
kstark@mcneeslaw.com


Counsel for the PJM Industrial
Customer Coalition

4

JA0557

By: */s/ Werner L. Margard III*
**David Yost** (0056290)
Attorney General

**John H. Jones** (0051913)
Section Chief

**Werner L. Margard III** (0024858)
**Thomas G. Lindgren** (0039210)
Assistant Attorneys General
30 E. Broad St., 16th Floor
Columbus, OH  43215
Tel.: (614) 466-4395
Fax: (614) 644-8764
Werner.Margard@ohioattorneygeneral.gov
Thomas.Lindgren@ohioattorneygeneral.gov

The Public Utilities Commission of Ohio's Office of the Federal Energy Advocate

Date:  November 12, 2020

By: */s/ Jacqueline Lake Robert's*
Jacqueline Lake Robert's, Esq.
West Virginia Consumer Advocate
300 Capitol St., Ste 300
Charleston, WV 25301

West Virginia Consumer Advocate

Document Accession #: 20201120-5203     Filed Date: 11/20/2020

Document Content(s)

Stamped Petition for Review Case 20-1449.PDF..............................1

JA0559

173 FERC ¶ 61,225
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  James P. Danly, Chairman;
                       Neil Chatterjee and Richard Glick.


PJM Interconnection, L.L.C.                          Docket No.  ER20-2046-001
American Transmission Systems Inc.


ORDER ADDRESSING ARGUMENTS RAISED ON REHEARING

(Issued December 17, 2020)

1.     On August 11, 2020, the Commission accepted revisions to Attachment M-3 of the PJM Interconnection, L.L.C. (PJM) Open Access Transmission Tariff (Tariff) to (1) identify and include Asset Management Projects within the existing planning procedures of Attachment M-3 of the PJM Tariff, and (2) include procedures for the identification and planning for end-of-life (EOL) needs (Attachment M-3 Revisions).[1]

2.     The New Jersey Board of Public Utilities (New Jersey Board), parties that protested the proposed Attachment M-3 Revisions (collectively, Protesting Parties),[2]

---

[1]  *PJM Interconnection, L.L.C.*, 172 FERC ¶ 61,136 (2020) (August 2020 Order); *see* PJM, Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0).  PJM filed the proposed revisions pursuant to Order. No. 714, on behalf of PJM Transmission Owners, as provided by the Consolidated Transmission Owners Agreement (CTOA).  *See Elec. Tariff Filings*, 124 FERC ¶ 61,270 (2008) (Ord. No. 714); PJM, Rate Scheds. TOA-42 § 4.1.3 PJM Tariff (0.0.0) ("Each Party shall transfer to PJM . . . responsibility for administering the PJM Tariff").

[2]  The Protesting Parties include American Municipal Power, Inc. (AMP), AMP Transmission, LLC, Blue Ridge Power Agency, Delaware Division of the Public Advocate, District of Columbia Office of People's Counsel, Indiana Office of Utility Consumer Counsel, LSP Transmission Holdings II, LLC, New Jersey Division of Rate Counsel, Old Dominion Electric Cooperative, PJM Industrial Customer Coalition, Public Power Association of New Jersey, The Public Utilities Commission of Ohio's Office of the Federal Energy Advocate, and West Virginia Consumer Advocate.

and Duquesne Light and Power Company (Duquesne) requested rehearing of the
August 2020 Order.

3.    Pursuant to *Allegheny Defense Project v. FERC*,[3] the rehearing requests filed in
this proceeding may be deemed denied by operation of law.  However, as permitted by
section 313(a) of the FPA,[4] we are modifying the discussion in the August 2020 Order
and continue to reach the same result in this proceeding, as discussed below.[5]

# I.    Background

## A.    Attachment M-3 for Supplemental Projects

4.    On August 26, 2016, the Commission, pursuant to section 206 of the FPA,[6]
established a proceeding to determine whether the PJM Transmission Owners were
complying with their Order No. 890 obligations related to openness, transparency, and
information exchange with respect to planning Supplemental Projects.[7]  On October 25,

---

[3] 964 F.3d 1 (D.C. Cir. 2020) (en banc).

[4] 16 U.S.C. § 825*l*(a) ("Until the record in a proceeding shall have been filed in
a court of appeals, as provided in subsection (b), the Commission may at any time, upon
reasonable notice and in such manner as it shall deem proper, modify or set aside, in
whole or in part, any finding or order made or issued by it under the provisions of this
chapter.").

[5] *Allegheny Def. Project*, 964 F.3d at 16-17.  The Commission is not changing
the outcome of the August 2020 Order.  *See Smith Lake Improvement & Stakeholders
Ass'n v. FERC*, 809 F.3d 55, 56-57 (D.C. Cir. 2015).

[6] 16 U.S.C. § 824e.

[7] *Monongahela Power Co.*, 156 FERC ¶ 61,134 (2016) (Show Cause Order); *see
Preventing Undue Discrimination & Preference in Transmission Serv.*, Order No. 890,
118 FERC ¶ 61,119, at P 444, *order on reh'g*, Order No. 890-A, 121 FERC ¶ 61,297
(2007), *order on reh'g*, Order No. 890-B, 123 FERC ¶ 61,299 (2008), *order on reh'g*,
Order No. 890-C, 126 FERC ¶ 61,228, *order on clarification*, Order No. 890-D,
129 FERC ¶ 61,126 (2009).  A Supplemental Project is defined as a transmission
expansion or enhancement that is not required for compliance with the following PJM
criteria: system reliability, operational performance or economic criteria, pursuant to a
determination by the Office of the Interconnection and is not state public policy project
pursuant to Operating Agreement, Sched. 6, section 1.5.9(a)(ii).  PJM, Intra-PJM Tariffs,
OA Definitions S – T (17.0.0).

Document Accession #: 20201217-3044     Filed Date: 12/17/2020
Docket No. ER20-2046-001                                                          - 3 -

2016, PJM and the PJM Transmission Owners, pursuant to section 205 of the FPA,[8] filed revisions to the PJM Tariff to include Attachment M-3,[9] and a revision to Schedule 6 of the PJM Amended and Restated Operating Agreement of PJM (Operating Agreement) in response to the Show Cause Order.[10]  On February 15, 2018, the Commission determined that the PJM Transmission Owners had not demonstrated that their filing was just and reasonable,[11] and pursuant to section 206 of the FPA the Commission established a just and reasonable set of Tariff provisions for an Order No. 890-compliant Attachment M-3 planning process.  On September 26, 2018, the Commission accepted the Tariff provisions for the Attachment M-3 planning process.[12]

### B.    Attachment M-3 Revisions

5.     On June 12, 2020, the PJM Transmission Owners filed the instant Attachment M-3 Revisions to include additional projects under the planning process described in Attachment M-3.[13]  The PJM Transmission Owners explained that the definition of Supplemental Project does not include Asset Management Projects and they made this filing to clarify that Asset Management Projects would for the first time be planned according to Order No. 890 principles.

6.     Specifically, the Attachment M-3 Revisions require each PJM Transmission Owner to present its criteria for assessing whether a need exists to replace an existing transmission facility for stakeholder input at least annually.  The PJM Transmission Owners stated that the Attachment M-3 Revisions achieve two goals.  First, by expanding the scope of the Attachment M-3 process, the PJM Transmission Owners stated that the filing will enhance transparency and the opportunity for stakeholder

---

[8] 16 U.S.C. § 824d.

[9] PJM, Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (0.1.0).

[10] PJM, Intra-PJM Tariffs, Sched. 6, OA Sched. 6 (0.0.0).

[11] *Monongahela Power Co.*, 162 FERC ¶ 61,129 (2018) (Attachment. M-3 Order).

[12] *Monongahela Power Co.*, 164 FERC ¶ 61,217 (2018) (Attachment M-3 Compliance Order).

[13] PJM Transmission Owners did not include or modify any Tariff provisions related to the cost allocation provisions of Schedule 12 of the PJM Tariff.

Document Accession #: 20201217-3044     Filed Date: 12/17/2020

review of EOL Needs.[14]  Second, the PJM Transmission Owners stated that the Attachment M-3 Revisions will better coordinate the transmission owners' end of life asset management activities with PJM's planning to address Regional Transmission Expansion Plan (RTEP) planning criteria.[15]  The PJM Transmission Owners noted that the filing also increases transparency regarding the process that the PJM Transmission Owners use to evaluate the need to replace transmission facilities and provides PJM up to five years of projected replacements that a Transmission Owner has identified (on a confidential basis).[16]

## C.  August 2020 Order

7.    In the August 2020 Order, the Commission accepted the PJM Transmission Owners' Attachment M-3 Revisions based on a finding that the PJM Transmission Owners retained responsibilities under the CTOA related to EOL planning.[17] Specifically, the Commission found that:

> Under the CTOA and the Tariff, the PJM [Transmission Owners] retain all rights that they have not specifically granted to PJM.  Under the CTOA, the PJM [Transmission Owners] agree to "transfer to PJM . . . the responsibility to prepare a Regional Transmission Expansion Plan and to

---

[14] EOL Need is defined as a need to replace a transmission line between breakers operating at or above 100 kV or a transformer the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities, which the Transmission Owner has determined to be near the end of its useful life, the replacement

of which would be an Attachment M-3 project.  PJM, Intra-PJM Tariffs, OATT ATT. M-3, OATT Attach. M-3 (1.0.0).

[15] RTEP is defined as the plan prepared by the Office of the Interconnection pursuant to Operating Agreement, Schedule 6 for the enhancement and expansion of the Transmission System in order to meet the demands for firm transmission service in the PJM Region.  PJM, Intra-PJM Tariffs, OATT Definitions – R - S, OATT Definitions – R - S, 23.0.0.

[16] PJM Transmission Owners Transmittal at 11.

[17] August 2020 Order, 172 FERC ¶ 61,136.  The Commission denied a motion to dismiss that contended that the Attachment M-3 Revisions should not have been made because the PJM Transmission Owners did not adhere to the procedural requirements of the CTOA.  *Id.* PP 78-79.

provide information reasonably requested by PJM to prepare the Regional Transmission Expansion Plan and shall otherwise cooperate with PJM in such preparation." Pursuant to the CTOA, PJM is limited to "[c]onduct[ing] its planning for the expansion and enhancement of transmission facilities." The PJM [Transmission Owners] specifically

retain the right to "maintain" their transmission facilities and generally reserve all rights not specifically granted to PJM.[18] (Citations omitted)

8.     The Commission further found:

Asset Management Projects do not fit within the categories of projects the CTOAs have transferred to PJM. These projects do not fall under regional planning under the Operating Agreement as they relate solely to maintenance of existing facilities, and they do not "expand" or "enhance" the PJM grid as the CTOA requires for planning transferred to PJM. They are solely projects that maintain the existing infrastructure by repairing or replacing equipment. These projects therefore fall within the category of rights not specifically granted to PJM and therefore reserved to the PJM [Transmission Owners].[19] (Citations omitted)

9.     The Commission found its conclusions consistent with *Atl. City Elec. Co. v. FERC*,[20] which held that "nothing in section 206 sanctions denying petitioners their right to unilaterally file rate and term changes."[21] The Commission also found its conclusion

---

[18] August 2020 Order, 172 FERC ¶ 61,136 at P 82.

[19] *Id.* P 83. Asset Management Projects are defined as "any modification or replacement of a Transmission Owner's Transmission Facilities that results in no more than an Incidental Increase in transmission capacity undertaken to perform maintenance, repair, and replacement work, to address an EOL Need, or to effect infrastructure security, system reliability, and automation projects the Transmission Owner undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements." PJM, Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (b) 1.

[20] 295 F.3d 1, 10 (D.C. Cir. 2002).

[21] August 2020 Order, 172 FERC ¶ 61,136 at P 82.

consistent with its *Southern California Edison Co.*,[22] and *California Public Utilities Commission v. Pacific. Gas & Electric Co.*[23] orders (hereinafter, *California Orders*). The Commission stated that:

> "[its] interpretation of the CTOA is consistent with the *California Orders*, in which the Commission concluded that it was appropriate to define "asset management" as activities that "encompass the maintenance, repair, and replacement work done on existing transmission facilities as necessary to maintain a safe, reliable, and compliant grid based on existing topology," . . . and "that the [Attachment M-3 Revisions] in this proceeding are consistent with the type of projects and activities that the Commission found were appropriately considered transmission owner asset management projects in the *California Orders*."[24]

## II.     **Discussion**

10.     As discussed below, we disagree with the arguments on rehearing and sustain the August 2020 Order.  While we are modifying the discussion in the August 2020 Order, we continue to reach the same result in this proceeding.

11.     The PJM Transmission Owners filed an answer to the requests for rehearing.  Rule 713(d) of the Commission's Rules of Practice and Procedure prohibits an answer to a request for rehearing.[25]  Accordingly, we reject the PJM Transmission Owners' answer.

---

[22] 164 FERC ¶ 61,160, at P 33 (2018).

[23] 164 FERC ¶ 61,161, at P 68 (2018).

[24] August 2020 Order, 172 FERC ¶ 61,136 at P 84 (citing *So. Cal. Edison Co*, 164 FERC ¶ 61,160 at P 33; *Cal. Pub. Util. Comm'n v. Pac. Gas & Elec. Co.*, 164 FERC ¶ 61,161 at P 68).

[25] 18 C.F.R. § 385.713(d)(1) (2020).

A.     **Motion to Dismiss**

   1.     **Rehearing Argument**

12.     The Protesting Parties contend that the Commission erred in denying the motion to dismiss.[26]  The Protesting Parties state that the CTOA requires a vote prior to any action of the Administrative Committee, and the initiation of consultation with the PJM Members Committee was an action taken by the Administrative Committee.[27]

   2.     **Commission Determination**

13.     Section 8.5 of the CTOA states in pertinent part: "any action taken by the Administrative Committee shall require a combination of the concurrence of the representatives' Individual Votes of the representatives of those Parties entitled to vote on such matters and Weighted Votes as specified in this Section 8.5."[28] Section 7.3.2 of the CTOA provides that "[t]he Transmission Owners shall consult with PJM and the PJM Members Committee beginning no less than 30 days prior to any Section 205 filing."[29]

14.     The Protesting Parties contend that, prior to notifying PJM, the CTOA requires a vote by the Administrative Committee.[30]  We disagree with Protesting Parties' interpretation of the CTOA.  Section 7.3.2 imposes the requirement that the PJM Transmission Owners notify PJM 30 days prior to making a section 205 filing with the Commission.  However, section 7.3.2 does not impose a requirement of a vote

---

[26] Protesting Parties Reh'g Req. at 12 (Statement of Errors 1).

[27] *Id.* at 12-13.

[28] PJM, Rates Scheds., TOA-42, 8.5 Manner of Acting (1.0.0) ((future citations to the CTOA may omit PJM, Rate Scheds).

[29] PJM, Rates Scheds., TOA-42, 7.3.2 (0.0.0).  The same provision can be found in section 9.1(b) of the PJM Tariff which provides that "[t]he Transmission Owners shall consult with PJM and the PJM Members Committee beginning no less than 30 days prior to any Section 205 filing."  PJM, Intra-PJM Tariffs, 9.1, OATT 9.1 Rights of the Transmission Owners (2.1.0).

[30] Protesting Parties Reh'g Req. at 13.

before initiating such a consultation.[31]  It is true that section 8.5.2 of the CTOA requires a majority vote of the members present at a quorum before taking action "on any matter other than those specified in [s]ection 8.5.1."  However, section 7.3.2, the section specifically dealing with consultation, does not require a vote prior to consultation.  Therefore, we do not find that such consultation is the type of "matter" that requires a vote by the quorum.  Consultation ordinarily would be an administrative matter, rather than the type of final action requiring a vote.  And, as the PJM Transmission Owners point out, their course of conduct over the years has been to have the Administrative Committee Chair post the consultation pursuant to their authority under the CTOA, without requiring a vote.[32]  Indeed, as the Commission found, this interpretation is logical as consulting with PJM prior to voting allows the PJM Transmission Owners to "consider the opinions of PJM and the Members Committee prior to the formal vote on the proposal under section 7.3.2 of the CTOA."[33]  Finally, while the voting requirements in the CTOA are designed to protect the rights of individual PJM Transmission Owners against actions taken without sufficient consensus, we agree with the PJM Transmission Owners that a vote prior to initiating the consultative process is not required by the CTOA because that consultation requirement exists to allow consideration of concerns and the interests of parties other than transmission owners, who do not participate in that vote.  Accordingly, we disagree with the rehearing arguments on this issue.

### B.     Attachment M-3 Revisions FPA Section 205 Filing Rights

#### 1.     Rehearing Requests

15.     The Protesting Parties contend that the Commission cites to no evidence that section 9.1 of the PJM Tariff, nor any other provision of the PJM Tariff or CTOA provide the PJM Transmission Owners with unilateral filing rights to alter transmission planning

---

[31] *See* PJM, Rates Scheds., TOA-42 8.5.1 Action by Two-thirds Majority (1.0.0); TOA-42 7.3.2 (0.0.0) (vote required for section 205 filing); TOA-42 7.6.4 (0.0.0) (resolving disputes among members); TOA-42 8.4 Meetings (0.0.0) (vote required to change agenda).

[32] Answer of the Indicated Transmission Owners to Mot. to Dismiss, Docket No. ER20-2046-000, at 7-8 (Jun. 25, 2020); TOA-42 8.3.2 Duties of the Officers (0.0.0) (the Chair shall "cause notices of meetings to be distributed").

[33] PJM, Rates Scheds., TOA-42 7.3.2 (0.0.0); *see* August 2020 Order, 172 FERC ¶ 61,136 at P 79.

in PJM, particularly the right to establish planning provisions that alter the scope of the regional planning process.[34]

## 2. Commission Determination

16.     Prior to the PJM Transmission Owners' filing in this proceeding, Asset Management Projects and EOL Projects were not subject to PJM's RTEP planning process or the Order No. 890 planning process in Attachment M-3.  In their filing, the PJM Transmission Owners voluntarily proposed to include Asset Management Projects and EOL Projects as part of the Order No. 890 process approved by the Commission in *Monongahela Power Co.*[35]

17.     Contrary to the argument made by the Protesting Parties, the Commission in the August 2020 Order did not expand the planning rights of the PJM Transmission Owners into areas reserved for PJM planning.  The Commission explained how the CTOA reserved filing rights for planning of Asset Management Projects to the PJM Transmission Owners.[36]  Under the PJM Operating Agreement and the prior version of Attachment M-3, Asset Management Projects and EOL Projects were not specifically addressed.  These projects either were developed by the individual transmission owner or adhered to the planning criteria for Supplemental Projects.[37]  The PJM Transmission Owners made their filing to clarify that Asset Management Projects and EOL Projects would be planned under Order No. 890 planning principles as described in Attachment M-3.[38]  The Attachment M-3 Revisions therefore do not restrict PJM's current planning

---

[34] Protesting Parties Reh'g Req. at 17 (Statement of Errors 2).

[35] Attachment M-3 Compliance Order, 164 FERC ¶ 61,217.

[36] *Id.*; August 2020 Order, 172 FERC ¶ 61,136 at PP 81-87.

[37] *See PJM Interconnection, L.L.C.*, 154 FERC ¶ 61,097, at P 8 n.13 (Dominion project to address end of useful life initially submitted as a Supplemental Project), *order on reh'g*, 157 FERC ¶ 61,191 (2016), *rev'd sub nom.*, *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, *reh'g denied,* 905 F.3d 671 (D.C. Cir. 2018).

[38] While there were no planning procedures to address EOL Needs prior to the Attachment M-3 Revisions, individual transmission owners, at times, filed projects at the end of their useful life as Supplemental Projects, demonstrating that planning for EOL Needs was within the PJM Transmission Owners' retained responsibilities.  *See PJM Interconnection, L.L.C.*, 154 FERC ¶ 61,097 at P 8 n.13, *order on reh'g*, 157 FERC ¶ 61,191, *rev'd sub nom.*, *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254 (D.C. Cir. 2018), *reh'g denied,* 905 F.3d 671.

responsibilities, but, in fact, enhanced the transparency of the planning process for Asset Management Projects and EOL Projects.

18.     As the Commission found in the August 2020 Order, the filing came within the filing rights reserved to the PJM Transmission Owners per the CTOA.  Pursuant to *Atlantic City*, PJM can exercise only those rights transferred to it by the PJM Transmission Owners.[39]  Under the CTOA, the PJM Transmission Owners agreed only to "transfer to PJM . . . the responsibility to prepare a Regional Transmission Expansion Plan."[40]  PJM is limited to "[c]onduct[ing] its planning for the expansion and enhancement of transmission facilities."[41]  The Commission found that Asset Management Projects are similar to Supplemental Projects and, therefore, not approved by the PJM Board.[42]  Given the specific definition of Asset Management Projects, including EOL Projects, in Attachment M-3 of the PJM Tariff, Asset Management Projects maintain, rather than enhance the grid.  In addition, as pointed out in the August 2020 Order, the PJM Transmission Owners specifically retained the right to "maintain" their transmission facilities[43] and, with respect to EOL Projects, determine when to "retire" facilities.[44]

19.     The Commission's determination here is consistent with its precedent on the scope of RTO planning.  In Order No. 890, the Commission found that RTO planning processes should focus "on regional problems and solutions, not local planning issues that may be

---

[39] Under the CTOA, the PJM Transmission Owners specifically reserved all rights not specifically granted to PJM.  PJM, Rate Schedules, TOA-42, Art. 5 Parties' Retailed Rights (0.0.0), TOA-42, 5.6 Reservation of Rights (0.0.0).

[40] PJM, Rates Scheds., TOA-42 4.1.4 Planning Information (0.0.0).

[41] PJM, Rates Scheds., TOA-42, 6.3.4 (0.0.0).

[42] August 2020 Order, 172 FERC ¶ 61,136 at P 83; *see* PJM, Intra-PJM Tariffs, OA Sched. 6 Sec 1.6, OA Schedule 6 Sec 1.6 Approval of the Final Regional Trans. (4.0.0) ("the PJM Board shall approve the [RTEP] in accordance with the requirements of Operating Agreement, Schedule 6"); OA Schedule 6 Sec 1.5 Procedure for Development of the Regi. (24.0.0), § 1.5.6 (n) ("Certain Regional RTEP Project(s) and Subregional RTEP Project(s) may not be required for compliance with the following PJM criteria:  system reliability, market efficiency or operational performance, pursuant to a determination by the Office of the Interconnection.  These Supplemental Projects shall be separately identified in the RTEP and are not subject to approval by the PJM Board.").

[43] PJM, Rate Scheds., TOA-42, 4.5 Operation and Maintenance (0.0.0).

[44] PJM, Rates Scheds., TOA-42 5.2 Facility Rights (1.0.0).

Document Accession #: 20201217-3044     Filed Date: 12/17/2020

addressed by individual transmission owners."[45]  The Commission found that when the individual transmission owners perform this planning, they also must comply with Order No. 890.[46]  In *Monongahela Power Co.*, the Commission found, specifically with respect to PJM, that "[t]he PJM Transmission Owners have primary responsibility for planning Supplemental Projects and, therefore, retain the filing rights to make modifications to these provisions."[47]  The Commission went on to explain, as it did in the August 2020 Order:

> [u]nlike the RTEP transmission projects, for which the PJM Transmission Owners have ceded planning to PJM as part of establishing an RTO, the PJM Transmission Owners remain responsible for planning Supplemental Projects, and we find that it is just and reasonable for the PJM Transmission Owners to establish the process for planning these transmission projects and to initiate under section 205 any proposed revisions.[48]

The Commission made similar findings in *Appalachian Power Co.*[49] in finding that the PJM Transmission Owners had reserved the right to plan and file procedures for Supplemental Projects designed to mitigate the risk associated with critical transmission stations and substations identified pursuant to NERC reliability standard CIP-014-2.

20.     As the Commission found in the August 2020 Order, it treated the PJM Transmission Owners' proposal in this case consistently with its recent decisions in the *California Orders*.  In the *California Orders*, the Commission determined that "asset management" projects do not fall under Order No. 890 planning principles and therefore do not have to go through the Order No. 890 process.  While that issue is not present in this case, as the PJM Transmission Owners voluntarily have included Asset Management Projects under their Order No. 890 protocols, the Commission found that the definition of "asset management" projects in the *California Orders* supported its determination that the Asset Management Projects in the PJM Transmission Owners' proposal fell under the filing rights that the PJM Transmission Owners retained.  In the *California Orders*, the Commission found that "asset management" projects "do not, as a general matter, expand

---

[45] Ord. No. 890, 118 FERC ¶ 61,119 at P 440.

[46] *Id.*

[47] Attachment M-3 Compliance Order, 164 FERC ¶ 61,217 at P 13.

[48] *Id.* P 14.

[49] 170 FERC ¶ 61,196, at P 59 (2020).

the California Independent System Operator (CAISO) grid. Rather, these asset management projects and activities include such items as maintenance, compliance, work on infrastructure at the end-of-useful life, and infrastructure security, that SoCal Edison undertakes to maintain its existing electric transmission system and meet regulatory compliance requirements."[50] The Asset Management Projects included in Attachment M-3 Revisions in this proceeding are consistent with this definition as they do not expand the PJM grid, but encompass maintenance and replacement of infrastructure.[51]

21.    The Protesting Parties argue that "[t]he *California Orders*, however, focused on whether certain activities, including the replacement of existing transmission facilities, 'expand' the transmission grid."[52] The Protesting Parties contend that the Commission, erred by failing to recognize that transmission projects to address EOL Needs may be enhancements to the transmission system.[53] The Protesting Parties continue, "[n]owhere does the Commission actually discuss whether EOL projects 'enhance' the grid. Only by ignoring the term 'enhancements' could the Commission reach the conclusion that 'Asset Management Projects' do not fit within the categories of projects that the CTOA transferred to PJM."[54] The Protesting Parties argue that even if the *California Orders* did apply to the instant case, they do not support the definition of Asset Management Project adopted by the PJM Transmission Owners because the projects at issue in the Attachment M-3 Revisions are not the same as the projects at issue in the *California Orders*.[55] The Protesting Parties also argue that distinctions exist between the CAISO and PJM such that the *California Orders* should not apply in PJM. They claim that the Commission failed to address the Protesting Parties' demonstration that the Attachment M-3 Revisions violate the PJM Operating Agreement, which is a critical distinction between PJM and the CAISO.[56]

---

[50] *S. Cal. Edison Co.*, 164 FERC ¶ 61,160 at P 32.

[51] August 2020 Order, 172 FERC ¶ 61,136 at P 84.

[52] Protesting Parties Reh'g Req. at 20-21.

[53] *Id.* at 21.

[54] *Id.*

[55] Protesting Parties Reh'g Req. at 33 (Statement of Errors 4).

[56] Protesting Parties Reh'g Req. at 34-35.

22.     Any replacement of a project with newer, more modern equipment may provide some enhanced capability, but we do not find that qualifies all replacement projects as within the province of PJM's planning.[57]  The term enhancement in the CTOA is part of the phrase "expansion and enhancement" which we interpret to mean projects that modify or revise the grid itself.[58]  As the Commission recognized in *California Public Utilities Commission*,[59] the replacement of a vintage 1940's transformer with a modern replacement could be considered an enhancement, particularly if the new equipment would be of higher capacity.  Nonetheless, the Commission found that, as long as that new equipment resulted in *no more than incremental increase in transmission capacity*, the project would still be best characterized as an asset management replacement.[60]  As such, the modernization of equipment would not be considered an enhancement subjecting such replacement to a different planning structure than repair or maintenance.

23.     Moreover, the Commission did not read out of the CTOA the term "enhancement," as the Protesting Parties argue.[61]  Asset Management Projects, as defined by the Attachment M-3 Revisions, are not enhancements of the grid as they merely replace worn out equipment.  As discussed above, enhancements and expansions of the transmission system are developed through the RTEP developed pursuant to Operating Agreement, Schedule 6.[62]

---

[57] *See* August 2020 Order, 172 FERC ¶ 61,136 at P 83 (Asset Management Projects "do not 'expand' or 'enhance' the PJM grid as the CTOA requires for planning transferred to PJM" and "are solely projects that maintain the existing infrastructure by repairing or replacing equipment"); *id.* P 84 ("[o]ur interpretation of the CTOA is consistent with the *California Orders*, in which the Commission concluded that it was appropriate to define 'asset management' as activities that 'encompass the maintenance, repair, and replacement work done on existing transmission facilities as necessary to maintain a safe, reliable, and compliant grid based on existing topology,' even if these projects result in an 'incidental increase in transmission capacity that is not reasonably severable from the asset management or activity'").

[58] PJM, Rates Scheds., TOA-42 6.3.4 (0.0.0).

[59] *S. Cal. Edison Co.*, 164 FERC ¶ 61,160 at P 32; *Cal. Pub. Utilities Comm'n*, 164 FERC ¶ 61,161 at P 68 (using as an example the replacement of a transformer at the end of its useful life).

[60] *Cal. Pub. Utilities Comm'n*, 164 FERC ¶ 61,161 at P 68.

[61] Protesting Parties Reh'g Req. at 21.

[62] PJM, Intra-PJM Tariffs, OA Sched. 6 Sec 1.5, OA Schedule 6 Sec 1.5 Procedure for Development of the Regi (24.0.0), § 1.5.6 Development of the Recommended

24.     Under *Atlantic City*, the PJM Operating Agreement cannot confer on PJM authority not granted by the PJM Transmission Owners.  While the Commission has authority under FPA section 206 to revise the PJM Operating Agreement,[63] as the Court of Appeals for the District of Columbia Circuit found in *Atlantic City*, "nothing in section 206 sanctions denying petitioners their right to unilaterally file rate and term changes" unless they agreed to do so.[64]  The Protesting Parties' argument that the PJM Tariff does not confer filing rights regarding planning to the PJM Transmission Owners[65] is backwards.  The question under *Atlantic City* is not whether the PJM Tariff accorded filing rights to the PJM Transmission Owners, but whether the PJM Transmission Owners conferred filings rights on PJM through the CTOA.  PJM agrees that Asset Management Projects and EOL Projects are outside the scope of PJM's planning authority based on the CTOA and other PJM governing documents.[66]

25.     In any event, the Attachment M-3 Revisions here are consistent with the PJM Operating Agreement.  As explained above, the PJM Operating Agreement limits PJM's planning to developing an RTEP based on PJM planning procedures, NERC Reliability Standards, Regional Entity reliability principles and standards, and the individual Transmission Owner FERC filed planning criteria as filed in FERC Form No. 715 as PJM planning criteria.[67]  As previously noted, the PJM Operating Agreement further recognizes that PJM does not plan Supplemental Projects.[68]  Indeed, Supplemental Projects under the PJM Operating Agreement may go beyond maintenance and replacement to include projects that expand and enhance the transmission  "that is not

---

Regional Transmission Expansion Plan; § 1.5.7 Development of Economic-based Enhancements or Expansions; §1.5.9 State Agreement Approach.

[63] *See, e.g., Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656 (D.C. Cir. 2017).

[64] *Atlantic City Electric Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002).

[65] Protesting Parties Reh'g Req. at 18, 39.

[66] Cmts. of PJM Interconnection, L.L.C., Docket No. ER20-2308-000, at 8-11 (July 2, 2020).

[67] PJM, Intra-PJM Tariffs, OA Sched. 6 Sec 1.2 Conformity with NERC and Other Applic. (2.0.0), § 1.2 (e).

[68] PJM, Intra-PJM Tariffs, OA Schedule 6 Sec 1.5 Procedure for Development of the Regi (24.0.0), § 1.5.6 (n) ("These Supplemental Projects shall be separately identified in the RTEP and are not subject to approval by the PJM Board.").  Planning for Supplemental Projects was included in Attachment M-3, and is included in the Attachment M-3 Revisions.

required for compliance with the following PJM criteria: system reliability, operational performance or economic criteria, pursuant to a determination by the Office of the Interconnection and is not state public policy project pursuant to Operating Agreement, Sched. 6, section 1.5.9(a)(ii)."

26.     The Protesting Parties' make a number of claims that the Attachment M-3 Revisions effected a "shift of planning responsibility for Asset Management Projects from PJM to the TOs."[69]  But Asset Management Projects always have been within the province of the PJM Transmission Owners who have planned these projects on their own or as Supplemental Projects.  The Attachment M-3 Revisions effectuated no change in planning, only further clarification of the process used to plan these projects.  We therefore find no inconsistency between the PJM Transmission Owners' proposal for Asset Management Projects and the PJM Operating Agreement.

### C.     Planning for EOL Needs Retained by PJM Transmission Owners

#### 1.     Rehearing Request

27.     The Protesting Parties argue that the Commission's approval of the Attachment M-3 Revisions ignored the fact that it shifts control over the scope of regional transmission planning from the PJM stakeholders to the PJM Transmission Owners.[70]

#### 2.     Commission Determination

28.     As discussed above, the PJM Transmission Owners' proposal does not shift responsibility for planning Asset Management Projects from PJM to the PJM Transmission Owners for the very reason that PJM never had this planning responsibility. The filing merely provides that these projects would be planned according to Order No. 890 principles, making more transparent the procedures the PJM Transmission Owners would use to plan these projects.

### D.     Role of PJM in Transmission Planning

#### 1.     Rehearing Request

29.     The Protesting Parties contend that the Commission erred in failing to address arguments that the Attachment M-3 Revisions limit the flexibility and role of PJM in

---

[69] Protesting Parties Reh'g Req. at 38-39 (Statement of Errors 5, 6, 7, & 8).

[70] Protesting Parties Reh'g Req. at 22.

transmission planning and are contrary to the PJM Operating Agreement.[71]  In support, the Protesting Parties point to the PJM Operating Agreement definition of Supplemental Project, as "a transmission expansion or enhancement that is not required for compliance with the following PJM criteria:  system reliability, operational performance or economic criteria, pursuant to a determination by the Office of the Interconnection . . . ."[72]  The Protesting Parties state that system reliability, operational performance or economic criteria are not defined and provide PJM flexibility as to the regional criteria that PJM should address.[73]

## 2.    Commission Determination

30.    As discussed above, the PJM Operating Agreement cannot confer planning authority to PJM that is not explicitly provided in the CTOA.  Also, the PJM Operating Agreement's delineation of PJM's planning responsibility is consistent with our interpretation of the limits included in the CTOA.  The PJM Operating Agreement limits PJM's planning to those projects that are transmission expansions and meet the RTEP planning criteria.  Specifically, PJM's Tariff defines the RTEP as limited to enhancement and expansion of the transmission system as does the CTOA.[74]  Moreover, the PJM Operating Agreement limits PJM's planning role to certain specified regional planning activities, none of which includes maintenance or asset management:

> [t]he Regional Transmission Expansion Plan planning criteria shall include, Office of the Interconnection planning procedures, NERC Reliability Standards, Regional Entity reliability principles and standards, and the individual Transmission Owner FERC filed planning criteria as filed in FERC Form No. 715, and posted on the PJM website.[75]

---

[71] *Id.* at 34.

[72] PJM, Intra-PJM Tariffs, S–T, OA Definitions S – T (17.0.0).

[73] Protesting Parties Reh'g Req. at 34.

[74] PJM, Intra-PJM Tariffs, OATT Definitions – R - S, OATT Definitions – R - S (24.0.0) ("Regional Transmission Expansion Plan defined as "the plan prepared by the Office of the Interconnection pursuant to Operating Agreement, Schedule 6 for the enhancement and expansion of the Transmission System in order to meet the demands for firm transmission service in the PJM Region").

[75] PJM, Intra-PJM Tariffs, OA Sched. 6 Sec 1.2, OA Sched. 6 Sec 1.2 Conformity with NERC and Other Applic (2.0.0).

31.     The phrase "system reliability, operational performance or economic criteria" in the definition of Supplemental Projects refers to the planning performed by PJM pursuant to the PJM Operating Agreement, and does not serve to expand the role of PJM planning beyond that conferred by the CTOA.

### E.     Attachment M-3 Revisions are Limited to Incidental Expansions

#### 1.     Rehearing Requests

32.     The Protesting Parties and the New Jersey Board contend that the Commission did not address whether Asset Management Projects at issue in this proceeding must comply with Order No. 890, and instead determined that "where transmission projects developed under the expanded Attachment M-3 process result in only incidental expansions of the transmission system, such asset management activities are not subject to Order No. 890 transmission planning principles, and are inconsistent with the Attachment M-3 Order.[76] The Protesting Parties contend that the Commission applied an invalid interpretation of Order No. 890 to the PJM Transmission Owners' proposal.[77] The Protesting Parties essentially challenge on rehearing the Commission's interpretation of Order No. 890 in the *California Orders* as not applicable to Asset Management Projects in this proceeding.

33.     The Protesting Parties state that they disagree with the *California Orders*. They note that the *California Orders* are subject to review in the United States court of Appeals for the Ninth Circuit. The Protesting Parties state that to the extent the Commission's determination in this proceeding (Docket No. ER20-2046) regarding the scope of Order No. 890 as set forth in the *California Orders* is modified or vacated, the Commission's reliance on the *California Orders* in this proceeding must also be modified or vacated.[78]

#### 2.     Commission Determination

34.     The Commission did not address whether Asset Management Projects at issue in this proceeding must comply with Order No. 890. Such a finding was unnecessary,

---

[76] Protesting Parties Reh'g Req. at 38 (citing August 2020 Order, 172 FERC ¶ 61,136 at P 89); New Jersey Board Reh'g Req. at 5.

[77] Protesting Parties Reh'g Req. at 35.

[78] Protesting Parties Reh'g Req. at 36 (citing *Cal. Pub. Utils. Comm'n v. FERC*, Case No. 19-72886 and *N. Cal. Power Agency*, Case No. 19-72925).

because the Attachment M-3 Revisions included Asset Management Projects in the Attachment M-3 Tariff which the Commission already had found just and reasonable.[79] While the August 20 Order agreed with the finding in the *California Orders* that asset management projects are not subject to Order No. 890 transmission planning principles,[80] that statement was dicta and was not necessary to the approval of the Attachment M-3 Revisions, and the Protesting Parties' attack on the *California Orders* would not invalidate the Commission's acceptance of the Attachment M-3 Revisions.

35.     Moreover, the Commission did not base its determination to accept the Attachment M-3 Revisions on the requirements of Order No. 890.  Rather, the Commission based its determination on the planning rights reserved by the PJM Transmission Owners in the CTOA and in the PJM Operating Agreement.  As pointed out earlier, Order No. 890 supports the Commission's reading of the CTOA, as Order No. 890 found that RTO planning focuses "on regional problems and solutions, not local planning issues that may be addressed by individual transmission owners."[81]  Therefore, the requirement that the planning of local projects comply with Order No. 890 was a necessary component in the establishment of an RTO.

## F.     Right of First Refusal in Violation of Order No. 1000

### 1.     Rehearing Request

36.     The Protesting Parties contend that the Attachment M-3 revisions improperly reinsert a right of first refusal in violation of Order No. 1000.[82]  They contend that the new Applicability section in Attachment M-3 gives each transmission owner responsibility for planning and constructing all transmission expansions or enhancements that are not needed for the five criteria listed in the same section, thus creating a new

---

[79] *See* August 2020 Order, 172 FERC ¶ 61,136 at n.141 ("We make no determination here as to whether EOL Needs or any of these Asset Management Projects, and in particular specific replacement activities, are subject to the transmission planning requirements of Order No. 890, as the PJM [Transmission Owners] proposed to include these types of projects in the Order No. 890 planning process in Attachment M-3").

[80] *Id.* P 89.

[81] Order No. 890, 118 FERC ¶ 61,119 at P 440.

[82] Protesting Parties Reh'g Req. at 24 (citing *Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051, at P 253 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g and clarification*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd sub nom. S.C. Pub. Serv. Auth.* v. *FERC*, 762 F.3d 41 (D.C. Cir. 2014)).

right of first refusal in the PJM Tariff that limits PJM's ability to create new categories of regional projects.[83]

## 2.    Commission Determination

37.    We do not find that the Attachment M-3 Revisions creates a new federal right of first refusal.  As we explained earlier, this filing is limited to those transmission projects that PJM cannot plan for as the PJM Transmission Owners retained the planning rights for these projects.  The five criteria listed in Attachment M-3 Revisions[84] that delineate the border between transmission owner transmission planning and PJM transmission planning are consistent with the criteria in the CTOA and PJM Operating Agreement, which define the planning responsibilities of PJM.  While the elimination of any federal right of first refusal applies to PJM-planned regional and interregional transmission facilities, the requirement to eliminate any federal right of first refusal does not apply to the transmission projects at issue here because they are not regional or interregional transmission facilities planned by PJM.[85]

## G.    Order No. 2000

## 1.    Rehearing Request

38.    The Protesting Parties contend that the August 2020 Order is at odds with the Order No. 2000 requirement that the RTO must have ultimate responsibility for both

---

[83] *Id.* at 25.

[84] *See* PJM, Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (a) ((1) NERC Reliability Standards (which includes Applicable Regional Entity reliability standards); (2) Individual Transmission Owner planning criteria as filed in FERC Form No. 715 and posted on the PJM website; (3) criteria to address economic constraints in accordance with section 1.5.7 of the Operating Agreement or an agreement listed in Sched. 12-App. B; (4) State Agreement Approach expansions or enhancements in accordance with section 1.5.9(a)(ii) of the Operating Agreement; (5) an expansion or enhancement to be addressed by the RTEP Planning Process pursuant to section (d)(2) of this Attachment M-3 in accordance with RTEP Planning Process procedures in Schedule 6 of the Operating Agreement).

[85] Order No. 1000, 136 FERC ¶ 61,051 at P 253 (explaining that the requirement to remove provisions from Commission-jurisdictional tariffs and agreements that grant incumbent transmission providers a federal right of first refusal applies only to transmission facilities that are selected in a regional transmission plan for purposes of cost allocation).

Document Accession #: 20201217-3044          Filed Date: 12/17/2020

transmission planning and expansion within its region that will enable it to provide efficient, reliable and non-discriminatory transmission service.[86]

## 2. Commission Determination

39.    The August 2020 Order does not violate Order No. 2000.  Order No. 2000 recognized that joining an RTO was voluntary and the Court in *Atlantic City* concluded that the Commission could not, under FPA section 206, require the transmission owners to cede their filing rights to PJM.  Order No. 2000 also provided general guidance as to planning.  It required that the RTO (1) encourage market-motivated operating and investment actions for preventing and relieving congestion, and (2) accommodate efforts by state regulatory commissions to create multi-state agreements to review and approve new transmission facilities, coordinated with programs of existing Regional Transmission Groups (RTGs) where necessary.[87]  But beyond those two categories, Order No. 2000 provided the RTO participants with "considerable flexibility in designing a planning and expansion process that works best for its region."[88]  Order No. 2000 also required that the RTO provide service under a tariff that is consistent with or superior to the Commission's *pro forma* tariff,[89] and as noted above, the division of responsibility in the CTOA and the PJM Operating Agreement is consistent with the general division of responsibility in Order No. 890.

## H. Attachment M-3 Revisions are Just and Reasonable

40.    The Protesting Parties argue that the Commission did not adequately respond to the issues raised in the protest that the Attachment M-3 Revisions were not just and reasonable.[90]  The Protesting Parties argue that the Attachment M-3 Revisions go beyond the responsibilities retained by the CTOA and affect the regional planning responsibilities

---

[86] Protesting Parties Reh'g Req. at 43 (citing *Reg'l Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089 (1999) (cross-referenced at 89 FERC ¶ 61,285), *order on reh'g*, Order No. 2000-A, FERC Stats. & Regs. ¶ 31,092 (2000) (cross-referenced at 90 FERC ¶ 61,201), *aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cty. v. FERC*, 272 F.3d 607 (D.C. Cir. 2001)). (Statement of Errors 9).

[87] Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at 31,163-64.

[88] *Id.*

[89] *Id.*

[90] Protesting Parties Reh'g Req. at 26 (Statement of Errors 3).

subject to the PJM Operating Agreement.[91]  The Protesting Parties include a list of specific provisions they deem unjust and unreasonable.

### 1.     Any Other Transmission Expansion and Enhancement

41.     The Protesting Parties claim the "applicability" section, related definitions of "Attachment M-3 Project," and "PJM Planning Criteria" provisions unjustly and unreasonably expand the applicability of the Attachment M-3 process and limit PJM's flexibility to improve its structure and operations to meet demands by restricting the PJM planning criteria.[92]  The applicability provision of the Attachment M-3 Revisions, approved by the Commission in the August 2020 Order states:

> Each Transmission Owner shall be responsible for planning and constructing in accordance with Schedule 6 of the Operating Agreement as provided in this Attachment M-3, to the extent applicable, (i) Asset Management Projects, as defined herein, (ii) Supplemental Projects, as defined in section 1.42A.02 of the Operating Agreement, and (iii) *any other transmission expansion or enhancement of Transmission Facilities that is not planned by PJM to address one or more of the following planning criteria*:

> 1.     NERC Reliability Standards (which includes Applicable Regional Entity reliability standards);

> 2.     Individual Transmission Owner planning criteria as filed in FERC Form No. 715 and posted on the PJM website, provided that the Additional Procedures for the Identification and Planning of EOL Needs, set forth in section (d), shall apply, as applicable;

> 3.     Criteria to address economic constraints in accordance with section 1.5.7 of the Operating Agreement or an agreement listed in Schedule 12-Appendix B;

> 4.     State Agreement Approach expansions or enhancements in accordance with section 1.5.9(a)(ii) of the Operating Agreement; or

---

[91] *Id.* at 27, 45, 62 (Statement of Errors 10, 13).

[92] *Id.* at 27.

Document Accession #: 20201217-3044          Filed Date: 12/17/2020

> 5.    An expansion or enhancement to be addressed by the
> RTEP Planning Process pursuant to section (d)(2) of this
> Attachment M-3 in accordance with RTEP Planning Process
> procedures in Schedule 6 of the Operating Agreement.[93]

The Protesting Parties assert that the Commission failed to explain how this provision, which authorizes the PJM Transmission Owners to plan for expansions or enhancements of the Transmission System that are not Supplemental Projects, is consistent with its finding that the Attachment M-3 Revisions are just and reasonable.[94]

42.    We continue to find this applicability provision is consistent with the responsibilities of the PJM Transmission Owners under the PJM Operating Agreement, which details the planning responsibilities of PJM,[95] leaving the planning responsibility for other transmission projects with the PJM Transmission Owners.  Moreover, the applicability section of Attachment M-3 does not define the planning authority the PJM Transmission Owners retain and the authority they transferred to PJM.  Rather, the planning reserved to the PJM Transmission Owners is defined by the CTOA, and the PJM Transmission Owners cannot expand on their authority through this revision to Attachment M-3.

43.    The Protesting Parties in particular contend that the Attachment M-3 Revisions include planning for Attachment M-3 Projects[96] that affect Transmission Facility ratings or significantly change the impedance of Transmission Facilities when such projects are

---

[93] PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (a).

[94] *Id.* at 28.

[95] The PJM Operating Agreement limits PJM's planning to developing an RTEP based on Office of Interconnection planning procedures, NERC Reliability Standards, Regional Entity reliability principles and standards, and the individual Transmission Owner FERC filed planning criteria as filed in FERC Form No. 715, and posted on the PJM website.  PJM, Intra-PJM Tariffs, OA Sched. 6 Sec 1.2 Conformity with NERC and Other Applic. (2.0.0), § 1.2 (e).

[96] Attachment M-3 Projects are defined as (i) an Asset Management Project that affects the connectivity of Transmission Facilities that are included in the Transmission System, affects Transmission Facility ratings or significantly changes the impedance of Transmission Facilities; (ii) a Supplemental Project; or (iii) any other expansion or enhancement of Transmission Facilities that is not excluded from this Attachment M-3 under any of clauses (1) through (5) of section (a). "Attachment M-3 Project" does not include a project to address Form No. 715 EOL Planning Criteria.  PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (b) 2.

Document Accession #: 20201217-3044     Filed Date: 12/17/2020

expansions and enhancements that provide regional benefit, conferring transmission planning authority beyond the scope of planning for Supplemental Projects.[97]  As discussed above, the Attachment M-3 Revisions do not reserve to the PJM Transmission Owners projects to address impedance that are planned by PJM pursuant to the PJM Operating Agreement.  The only impedance projects the PJM Transmission Owners would plan are those they have reserved as they are not based on PJM Planning Criteria in the Operating Agreement.

44.     The Protesting Parties also maintain that the phrase "any other transmission expansion or enhancement" improperly reserves to the PJM Transmission Owners the right to plan beyond Supplemental Projects.  We disagree that this filing expands the authority of the PJM Transmission Owners or infringes on PJM's planning authority.  As discussed above, Attachment M-3 Revisions reserves to the PJM Transmission Owners only those projects that PJM does not plan under the RTEP.  The Attachment M-3 Revisions include planning for transmission facilities that are not part of the RTEP but are developed based on Order No. 890 local transmission planning.

## 2.  **Incidental Increase**

45.     The Protesting Parties argue that the definition of Incidental Increase in the Attachment M-3 Revisions is unreasonably broad as it is susceptible to manipulation through unfettered modifications to Transmission Owner design standards.[98]  They further argue the definition also references "advancements in technology" but there is no limitation on the phrase, so it could refer to more efficient equipment, replacement from lower voltage to regionally beneficial higher voltage facilities, or the inclusion of new energy storage technology.

46.     The Attachment M-3 Revisions define an Incidental Increase as follows:

> an increase in transmission capacity achieved by advancements in technology and/or replacements consistent with current Transmission Owner design standards, industry standards, codes, laws or regulations, which is not reasonably severable from an Asset Management Project. A transmission project that results in more than an Incidental Increase in

---

[97] Protesting Parties Reh'g Req. at 23-24.

[98] *Id.* at 28.

Document Accession #: 20201217-3044     Filed Date: 12/17/2020

transmission capacity is an expansion or enhancement of Transmission Facilities.[99]

47.     We find that this definition is appropriate as it limits incidental increases in two ways.  First, the increase has to be the result of technological or other change related to the equipment itself, such as improved transformers as in the example above.  Second, the change under no circumstances can result in more than an incidental increase in transmission capacity.  Even if the Protesting Parties are correct that the definition might be subject to manipulation, the second part of the definition protects against any project that more than incidentally increases transmission capacity and would be planned by PJM, and therefore would not fall under the Attachment M-3 Revisions definition.

### 3.     Definition of EOL Need

48.     The Protesting Parties argue the definition of "EOL Need" is unjust and unreasonable because it includes a "test" for regional planning of transmission lines operating at or above 100 kV or a transformer.  They argue that it is not limited to local Supplemental Projects and, thus, unlawfully confers authority for transmission planning to the PJM Transmission Owners.[100]  The Protesting Parties contend that EOL Need definition also creates a test that will limit regional planning, by creating a backdoor right of first refusal on substations and anything else that is not a replacement transmission line or transformer.  EOL Need is defined as:

> a need to replace a transmission line between breakers operating at or above 100 kV or a transformer, the high side of which operates at or above 100 kV and the low side of which is not connected to distribution facilities, which the Transmission Owner has determined to be near the end of its useful life, the replacement of which would be an Attachment M-3 Project.[101]

49.     We find this definition is just and reasonable and does not restrict PJM's legitimate planning responsibilities as conveyed by the CTOA.  This definition limits the PJM Transmission Owners to replacing transmission lines or transformers near the end of their useful lives which, as discussed above, is the maintenance of facilities the PJM Transmission Owners reserved under the CTOA.

---

[99] PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (b) 3.

[100] Protesting Parties Reh'g Req. at 28.

[101] PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0).

Document Accession #: 20201217-3044     Filed Date: 12/17/2020

### 4.    Candidate EOL Needs List

50.    The Protesting Parties contend that the definition of "Candidate EOL Needs List" is unjust and unreasonable because it is not transparent in contravention of Order No. 890 requirements.[102]  Under the Attachment M-3 Revisions, each PJM Transmission Owner will provide to PJM annually a Candidate EOL Needs List comprising its non-public confidential, non-binding projection of up to five years of EOL Needs that it has identified under the Transmission Owner's processes for identification of EOL Needs documented under section (d)(1)(i) of the Attachment M-3 Revisions.[103]  We do not find that the provision of a non-binding, confidential list to PJM is unjust and unreasonable. The Attachment M-3 Revisions provide that prior to actually planning the project, stakeholders will be involved and that would be sufficient under Order No. 890, even if Order No. 890 did apply to these projects.[104]  Providing such a list to PJM in advance will help PJM's own five-year planning process, and the Protesting Parties have cited to no provision of Order No. 890 or other Commission requirement that every such non-binding list must be shared with stakeholders.

### 5.    Form No. 715 EOL Planning Criteria

51.    The Protesting Parties contend the proposed definition of "Form No. 715 EOL Planning Criteria" is unjust, unreasonable and unlawful because it modifies the RTEP and, thus exceeds the authority of the PJM Transmission Owners to modify the Operating Agreement through a unilateral FPA Section 205 filing.[105]  Form No. 715 EOL Planning Criteria is defined as "planning criteria filed by a Transmission Owner in FERC Form No. 715 to address EOL Needs."[106]

52.    The Protesting Parties do not explain how this definition modifies the RTEP or in any way exceeds the PJM Transmission Owners' reserved planning rights.  This is a definition of the current PJM Transmission Owners' right to include end of life criteria in its Form No. 715 filing with the Commission.  Once an EOL Project is included in Form

---

[102] Protesting Parties Reh'g Req. at 28-29.

[103] PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (b) 6.

[104] As noted earlier, the Commission's position in the *California Orders* is that Order No. 890 does not apply to asset management activities, including end of life projects.

[105] Protesting Parties Reh'g Req. at 29.

[106] PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (b) 8.

No. 715, PJM plans the project under the current Operating Agreement and this definition effects no change to that process.

### 6.    No Limitations on Meetings

53.    The Protesting Parties contend that the revisions to Paragraph (c) 7 of Attachment M-3 expand the use of Attachment M-3 to other undefined "Transmission Projects," and, thus, are unjust and unreasonable because they confer authority to the PJM Transmission Owners to use the Attachment M-3 transmission planning process beyond local projects.[107]  Attachment M-3 Revisions, Paragraph (c) 7 is entitled "No Limitation on Additional Meetings and Communications or Use of Attachment M-3 For Other Transmission Projects" and it merely indicates that the PJM Transmission Owners are free to schedule additional meetings with stakeholders on Attachment M-3 Projects as well as other transmission projects.[108]

54.    We find that this provision merely provides for additional transparency to stakeholders, which does nothing to expand transmission owners' planning rights beyond those they reserved in the CTOA.

### 7.    Decrease in Coordination

55.    The Protesting Parties argue that the Commission erred in not responding to arguments that the Attachment M-3 Revisions will decrease coordination between the PJM Transmission Owners and PJM, will reduce transparency in transmission planning, and will have negative implications even beyond transmission planning in PJM.[109]

56.    We find that these arguments do not render the Attachment M-3 Revisions unjust and unreasonable.  This filing did not decrease coordination because PJM previously did not plan these EOL Projects.  The PJM Transmission Owners have not transferred this planning authority to PJM.  As we found in the August 2020 Order, the Attachment M-3 Revisions ensure transparency for these projects pursuant to the procedures established in Order No. 890.[110]

---

[107] Protesting Parties Reh'g Req. at 29.

[108] PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (c) 7.

[109] Protesting Parties Reh'g Req. at 30-32.

[110] August 2020 Order, 172 FERC ¶ 61,136 at P 88.

## 8.    Interconnection Studies Impact

57.    The Protesting Parties argue that the Commission failed to address arguments that the proposed transmission planning changes will necessarily impact the timing and results of interconnection studies by adding uncertainty to the transmission planning process.[111]  As PJM explained, the interconnection process will not be affected by this filing.[112]  We thus agree with the PJM Transmission Owners that this concern is beyond the scope of this proceeding.[113]  Further, as noted above, we find that the Attachment M-3 Revisions add transparency to asset management activities that the PJM Transmission Owners had been conducting.

## I.    Form No. 715 Filing Requirement

58.    The Protesting Parties contend that the Commission erred in interpreting the Form No. 715 filing requirement as voluntary.[114]  They argue that Attachment M-3 Revisions, section (d) coupled with the definition of Form No. 715 EOL Planning Criteria, gives the PJM Transmission Owners the right to determine that a PJM-identified project does not address the "projected EOL need. . . [and] propose a project to address the Form No. 715 EOL Planning Criteria."[115]

59.    We disagree.  The Attachment M-3 Revisions effect no change in the treatment of Form No. 715 filings.  PJM will continue to plan for all transmission projects to address Form No. 715 planning criteria.  The Attachment M-3 Revisions are very clear that "'Attachment M-3 Project' does not include a project to address Form No. 715 EOL Planning Criteria."[116]  The Commission pointed out that a PJM Transmission Owner "may voluntarily include end of life criteria in its Form No. 715."[117]  This statement reflected the current tariff provisions under which PJM Transmission Owners may include end of life criteria in their Form No. 715 in which case PJM will continue to plan

---

[111] Protesting Parties Reh'g Req. at 32 (citing Cmts. of J-Power USA Development Co., LTD at 5).

[112] PJM Limited Answer, Docket No. ER20-2046-000 (July 21, 2020).

[113] PJM Transmission Owner Answer to Protest at 52.

[114] Protesting Parties Reh'g Req. at 66 (Statement of Errors 14).

[115] *Id.* at 67.

[116] PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (b)(2).

[117] August 2020 Order, 172 FERC ¶ 61,136 at P 86.

Document Accession #: 20201217-3044    Filed Date: 12/17/2020

for all EOL Projects.  But a PJM Transmission Owner may choose not to include end of life criteria in its Form No. 715 in which case the transmission project will be planned under the Attachment M-3 Revisions.

60.    Nothing in paragraph (d) of Attachment M-3 Revisions changes PJM's responsibility to address Form No. 715 planning criteria.  Under paragraph (d)(2)(ii) of Attachment M-3 Revisions, if (1) PJM determines that a substantial electrical overlap exists between a PJM proposed Required Transmission Enhancement project and a projected EOL Need, including a transmission project to address a Form No. 715 planning criteria, such that one project can resolve both issues, and (2) if a PJM Transmission Owner determines that the projected EOL Need is not met by the PJM's proposed Required Transmission Enhancement, the PJM Transmission Owner has the right to "*plan* an Attachment M-3 Project to address the projected EOL Need or *propose* a project to address the Form No. 715 EOL Planning Criteria," together with documentation of the reasons for its determination.[118]  The important distinction here is between the right to "plan" an Attachment M-3 Project and the ability to only "propose" a transmission project to address a Form No. 715 planning criteria.  PJM will still plan transmission projects to address Form No. 715 planning criteria and if it disagrees with the PJM Transmission Owner's justification, PJM may determine that a single project resolves both the PJM Planning Criteria and the end of life criteria.

### J.    <u>No Revisions to the Cost Allocation Provisions of Schedule 12 of the PJM Tariff</u>

#### 1.    <u>Rehearing Request</u>

61.    The Protesting Parties and the New Jersey Board contend that the August 2020 Order errs in not providing a reasoned explanation for departing from Commission precedent on regional planning and cost allocation.  They argue that this restriction from regional cost allocation for projects that provide regional benefits is inconsistent with the United States Court of Appeals for the D.C. Circuit (D.C. Circuit) order in *Old Dominion*.[119]

---

[118] PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (d)(2_(ii) (emphasis added).

[119] Protesting Parties Reh'g Req. at 49 (Statement of Errors 11); New Jersey Board Reh'g Req. at 11 (citing *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, *reh'g denied*, 905 F.3d 671 (remanding order accepting PJM Transmission Owner proposed revisions to Schedule 12 of the PJM Tariff to allocate one 100% of costs for reliability projects that are included in the PJM RTEP solely to address individual transmission owner Form No. 715 local planning criteria to the transmission zone of the transmission owner whose Form No. 715 local planning criteria underlie each project); *PJM*

62.     The New Jersey Board posits that while the Attachment M-3 Revisions may not amend Schedule 12 on their face, they clearly control which type of cost allocation these projects will receive under Schedule 12 of the PJM Tariff.  Therefore, the New Jersey Board argues that the cost implications cannot be fairly divorced from the Attachment M-3 Revisions.[120]

63.     The New Jersey Board states that the D.C. Circuit has stated that nothing prevents PJM from "amending the Tariff, the Operating Agreement, or PJM's own planning criteria . . . to establish appropriate end-of-life planning criteria . . .as long as any amendment respects the cost-causation principle."[121]  Because changes to planning criteria, including EOL planning criteria, may have some effect on costs, the New Jersey Board argues that any changes to planning criteria must comport with the cost-causation principle.

## 2.     Commission Determination

64.     In the August 2020 Order, the Commission stated that the cost allocation provisions of Schedule 12 of the PJM Tariff assign cost responsibility for Required Transmission Enhancements,[122] and that the Attachment M-3 Revisions included no revisions to Schedule 12 of the PJM Tariff and cost allocation.  The Commission found that since this FPA section 205 filing proposes no change to cost allocation, that issue is beyond the scope of this proceeding.[123]

---

*Interconnection, L.L.C.*, 168 FERC ¶ 61,133 (2019), *reh'g denied*, 171 FERC ¶ 61,012 (2020) (order on remand rejecting the PJM Transmission Owner revisions to Schedule 12 of the PJM Tariff)).

[120] New Jersey Board Reh'g Req. at 9, 14.

[121] *Id.* at 11 (citing *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254 at 1263).

[122] Required Transmission Enhancements are defined as "enhancements and expansions of the Transmission System that (1) a [RTEP] developed pursuant to PJM Operating Agreement, Schedule 6 or (2) any joint planning or coordination agreement between PJM and another region or transmission planning authority set forth in Tariff, Schedule 12-App. B ('Appendix B Agreement') designates one or more of the Transmission Owner(s) to construct and own or finance."  PJM, Intra-PJM Tariffs, OATT Definitions – R - S, OATT Definitions – R - S (18.2.0).

[123] *See ANR Pipeline Co. v. FERC*, 771 F.2d 507, 514 (D.C. Cir. 1985) (finding the Commission cannot revise an "unchanged part" of a rate under section 4 of the Natural Gas Act, the counterpart to section 205 of the Federal Power Act); *Appalachian Power Co.*, 170 FERC ¶ 61,196 at P 61 (where the filing did not propose changes to

Document Accession #: 20201217-3044          Filed Date: 12/17/2020

65.     The New Jersey Board claims that cost allocation must be considered because the filing controls which type of cost allocation transmission projects planned pursuant to the Attachment M-3 Revisions will receive under Schedule 12 of the PJM Tariff.  First, we do not agree that simply because a filing has a tangential relationship to cost allocation, the Commission can amend the cost allocation provisions under section 205 of the FPA. Second, as discussed earlier, the Attachment M-3 Revisions have not changed the current planning for any facilities; transmission projects planned pursuant to the Attachment M-3 Revisions currently are planned by the Transmission Owners and the Attachment M-3 Revisions merely regularizes and enhances the transparency of that planning.

66.     While the D.C. Circuit in *Old Dominion* indicated that nothing prevents PJM from amending the PJM Tariff, the PJM Operating Agreement, or PJM's own planning criteria to establish appropriate end-of-life planning criteria as long as any amendment respects the cost-causation principle, the D.C. Circuit's dicta was related to the planning for transmission projects to address Form No. 715 planning criteria, which are within PJM's planning responsibility and stands for the proposition that any amendment to the planning criteria for these projects must respect the court's ruling, and the Commission found that the cost allocation provisions in Schedule 12 of the PJM Tariff would apply to transmission projects to address Form No. 715 planning criteria.[124]  The decision did not expand the scope of the Commission's authority under section 205 of the FPA to enable the Commission to revise the unchanged cost allocation provisions of Schedule 12 of the PJM Tariff.

### K.     Duquesne Arguments Regarding Allocation of Transmission Owner Planning Responsibility

#### 1.     Rehearing Request

67.     Duquesne contends that the August 2020 Order fails to address its concern that the Attachment M-3 Revisions reflect a fundamental deviation from the existing allocation of responsibility between PJM's regional planning responsibilities and an individual transmission owner's local planning responsibilities.[125]  Specifically, Duquesne requests that the Commission address its contention that under the Attachment M-3 Revisions, PJM would be required to look for electrical overlap with EOL Need projects to determine if the EOL Need could be met by a regional transmission enhancement project,

---

Schedule 12, issues related to assignment of cost responsibility for Attachment M-4 are beyond the scope of the proceeding).

[124] *PJM Interconnection, L.L.C.*, 168 FERC ¶ 61,133 at P 27 (order on remand rejecting the PJM Transmission Owner revisions to Schedule 12 of the PJM Tariff).

[125] Duquesne Reh'g Req. at 3.

and as such the Attachment M-3 Revisions infringe on Duquesne's rights as a transmission owner.[126]

### 2. Commission Determination

68.     First, we note that under the provisions of the CTOA, Duquesne agreed to the filing provisions when the other transmission owners reach the required consensus to submit a tariff revision.[127]  Second, we cannot find these additional planning procedures unjust and unreasonable.  The Attachment M-3 Revisions require only that PJM and the Transmission Owner "consult" in the event that PJM identifies a single solution to address a validated PJM Planning Criteria Need and address a projected EOL Need.[128] But the provision in question does not permit PJM to prevent the PJM Transmission Owner from building its project.  It permits the PJM Transmission Owner to construct the project as long as the PJM Transmission Owner provides documentation to PJM and stakeholders on the rationale supporting its determination at the next appropriate meeting of the Transmission Expansion Advisory Committee or subregional RTEP Committee.[129] We find that the PJM Transmission Owners' Attachment M-3 Revisions, in agreeing to provide this additional process within the RTEP, are consistent with the CTOA and reasonable.

### L. Consolidation Not Appropriate

### 1. Rehearing Request

69.     The Protesting Parties argue that the Commission erred in not addressing the motion to consolidate the proposed Attachment M-3 Revisions with proposed revisions to the PJM Operating Agreement developed in the PJM Stakeholders Proposal filed in Docket No. ER20-2308-000.[130]

---

[126] *Id.* at 3-4.

[127] PJM, Rates Scheds., TOA-42 Art. 3, TOA-42 Article 3 – Participation in this Agreement (0.0.0); TOA-42 8.5.1 Action by Two-thirds Majority (1.0.0).

[128] PJM Intra-PJM Tariffs, OATT ATT M-3, OATT Attach. M-3 (1.0.0), § (d)(2).

[129] Of course, in any proceeding to recover the cost of such a project, the PJM Transmission Owner would be subject to a prudency challenge.

[130] Protesting Parties Reh'g Req. at 57 (Statement of Errors 12).

Document Accession #: 20201217-3044     Filed Date: 12/17/2020

## 2.     **Commission Determination**

70.     The Commission generally considers consolidation only when a trial-type evidentiary hearing is instituted to resolve common issues of law and fact, and where consolidation will ultimately result in greater administrative efficiency.[131]  Here, the Commission found that a hearing was not required and that consolidation was not necessary to resolve the issues in this proceeding.  The issues in this proceeding related to the PJM Transmission Owners' authority to file the Attachment M-3 Revisions and whether those provisions were just and reasonable.  The Commission concluded that the PJM Transmission Owners had the right to make the filing at issue this proceeding and that the Attachment M-3 Revisions were just and reasonable.

The Commission orders:

      In response to the requests for rehearing, the August 2020 Order is hereby modified and the result sustained, as discussed in the body of this order.

By the Commission.  Commissioner Clements is not participating.

( S E A L )


                                         Kimberly D. Bose,
                                         Secretary.

---

[131] *See Startrans IO, L.L.C.*, 122 FERC ¶ 61,253, at P 25 (2008); *Midcontinent Indep. Sys. Operator, Inc.*, 170 FERC ¶ 61,241, at P 43 (2020).

Document Content(s)

ER20-2046-001.DOCX.....................................................1